RECEIVED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**  5: 31
**NORTHERN DIVISION**

U.S.

| | |
|---|---|
| **OZETTA THOMAS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| -v.- | ) **Civil Action No. 2:05-cv-411-WKW** |
| | ) |
| **ED SCHAFER, SECRETARY,** | ) |
| **UNITED STATES DEPARTMENT OF** | ) |
| **AGRICULTURE, FARM SERVICE** | ) |
| **AGENCY, (FSA),**[1] | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

LEURA G. CANARY
United States Attorney for the
Middle District of Alabama

JAMES J. DUBOIS
Assistant United States Attorney
Georgia Bar No. 231445
United States Attorney's Office
Post Office Box 197
Montgomery, AL 36101-0197
Telephone: (334) 223-7280
Counsel for Respondent

---

[1] Ed Schafer became the Secretary of USDA on January 28, 2008. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Ed Schafer should, therefore, be substituted for Secretary Mike Johanns as the defendant in this suit.

## TABLE OF CONTENTS

Table of Contents.................................................................................................................i

Table of Citations.............................................................................................................iii

Statement of the Case..........................................................................................................1

Statement of the Facts ........................................................................................................3

    I.     Background ...............................................................................................3

           A.       Plaintiff's Employment History ................................................3

           B.       Plaintiff's Pre-Settlement Agreement Employment Under Danny Crawford .................................................................................4

           C.       Plaintiff's First EEO Complaint and December 5, 2001, Settlement Agreement ...........................................................................6

    II.    Plaintiff's Claims in Her Complaint and Relevant Facts ...........................................7

           A.       Laptop removal and password deactivation ...............................7

           B.       Memorandum to FSA noting that Plaintiff "had been detailed" to the OCR and naming of Knotts as Acting Chief ........................................9

           C.       Delivery of revised "achieved" PWP in unsealed envelope, with SED's signature signed by his Executive Assistant ...............................9

           D.       Denial of request to attend 2002 BIG Conference ....................10

           E.       Alleged breach of December 5, 2001, Settlement Agreement .................11

           F.       Plaintiff's (allegedly forced) retirement ...................................12

Argument and Citation of Authority .................................................................................17

    I.     Plaintiff's Failure to Exhaust Her Mandatory Administrative Remedies .................17

           A.       Plaintiff's Unexhausted Discrimination and Retaliation Claims .............18

            B.       Plaintiff's Unexhausted Challenges to the Settlement Agreement ...........20

    II.    Plaintiff Cannot Show a Breach of the December 5, 2001, Settlement Agreement ..22

III.  Plaintiff's Discrimination Claims Fail as a Matter of Law .......................................24

    A.     Plaintiff Cannot Establish a Prima Facie Case of Disparate Treatment ...24

          1.    Plaintiff Did Not Suffer Any Adverse Employment Actions .......25

                  a.    No Adverse Actions in Paragraphs 11, 13-14 and 18-22 of Complaint ........................................................................26

                  b.    Plaintiff's Retirement Was Not An Adverse Action .........28

          2.    No Evidence Due to Race or Gender ...........................................35

    B.     Plaintiff Cannot Show Defendant's Reasons for Actions Are Pretext ......37

IV.  Plaintiff Retaliation Claims Fail as a Matter of Law .................................................41

    A.     Plaintiff Suffered No Adverse Actions .....................................................41

          1.    No Adverse Acts in Paragraphs 11, 13-14 and 18-22 of Complaint ......................................................................................41

          2.    Plaintiff's Retirement Was Not An Adverse Action ....................44

    B.     Plaintiff Cannot Show Causation ..............................................................44

    C.     Plaintiff Cannot Show Pretext ..................................................................46

Conclusion .........................................................................................................................46

Certificate of Service..........................................................................................................47

# TABLE OF CITATIONS

FEDERAL CASES

Baker v. City of Toledo, 2007 U.S. Dist. LEXIS 26795, at 21-22 (N.D. OH.
April 11, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 43

Baloch v. Norton, 517 F. Supp. 2d 345, 356-358 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . 43, 44

Bickham v. Miller, 584 F.2d 736, 738 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Boze v. Brantstetter, 912 F.2d 801, 805-806 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 31

Bristow v. The Daily Press, 770 F.2d 1251, 1255 (4th Cir. 1985) . . . . . . . . . . . . . . . . . . . . 34

Brown v. American Honda Motor Co., 939 F.2d 946, 951 (11th Cir. 1991) . . . . . . 38, 40, 45, 46

Brown v. Snow, 440 F.3d 1259, 1266 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Bullock v. Widnall, 953 F. Supp. 1461 (M.D. Ala. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Burlington N. & Sante Fe Ry. Co. v. White, 126 S.Ct. 2405, 2415 (2006) . . . . . . . . . . . . . 41, 42

Bush v. Regis Corp., 2007 U.S. App. LEXIS 28210, at *7 (11th Cir. Dec. 3, 2007) . . . . . . . . .43

Bussell v. Motorola, Inc., 228 Fed. Appx. 832, 832 (11th Cir. 2006) (per curiam) . . . . . . . . . 42

Byrd v. Auburn Univ. at Montgomery, 2007 U.S. Dist. LEXIS 28411, at *46 (M.D. Ala. April
17, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Cain v. Geren, 2008 App. LEXIS 352, *3-5 (11th Cir. Jan. 7, 2008) . . . . . . . . . . . . . . . . . . . 42

Cantrell v. Jay R. Smith Mfg. Co., 248 F. Supp. 2d 1126, 1136-1137 (M.D. Ala. 2003) . . . . . . 25

Carpenter v. Con-Way Central Express, Inc., 481 F.3d 611, 618-619 (8th Cir. 2007) . . . . . . . . 44

Carter v. Bell, 33 F.3d 450, 459 (4th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Celotex v. Catrett, 477 U.S. 317, 322 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Chapman v. AI Transport, 229 F.3d 1012, 1028 (11th Cir. 2000) (en banc) . . . . . . . . . . . . . 37, 38

Clark County School District v. Breeden, 532 U.S. 268, 273 (2001) . . . . . . . . . . . . . . . . . . . 45

Clegg v. Ark. Dep't of Corrections, 496 F.3d 922, 927-929 (8th Cir. 2007) . . . . . . . . . 28, 32, 43

Combs v. Meadowcraft, Inc., 106 F.3d 1519, 1538 (11th Cir. 1997) . . . . . . . . . . . . . . 24, 37, 40

Cortes v. Maxus Exploration Co., 977 F.2d 195, 197-200 (5th Cir. 1992) . . . . . . . . . . . . . . .  30

Crawford v. Babbitt, 186 F.3d 1322, 1326 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . .  18

Crawford v. Medina Gen. Hosp., 96 F.3d 830, 836 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . .  36

Dale v. Wynne, 497 F. Supp. 2d 1337, 1344 (M.D. Ala. 2007) . . . . . . . . . . . . . . . . . . . . . 29, 40

Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) . . . . . . . . . . . . . . 25, 27

DeHart v. Baker Hughes Oilfield Operations, Inc., 214 Fed. Appx. 437, 442 (5th Cir. 2007)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

Deprado v. City of Miami, 2008 U.S. App. LEXIS 2474, at *7-8, n.1 (11th Cir Feb. 1, 2008) . .42

Doe v. Dekalb County School Dist., 145 F.3d 1441, 1450 (11th Cir. 1998) . . . . . . . . . . 28, 29, 32

Edwards v. U.S. EPA, 456 F. Supp. 2d 72, 84-86 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . 28

EEOC v. Union Camp Corp., 7 F. Supp. 2d 1362, 1380 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) . . . . . . . . . . . . . . . . . 37

Eneje v. Ashcroft, 183 F. Supp. 2d 931, 933 (E.D. Ky. 2001) . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Enowmbitang v. Seagate Tech., 148 F.3d 970, 974 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 26

Farragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 977 (11th Cir. 2003) . . . . . . .29, 32, 34, 44

Folley v. Henderson, 175 F. Supp. 2d 1007, 1011-1012 (S.D.Ohio 2008) . . . . . . . . . . . . . . . . 31

Forkkio v. Powell, 306 F.3d 1127, 1130-1131 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 26

Frahm v. United States, 492 F.3d 258, 262-263 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 22

Gaddis v. Russell Corp., 242 F. Supp. 2d 1123, 1144-1150 (M.D. Ala. 2003) . . . . . . . . . . . . . 46

Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir.1987) . . . . . . . . . . . . . . . 29, 34

Gilbert v. Dep't of Justice, 334 F.3d 1065, 1071 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 22

Grier v. Secretary of the Army, 799 F.2d 721, 724 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . 17

Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . 25, 44

Haley v. Alliance Compressor LLC, 391 F.3d 644, 650-652 (5th Cir. 2004) . . . . . . . . . . . . . . 32

Hammer v. Paulson, 2007 U.S. Dist. LEXIS 70785, at *6-7, 18 (N.D. Ga. Sept. 25, 2007 . . . . 30

Hanley v. The Sports Authority, 143 F. Supp. 2d 1351, 1364 . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Harvey v. City of Bradenton, 2005 U.S. Dist. LEXIS 38095, at *15 (M.D. Fla. Dec. 22, 2005) . 28

Henson v. Dundee, 682 F.2d 897, 907 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

Higgins v. Gonzales, 481 F.3d 578, 590-591(8th . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . 29

Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001) . . . . . . . . . . . 29, 31, 44

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 25, 35, 37, 46

Hunter v. Stephenson Roofing, Inc., 790 F.2d 472, 475 (6th Cir. 1986) . . . . . . . . . . . . . . . 18, 20

Jackson v. Joseph State Hosp., 840 F.2d 1387, 1391 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . 44

Jenkins v. Potter, 271 F. Supp. 2d 557, 562 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Johnson v. Ashcroft, 2005 U.S. Dist. LEXIS 18034, at *1617 (D.D.C. Aug. 25, 2005) . . . . . . . 30

Jones v. Wynne, 2008 U.S. APP. LEXIS 4265, at *3-6 (11th Cir. Feb. 26, 2008) . . . . . . . . . . . 21

Knieriem v. Group Health Plan, Inc., 434 F.3d 1058, 1060 (8th Cir. 2006) . . . . . . . . . . . . . . . 23

Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) . . . . . . . . . . 34, 37

Macuba v. DeBoer, 193 F.3d 1316, 1322 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Malladi v. Brown, 987 F. Supp. 893, 905 (M.D. Ala. 1997) . . . . . . . . . . . . . . . . . . 22, 25, 36, 27

Manni v. ORS Nasco, 2006 U.S. Dist. LEXIS 42374, at *24 (D. Minn. June 20, 2006) . . . . . . . 26

Manning v. Carlin, 786 F.2d 1108, 1108-1109 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . 18, 19

Marshall v. James, 276 F. Supp. 2d 41, 49-50 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) . . . . . . . . . . . . . 17

McAlinden v. County of San Diego, 192 F.3d 1226, 1239 (1999), amended 201 F.3d 1211 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Miller v. Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Morgan v Potter, 489 F.3d 195, 196-197 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

Nettles v. LSG Sky Chefs, 211 Fed. Appx. 837, 839 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 33

Nichols v. Caroline Bd. of Educ., 123 F. Supp. 2d 320, 327 (D. Md. 2000) . . . . . . . . . . . . . . . 37

Nix v. WLCY Radio/Rahall Communs., 738 F.2d 1181, 1187 (11th Cir. 1984) . . . . . . . . . . . . 38

Osahar v. Postmaster General, 2008 U.S. App. LEXIS 1073, at *30 (11th Cir. Jan. 15, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Payan v. Aramark Mgmt. Servs. Ltd., 495 F.3d 1119, 1125-26 (9th Cir. 2007) . . . . . . . . . . 19, 20

Pennsylvania State Police v. Suders, 542 U.S. 129, 147-148 (2004) . . . . . . . . . . . . . . . . . . . . . 29

Perryman v. West, 949 F. Supp. 815, 822 (M.D. Ala. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Petrosino v. Bell Atlantic, 385 F.3d 210, 231 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001) . . . . . . . . . . 31, 34

Poland v. Chertoff, 494 F.3d 1174, 1185 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Poole v. Country Club, 129 F.3d 551, 553 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

Puckett v. Potter, 342 F. Supp. 2d 1056, 1064-1065 (M.D. Ala. 2004) . . . . . . . . . . . . . . . . . . . 21

Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Reis v. Universal City Dev. Partners, LTD., 442 F. Supp. 2d 1238, 1253 (M.D. Fla. 2006) . . . 42

Rivera v. Dalton, 77 F. Supp. 2d 220, 224-226 (D.P.R. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 39

Rosell v. Kelliher, 486 F. Supp. 2d 39, 50 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Sanders v. City of Montgomery, 319 F. Supp. 2d 1296, 1313 (M.D. Ala. 2004) . . . . . . . . . . . . 36

Sanders v. Reno, 186 F.3d 684, 685 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Schawrtz v. Fla. Bd. of Regents, 807 F.2d 901, 905 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . 22

Schmann v. O'Keefe, 314 F. Supp. 2d 515, 531 (D. Md. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 28

Serben v. Inter-City Manu. Co., Inc., 36 F.3d 765, 766 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . 35

Smith v. Ala. Dep't of Public Safety, 64 F. Supp. 2d 1215, 1223-1224 (M.D. Ala. 1999) . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27, 46

Spence v. Maryland Casualty Co., 995 F.2d 1147, 1156 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 34

Stedman v. Bizmart, Inc., 219 F. Supp. 2d 1212, 1225 (N.D. Ala. 2002) . . . . . . . . . . . . . . . . 34

Streeter v. The Bridge, Inc., 2006 U.S. Dist. LEXIS 14084, at *15-16 (M.D. Ala. March 16,
2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Taughinbaugh v. Potter, 2006 U.S. Dist. LEXIS 5417, at *8-14 (E.D. Mich. Feb. 14, 2006). . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Thomas v. Atmos Energy Corp., 223 Fed. Appx. 369, 376 n.2 (5th Cir. 2007) . . . . . . . . . . . . 44

Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) . . . . . . . . . . . . . . . . . 45

Thompson v. West, 883 F. Supp. 1502, 1507 (M.D. Ala. 1995) . . . . . . . . . . . . . . . . . . 17, 18, 19

Toland v. Potter, 2007 U.S. Dist. LEXIS 42153, at *23-24 (D. Kan. June 8, 2007) . . . . . . . 26, 43

Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998) . . . . . . . . . . . . . . 24

Veitch v. England, 471 F.3d 124, 130-131 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Wardwell v. School Bd. of Palm County, Fla., 786 F.2d 1554, 1557-1558 (11th Cir. 1986) . . 33

Watkins v. Sverdrup Tech., Inc., 153 F.3d 1308, 1316-17 & n. 8 (11th Cir. 1998) . . . . . . 37 , 41

Weeks v. Harden Man. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 41

Williams v. Glover, 2006 U.S. Dist. LEXIS 15536, at *13 (M.D. Ala. March 31, 2006) . . . 25, 26

**FEDERAL STATUTES**

42 U.S.C. § 2000e ...................................................... 7, 8

**FEDERAL REGULATIONS**

29 C.F.R. § 1614.105(a) ................................................. 24

29 C.F.R. § 1614.106(a) ................................................. 24

29 C.F.R. § 1614.407(c) ................................................. 27

29 C.F.R. § 1614.504(a) ............................................. 26, 27

29 C.F.R. § 504(a) ..................................................... 29

29 C.F.R. §§ 1614.401 .................................................. 24

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| OZETTA THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 2:05-CV-411-WKW |
| | ) |
| ED SCHAFER, SECRETARY, | ) |
| UNITED STATES DEPARTMENT OF | ) |
| AGRICULTURE, FARM SERVICE | ) |
| AGENCY, (FSA), | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Defendant, by and through Leura G. Canary, United States Attorney for the

Middle District of Alabama, and files this Memorandum in Support of Defendant's Motion for

Summary Judgment. For the reasons that follow, there are no genuine disputes of material fact and

Defendant is entitled to judgment as a matter of law on all Plaintiff's claims.

