OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF  OZETTA THOMAS

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


OZETTA THOMAS,

     Plaintiff,

vs.                                    CASE NO. 05-CV-411

MIKE JOHANNS, Secretary,
Pine States Department
of Agriculture, Farm
Service, (FSA)

     Defendant.



         * * * * * * * * * *


     DEPOSITION OF OZETTA CAVER THOMAS, taken

pursuant to stipulation and agreement before Wendy

Lewis, Court Reporter and Commissioner for the State

of Alabama at Large, in the Law Offices of Chestnut,

Sanders, Sanders, Pettaway, Campbell & Albright, One

Union Street, Selma, Alabama, on Thursday, November

29, 2007, commencing at 9:31 a.m.



         * * * * * * * * * *

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF  OZETTA THOMAS

2 (Pages 2 to 5)

---

**Page 2**

```
 1              APPEARANCES
 2   FOR THE PLAINTIFF:
 3   Mr. Collins Pettaway
     CHESTNUT, SANDERS, SANDERS,
 4   PETTAWAY, CAMPBELL & ALBRIGHT
     Attorneys at Law
 5   One Union Street
     Selma, Alabama 36702
 6
     FOR THE DEFENDANT:
 7
     Mr. James J. DuBois
 8   Assistant United States Attorney
     UNITED STATES DEPARTMENT OF JUSTICE
 9   FOR THE MIDDLE DISTRICT OF ALABAMA
     131 Clayton Street
10   Montgomery, Alabama 36104
11   Mr. Craig G. Cornwell
     Assistant Regional Counsel
12   PINE STATES DEPARTMENT OF AGRICULTURE
     4121 Carmichael Road, Suite 205
13   Montgomery, Alabama 36106
14          * * * * * * * * * *
15         EXAMINATION INDEX
16   OZETTA CAVER THOMAS
       BY MR. DUBOIS         3
17
18          * * * * * * * * * *
19         STIPULATIONS
          It is hereby stipulated and agreed by and
     between counsel representing the parties that the
22   deposition of OZETTA CAVER THOMAS is taken pursuant to
23   the Federal Rules of Civil Procedure and that said
24   deposition may be taken before Wendy Lewis, Court
25   Reporter and Commissioner for the State of Alabama at
```

---

**Page 3**

```
 1   Large, without the formality of a commission; that
 2   objections to questions other than objections as to
 3   the form of the questions need not be made at this
 4   time but may be reserved for a ruling at such time as
 5   the deposition may be offered in evidence or used for
 6   any other purpose as provided for by the Federal Rules
 7   of Civil Procedure.
 8          It is further stipulated and agreed by and
 9   between counsel representing the parties in this case
10   that said deposition may be introduced at the trial of
11   this case or used in any manner by either party hereto
12   provided for by the Federal Rules of Civil Procedure.
13          * * * * * * * * * *
14      MR. DuBOIS: Would she like to read and sign?
15      MR. PETTAWAY: Yes, do that. We'll read and
16   sign it.
17         OZETTA CAVER THOMAS
18      The witness, first having been affirmed to
19   speak the truth, the whole truth and nothing but the
20   truth, testified as follows:
21         EXAMINATION
22   BY MR. DuBOIS:
23      Q.  Ms. Thomas, please state and spell your full
24   name for the record.
25      A.  My name is Ozetta C. Thomas. O-Z-E-T-T-A, C.
```

---

**Page 4**

```
 1   T-H-O-M-A-S.
 2      Q.  And does the C. stand for anything?
 3      A.  Caver.  My maiden name.
 4      Q.  Ms. Thomas, we met a few minutes ago.  My
 5   name is Jim DuBois, and I'm the Assistant U.S.
 6   Attorney representing the defendant in the lawsuit you
 7   have filed against the Secretary of Agriculture.  I'll
 8   be asking you some questions about your lawsuit
 9   today.
10      If at any point you don't understand my question
11   or you don't -- I don't speak loud enough, please let
12   me know; and I'll rephrase them or restate them.  Is
13   that okay?
14      A.  That's fine.
15      Q.  If you don't let me know that you don't
16   understand them, I will assume you do understand
17   them.  Okay?
18      A.  Okay.
19      Q.  At the same time, when I'm asking the
20   questions, I ask you to answer them in a yes or no, if
21   it's a question that can be answered with a yes or a
22   no, instead of shaking your head; because the court
23   reporter wants to accurately get down the answers.  As
24   a corollary to that, when I'm asking a question,
25   please wait until I finish the question before you
```

---

**Page 5**

```
 1   start answering so we don't speak over each other.  Is
 2   that all right?
 3      A.  Sure.
 4      Q.  And this is not supposed to be any type of
 5   endurance contest or anything.  I usually take a break
 6   every hour, hour and a half; but if at any point you
 7   need a break, let me know and I'll find a convenient
 8   place to stop.  The only thing I ask is that if I have
 9   a question pending, you answer the question before we
10   take a break.  Is that okay?
11      A.  Sure.  That's fine.
12      Q.  And do you understand you're giving testimony
13   today under oath and that the penalties of perjury
14   apply?
15      A.  Yes, I do.
16      Q.  Are you aware of any reason that you would
17   not be able to give me complete and honest answers to
18   the questions I'm asking?
19      A.  I have no reasons to believe that I would
20   not.
21      Q.  Are you taking any medication this morning?
22      A.  No.
23      Q.  And besides this lawsuit that we're talking
24   about today, have you been a party, meaning a
25   plaintiff or a defendant, in any other lawsuit?
```

OZETTA THOMAS v. MIKE JOHANNS                          11/29/2007
DEPOSITION OF  OZETTA THOMAS

3 (Pages 6 to 9)

Page 6

1     A.  No.
2     Q.  Have you been a witness, meaning someone who
3  provided testimony, in another lawsuit?
4     A.  No.
5     Q.  Have you ever been deposed before?
6     A.  No.
7     Q.  Now, I know that you testified under oath at
8  an administrative hearing on May 23rd, 2006, regarding
9  the EEO claim you have regarding, I guess, a
10  nonselection to a program complaint specialist
11  position; is that right?
12     A.  That's correct.
13     Q.  That nonselection is not part of this
14  lawsuit; is that correct?
15     A.  No, it is not.
16     Q.  Now, other than that one time when you
17  testified at that administrative hearing, have you
18  ever testified under oath before at any other
19  hearings?
20     A.  Any hearings or any EEO hearings?
21     Q.  Any EEO hearings.
2     A.  No.
23     Q.  Have you ever given an affidavit, meaning a
24  signed statement, to anyone for use in an EEO
25  proceeding?

Page 7

1     A.  Yes.
2     Q.  Who have you given affidavits to?
3     A.  To the investigator of this complaint here.
4     Q.  How about besides in your EEO complaints,
5  have you given EEO -- any affidavits to other EEO
6  investigators?
7     A.  Yes, I have.
8     Q.  To whom have you given affidavits to?
9     A.  It was to the attorney. I don't recall his
10  name, but it was for a complaint filed by Daniel
11  Robinson.
12     Q.  Do you know approximately when that was?
13     A.  I don't recall the exact time.
14     Q.  Was that after Mr. Robinson left his SED
15  position?
16     A.  Yes.
17     Q.  Besides that affidavit, have you given any
18  other statements or affidavits for use in other EEO
19  proceedings?
)     A.  Yes.
21     Q.  Can you tell me the next one you remember?
2     A.  The next one was for my former employer --
23  employee, Sharrie Peterson.
24     Q.  All right. And when was that?
25     A.  I don't recall.

Page 8

1     Q.  Approximately?
2     A.  It was after I was forced to retire. I
3  believe the next year.
4     Q.  Besides those two, any other ones?
5     A.  No.
6     Q.  Have you ever declared bankruptcy?
7     A.  No.
8     Q.  And have you ever been convicted of a crime
9  other than a minor traffic offense?
10     A.  No.
11     Q.  Ever been arrested or charged with any crime
12  other than a minor traffic offense?
13     A.  No.
14     Q.  Did you review any documents in preparation
15  for your deposition today?
16     A.  Yes.
17     Q.  Can you tell me what documents you reviewed?
18     A.  I reviewed my ROI and my Plaintiff's Answers
19  to Defendant's First Interrogatories.
20     Q.  So you reviewed the ROI file related to your
21  EEO complaints and your responses to interrogatories
22  that were served in this lawsuit?
23     A.  Yes.
24     Q.  Any other documents you reviewed?
25     A.  No.

Page 9

1     Q.  Have you provided to your attorney all the
2  documents you believe relate to your claim?
3     A.  Yes.
4     Q.  Do you keep any journal, diary, or daily
5  planner, or did you keep any journal, diary, or
6  calendar, daily planner, anything like that, when you
7  were employed by USDA?
8     A.  Yes.
9     Q.  Did you make any notes in that -- what kind
10  of -- what -- strike that.
11     What was it? A journal? Diary? Daily planner?
12     A.  It was just a daily record of incidents.
13     Q.  All right. Did you write anything in that
14  journal or daily record about the allegations in your
15  EEO complaints?
16     A.  Yes.
17     Q.  Do you still have a copy of that today?
18     A.  Yes.
19     Q.  Have you provided that to your attorney?
20     A.  Yes.
21     MR. DuBOIS: Has that been produced?
22     MR. PETTAWAY: I don't know.
23     A.  It's in the ROI. It's a chronology of
24  incidents.
25     Q.  So it's a document that --

OZETTA THOMAS v. MIKE JOHANNS                              11/29/2007
DEPOSITION OF  OZETTA THOMAS

4  (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|

Page 10

1     A.  Leading up to the complaints.
2     Q.  I guess you provided that to the EEO
3  investigator, then?
4     A.  I did.
5     Q.  And so is every note or document you have
6  containing notes regarding any allegations involving
7  your EEO complaint, has it been turned over to the EEO
8  investigators and it's in the ROIs?
9     A.  Yes.
10    Q.  Did you talk to anyone besides your attorney
11  in getting ready for your deposition today?
12    A.  No.
13    Q.  Now, since you filed your EEO complaints,
14  have you sent any emails to anyone relating to the
15  allegations in your EEO complaints?
16    A.  No.
17    Q.  Did you send any emails from your home
18  address to anyone relating to any of the allegations
19  in this lawsuit?
20    A.  Not that's not included in the ROI.
21    Q.  So everything you have, you've --
22    A.  Everything I have done is in the ROI.
23    Q.  All right.  Now, what is your date of birth?
24    A.  November 13th, 1947.
25    Q.  And where were you born?

Page 11

1     A.  In Autauga County, Autaugaville, Alabama.
2     Q.  Do you have any nicknames or aliases --
3     A.  Yes.
4     Q.  -- you go by?  What are they?
5     A.  Zett.
6     Q.  Zett?  And how do you spell that?
7     A.  Z-E-T-T.
8     Q.  And earlier I think, I believe, your maiden
9  name was --
10    A.  Caver.
11    Q.  Have you been known by any other name
12  besides, I guess, that nickname Zett and Caver?
13    A.  No.
14    Q.  Did you ever go by Zett at work, or is that a
15  family nickname?
16    A.  Some of my coworkers would call me Zett
17  occasionally.
18    Q.  And are you still living at 2629 Highway 14
19  East, Selma, Alabama?
20    A.  Yes.
21    Q.  How long have you lived at that address?
22    A.  33 years.
23    Q.  And do you own or rent?
24    A.  Own.
25    Q.  Does anyone share that house with you?

Page 12

1     A.  No.
2     Q.  And are you currently married?
3     A.  Divorced.
4     Q.  When -- start with that.  When did you get
5  married to begin with?
6     A.  November 1968.
7     Q.  And what was your former spouse's name?
8     A.  Clifton L. Thomas, Jr.
9     Q.  When did you get divorced?
10    A.  1992.
11    Q.  Does your former spouse -- where does he
12  live?
13    A.  He's deceased.
14    Q.  Did you have any children?
15    A.  Yes.
16    Q.  And how old are your children?
17    A.  36 and 32.
18    Q.  Do either of them live in Alabama?
19    A.  Yes.
20    Q.  Where about?  Let's start with the one that's
21  36.  What's --
22    A.  36.  Lives here in Selma, Alabama.
23    Q.  How about the one that's 32?
24    A.  He lives in Columbus, Georgia.
25    Q.  What's the name of the one who lives in

Page 13

1  Selma, Alabama?
2     A.  Daryl.
3     Q.  Daryl?
4     A.  D-A-R-Y-L.
5     Q.  Where is he employed in Selma, Alabama?
6     A.  He's employed with Rural Health.
7     Q.  All right.  Do you have any relatives,
8  meaning parents, in-laws, cousins, siblings, nieces,
9  nephews, who live in Alabama besides your children you
10  told me about?
11    A.  Yes.
12    Q.  All right.  Do you have parents living here
13  in Alabama?
14    A.  No.  I have siblings.
15    Q.  Siblings.  How many siblings?
16    A.  Three here in Alabama.
17    Q.  Do they live in Selma?
18    A.  Yes.
19       MR. PETTAWAY:  Let me ask you something.
20  Well, go ahead with your question.  I was just trying
21  to find out the nature of all of that, whether you
22  were trying to find out folks who might be potential
23  jurors.
24       MR. DuBOIS:  That's part of it, and part of
25  it is just background.  But if they live in Selma, I'm

OZETTA THOMAS v. MIKE JOHANNS                                    11/29/2007
DEPOSITION OF  OZETTA THOMAS

5 (Pages 14 to 17)

Page 14

1  not interested.  What I want to know is if they live
2  in the Middle District.
3      Q.  So do any of your siblings live in -- they're
4  all in Selma, you said?
5      A.  They're all in Selma.
6      Q.  Now, do you belong to any social clubs or
7  organizations or churches?
8      A.  Yes.
9      Q.  Any of them in Montgomery?
10     A.  No.
11     Q.  Do you still have any friends who are current
12  USDA employees that you communicate with?
13     A.  Yes.
14     Q.  And who is that?
15     A.  I communicate with one, Vicki Anthony, that's
16  still employed.
17     Q.  How do you generally communicate with her?
18  Email, telephone, or in person?
19     A.  We exchange emails and general telephone
20  conversation occasionally.
21     Q.  When was the last time you spoke with her?
2      A.  About -- I'm not sure of the date, but it's
23  been more than two months ago.
24     Q.  Do you ever -- does the issue of your lawsuit
25  or any of your EEO complaints ever come up with her?

Page 15

1      A.  No.
2      Q.  All right.  Besides Ms. Anthony, are there
3  any other friends or current employees of USDA that
4  you regularly communicate with?
5      A.  No.
6      Q.  How about former USDA employees that you
7  regularly communicate with?  Are there any of them?
8      A.  Yes.
9      Q.  Who are they?
10     A.  Daniel Robinson.
11     Q.  All right.  How often do you speak to
12  Mr. Robinson or communicate with him?
13     A.  Once weekly, maybe sometimes twice during the
14  week.  We remain friends.
15     Q.  Is that generally by telephone or email?
16     A.  Telephone.
17     Q.  And does --
18     A.  And we exchange emails, too.
19     Q.  Does the subject of your lawsuit or your EEO
20  complaints ever come up with him?
21     A.  No.
2      Q.  All right.  Any other former USDA employee
23  besides Mr. Robinson?
24     A.  No.
25     Q.  I'm going to ask you a little bit about your

Page 16

1  education and employment history.  And to help us
2  speed that up, I've marked as Defendant's Exhibit #1 a
3  document.  Can you look at that and tell me if you
4  recognize it?
5      A.  Yes.
6      Q.  And this is a copy of I guess a resume that
7  you prepared after you left your employment with USDA;
8  is that correct?
9      A.  Yes.
10     Q.  All right.  I want to move first to your
11  education.  Turn to the second page.  You attended
12  Autauga County High School; is that correct?
13     A.  Yes.
14     Q.  And you graduated in 1965?
15     A.  Yes.
16     Q.  And then you have Wallace Community College.
17  Did you graduate from Wallace Community College?
18     A.  No.
19     Q.  How many classes or how many credit hours did
20  you complete there?
21     A.  It was just the clerical classes and typing
22  and shorthand, filing.  So there were no credit hours.
23     Q.  Besides the classes you attended at Wallace
24  Community College, have you attended any other post
25  high school, I guess college level classes, or

Page 17

1  attended any classes at a college?
2      A.  No.
3      Q.  Have you ever served in the military?
4      A.  No.
5      Q.  All right.  Now, turning to the first page of
6  your resume, which is marked as Defendant's Exhibit
7  #1 -- let's see.  The first job you have listed here
8  starts in 1968.  Is that the first job you held with
9  USDA?
10     A.  Yes.
11     Q.  All right.  And what was that job, if you can
12  tell me?  What was it called and what were your
13  general duties?
14     A.  I was hired as a planimeter operator.
15     Q.  And what --
16     A.  That's an instrument where you measure acres
17  of land on an aerial photograph.
18     Q.  And is that generally what you did in your
19  daily duties, measure the acreage using that?
20     A.  Yes.  Until I was promoted on up to clerk.
21     Q.  At what point were you promoted to clerk?
22     A.  I don't recall.
23     Q.  And who was your supervisor -- well, move
24  back.  When you were clerk, did you still work at the
25  same location, Dallas County ACCS -- ASCS?

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF  OZETTA THOMAS

6 (Pages 18 to 21)

---

Page 18

1    A.  Dallas County ASCS, yes.
2    Q.  And who was your supervisor when you worked
3  at that location?
4    A.  Sam O'Hara was my first supervisor.
5    Q.  All right.  Did your supervisor change when
6  you became clerk?
7    A.  He's the one that promoted me to clerk.
8    Q.  So he was a manager/supervisor?
9    A.  Yes.  But, now, I have others after him.
10    Q.  All right.  If you could just run through
11  them.
12    A.  Go through them?
13    Q.  Yeah.
14    A.  Okay.  After Sam O'Hara was Pat Chestnut.
15  And after Pat Chestnut was Winfred Greene.  After
16  Winfred Greene was Wanda Porter.  That was the last
17  one.
18    Q.  So those were the four supervisors you worked
19  under at the Dallas County location?
20    A.  ASCS, yes.
21    Q.  What was your reason for leaving that
22  position?
23    A.  I was promoted to program specialist position
24  in the state office in Montgomery.
25    Q.  And that's the second job listed in

---

Page 19

1  Defendant's Exhibit #1.  From 1986 to 1998, you held
2  that position?
3    A.  Yes.
4    Q.  Who was your supervisor when you started as a
5  program specialist?
6    A.  Daniel Robinson.
7    Q.  Had you known Mr. Robinson before that time?
8    A.  Yes.
9    Q.  How did you come to know him to begin with?
10    A.  When I was working in the Dallas County
11  office, he would come to Selma to do reviews.  This
12  was our first meeting.
13    Q.  And what was his position at the time when
14  you met him when you worked in Dallas County?
15    A.  I don't recall what his position was then.
16    Q.  And what was his position when he was your
17  supervisor when you were an agricultural program
18  specialist?
19    A.  Chief agricultural program specialist.
20    Q.  And can you tell me generally your duties you
21  had in that position?
22    A.  Yes.  My duties was to administer fund
23  programs to the 67 counties in the state of Alabama as
24  regulated by the national office.  And my duties were
25  in the Production Adjustment and Compliance Division

---

Page 20

1  in the program area.
2    Q.  And in that position, what would a typical
3  day be like, if you had a typical day?
4    A.  My typical day would be to answer all
5  telephone calls from the field regarding program
6  matters.
7    Q.  And these would be calls from what type of
8  individuals?
9    A.  From county employees in the counties within
10  the state.
11    Q.  And what kind of questions generally would
12  they be asking?
13    A.  Would be program matters.  If there were a
14  problem that existed or just if they did not
15  understand a particular program matter, I would assist
16  in giving them the answers to their questions and
17  carrying out the integrity of the programs.
18    Q.  Did you work closely with Mr. Robinson when
19  he was your chief?
20    A.  Yes.  I was his assistant.
21    Q.  At what point did you become his assistant?
22    A.  Here again, I don't recall the exact year.
23    Q.  Approximately.
24    A.  But it would have been early '70s.
25    Q.  Early '70s or early '90s?

---

Page 21

1    A.  I mean, yes, early '90s.
2    Q.  And at some point, did he make it where you
3  were acting chief in his absence?
4    A.  Yes.
5    Q.  Did you ever serve in that capacity?
6    A.  Yes.
7    Q.  How often would you do that?
8    A.  Anytime he was out of the office for any
9  reason, then I took the responsibilities of being
10  chief.
11    Q.  Was there a written designation that made you
12  acting chief?
13    A.  No, there were no written designation.
14    Q.  And what was your reason for leaving your
15  agricultural program specialist position?  This would
16  be in 1998.
17    A.  Oh.  I applied for a position with the Office
18  of Civil Rights, which was -- was a promotion.
19    Q.  And that was when David Winningham was
20  setting up the office here in Montgomery?  You applied
21  for one of the original --
22    A.  Yes.
23    Q.  -- spots in that office?
24    A.  Yes.
25    Q.  And was it a -- you said it was a promotion.