## STATEMENT OF THE CASE

This is an action for alleged discrimination and retaliation brought pursuant to Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. Plaintiff, a former United States

Department of Agriculture ("USDA") employee, alleges that essentially everything that happened

to her after she started working for a new supervisor was race or gender discrimination or retaliation

for her Equal Employment Opportunity ("EEO") complaints. Plaintiff filed her first EEO complaint

in September 2001, after her new supervisor advised her that he had received numerous complaints

about her performance. She subsequently entered into a Settlement Agreement with the USDA on

December 5, 2001, pursuant to which she was detailed for a year to a different office, was paid

attorney's fees, received a raise, had her personnel file expunged of a "not-achieved" Performance Work Plan ("PWP") and replaced with an "achieved" PWP, and was given a period of paid leave. (Comp. ¶ 10). In this lawsuit, Plaintiff challenges discrete acts occurring after this Settlement, including the removal of her laptop and deactivation of her password while she was on leave before her detail, the wording of a memorandum to indicate she "had been detailed" instead of "had accepted a detail," the designation of a different person to fill her position during her detail than she would have chosen, the hand-delivery of a replacement "achieved" PWP in an unsealed envelope, and the denial of a request to attend an optional Blacks in Government ("BIG") Conference. (Id. at ¶¶ 11, 13-14,18-22). She also claims that Defendant breached the Settlement due to the time and manner in which it delivered her revised PWP. (Id. at ¶¶ 18-19). Finally, she asserts that her retirement after she returned from her agreed-upon, one-year detail was involuntary. (Id. at ¶ 25).

When settled law is applied to the undisputed facts, this Court should grant summary judgment on Plaintiff's claims for a number of reasons. First, Plaintiff failed to exhaust most of her claims, including her breach-of-the-Settlement-Agreement claim, by not timely and fully complying with Title VII's mandatory administrative exhaustion requirements. Second, Plaintiff received all the material benefits of the Settlement Agreement and cannot show a breach. Third, Plaintiff cannot establish a prima facie case of discrimination because she cannot show that she suffered any adverse actions or that race or gender had anything to do with the challenged actions. Fourth, Plaintiff cannot even come close to showing that she endured the intolerable atmosphere necessary to convert a voluntary retirement into a constructive discharge. Fifth, Plaintiff cannot establish a prima facie case of retaliation because she did not suffer any adverse actions and cannot establish causality. Finally, Defendant acted pursuant to legitimate, non-discriminatory reasons, and Plaintiff cannot show that

- 2 -

any of Defendant's explanations are pretext for discrimination or retaliation. In short, there are no genuine disputes of material fact, and all Plaintiff's claims fail as a matter of law.

## STATEMENT OF THE FACTS

I.   **Background.**

    A.   **Plaintiff's Employment History.**

Plaintiff, an African-American female, is a former USDA employee. (Pl. Dep. 178:7-10).[1] From 1986 through early 1998, she was employed as an agricultural program specialist in the Production Adjustment/Compliance section of the USDA's Farm Service Agency ("FSA") State Office in Montgomery, Alabama. (Pl. Dep. 18:23-3, Ex. 1; Crawford Dep. 9:18-21). In this position, she answered questions from FSA county offices in Alabama about the administration of FSA programs to farmers. (Pl. Dep. 19:22-20:17). Her supervisor during this 12-year period was Daniel Robinson, an African-American who was Chief of Program Adjustment/Compliance, and Plaintiff considered him a close friend and mentor.[2] (Pl. Dep.15:11-14, 19:4-19, 20:18-20, 22:5-18, 42:18-43:17, 95:13-15). Plaintiff left her position in early 1998 to work in FSA's Office of Civil Rights ("OCR"), but after Robinson was appointed the FSA's State Executive Director ("SED") in Alabama, he hired her to fill his vacated supervisor position. (Pl. Dep. 22:24-23:2, 23:20-24:19).

Plaintiff, as Chief of Program Adjustment/Compliance, retained responsibility for the farm program area of Payment Limitations ("PL") while delegating other specific farm programs to the

---

[1] Depositions, declarations, and exhibits are filed with Defendant's Evidentiary Submission. Defendant's deposition citations are Deponent's last name, Dep., page number(s): line number(s). Defendant's declaration citations are Declarant's last name, Dec., and paragraph number.

[2] Plaintiff ate lunch with Robinson, socialized with him outside of work, and still talks to him one or two times a week. (Pl. Dep. 15:11-16, 42:23-43:17).

three program specialists whom she supervised.[3]  (Pl. Dep. 27:3-29:7).  Her Chief duties also included reading handbooks and keeping abreast of FSA program changes, answering calls from FSA county offices with questions on PL and other areas when the assigned specialists were not available, and handling farmer appeals challenging program determinations.  (Pl. Dep. 28:9-29:18, 30:7-32:9).  Plaintiff served as Chief under Robinson, in what she considered a "good SED-Chief relationship," until he left his position as SED in early 2001.[4]  (Pl. Dep. 41:21-42:17, 43:18-20).

**B.    Plaintiff's Pre-Settlement Agreement Employment Under Danny Crawford.**

Danny Crawford was appointed SED in May 2001, and he became responsible for overseeing the administration of FSA programs in Alabama.[5]  (Crawford Dep. 922-10:7).  In this capacity, he supervised five Divisions in the FSA State Office.  (Crawford Dep. 22:7-11, 27:2-31:2).  The Executive Division included Debbie Williams, his Executive Assistant and Assistant SED, and Irean Bennett, his secretary.  (Crawford Dep. 16:19-19:12).  The other four Divisions were the Program Adjustment/Compliance Division supervised by Plaintiff; the Administrative Division supervised by Verdell Zeigler, an African-American female; the Farm Loan Program Division; and the Conservation/Price Support Division.  (Crawford Dep. 27:2-30:16; Zeigler Dec. ¶¶ 1, 4).  Crawford

---

[3]The programs were assigned as follows:  Sharrie Peterson handled reconstitutions, AMTA, peanuts, tobacco, and common provisions; Jeff Knotts handled compliance and Non-Insured Assistance Program ("NAP"); Walda Messer handled disaster and NAP.  (Pl. Dep. 27:11-28:5).

[4]Plaintiff believed Robinson had a wealth of knowledge in FSA programs, and she trusted his answers to questions she asked him.  (Pl. Dep. 41:21-42:17).  Robinson also made Plaintiff his "right-hand man" and assigned her additional tasks she enjoyed performing.  (Pl. Dep. 38:6-39:19).

[5]Crawford had previously been County Executive Director ("CED") for Limestone County.  (Crawford Dep. 10:8-13).  In that position, he had dealt with Plaintiff when he had to obtain answers to questions relating to FSA programs.  (Pl. Dep. 44:12-45:2; Crawford Dep. 99:7-11).  Plaintiff always found Crawford to be friendly and cordial during these interactions.  (Pl. Dep. 45:3-8).

- 4 -

also supervised District Directors ("DD") in charge of four regions of FSA county offices in Alabama, each of whom supervised County Executive Directors ("CEDs") of the offices in each county. (Crawford Dep. 32:12-33:5; Crawford Dec. ¶ 1). Crawford, who spent a significant amount of time out of the State office at meetings or training, periodically met with the DDs and Williams, and with his SED staff, including Williams and the Division Chiefs. (Crawford Dec. ¶¶ 2-3).

Shortly after he became SED, Crawford begin receiving numerous complaints from DDs that Plaintiff gave wrong or inaccurate answers to questions about PL and other programs and that their CEDs and county office employees lacked confidence in Plaintiff's knowledge of programs, ability to correctly answer questions about programs, and training abilities.[6] (Crawford Dep. 98:7-19, 105:16-106:8; Crawford Dec. ¶¶ 4-5). He also received complaints from Plaintiff's staff about her lack of guidance and program knowledge.[7] (Crawford Dep. 49:11-50:2, 51:31-53:22, 102:17-22). At around the same time, USDA conducted a review of PL, one of Plaintiff's responsibilities, in Geneva County, and found major problems. (Crawford Dec. ¶ 8). After this review, Crawford's supervisor sent a memorandum expressing concerns over the State Office's apparent weakness and lack of expertise in handling PL matters. (Crawford Dec. ¶ 8; Pl. Dep.60:1-8, 61:5-12, Ex. 3).

On August 20, 2001, Crawford told Plaintiff about the many complaints that he had received from the field and her staff about her performance.[8] (Pl. Dep. 67:13-25, 69:2-70:25; Crawford Dec.

---

[6]The DDs were Johnny Raby, Philip Thrower, Richard Burge, and Jack Crawley. (Crawford Dec. ¶ 1). When Crawford had been a CED, he had similar experiences with Plaintiff providing wrong or inaccurate answers to questions about PL. (Crawford Dep. 98:20-100:10).

[7]Crawford had previously heard complaints about Plaintiff's time and attendance, and he counseled her on July 3, 2001, about it. (Crawford Dep. 70:15-71:13; Pl. Dep. 55:1-59:12, Ex. 2).

[8]A memorandum provided to Plaintiff on September 12, 2001, describes in detail what Crawford discussed with Plaintiff. (Pl. Dep. 71:1-72:4, 74:14-22, Ex. 7; Crawford Dep. 85:6-16).

¶ 9). Crawford subsequently gave Plaintiff a "not achieved" Performance Work Plan ("PWP") and placed her on an Opportunity To Improve ("OTI") on November 6, 2001.[9] (Pl. Dep. 107:3-22, Ex. 9; Crawford Dec. ¶ 10). He had a follow-up meeting with Plaintiff on the OTI on November 28, 2001, at which time he discussed her performance and informed her that she was making progress and he felt she would continue to improve.[10] (Pl. Dep. 113:12-15, Ex.11). Plaintiff told him at the time that she planned on retiring when she was eligible in November 2002. (Pl. Dep. 115:1-19).

### C.    Plaintiff's First EEO Complaint and December 5, 2001, Settlement Agreement.

After Crawford first advised Plaintiff that he had received complaints about her performance, she filed an EEO complaint on September 14, 2001, that "[p]rior to and since reporting to duty as SED ... Crawford has embarked on a blatant practice of race discrimination, and he has created a hostile working environment...."[11] (Pl. Dep. 75:3-9, 78:14-22, Ex. 8). Plaintiff, who was represented by counsel, subsequently agreed to participate in the USDA's early resolution program. (Pl. Dep. 123:1-124:22, Ex. 12). On December 5, 2001, she attended a mediation session covering her EEO complaint, PWP, and OTI, and she reached a binding settlement with the USDA regarding all her claims. (Pl. Dep. 123:1-7, 124:2-7, 124:17-126:18, Ex. 13; Crawford Dep. 120:9-17, 123:10-12).

---

[9]The PWP rating was based on the numerous complaints Crawford had received expressing lack of confidence in Plaintiff's performance and his own experiences with her. (Crawford Dep. 98:7-19, 102:17-22, 105:16-106:8). Williams prepared a memorandum that accurately describes what was discussed when Crawford met with Plaintiff about the PWP and OTI. (Pl. Dep. 107:23-108:1, 109:19-110:23, Ex. 10; Crawford Dec. ¶ 10; Crawford Dep. 116:15-117:2).

[10]Bennett, who attended the meeting and took notes, prepared a memorandum that accurately reflects the discussion at the meeting. (Pl. Dep. 114:14-25, Ex. 11; Crawford Dec. ¶ 10).

[11]Plaintiff was referring to two times that Crawford counseled her in July and August 2001, and two meetings that Plaintiff had not attended that were attended by employees in her section who specialized in the areas covered by the meetings. (Pl. Dep. 78:23-80:14, 87:1-13, 88:12-89:14).