Page 22

1  Was it a higher GS level than what you were at?
2      A.  Yes.
3      Q.  Did you go to a GS13 position?
4      A.  Yes.
5      Q.  When you left your position as agricultural
6  program specialist, was there a party thrown for you
7  by the FSA employees?
8      A.  No.
9      Q.  You don't recall having lunch at a restaurant
10 and receiving some luggage?
11     A.  Oh, you mean when I went to Office of Civil
12 Rights?
13     Q.  Yes.
14     A.  Oh, yes.  Yes.  Excuse me.
15     Q.  Do you know who organized that party?
16     A.  My supervisor.
17     Q.  And who was -- that was Daniel Robinson?
18     A.  Daniel Robinson.
19     Q.  What restaurant was that?  Do you recall?
20     A.  I don't recall.
21     Q.  Do you recall who attended?
22     A.  Not everyone, but there were state office
23 employees that attended.
24     Q.  All right.  And you started in your position
25 at the Office of Civil Rights program complaint

Page 23

1  specialist in March 1998; is that right?
2      A.  Yes.
3      Q.  And who was your supervisor in that position?
4      A.  At that time, it was Mel Will.
5      Q.  And did you remain long enough in that job to
6  get an annual performance review?
7      A.  Yes.
8      Q.  When would you have gotten that review?
9      A.  October.
10     Q.  Do you recall what your rating was?
11     A.  Fully successful.
12     Q.  And what were your duties as a program
13 complaint specialist?
14     A.  It was to investigate complaints filed by
15 farmers in program areas.
16     Q.  What types of complaints?
17     A.  Civil rights complaints.
18     Q.  Did you enjoy the position?
19     A.  Very much so.
20     Q.  What was your reason for leaving in October
21 1998?
22     A.  My reason for leaving was because
23 Mr. Robinson had been appointed to state executive
24 director, and it was my desire to be the first
25 African-American female chief for Farm Service Agency.

Page 24

1      Q.  So I guess a vacancy announcement came out
2  and you applied for it?
3      A.  Yes.
4      Q.  Did Daniel Robinson ask you to apply?
5      A.  No.
6      Q.  Did anyone ask you to apply?
7      A.  No.
8      Q.  Do you know who else applied?
9      A.  Yes.
10     Q.  Who, to your knowledge?
11     A.  Two of my former coworkers.
12     Q.  And who would those be?
13     A.  Sharrie Peterson and Jeffrey Knotts.
14     Q.  I guess you were interviewed for the
15 position?
16     A.  Yes.
17     Q.  And eventually, you were offered it by
18 Mr. Robinson?
19     A.  Yes.
20     Q.  Now, would you have applied for that position
21 if Mr. Robinson had not been SED?
22     A.  Yes.
23     Q.  Did you feel like you had an inside track
24 because you knew him?
25     A.  No.

Page 25

1      Q.  Now, how would you describe for me the duties
2  when you became chief of the -- I guess the Program
3  Adjustment Compliance Division?
4      A.  Yes.
5      Q.  What were the general duties in that
6  position?
7      A.  The general duties were the same as I had as
8  program specialist with the additional duties of
9  supervisory.
10     Q.  Can you, I guess, explain the programs that
11 were under your supervision as chief and kind of list
12 them?
13     A.  Okay.  The programs was the AMTA programs,
14 where we administered funds to producers who had
15 program bases, like cotton, corn, soy; also had
16 Reconstitutions, where we reconstituted farms from
17 where there was a combination or either a division of
18 farms.  I had the Peanut Program, where we
19 administered the quota and the marketing of peanuts,
20 and tobacco.  I had Common Provisions, where we kept
21 up with updated name and address files; had the AFIDA
22 program, which is the program where land was owned by
23 foreign people.  And we had a disaster program or NAP
24 program.  All of that comes under disaster.  When
25 there were disasters on crops, we administered funds

OZETTA THOMAS v. MIKE JOHANNS                11/29/2007
DEPOSITION OF OZETTA THOMAS

8 (Pages 26 to 29)

Page 26

1    to producers who had losses on their crops due to
2    disasters.
3        Q.  All right.  And that included, you said, NAP,
4    which does that stand for Noninsured Assistance
5    Program?
6        A.  Noninsured Assistance Program, yes.
7        Q.  Did you also deal with something called
8    Payment Limitations?
9        A.  Yes.  Payment Limitations, where producers
10   could earn a certain amount.
11       Q.  Is there an area in any of these programs
12   that you specialized in when you were -- before you
13   became chief and you were just a -- I guess a program
14   specialist?  Did you specialize in any of these
15   programs, or did you just work in general in all of
16   them?
17       A.  Now, I -- before I became chief, I
18   specialized in Payment Limitation, Common Provisions,
19   AFIDA, and AMTA.
20       Q.  All right.  And AMTA is A-M-T-A?
21       A.  Yes.
22       Q.  And AFIDA, A-F-I-T-A?
23       A.  A-F-I-D-A.
24       Q.  Just to clarify the transcript there.
25       A.  Yes.

Page 27

1        Q.  How about when you became chief?  Did you
2    specialize in any particular programs?
3        A.  I worked in all pro -- all areas, all
4    programs, and assigned special to other employees.
5    And, of course, I worked in all of them.
6        Q.  And who did you supervise in that position?
7        A.  I -- by name?
8        Q.  Yes.
9        A.  I supervised Sharrie Peterson, Jeffrey
10   Knotts, Walda Messer, and Pamela Polke.
11       Q.  All right.  And what specialties did you
12   assign to each of these individuals?  Let's start with
13   Sharrie Peterson.  Did she have certain
14   responsibilities?
15       A.  Yes.  She had Reconstitutions, AMTA, Common
16   Provisions.  Jeffrey Knotts had Compliance.  Oh, I
17   failed to mention that one for me, too.  Compliance.
18       Q.  Compliance is one that you had worked in?
19       A.  Yes.
20       Q.  When you were -- before you became chief?
21       A.  Yes.
22       Q.  So he was assigned Compliance?
23       A.  Yes.
24       Q.  What was Walda Messer?
25       A.  Walda was assigned the Disaster and NAP.

Page 28

1        Q.  Did Jeff Knotts ever do any NAP work?
2        A.  Yes.  He assisted, yes.
3        Q.  And how about Peanuts and Tobacco?  Was that
4    Sharrie Peterson?
5        A.  Sharrie Peterson, yes.
6        Q.  And what did it mean when a program was
7    assigned to a specialist?
8        A.  Excuse me?  I didn't understand.
9        Q.  What does it mean when you, I guess, gave
10   some programs to a specialist to, I guess, be their
11   area to work in?
12       A.  It meant that particular person would
13   specialize in that particular program but have general
14   knowledge of all programs; but if there was a question
15   on the particular program, they knew what specialists
16   were the -- the specialist that was specialized in
17   that area to answer any calls that may come in.
18       Q.  When you say "they" would know, that the
19   county employees would know who to call?
20       A.  Yes.  Yes.
21       Q.  How was that, I guess, broadcasted or made
22   known to the county employees as to who to call for
23   certain specialities?
24       A.  Any time we had training meetings, we would
25   always inform the counties who to call for particular

Page 29

1    programs.  And for the Payment Limitation Program I
2    didn't assign that to any other employee.
3        Q.  So if phone calls came in on Payment
4    Limitation --
5        A.  Payment Limitation.
6        Q.  -- that would be directed to you?
7        A.  Yes.
8        Q.  Did you ever answer questions on the other
9    subject areas besides Payment Limitations?
10       A.  Yes.
11       Q.  And how would those find a way to you?  Would
12   the county employees call you directly, or would they
13   call and the employee they're calling would not be
14   there and then be transferred to you?
15       A.  Yes.  They would call the particular
16   specialist in that area.  And, of course, if that
17   specialist is not there, the call would be transferred
18   to the chief.
19       Q.  When you worked for Daniel Robinson, did he
20   have a specialty as chief, an area that he focused on
21   more than others?
22       A.  Daniel was an expert in all those areas.
23       Q.  There was no area that he --
24       A.  No.  He assigned.
25       Q.  -- focused on?

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF  OZETTA THOMAS

9 (Pages 30 to 33)

Page 30

1     A.  He -- well, he -- he focused on all of them.
2   He focused on every last one of those.  And he
3   assigned the programs out to specialists as well.
4     Q.  Would you describe him as a wealth of
5   knowledge about all of these programs?
6     A.  Very much so.
7     Q.  All right.  So on a daily basis -- this is
8   when you started the chief job under Daniel
9   Robinson -- what would you be doing?  There would be
10  some phone calls, perhaps, that might come in from
11  county employees on Payment Limitations.  There may be
12  some phone calls that get transferred to you if
13  someone called another specialist and they're not
14  there.  What else would you be doing throughout the
15  day?
16    A.  Well, we would always have to stay abreast of
17  program changes.  So, therefore, all handbooks were
18  readily available to read, keep updated on changes.
19  And sometimes there may be farmers that would come
20  into the office, and you would entertain them with
21  whatever questions that they may have.
22    Q.  Did you -- anything -- I mean, you said you
23  would read and keep up to date on farm programs,
24  meeting with people who might come in.  Any other kind
25  of general duties that occurred when you were chief

Page 31

1   that you spent your time on?
2     A.  I don't think so.
3     Q.  Was there any work --
4     A.  Other than day-to-day operations.
5     Q.  And what are day-to-day operations?  What do
6   you mean by that?
7     A.  Every day may be something totally different,
8   so whatever came up for that day is what we worked on.
9     Q.  Things that would come up unexpectedly you
10  would deal with?
11    A.  Yes.  Yes.
12    Q.  Did you handle any types of appeals?
13    A.  Yes.  Yes.
14    Q.  All right.  What types of appeals were
15  handled?  First by your I guess section and second by
16  you personally?
17    A.  Yes.  When farmers were denied program
18  benefits and they felt like they were not treated
19  fairly, they would appeal the decision to the state
20  committee; and I would handle those appeals.
21    Q.  The appeals to the state committee?
22    A.  To the state committee, yes.
23    Q.  And what did handling those appeals involve?
24  What type of work?
25    A.  It involved investigating the facts, taking

Page 32

1   the farmer's complaint and analyzing it, presenting it
2   to state committee.  The state committee makes a
3   decision as to whether that farmer was eligible or
4   not.
5     Q.  Anyone else in your section handle those
6   appeals besides you?
7     A.  Daniel Robinson.
8     Q.  Well, when you were chief.
9     A.  Oh, when I was chief, Sharrie Peterson.
10    Q.  How often would those appeals come in?
11    A.  Every month we will have some appeals.  Of
12  course, we were working with the entire state; so from
13  some area of the state, some farmer had an appeal.  So
14  there would be appeals on a monthly basis.
15    Q.  So average one a month, more than that?
16    A.  It would be more than one a month.  I'd say
17  between -- let's just say average three per month.
18    Q.  When you were chief, did you ever, I guess,
19  call county employees or county offices to see what
20  kind of issues or concerns they had without them
21  calling you, just reach out to the field and see
22  what's going on and what you might be able to do?
23    A.  No.
24    Q.  Now, if specialists were handling calls
25  directly, how would you know what's going on in their

Page 33

1   particular area of expertise?
2     A.  We had a staff meeting every Monday.
3     Q.  Every Monday?
4     A.  Yes.
5     Q.  And what would you generally cover?
6     A.  We would cover what we did that week before;
7   and we would cover what we were planning to do for the
8   week m-- of that particular week.
9     Q.  And would there be a --
10    A.  And specialists would tell me of any problems
11  that they had going on during that meeting.
12    Q.  So you didn't --
13    A.  We kept abreast of each other's.
14    Q.  You expected your specialists, when they had
15  their section or time at the meeting, to tell you
16  about any problems that they encountered the previous
17  week or expected to come up in the future week?
18    A.  Yes.  Or if a problem arose right then at
19  their desk, they could leave their desk and come to my
20  office and we'd talk about it; so it didn't really
21  have to wait until staff meeting.
22    Q.  So you --
23    A.  But that's when we would catch up, during the
24  staff meeting.
25    Q.  How about just general calls that might not

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF OZETTA THOMAS

10 (Pages 34 to 37)

Page 34

1  be a problem in itself, but just questions that come
2  up from the field?  Would there be a log of those kept
3  anywhere in the office that you would read or that you
4  would know what types of calls are coming in?
5      A.  It ended up being that, yes.
6      Q.  At what point in time?
7      A.  After Mr. Crawford.  Well, can I back up a
8  little bit?  We did that when I first came in as
9  specialist back in 1986.
10     Q.  Is that something that Daniel Robinson at the
11 time had had in the office?
12     A.  Yes.
13     Q.  But at some point was discontinued?
14     A.  Well, it was done because of complaints from
15 the field.
16     Q.  And in response to those complaints, the
17 office started keeping a call log of all the calls
18 that came in?
19     A.  Not the office.  I did.
20     Q.  You did.
21     A.  Yes.
22     Q.  Of what, calls that came in to you or --
23     A.  Calls that came in to me, the nature of the
24 calls and the answers.
25     Q.  So Daniel Robinson asked you to keep a log of

Page 35

1  all the phone calls you handled and the answers you --
2      A.  Yes.
3      Q.  Let me finish the question just for the
4  transcript.
5      A.  Yes.
6      Q.  Of all the calls that came in and how you
7  responded?
8      A.  Yes.
9      Q.  Did he ask anyone else to do that?
10     A.  No.  He was not getting complaints from
11 anyone else.
12     Q.  It was your understanding he was getting some
13 complaints about your answers?
14     A.  Yes.
15     Q.  Do you know who he got those complaints from?
16     A.  No.
17     Q.  How long did you keep a log of the calls?
18     A.  For weeks, until we had a meeting with the
19 state director and the district directors.
20     Q.  And who was the state director at that time?
21     A.  His name is on my tongue.  I can't recall his
22 name.
23     Q.  Well, if it comes to you, just let me know.
24 How about the district directors at the time?  Do you
25 remember their names?

Page 36

1      A.  Yes.  It was Richard Burge, Jack Crawley.  It
2  was Sam Ledbetter.  And I can't recall the other one
3  right off.  I can't recall his name.
4      Q.  So there was a meeting held and after that
5  meeting, you no longer kept the log?
6      A.  No.
7      Q.  And then you said when you were chief, that
8  you didn't have employees under you keep a log of all
9  their calls and answers?
10     A.  Not until Daniel Crawford.
11     Q.  Did he ask you to do that?
12     A.  Yes.
13     Q.  And at what point in time did you start doing
14 that?  Do you know?
15     A.  After I started filing complaints.
16     Q.  Can you tell me a date?
17     A.  It was like August, September of 2001.
18     Q.  Did Mr. Crawford tell you why he wanted to
19 keep those logs?
20     A.  Yes.
21     Q.  What did he say?
22     A.  Because I didn't know my job.
23     Q.  Did he suggest that if you had those logs,
24 that you would be able to read and see what's going on
25 with the employees in your section?

Page 37

1      A.  Yes.
2      Q.  And did you disagree with this advice?  This
3  was something you did not want to do?
4      A.  No, it was not anything that I didn't want to
5  do, but the reasoning for doing it when no other chief
6  were asked to do it.
7      Q.  Okay.  You thought it was unfair that he was
8  asking you to have your employees keep these logs as
9  opposed to asking other chiefs?
10     A.  Yes.  Disparity.
11     Q.  Do you know if he was receiving complaints at
12 that time about other chiefs?
13     A.  He told me he was receiving complaints on me.
14     Q.  Did not discuss other chiefs?
15     A.  No.
16     Q.  Now, when you were chief, how often would you
17 talk to employees in your section other than the staff
18 meetings you held, which you said were every Monday?
19     A.  Every day.
20     Q.  Would you go by their little cubicles, or
21 would they come by your office?
22     A.  Both.
23     Q.  Both?  Would you make I guess a practice of
24 walking through and checking on them or --
25     A.  Yes.

OZETTA THOMAS v. MIKE JOHANNS                               11/29/2007
DEPOSITION OF  OZETTA THOMAS

11 (Pages 38 to 41)

Page 38

1    Q.  Did you ever work with your door shut?
2    A.  Very, very seldom.
3    Q.  Did you work pretty closely with Daniel
4  Robinson when he was SED and you were chief?
5    A.  No.
6    Q.  Would you disagree with his statement, I
7  guess at the administrative hearing regarding
8  nonselection, where he said you were his right-hand
9  man?
10    A.  No, I don't disagree with that.  That was why
11  he was my chief.
12    Q.  So he assigned additional tasks to you?
13    A.  Yes.
14    Q.  What kind of tasks, additional tasks, would
15  he assign to you?
16    A.  He would assign me to go to different
17  meetings, like with the Freedom of Information Act
18  meeting, which was not my particular program.  He had
19  me to go to those meetings, to when people requested
20  information with the Freedom of Information Act, that
21  was an additional task.
2    Q.  What other types of additional tasks?
23    A.  Any time the national office needs some
24  assistance on program areas, he designated me to go
25  and help with that.

Page 39

1    Q.  What about something --
2    A.  Any time --
3    Q.  Before you answer the next question, would
4  that be something that would go to the chief of
5  program adjustment -- Production Adjustment anyway, or
6  are you saying something additional to what would
7  regularly go to a chief?
8    A.  No, no.  It would be -- it would be on that
9  particular program in Production Adjustment but, it
10  did not have to be that particular person.  It could
11  have been anyone out of that division.
12    Q.  And he would choose you?
13    A.  Yes.
14    Q.  What other additional tasks did he give you?
15    A.  When county offices needed assistance in
16  program areas, I would visit the county offices and
17  help with those programs.
18    Q.  And did you enjoy these additional tasks?
19    A.  Yes.
0    Q.  How often would you go to county offices
21  like --
2    A.  I would say on an average maybe two or three
23  times annually.  He also assigned me a different --
24  another task of district director for Chilton County,
25  which was not part of Production Adjustment.

Page 40

1    Q.  So you were -- I guess would be acting
2  district director for that county?
3    A.  Yes.
4    Q.  Who was the regular district director?
5    A.  Richard Burge.
6    Q.  Was this a temporary appointment?
7    A.  Yes.
8    Q.  How long were you, I guess, acting district
9  director?
10    A.  More than a year.
11    Q.  And what kind of additional work did this add
12  to your daily responsibilities?
13    A.  I would go to Chilton County at least once a
14  month and meet with their county committee.  Their
15  county committee would be meeting on appeals or
16  problems from the farmers on program areas.  And I
17  would go and do -- help do inspections on certain
18  crops in the county.
19    Q.  And did Mr. Robinson tell you why he was
20  making you acting district director?
21    A.  Yes.
22    Q.  What did he tell you?
23    A.  He told me he was making me district director
24  because that district director -- that county had been
25  removed from him because of some sexual harassment on

Page 41

1  one of the employees in the office.
2    Q.  Did he give you any more details besides
3  that?
4    A.  No.
5    Q.  Can you think of any other additional tasks
6  Mr. Robinson assigned you?
7    A.  Not right now, no.
8    Q.  And how often would you talk to Mr. Robinson
9  when you were chief?  Daily basis?
10    A.  Not daily.  It -- when -- because a lot of
11  times he was out, you know.  I would talk to him
12  within that week, though, but not on a daily -- not
13  every day.
14    Q.  A lot of times he would be out of the office
15  and you could not get in touch with him?
16    A.  Right.  And we would talk to stay abreast on
17  program matters.
18        (Brief interruption)
19    Q.  We were talking about how often you talked to
20  Mr. Robinson full-time.
21    A.  Yes.  I was saying we would stay -- we would
22  talk to stay abreast of program matters.  We would
23  stay abreast of farmers' problems with appeals.  We
24  just -- we had a good SED-chief relationship.
25    Q.  Did you find him to be accessible?  Could you

get in touch with him when you needed him?
A. Well, if -- when I needed him, I could, yes; but if it was something that wasn't so important, it could wait. I mean, I didn't have to just run him down, no.
Q. What I meant is he responded to emails and when you left him a telephone message, he would respond?
A. Yes.
Q. And you trusted his answers to any questions you might have?
A. Yes.
Q. All right. And did you find it beneficial that he was an SED who I guess had been chief, who had held your position before and been chief over the same programs you were running?
A. Yes.
Q. Now, did you consider Mr. Robinson a mentor?
A. Yes.
Q. All right. And you mentioned before he was a friend?
A. Yes.
Q. Was it a work friendship or did you ever socialize outside of the office?
A. We would socialize outside of the office. We

would go to lunch together.
Q. Did your families go out together?
A. If his family had something going on, we would attend. If my family had something going on, they would attend. They would have just been friends.
Q. All right. And I guess you said earlier you remained friends since you left USDA?
A. Yes.
Q. And I think -- I believe you used him as a reference on some of your employment applications you produced?
A. Yes.
Q. And when was the last time you spoke to him?
A. Day before yesterday. That would have been Tuesday? Tuesday.
Q. Tuesday. That's right.
A. Yes.
Q. All right. Now, following the elections in 2000, Mr. Robinson left his position as SED, correct?
A. That's correct.
Q. I guess for a brief period of time, Joan Grider was acting SED?
A. Yes.
Q. And then in approximately May 2001, Danny Crawford became SED; is that right?