- 6 -

Pursuant to the December 5, 2001, Settlement Agreement ("the Agreement"), the USDA, without admitting Plaintiff's allegations of discrimination, detailed her to the OCR from December 16, 2001, to January 5, 2003; paid her $1,500 in attorneys fees; granted her a salary increase; expunged her official personnel files of performance matters including her "not achieved" PWP and OTI, which was replaced with an "achieved" PWP; and placed her on paid leave until her detail. (Pl. Dep. 127:19-132:10, Ex. 13; Williams Dec. ¶¶ 2-3, Ex. A). In return, Plaintiff agreed to withdraw her EEO complaint, not file any new claim about the same incidents, and "[r]elease, waive, and withdraw any and all complaints, grievances, appeals, or civil actions against the Agency, its employees, or officers ... for any concerns arising out of these (or related) employment situations prior to the signing of this agreement." (Pl. Dep. 123:4-124:7, 132:11-16, Ex. 13).

Plaintiff, whose request for a permanent reassignment to the OCR as part of the Settlement was denied by the USDA, understood that at the end of her one-year detail under the Agreement she had the option of retiring or returning to her Chief position in the State Office. (Pl. Dep. 132:17-21, 142:2-11). Plaintiff claims that she had not decided what she was going to do. (Pl. Dep. 132:22-24).

## II.    Plaintiff's Claims in Her Complaint and Relevant Facts.[12]

### A.    Laptop removal and password deactivation.  (Comp. ¶¶ 13(a) & (b), 20).

While Plaintiff was on leave before her detail, the desktop computer assigned to Valerie Moses, the employee handling time and attendance for FSA, began having problems and the office had no spare computers.  (Crawford Dec. ¶ 13; Williams Dep. 51:14-52:11; Reynolds Dec. ¶ 2).

---

[12]The scope of a lawsuit is governed by the acts challenged in the Complaint. See Brown v. Snow, 440 F.3d 1259, 1266 (11th Cir. 2006).  While Plaintiff's Complaint references applying for and not receiving a permanent OCR position after she retired, Plaintiff testified she is not pursuing a non-selection claim in this lawsuit.  (Pl. Comp. ¶¶ 23, 26; Pl. Dep. 6:7-15, 291:9-15).  The acts challenged in this lawsuit, and the relevant undisputed facts, are discussed in this Section.

Crawford did not expect Plaintiff, who was on leave, to be in the office, and thus agreed with Williams's suggestion that Plaintiff's laptop be given to his secretary Bennett, who had asked for a laptop to be able to work from home, and that Bennett's desktop computer be given to Moses until Moses's computer could be repaired. (Crawford Dep. 155:16-156:4; Crawford Dec. ¶ 13; Williams Dep. 57:2-8). Williams conveyed these instructions to Mary Reynolds, a USDA computer specialist, and she set up the computers for Moses and Bennett. (Williams Dec. ¶ 6; Reynolds Dec. ¶¶ 2-4).

Without any advance notice, Plaintiff came into the office on December 6, 2001, to send an email to all FSA employees to let them know she was leaving and to express her appreciation for having worked with them. (Pl. Dep. 187:3-22, 188:13-15). When she arrived unannounced, she realized her laptop was missing. (Pl. Dep. 188:16-19). Plaintiff asked Williams for her laptop so she could check email, and Williams told Reynolds to return it. (Pl. Dep. 188:16-189:3; Williams Dec. ¶ 8; Reynolds Dec. ¶ 5). After Reynolds set the laptop up, Plaintiff had password problems and Reynolds re-set the password for her on the server.[13] (Pl. Dep. 192:2-15; Reynolds Dec. ¶¶ 5-7).

Plaintiff claims she still had trouble accessing her email, but went home without telling anyone. (Pl. Dep. 192:10-25). When Plaintiff stopped by her office on a later day, her laptop had been returned to Bennett and she did not ask for it back. (Pl. Dep. 192:17-194:6; Reynolds Dec. ¶ 7). Neither Crawford nor Williams knew that Plaintiff had been unable to retrieve her email or that she had come into the office a second time. (Williams Dec. ¶ 8; Crawford Dec. ¶ 14). Plaintiff was given a new computer and password when she began her detail to the OCR. (Pl. Dep. 202:18-203:2).

---

[13]Neither Crawford nor Williams asked that Plaintiff's password be deactivated. (Crawford Dec.¶ 13; Williams Dec. ¶ 7; Reynolds Dec. ¶ 4). Reynolds had not deliberately done anything to the password and has no idea why Plaintiff had trouble. (Reynolds Dec. ¶¶ 4-6). She does, however, often reset passwords when employees type them incorrectly or forget them. (Reynolds Dec. ¶ 4).

**B.    Memorandum to FSA noting that Plaintiff "had been detailed" to the OCR and
naming of Knotts as Acting Chief.  (Comp. ¶¶ 13(c) & (d), 20, 21).**

After the mediation, Crawford had Bennett send a memorandum to FSA employees advising

them that Plaintiff had been detailed to OCR and naming an acting chief for her Division. (Crawford

Dep: 128:9-18; Crawford Dec. ¶ 15; Bennett Dep. 30:2-31:22, Ex. 31).  Crawford believed that it

was necessary to send this notice because FSA employees needed to know who would be handling

Plaintiff's responsibilities in her absence. (Crawford Dec. ¶ 15).  Plaintiff had no discussion with

Crawford, or anyone else at FSA, regarding the wording of the memorandum or who should be

selected as acting chief during her detail. (Pl. Dep. 205:5-12, 210:2-11).  Crawford initially chose

Jeff Knotts, one of the specialists in the Program Adjustment/Compliance Division, to be acting

chief based on his assessment of Knott's past experience. (Crawford Dec. ¶ 15).

**C.    Delivery of revised "achieved" PWP in unsealed envelope, with SED's signature
signed by his Executive Assistant. (Comp. ¶¶ 11, 18-20).**

Plaintiff began her detail as a program complaint specialist in the OCR on December 16,

2001. (Pl. Dep. 133:14-25).  On January 22, 2002, Bennett hand-delivered to her, in an unsealed

envelope, a copy of Plaintiff's "achieved" PWP.[14] (Pl. Dep. 130:19-131:9, 217:15-218:19, Ex. 16).

Plaintiff understood that, as part of the Settlement Agreement, the "achieved" PWP replaced the

"not-achieved" PWP that she had been given on November 6, 2001.  (Pl. Dep. 131:17-20).

Williams, who handled personnel matters for the FSA State Office and was Assistant SED, had been

tasked by USDA with ensuring that the Agreement was implemented. (Williams Dec. ¶¶ 1-3;

Crawford Dec. ¶ 12).  She signed Crawford's signature on the "achieved" PWP with his authority,

---

[14]Bennett, as the SED's secretary, regularly hand-delivered PWPs and other confidential
documents to employees in unsealed envelopes. (Bennett Dep. 29:7-30:1).  She only sealed the
envelopes if she was leaving it in an employee's in-box. (Bennett Dep. 29:7-30:1).

and her signing of his name had the same force and effect as if Crawford had personally signed the document. (Williams Dec. ¶ 3; Crawford Dec. ¶ 12). She asked Bennett to hand-deliver the document to Plaintiff, without telling Bennett anything about the Settlement, the document, or why the document was being delivered. (Williams Dec. ¶ 5; Bennett Dep. 33:16-20).

**D.    Denial of request to attend 2002 BIG Conference. (Comp. ¶¶ 14, 22).**

In April 2002, while on detail to the OCR, Plaintiff made a request to Crawford that she be allowed to attend an optional training opportunity, the BIG Conference in Atlanta, at government expense.[15] (Pl. Dep. 245:8-21, 255:19-25, Ex. 41; Crawford Dec. ¶ 16). BIG is a support and advocacy organization that promotes opportunities for African-Americans in government. (Pl. Dep., Ex. 42). Crawford had authorized federal funding to allow Plaintiff and Vicki Anthony Lane to attend the 2001 BIG Conference in Los Angeles. (Pl. Dep. 49:2-19; Crawford Dep. 146:15-23; Crawford Dec.¶ 16). At the time, Crawford was told that the FSA policy allowed two employees from each State to attend the conference at government expense. (Crawford Dep. 146:18-22, 149:11-20). To be fair and make the BIG conference accessible to more employees, Crawford decided to make future funding for the conference available to the most senior employees who wished to attend who had not previously attended. (Crawford Dec. ¶ 16).

When Crawford found out about the 2002 Big Conference, he had Zeigler send out a notice regarding the conference to FSA employees to see who might be interested in attending and asked her to select the two most senior employees who had not previously attended a conference. (Crawford Dec. ¶ 17; Zeigler Dec. ¶¶ 6-8, Ex. A). Beverly Fraser and Cozia Heard both indicated to Zeigler that they wished to attend the BIG Conference, in addition to Plaintiff, Lane, and several

---

[15]The OCR also sent some employees, but its slots had been taken. (Pl. Dep. 244:1-21).

other employees. (Zeigler Dec. ¶ 8, Ex. B). Fraser and Heard, who are both African-American females, were the most senior FSA employees who wished to attend who had not previously attended a BIG Conference. (Crawford Dep. 147:12-23; Zeigler Dec. ¶¶ 9-10, Ex. C; Pl. Dep. 250:22-251:2). As a result, Crawford authorized them to attend the 2002 BIG conference at federal expense. (Crawford Dec. ¶ 17). Crawford advised Plaintiff that her request to attend the 2002 BIG conference was denied because she had attended the 2001 BIG Conference. (Pl. Dep. 249:20-250:3, Ex. 43).

**E.**     **Alleged breach of December 5, 2001, Settlement Agreement. (Comp. ¶¶ 18-19).**

While Plaintiff was on detail to the OCR, her attorney sent a letter to the USDA's Employment Compliance and Technical Assistance Division ("ECTAD") alleging that the agency had violated the Settlement Agreement by not carrying out all its terms within 30 days. (Pl. Dep. 233:6-13, Ex. 35). As relief, Plaintiff's attorney sought a permanent reassignment of Plaintiff to the OCR (which plaintiff had unsuccessfully sought during the mediation instead of a detail), damages, and reinstatement of Plaintiff's September 2001, EEO complaint.[16] (Pl. Dep. 142:2-11, 233:14-19). Plaintiff's attorney also sent a second letter, as her agreed-upon detail was about to end, seeking an indefinite extension of the one-year detail due to the alleged breach. (Pl. Dep. 234:20-235:3, Ex. 36).

On December 26, 2002, right before the end of Plaintiff's detail, the USDA issued a Final Agency Decision ("FAD") finding no merit to Plaintiff's allegations of non-compliance with the Agreement.[17] (Pl. Dep. 235:17-236:4, Ex. 38). Plaintiff appealed the FAD in January 2003, and the

---

[16]There were no vacancies in the OCR at the time, but Plaintiff contends that the USDA should have created a position for her to settle her complaints. (Pl. Dep. 140:1-142:20, 291:5-21).

[17]The EEOC noted that: (1) the Agreement only required the USDA to notify Plaintiff within 30 days of the last act taken to implement it; (2) the last act to implement it had been a December 26, 2001, check to Plaintiff; and (3) the USDA mailed Plaintiff notice of the actions it had taken on January 23, 2002, within 30 days of the check. (Pl. Dep. 129:3-10, Exs. 15, 38; Williams Dec. ¶ 3).

EEOC affirmed it on October 23, 2003. (Pl. Dep. 238:2-8, Ex. 39). Plaintiff did not seek reconsideration of the EEOC's final decision rejecting her original breach claims. (Pl. Dep. 239:8-17). Instead, in November 2003, Plaintiff's attorney raised new claims to ECTAD that Bennett's delivery of the "achieved" PWP in January 2002, with Crawford's name signed by Williams, had violated the Agreement's privacy and good faith provisions. (Pl. Dep. 239:18-241:16, Ex. 40).

### F.    Plaintiff's (allegedly forced) retirement (Comp. ¶ 25).

Pursuant to the Settlement Agreement, Plaintiff's agreed-upon, one-year detail to OCR ended on January 5, 2003. (Pl. Dep. 127:19-128:14, 140:1-7, Ex. 13). On December 31, 2002, Crawford sent a memorandum to Plaintiff advising her that her detail was about to end and that the paperwork had been processed for her to return to her Chief position. (Pl. Dep. 149:13-150:19, Ex. 22). The memorandum further stated that "[w]e look forward to seeing you on Monday, January 6, 2003," and "[i]f you have any questions or need any assistance, please feel free to contact me." (Pl. Dep. 150, Ex. 22). Plaintiff found nothing objectionable about this memorandum. (Pl. Dep. 150:18-19).

At about the same time, Plaintiff, who enjoyed working in the OCR, sent a letter to Crawford advising him that she had alleged non-compliance with the Settlement Agreement, that her attorney was trying to get an indefinite extension of her detail to the OCR from ECTAD, and that she did not want to return to what she claimed was "an uncomfortable environment" at the State Office. (Pl. Dep. 134:5-7, 143:1-18, Ex. 19). Plaintiff also requested that if her attorney had not heard a response by the end of her detail that she be allowed to work "at a location outside the State Office" or, if that was not feasible, be given indefinite sick leave.[18] (Pl. Dep. 143:14-145:20, Ex. 19).

---

[18]Notably, the USDA's December 26, 2002, FAD, which crossed paths in the mail with Plaintiff's letter, found no merit to Plaintiff's attorney's allegations that the Agreement had been breached and thus effectively denied the requested relief for the alleged breach of permanent

Crawford interpreted Plaintiff's request to work at a location outside the State Office as a request to perform her Chief job from a satellite location. (Crawford Dec. ¶ 20; Williams Dep.64:10-67:16, Ex. 19). He did not think this request was feasible because he thought a Chief had to be present in the State Office to personally supervise staff. (Crawford Dec. ¶ 20; Williams Dep. 66:11-18; Williams Dec. ¶ 10). As a result, he turned to the alternative request for indefinite sick leave, and advised her that she had to provide a doctor's note if she wanted to take more than three days of leave. (Crawford Dep. 134:23-135:18, 136:16-19; Crawford Dec. ¶ 20; Pl. Dep. 147:13-148:13, Ex. 20; Williams Dep. 66:16-22). Plaintiff did not obtain a doctor's note, and instead took three days of leave and returned to work as Chief on January 9, 2003.[19] (Pl. Dep. 148:11-17).