A. Yes.
Q. Now, Mr. Crawford had been the CED in Limestone County, right?
A. Yes.
Q. And when had you first met Mr. Crawford?
A. When I first came to the state office in 1986.
Q. What position was he in at that time?
A. CED.
Q. Oh, he was in the CED position at that time?
A. Yes.
Q. And how much personal interaction did you have with him when you were just an agricultural specialist, before you became chief?
A. We would talk on the phone about program matters. I would visit his office for reviews, was even invited to a cookout that he sponsored one day after -- in visiting his county office.
Q. How often would you talk to him then? Is there an average?
A. Well, now, even -- I may not have talked with him personally; but I would talk with his office, with the PT, program technician, in his office very often.
Q. How about with him?
A. With him, that's hard to say. It was not so

often with him. And I couldn't even average that out. I would just say occasionally.
Q. Were your interactions cordial?
A. Very.
Q. All right. Would you see him at training?
A. Yes.
Q. Would he always be friendly?
A. Always.
Q. And then when you became chief of this section in '98, how often did you interact with him at that point? Did the amount of interaction increase, decrease, stay the same?
A. None.
Q. Now, this is when you became chief --
A. Oh, when I became --
Q. -- in '98 and you were under Daniel Robinson.
A. Oh. It was about the same.
Q. About the same?
A. About the same as when I was a specialist.
Q. And that would just be occasional phone calls?
A. Yes.
Q. And then you would see him at training?
A. And then trainings, yes..
Q. Always friendly and cordial?

OZETTA THOMAS v. MIKE JOHANNS                           11/29/2007
DEPOSITION OF  OZETTA THOMAS

Page 46

1    A.  Yes.
2    Q.  Did you have any opinion of his skills or
3  capabilities as a county executive director?
4    A.  Opinion?
5    Q.  Yeah.  Based on your interactions with him or
6  his office.
7    A.  He was a good CED.
8    Q.  And what --
9    A.  But, of course, there -- there were
10  complaints against him from farmers.
11    Q.  Complaints made to you?
12    A.  Well, to the SED.  And one of the reviews I
13  went up there to do was because of a complaint.
14    Q.  Did you know what the nature of the complaint
15  was?
16    A.  It was on a particular program.  Had to do
17  with the AMTA Program having received payments, I
18  think, and the producer was not satisfied with it.
19  Also, there were complaints about him having -- what
20  you call these things -- stuffed animals on the walls
21  in his office.  He was a hunter, and he would --
2    Q.  Oh, like --
23    A.  -- have his turkeys and his deer heads.
24    Q.  Animal heads from hunting on the walls of his
25  office?

Page 47

1    A.  Yes.  And some farmers complained about that.
2    Q.  Now, when Mr. Crawford became the state
3  executive director, did he meet with his employees?
4  Was there like a group meeting where he explained his
5  expectations or goals for the office or anything like
6  that?
7    A.  He met with each chief separate.  Of course,
8  he never asked to meet with me, but I asked to meet
9  with him.
10    Q.  All right.  When he first came on board, you
11  met with him individually?
12    A.  Yes.
13    Q.  Do you know if the other chiefs asked to meet
14  with him or whether he asked them?
15    A.  From what I can recall, he asked them --
16    Q.  And what --
17    A.  -- to come and abreast him on programs --
18    Q.  What is that --
19    A.  -- that was going on in their particular
0  shop.
21    Q.  What is that based on?  How do you know he
2  asked them as opposed to --
23    A.  Well, this is just by word of mouth.  Joan.
24  Because she asked me had I gone up to talk with him,
25  and I told her I didn't know if I needed to or had to;

Page 48

1  he hadn't asked me.  And she said, well, you go and
2  ask Irean to set up an appointment.  So that's how I
3  got in with him.
4    Q.  And you don't know if Ms. Grider had gone up
5  and asked to get an appointment on her own, do you, or
6  whether it was set --
7    A.  No, I don't, but all of them had already
8  talked with him prior to my talking with him.
9    Q.  What do you recall from your meeting with
10  him?
11    A.  He listened.  He was cordial.  Then in a
12  staff meeting where we all came together, he was
13  cordial; and he made the statement that -- this was
14  when the whole staff got together -- that if
15  specialists have any problems in their area, go to
16  your chief first before you come to me.
17    Q.  What do you recall from your individual
18  meeting with him?  Do you recall what was discussed?
19    A.  I don't recall the specifics of what were
20  discussed, but I know I discussed what we had going on
21  at that particular time --
22    Q.  In your --
23    A.  -- and like meetings that had been scheduled,
24  trainings that had been scheduled.
25    Q.  Was anyone else present in that meeting where

Page 49

1  you met with him, or was it just the two of you?
2    A.  It was just the two of us at that time.  And
3  I met with him one time again with Vicki Anthony to
4  discuss attending the Black In Government conference,
5  which we had been chosen as delegates.
6    Q.  And he allowed you to attend at that time,
7  correct?
8    A.  Yes.  Because, see, this had happened prior
9  to him coming.  It had already been approved by
10  Mr. Robinson.  But at the time of the conference,
11  Mr. Crawford was on board by that time; so we went in
12  to abreast him on the approval of our attending as
13  delegates.
14    Q.  And that was in Los Angeles?
15    A.  Yes.
16    Q.  Do you recall when it was in 2001 that you
17  actually attended the BIG conference?
18    A.  August.  August.  No, no, no.  Wait, now.
19  Let me make sure.  Yes, August 2001.
20    Q.  All right.  So you had the individual meeting
21  when he first became SED, and then he had a group
22  meeting with everybody.
23    A.  Yes.
24    Q.  And after that group meeting, how often would
25  he have staff meetings in the office?

Page 50

1    A. Occasionally.
2    Q. And at those staff meetings, I guess each
3    section would be able to talk about issues or concerns
4    they had in their section?
5    A. Yes.
6    Q. Did Mr. Robinson have similar staff meetings?
7    A. Yes. Mr. Robinson had staff meetings every
8    week.
9    Q. He had them every week?
10   A. Not every week. Every month.
11   Q. And did Mr. Crawford generally have them
12   every month?
13   A. If he was there. He would -- a lot of time
14   it's -- well, during his -- when he first came on
15   board, he was gone most of the time.
16   Q. Would you say he was on -- well, where was
17   your office in relation to his?
18   A. About 50 feet. I'm not sure of that, but I
19   was not close to his office.
20   Q. I mean, could you see his office from the
21   door of your office?
22   A. No.
23   Q. How would you know when he was in or out of
24   the office?
25   A. From the itinerary.

Page 51

1    Q. There would be, I guess, a weekly schedule
2    that went out?
3    A. Yes.
4    Q. And it would state where I guess everybody's
5    office --
6    A. Where everybody would be for that week.
7    Q. And that came out every week?
8    A. Yes.
9    Q. From your, I guess, reading that itinerary,
10   was it your understanding, I guess, that Mr. -- was
11   Mr. Crawford out of the office more or less than
12   Mr. Robinson?
13   A. More.
14   Q. All right. And during, I guess, his first
15   couple of months, you said he was rarely in the
16   office. That was your understanding from reading that
17   calendar?
18   A. Yes. He was -- yes, rarely.
19   Q. Who would attend the staff meetings that
20   Mr. Crawford held? Would it be each of the section
21   chiefs?
22   A. Yes.
23   Q. Who were they?
24   A. Joan Grider for Conservation, Bill Sewell for
25   Farm Loans, Verdell Zeigler for Administrative, Vicki

Page 52

1    Lane for Outreach, and myself for Production
2    Adjustment.
3    Q. Would the SED's secretary, Ms. Bennett,
4    attend these meetings as well?
5    A. Yes. Yes. She would attend and take the
6    minutes.
7    Q. She would take the minutes?
8    A. Yes.
9    Q. Were the minutes provided to different chiefs
10   afterwards? Did you ever see the minutes?
11   A. No.
12   Q. Do you know if they were kept anywhere in the
13   office? I mean, if you needed to for some reason,
14   could you access them?
15   A. If we needed to, we could go in and request a
16   copy from Irean. Oh, I forgot one. Debbie Williams
17   would also attend the meetings.
18   Q. Who was Ms. Williams?
19   A. She was the -- his executive officer.
20   Q. Was she also executive officer under
21   Mr. Robinson?
22   A. Yes.
23   Q. And how long had you known Ms. Williams?
24   A. Since 1984.
25   Q. How would you describe your relationship with

Page 53

1    her?
2    A. I just knew her.
3    Q. Did you have much interaction with her?
4    A. No.
5    Q. Based on your understanding, what kind of
6    duties did she perform for Mr. Robinson?
7    A. Administrative duties as far as complaints.
8    Q. Would she serve as acting SED in his absence?
9    A. He had a written list of who would serve in
10   his absence based on their presence, and she -- I
11   can't recall if she was number one. I don't believe
12   so.
13   Q. Who do you think might have been number one,
14   or do you have any recollection?
15   A. I think number one was Joan Grider, then
16   Debbie Williams.
17   Q. Did you at any point serve as acting SED?
18   A. Yes.
19   Q. So you were somewhere on that list?
20   A. Somewhere on that list, yes, down at the
21   bottom.
22   Q. How often would you have that responsibility?
23   A. Seldom. Seldom. Because one of the others
24   would be present. I think I can only recall just one
25   time.

Page 54

1    Q. When you were working for Mr. Robinson, were
2  you ever late for work?
3    A. Yes.
4    Q. And when you were late for work, did you just
5  work late?
6    A. Yes. We were on what we called a compressed
7  comp time. We would earn that. So you -- you could
8  work over and earn comp time.
9    Q. So it was no problem in coming in late and
10 working a little bit later, working kind of a little
11 bit flexible schedule?
12   A. Right.
13   Q. How much leeway in terms of -- what were your
14 regular office hours? When were you regularly in the
15 office?
16   A. My regular office hours was like 7:30 to 5,
17 but most of the time I would be six o'clock leaving.
18   Q. And you would come in a little bit later in
19 the morning?
20   A. Well, no more than five or 10 minutes, never
21 late late, just -- just a few minutes.
2    Q. Let's see. I'll mark this -- this has been
23 marked as Defendant's Exhibit #2 and hand you a copy
24 of that.
25       MR. DuBOIS: I have a copy for you, too.

Page 55

1    Q. I hand you a document that's been marked as
2  Defendant's Exhibit #2. Do you recognize this
3  document?
4    A. Yes, I do.
5    Q. Okay. And that is your signature at the
6  bottom with the date you received it being July 9th,
7  2001; is that right?
8    A. That's correct.
9    Q. And this was I guess a written document that
10 came after Mr. Crawford had met with you on July 3rd
11 to talk about some attendance or some time issues?
12   A. Yes.
13   Q. Now, do you recall that July 3rd, 2001,
14 discussion with him?
15   A. Yes.
16   Q. What do you recall about that? Or, first,
17 where it was held?
18   A. It was held in his office.
19   Q. Was anyone else in attendance?
20   A. Debbie Williams.
21   Q. All right. Anyone else?
22   A. That's all.
23   Q. What do you recall from that meeting?
24   A. I recall that he called me in and told me
25 that -- his exact words was -- is that, You know, when

Page 56

1  you go to a place and people come to you and say
2  Ozetta is being late coming in; and he said, I know
3  not Ozetta. And he said that coming in late was not
4  an example for me as chief and that he had recorded --
5  had my time and attendance had been recorded for two
6  pay periods without my knowledge.
7    Q. What else do you recall, if anything?
8    A. It -- I don't -- it was a time that really
9  shocked -- that really shocked me so till, you know, I
10 don't even have any recollection other than, you know,
11 what he has there. And, of course, he did say he was
12 giving me an opportunity to correct that because they
13 had told him that I could be -- that he could -- he
14 could, I guess, fire me; but instead, he was giving me
15 an opportunity.
16   Q. All right. So what is --
17   A. And he put restrictions on what door to use
18 when coming into the office. There were two
19 entrances. And, of course, the -- the back entrance
20 was closer to my office; but, of course, I never used
21 that entrance anyway. I always would come through the
22 double doors which was closer to Irene's office.
23   Q. Okay. So, what, he said everyone had to come
24 through the front door?
25   A. Yes. He put restrictions on never using the

Page 57

1  back door to come in and to work. Of course, it
2  didn't matter with me because I didn't anyway, but
3  those restrictions were to keep tally on me as to my
4  time and attendance.
5    Q. Did he I guess convey to you that there had
6  been some complaints about you coming in late?
7    A. Well, that's what he told me when I first got
8  in there, that --
9    Q. Did he mention who had made those complaints?
10   A. He did not. Only thing he told me, that my
11 staff, the DDs, and this -- all the CEDs had a problem
12 with me.
13   Q. Did he say that regarding your attendance? I
14 mean, this is --
15   A. He didn't say that -- no, he didn't say that
16 regarding the attendance. He just said he was told
17 that. He didn't tell me who told him that for the
18 attendance.
19   Q. Did he mention all these individuals at this
20 meeting -- I'm just talking about this July 3rd
21 meeting when he talked to you?
22   A. Oh, no, no. That was at another counseling
23 session, yes.
24   Q. You understood from the meeting that there
25 were some complaints, but he didn't say from who?

Page 58

1    A.  Right.
2    Q.  And he said that he expected -- well, did he
3  say that he was calling to tell you he expected his
4  chiefs to set an example, to be an example for the
5  subordinates?
6    A.  Yes.
7    Q.  Is that a reasonable expectation?
8        MR. PETTAWAY:  Object to the form of the
9  question.  You can answer.
10       THE WITNESS:  Pardon?
11       MR. PETTAWAY:  You can answer.
12    Q.  He's objecting, but you can answer if you
13  can.  Go ahead.
14    A.  I think it would be fair if he was asking
15  that of all the chiefs.
16    Q.  Did you tell him at this meeting you thought
17  that other chiefs were coming in late?
18    A.  I don't recall what I told him.
19    Q.  Do you have any knowledge that he had any
20  complaints about other chiefs coming in late?
21    A.  I don't know.
22    Q.  Do you recall telling him that any, I guess,
23  time sheet mistakes were not intentional, you didn't
24  sign in late -- that you didn't sign in every day, and
25  sometimes you would come in and stay late?

Page 59

1    A.  Oh, yes.  Yes, uh-huh.
2    Q.  Now, when he provided you this document which
3  is marked as Defendant's Exhibit #2, was there any
4  discussion or did he just give it to you?
5    A.  No.  He just gave it to me and asked me to
6  sign it.
7    Q.  There was no further discussion?
8    A.  No.
9    Q.  And then after you received this document I
10  guess on July 9th, you had no further conversation
11  with Mr. Crawford about your attendance?
12    A.  No.
13       MR. DuBOIS:  Let's take a short break.  Is
14  that all right?  A five-minute break.
15       MR. PETTAWAY:  Sure.
16       (Brief recess)
17    Q.  Back on the record.  Oh, this is the SED back
18  in the 1980s?
19    A.  Yes.
20    Q.  What was his name again?
21    A.  Bubba, Bubba Trotman.
22    Q.  Can you spell that?
23    A.  B-U-B-B-A.
24    Q.  How about the last name?
25    A.  T-R-O-T-M-A-N.

Page 60

1    Q.  I'm going to hand you a document that's been
2  marked as Defendant's Exhibit #3.  And can you tell me
3  if you recognize this document?
4    A.  Yes.
5    Q.  Now, this is a memorandum from John Chott,
6  Acting Executive Director For State Operations, to the
7  State Executive Director of Alabama, correct?
8    A.  Yes.
9    Q.  And it's dated August 15th, 2001.  When did
10  you receive a copy of this or when did you first see
11  this document?
12    A.  I don't recall the specific date; but right
13  after this had gone out, it was mistakenly put in my
14  mailbox.
15    Q.  What do you mean after it had gone out?
16    A.  After August the 15th, sometimes after that
17  date.  I don't recall the specific date.
18    Q.  You received a copy?
19    A.  Yes.
20    Q.  How did it --
21    A.  I --
22    Q.  When you say it was mistakenly put in your
23  box, how do you know it was a mistake?
24    A.  Well, because it wasn't my mail.
25    Q.  Do you know who put it in your box?

Page 61

1    A.  No.
2    Q.  Somehow it came to your mail?
3    A.  Somehow the mail got mixed up, I guess, and
4  one of them got in my mailbox.
5    Q.  In this memo, Mr. Chott states, I'm concerned
6  about apparent weakness and your state office's lack
7  of expertise in handling of payment limitations
8  matters.  See that part?
9    A.  Yes.
10    Q.  Now, the payment limitation matters was under
11  your responsibility as chief?
12    A.  Yes.
13    Q.  Had you ever met Mr. Chott before?
14    A.  No.
15    Q.  Had you ever spoken with him?
16    A.  No.
17    Q.  Do you know how long he had been in the
18  position as acting executive director for state
19  operations?
20    A.  No.
21    Q.  Now, prior to receiving this memo that's been
22  marked as Defendant's Exhibit #3, are you aware that
23  Kirk Ellis had done a payment limitations review of
24  Geneva County and found a number of problems?
25    A.  I don't recall if it was prior or afterwards.

**Page 62**

1    Q.  Before seeing this Defendant's Exhibit #3, do
2  you recall Mr. Crawford having forwarded to your
3  attention, I guess, a suggested memo to Mr. Chott with
4  some suggested actions to take regarding payment
5  limitations?
6    A.  No.
7    MR. DuBOIS:  This will be Defendant's Exhibit
8  #4.  I don't think I have an extra copy of this one.
9    MR. PETTAWAY:  Wait a minute and I'll go make
10  a copy.  What is it?  Here, I'll go run make a copy.
11    MR. DuBOIS:  You want to take that one?
12    MR. PETTAWAY:  Okay.  It doesn't matter.
13    (Brief pause)
14    Q.  Back on the record.  I hand you a document
15  marked as Defendant's Exhibit #4.  Can you tell me if
16  you've seen this email before and the attachment?
17    A.  Yes.
18    Q.  And this is an email that was sent from
19  Ms. Bennett on Tuesday, August 7th, 2001, to a number
20  of people, including yourself, correct?
21    A.  Yes.
22    Q.  And it says, Daniel would like you to review
23  the attached memo and provide any comments,
24  suggestions, et cetera, right?
25    A.  Yes.

**Page 63**

1    Q.  And did you review that attached memo and
2  provide any suggestions to Mr. Crawford?
3    A.  I responded to her email that these were some
4  of the same issues that I had addressed already with
5  Ms. Grider.  Of course, I didn't know about this until
6  I got this.  I didn't know about Mr. Ellis even being
7  there until I received this.
8    Q.  Didn't you receive this email August 7th?
9  You're saying this was the first time you had known
10  Mr. Ellis had done a review?
11    A.  Yes.
12    Q.  Now, you said you sent an email back.  Other
13  than the email back to Ms. Bennett, did you have any
14  conversation with Mr. Crawford about this response to
15  Mr. Chott?
16    A.  I had a conversation with Mr. Crawford after
17  I received this -- your Exhibit #3 here.
18    Q.  That's Exhibit #3.  Okay.  And we'll get to
19  that in a few minutes.
20    A.  Okay.
21    Q.  But right now you received this Defendant's
     Exhibit #4, which is an email seeking some comments on
23  the attached memo, and you sent an email back.
24    A.  Yes.
25    Q.  Other than sending an email back, did you

**Page 64**

1  have any conversations with Mr. Crawford about
2  suggestions or comments before this was sent to
3  Mr. Chott?
4    A.  No.  I didn't know about it.
5    Q.  Okay.  Let me mark this as #5, Defendant's
6  Exhibit #5.  Can you take a look at Defendant's
7  Exhibit #5 and tell me if this is the email that you
8  sent back to Mr. Bennett?
9    A.  Yes, it is.
10    Q.  And you're conveying that the recommendations
11  that are in the memo that's attached to Defendant's
12  Exhibit #4 are pretty much the same as some you had
13  previously suggested to Joan Grider?
14    A.  Yes.
15    Q.  Other than providing that comment regarding
16  the memo that Mr. Crawford had sought your input on to
17  this email, did you have any conversation with him or
18  did you just send this email?
19    A.  No.  I just sent this email.  We never
20  talked.  We never had conversations.
21    Q.  When you sent this email to Ms. Bennett on
22  August 7th, you were aware there were some problems
23  with I guess PL in Geneva County, right?
24    A.  I didn't know there were any problems with
25  Payment Limitations, the program itself.  I knew there

**Page 65**

1  was a problem with some -- with a farmer that I had
2  gone down to review who had -- who the district
3  director thought had received erroneous payment and
4  exceeded the payment limitation.
5    Q.  And you had done a review when you were down
6  there?
7    A.  Yes.  For that particular farmer, yes.
8    Q.  And that was Mr. Ronnie Hale?
9    A.  Yes.
10    Q.  Let's make this #6.
11    MR. DuBOIS:  I don't have an extra copy of
12  this one either.
13    MR. PETTAWAY:  We'll make a note to get a
14  copy.  Let's do this.  Most of them I do have extra
15  copies, but let's see.
16    MR. DuBOIS:  Let's put a little sticky on the
17  ones you don't have copies of and at a break --
18    MR. PETTAWAY:  Okay.
19    Q.  SO let me hand you Defendant's Exhibit #6.
20  And tell me if you recognize this document.
21    A.  Yes, I do.
22    Q.  And is this a memo you prepared to Ms. Grider
23  when she was acting SED regarding, I guess, the
24  results of your review of Ronnie Hale's farming
25  operations in Geneva County?