When Plaintiff returned from her detail, she spent most of her time in her office learning the FSA program changes that had been implemented by a new farm bill that Congress had passed in May 2002, during her absence. (Pl. Dep.138:9-12, 167:2-15, 177:23-25). The last farm bill had been passed in 1996, before Plaintiff was Chief of her section, and this new bill dramatically and significantly changed a number of programs that FSA administered. (Pl. Dep. 138:13-20; Crawford Dec. ¶ 19; Peterson Dec. ¶ 4). Two of the biggest changes related to programs in Plaintiff's Division, where the AMTA subsidy was replaced by the Direct and Counter Cyclical Program ("DCP") and the Peanut Quota Buyout Program ("QBOP") was introduced.[20] (Pl. Dep.154:2-15,

---

reassignment or extension of the one year, agreed-upon detail. (Pl. Dep., Exs. 35-38).

[19]Crawford never had another employee request indefinite sick leave. (Crawford Dec. ¶ 20). Notably, when Plaintiff later submitted a request for more than three days of sick leave and provided a doctor's note, the request was granted. (Pl. Dep. 171:5-172:11, Ex. 27; Crawford Dec. ¶ 20).

[20]DCP was a dramatic and confusing change to the entire way production histories were calculated. (Crawford Dec. ¶ 19; Peterson Dec. ¶ 4). The new bill also replaced the tobacco program with a tobacco program buy-out and added new commodities. (Crawford Dec. ¶ 19).

159:23-160:15, 162:16-22, 163:16-20, 176:14-21; Crawford Dec. ¶ 19). Plaintiff admits that learning the program changes in the new farm bill was important, and that she could not answer program questions until she learned it. (Pl. Dep. 263:1-6). Plaintiff had the handbooks regarding the programs in the new farm bill, and she spent her time reading them and talking to her staff about the changes. (Pl. Dep. 166:19-167:17, 177:18-25). No one did anything to interfere with her ability to learn the changes.[21] (Pl. Dep. 177:5-7, Ex. 26). Plaintiff estimates that it would have taken her at least several weeks to learn all the program changes in the new farm bill. (Pl. Dep.176:22-177).

Crawford was extremely busy most of the first two months of 2003, while Plaintiff was learning the new farm bill, and he had limited contact with her. (Crawford Dec. ¶ 21, Ex. E; Pl. Dep. 168:25-169:14). During the few times they were both in the office, Plaintiff met with Crawford on her first day in the office; attended a SED staff meeting on January 23, 2003, at which he welcomed her back; and attended another SED staff meeting on February 18, 2003.[22] (Pl. Dep. 150:20-151:25, 158:2-165:12, Exs. 24-25; Crawford Dec. ¶¶ 21-25; Bennett Dec. ¶ 3, Ex. B). Crawford also asked Plaintiff by email on January 14, 2003, to speak at a cotton meeting on February 28, 2003, on the DCP program if he was not able to attend. (Pl. Dep. 165:13-166:6, Ex. 26). Plaintiff did not find this request objectionable, and she responded by email that she would be glad to attend but was still learning the new farm bill, found that DCP was "a lot to decipher," and was talking to her staff to

---

[21]Plaintiff had attended training on the new farm bill in September 2002 with the OCR during her detail. (Pl. Dep. 138:21-139:4). After her return, she never asked anyone whether she could attend any additional training on the new farm bill. (Pl. Dep. 177:14-17).

[22]Plaintiff testified that she cannot now remember attending these staff meetings that are reflected in minutes created back in January 2003, but she does not contend that they did not occur or that she did not attend them. (Pl. Dep. 158:2-159:16, 163:18-165:12; Bennett Dec. ¶ 3, Ex. B).

learn it. (Pl. Dep. 166:7-167:1, Ex. 26). She also wrote she would place one of her staff on standby "just in case," and Crawford replied "that would be fine, thanks."[23] (Pl. Dep. 167:18-168:8, Ex. 26).

Plaintiff, for her part, made no effort to initiate conversations with Crawford about any meetings or the programs in her section. (Pl. Dep. 169:15-20, 265:4-6, 273:16-18, 276:8-277:12). Nor did she take any initiative to notify field employees that she was back as Chief and to see what might have transpired during her detail.[24] (Pl. Dep. 155:6-10). Plaintiff, however, complains that Crawford did not personally invite her to two farm loan meetings where issues related to the NAP program were discussed and that she did not receive enough telephone calls from county employees.[25] (Pl. Dep. 262:9-263:20). One meeting had been scheduled while Plaintiff was still on detail, and Plaintiff learned about it from Messer, her subordinate who planned on attending. (Pl. Dep. 263:14-20, 264:1-6). Plaintiff made no effort to attend the meeting once she learned about it, either with Messer or instead of her, and was never told that she could not attend it. (Pl. Dep. 265:4-23; Crawford Dec. ¶ 23). Plaintiff learned about another meeting when she was asked to answer some NAP questions raised by farmers at a farm loan meeting. (Pl. Dep. 266:12-268:5, 272:15-20). After Plaintiff was not able to answer the questions, Burge, a DD, requested Plaintiff see if Messer was available.[26] (Pl. Dep. 268:2-269:3, 272:21-273:15). Plaintiff returned with Messer, who was

---

[23]Plaintiff asked Peterson, who handled cotton and DCP, to speak at the meeting and this was mentioned at the February 18, 2003, SED meeting. (Pl. Dep. 168:9-15, Ex. 25; Peterson Dec. ¶ 5).

[24]Bennett prepared an updated FSA roster on or about December 30, 2002, that listed Plaintiff returning as Chief of her section, and she sent it to Alabama FSA employees. (Bennett Dec. ¶ 2).

[25]Crawford never told employees not to call Plaintiff, and while Plaintiff has no idea why she did not receive more telephone calls she assumes that the county employees did not have confidence in her abilities. (Pl. Dep. 273:24-274:1, 283:23-25, 284:1-285:3; Crawford Dec. ¶ 21).

[26]Plaintiff claims she was humiliated by Burge's tone of voice. (Pl. Dep. 268:7-21).

able to answer the questions. (Pl. Dep. 269:4-270:9, 271:17-19). Crawford was not at this meeting and did not know which specific issues would be raised. (Pl. Dep. 273:8-10; Crawford Dec. ¶ 23).

On the morning of Monday, February 24, 2003, Plaintiff woke up and made the "spur-of-the-moment" decision to retire and begin receiving her retirement annuity payments.[27] (Pl. Dep. 178:7-179:21, 296:3-14, Ex. 50). Plaintiff claims that she was sick the morning she decided to retire, but admits that she was no sicker than she had been on any other day she worked for Crawford.[28] (Pl. Dep. 179:12-18, 277:25-278:25). She attributes her sickness to a fear that Crawford was going to "chew her out for something" but admits that after she returned from her detail, Crawford never criticized her performance. (Pl. Dep. 172:12-25, 174:3-9; Crawford Dec. ¶ 22). Plaintiff also admits that she did not hear anyone make any negative comments about her and has no knowledge about anyone complaining about her performance after she returned from her detail. (Pl. Dep. 154:21-23, 282:5-11). Moreover, no one told Plaintiff that she had to retire or that she was not welcome at FSA. (Pl. Dep. 257:21-25). Plaintiff filed an EEO complaint on April 1, 2003, alleging that her retirement had not been voluntary.[29] (Pl. Dep., Ex. 46). This lawsuit followed in May 2005.

---

[27]Plaintiff was physically present in the office for a total of only 14 days after her detail ended before she chose to retire on February 24, 2003. (Pl. Dep. 170:3-171:13, Ex. 27).

[28]Plaintiff's last day at work was February 18, 2003, and she cannot recall anything occurring that day that made her ill or decide to retire. (Pl. Dep. 175:14-16, 277:5-278:25, 285:4-9).

[29]Plaintiff also filed other EEO complaints relating to claims in this lawsuit: (1) she filed an informal complaint on January 3, 2002; and a formal complaint on March 4, 2002, challenging the removal of her computer and password deactivation; the "has been detailed" memorandum; and the designation of an acting chief; and (2) she filed an EEO complaint on May 29, 2003, challenging her failure to be chosen to attend the BIG Conference. (Pl. Dep., Exs. 32, 45). The EEOC issued its final decision finding no merit to these claims of discrimination and retaliation on January 13, 2005. (Pl. Dep., Ex. 34). In November 2003, Plaintiff also alleged, as a possible breach of the December 5, 2001, Settlement Agreement, that the delivery of her "achieved" PWP in January 2002 had been discriminatory on the basis of her race and gender. (Pl. Dep., Ex. 40).

## ARGUMENT AND CITATION OF AUTHORITY

This Court should grant complete summary judgment to Defendant. The Federal Rules of Civil Procedure dictate that summary judgment be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once a party moving for summary judgment demonstrates a lack of any genuine issues of material fact, the non-moving party has the burden of coming forward with specific and admissible facts in support of its case and cannot merely rest on the pleadings. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Macuba v. DeBoer, 193 F.3d 1316, 1322 (11th Cir. 1999). If the admissible record "taken as a whole" could not lead a reasonable juror to find for the non-moving party, then there is no "genuine issue for trial" and summary judgment should be entered. See Matsushita, 475 U.S. at 587. As set forth below, when this standard is applied to the present case, Defendant is entitled to judgment as a matter of law.

## I.    Plaintiff's Failure to Exhaust Her Mandatory Administrative Remedies.

As an initial matter, the Court should grant summary judgment on Plaintiff's claims that are barred by her failure to exhaust her mandatory administrative remedies. Before a federal employee may file a Title VII lawsuit, she must satisfy certain administrative procedures that require her to timely submit her claims to the EEO office of her employing agency. See Grier v. Secretary of the Army, 799 F.2d 721, 724 (11th Cir. 1986); Bickham v. Miller, 584 F.2d 736, 738 (5th Cir. 1978). These requirements "are not mere technicalities, but are integral parts of Congress' statutory scheme of achieving a careful blend of administrative and judicial enforcement powers." See Thompson v. West, 883 F. Supp. 1502, 1507 (M.D. Ala. 1995). If an employee files a lawsuit without timely and fully complying with these administrative requirements, then her lawsuit must generally be dismissed

- 17 -

for failure to exhaust. See Crawford v. Babbitt, 186 F.3d 1322, 1326 (11th Cir. 1999); Manning v. Carlin, 786 F.2d 1108, 1108-1109 (11th Cir. 1986). See also Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980) ("strict adherence" to Title VII's procedural requirements is "the best guarantee of evenhanded administration of the law."). In this case, Plaintiff did not exhaust her claims regarding the removal of her computer and password deactivation, the "has been detailed" memorandum and designation of an acting chief, the delivery and signing of her "achieved" PWP, or the denial of her request to attend a BIG Conference. (Comp. ¶¶ 11, 13-14, 18-22). Nor did she exhaust any breach claims relating to the December 5, 2001, Settlement Agreement. (Comp. ¶¶ 18-19).

### A.    Plaintiff's Unexhausted Discrimination and Retaliation Claims.

This Court should grant summary judgment on Plaintiff's discrimination and retaliation claims in paragraphs 11, 13-14, and 18-22 of her Complaint that Plaintiff failed to exhaust in a timely manner. The mandatory exhaustion regulations applicable to federal employees first require an employee to informally consult with an EEO counselor within 45 days of an allegedly discriminatory or retaliatory act. See 29 C.F.R. § 1614.105(a); Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002); Thompson, 883 F. Supp. at 1507. Upon completion of informal counseling, an employee has 15 days to file a formal complaint. See 29 C.F.R. § 1614.106(a). Finally, an employee must file a lawsuit within 90 days of the Final Agency Decision ("FAD") on a formal complaint or the final decision of the EEOC on an appeal from a FAD or request for reconsideration, whichever is later. See 29 C.F.R. §§ 1614.401, 402(a) and 407(a) & (c). See also Morgan v Potter, 489 F.3d 195, 196-197 (5th Cir. 2007); Hunter v. Stephenson Roofing, Inc., 790 F.2d 472, 475 (6th Cir. 1986); Jenkins v. Potter, 271 F. Supp. 2d 557, 562 (S.D.N.Y. 2003); Marshall v. James, 276 F. Supp. 2d 41, 49-50 (D.D.C. 2003). Plaintiff did not comply with these mandatory requirements because

- 18 -

she did not meet the 45-day deadline for the claims in paragraphs 11, 18, and 19, of her Complaint, or the 90-day deadline for her claims in paragraphs 13-14 and 20-22 of her Complaint.

First, Plaintiff failed to contact an EEO counselor within 45 days of Bennett's January 22, 2002, delivery of the "achieved" PWP. (Pl. Comp. ¶¶ 11, 18-19; Pl. Dep. 217:4-218:7, 223:17-224:4, Ex. 16). Plaintiff first raised discrimination claims regarding the delivery and signing of this PWP in a complaint filed with the USDA on November 26, 2003, and never presented retaliation claims. (Pl. Dep.232:19-233:5, 240:9-241:16, Ex. 40). Since Plaintiff waited more than 45 days after the incident to assert her claims, she cannot pursue them in this lawsuit. See Manning, 786 F.2d at 1108; Thompson, 883 F. Supp. at 1507 ("it [is] settled ... that a federal employee's unexcused failure to timely initiate an administrative discrimination complaint results in dismissal of the suit.").

Second, Plaintiff failed to file a lawsuit within 90 days of the EEOC's final decision regarding the acts that Plaintiff challenges in paragraphs 13-14 and 20-22 of her Complaint. The EEOC mailed its final decision on these acts to Plaintiff and her attorney on January 13, 2005, denying her request to reconsider its prior determination finding no merit to her claims that Defendant discriminated and retaliated against her when it took her computer and deactivated her password while she was on leave, sent out a memorandum indicating she "had been detailed" and selecting an acting chief, and denied her request to attend a BIG Conference. (Pl. Dep. 214:7-215:5, Exs. 33-34). The law presumes receipt of such a mailing within 3 to 5 days.[30] See, e.g., Payan v.