Page 66

1    A.  Yes.
2    Q.  Going to the last paragraph on the second
3  page, what do you mean when you say, I recommend that
4  a COR review the entire county for payment
5  limitations?
6    A.  The county -- the COR is the county office
7  reviewer.  That is a person that reviews all program
8  matters in counties.  At the time that I made this
9  review, I noted a lot of irregularities in the payment
10  limitation when the county office were having farmers
11  to fill out the wrong documents.  And this is why I --
12  I recommended that the entire county be reviewed.
13  Because I also met with Mr. Hale that same day, and he
14  had a problem with the district director showing
15  favoritism to some of the farmers in the county.  So,
16  therefore, it was my recommendation that the entire
17  county be reviewed.
18    Q.  When you submitted this memo to Ms. Grider,
19  did you ever give a copy to Mr. Crawford when he
20  became SED or have any conversations with him about
21  this particular memo?
2    A.  I didn't.  I don't know if Ms. Grider did.
23  She was the acting, so she met with him concerning
24  issues that were going on while she was acting.
25    Q.  And you weren't -- were you present during

Page 67

1  that meeting?
2    A.  No.  After this, I was totally out.
3    Q.  All right.  Now, after you received
4  Defendant's Exhibit #3, do you recall having a
5  conversation with Mr. Crawford regarding the memo and
6  some concerns that Mr. Crawford had with your
7  performance?
8    A.  Yes, I did.
9    Q.  Where was that conversation held?
10    A.  That was in my office.
11    Q.  And how did it come about?  Did you seek
12  Mr. Crawford out, or did he come into your office?
13    A.  No.  What happened, he was coming in to Bill
14  Sewell's office.  Bill Sewell's office is -- our doors
15  were just right there together at the time.  And when
16  he peeped in and waved at me, I asked to meet -- I
17  told him I needed to talk with him about something.
18    Q.  Okay.
19    A.  And he came on in my office right then.
20    Q.  So he peeped in and waved and said good
21  morning or hi?
22    A.  He waved good morning, yes, on going into
23  Bill's office.
24    Q.  And you told him you need to talk?
25    A.  And I let him know I wanted to talk to him.

Page 68

1  yes.
2    Q.  What do you recall of that conversation?
3  Well, before, was there anyone present besides the two
4  of you?
5    A.  Not in my office, no, but there were people
6  sitting close to me, right next door.  And right there
7  at my door was his PT.
8    Q.  What do you recall from the conversation?
9    A.  That was the most worse feeling I've had
10  during my whole work career when I told him my concern
11  with the national office saying there was a weakness
12  in this program area and I was not aware of any
13  weakness.  I was not aware of any review being done by
14  Keith Ellis.  And I told him how unfair I thought that
15  was.
16    Q.  And how did he respond?
17    A.  And I just got chewed -- it was the most
18  condescending conversation you could ever experience.
19  I just -- I got chewed out.
20    Q.  Were there raised voices?
21    A.  The tone, yes.
22    Q.  What about his tone?
23    A.  It -- harsh.
24    Q.  What made you think it was a harsh tone?
25    A.  What make me think it was a harsh tone?  The

Page 69

1  things that he said to me.
2    Q.  Did he express to you a concern over you
3  appearing to have a lack of knowledge on a number of
4  programs under your responsibility?
5    A.  Sure.  Sure.  That -- there is -- you should
6  have a counseling session for that particular time
7  that I did not sign because it -- it just included
8  what he thought was said, because it was like three
9  weeks later before he brought that to me.
10    Q.  And I'll ask you about that when we're able
11  to make another copy.
12    A.  Okay.  Okay.
13    Q.  Do you recall him telling you that he
14  received some complaints from the field about your
15  training techniques?
16    A.  Yes.
17    Q.  And did he express that he had received
18  complaints expressing a lack of confidence in you?
19    A.  Yes.  He constantly told me that.
20    Q.  Did he say who had made these complaints?
21    A.  My staff.  He didn't call any particular
22  names.  He said my staff, the district directors, and
23  all of the CEDs.
24    Q.  When he said your -- when you say my staff,
25  you're saying it was your staff, the people under

OZETTA THOMAS v. MIKE JOHANNS                                  11/29/2007
DEPOSITION OF OZETTA THOMAS

19 (Pages 70 to 73)

Page 70

1   your --
2       A.  Under my supervision, yes.
3       Q.  Now, you were not involved in any
4   conversations where any of these employees complained
5   to Mr. Crawford about you, were you?
6       A.  No.  I didn't know -- I didn't know they had
7   complained until he told me.
8       Q.  So until he mentioned it, you weren't aware
9   of any complaints from anyone?
10      A.  No.
11      Q.  Do you have any evidence that he did not
12  receive these complaints from people in the field and
13  from your staff?
14      A.  I don't know.  I know he did receive some
15  signed statements on me.
16      Q.  And how do you know that?
17      A.  Because I'm in receipt of one of them that
18  I've also forwarded to you.
19      Q.  Okay.  I'm talking about at the time of this
20  meeting that you had in August 2001, had you seen any
21  signed documents?
22      A.  Oh, no.  No.
23      Q.  And you had no knowledge one way or another
24  whether anyone had complained about you?
25      A.  No.

Page 71

1       Q.  Let's make this Defendant's Exhibit #7.  I'm
2   going to hand you a document marked as Defendant's
3   Exhibit #7.  Do you recognize this document?
4       A.  Yes.
5       Q.  All right.  Now, is this a memo that
6   Mr. Crawford submitted to you at a later time
7   regarding this conversation you had with him in
8   August?
9       A.  Yes.
10      Q.  All right.  And turn to the second page.  Is
11  that your handwriting at the bottom?
12      A.  Yes, it is.
13      Q.  And you wrote, This was received by me on
14  9/12/2001 in my motel room.  I refused to sign it.
15  This is not inclusive of our conversation on 8/20/01.
16      A.  Yes.
17      Q.  With your initials and the date you signed
18  it.
19      A.  Yes.
20      Q.  What did you mean when you wrote, This is not
21  inclusive?
22      A.  Because he only talked about what he said.
23  He did not include what I said.
24      Q.  Other than it not being inclusive, in terms
25  of what's in here, does it look like an accurate

Page 72

1   account of the meeting?  When you read through it, do
2   you see anything that looks inaccurate to you?
3       A.  No.  This is -- it's pretty much what he --
4   he said.
5       Q.  What do you think was left out that should
6   have been included in this memo?
7       A.  My feelings and what I said to him about my
8   lack of knowledge as to what was going on in the state
9   office while I was ostracized, why I was not being
10  treated as the other people in that office.
11      Q.  And what specifically did you tell him
12  about?  Did you tell him you felt ostracized?
13      A.  Yes, I did.
14      Q.  What did you say about this feeling?
15      A.  What did I -- I told him that I was not being
16  allowed to handle my job.  And --
17      Q.  And you -- go ahead.
18      A.  And instead of him conversating with me, he
19  was conversating all around me.  You know, he would --
20  anything he needed, he would go to my staff; or if he
21  wanted me to know something specifically, he would not
22  come to me himself.  He would not come -- he would
23  leave the voice mail occasionally.  If he wanted me
24  to come up to his office, it would always go
25  through -- someone else would have to call me,

Page 73

1   Mr. Crawford want to see you.
2       There -- there were just no communication between
3   us at all.  And I thought that was so unfair.
4       Q.  And you expressed that to him?
5       A.  Yes, I did.
6       Q.  And what is objectionable about getting a
7   call from someone saying your supervisor wants to see
8   you?
9       A.  There is no objection; but I knew when I got
10  that call, it was to be chewed out.  Because there
11  was -- there were no cordial conversation between
12  Mr. Crawford and I, ever, since that first meeting
13  with him.  Anytime he -- I was called to his office,
14  it was to chew me out about something.
15      Q.  And how often were you called to his office?
16      A.  Each time I got -- it was about -- at
17  least about four times, four to five times.  Because I
18  would get a copy.  I would always ask for a copy of
19  the -- of the minutes.
20      Q.  Is this the first time, this August 20th --
21  or this meeting you had with him in your office August
22  20th, 2001, when he expressed these concerns about
23  your performance to you?
24      A.  Yes, very first time.
25      Q.  Okay.  So prior to that time --

OZETTA THOMAS v. MIKE JOHANNS                                      11/29/2007
DEPOSITION OF   OZETTA THOMAS

20 (Pages 74 to 77)

Page 74

1     A.  Well, the first time was when the -- about
2  the T&A.
3     Q.  Okay.  Yeah.
4     A.  That was the very first time when I started
5  feeling something -- something was really building on
6  me to get rid of me.
7     Q.  And between the time of that conversation
8  regarding the attendance, which I believe was in --
9     A.  In July.
10    Q.  -- July 2001 and this conversation in August
11 2001, you didn't have any conversation with him about
12 your performance?
13    A.  No.
14    Q.  Now, what else, if anything, do you recall
15 talking about at this meeting on August 20th that's
16 not in this memo?
17    A.  I don't recall anything else.  I -- I just
18 can recall how I felt.
19    Q.  Do you recall anything else he said to you
20 that's not in this memo?
21    A.  No.  This is pretty -- this is pretty much
2  what he said to me.
23    Q.  All right.  Let me give you another document
24 now.  We're up to #8.  I'm going to mark this document
25 as Defendant's Exhibit #8.  And can you tell me if you

Page 75

1  recognize this document?
2     A.  Yes.
3     Q.  And is Defendant's Exhibit #8 I guess an EEO
4  complaint that you filed against Mr. Crawford on
5  September 19th, 2001?
6     A.  Yes.
7     Q.  And is this the first complaint you filed
8  against Mr. Crawford?
9     A.  Yes.
10    Q.  Do you know when you first contacted the EEO
11 counselor?  Was it before this letter?
12    A.  Yes.  My -- my first --
13    Q.  All right.
14    A.  My first contact with the EEO counselor was
15 this date right here.
16    Q.  Actually, after I asked that question, I
17 looked at the first sentence of your EEO complaint.
18 It says, This will confirm the verbal EEO complaint I
19 filed with you officially on September 13th, 2001.
0     A.  Okay.  But it was this -- it was at this same
21 meeting.  The EEO counselor came to that meeting, and
22 I got to talk to him then.  It may have been the next
23 day.  You know, I know it was during this same time
24 when I talked to him.
25    Q.  So he was present at this -- what meeting

Page 76

1  were you at when you received --
2     A.  This was --
3     Q.  Let me finish the question.  What meeting
4  were you at when you received Defendant's Exhibit #7?
5     A.  If I recall, it -- it was a meeting he had
6  called for all managers in Birmingham, if I recall
7  correctly.  I'm thinking that was the meeting.  It was
8  during 9/11.
9     Q.  Okay.
10    A.  And it was -- the new state committee was on
11 board; and that was the purpose of the EEO counselor
12 coming, to abreast the state committee on EEO and
13 civil rights laws.
14    Q.  Did you know Mr. McKenzie beforehand?  Had
15 you met him before?
16    A.  Oh, I had met him before, yes.
17    Q.  When you were handed Defendant's Exhibit #7,
18 was there any discussion or conversation when they
19 asked you to sign that?
20    A.  Yes.  When -- when I got in my room that
21 afternoon, Irean called me by telephone.
22    Q.  And this is Ms. Bennett?
23    A.  Bennett, yes.
24    Q.  Mr. Crawford's secretary?
25    A.  Yes.  She told me that Mr. Crawford needed to

Page 77

1  see me.  And my heart fell because I knew it had to be
2  something wrong or otherwise -- but, anyway, I told
3  her, I said, Well, I was just changing my clothes.  I
4  said, Give me a few minutes.  And I said, Where does
5  he want me to meet him?  She said, Would it be okay if
6  he and Debbie come to your room?  And I told her,
7  Okay, just give me a chance to change clothes.
8  Because I was changing out of my meeting clothes to
9  put on something comfortable.
10       And they came to my room, knocked on the door.
11 And he had this in his hand.  And he asked me if I
12 remembered the discussion we had back a few weeks ago,
13 this was a copy -- this was his recollection of what
14 was said, and asked me if I would sign it.  I told him
15 to give me a chance to read it first, and then I'll
16 get it back to you.
17       So this was the next day.
18    Q.  Did he have any problem with that?
19    A.  Did he have any problem with it?
20    Q.  Yeah.  Not with -- with you reading it and
21 getting it back to him.  Did he say that was okay?
22    A.  Yes, he said it was okay.
23    Q.  Any other conversation at that point, or did
24 they leave after they had given it to you?
25    A.  No.  No.  That was all.  No other

OZETTA THOMAS v. MIKE JOHANNS                              11/29/2007
DEPOSITION OF OZETTA THOMAS

21 (Pages 78 to 81)

Page 78

1   conversation that I can recall. No, no other
2   conversation.
3       Q.  And then you read it over. And did you have
4   a conversation with him again about when you provided
5   him a copy? I mean, you wrote that little statement
6   at the bottom of Defendant's Exhibit #7.
7       A.  No, I had no other conversation with him.
8       Q.  Did you leave it with somebody?
9       A.  No, no, no. I gave it back to him just like
10  this.
11      Q.  Okay. The following day?
12      A.  The following day. No words exchanged at
13  all.
14      Q.  All right. Now let's go to Defendant's
15  Exhibit #8. In Defendant's Exhibit #8, if you look at
16  the first paragraph, you allege, let's see, Prior to
17  and since reporting to duty as SED on May 20th, 2001,
18  Mr. Crawford has embarked on a blatant practice of
19  racial discrimination. He has created a hostile
20  working environment for me.
21      Do you see that sentence?
2       A.  Prior to -- yes.
23      Q.  All right. And what are you alleging? What
24  are you claiming Mr. Crawford had done up to that
25  point to create a hostile work environment for you?

Page 79

1       A.  Because when he first came in, any time I met
2   with him after that initial meeting, it was things
3   that I had done that I knew nothing about. It was
4   complaints that had been filed or been -- I don't know
5   if particularly filed, but being complained to him
6   that I knew nothing about. There were times when
7   there were meetings held on programs that I supervised
8   that I could not attend.
9       And then going back to the T&A, he choose to
10  monitor my T&A when no one else -- no one else -- were
11  monitored. And it was monitored without even a
12  warning.
13      Q.  Anything else you're referring to there when
14  your alleging he created a hostile work environment
15  for you?
16      A.  And with all of the -- with the counseling
17  sessions that we have had, to me, that -- that -- I
18  was humiliated. This was in the presence of other
19  people.
20      Q.  Anything else?
21      A.  As of this date?
22      Q.  Yes.
23      A.  I think that was all I listed because the
24  performance rating came a little bit later than this
25  date.

Page 80

1       Q.  Yeah. And I'm going to ask you about that a
2   little bit later.
3       A.  Okay.
4       Q.  But as of this point in time. Okay. So at
5   this point in time, how many times had Mr. Crawford
6   talked to you about your performance?
7       A.  One and two.
8       Q.  And these being the time in August 2001?
9       A.  July and August.
10      Q.  July and August?
11      A.  Yes.
12      Q.  Had he counseled you at any other time about
13  your performance up until September 19th, 2001?
14      A.  No.
15      Q.  All right. When you said you were humiliated
16  because others were present when he counseled you,
17  what were you referring to?
18      A.  Either his executive officer or his secretary
19  were in the meeting, and they could hear, and then I'm
20  sure their friends who were employees. I'm sure it
21  was talked about.
22      Q.  All right. You weren't involved in any
23  conversations between anyone else regarding you, were
24  you?
25      A.  Not me personally, no.

Page 81

1       Q.  So you don't know for sure that they talked
2   about it with anyone else?
3       A.  Well, I asked a member of my staff, and she
4   told me that it was talked about.
5       Q.  All right. Who was that member?
6       A.  That was Sharrie.
7       Q.  Sharrie Peterson?
8       A.  Yes.
9       Q.  When did you have a conversation her?
10      A.  I would talk to Sharrie every day. At least,
11  I talked to all of them every day, but I only would
12  mention this to Sharrie.
13      Q.  And what did you say to her?
14      A.  You know, I just asked her, you know, what
15  was Mr. Crawford talking to them -- what were they
16  telling Mr. Crawford about me. And she informed me
17  that she wasn't telling them anything but that he did
18  come to them and was asking them questions, you know,
19  about my performance, whether I came out and talked to
20  them, whether I kept my door closed, and that kind of
21  thing.
22      And I do recall talking to Jeff one time, and it
23  was when I had received a letter that Mr. Chott had
24  sent. And I just -- I went to Jeff. I said, Jeff, it
25  seems like there is a problem with this SED, you know,

Page 82

1   not informing me on anything. I said, Now -- I said,
2   Because every -- every member of your staff also gets
3   a copy of the same mail that's in my mailbox. So I
4   asked him had he read that, and he said he did. And I
5   said, Well, now, what -- did he think this was -- it
6   was time for me to say something. I did ask Jeff
7   about that before I even said anything to --
8      Q. Time for you to say -- time to say something
9   about what?
10     A. To Mr. Crawford about what -- what was --
11  what this meant.
12     Q. What's in Defendant's Exhibit #3?
13     A. This was Defendant's Exhibit #3, yes. That
14  was the only time I said something to him. You know,
15  I said, It just seems like there's a problem with me.
16  And he -- I said, Do you think it's time that I need
17  to say something to Mr. Crawford? And he told me yes.
18     Q. Did Mr. Knotts say anything else?
19     A. No. That was it. And that was the only time
20  I said anything to him.
21     Q. Okay. And you previously mentioned some
22  meetings that you said you could not attend?
23     A. Well, it --
24     Q. What are you referring to there?
25     A. It was -- the first one was a meeting on loss

Page 83

1   adjustment, which was in my shop, where loss adjusters
2   would come together and be trained on appraising
3   crops. And this meeting was already scheduled.
4      Q. When you became SED?
5      A. Yes.
6      Q. Where was it scheduled for?
7      A. It was scheduled for Foley.
8      Q. Foley, Alabama?
9      A. Yes.
10     Q. Okay. Do you know approximately when, when
11  it was supposed to be held?
12     A. I have it in my chronology of incidents; but
13  off the top of my head, I don't remember the exact
14  date.
15     Q. And did you talk to Mr. Crawford about going
16  to that meeting?
17     A. I did. I did. That's when I met with him.
18  I let him know this was on the calendar for going to
19  that meeting.
20     Q. This is the meeting you had when he first
21  came on board?
22     A. Yes. Yes. It's when I informed him of what
23  we had going on.
24     Q. Okay.
25     A. But at the time, Mr. Crawford decided that we

Page 84

1   needed to look into having this meeting at some other
2   location that was closer because of costs
3   constraints. And I remember going back to my office
4   and getting Jeff, because Jeff was the specialist
5   assigned to this particular program area. And I let
6   him know that Danny had a problem with us scheduling
7   the meeting in Foley when we could have it in some
8   place like Chilton County, you know.
9      So Jeff then, in turn, went back to
10  Mr. Crawford's office with me to discuss with him why
11  we thought Foley was the better place. And it was
12  because of the -- the crops, the different crops that
13  we could have access to in order to train on
14  appraisal. So then Mr. Crawford decided then, hey, we
15  would leave it in Foley.
16     Q. Did Jeff Knotts advise Mr. Crawford at the
17  time that he had already agreed with somebody as
18  producer to have some on-site training down in Foley?
19     A. Yes. And we already had a farmer already
20  scheduled that we could come to his farm and use his
21  crops to appraise.
22     Q. So that already had been set up?
23     A. Yes. Yes.
24     Q. Okay.
25     A. So about two -- two or three days prior to

Page 85

1   this meeting, Mr. Crawford did come to my office to
2   let me know that due to cost, there were no need for
3   me -- and, of course, Walda Messer was also scheduled
4   to go. He said there were no need for us to go.
5      Q. So he didn't allow you or Ms. Messer to go?
6      A. Right.
7      Q. Who went from your section?
8      A. Jeff did.
9      Q. All right. Mr. Crawford said it was due to
10  cost?
11     A. He said it was a cost measurement; but he
12  allowed Jeff to go a day early, which was another
13  extra night of motel. Cost was not considered then.
14     Q. Wasn't Mr. Knotts going a day earlier to meet
15  with the farmer and go over the on-site training which
16  would take place the following day? Did he tell you
17  that?
18     A. No. Well, that should have been me. I'm the
19  chief.
20     Q. Mr. Knotts didn't tell you he was going to do
21  that?
22     A. He came and told me that Mr. Crawford had
23  allowed him to go a day earlier and if I had a
24  problem, to call him.
25     Q. Did he tell you why he was going a day

Page 86

1    earlier, though?
2        A.  I don't recall him telling me why he was
3    going a day earlier, because usually this is an
4    ongoing training annually.  The farmers, they already
5    knew.  They didn't need a pre-update as to what we
6    were going to do.
7        Q.  You're saying the farmers who had agreed to
8    let people come on their land, on site --
9        A.  Sure.
10       Q.  -- didn't have to be met with in advance, in
11   your opinion?
12       A.  No, no, no.  That was already done.  That was
13   already done prior to him going.
14       Q.  It had already been set up.
15       A.  It had been set up already.
16       Q.  But in terms of going down and meeting with
17   them as a courtesy before you have the training the
18   day before, to say this is what we're going to be
19   doing and actually see the fields, you're saying
20   that's not --
21       A.  We had never done it before.
2        Q.  Jeff Knotts, did he tell you why he was going
23   down a day early?  Was there any discussion about
24   that?
25       A.  I don't recall any.