_____

[30]Plaintiff testified at her deposition that she has no independent recollection of when she received the EEOC's decision mailed on January 13, 2005. (Pl. Dep. 215:23-216:11). Plaintiff thought she might have written the date she received it on the envelope, and she was asked to produce this envelope, and all other envelopes, as such documents should have already been produced in response to Defendant's discovery requests. (Pl. Dep. 216:1-217:3, 299:4-17). This request was repeated in a December 14, 2007, letter to Plaintiff's counsel from Defendant's counsel and in telephone conversations between counsel. Subsequently, Plaintiff brought original envelopes

Aramark Mgmt. Servs. Ltd., 495 F.3d 1119, 1125-26 (9th Cir. 2007) (three-day presumption of receipt in Federal Rules was reasonable); Morgan, 489 F.3d at 196-197 (five-day presumption of receipt in C.F.R. was reasonable). Plaintiff did not file this lawsuit until May 5, 2005, more than 90 days after the EEOC's final decision. Accordingly, the Court should dismiss these claims as untimely. See Morgan, 489 F.3d at 196-197 (dismissing as untimely lawsuit filed 97 days after EEOC decision); Hunter, 790 F.2d at 475; Bullock, 953 F. Supp. at 1472.

### B.   Plaintiff's Unexhausted Challenges to the Settlement Agreement.

The Court should grant summary judgment on Plaintiff's claims in paragraphs 18 and 19 of her Complaint alleging a breach of the December 5, 2001, Agreement, because she failed to timely exhaust her mandatory administrative remedies. See Osahar v. Postmaster General, 2008 U.S. App. LEXIS 1073, at *30 (11th Cir. Jan. 15, 2008); Sanders v. Reno, 186 F.3d 684, 685 (5th Cir. 1999). Pursuant to 29 C.F.R. § 1614.504(a), a federal employee who believes an agency has not complied with the terms of a settlement agreement must notify "the [agency] EEO Director, within 30 days of when the complainant knew, or should have known, of the alleged non-compliance."[31]   See Sanders, 186 F.3d at 685; Eneje v. Ashcroft, 183 F. Supp. 2d 931, 933 (E.D. Ky. 2001); Rivera v. Dalton, 77 F. Supp. 2d 220, 224-226 (D.P.R. 1999). If the agency issues a decision finding no breach, the complainant may appeal that determination to the EEOC. See 29 C.F.R. § 1614.504(a). Once the EEOC issues a final decision on the matter, the plaintiff must file a lawsuit within 90 days

---

and other documents to Defendant's counsel's office on January 10, 2008, and represented that she had produced every responsive envelope in her possession and that there were no more documents. Plaintiff did not provide an envelope for this FAD. Accordingly, it either no longer exists or Plaintiff did not produce it because it confirms that Plaintiff received the FAD within 3-5 days of mailing.

[31]The December 5, 2001, Agreement advised Plaintiff that she had to bring any non-compliance claim to the USDA within 30 days and provided a contact address. (Pl. Dep., Ex 13).

of receipt of that decision. See 29 C.F.R. § 1614.407(c); Jones v. Wynne, 2008 U.S. App. LEXIS 4265, at *3-6 (11th Cir. Feb. 26, 2008); Taughinbaugh v. Potter, 2006 U.S. Dist. LEXIS 5417, at *8-14 (E.D. Mich. Feb. 14, 2006); Puckett v. Potter, 342 F. Supp. 2d 1056, 1064-1065 (M.D. Ala. 2004). In this case, Plaintiff appears to assert two general breach theories, but she did not fully and timely exhaust either theory. (Pl. Dep. 231:20-233:13, 239:18-241:17, Exs. 35, 40).

Plaintiff presented her first breach theory to the USDA on January 11, 2002, when she alleged that the agency failed to comply with a 30-day time limit in the Agreement. (Pl. Dep. 232:13-233:13, Ex. 35). The USDA issued a Final Agency Decision ("FAD") on December 23, 2002, finding no merit to her contentions. (Pl. Dep. 235:17-236:6, Ex. 38). Plaintiff appealed this decision to the EEOC on January 24, 2003, and the EEOC affirmed the USDA's decision on October 23, 2003. (Pl. Dep. 237:10-238:8, Ex. 39). Plaintiff did not file this lawsuit until May 2005, far more than 90 days after October 23, 2003. Accordingly, she did not timely exhaust her first breach theory and cannot pursue it in this lawsuit. See Jones, 2008 U.S. App. LEXIS 4265, at *3-6 (holding plaintiff failed to exhaust administrative remedies when she did not file lawsuit within 90 days of receiving EEOC's final decision on challenge to settlement agreement); Taughinbaugh, 2006 U.S. Dist. LEXIS 5417, at *14 (same). See also Puckett, 342 F. Supp. 2d at 1064-1065 (holding judicial review of EEOC decision regarding agency compliance must be sought within 90 days).

Plaintiff presented her second breach theory to the USDA on November 26, 2003, when she alleged that the manner in which the USDA delivered and signed her revised PWP on January 22, 2002, breached privacy and good faith portions of the Agreement.[32] (Pl. Dep. 239:15-239:23, 240:9-

---

[32]This theory was actually first referenced in Plaintiff's January 2003 appeal to the EEOC on her first breach theory, and the EEOC declined to address it and directed her to 29 C.F.R. § 1614.504(a), which contains the 30-day time limit. (Pl. Dep. 232:238:24-239:3, Ex. 39).

241:16, Ex. 40). Plaintiff did not raise this second breach theory until more than 30 days after the January 22, 2002, delivery of the PWP. (Pl. Dep. 241:11-16, Exs. 16, 39, 40). Accordingly, Plaintiff did not timely present these breach claims to the USDA, and she cannot raise them in this lawsuit. See Osahar, 2008 U.S. App. LEXIS 1073, at *30-31 (dismissing challenge to settlement not presented to agency within 30 days); Sanders, 186 F.3d at 685; Taughinbaugh, 2006 U.S. Dist. LEXIS 5417, at *12-13; Eneje, 183 F. Supp. 2d at 932-933; Rivera, 77 F. Supp. 2d at 225-226.

## II.    Plaintiff Cannot Show a Breach of the December 5, 2001, Settlement Agreement.

Even if Plaintiff had exhausted her administrative remedies, her breach claims fail as a matter of law. A Title VII settlement agreement is a contract governed by general principles of contract law. See Schawrtz v. Fla. Bd. of Regents, 807 F.2d 901, 905 (11th Cir. 1987). To show a breach, a party must show that the other party was in material non-compliance with its terms. See Gilbert v. Dep't of Justice, 334 F.3d 1065, 1071 (Fed. Cir. 2003); Malladi v. Brown, 987 F. Supp. 893, 905 (M.D. Ala. 1997). A breach is material when it "relates to a matter of vital importance, or goes to the essence of a contract." See Gilbert, 334 F.3d at 1071. Contract interpretation is a question of law, and a court should give terms their plain and ordinary meaning. See Schawrtz, 807 F.2d at 905.

As an initial matter, Plaintiff has failed to state a breach claim because her lawsuit only seeks money damages. The United States has not waived its sovereign immunity to allow for money damages for breach of a Title VII settlement agreement. See Frahm v. United States, 492 F.3d 258, 262-263 (4th Cir. 2007). Instead, pursuant to federal regulations, a plaintiff alleging breach of a Title VII settlement may only "request that the terms of the settlement agreement be specifically implemented or, alternatively, that the complaint be reinstated for further processing from the point

processing ceased."[33] See id. at 263 (quoting 29 C.F.R. § 504(a)). Given Plaintiff's failure to seek in this lawsuit either specific performance or reinstatement of her EEO complaint, any breach claim Plaintiff seeks to pursue must be dismissed for failure to state a claim upon which relief may be granted. See id. See also Knieriem v. Group Health Plan, Inc., 434 F.3d 1058, 1060 (8th Cir. 2006) (dismissing claim which improperly sought damages not available under statute).

In any event, Plaintiff cannot show a breach of the Agreement. Though Plaintiff obtained all the Agreement's material benefits, she seeks to escape her sole material obligation under the Agreement - release of her claims - by alleging that the USDA breached various ancillary provisions regarding timeliness, privacy, and good faith.[34] (Pl. Dep., Exs. 35, 40). Plaintiff's first theory is that the agency had 30-days to implement the Agreement and failed to do so. (Pl. Dep. 225:8-25, 232:13-16). She mis-reads clear language in the Agreement, however, that only required the USDA to notify her of its actions taken within 30 days of the last act it took to implement the Agreement.[35] (Pl. Dep., Exs. 13, 38). This was done. (Pl. Dep., Ex. Exs. 17, 38; Williams Dec. ¶¶ 2-3, Ex. A). Plaintiff's second theory is that Bennett's delivery of Plaintiff's "achieved" PWP in an unsealed envelope, with Crawford's signature signed by Williams, violated the Agreement's privacy and good faith

---

[33]The Settlement Agreement contains these same limitation of remedies. (Pl. Dep., Ex. 13).

[34]Pursuant to the Agreement, the USDA detailed Plaintiff to the OCR for one year; paid her attorney's fees; granted her a raise; expunged her personnel files of performance-related documents, including replacing her "not achieved" PWP and OTI with an "achieved" PWP; and gave her paid leave until her detail. (Pl. Dep. 127:19-132:10, Ex. 13). Plaintiff agreed in return to "Release, waive, and withdraw any and all complaints, grievances, appeals, or civil actions against the Agency, its employees, or officers ... for any concerns arising out of these (or related) employments situations prior to the signing of this agreement." (Pl. Dep.132:11-16, Ex. 13).

[35]In pertinent part, the Agreement states "That after the Agreement is fully implemented, the Agency will within 30 days provide the Complainant with a written notice explaining the specific actions taken to implement the agreement." (Pl. Dep., Ex. 13, pg. 2)(emphasis added).

- 23 -

provisions. (Pl. Dep. 241:11-16, Ex. 40). Notably, the Agreement was between Plaintiff and the USDA, and the privacy provision did not prevent USDA employees from communicating among themselves as necessary to implement the Agreement. (Pl. Dep., Ex. 13). Williams, who was at the mediation, had full authority to carry out tasks for Crawford and sign his signature, and she did not tell Bennett anything about the Agreement's terms when she asked Bennett to hand-deliver the PWP to Plaintiff. (Pl. Dep. 222:7-22; Crawford Dec. ¶ 12; Williams Dec. ¶¶ 3-5; Bennett Dep. 33:16-20).

### III.    Plaintiff's Discrimination Claims Fail as a Matter of Law.

Even assuming _arguendo_ that they were all properly exhausted, this Court should grant summary judgment on Plaintiff's discrimination claims because they fail as a matter of law. Pursuant to the burden-shifting scheme applicable to Title VII claims, a plaintiff must first establish a prima facie case of discrimination. See Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998). A defendant may then remove any inference of discrimination by offering legitimate, non-discriminatory reasons for its actions. See id. To survive summary judgment, a plaintiff must then show that the proffered reasons are pretext by offering evidence for a reasonable factfinder to disbelieve them and conclude that they were not what actually motivated the employer. See Combs v. Meadowcraft, Inc., 106 F.3d 1519, 1538 (11th Cir. 1997). In this case, Plaintiff's claims fail as a matter of law because she cannot establish a prima facie case and Defendant has offered legitimate, non-discriminatory reasons for its actions that she cannot show are pretext.

### A.    Plaintiff Cannot Establish a **Prima Facie** Case of Disparate Treatment.

Plaintiff cannot establish a prima facie case of disparate treatment. To make the necessary showing, a plaintiff must offer evidence that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; and (3) her employer treated similarly-situated

- 24 -

employees outside her protected class more favorably. See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). Plaintiff cannot show that she suffered an adverse employment action or that she was treated differently from similarly-situated employees outside her protected classes.

### 1.    Plaintiff Did Not Suffer Any Adverse Employment Actions.

As an initial matter, the Court should grant summary judgment on Plaintiff's discrimination claims because she did not suffer any adverse employment actions. To constitute an adverse employment action, an employer's conduct must cause a "serious and material change in the terms, conditions, or privileges" of a plaintiff's employment that a reasonable person would view as materially adverse. See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001). To meet this high threshold of substantiality, a challenged action must generally involve a reduction in compensation or benefits or a material and negative change in job duties. See id. at 1238-40, 1244; Cantrell v. Jay R. Smith Mfg. Co., 248 F. Supp. 2d 1126, 1136-1137 (M.D. Ala. 2003). The loss of self-esteem, humiliation, or "bruised ego" that may accompany being embarrassed by a supervisor's actions is not sufficient. See Davis, 245 F.3d at 1242; Williams v. Glover, 2006 U.S. Dist. LEXIS 15536, at *13 (M.D. Ala. March 31, 2006) (Watkins, J.); Smith v. Ala. Dep't of Public Safety, 64 F. Supp. 2d 1215, 1223-1224 (M.D. Ala. 1999); Malladi, 987 F. Supp. at 918. In short, Title VII does not provide a cause of action for everything that makes an employee unhappy, and this high standard prevents lawsuits by "irritable, chip-on-the-shoulder employee[s]" regarding every minor and trivial act that occurs during their employment. See Davis, 245 F.3d at 1242.

Plaintiff's laundry list of alleged adverse actions in her Complaint, either alone or collectively, fall well short of constituting adverse employment actions. In fact, Plaintiff primarily complains about being embarrassed, defamed, or humiliated by the various acts. (Comp. ¶¶ 18-26).

- 25 -

Plaintiff's subjectively hurt feelings are irrelevant and entirely insufficient to meet her high burden. See Forkkio v. Powell, 306 F.3d 1127, 1130-1131 (D.C. Cir. 2002) ("public humiliation or loss of reputation ... are not adverse actions"); Williams, 2006 U.S. Dist. LEXIS 15536, at *13 (fact plaintiff claimed she was "humiliated and stripped of dignity" by actions was irrelevant to adverse action element). Indeed, as set forth below, Plaintiff simply suffered no material harm and she whines about nothing more than the ordinary tribulations of the workplace. See Malladi, 987 F. Supp. at 918. See also Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) ("Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace.")