Page 87

1        Q.  Did you ever tell Mr. Crawford that you
2    thought you should go instead of Mr. Knotts?
3        A.  By this time, I knew what was happening.
4    No.  I just -- no.
5        Q.  I mean, he was a specialist in your section
6    in this area?
7        A.  Yes.  Yes.  Yes.
8        Q.  So you didn't attend this training.  Is there
9    any other meetings or trainings that you say you
10   didn't attend?
11       A.  Yes.  There was a -- peanut training.
12       Q.  And where was that held?
13       A.  That was in Florida.
14       Q.  And when, if you know?
15       A.  I don't recall the dates in my head, but I --
16   the dates are in -- in the ROI.
17       Q.  Approximately do you know?
18       A.  It was --
19       Q.  The month.  I don't need the exact date.
0        A.  It was right after that match.  I believe
21   September.  I'm -- I'm not sure.  I'm not -- don't let
22   me give you a date.  I don't recall.
23       Q.  Some time in late summer, early fall?  Is
24   that a fair statement?
25       A.  Yes.

Page 88

1        Q.  And who attended that training from the state
2    office?
3        A.  Mr. Crawford, Sharrie.  And, of course, Walda
4    took annual leave just to go.
5        Q.  And Sharrie Peterson was in charge of
6    peanuts?
7        A.  Yes.
8        Q.  Who else?
9        A.  The district directors.  And there was a
10   CED.  I don't recall what CED.  I believe it was David
11   Ely -- I'm not sure -- that went to that meeting.
12       Q.  Did you ask Mr. Crawford to go to this
13   meeting?
14       A.  We were not talking.  There were never any
15   conversations with us.  The only time I had a
16   conversation was when I got -- when I asked him for
17   conversation was when I first met with him initially
18   and when I got this letter from Mr. Chott.
19       Q.  Well, you say you weren't allowed to attend
20   this meeting.  Did you have any communications with
21   him about going to this meeting?
22       A.  Well, I had informed him of this meeting at
23   the same time when I apprised him what was going on in
24   my shop during that initial meeting.
25       Q.  When he first came on board?

Page 89

1        A.  Yes.
2        Q.  And then at some point, did you have a
3    communication where he said you could not go to this
4    meeting, the peanut meeting?
5        A.  He told me that he would talk with Sharrie
6    about that.  And that's the last conversation we had
7    on it.
8        Q.  And you didn't go to the meeting?
9        A.  I didn't go, didn't get any information on
10   it, didn't get any material on it, didn't get
11   anything.
12       Q.  Did you ever follow up with him, send him an
13   email, leave him a voice mail?
14       A.  I tell you by this time, no.
15       Q.  Did you ever talk to Sharrie Peterson about
16   the meeting or --
17       A.  I did.
18       Q.  What do you recall about that conversation?
19       A.  It was at this meeting when she told me about
20   the conversation around the pool.
21       Q.  All right.  I think I know what you're
22   talking about.  I'll get to that in a second.
23       A.  Okay.
24       Q.  But in terms of who should go to the
25   conference, you had a discussion with Sharrie

OZETTA THOMAS v. MIKE JOHANNS          11/29/2007
DEPOSITION OF  OZETTA THOMAS

24 (Pages 90 to 93)

Page 90

1  Peterson. She was in your section in charge of
2  peanuts. Did you think she should be going to the
3  meeting?
4    A. Well, what had happened prior, when the
5  meeting was the year before, I was called in by the
6  SED, which was Daniel Robinson at that time, and
7  because of -- of -- of cost constraints. And since
8  Sharrie was the peanut specialist, he asked me -- he
9  asked me if I would let Sharrie go in my place since
10  she was from the Wiregrass area, had worked this
11  particular program area in the county office before
12  even coming to the state office. And I agreed.
13    Q. Okay. Now, what's the conversation you
14  recall having with Ms. Peterson about -- I guess
15  something about around a pool? What were you
16  referring to there?
17    A. I asked her how did the meeting go. And, of
18  course, you know, she said the meeting went well. And
19  I asked was there anything said about me that she
20  could recall. She said, I do recall us sitting one
21  day -- one evening after the meeting were over, they
22  were all sitting around the pool. And Danny decided
23  that he would have a little meeting with them while
24  they were just there, just an informal meeting while
25  they were there at the pool.

Page 91

1    Q. Did Sharrie Peterson say who was present?
2    A. The district directors, Walda, and that CED
3  that -- it was all those that went to the meeting from
4  Alabama.
5    Q. From Alabama?
6    A. Yes.
7    Q. What did she tell you was said?
8    A. She said that he told them, I don't know what
9  I'm going to do with Ozetta at this time.
10    Q. Did she tell you what conversation preceded
11  that comment by Mr. Crawford?
12    A. No.
13    Q. Or what was said after Mr. Crawford said
14  that?
15    A. No.
16    Q. Did she tell you anything else about the
17  conversation other than that statement?
18    A. No.
19    Q. Did you ever ask Mr. Crawford what he meant?
20    A. No.
21    Q. Did you have any conversation with him about
22  that?
23    A. We had no conversation, period.
24    Q. Did you have a conversation with either
25  Ms. Messer or the CED or any district directors about

Page 92

1  that comment?
2    A. No. Only Sharrie. I only talked to Sharrie.
3    Q. Did she tell you anything else about the
4  meeting?
5    A. No. Except that it went well.
6    Q. All right. Any other meetings that you claim
7  you were not allowed to attend besides the two you
8  just told me about?
9    A. Yes.
10    Q. Okay. Which?
11    A. There was another one.
12    Q. Was that the last one, or is there another
13  one?
14    A. No. This is another one.
15    Q. Oh, okay.
16    A. This is another one.
17    Q. Which one is this?
18    A. And this -- this were like late. I believe
19  this was like in October. No, no, no. No, no, no.
20  Yes, October, November. There were a state committee
21  meeting scheduled off-site. When I say off-site, it
22  was -- rather than being in the state office, it was
23  held in Dothan.
24    Q. Well, let me ask about that in a few
25  minutes. What I'm asking about are any meetings prior

Page 93

1  to this September 19th memo, which is Defendant's
2  Exhibit #8. When I asked you what the basis of the
3  allegation about the hostile working environment was,
4  you mentioned some meetings that you hadn't been
5  allowed to attend. So prior to that time --
6    A. Oh, okay.
7    Q. -- are there any more other than --
8    A. No, no. Not prior to this time, no.
9    Q. And going back to Defendant's Exhibit #8, you
10  allege that Mr. Crawford took actions because of your
11  race.
12    A. Yes.
13    Q. What evidence do you have or what made you
14  believe that anything Mr. Crawford had done up to this
15  point was because of your race?
16    A. Because I was the only African-American
17  supervisor. And there were two whites that had
18  applied for this position and didn't get it.
19    Q. And those were Mr. Knotts and Ms. Peterson?
20    A. Yes.
21    Q. All right. And what about that made you
22  believe anything Mr. Crawford might have done was due
23  to your race?
24    A. Because they were not wanting to receive
25  instructions from a black.

Page 94

1    Q.  And who is they?
2    A.  I'm -- I'm saying just because I was -- I
3  was -- I was black, staff didn't want to receive
4  instructions from a black, because Jeff and Sharrie
5  both thought they should have received the position
6  because I had left.
7    Q.  On what do you base your claim that
8  Ms. Peterson and Mr. Knotts didn't want to accept
9  instructions from you because you were black?
10   A.  Because they told me they were upset that I
11 got the position.  They were upset that they didn't
12 get the position, at least, and that I should have
13 stayed with Civil Rights, where I was, rather than
14 coming back taking the chief position.
15   Q.  Well, simply -- so they mentioned to you they
16 were upset they didn't get the job.
17   A.  Yes.  Yes.
18   Q.  What about that made you believe that they
19 were upset because you're African-American?
20   A.  That's just the way it is.  That's just the
21 way it is nationwide.
22   Q.  Is there anything you can point me to in
23 particular that made you have that belief here?
24   A.  I don't know if there is anything I can point
25 to particularly other than just being black.

Page 95

1    Q.  Now, Mr. Knotts and Ms. Peterson both worked
2  for Mr. Robinson, correct?
3    A.  Yes.
4    Q.  And they both admired him, correct?
5    A.  As far as I know.
6    Q.  Did they ever say anything bad about
7  Mr. Robinson to you?
8    A.  They were very upset with him that he hired
9  me.
10   Q.  Well, I'm talking about his performance when
11 he was chief.
12   A.  Oh.  Not that I know of.
13   Q.  And he -- and Mr. Robinson is
14 African-American, correct?
15   A.  Yes.
16   Q.  Now, going back to Mr. Crawford, I asked you
17 what made you think anything Mr. Crawford might have
18 done when you filed this complaint and alleged race
19 discrimination was due to your race.  You mentioned
20 that Mr. Knotts and Ms. Peterson -- you didn't believe
21 they wanted to accept instruction from you.  What else
22 made you believe --
23   A.  What else made me believe that, because --
24   Q.  Let me finish the question -- that anything
25 Mr. Crawford was doing was due to your race?

Page 96

1    A.  Okay.  If I can bring you up to date, this
2  really started before Mr. Crawford.  And it started
3  with Debbie Williams and the district directors.  They
4  didn't want me in this position.
5    Q.  And when you say this position, what position
6  are you referring to?
7    A.  As chief.
8    Q.  And what is your basis for saying
9  Ms. Williams and the district directors didn't want
10 you as chief?
11   A.  Because Ms. Grider had informed me -- and not
12 only me, she really informed the entire staff -- that
13 the district directors wanted her to make some
14 changes; but she said she told them that she would not
15 make any changes at this time, she would wait until
16 the permanent SED come on board.  It was Ms. Grider
17 that came to me and asked me to put the Geneva County
18 review as my first priority because Mr. Crawley was on
19 her case about these erroneous payments that he
20 thought had been issued.
21       And this had also been an issue prior to
22 Mr. Robinson leaving.  And Mr. Crawley has said that
23 since Mr. Robinson didn't do anything about it, then
24 he was asking Ms. Grider to do something about it.
25 So --

Page 97

1    Q.  Okay.  Just hold on for a second.  Who is
2  Mr. Crawley?
3    A.  Jack -- Jack Crawley is the district
4  director --
5    Q.  For Geneva County?
6    A.  -- for Geneva County.  Yes.  So -- and this
7  is when the issue came up about payment limitations
8  and when the issue came up about they needed someone
9  other than my recommendations to come in and review
10 payment limitations in Geneva County.  And it is my
11 opinion that this was done on payment limitations
12 because I was the only one familiar with that program,
13 and it was to shed light that I didn't know my
14 programs in order to get rid of me.
15       So there were discussions with Mr. Crawford
16 before he was confirmed, and he just carried out their
17 wishes once he came on board.  And that's because I
18 was black.
19   Q.  First, were you involved in any of these
20 conversations with Mr. Crawford?  You personally
21 weren't present for any conversations?
22   A.  I personally wasn't, but I have witnesses
23 that informed me of that.
24   Q.  Let me finish.  You weren't present for any
25 conversation Mr. Crawford had with Ms. Williams or any

OZETTA THOMAS v. MIKE JOHANNS                                    11/29/2007
DEPOSITION OF  OZETTA THOMAS

26 (Pages 98 to 101)

Page 98

1  of the district directors regarding you, correct?
2    A.  No.
3    Q.  Now, you say you have some witnesses who told
4  you about some conversations?
5    A.  Yes.
6    Q.  Who are you referring to?
7    A.  Mr. Robinson told me.
8    Q.  What did Mr. Robinson tell you?
9    A.  That prior to him leaving, we were in a
10 meeting in Birmingham and it was rumor at the time
11 that Mr. Crawford would be the SED.  And there was a
12 meeting held in one of the CEDs' room.  Because at the
13 same time, Mr. Robinson was trying to stay on until
14 Mr. Crawford was confirmed.  He was trying to stay on
15 as acting.  So there was a meeting among the CEDs in
16 their -- in a motel room concerning our fate with the
17 office.  And then once Mr. Robinson had to go because
18 of the change in the administration, because he had an
19 appointed position, then the next step was to get rid
20 of me.
21    Q.  Now, what -- Mr. Robinson told you he
22 attended some meeting in the hotel with these people
23 or he heard about it?
24    A.  He told -- he told me that -- he didn't tell
25 me who told him, but someone who was present told him.

Page 99

1    Q.  So someone told him about a meeting?
2    A.  Yes.
3    Q.  What did they tell him about the meeting?
4    A.  That they were discussing our fate, his fate
5  and mine, with the agency when Mr. Crawford would be
6  confirmed as the SED.
7    Q.  But Mr. Robinson wasn't present during this
8  meeting?
9    A.  No.  He told me someone else present --
10   Q.  He didn't identify who it was?
11   A.  No, he didn't tell me.
12   Q.  Did he say -- did he make any indication that
13 this person told him what specifically was discussed?
14   A.  No.  That's all he told me.
15   Q.  Or whether --
16   A.  That they discussed our fate with the agency.
17   Q.  Did he mention whether any other employees'
18 fate was discussed?
19   A.  No.  That was all he told me.
20   Q.  And let me jump back.  Earlier you mentioned
21 that Ms. Grider had stated that, I guess, someone had
22 asked that she make some changes in the staff.
23   A.  Yes.
24   Q.  When did she make that comment to you?
25   A.  It was during a staff meeting and -- okay.

Page 100

1  Mr. Robinson left in -- it was between February and
2  March of 2001.
3    Q.  Did she indicate who asked for changes or
4  what types of changes?
5    A.  No.
6    Q.  Did you ever ask her?  Like following that
7  meeting, did you have any conversation with her about
8  it?
9    A.  No.  The only conversation I had with her was
10 after my detail.
11   Q.  What was that conversation?
12   A.  She told me that she knew I had had a rough
13 time and that while I was on detail, there had been a
14 national training on the new farm bill.  She said, I
15 know you're not familiar with the new farm bill.  She
16 said, But what I want you to do, don't let them run
17 you away again.  She said, Get your handbook and study
18 on this new farm bill, and you stay here with your
19 job.
20   Q.  All right.  Do you know approximately when
21 this conversation was?
22   A.  It was as soon as I went back January --
23 January 2000 --
24   Q.  '03, when you returned to --
25   A.  '03, when I returned.

Page 101

1    Q.  -- your duty?
2    A.  Yes.
3    Q.  Did you have any other conversations with
4  Ms. Grider?
5    A.  No.
6    Q.  And she has passed away, hasn't she?
7    A.  Yes.
8    Q.  All right.  And earlier you mentioned that it
9  was your opinion that there was, I guess, some kind of
10 focus on program limitations, because that was your
11 speciality.
12   A.  Uh-huh.
13   Q.  And you indicated you thought the focus was
14 because you were African-American.
15   A.  Uh-huh.
16   Q.  What made you lead to that conclusion?
17   A.  Because they wanted -- they wanted me fired.
18 They wanted to leave.
19   Q.  And what --
20   A.  And that was their way to attack my
21 performance.
22   Q.  Were you involved in any conversations among
23 any other employees about program limitations or any
24 problems in that area?
25   A.  None other than when I went to Geneva County

Page 102

1   for that review, the PT, who I didn't even know
2   handled that program, let me know that she had had no
3   training in Payment Limitation and she needed
4   training.
5       Q.  So is it your opinion -- would you admit
6   there were problems with program limitations in Geneva
7   County?
8       A.  I admit there's problems with everything in
9   Geneva County not just Payment Limitation, but that
10  was just the focus point at that time.
11      Q.  Did you express to anybody else any concerns
12  you had with other problems in Geneva County besides
13  program limitations?
14      A.  On my case?
15      Q.  Well, anytime.  You said there were always
16  problems in Geneva County.  Why didn't you express --
17  I saw that you wrote a memo to Ms. Grider regarding
18  the problems you had with program limitations.  Did
19  you express any other problems or concerns you had
20  about --
21      A.  No.  Not to anybody else, no, other than Art
22  Lynn, who was the CED at the time.
23      MR. PETTAWAY:  Did you understand his
24  question?
25      THE WITNESS:  He asked me did I talk to

Page 103

1   anybody else other than Ms. Grider.
2       MR. PETTAWAY:  He's asking about did you
3   express any other concern about any other areas in
4   Geneva County to anybody else.  That's what he asked
5   you.
6       THE WITNESS:  Oh, okay.
7       A.  Okay.  Can I --
8       Q.  Besides Payment Limitations.
9       A.  Okay.  Can I address that?
10      MR. PETTAWAY:  Yeah.
11      Q.  Yeah.  I want you to answer my question.
12      A.  Okay.  Yes.  Recently, there was a black
13  female CED in Geneva County that was terminated
14  because of the problem in all program areas in Geneva
15  County.  And I spoke with her about it.
16      Q.  What is her name?
17      A.  Olivia McGray.
18      Q.  All right.  Going back to 2001, when you
19  had -- were you aware of other problems in Geneva
20  County in 2001 when you did the review of Mr. Hale's
21  and wrote the memo to Ms. Grider?
22      A.  Well, I knew from the existence of Geneva
23  County, there have always been problems.  Even when I
24  first went to the state office in 1986, there have
25  always been problems.  Never --

Page 104

1       Q.  Did you write any memos or request any action
2   to be taken?
3       A.  No.  I was not asked to review anything at
4   the time, but there were other reviews done by other
5   people on other programs.
6       Q.  And what reviews are those?
7       A.  There were CEDs that were put on OTI.  So
8   that's what I'm saying.  There's always been a problem
9   in Geneva County.  We had a state specialist that went
10  to Geneva County as a CED and was placed on OTI.
11  There has always been friction between the district
12  director and some of the farmers in Geneva County and
13  some of your employees.
14      Q.  Now, these things you read about or heard
15  about?
16      A.  Yes, read about in reports.  When the COR
17  would do reports, each -- each division had an
18  opportunity to read those reviews as to problems that
19  existed.  And then you hear talk, too.
20      Q.  All right.  Going back earlier, you said you
21  were the only African-American supervisor.
22  Ms. Verdell Zeigler is African-American, isn't she?
23      A.  I said in the program area.
24      Q.  Okay.  In the program area meaning?
25      A.  Ms. Zeigler is in administrative.

Page 105

1       Q.  Would there be only one supervisor in the
2   program area, though, the chief of the section?
3       A.  Yes, uh-huh.  But we had never had one before
4   is what I'm saying.
5       Q.  Well, Mr. Robinson was chief.
6       A.  No, no, no.  Female, black female.
7       Q.  Oh, okay you're saying black female?
8       A.  Yes.
9       Q.  Did Mr. Knotts or Ms. Peterson ever say
10  anything derogatory about African-Americans?
11      A.  Not to me.
12      Q.  Did you ever hear that they had said anything
13  derogatory about African-Americans to anyone else?
14      A.  No.
15      Q.  All right.  Going back to Defendant's
16  Exhibit #19, have you told me all the reasons you
17  believe that any actions Mr. Crawford had taken up to
18  the point you filed this complaint was due to your
19  race?
20      A.  I thought I filed race and gender on my
21  initial complaint, or did I?
22      Q.  I'm looking at Defendant's Exhibit #8, and I
23  only see race here.
24          (Brief pause)
25      A.  I -- it may not have been this one but I -- I

Page 106

1    included gender on one. I filed so many. How about
2    that second paragraph? Can I look through here a
3    minute?
4        Q. Well, if we take a break to go off the
5    record. What are you referring to? You want to look
6    through an ROI?
7        A. I -- to see the particular one where I said
8    race and gender. It may not have been this one.
9        Q. Defendant's Exhibit #8?
10           MR. DuBOIS: Let's go off the record for a
11   second if you want to check.
12           (Brief recess)
13           MR. DuBOIS: Back on the record.
14       Q. My question, I think --
15           MR. DuBOIS: What was my last question? Can
16   you read it back?
17           (Court reporter read as requested.)
18       Q. Have you told me all the reasons you believe
19   Mr. Crawford has acted because of your race when you
20   made this complaint in Defendant's Exhibit #8?
21       A. Yes, I have. Because there -- in the history
22   of this agency, there had been no African-American
23   supervisors. Very few. Very, very few.
24       Q. Anything else that made you think it was due
25   to race other than what you told me?