###### a.    No Adverse Actions in Paragraphs 11, 13-14 and 18-22 of Complaint.

Plaintiff first challenges the removal of her laptop and password deactivation while she was on leave prior to her detail. (Comp. ¶¶ 13, 20). Plaintiff, however, has admitted that these actions were "trivial," and she does not identify any tangible harm from them. (Pl. Dep. 186:4-187:2, 203:5-204:17, Ex. 30). Numerous courts have agreed that the removal of an employee's computer and password is nothing more than a mere inconvenience that does not rise to the level of an adverse action. See, e .g., Toland v. Potter, 2007 U.S. Dist. LEXIS 42153, at *23-24 (D. Kan. June 8, 2007) (removal of computer, making tasks more difficult, time-consuming, and frustrating, was not adverse action as it did not affect employment status); Streeter v. The Bridge, Inc., 2006 U.S. Dist. LEXIS 14084, at *15-16 (M.D. Ala. March 16, 2006); Manni v. ORS Nasco, 2006 U.S. Dist. LEXIS 42374, at *24 (D. Minn. June 20, 2006) (expired computer password not adverse action). See also Enowmbitang v. Seagate Tech., 148 F.3d 970, 974 (8th Cir. 1998) ("failure to provide ... computer does not rise above a 'mere inconvenience' and ... [is not] an adverse employment action.").

Plaintiff next challenges the wording of the memorandum issued to FSA employees to notify them that she had been detailed to the OCR and to designate an acting chief in her absence. (Comp. ¶¶ 13, 20-21; Pl. Dep., Ex. 31). Plaintiff admits that she was <u>not</u> harmed by Defendant's choice of the acting chief to serve during her detail, but claims she was harmed by the use of the phrase "has been detailed" because she believed it suggested she had been "put out." (Pl. Dep. 208:25-209:11, 213:4-8). Plaintiff's subjective feelings, however, are irrelevant. <u>See</u> <u>Davis</u>, 245 F.3d at 1239. <u>See also</u> <u>Smith</u>, 64 F. Supp. 2d at 1222 ("mere evidence of a "bruised [] ego" does not constitute adverse employment action"). She had in fact been detailed to the OCR. (Pl. Dep. 127:18-128:3). In short, Defendant's wording of this memorandum simply had no effect on Plaintiff's employment. <u>Cf.</u> <u>Malladi</u>, 987 F. Supp. at 918 (supervisor telling subordinates about plaintiff's detail before telling plaintiff was not adverse action even if it caused plaintiff embarrassment and anguish).

Plaintiff also suffered no tangible harm regarding the delivery or signing of her "achieved" PWP in January 2002. (Comp. ¶ 11, 18-20). Plaintiff claims that she was harmed because the delivery was, in her opinion, late and in breach of the Settlement Agreement. (Pl. Dep. 225:4-226:6). The delivery of an "achieved" PWP, the highest rating on the PWP, even if late, would have no negative effect on the terms and conditions of Plaintiff's employment. <u>See</u> <u>Davis</u>, 245 F.3d at 1240-1242. Moreover, as discussed <u>supra</u>, the PWP was not late under the Agreement. Even assuming <u>arguendo</u> it was late, however, a possible breach of a settlement does not cause tangible harm to a plaintiff's terms and conditions of employment. <u>See</u> <u>Malladi</u>, 987 F. Supp. at 916 (noting federal employee's claim that breach of settlement constituted an adverse employment action was "baseless" and "meritless," and suggesting proper relief for such a claim would be breach of contract claim).

Finally, Plaintiff suffered no tangible harm when her request to attend a BIG Conference was

- 27 -

denied. (Comp. ¶¶ 14-22). Plaintiff claims that she was harmed because she wanted to attend some of the training offered at the BIG Conference to become a better employee. (Pl. Dep. 251:24-252:2, 255:13-18). She admits, however, that the conference was not mandatory and that it was merely an optional training opportunity. (Pl. Dep. 255:19-25). The denial of an optional training opportunity, which does not alter the terms and conditions of a plaintiff's employment, is simply not an adverse employment action. See Clegg v. Ark. Dep't of Corrections, 496 F.3d 922, 927-929 (8th Cir. 2007) (denial of request for training not adverse action in itself); Edwards v. U.S. EPA, 456 F. Supp. 2d 72, 84-86 (D.D.C. 2006) (denial of request to attend Native American training conference was not adverse action since plaintiff suffered no tangible employment consequence); Schmann v. O'Keefe, 314 F. Supp. 2d 515, 531 (D. Md. 2004) (denial of funding to attend non-essential conference was not adverse action when it did not affect employment). See also Baker v. City of Toledo, 2007 U.S. Dist. LEXIS 26795, at 21-22 (N.D. OH. April 11, 2007) (denial of optional training not adverse action); Harvey v. City of Bradenton, 2005 U.S. Dist. LEXIS 38095, at *15 (M.D. Fla. Dec. 22, 2005) (denial of training that did not affect salary, title, position, or duties, was not adverse action).

**b.    Plaintiff's Retirement Was Not An Adverse Action (Comp. ¶ 25).**

Plaintiff's attempt to show an adverse action by claiming that she was forced to retire also fails as a matter of law. (Comp. ¶ 25). Pursuant to the constructive-discharge doctrine, "if [an] employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer is liable ... as if it had formally discharged ... the employee." See Doe v. Dekalb County School Dist., 145 F.3d 1441, 1450 (11th Cir. 1998); Poole v. Country Club, 129 F.3d 551, 553 (11th Cir. 1997). To establish a constructive discharge, a plaintiff must show that her employer made her work conditions "so intolerable that a reasonable

person in [the employee's] position would have been compelled to resign." See Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 977 (11th Cir. 2003); Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991). The subjective feelings of the plaintiff are irrelevant. See Doe, 145 F.3d at 1450. Moreover, a reasonable employee is one who "does not assume the worst" or "jump to conclusions." See Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir.1987).

The standard for a constructive discharge is "quite high," and it mandates a showing of "a greater severity or pervasiveness of harassment" than even that necessary "to prove a hostile working environment."[36] See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001); Dale v. Wynne, 497 F. Supp. 2d 1337, 1344 (M.D. Ala. 2007). Indeed, the Supreme Court has described a constructive discharge as presenting "a 'worse case' harassment scenario, harassment ratcheted up to the breaking point." See Pennsylvania State Police v. Suders, 542 U.S. 129, 147-148 (2004). In Suders, for example, the Supreme Court found a possible constructive discharge existed when the female plaintiff, who worked in a police station, was subjected to a "continuous barrage of sexual harassment" from her three male supervisors that included obscene sexual comments and gestures on a daily basis and culminated in them arresting, handcuffing, and interrogating her on a baseless charge related to her on-the-job activities. See id. at 135-136. Constructive discharge thus only

---

[36]To establish a hostile work environment, a plaintiff must show that (1) she is in a protected class; (2) she was subjected to unwelcome harassment; (3) because of her membership in a protected class; (4) that was subjectively and objectively severe enough to alter a term, condition, or privilege of employment. See Miller v. Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). To establish the final prong, a plaintiff must show that the "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe to alter the conditions" of employment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993). As discussed infra, not only does Plaintiff fail to show that she suffered a constructive discharge, but her allegations do not even come close to showing that she endured anything severe or pervasive enough to create an objectively hostile work environment. See Farragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (noting "conduct must be extreme to amount to a change in the terms and conditions of employment.").

exists in the most severe situations where no reasonable person could be expected to remain on the job for another day. See, e.g., Poole, 129 F.3d at 552 (holding plaintiff had constructive discharge claim when employer made derogatory comments about her age, stripped her of "all existing responsibilities" so that she had absolutely nothing to do, moved her to a different area, had her sit in a chair with no desk, placed her belongings in boxes piled around her, and told employees not to speak with her); Cortes v. Maxus Exploration Co., 977 F.2d 195, 197-200 (5th Cir. 1992) (affirming constructive discharge when plaintiff's supervisor subjected her on daily basis to lewd remarks about her body, vulgar jokes, pornographic pictures, brushed up against her legs and breasts, and required her to ask permission to use the restroom and stood outside when she did so).

Plaintiff's allegations fall well short of meeting this "worse case" standard. She claims that she was forced to retire a few weeks after she returned from her detail because she was intimidated, her character had been defamed, and she was ostracized. (Pl. Dep. 262:9-20). Notably, the alleged intimidation and defamation relate to Crawford's criticism of Plaintiff's performance in counseling sessions in 2001, including her "not-achieved" PWP and OTI, all of which occurred prior to the December 5, 2001, Settlement Agreement and Plaintiff's one-year detail to OCR. (Pl. Dep. 273:22-274:14, 281:22-283:20, 285:4-9). This Court should not consider this conduct because the Agreement constitutes a binding release of all Title VII claims relating to events prior to its entry.[37] See, e.g., Hammer v. Paulson, 2007 U.S. Dist. LEXIS 70785, at *6-7, 18 (N.D. Ga. Sept. 25, 2007); Johnson v. Ashcroft, 2005 U.S. Dist. LEXIS 18034, at *1617 (D.D.C. Aug. 25, 2005) (only considering post-settlement acts when analyzing constructive discharge claim). Plaintiff cannot

---

[37]The Agreement's release, by its plain terms, is broad and covers all Plaintiff's claims regarding acts occurring prior to December 5, 2001. (Pl. Dep. 123:4-124:7, 132:11-16, Ex. 13).

obtain the material benefits of the Agreement, and then rely upon acts covered by its scope to argue in the present lawsuit that she was constructively discharged.[38] See Perryman v. West, 949 F. Supp. 815, 822 (M.D. Ala. 1996). See also Folley v. Henderson, 175 F. Supp. 2d 1007, 1011-1012 (S.D. Ohio 2001) (holding settlement agreement "extinguished" any Title VII claims based on events leading up to it, and plaintiff could not use such events to support later harassment claim).

Nevertheless, even if the Court considers pre-settlement conduct when analyzing Plaintiff's constructive discharge claim, Plaintiff's alleged intimidation and damaged reputation relate to Crawford's criticism of her job performance. (Pl. Dep. 262:9-15, 274:3-17; 283:1-17). Criticism from a supervisor about performance, even if it is humiliating and harms an employee's reputation, is simply an ordinary tribulation of the workplace that does not create an intolerable work environment. See Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001) ("Repeatedly receiving poor evaluations would be unpleasant for anyone, but it does not rise to the level of such intolerable conditions that no reasonable person would remain on the job"); Hipp, 252 F.3d at 1233 (being publically berated by supervisors about poor work and resulting humiliation did not lead to constructive discharge); Boze v. Brantstetter, 912 F.2d 801, 805-806 (5th Cir. 1990) (no constructive discharge when plaintiff given bad reviews, placed on probation, told he was worst lawyer in department, had duties reassigned, and was denied promotion). Moreover, Plaintiff's "not achieved" PWP and OTI were expunged and replaced with an "achieved" PWP. (Pl. Dep. 130:1-

---

[38]Indeed, Plaintiff's stance in this case is analogous to Perryman, in which the plaintiff was given a different job and had her personnel record purged in settlement of an EEO complaint, and then sought to use allegations covered by her settlement agreement to support a later hostile work environment claim. See Perryman, 949 F. Supp. at 822. The court held that "[a]ny claims which [plaintiff] may have asserted on discrimination she alleged in her EEO complaints were disposed of when she settled those complaints," and did not consider facts underlying the settled claims. See id.

131:19; Williams Dec. ¶ 2 ). These withdrawn documents, therefore, had no affect on her work conditions. See, e.g., Fitz, 348 F.3d at 977 ("A withdrawn reprimand, which has yielded no adverse consequences, is not a 'working condition,' at all" and cannot be "intolerable working condition.").

Accordingly, Plaintiff, who admits Crawford did not say a single negative thing about her after her detail, is left merely complaining that she felt "ostracized" as she spent time in her office learning the new farm bill because: (1) Crawford did not do enough to welcome her back; (2) Crawford did not "include" her on two farm loan meetings where NAP issues arose; and (3) she only received one call from the field.[39]  (Pl. Dep. 172:12-25, 174:3-9; 263:7-273:25, 275:18-277:12, 283:13-285:9). While Plaintiff may have preferred a welcome back party, daily pep talks from Crawford, and numerous calls from the field upon her return, her subjective preferences are irrelevant. See Doe, 145 F.3d at 1450-52. Plaintiff's few instances of alleged "ostracism" fall well short of showing that she was faced with an objectively intolerable work environment that no reasonable person could endure. See Clegg, 496 F.3d at 927-929 (no adverse action when plaintiff was not welcomed back to work upon return from leave as she would have liked by supervisor); Veitch v. England, 471 F.3d 124, 130-131 (D.C. Cir. 2006) (no constructive discharge when supervisor did not speak to plaintiff during meetings, did not assign him collateral duties, spoke to him in a "curt" manner, and criticized work); Haley v. Alliance Compressor LLC, 391 F.3d 644, 650-652 (5th Cir. 2004) (no constructive discharge when, after plaintiff returned from leave,

---

[39]While Plaintiff contends that Crawford did not do enough to welcome her back, he did send her a memorandum indicating that "We look forward to seeing you on Monday, January 6, 2003," as her detail was about to end, and he welcomed her back at the first SED staff meeting. (Pl. Dep., Ex. 158:18-159:16, Ex. 24; Crawford Dec. ¶¶ 18, 24; Bennett Dec. ¶ 3, Ex. B). Moreover, Crawford did nothing to exclude Plaintiff from any meetings or prevent FSA employees from calling her. (Pl. Dep. 284:22-285:3; Crawford Dec. ¶¶ 21-23). Plaintiff also made no effort to initiate conversations with Crawford about meetings or programs. (Pl. Dep. 169:9-12, 265:4-6, 273:16-18, 276:18-277:12).

supervisors excluded her from three meetings and ridiculed her in front of peers); EEOC v. Union Camp Corp., 7 F. Supp. 2d 1362, 1380 (S.D. Ga. 1997) (no constructive discharge when plaintiff was ostracized and criticized by supervisor). See also Nettles v. LSG Sky Chefs, 211 Fed. Appx. 837, 839 (11th Cir. 2006) (no constructive discharge when employer, inter alia, excluded plaintiff from meeting with company chairman and undermined authority in front of peers and subordinates).