Page 107

1        A. I think that's all that I can think of right
2    at this time.
3        Q. I'm going to hand you a document marked as
4    Defendant's Exhibit #9. If you could take a second
5    and look at Defendant's Exhibit #9 and tell me if this
6    is a performance review you were handed on November 6,
7    2001, as well as an Opportunity to Improve?
8        A. Yes.
9        Q. And do you know where you were when this was
10   given to you?
11       A. In Mr. Crawford's office.
12       Q. All right. Was anyone else present besides
13   you and Mr. Crawford?
14       A. I believe it was Debbie present this time,
15   Debbie Williams.
16       Q. And was this the first annual review you had
17   under Mr. Crawford?
18       A. Yes.
19       Q. And this document which he handed you on,
20   what, November 6th, 2001, had a results not
21   achieved/meeting?
22       A. Yes.
23       Q. Did you have a discussion with Mr. Crawford
24   about this performance work plan and the OTI when he
25   handed it to you?

Page 108

1        A. Yes.
2        Q. What do you recall from that discussion?
3        A. I was -- I was so shocked. Let me see if I
4    can remember what I recalled. I recalled asking him
5    was I going to be given an opportunity to -- to
6    rebuttal on this performance rating.
7        Q. You mean like --
8        A. On this Opportunity to -- to Improve. I also
9    recall that it was not really filled out in its
10   entirety.
11       Q. You thought they should have had more
12   comments?
13       A. And I also asked him why it was not even
14   signed by Mr. Chott. I believe regulations stated
15   that if an employee receives a not achieved rating, it
16   had to have the approval of Mr. Crawford's
17   supervisor. Then if you look at the OTI, the second
18   page of the OTI, where it shows the element eight that
19   I failed in, they didn't complete eight and nine.
20       Q. All right. So when Mr. Crawford handed you
21   documents, you believe that you told him that parts of
22   them were incomplete and that it was missing
23   Mr. Chott's signature?
24       A. Right, uh-huh.
25       Q. Did you bring that up? Do you recall

Page 109

1    bringing that up and discussing that?
2        A. I'm thinking I did, as to why it was not
3    signed by -- by Mr. Chott.
4        Q. Do you have any --
5        A. And I -- I asked was I going to have a chance
6    to rebuttal. But I was informed that I would have to
7    go on and -- take the OTI and abide by it and I
8    did so.
9        Q. All right. Let me hand you documents marked
10   Defendant's Exhibit #10.
11       A. It's been so long ago.
12       Q. Can you tell me if you've seen Defendant's
13   Exhibit #10 before?
14       A. I believe this is the one that Debbie emailed
15   me.
16       Q. Did she provide you a copy of these notes in
17   November 2001?
18       A. Yes. I think she emailed this to me.
19       Q. And this states it's a memo for record
20   regarding the meeting Mr. Crawford had with you on
21   November 6th, 2001, when he gave you your performance
22   work plan in the OTI, correct?
23       A. Uh-huh. Yes.
24       Q. Does this look to be an accurate statement of
25   the conversation that took place on that day?

Case 2:05-cv-00411-WKW-SRW    Document 57-2    Filed 03/04/2008    Page 29 of 43
OZETTA THOMAS v. MIKE JOHANNS                                11/29/2007
DEPOSITION OF  OZETTA THOMAS

29 (Pages 110 to 113)

Page 110

1    A. Yes. Yes, uh-huh. This is about what he
2  told me.
3    Q. Do you recall anything else that's not in
4  this memo being discussed on that day other than what
5  you've previously told me, if that's not in here?
6    A. I don't know if it's in here, but I -- I do
7  recall the first OTI they had scheduled for me was not
8  a good date and had to be rescheduled. I don't know
9  if that's in here or not.
10   Q. You mean the first follow-up meeting on the
11  OTI?
12   A. No, no. The first -- the first training that
13  I needed to attend, right, was inconvenient; so it was
14  rescheduled.
15   Q. All right. It looks to be -- what I think
16  you're referring to is the third paragraph on the
17  first page.
18   A. Yes.
19   Q. Okay. Anything else you can think about that
20  was discussed in this meeting other than what's in
21  this memo and what you told me about?
22   A. I don't think so. That's been five years
23  ago.
24   Q. Going back to Defendant's Exhibit #9, it
25  states you refused to sign. Is that your handwriting

Page 111

1  where it says refused to sign? I'm looking at
2  Defendant's Exhibit #9, one, two, three, four pages
3  in.
4    A. No.
5    Q. Did you tell Mr. Crawford you refused to sign
6  it?
7    A. I told him I wasn't going to sign it.
8    Q. Did you tell him the reason? Do you recall
9  if you did tell him a reason?
10   A. I told him I -- because I didn't -- I didn't
11  agree with it.
12   Q. And what's your understanding of an
13  Opportunity to Improve? How does that work? Is there
14  a limited period of time? What was your understanding
15  of explaining what an OTI is?
16   A. This was my first really being involved in an
17  OTI. I -- before. My first, only, and last.
18   Q. Had you ever placed any of your employees
19  under an OTI?
20   A. No, no. And I knew it was an opportunity to
21  improve where they give that employee some training to
22  improve their performance.
23   Q. Was it your understanding it would be removed
24  if you satisfactorily completed the training after a
25  certain period of time?

Page 112

1    A. Yes. That's regulations.
2    Q. And that during that period of time, I guess
3  you have some more meetings with a supervisor to
4  monitor performance or to discuss performance?
5    A. Yes.
6    Q. Did Mr. Crawford explain that to you?
7    A. He did. I think I only had one more meeting
8  before I was detailed. I had one training and one
9  more follow-up, if I can remember correctly.
10   Q. Let me hand you Defendant's Exhibit #11.
11   A. Yes.
12   Q. Can you tell me if this is a memo that
13  accounts, I guess, a follow-up session you had on your
14  OTI with Mr. Crawford on November 28th, 2001?
15   A. Okay. Yes. This was the one that was
16  emailed to me. I -- I -- not that one. This was the
17  one that was emailed to me.
18   Q. Well, going back to Defendant's Exhibit #10,
19  have you seen that document before?
20   A. Yes. Yes, I have.
21   Q. So you did receive a copy?
22   A. Yes.
23   Q. Now, Defendant's Exhibit #11, you were
24  emailed a copy of this document?
25   A. Yes.

Page 113

1    Q. All right. And do you recall this meeting
2  where you -- I guess you met with Mr. Crawford to
3  discuss your performance on November 28th, 2001?
4    A. Uh-huh. Yes.
5    Q. And when Ms. Bennett was present taking
6  notes?
7    A. Either Ms. Bennett or Debbie. I think it --
8  it could have been Ms. Bennett.
9    Q. You don't recall?
10   A. I don't recall which one it was. One of the
11  two.
12   Q. At the end of that meeting on November 28th,
13  did Mr. Crawford tell you you were making progress and
14  he did not see any reason why it would not continue?
15   A. I remember him telling me that.
16   Q. What evidence do you have that he did not
17  honestly want you to improve?
18      MR. PETTAWAY: Object to the form of the
19  question as phrased, but go ahead and answer it if you
20  can.
21   A. Okay. It was -- well, I didn't need to
22  improve. This was just a way of getting me out.
23   Q. In your opinion, you didn't need any of this
24  additional training?
25   A. Well, there is always room for improvement.

Page 114

1    You know, there is always room for improvement for
2    anyone; but what I'm saying, my performance didn't
3    equal to this. This was not my performance at all.
4        Q. You disagree with his assessment of your
5    perform --
6        A. I disagree totally, yes.
7        Q. Let me finish. You disagree with his
8    assessment of your performance?
9        A. Yes.
10       Q. Did he tell you on this November 28th, 2001,
11   meeting that you could come to him at any time for
12   assistance?
13       A. I don't recall.
14       Q. Well, looking through -- you can look through
15   Defendant's Exhibit #11. Does it appear to be an
16   accurate account of that meeting on November 28th,
17   2001?
18       A. Yes. This is a pretty extensive one here,
19   yes.
20       Q. Do you recall anything discussed at the
21   meeting on November 28th, 2001, that's not in this
2    memo?
23       A. I don't think so. What else could you --
24   what else could you have that wasn't in here?
25   Everything is in here.

Page 115

1        Q. Did you tell him in this meeting on
2    November 28th, 2001, that you would be retiring in 11
3    months?
4        A. I told him that during this meeting, yes.
5        Q. That was your intention at the time? Were
6    you planning on retiring in 11 months?
7        A. That was what I was feeling. Anything to get
8    out of the situation I was in. This was prior to any
9    mediation, and I just -- just knew I couldn't keep
10   tolerating these types of treatments. Yes, I told him
11   that because I was going to be of age at that time and
12   not because I had made plans to do it.
13       Q. Did he have any response when you said that?
14   Do you recall?
15       A. I believe he said, you need to wait until the
16   first of the year or something like that, I think is
17   what he said.
18       Q. Any other conversation about retirement?
19       A. No. No.
20       Q. Now, after this November 28th, 2001, meeting
21   regarding your OTI follow-up, you agreed to attend a
2    binding mediation relating to your first EEO complaint
23   that you filed in September 2001, right?
24       A. Yes.
25       Q. Do you recall that?

Page 116

1        A. Yes.
2        Q. Before I get there, earlier you mentioned, I
3    believe, that there was a meeting in November,
4    December 2001 you believe that you weren't allowed to
5    attend.
6        A. That was the peanut meeting in Florida.
7        Q. That was the peanut meeting?
8        A. Yes.
9        Q. So you told me about all of the meetings that
10   you thought you should have been allowed to attend and
11   didn't?
12       A. I didn't tell you -- did I tell you about the
13   peanut tour in Dothan? That's the one you cut me off
14   on, I think.
15       Q. So there was a peanut tour in Dothan?
16       A. Yes. It was a state committee meeting in
17   Dothan. And in conjunction with that meeting, state
18   committee and state specialists who were in attendance
19   would tour the peanut marketing because that was the
20   area where our peanuts were marketed.
21       Q. And this was in Dothan?
22       A. Dothan, Alabama.
23       Q. What point in 2001? October, November? Is
24   that what you said earlier?
25       A. This was like October. I think it's -- yeah,

Page 117

1    it was prior to.
2        Q. And who from the state office went to this
3    state -- or this peanut tour?
4        A. It was all the chiefs. You want them by
5    name?
6        Q. Yeah. Who do you recall attending or --
7        A. It was -- I can't recall who all went to the
8    tour because I wasn't there for the tour, but I can
9    probably recall who went to the meeting.
10       Q. Okay. Now, were you at the meeting?
11       A. I went to the meeting, yes.
12       Q. You went to the meeting; you just didn't go
13   to the tour?
14       A. Right. The meeting was Joan Grider, Bill
15   Sewell, Debbie Williams, and of course Walda Messer,
16   all of your district directors, and all of your state
17   committee persons.
18       Q. All right. Now, did you ask to go on this
19   tour?
20       A. The meeting -- the tour was scheduled in
21   order to give all attendees an opportunity to see the
22   marketing of peanuts. Okay. But what happened,
23   there -- there were schedules that were changed two
24   and three times because as a division meet with the
25   state committee, depending on the time of their

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF OZETTA THOMAS

31 (Pages 118 to 121)

Page 118

1  meeting with the state committee, they were not
2  authorized to stay overnight. Because the tour was to
3  be the next morning. Initially, I was scheduled late,
4  which would have given me the opportunity to spend the
5  night and I could have gone to the peanut tour; but it
6  was changed three times. And as it was changed, Irean
7  would send out the schedule. The last one, my name
8  was deleted, because they rescheduled me to meet with
9  the state committee and I had to return a 300-mile
10 round-trip so that I would not have to tour -- take
11 the peanut tour.
12    Q. Did you have any discussion with anyone as to
13 why the meeting time had been changed?
14    A. No.
15    Q. Did you ever make any requests to anybody to
16 be allowed to stay to go on the tour?
17    A. No.
18    Q. Did anyone from your section go on the tour,
19 to your knowledge?
20    A. Yes. Walda Messer.
21    Q. And how did you hear that she went on the
2  tour?
23    A. Because she was there. She stayed overnight.
24    Q. Was she giving some presentation?
25    A. No.

Page 119

1     Q. Do you know why she was at the meeting?
2     A. Because she's a friend of Debbie.
3     Q. Did someone tell you that, or is that just
4  your --
5     A. Oh, I know she's a friend of Debbie. They're
6  very good friends.
7     Q. All right. Have you told me about all of the
8  meetings or tours you believe you weren't allowed to
9  attend?
10    A. Well, this may be irrelevant; but to show you
11 another case of disparity, at this same meeting, for
12 lunch hour, they had made reservations, although it
13 was there at the motel, as a group for all employees
14 to dine together. I was not invited to that. But it
15 just so happened I was finished with my meeting and I
16 was going to eat before heading back to Montgomery.
17 And when I walked into the restaurant, the waitress
18 asked me was I a part of this group. Of course, I
19 didn't know anything about it, but -- so.
20    Q. Did you talk to anyone about that at any
21 point in time?
2     A. No. I -- I had a seat with some of the state
23 committee persons --
24    Q. So you did --
25    A. -- in the restaurant.

Page 120

1     Q. You did have lunch with --
2     A. I did have -- yes, I did lunch with them.
3     Q. -- with the employees?
4     A. Yes.
5     Q. Do you have any idea who set up that
6  reservation?
7     A. I'm sure Irean did. She set up all of that
8  for the meetings.
9     Q. That's just based on her position?
10    A. On her position, yes.
11    Q. Do you have any idea whose responsibility it
12 was to let people know about the reservations?
13    A. She would have.
14    Q. What makes --
15    A. She would -- she would let people know.
16    Q. What's your basis for asserting that -- are
17 you claiming that you weren't told about the
18 reservations --
19    A. I wasn't.
20    Q. -- because of your race?
21    A. I wasn't told.
22    Q. What makes you think it had anything to do
23 with your race?
24    A. By this time, nobody would have anything to
25 do with me or say to me. I was totally ostracized.

Page 121

1     Q. Who are you claiming was ostracizing you by
2  this point?
3     A. It was all orchestrated by Mr. Crawford.
4     Q. But my question is, do you have any evidence
5  that Mr. Crawford told people not to talk to you or
6  not to socialize with you?
7     A. I don't know that. I don't know that. But
8  with him saying they all had complaints with me, there
9  had to be some conversations between them somehow.
10    Q. So what particular employee are you -- when
11 you're saying I was ostracized, what employees are you
12 referring to? Are you saying everybody in the state
13 office?
14    A. Yes.
15    Q. Did you talk -- did you have anyone that you
16 talked to in the state office?
17    A. Except Vicki.
18    Q. So is it your testimony that Vicki is the
19 only person that talked to you?
20    A. Yes.
21    Q. You didn't talk to Sharrie Peterson?
22    A. Not about my case, no.
23    Q. How about the work in your section?
24    A. Oh, sure. We talked about work, sure. And
25 sure, I talk with my staff about work. But I'm saying

OZETTA THOMAS v. MIKE JOHANNS                                    11/29/2007
DEPOSITION OF OZETTA THOMAS

32 (Pages 122 to 125)

Page 122

1   for anything outside of my work inside the state
2   office, I didn't have any conversations with anybody.
3       Q.  Did you initiate any with anybody about any
4   issues and they just walked away from you, or are you
5   just saying you didn't feel --
6       A.  By this time when you -- when you realize
7   that you are not wanted, when you realize that people
8   are doing everything in the world to get rid of you,
9   you have that feeling. You know when people want to
10  talk to you and when they don't.
11      Q.  So is the answer --
12          MR. PETTAWAY: You got to answer his
13  question.
14      Q.  So the question was, did you go up to other
15  people -- what was the question?
16          MR. DuBOIS: Read back the question.
17              (The court reporter read as
18              requested.)
19      A.  Okay. No, I didn't -- I didn't initiate any
20  conversation with anybody.
21      Q.  And no one walked away in the middle of a
22  conversation?
23      A.  No. No. Because I never talked to anybody.
24      Q.  All right. Let me mark this as Defendant's
25  Exhibit #12. Let me give you a document marked as

Page 123

1   Defendant's Exhibit #12. Can you tell me if you
2   recognize this document?
3       A.  Yes. I signed this.
4       Q.  And this is an agreement to participate in an
5   early resolution program to resolve your EEO
6   complaints, correct?
7       A.  Yes.
8       Q.  On the first page, is that your handwriting?
9       A.  Yes.
10      Q.  So did you fax this two-page document which
11  is marked as Defendant's Exhibit #12 to
12  Ms. Lombardino?
13      A.  Yes.
14      Q.  Turn to the second page. Is that your name
15  printed there and your signature?
16      A.  Yes.
17      Q.  And I guess you filled this out on
18  November 1st, 2001.
19      A.  Yes.
20      Q.  Okay. Now, prior to the mediation which took
21  place in December, did you have some conversation with
22  Ms. Lombardino about the mediation?
23      A.  Yes.
24      Q.  And she at the time was the chief of the EEO
25  Counseling and Mediation Branch for USDA?

Page 124

1       A.  Yes.
2       Q.  Did you request to her that your performance
3   work plan and your opportunity to improve be included
4   in the mediation?
5       A.  Yes.
6       Q.  Did she say yes, that's okay?
7       A.  Yes, she did.
8       Q.  Did you at any point ask Ms. Lombardino to
9   assign a female mediator to mediation?
10      A.  Yes.
11      Q.  Why did you make that request?
12      A.  Because I felt females would have been more
13  familiar with my feelings as a female.
14      Q.  And I guess a female mediator was assigned,
15  Ms. Hope Light; is that right?
16      A.  Yes.
17      Q.  And the mediation was held on December 5th,
18  2001?
19      A.  Early December, yes. I'm not sure of the
20  exact date.
21      Q.  At that time, you were represented by
22  counsel, right?
23      A.  Yes.
24      Q.  And when did you first retain an attorney?
25      A.  Soon after I filed the first complaint in

Page 125

1   September.
2       Q.  Did someone refer you to the attorney that
3   you ended up retaining?
4       A.  No.
5       Q.  And that was, I guess, a -- it was a
6   Mr. Robinson?
7       A.  Yes. It was this firm.
8       Q.  At this particular law firm?
9       A.  Yes.
10      Q.  And did your attorney meet -- I mean attend
11  the mediation with you?
12      A.  Yes.
13      Q.  Who else was present at the mediation?
14      A.  Mr. Crawford; Debbie Williams; the mediator,
15  Hope Light; and the resolving official, William Marsh;
16  my attorney, Robinson; and myself.
17      Q.  And did that essentially -- at the mediation,
18  did the mediator talk to you and your attorney in
19  private and caucus with the other side in private and
20  go back and forth trying to reach some kind of
21  agreement? Is that what took place?
22      A.  Well, the mediator would not let my attorney
23  speak.
24      Q.  All right. So --
25      A.  He was just an observer. So she -- she --

OZETTA THOMAS v. MIKE JOHANNS                                11/29/2007
DEPOSITION OF OZETTA THOMAS

33 (Pages 126 to 129)

Page 126

1    after the meeting -- she caucused with us first, yes.
2    She caucused with me and my attorney first and then
3    allowed us to go to lunch while she caucused with
4    Danny and Debbie. And then on our way back walking
5    back to the building from lunch, Dan and Debbie were
6    in their car leaving. So there were no back and
7    forth; it was just a onetime thing.
8        Q. And the mediator -- what you said -- or
9    strike that.
10       And you did reach an agreement to settle your
11   claim at that action, correct?
12       A. Yes.
13       Q. And let me hand you Defendant's Exhibit #13.
14   Is this a copy of the resolution agreement you reached
15   on that date?
16       A. Yes.
17       Q. And turning to the third page, under
18   paragraph six, is that your signature on the first
19   line?
20       A. Yes.
21       Q. And the date you signed it was December 5th,
2    2001?
23       A. Yes.
24       Q. And looks like your attorney signed it as
25   well?

Page 127

1        A. Yes.
2        Q. Were you allowed to consult with your
3    attorney before you signed this?
4        A. What you mean, in privacy?
5        Q. Yeah, in private.
6        A. No.
7        Q. Did you talk to your attorney at all about
8    this before you signed it?
9        A. No.
10       Q. I don't want to know the nature of what you
11   talked about. You didn't talk to your attorney?
12       A. No. We was sitting there waiting for them to
13   bring this to us, no. And the mediator had to carry
14   it to Danny and Debbie for their signature. They had
15   gone back to the office.
16       Q. All right. Now, you voluntarily signed this
17   agreement, correct?
18       A. I did.
19       Q. Now, in this agreement, going to the first
0    page, one of the provisions is the agency agreed to
21   detail you to the Civil Rights and Small Business
22   Utilization Staff Program Complaints Branch in
23   Montgomery effective December 16th to return to your
24   former position effective January 5th, 2003, correct?
25       A. Yes.