Tellingly, Plaintiff admits that keeping abreast of changes to FSA programs was part of her job duties, that it was important to learn the new farm bill, that she had to learn the new farm bill to answer questions from the field, and that she was able to devote a 100% of her time to learning the new farm bill without any interference. (Pl. Dep. 30:14-18, 167:2-8, 177:5-25, 263:1-6). While Plaintiff may not have enjoyed spending time upon her return from her detail learning the extensive changes to FSA programs implemented by the first new farm bill in six years, mere displeasure with the job duties of her Chief position does not create an intolerable work environment.[40] See Petrosino v. Bell Atlantic, 385 F.3d 210, 231 (2d Cir. 2004) ("the law is clear that constructive discharge cannot be proved by demonstrating ... an employee is dissatisfied with the work assignments she receives within her job title"); Carter v. Bell, 33 F.3d 450, 459 (4th Cir. 1994) ("[d]issatisfaction

_____

[40]Similarly, Plaintiff may have preferred to remain in the OCR instead of returning to her Chief job and the daunting task of learning the first new farm bill in years, and she may have been upset at her failure to either prevail on her administrative breach claims or obtain a new settlement that would have extended the one-year, agreed-upon detail in the December 5, 2001, Agreement, or permanently reassigned her to a newly-created position in the OCR. (Pl. Dep. 140:9-142:11, 261:1-262:8). Plaintiff, however, voluntarily agreed to the one-year detail in the Agreement. (Pl. Dep. 127:16-18, 128:7-14, 132:17-24, 142:2-11). Her disappointment at actually having to comply with the Agreement she voluntarily entered into and return to FSA at the end of that detail does not by itself make her work environment intolerable. See, e.g., Wardwell v. School Bd. of Palm County, Fla., 786 F.2d 1554, 1557-1558 (11th Cir. 1986) (failure to receive promotion, resulting embarrassment, and increased workload, did not constitute a constructive discharge). See also Poland v. Chertoff, 494 F.3d 1174, 1185 (9th Cir. 2007) ("constructive discharge cannot be based on upon the employee's subjective preference for one position over another.").

- 33 -

with job assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.").

In sum, Plaintiff cannot point to anything that Crawford did after she returned from her detail that made the environment so intolerable as to objectively compel her "spur of the moment" decision to retire on February 24, 2003. (Pl. Dep. 275:18-278:15). She simply alleges that she woke up that morning feeling sick, the same as she had every other day working for Crawford upon her return, due to her unrealized fear that he might criticize her for something. (Pl. Dep. 172:12-25, 174:3-9, 179:12-18, 277:25-278:25). Stress, however, is a normal part of the workplace. See Bristow v. The Daily Press, 770 F.2d 1251, 1255 (4th Cir. 1985) ("Every job has its frustrations, challenges and disappointments; these inhere in the nature of work [and an employee] is not guaranteed a working environment free of stress."). A constructive discharge is not established merely because the stress makes an employee sick. See Stedman v. Bizmart, Inc., 219 F. Supp. 2d 1212, 1225 (N.D. Ala. 2002); Hanley v. The Sports Authority, 143 F. Supp. 2d 1351, 1364 (S.D. Fla. 2000). See also Spence v. Maryland Casualty Co., 995 F.2d 1147, 1156 (2d Cir. 1993); Rosell v. Kelliher, 486 F. Supp. 2d 39, 50 (D.D.C. 2006) ("an employer is not liable for constructive discharge when an employee's stress-related health problems mandate resignation, even if ...caused by the demands or criticism of the employer."). Plaintiff has fallen far short of showing that a reasonable person in her position would have had no choice but to retire, and thus she cannot convert her voluntary decision to retire into a constructive discharge.[41] See Fitz, 348 F.3d at 977; Pipkins, 267 F.3d at 1201.

---

[41]Indeed, by retiring so soon after returning to the office and before she even learned the new farm bill, Plaintiff impermissibly and unreasonably "assumed the worst" and did not give post-Settlement Agreement employment in the State Office a fair chance. See Garner, 807 F.2d at 1539.

## 2.    No Evidence Due to Race or Gender.

Plaintiff also cannot establish a prima facie case of discrimination because she cannot show that she was treated differently due to her race or gender. See Holifield, 115 F.3d at 1562. To establish the inference of discrimination required by a prima facie case, a plaintiff bears the burden of pointing to a similarly-situated employee outside her protected classes who was treated more favorably. See Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003). The alleged comparator must be similarly situated "in all relevant respects." See id. Moreover, a plaintiff cannot satisfy this element of a prima facie case simply because she is a black female. See Serben v. Inter-City Manu. Co., Inc., 36 F.3d 765, 766 (8th Cir. 1996) ("mere membership in the protected class does not permit an inference of [race or gender] discrimination.").

Plaintiff cannot identify any Chief who was treated better than her in relation to any of her contentions in this lawsuit. Indeed, Plaintiff knows of no other Chief who was detailed, under Crawford's supervision, from FSA to the OCR or anywhere else, for any period of time. (Pl. Dep. 207:17-20, 211:24-212:3). Plaintiff thus has no comparator evidence regarding the "has been detailed" memorandum, designation of an acting chief, or anything else pertaining in any way to the one-year detail she agreed to in her Settlement Agreement.[42] (Comp. ¶¶ 13, 20-21). Moreover, since Plaintiff cannot point to any other employee who was on detail for a year before returning to a position under Crawford, she also cannot show that Crawford's treatment of her when her detail ended and she returned to her Chief position was less favorable than how he treated anyone else in

---

[42]Bennett also testified that she regularly used unsealed envelopes to directly deliver confidential documents to employees, and Williams testified that she routinely signed Crawford's signature for him. (Bennett Dep. 29:7-30:1; Williams Dec. ¶ 3). Thus, Plaintiff has no evidence she was treated worse than anyone else regarding her "achieved" PWP. (Comp. ¶¶ 11, 18-19).

a similar position. She even admits that she has no knowledge of what Crawford was doing on a daily basis or how he interacted with other Chiefs after she returned from her detail. (Pl. Dep. 277:10-24). Accordingly, she has no basis to even speculate that anything she allegedly factored into her decision to retire had anything to do with her gender or race.[43] See, e.g., Henson v. Dundee, 682 F.2d 897, 907 (11th Cir. 1982) (environment supposedly leading to constructive discharge must be because of plaintiff's gender or race to form basis of Title VII claim).

Furthermore, Plaintiff cannot show that Crawford allowed any other employee, who attended a BIG Conference in the past, to attend in 2002. (Comp. ¶ 22). The two employees Crawford selected to attend in 2002 had not previously attended any BIG Conference. (Pl. Dep. 250:25-251:2). Moreover, it is undisputed that they were both Black females like Plaintiff. (Pl. Dep. 250:13-24, Ex. 44). Thus, Plaintiff cannot show that race or gender had anything to do with the decision. Cf. Sanders v. City of Montgomery, 319 F. Supp. 2d 1296, 1313 (M.D. Ala. 2004) (plaintiff could not show prima facie case of race discrimination when employer promoted employee of same race).

In sum, Plaintiff's entire case is based on the speculative theory that everything happened to her simply because she is a black female, and she believed that the USDA did not want a black female in her specific Chief position. (Pl. Dep. 93:13-94:25, 106:18-107:2, 194:12-195:10, 200:6-201:23, 212:4-14, 223:17-224:4, 232:4-12, 279:1-14). The law is clear, however, that Plaintiff cannot establish a prima facie case of race or gender discrimination simply because she is African-American and female and is unhappy with certain events. See Crawford v. Medina Gen. Hosp., 96

---

[43]Notably, if this Court considered conduct barred by the Settlement Agreement when analyzing Plaintiff's constructive discharge claim, Plaintiff cannot show that any of Crawford's pre-Settlement actions were due to her race or gender. Indeed, Crawford undisputedly received numerous complaints about Plaintiff's performance after becoming SED, and he did not receive similar complaints about other Chiefs. (Crawford Dec.¶¶ 5-7; Pl. Dep. 70:11-25).

F.3d 830, 836 (6th Cir. 1996) (rejecting as false syllogism reasoning that "A) my [supervisor] hates me; B) I am female; C) my [supervisor] hates me because I'm female."); Nichols v. Caroline Bd. of Educ., 123 F. Supp. 2d 320, 327 (D. Md. 2000) ("That [plaintiff] is African-American and that [her] superiors are [Caucasian] is hardly proof that their actions were racially motivated."). Since she has not shown any evidence to suggest that she was ever treated differently due to her race or gender, this Court should grant summary judgment on all her claims. See Knight, 330 F.3d at 1319.

**B.    Plaintiff Cannot Show Defendant's Reasons for Actions Are Pretext.**

This Court should also grant summary judgment on Plaintiff's claims because Defendant has articulated legitimate, non-discriminatory reasons for its actions that Plaintiff cannot show are pretext for discrimination. See Holifield, 115 F.3d at 1564-65. A defendant's articulation of legitimate, non-discriminatory reasons for its actions removes any presumption of discrimination created by a prima facie case. See Chapman v. AI Transport, 229 F.3d 1012, 1028 (11th Cir. 2000) (en banc). Once a defendant offers such reasons for its actions, a plaintiff can avoid summary judgment only by offering sufficient evidence for a reasonable jury to disbelieve the proffered reasons and conclude they were not what motivated the employer. See id. at 1024-1025; Watkins v. Sverdrup Tech., Inc., 153 F.3d 1308, 1316-17 & n. 8 (11th Cir. 1998); Combs, 106 F.3d at 1538.

Importantly, settled authority holds that courts are not to be used as super-personnel boards to second-guess employment decisions. See Combs, 106 F.3d at 1543; Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Instead, the sole inquiry at the pretext stage is whether the employer gave an honest explanation for its decision. See Chapman, 229 F.3d at 1030-1031; Elrod, 939 F.2d at 1470. See also Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) ("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole

concern is whether unlawful discriminatory animus motivates a challenged employment decision.");

Nix v. WLCY Radio/Rahall Communs., 738 F.2d 1181, 1187 (11th Cir. 1984) (an employer can

make a decision "for a good reason, a bad reason, a reason based on erroneous facts, or no reason

at all, as long as its action is not for a discriminatory reason."). The plaintiff must meet the proffered

reason head on and show that it was not what actually motivated the employer. See Chapman, 229

F.3d at 1030. As set forth below, Defendant has articulated legitimate, non-discriminatory reasons

for all its challenged actions and Plaintiff has no evidence that they are false.

Defendant explained that Plaintiff's laptop was reassigned because the FSA office was

having trouble with the computer used by an employee to input time and attendance, the office had

no spare computers, Plaintiff was on leave, and no one expected her to come to work to use her

laptop. (Crawford Dep. 155:16-156:4; Crawford Dec ¶ 13; Williams Dec. ¶¶ 6-8; Reynolds Dec.

¶¶ 4-8). The password was not intentionally deactivated. (Crawford Dec. ¶ 13; Reynolds Dec.¶¶

4-6). Plaintiff may disagree with this resource allocation and argue that her computer should have

been left collecting dust during her leave, but her disagreement with this business decision does not

show pretext. See Brown v. American Honda Motor Co., 939 F.2d 946, 951 (11th Cir. 1991) ("the

court's responsibility [is] not to second guess the wisdom of [an employer's] reasoning, but to

determine if the reasons given were merely a cover for a discriminatory intent.").

Defendant explained that Crawford sent a memorandum to FSA employees advising them

that Plaintiff had been detailed and naming an acting chief because he believed it was necessary for

field employees to know that Plaintiff would be absent and to provide a new contact for them.

(Crawford Dec. ¶ 15). Furthermore, he believed the memorandum accurately described what

happened, in that Plaintiff had been detailed from the State Office to the OCR, and had no negative

- 38 -

connotations. (Crawford Dec. ¶ 15). Crawford chose Knotts as acting chief based on his assessment of Knott's past experience. (Crawford Dec. ¶ 15). Plaintiff cannot show that these reasons are false. Moreover, the wording of the memorandum and the selection of an acting chief during her absence are business decisions that cannot be second-guessed merely because an employee would have handled things differently. See also Rojas, 285 F.3d at 1342 ("This kind of inquiry – whether a business decision is wise or nice or accurate – is precluded...").

Defendant has also provided legitimate, non-discriminatory reasons for its handling of Plaintiff's "achieved" PWP pursuant to the Settlement Agreement. Williams, as Crawford's Executive Assistant, was assigned the responsibility of ensuring that the Agreement was carried out, and she signed the document for him with his authority in his absence. (Williams Dec. ¶¶ 1-3; Crawford Dec. ¶ 12; Crawford Dep. 130:7-131:8). Williams asked Bennett to hand-deliver the PWP to Plaintiff because she thought that would be the most confidential way to deliver such a document. (Williams Dec. ¶ 5). Plaintiff cannot show that these reasons are false. While Plaintiff may have preferred the PWP to be signed by Crawford personally and the envelope sealed, her opinions about how Defendant carries out administrative duties are irrelevant. See Rojas, 285 F.3d at 1342.

Defendant also provided legitimate, non-discriminatory reasons why Plaintiff's request to attend the 2002 BIG Conference at government expense was denied. Crawford based his selection decision on the seniority and past attendance of those employees who expressed interest in attending the BIG Conference in 2002, and applied these criteria equally. (Crawford Dec. ¶¶ 16-17; Zeigler Dec. ¶¶ 6-10). Plaintiff had attended the 2001 BIG Conference, and Crawford selected the most senior employees who expressed interest in attending who had not previously attended a BIG conference. (Crawford Dep. 147:17-23; Crawford Dec. ¶¶ 16-17; Zeigler Dec. ¶¶ 6-10, Exs. B, C).

- 39 -

While Plaintiff may have applied different criteria if she were making the selection decision and given herself the privilege of attending the conference every year to the exclusion of anyone else, her self-centered second-guessing of the applied criteria does not show pretext. Indeed, the Eleventh Circuit has held that an employer is entitled to select the criteria for its decisions, and that "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer." See Combs, 106 F.3d at 1543. See also Brown, 939 F.2d at 951 (noting an employer can make a decision for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as it [] is not for a discriminatory reason.").