Page 128

1        Q. And this was done, right? You were actually
2    detailed for that period of time?
3        A. Yes.
4        Q. And did you receive, I guess, an SF51 form
5    about that detail? Do you recall receiving one?
6        A. I did get one later on.
7        Q. Now, when you signed this agreement, there
8    was no guarantee that that detail would be extended,
9    correct?
10       MR. PETTAWAY: Object to the form. You can
11   answer.
12       A. No.
13       Q. You understood that?
14       A. No. I understood that, yes.
15       Q. Let me give you -- let's see Defendant's
16   Exhibit #14. I think I'm up to #14.
17       Do you recall receiving a copy of this, which is
18   request for personal action indicating your detail to
19   the Office of Civil Rights?
20       A. Yes.
21       Q. And if you go to the resolution agreement,
22   which is Exhibit #13, the agency agreed to pay you the
23   sum of $1500, which it indicates is a total and
24   complete settlement of all money issues payable to
25   complainant or to her attorney in this matter. You

Page 129

1    see that?
2        A. Yes.
3        Q. And you were actually given a check for $1500
4    for attorney's fees, correct?
5        A. Yes.
6        Q. And let me -- Defendant's Exhibit #15. If
7    you could take a look at that and tell me if that's a
8    copy of the check that was given to you and your
9    attorney.
10       A. Yes.
11       Q. And going back to the resolution agreement,
12   on the first page, the third thing there is the agency
13   agreed to grant you a one grade increase from -- let's
14   see -- GS13, Grade 6, to a GS13-7 with an effective
15   date of January 13th, 2002. You see that?
16       A. Yes.
17       Q. Do you recall it turned out that you were
18   already a GS-13-7 at this time, and instead you were
19   bumped to a GS-13, Step 8?
20       A. Yes. That was a mixup during the --
21       Q. Do you know how much that increased your
22   paycheck to go up from a Step 7 to a Step 8?
23       A. About $2,000.
24       Q. Would that be per paycheck or per month?
25       A. Per pay period.

Page 130

1    Q.  In the next -- and I'm looking at the first
2  page of the resolution agreement.  The agency agreed
3  t  expunge all references and all records maintained
4  b  the agency of performance-related matters
5  concerning the complainant since May 21st, 2001.  Do
6  you see that?
7    A.  Yes.
8    Q.  And that was done, correct?
9    A.  I hope so.
10   Q.  Did you ever ask to review your personnel
11  file?
12   A.  No.
13   Q.  You were advised that the PWP and the OTI had
14  been removed, correct?
15   A.  I don't think I was ever advised nor did I
16  ask to look at it.
17   Q.  But it was your understanding that was done?
18   A.  It was my understanding it was.
19   Q.  Let me hand you now Defendant's Exhibit #16.
20  Can you tell me if Defendant's Exhibit #16 is a copy
21  of a revised performance work plan that indicates
22  results achieved that you were provided in January
23  2002?
24   A.  Yes.
25   Q.  And if you go to the last page, you see the

Page 131

1  top where it has REC and a date of 1/22/02?
2    A.  Uh-huh.
3    Q.  Is that your handwriting?
4    A.  Yes.
5    Q.  Are those your initials?
6    A.  OT.  OT, yes.
7    Q.  So did you receive a copy of this on that
8  day?
9    A.  Yes.
10   Q.  And see how it's dated November 6th, 2001,
11  which is the date of the original performance work
12  plan?
13   A.  Yes.
14   Q.  Do you have any objection as to it being
15  dated on that day?
16   A.  Yes.  Because that's not when I received it.
17   Q.  But it was your understanding it was
18  replacing the one you received on that day, correct?
19   A.  Yes, I understand it was a replacement, but
20  it was not given to me correctly.
21   Q.  You would have preferred the date to be a
22  January date in 2002?
23   A.  I preferred it to have been a privacy matter.
24   Q.  You raised some claims about this, and we'll
25  get to that later.  You received a copy of this in

Page 132

1  January 2002?
2    A.  Yes.
3    Q.  Going back to the resolution agreement, let's
4  see.  Step five -- or paragraph five in the first page
5  says the agency agreed to place you on paid
6  administrative leave from December 6th to December
7  15th.  You see that?
8    A.  Yes.
9    Q.  And that was done, correct?
10   A.  Yes.
11   Q.  And then return to -- I guess in this
12  resolution agreement, you agreed to release, waive,
13  and withdraw any and all claims you have as set forth
14  in paragraphs one, two, and three of the second page.
15  Do you see that?
16   A.  Yes.
17   Q.  Now, when you agreed to the terms of this
18  settlement, you had the option of either retiring
19  after your detail ended or coming back to your chief
20  position, correct?
21   A.  Yes.
22   Q.  Had you made a decision at that time what you
23  were going to do?
24   A.  No.
25   Q.  Now, subsequent to this resolution agreement

Page 133

1  did you have any conversations with Mr. Crawford
2  before you began your detail?
3    A.  No.
4    Q.  Did you talk to any of your coworkers about
5  this resolution agreement before your detail?
6    A.  No.
7    Q.  I'm handing you a document marked as
8  Defendant's Exhibit #17.  I just want to know, did you
9  receive a copy of that document?
10   A.  Oh, yes.
11     MR. DuBOIS:  All right.  Let's take a break.
12  You guys want to eat lunch now?
13       (Lunch recess)
14   Q.  From December 16th, 2001, through January
15  5th, 2003, you served a detail as a program complaint
16  specialist with the Office of Civil Rights, correct?
17   A.  Yes.
18   Q.  Is the Office of Civil Rights in the same
19  building as FSA?
20   A.  Yes.
21   Q.  Was it the same floor at that time?
22   A.  It was then, yes.
23   Q.  And direct supervisor was Carlton O'neal?
24   A.  Yes.
25   Q.  Dr. Carlton O'neal?

Page 134

1     A.  Yes.
2     Q.  And you performed the same duties you
3  performed back in 1998 when you were in that office?
4     A.  Yes.
5     Q.  Did you enjoy this job while you were on
6  detail?
7     A.  Yes.  And had -- there was some other added
8  responsibilities when I was on detail.  We were doing
9  state reviews as well.
10    Q.  So there was additional duties being
11 performed by the office then --
12    A.  Yes.
13    Q.  -- than before?
14    A.  Right.
15    Q.  Did you tell anyone at the Office of Civil
16 Rights why you were on detail?
17    A.  Some -- they already knew.  Yes, they knew.
18    Q.  All right.  And when you say they knew, who
19 are you referring to?
20    A.  All of the employees.
21    Q.  The employees that were there?
22    A.  Yes, every last one of them.
23    Q.  Did they say how they found out or what they
24 found out about your detail?
25    A.  Well, no, they didn't say, but talk gets

Page 135

1  around.
2     Q.  Did you tell anyone about your resolution
3  agreement?
4     A.  No.  That was stipulated not to talk about.
5     Q.  Did you complain about any of the employees
6  over in FSA to anyone in the Office of Civil Rights?
7     A.  Yes.
8     Q.  Who did you complain to?
9     A.  Mary -- who did I complain to?
10    Q.  Yes.
11    A.  Well, to the employees and to Dr. O'neal.
12    Q.  Which specific employees did you complain to?
13    A.  Okay.  Those that sat like next to me was --
14 there was Pat -- Pat Gates, Sharrie Irving.  It was
15 Barbara Estes at the time.  She's now deceased.
16 Carnell McAlpine, Olan Sanders, and Richard Jones.
17 And at that time, had Charles Lewis and Dr. O'neal.
18    Q.  And what did you complain to these employees
19 about?
20    A.  The harassment that I was continuing to
21 receive.
22    Q.  And what is that -- what are you referring to
23 when you say that?
24    A.  Even after being detailed, the IT,
25 information technician -- of course, she had the

Page 136

1  responsibility to do the computer work in both
2  divisions.  And she had a problem with my screen
3  savers I had on my computer.
4     Q.  And who is this person?
5     A.  Mary Reynolds.
6     Q.  She had a problem with the screen savers on
7  your computer?
8     A.  Yes.
9     Q.  What kind of problem did she have?
10    A.  Well, she said Danny had issued a notice.  I
11 think there had been some -- some vulgar something,
12 some vulgar information from one of the county
13 offices; and he had stipulated that no other software
14 be offloaded on your computer.
15    Q.  Is this software you had loaded on your
16 computer, this screen saver?
17    A.  Screen savers, yes.
18    Q.  And Mary Reynolds asked you to take them off?
19    A.  Yes.
20    Q.  Did you take them off?
21    A.  No, not at that time.
22    Q.  Did you eventually take them off?
23    A.  Yes.  It was brought to the attention of my
24 supervisor.
25    Q.  What, that you had not taken them off?

Page 137

1     A.  Because all the other employees had screen
2  savers, too.
3     Q.  That they had downloaded or they installed
4  themselves?
5     A.  Yes.  Yes.  And we were under the impression
6  that that notice did not mean for the Office of Civil
7  Rights.  So, therefore, after talking to Dr. O'neal
8  and he talked with the national office, he made the
9  decision that everybody would remove them.
10    Q.  So after Dr. O'neal directed that they be
11 removed, everyone removed their screen savers?
12    A.  Yes.
13    Q.  Any other complaints you made to anyone about
14 anyone over at FSA?
15    A.  No.
16    Q.  During your detail, did you have any
17 conversations or communications with Mr. Crawford?
18    A.  None.
19    Q.  Did you see him in the hall at all?
20    A.  Very seldom I would see him.
21    Q.  How about with Ms. Williams?  Any
22 communications or conversations with her?
23    A.  No.
24    Q.  How about anyone else in your old office, any
25 of your support employees?

OZETTA THOMAS v. MIKE JOHANNS                                11/29/2007
DEPOSITION OF  OZETTA THOMAS

36 (Pages 138 to 141)

Page 138

1    A.  No more than Vicki that I would hold a
2  conversation with.
3    Q.  Did you see her in the halls or --
4    A.  Yeah.  And we ate dinner, we ate lunch
5  together.  We ate lunch almost every day when I was on
6  that side.  And then after I moved to the other
7  division, we would eat together occasionally,
8  depending on if our lunch hours meet at the same time.
9    Q.  Now, when you were on detail to the Office of
10 Civil Rights in May of 2002, Congress passed a new
11 farm bill, right?
12   A.  Yes.
13   Q.  So the last farm bill had been passed in
14 1996.  Is that right?
15   A.  Yes.  It was '96, yes.
16   Q.  All right.  Were you aware that this farm
17 bill changed a number of the farm programs,
18 including some in the Production/Adjustment Compliance
19 area?
20   A.  Sure, yes.
21   Q.  Do you recall attending training in
22 September 2002 on the new farm bill?
23   A.  Yes, along with the other employees of the
24 Civil Rights Division.
25   Q.  A number of employees from Civil Rights

Page 139

1  Office went to that training?
2    A.  Yes.
3    Q.  It was in Tuscaloosa?
4    A.  Yes.
5    Q.  Let me hand you a document that's been marked
6  as Defendant's Exhibit #18.  And can you tell me if
7  that looks like an accurate agenda of that training
8  you took back in September 2003?
9    A.  I believe so.
10   Q.  And that several of the, I guess, individuals
11 who had reported to you when you were chief provided
12 training at that time, correct?
13   A.  Just one -- well, yes, two.
14   Q.  Sharrie Peterson and Ms. Messer?
15   A.  And Walda Messer, yes.
16   Q.  Did you talk to either Ms. Peterson or
17 Ms. Messer at this training?
18   A.  No.
19   Q.  Did you talk to anyone from the FSA side of
20 training?
21   A.  No.
22   Q.  All right.  Now, pursuant to your resolution
23 agreement, your detail was set to end on January 5th,
24 2003; is that right?
25   A.  Ask the question again.

Page 140

1    Q.  Pursuant to the resolution agreement, your
2  detail to the Office of Civil Rights was set to end on
3  January 5th, 2003?
4    A.  January 5th or 6th, yes, whichever is that
5  Monday.
6    Q.  I think the 5th was on Sunday, 6th was on
7  Monday.  So your first day back would be the 6th?
8    A.  Right.  That's right.
9    Q.  As that day approached, did you talk to
10 anyone on the FSA side to work out the logistics of
11 returning?
12   A.  I tried very, very hard.
13   Q.  Who did you talk to?
14   A.  On the national level.
15   Q.  Oh, on the national level.
16   A.  Yes.  And I can't recall all of the names
17 that I talked to.  I was trying to get some resolution
18 and I was requesting a reassignment so that I would
19 not have to go back.
20   Q.  Do you recall who you talked to about getting
21 a reassignment?
22   A.  I don't recall all the names, but I can -- I
23 can give you Ms. Sharon Holmes, who was the director
24 of Civil Rights, talked with her, met with her.
25 Dr. O'neal.  And I don't know the names of the --

Page 141

1  those that I called, you know, when I called the
2  Office of Civil Rights in D.C.  I can't recall any
3  names, but I talked to several people.
4    Q.  And what exactly did you request?
5    A.  I requested a reassignment to the Office of
6  Civil Rights.
7    Q.  Now, when you requested that reassignment,
8  were you aware of any vacancy announcements in the
9  Office of Civil Rights?
10   A.  No.  There were none.
11   Q.  So were you asking one to be created for you?
12   A.  Well, whatever it took to reassign me to keep
13 me from having to go back to being supervised by
14 Mr. Crawford.  They can create positions for
15 complaints.
16   Q.  So it's your understanding to resolve a
17 complaint, they can create a position?  Is that what
18 you're saying?
19   A.  They can.
20   Q.  Who told you that?
21   A.  Regulations.  To solve -- to resolve a
22 complaint, the national level can do whatever is
23 necessary to resolve a complaint.
24   Q.  Now, were your requests for reassignment made
25 in connection to the resolution agreement you had

Page 142

1   already entered?
2      A.  Well, I requested a reassignment from the
3   mediator.  That was my request when she caucused --
4      Q.  What was her response?
5      A.  -- with me.  When I -- when we went back
6   after lunch and after she had caucused with Dan and
7   Debbie, she said that the national office would not
8   approve a reassignment, but they would approve a
9   detail.  And that's when she told me I could be
10  detailed for that one year and go back to my regular
11  position or retire if I wanted to.
12     Q.  Do you know who in the national office makes
13  those kind of decisions?
14     A.  Mr. Chott's office.
15     Q.  What do you base that statement on?
16     A.  Because he is the executive director for
17  field office employees.  He is the boss.
18     Q.  So you think it would be his office that
19  would make the decision?
20     A.  Yes.
21     Q.  Did you ever talk to him about a reassignment
22  before your detail ended?
23     A.  No, I never talked to him.
24     Q.  Did you talk to Mr. Crawford?
25     A.  I wrote Mr. Crawford a letter.

Page 143

1      Q.  Let's make this Defendant's Exhibit #19.  And
2   is this a letter that you sent to Mr. Crawford on or
3   about December 31st, 2002?
4      A.  Yes.
5      Q.  Is this the letter you were just referring
6   to?
7      A.  Yes.
8      Q.  Now, in this letter, you request -- let's
9   see.  If I go to the third paragraph -- I'll jump
10  back.  You indicate in the middle paragraph, your
11  attorney has requested an extension of detail and
12  you're waiting for a decision on that.
13     A.  Yes.
14     Q.  And then it says in the event I have not
15  received a response, I am requesting you to allow me
16  to work in a location outside of the state office.  Do
17  you see that?
18     A.  Yes.
19     Q.  What do you mean when you were asking to work
20  in a location outside of the state office?  Like a
21  satellite office or work at home?
22     A.  No.  I was really meaning to be reassigned to
23  some other place other than that state office
24  regardless of where it was.
25     Q.  So you meant be reassigned, be the chief and

Page 144

1   work at another location, or did you want to be
2   assigned to a different job at FSA?
3      A.  I really wanted to be reassigned to another
4   job in FSA.
5      Q.  Okay.  And that's what you meant by allow me
6   to work at a location outside the state office?
7      A.  Yes.
8      Q.  Do you know if Mr. Crawford had authority to
9   reassign you outside of FSA?
10     A.  He had authority to recommend to Mr. Chott.
11  That was his decision.
12     Q.  But you're aware when you were on detail, you
13  were a full-time position but still with FSA?
14     A.  Yes.
15     Q.  You are being paid through them; you're on
16  loan?
17     A.  Yes.
18     Q.  They couldn't fill your position while you're
19  on detail.
20     A.  Right.
21     Q.  Now, did you ever have a talk in person with
22  Mr. Crawford about your request to work outside of the
23  state office?
24     A.  No.  We were not conversating.
25     Q.  Did you talk to anyone else besides him about

Page 145

1   this request in this letter?
2      A.  To work outside the state office?
3      Q.  Yeah.
4      A.  Well, for reassignments, yes.  I talked to
5   Ms. Holmes, Mr. -- I mean, Dr. O'neal, and others in
6   the national office that I can't recall their names,
7   those in the area of -- of Civil Rights, Office of
8   Civil Rights.
9      Q.  How about Ms. Williams or anyone on the FSA
10  side of Montgomery?  Did you talk to any of them?
11     A.  No.
12     Q.  All right.  In the second part of this, it
13  says -- let's see -- If this request is unfeasible, I
14  an enclosing a signed request for sick leave for your
15  approval.  So the alternative here is an indefinite
16  sick leave until -- at what point in time were you
17  requesting sick leave?
18     A.  I said it was indefinite because I didn't
19  know at what time they would make a decision on my --
20  on my recommendation.
21     Q.  Did you talk to Mr. Crawford and Ms. Williams
22  or anyone on the FSA side about sick leave requests?
23  Was it a conversation, or did you just submit this?
24     A.  I submitted this letter, and I received
25  return the next day Federal Express.

Page 146

1    Q.  Were you seeing a doctor at this time?
2    A.  Yes, I was.  I was seeing -- for physical
3  conditions at that time.
4    Q.  What was the doctor's --
5    A.  And I was also seeing a counselor at that
6  time.
7    Q.  What was the doctor's name?
8    A.  Dr. Chittom.
9    Q.  And have you provided his address in
10  discovery responses?
11    A.  Yes, I did.
12    Q.  How long have you been seeing Dr. Chittom?
13    A.  About, I'd say, 10 years.
14    Q.  A general practitioner?
15    A.  General practitioner, yes.
16    Q.  And had you seen him in December 2002?
17    A.  I'm sure I did, yes.
18    Q.  Do you know what -- what condition you saw
19  him for?
20    A.  Anxiety, depression, all of that.
21    Q.  Did he diagnose you with anything or give you
22  any medication?
23    A.  He told me he could prescribe me some
24  medication, but I was receiving spiritual counseling,
25  and I was against taking medication.

Page 147

1    Q.  So you didn't take any medication?
2    A.  So I didn't take medication.
3    Q.  Did he provide you any doctor's note or
4  anything to submit with your request for indefinite
5  sick leave?
6    A.  No.  I didn't even ask him for -- we had
7  never had to do that before in all my 35 years.  I've
8  been on extended sick leave for a few times, and the
9  manager just never requested it before.
10    Q.  Had you ever requested indefinite sick leave
11  from Mr. Crawford before?
12    A.  No, other than this time.
13    Q.  Now, after you submitted this memo which
14  we've marked as Defendant's Exhibit #19, do you recall
15  getting the response of them denying your request for
16  sick leave?
17    A.  Yes.
18    Q.  I hand you a copy of a document marked as
19  Defendant's Exhibit #20.  Do you recall receiving this
20  document?
21    A.  Yes.
22    Q.  This is a memo from Mr. Crawford denying a
23  request for, I guess, sick leave for lack of
24  supporting medical documentation?
25    A.  Yes.