Finally, Defendant provided explanations for the few acts that Plaintiff challenged after her agreed-upon, one-year detail ended and she returned to her Chief position in January 2003.[44] Plaintiff claims that Crawford did not do enough to welcome her back, did not tell her about two farm loan meetings where NAP was discussed, and that she only received one phone call from county offices. (Pl. Dep. 263:7-273:25). Crawford explained that he was exceptionally busy during the first two months of 2003 with meetings, including on Plaintiff's first days in the office, and he did not specifically ignore Plaintiff. (Crawford Dec. ¶¶ 21-22, Ex. E). Crawford did not tell anyone to exclude Plaintiff from any meetings or not to call her. (Crawford Dec. ¶¶ 21-23). Plaintiff has no evidence that Crawford's reasons for any actions are false.[45] See Dale, 497 F. Supp. 2d at 1345.

---

[44]Crawford also explained that he denied Plaintiff's end-of-detail request to work at a satellite location because he believed the Chief needed to be present in the State Office to supervise her staff, and he denied her alternative request for indefinite sick leave (which no one else had ever requested) because she did not provide a doctor's note. (Crawford Dec. ¶ 19; Williams Dec. ¶ 10).

[45]Furthermore, even if this Court was to consider conduct barred by the Settlement Agreement when analyzing Plaintiff's constructive discharge claim, Crawford has explained that he

**IV.    Plaintiff's Retaliation Claims Fail as a Matter of Law.**

Even assuming <u>arguendo</u> they were all properly exhausted, Defendant is entitled to summary judgment on Plaintiff's retaliation claims because she cannot establish a <u>prima</u> <u>facie</u> case or show pretext.  To establish a <u>prima</u> <u>facie</u> case of retaliation, a plaintiff must show that:  (1) she engaged in protected activity; (2) she suffered an adverse action; and (3) there was a causal relation between the protected activity and the adverse action.  <u>See</u> <u>Weeks v. Harden Man. Corp.</u>, 291 F.3d 1307, 1311 (11th Cir. 2002).  Once Defendant offers a legitimate, non-discriminatory reason for its actions, she can survive summary judgment only by showing that the proffered reasons are pretext.  <u>See</u> <u>Watkins</u>, 153 F.3d at 1316.  Plaintiff bases her retaliation claims on the same acts as her discrimination claims.  (Comp. ¶¶ 11-14, 18-22, 25 ; Pl. Dep. 194:7-11, 208:13-17, 223:17-24, 232:4-8, 254:1-7, 279:1-4.)  She cannot show that she suffered any adverse action, that anything she endured was causally related to an EEO complaint, or that Defendant's legitimate, non-discriminatory reasons are pretext.

**A.    Plaintiff Suffered No Adverse Actions.**

**1.    No Adverse Acts in Paragraphs 11, 13-14 and 18-22 of Complaint.**

Plaintiff's retaliation claim fails as a matter of law because she cannot show that she endured any adverse action.  The Supreme Court has held that the adverse action element of a retaliation claim is not limited to merely conduct that affects the terms and conditions of a plaintiff's employment.  <u>See</u> <u>Burlington N. & Sante Fe Ry. Co. v. White</u>, 126 S.Ct. 2405, 2415 (2006).  Instead, to constitute an adverse action in a retaliation claim, a "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means

---

gave Plaintiff the expunged "not achieved" PWP and OTI because he received numerous complaints about Plaintiff's performance. (Crawford Dec.¶¶ 5-7; Crawford Dep. 98:7-19, 102:17-22, 105:16-106:8).  Plaintiff has no evidence that he did not receive such complaints. (Pl. Dep. 70:3-25).

it well might have dissuaded a reasonable worker from making ... a charge of discrimination." <u>See</u> <u>id</u>. at 2415. The Supreme Court stated that this objective standard recognizes that Title VII's anti-retaliation provision only protects employees from <u>material</u> "injury or harm" and does not "immunize" an employee "from those petty slights and minor annoyances that often take place at work and that all workers experience." <u>See id</u>. at 2414-15. Courts applying this objective standard to employment-related conduct have generally concluded that those acts that are not materially adverse for a discrimination claim are also not materially adverse for a retaliation claim. <u>See, e.g.,</u> <u>Cain v. Geren</u>, 2008 U.S. App. LEXIS 352, *3-5 (11th Cir. Jan. 7, 2008) (no adverse action under <u>Burlington</u> when performance review did not affect employee's ability to receive promotion, raise, or other benefit and thus reasonable employee would not have been dissuaded); <u>Higgins v. Gonzales</u>, 481 F.3d 578, 590-591(8th Cir. 2007) (failure of supervisor to provide mentoring and adequate supervision, absent negative affect on employment, not adverse under <u>Burlington</u>); <u>Bussell v.</u> <u>Motorola, Inc.,</u> 228 Fed. Appx. 832, 832 (11th Cir. 2006) (per curiam); <u>Reis v. Universal City Dev.</u> <u>Partners, LTD.,</u> 442 F. Supp. 2d 1238, 1253 (M.D. Fla. 2006). <u>See also</u> <u>Deprado v. City of Miami</u>, 2008 U.S. App. LEXIS 2474, at *7-8, n.1 (11th Cir Feb. 1, 2008) ("<u>Burlington</u> has little bearing here since [plaintiff] did not allege any non-employment related adverse acts").

For the reasons discussed in section III(A)(1), <u>supra</u>, the actions Plaintiff challenges in this lawsuit were not materially adverse. In short, Plaintiff suffered no material harm when Defendant removed her computer and deactivated her password while she was on leave, sent out a memorandum indicating she "had been detailed" and designating an acting chief, delivered an "achieved" PWP with Crawford's name signed by Williams in an unsealed envelope, and denied her request to attend an optional BIG Conference at government expense. (Comp. ¶¶ 11-13, 18-22).

- 42 -

Accordingly, none of these trivial inconveniences, either alone or collectively, would have dissuaded a reasonable person from filing a charge of discrimination. See Clegg, 496 F.3d at 929 (denial of request to attend training session would not have dissuaded reasonable employee from engaging in protected activities); Byrd v. Auburn Univ. at Montgomery, 2007 U.S. Dist. LEXIS 28411, at *46 (M.D. Ala. April 17, 2007) (being treated with hostility and criticized by supervisor and receiving hostile emails and directives were nothing more than "petty slights" and "minor inconveniences" that would not have dissuaded a reasonable person from filing complaint). See also Toland, 2007 U.S. Dist. LEXIS 42153, at *23-24 (removal of computer, making tasks more difficult, time-consuming, and frustrating, would not dissuade reasonable worker from making complaint); Baker, 2007 U.S. Dist. LEXIS 26795, at 21-22 (denial of training not materially adverse action for retaliation claim).

　　　The fact that none of these actions was materially adverse for purposes of a retaliation claim is further bolstered because Plaintiff filed multiple EEO complaints in 2002 and 2003 after every act that she now contends in this lawsuit was an adverse action. (Pl. Dep. Exs. 32, 35, 45, 46, 47). The Eleventh Circuit has taken into account whether a plaintiff actually filed subsequent EEO complaints when deciding whether a challenged act was materially adverse enough to have dissuaded a reasonable person from pursuing Title VII remedies. See Bush v. Regis Corp., 2007 U.S. App. LEXIS 28210, at *7 (11th Cir. Dec. 3, 2007) (noting plaintiff had not been deterred from filing a charge of discrimination due to two written reprimands when concluding those acts were not materially adverse actions for purpose of a retaliation claim); DeHart v. Baker Hughes Oilfield Operations, Inc., 214 Fed. Appx. 437, 442 (5th Cir. 2007). See also Baloch v. Norton, 517 F. Supp. 2d 345, 356-358 (D.D.C. 2007) (holding plaintiff's filing of administrative complaints after alleged retaliation indicated alleged retaliation was not materially adverse action since it did not dissuade

- 43 -

him from exercising rights). For this reason alone, Plaintiff cannot show that she suffered any materially adverse actions, and her retaliation claims all fail as a matter of law. See Bush, 2007 U.S. App. LEXIS 28210, at *7; DeHart, 214 Fed. Appx. at 442; Baloch, 517 F. Supp. 2d at 356-358.

## 2. Plaintiff's Retirement Was Not An Adverse Action (Comp. ¶ 25).

Plaintiff also cannot show that her voluntary retirement was an adverse action. The rigorous standard necessary to show a constructive discharge is the same under either a discrimination or retaliation theory. See Carpenter v. Con-Way Central Express, Inc., 481 F.3d 611, 618-619 (8th Cir. 2007); Thomas v. Atmos Energy Corp., 223 Fed. Appx. 369, 376 n.2 (5th Cir. 2007); Pittman v. Marshall, 2007 U.S. Dist. Lexis 77591, at *23-29 (M.D. Ala. Oct. 18, 2007) (Watkins, J.). As discussed supra in section III(A)(1)(b), Plaintiff did not suffer a constructive discharge because she cannot show that she endured an environment that was so intolerable that a reasonable person would have been compelled to resign. See Fitz, 348 F.3d at 977; Hipp, 252 F.3d at 1233. Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliatory "forced retirement" claim.

## B. Plaintiff Cannot Show Causation.

Some of Plaintiff's retaliation claims fail for the additional reason that she cannot establish a causal connection. See Gupta, 212 F.3d at 590. To demonstrate the requisite causal connection, a plaintiff must show that "the decision-makers [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated." See id. To suggest that a protected activity and an alleged adverse action are not completely unrelated, a plaintiff must show that a decision maker had "knowledge of the protected expression" and that there was "a close temporal proximity between this awareness and the adverse ... action." See Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004). When there is a large passage of time between a protected activity

- 44 -

and a challenged action it negates any inference of causation. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). In short, Plaintiff cannot automatically establish a prima facie case of retaliation simply because at some point she filed an EEO complaint. Cf. Jackson v. Joseph State Hosp., 840 F.2d 1387, 1391 (8th Cir. 1988) ("Title VII protection from retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct in dealing with subordinates and with his peers.").

As an initial matter, the large passage of time between some of Plaintiff's EEO complaints and the challenged actions negates any suggestion of causation. Plaintiff claims the removal of her laptop, password deactivation, issuance of a "has been detailed" memorandum, and designation of an acting chief were retaliatory, but these acts took place approximately three months after Plaintiff's first complaint. (Pl. Dep. 202:5-14, Ex. 8). Plaintiff also claims that events that occurred after she returned from her detail leading up to her decision to retire were retaliatory, but when Plaintiff returned from her detail more than six months had passed since her last EEO complaint. (Pl. Dep., Ex. 45). The passage of more than three-months negates any inference of causation. See Clark County School District v. Breeden, 532 U.S. 268, 273 (2001)(citing with approval cases in which 3-4 months was too long to show causation); Thomas, 506 F.3d at 1364 (3-month gap between complaint and alleged retaliation did not allow inference of causation); Higdon, 393 F.3d at 1220.

Furthermore, Plaintiff cannot show a causal connection in relation to her claim that her request to attend the BIG conference in 2002 was denied because she was treated the same as employees who had not filed EEO complaints. The Eleventh Circuit has recognized that "[i]t is difficult to hold that a practice which affects applicants of all [protected characteristics] in the same manner is actually designed to conceal a ...discriminatory motive." See Brown, 939 F.2d at 951;

- 45 -

Smith, 64 F. Supp. 2d at 1223. In this case, Plaintiff and Lane both attended the BIG Conference in 2001 and both requested to attend in 2002. (Pl. Dep.49:2-19; Lane Dec. ¶¶ 4-5). Both requests were denied. (Zeigler Dec. ¶¶ 9-10). Plaintiff had filed an EEO complaint, while Lane had never filed one. (Pl. Dep., Ex. 8; Lane Dec. ¶ 3). Accordingly, Plaintiff cannot show that Crawford's decision, which affected all applicants equally regardless of past EEO complaints, had anything to do with her EEO complaints. See Brown, 939 F.2d at 951; Smith, 64 F. Supp.2d at 1223. See also McAlinden v. County of San Diego, 192 F.3d 1226, 1239 (1999), amended 201 F.3d 1211 (9th Cir. 2000) (no causality when employer treated plaintiff same as all other employees).

### C.    Plaintiff Cannot Show Pretext.

Finally, Plaintiff's retaliation claims fail as matter of law because she cannot show that Defendant's legitimate, non-discriminatory reasons for its actions are pretext. See Holifield, 115 F.3d at 1566. Since Plaintiff bases her retaliation claims on the same conduct that supports her disparate treatment claims, Defendant is entitled to summary judgment for the same reasons that those claims must fail. (Pl. Dep. 194:7-11, 208, 13-17, 223:17-24, 232:4-8, 254:1-7, 279:1-4; Comp. ¶¶ 11-14, 18-22, 25 ). Specifically, as discussed supra, Plaintiff cannot show that Defendant's legitimate, non-discriminatory reasons for its actions are false. For this reason alone, this Court should grant summary judgment on all Plaintiff's retaliation claims. See Holifield, 115 F.3d at 1566; Gaddis v. Russell Corp., 242 F. Supp. 2d 1123, 1144-1150 (M.D. Ala. 2003).

### CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant this Motion for Summary Judgment and enter an appropriate Order dismissing this action with prejudice.

Respectfully submitted this 4th day of March, 2008.

LEURA G. CANARY
United States Attorney

By:

JAMES J. DUBOIS
Assistant United States Attorney
Georgia Bar No. 231445
United States Attorney's Office
Post Office Box 197
Montgomery, AL 36101-0197
Telephone: (334) 223-7280
Facsimile: (334) 223-7418
E-mail: james.dubois2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2008, I filed the foregoing with the Clerk of the Court

and I hereby certify that I have mailed, by United States Postal Service, a copy of same to the

following:

Collins Pettaway, Jr., Esquire
Chestnut, Sanders, Sanders,
Pettaway & Campbell, P.C.
P.O. Box 1290
Selma, Alabama 36702-1290

Assistant United States Attorney

- 47 -