Page 148

1    Q.  After you received this -- strike that.
2    When you received -- how did you receive this
3  document?
4    A.  Federal Express.
5    Q.  Do you know what date you received it on?
6    A.  I believe the very next day.
7    Q.  Did you have any conversation with anyone,
8  with Mr. Crawford or anyone at the Alabama state
9  office, that they received it?
10    A.  No.
11    Q.  Did you, after receiving this, go and get any
12  medical confirmation from your doctor?
13    A.  No.
14    Q.  And then you submitted a sick leave request
15  for January 6th, 7th, and 8th, and reported to the
16  office on the 9th; is that right?
17    A.  Yes.
18    Q.  And when you took the 6th, 7th, and 8th off,
19  did you call in and let them know you wouldn't be
20  coming in?
21    A.  Yes.
22    Q.  Who did you talk to, or do you recall?
23    A.  I don't recall.  Possibly Irean.  I -- I
24  don't recall.
25    Q.  I'm going to hand you -- I'm going to redact

Page 149

1  the first part of your social security number here.
2  I'm going to hand you Defendant's Exhibit #21.  And
3  I've got this one marked to make you a copy.  Can you
4  tell me if this is the request for leave that you
5  submitted for those three days, the 6th, 7th, and
6  8th?
7    A.  Yes.
8    Q.  And that's your signature on the
9  certification on line seven?
10    A.  Yes.
11    Q.  And this was approved, correct?
12    A.  Yes.
13    Q.  Now, at some point, did you receive the
14  document I'm handing you that is marked as Defendant's
15  Exhibit #22?  Do you recall receiving this document?
16    A.  I -- yes.  Yes.
17    Q.  When did you receive it?
18    A.  The day after I submitted my letter to -- to
19  Debbie Williams, same.  I got this letter the next
20  day.  I hand-delivered mine on December 31st and --
21    Q.  You have no evidence of when this document
22  marked Defendant's Exhibit #22 was prepared, do you?
23  You don't know if it was prepared before or after you
24  submitted your letter?
25    A.  I didn't receive it until after I submitted

Page 150

1    my letter.
2       Q.  You didn't receive it, but you don't know
3    when it was prepared?
4       A.  No, I don't.  According to her date, she
5    prepared it December 31st.
6       Q.  Do you know if it was placed in the mail
7    before your document was received?  Do you have any
8    idea one way or another?
9       A.  No.
10      Q.  All right.  Now, this document states they
11   processed the paperwork for you to return to your
12   chief position, correct?
13      A.  Yes.
14      Q.  And it says, We look forward to seeing you on
15   Monday, January 6th, 2003.  If you have any questions
16   or need assistance, please feel free to contact us at
17   any time.
18         Is there anything objectionable about this memo?
19      A.  No.
20      Q.  All right.  Now, the first day back from your
21   detail, I guess is January 9th.  Do you recall meeting
.2   with Mr. Crawford that day?
23      A.  I went -- yes, I went in his office, yes.
24      Q.  What do you recall from any discussion you
25   had with him that day?

Page 151

1       A.  There were none.  I went in the office and
2    told him that I was back, and he said okay.  He said,
3    I will have Mary to come and set you up a computer and
4    get with you later.
5       Q.  Did he tell you to read up on the new farm
6    bill or take as much time as you needed to read up on
7    the new farm bill?
8       A.  Not at that time, no.
9       Q.  Okay.  At some subsequent time, did he tell
10   you that?
11      A.  At a subsequent time when he had asked me to
12   attend a meeting for him on the new farm bill, I
13   informed him at the time, that that's what I was
14   doing, studying my handbooks, and trying to talk to my
15   staff and get acquainted with the new farm bill.
16      Q.  At this meeting on your first day back, do
17   you recall any other conversation other than what you
18   told me about?
19      A.  I don't recall any more.
20      Q.  Did you ask him any questions?
21      A.  No.  He said he would be getting back with
22   me.
23      Q.  Did you know what he was doing that day or
24   what obligations were on his calendar?
25      A.  No, I don't.

Page 152

1       Q.  Did you find the office to be fairly hectic
2    with the new farm bill passage?  Were people busy?
3       A.  I would say normal.
4       Q.  It wasn't any busier than usual?
5       A.  Than -- right.
6       Q.  Even with the passage of the new farm bill?
7       A.  Yes.  It was just about normal.
8       Q.  Did you talk to -- did you take time that
9    first day to meet with the members of your staff?
10      A.  Yes.
11      Q.  Who were they at that time?
12      A.  At that time, it was Sharrie Peterson, Walda
13   Messer; and Judy Norris had been hired while I was
14   away.
15      Q.  Ms. Norris replaced Jeff Knotts?
16      A.  Right.  And Pamela Polke.
17      Q.  Did you hold a staff meeting with them upon
18   your return, or did you meet with them individually?
19      A.  I had a staff meeting, as far as I can
20   recall.
21      Q.  What do you recall about that staff meeting?
22      A.  What I recall from that staff meeting was
23   meeting with them, letting them know that I was back
24   and I would appreciate any information that they could
25   help me in with in getting me acquainted with the new

Page 153

1    farm bill, and I was looking forward to working with
2    them in a harmonious way.
3       Q.  Did you have them fill you in on what had
4    happened in your absence?
5       A.  In the -- in -- well, not at that first
6    meeting, but I told them that when they got some time,
7    some available time, I would like for them to come in
8    one-on-one --
9       Q.  And did they?
10      A.  -- and talk to me about what was going on.
11      Q.  Did they subsequently do that?
12      A.  I can't recall if they all did that.  I'm
13   thinking Sharrie did.
14      Q.  But you don't recall whether or not the
15   others --
16      A.  I don't recall about the others, about Judy
17   or Walda.
18      Q.  What was your understanding of the different
19   responsibilities they were handling at this time?
20      A.  I was told by Judy that she was told that she
21   would be handling Compliance.
22      Q.  And who had handled Compliance before?
23      A.  It was Jeff.  Jeff had handled Compliance.
24      Q.  What was Ms. Messer's responsibility?
25      A.  She was still in the area of Disaster and

Page 154

1  NAP.
2      Q.  How about Ms. Peterson?
3      A.  She still had her same programs, and she had
4  also been assigned Payment Limitation at this time
5  when I returned.
6      Q.  Well, was she also in charge of the Direct
7  and Counter Cylical Program of the new farm bill?
8      A.  Yes.  See, that took the place of the AMTA
9  Program.
10     Q.  Is that something she had previously handled,
11  that program?
12     A.  AMTA?
13     Q.  Yeah.
14     A.  Yes.  We all handled that program.  That was
15  one of the primary programs we had.
16     Q.  Had you worked with Ms. Norris before, Judy
17  Norris?
18     A.  Not other than in trainings, and she -- and
19  she was also a program technician in Geneva County
20  when I went down for that review.
21     Q.  Did Ms. Peterson, Ms. Messer, or Ms. Norris
22  say anything negative to you upon your return?
23     A.  No.
24     Q.  Were they friendly?
25     A.  Well, just normal.  They -- they were just --

Page 155

1      Q.  Did you ask for any written reports from them
2  on what they had been doing the past year?
3      A.  Written, no.
4      Q.  Just when they had time, come by your office?
5      A.  Yes.
6      Q.  Did you call or email anyone in the field or
7  county employees to let them know you were back and
8  see what concerns might have arisen while you were
9  gone?
10     A.  No.  It had been normal practice for state
11  office, when there was a change in personnel, they
12  would notify the field.
13     Q.  Did you ask anyone to notify the field?
14     A.  No.
15     Q.  And when you say normal practice, had you
16  experienced returning from a detail before?
17     A.  Not from a detail but from any other
18  personnel.  If someone was out ill or if -- if someone
19  would be working in a different county, they would
20  just always send out a notice.
21     Q.  Do you know who was in charge of sending out
22  that notice?
23     A.  Mr. Crawford's office.
24     Q.  Do you know if any of those employees asked
25  for the notice to be sent when they returned?  You

Page 156

1  weren't involved in conversations between them and
2  Mr. Crawford's office?
3      A.  No.
4      Q.  I hand you Defendant's Exhibit #23.  And tell
5  me if you've seen that document before.
6      A.  I don't know if it's this particular one, but
7  I received numerous organization charts.
8      Q.  These were distributed by Mr. Crawford's
9  secretary periodically?
10     A.  Yes.
11     Q.  To all the, I guess, FSA employees in
12  Alabama?
13     A.  Yes.
14     Q.  Do you have any evidence that this one that's
15  dated December 30th, 2002 and has your name as the
16  chief agricultural program specialist did not go out
17  to the field?
18     A.  It had not been.  That's why I don't know if
19  I received this one or not.  All the others that I
20  received had vacant.
21     Q.  Do you have any evidence --
22     A.  I don't remember receiving this one --
23     Q.  -- that it was not sent out?
24     A.  -- of this particular date.  This was -- this
25  was the -- I don't -- I doubt that.  I don't recall --

Page 157

1      Q.  Well, do you --
2      A.  -- this date at all.
3      Q.  You don't recall seeing it?
4      A.  No, not -- no, not with my name as chief
5  agricultural program specialist.  I think I have some
6  in this ROI shows vacant.
7      Q.  During your detail, it was vacant until you
8  returned.
9      A.  Yes.
10     Q.  So your testimony is you never saw one after
11  you returned that had your name on it?
12     A.  I never did see one after I returned.  This
13  was prior to my returning here.
14     Q.  Well, you don't know when this document was
15  prepared, do you?
16     A.  I'm just going by the date that's on it.
17     Q.  Your testimony is you never saw this?
18     A.  No.  Well, I can't -- I don't recall
19  receiving that, seeing that, not for that particular
20  date.  I don't recall it.
21     Q.  And after your return from your detail, you
22  did attend some staff meetings, correct?
23     A.  Staff meetings with?
24     Q.  I guess state executive directors and staff
25  meetings.  Do you recall attending some?

OZETTA THOMAS v. MIKE JOHANNS                          11/29/2007
DEPOSITION OF OZETTA THOMAS

41 (Pages 158 to 161)

Page 158

1    A. No.
2    Q. What document are we at? #24. I'm going to
3  hand you two documents marked Exhibits #24 and #25.
4  January 23rd is #24, and February 18th is #25. Now,
5  I've handed you two documents --
6      MR. PETTAWAY: February 18th, you say is
7  #25?
8      MR. DuBOIS: Yes.
9    Q. Ms. Thomas, I've handed you two documents,
10 Defendant's #24 and #25, that are staff meeting
11 notes. Exhibit #24 is dated January 23rd, 2003, and
12 Exhibit #25 is dated February 18th, 2003. Have you
13 seen these minutes before?
14   A. No.
15   Q. Having seen these minutes, do you recall
16 attending staff meetings by these dates?
17   A. I don't recall this. I don't.
18   Q. Let me ask you some of the specifics and see
19 if any of this sparks your memory. I direct you first
20 to Defendant's Exhibit #24. First, the attendance
21 list. Are those generally the people who attend SED
22 staff meetings?
23   A. Yes, usually.
24   Q. And would Mr. Crawford begin the staff
25 meeting by talking about some items and then have the

Page 159

1  chiefs talk about their sections?
2    A. That's the normal procedure.
3    Q. Turning to the second page, you'll see where
4  it has PA/CP at the bottom?
5    A. Yes.
6    Q. It says, Danny welcomed Ozetta back. Do you
7  recall him welcoming you back at the staff meeting?
8    A. I do not recall.
9    Q. After looking at this document, is it your
10 testimony you just don't recall attending these staff
11 meetings or that you did not attend these staff
12 meetings?
13   A. I don't -- I don't recall.
14   Q. You don't know one way or the other?
15   A. I can't remember. I can't remember
16 attending. I just don't recall.
17   Q. So going to this last paragraph on
18 Defendant's Exhibit #24, it says, Ozetta informed the
19 SED of activities in her division, including taking
20 calls from farmers on QBOP.
21   Do you recall advising him of that?
22   A. No, I don't.
23   Q. Do you know what QBOP stands for?
24   A. No, I don't. It's something in the new farm
25 bill, I assume.

Page 160

1    Q. Quota buyout on peanuts. Does that sound
2  familiar?
3    A. Oh, that sounds familiar, now that you said
4  it. Quota buyout.
5      MR. PETTAWAY: You're saying it so fast.
6    Q. Do you recall your division taking calls from
7  farmers on that subject after you returned from
8  detail?
9    A. That was a program within the new farm bill.
10   Q. And calls on that would be coming to your
11 section?
12   A. Yes. To my division, yes.
13   Q. Who in your division was in charge of that?
14   A. That would have been Sharrie.
15   Q. And the next thing said, Walda was checking
16 to see what payment codes had been downloaded for
17 NAP. Walda would be Ms. Messer?
18   A. Yes.
19   Q. And she was in charge in the division for
20 NAP?
21   A. Yes.
22   Q. Do you recall making that statement at the
23 meeting?
24   A. No. No.
25   Q. And then it says, Ozetta advised the SED of

Page 161

1  an appeal hearing with Willie James Brown in Elmore
2  County on watermelons.
3    Do you recall ever -- do you know a Mr. Willie
4  James Brown in Elmore County?
5    A. Yes, I do.
6    Q. Was he a farmer?
7    A. Yes.
8    Q. Do you know if he had an appeal relating to
9  watermelons in January 2003?
10   A. Sharrie advised me of an appeal for
11 Mr. Brown.
12   Q. And who was handling that appeal?
13   A. She was.
14   Q. Is that something ordinarily within her
15 responsibility? Did she handle appeals with you
16 before?
17   A. No. She started handling that after I was on
18 detail, I assume.
19   Q. I thought you previously testified that you
20 both handled some appeals.
21   A. That we both handled some appeals?
22   Q. That you both handled appeals, yeah.
23   A. Now, she handled -- she handled the appeals
24 while I was away. And I remember going to an appeal
25 with her after I returned, which was Mr. Brown's.

OZETTA THOMAS v. MIKE JOHANNS                                    11/29/2007
DEPOSITION OF OZETTA THOMAS

42 (Pages 162 to 165)

Page 162

1   Q.  Do you know when it was?
2   A.  I don't recall.  Maybe January.
3   Q.  And then it says, SED asked for research on
4  NAP, what input we have in setting up programs.
5  Do you know what that refers to?
6   A.  No.
7   Q.  Do you recall doing any research for him on
8  any NAP issue?
9   A.  I don't remember this at all.
10   Q.  Going through that, you still don't remember?
11   A.  No.  No, I don't.
12   Q.  All right.  Let's go to Defendant's
13  Exhibit #25.  Do you recall attending a staff meeting
14  on this day?
15   A.  No.
16   Q.  Going down to the middle of the page, it says
17  Ozetta and Danny discussed the DCP sign-up, which
18  referred to, I guess, the Direct Encounter Reciprocals
19  Program?
20   A.  Yes.
21   Q.  And that was a part of the new farm bill?
22   A.  Yes.
23   Q.  Do you recall having any discussion with him
24  about the DCP sign up?
25   A.  No.

Page 163

1   Q.  And who was -- do you know Johnny Raby?
2   A.  He's district director.
3   Q.  Which district?
4   A.  District 1, I believe.
5   Q.  All right.  And going down to the second
6  paragraph from the bottom, it says, Danny asked Ozetta
7  to research whether farmers could initial a common
8  appendix or notate somewhere on the paperwork for the
9  DCP that they had read it so that the counties would
10  not have to print out so many pages after each
11  producer signs up.
12  Do you recall having any discussions --
13   A.  None whatsoever.
14   Q.  -- about that topic?
15   A.  No.
16   Q.  Now, DCP, is that something Sharrie Peterson
17  would be handling?
18   A.  Yes.  All of that was on the new farm bill.
19  I had no conversations with anybody on any programs on
20  the new farm bill.
21   Q.  Are you saying you didn't have any
22  conversations at the staff meeting, or you just don't
23  recall?
24   A.  I mean, I don't have any recollection of any
25  conversations outside of my staff meeting.

Page 164

1   Q.  Going to the last page, you see the last page
2  under PA/CP?
3   A.  On the last page?
4   Q.  Yeah.  Last page of Defendant's Exhibit #25.
5  I'm sorry.  It says Ozetta informed the SED of an
6  appeal hearing and told him that Sharrie would be
7  speaking at a cotton meeting on Friday in Dothan.
8  Do you see that?
9   A.  I see that.
10   Q.  Do you recall any of that?
11   A.  Nope.
12   Q.  Do you know of any appeal hearing in February
13  of 2003?
14   A.  An appeal hearing in February 2003?  I don't
15  recall that.
16   Q.  Do you recall talking to Sharrie Peterson
17  about speaking at a cotton meeting in Dothan February
18  28th, 2003?
19   A.  I know I didn't speak to Sharrie about
20  speaking at a cotton meeting in Dothan.
21   Q.  You don't recall, or is it your testimony --
22   A.  I didn't speak to Sharrie.  I spoke with
23  Danny when he emailed me about this meeting.
24   Q.  All right.  So is it your testimony that you
25  did not make this statement at the staff meeting on

Page 165

1  February 28th, 2003?
2   A.  I don't recall making that statement.
3   Q.  Well, you don't recall or you don't know?
4   A.  I -- I don't remember attending a staff
5  meeting.
6   Q.  Are you saying it didn't happen or you just
7  don't recall?
8   A.  I just don't recall it happening.  If it
9  happened, I was out of my mind.  I don't remember it.
10   Q.  So it could have happened, you just don't
11  remember it?
12   A.  I just don't remember it.
13   Q.  Let me hand you -- let's mark this as
14  Defendant's Exhibit #26.  Tell me if you recognize
15  this email.
16   A.  Yes.  This is the one that I was talking
17  about.
18   Q.  All right.  This is, I guess, a series of
19  three emails, correct?  Actually, it looks like four.
20  At the start of it, it looks like Mr. Crawford
21  forwarded you an email that he had received I guess
22  from Virginia Payne?
23   A.  From Virginia Payne, yes.
24   Q.  About a Cotton Expo in Dothan, Alabama, on
25  February 28th, 2003, and requesting someone to speak;

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF  OZETTA THOMAS

43 (Pages 166 to 169)

Page 166

1   is that right?
2       A.  Yes. Yes.
3       Q.  And Mr. Crawford wrote you and said, if I'm
4   not available, national CRP training is scheduled that
5   week, could you handle this meeting in Dothan?
6       A.  Yes.
7       Q.  Now, cotton and the DCP program were both in
8   your section, correct?
9       A.  Yes.
10      Q.  And did you find it objectionable that he
11  would ask you to speak, if he couldn't, on those
12  issues?
13      A.  No. I -- I -- I don't, but he knew I was not
14  trained. I didn't get the national training on that
15  to be able to speak on it anyway. So, therefore, I
16  felt that I could study the handbooks to be
17  knowledgeable enough, but that's really not enough
18  when you're not in on a training that's with hands on.
19      Q.  Is this what -- is that what you wrote back
20  in your response email: I would be glad to attend;
21  however I was not in on the ground floor of the DCP
22  program and have only focused on it since my return
23  last week. I found the program is a lot to decipher,
24  and I'm reading the handbook and talking to the staff
25  in familiarizing myself with it.

Page 167

1       A.  Yes.
2       Q.  So at that time, you were spending your time
3   reading the new farm bill and the handbook?
4       A.  Yes.
5       Q.  What percentage of your time would you say
6   you were spending on the new farm bill?
7       A.  About 100. About 100, because that's all I
8   was doing.
9       Q.  When you say it was a lot to decipher, you
10  mean a lot, so voluminous, or difficult?
11      A.  When you're not in on the national training,
12  just to read a handbook, it's hard to decipher, you
13  know. You got to put it into practical use and get
14  the feel of it. So that's what I meant.
15      Q.  Okay. Who on your staff were you talking to
16  to familiarize yourself with this program?
17      A.  With Sharrie, yes.
18      Q.  All right. Then you mentioned, I will put
19  someone on standby just in case. Do you see that in
20  this email?
21      A.  Yes.
22      Q.  Who are you referring to putting on standby?
23      A.  One of the staff members.
24      Q.  Do you know --
25      A.  Which would have probably been Sharrie.

Page 168

1       Q.  So those were in her area of expertise?
2       A.  Yes.
3       Q.  And then Mr. Crawford wrote back at the top,
4   That will be fine, thanks?
5       A.  Yes.
6       Q.  Did you have any other communications with
7   him about this issue?
8       A.  No.
9       Q.  And you don't recall asking Sharrie Peterson
10  to speak at that meeting, the staff meeting on
11  February 28th?
12      A.  I don't recall.
13      Q.  But she would be the person that would be set
14  to speak if you decided you did not want to?
15      A.  Yes.
16      Q.  Now, other than this email, which I guess is
17  Defendant's Exhibit #26, did you receive any other
18  emails from Mr. Crawford when you returned from your
19  detail?
20      A.  I don't believe so, unh-unh.  I don't recall.
21      Q.  Other than -- strike that.
22      Did you have much interaction with him when you
23  returned from your detail?
24      A.  No.  This was -- this was it right here.
25      Q.  Was it fair to say he was out of the office a

Page 169

1   lot during that first two months of 2003?
2       A.  I don't know.
3       Q.  All right.  Did you get the -- I guess the
4   office itineraries that you had received previously
5   when you returned from your detail?  Do you remember
6   seeing those?
7       A.  I'm pretty sure I did, but I just don't
8   recall.
9       Q.  All right.  You wouldn't know one way or the
10  other whether or not he was in the office or out of
11  office?
12      A.  No, I wouldn't, because we didn't have that
13  contact, so I wouldn't know whether he was there or
14  whether he wasn't.
15      Q.  Did you ever leave him any voice messages
16  that he didn't respond to?
17      A.  I don't think so.
18      Q.  Do you remember sending him emails on any
19  issues?
20      A.  Not that I recall.
21      Q.  Now, after you returned from your detail, you
22  took some time off, some sick leave.  Do you recall
23  doing that?
24      A.  Yes.
25      Q.  Let's mark this as Defendant's Exhibit #27.