OZETTA THOMAS v. MIKE JOHANNS                              11/29/2007
DEPOSITION OF  OZETTA THOMAS

44 (Pages 170 to 173)

Page 170

1    And I don't have an extra one for you, so I will have
2    to flag it.
3        Let me hand you Defendant's Exhibit #27. Can you
4    tell me if this, I guess, set of documents here -- if
5    you turn in it, there are several different things.
6    There's work schedule logs and then request for leave
7    or approved absence that all go to pay period one,
8    two, and three of 2003.
9        A.  Yes. It's my T&A.
10       Q.  And going -- let's see. Let's talk about
11   first the -- first one, two. three -- looks like the
12   first four pages of this related to pay period one,
13   which was a period January 13th to January 24th. And
14   this indicates you took, I guess, 12 hours annual
15   leave the Friday before and Tuesday after Martin
16   Luther King Day. Do you recall doing that?
17       A.  What date was that now?
18       Q.  It would be -- well, let's look at this.
19       A.  Okay. January 23rd.
20       Q.  January 17th, you took three hours; and
21   Martin Luther King Day was Monday, the 20th; and 21st,
22   nine hours?
23       A.  Okay. Yes.
24       Q.  Did you go on a trip or something during that
25   time? Do you know what you took that time off for?

Page 171

1        A.  For annual leave?
2        Q.  Yes.
3        A.  No. I don't know why I took it off. I just
4    wanted to be on annual leave, I assume.
5        Q.  And then let's see. If we go to pay period
6    three, which this is the last, I believe, three pages,
7    indicates you took, I guess, 44 hours of sick leave
8    from February 10th to February 14th.
9        A.  Uh-huh.
10       Q.  Do you see that?
11       A.  Uh-huh.
12       Q.  Is that your signature down at the bottom?
13       A.  Yes, it is.
14       Q.  Let's see. Three pages in from the back is a
15   work schedule log, and that's your signature at the
16   bottom?
17       A.  Yes.
18       Q.  And the date you signed was February 24th,
19   2003?
20       A.  February -- wait a minute. 24th? Okay.
21   Yes.
22       Q.  Now, when you took this sick leave, were you
23   seeing a doctor?
24       A.  Yes, I did.
25       Q.  What was the doctor you were seeing?

Page 172

1        A.  I was -- it was Dr. Chittom.
2        Q.  And it looks like --
3        A.  He's the one -- he's the one put me on sick
4    leave.
5        Q.  And you submitted a little note from him
6    regarding those four days. You see that attached at
7    the end?
8        A.  Yes. At that time, I requested this from
9    him. Because I just told him I could only take three
10   days without notice from a doctor. This was my first
11   time ever getting an excuse from a doctor.
12       Q.  What symptoms were you experiencing at the
13   time you went to the doctor?
14       A.  I started experiencing the same ones I had
15   before I left: Anxiety; my stomach just coiled time
16   to get up to go to work in the mornings.
17       Q.  This would be in the mornings when you got
18   up?
19       A.  Yes.
20       Q.  Would it last throughout the day?
21       A.  Yes, pretty much so. Because I knew I was
22   going to be chewed out for something, and I just -- I
23   just -- I just got just filled with anxiety. And I
24   just couldn't handle it, just couldn't handle it
25   anymore.

Page 173

1        Q.  What other symptoms did you go see
2    Dr. Chittom for at this time?
3        A.  Same -- same thing.
4        Q.  Anxiety?
5        A.  Just sick. I was sick on my stomach,
6    throwing up.
7        Q.  Did he diagnose you with any medical
8    condition? Do you know?
9        A.  No, he didn't diagnose me with any medical
10   condition.
11       Q.  Did he give you any medication for the
12   anxiety?
13       A.  Sure. Sure. Not for anxiety. He gave me
14   medication for the nausea and the dizziness and the
15   throwing up.
16       Q.  Do you recall what medication he gave you?
17       A.  No, I don't.
18       Q.  How often were you throwing up?
19       A.  Every day.
20       Q.  Every morning? afternoon? How often a day?
21       A.  It was at no certain time. Most of the time
22   it was in the morning was when I would get the knots
23   in my stomach and then sometimes even at work, you
24   know. I would just get so sick, have to run to the
25   ladies' room.

OZETTA THOMAS v. MIKE JOHANNS                           11/29/2007
DEPOSITION OF OZETTA THOMAS

45 (Pages 174 to 177)

---

Page 174

1    Q.  When did this nausea start?
2    A.  As soon as I got back.
3    Q.  And after you returned from your detail,
4    Mr. Crawford never criticized your performance, did
5    he?
6    A.  Not to me, no, that I know of.
7    Q.  Do you know of him criticizing your
8    performance to anyone else?
9    A.  No.  I don't know, no.
10   Q.  Now, according to these -- I'm going back to
11   Defendant's Exhibit #27, these leave things.  You
12   returned to work and worked February 18th, and then
13   you took 18 hours of sick leave on February 19th
14   through the 20th.  You see that?
15   A.  February what now?
16   Q.  February -- let's see.  Returned to work on
17   February 18th and then took the 19th and 20th off?
18   A.  Okay.  I see that.
19   Q.  Did you go back to the doctor on the 19th and
20   20th?  Do you know?
21   A.  I don't think so.  I -- I don't think so.
2    Q.  Do you know why you came back to work on the
23   18th?  Were you feeling better?
24   A.  Well, yes, I would feel -- I was feeling
25   better when I came back; but each time I would come

---

Page 175

1    back, the same thing happens to me.  It just -- it
2    just got unbearable.
3    Q.  Do you recall anything in particular
4    happening on the 18th that made you stressed out or
5    made you feel ill?
6    A.  On the 18th of --
7    Q.  February.
8    A.  -- February?  I don't know unless it was the
9    day of the meeting with the farmers.  I don't recall
10   the date.
11   Q.  There was a staff meeting that day we talked
12   about earlier.  You didn't recall that?
13   A.  No, unh-unh.  No.
14   Q.  Do you recall anything in particular that
15   happened on the 18th that made you feel ill?
16   A.  No, I don't recall anything in particular.
17   Q.  Let me jump back for a minute.  Now, farm
18   bills are regularly passed by Congress about every
19   five years, is that right, in your experience?
20   A.  No.  I believe the last one was for seven
21   years.
22   Q.  Okay.  Every five to seven years?
23   A.  Every five to seven years, yes.
24   Q.  And this was the first farm bill that had
25   been passed while you were in the capacity as chief;

---

Page 176

1    is that right?
2    A.  That's correct.
3    Q.  Now, when you attended the training as a
4    member of the Office of Civil Rights on the new farm
5    bill back in September 2002 when you were on detail do
6    you recall what you learned at that training about the
7    new farm bill?  Did they give you documents or
8    handouts?
9    A.  They -- they had documents that they pass out
10   to the field.  And -- and, of course, I'm -- I'm sure
11   I got a copy of the document.
12   Q.  Did you find that training helpful at all?
13   A.  No.
14   Q.  Now, is it your understanding that the change
15   of the AMTA subsidy program and the DCP program and
16   the Peanut Quota Buyout Program were the two biggest
17   changes in the new farm bill?
18   A.  Yes, I do understand that.
19   Q.  Now, you testified earlier that you didn't
20   recognize the QBOP acronym?
21   A.  No, I did not.
22   Q.  How long did you think it was going to take
23   you to familiarize yourself after you returned from
24   your detail?
25   A.  I feel that if it was under the spirit of --

---

Page 177

1    of helping, if it's under the conditions of someone
2    really working with me, maybe within a few weeks.  But
3    in the spirit of uncooperation, I probably never would
4    have.
5    Q.  Well, did anyone do anything to interfere
6    with your ability to learn the new farm bill?
7    A.  No.  No one ever did anything to help.
8    Q.  Did you request through anyone to go to any
9    additional training anywhere on the new farm bill?
10   A.  Well, I -- I didn't know to request to go to
11   the new farm bill training, because I didn't know when
12   it was going to be held.  I was not in the office at
13   that time.
14   Q.  I'm saying when you returned from your
15   detail, did you talk to anybody about the possibility
16   of perhaps going to the training?
17   A.  No.  No.  I didn't communicate with anybody.
18   Q.  But did you have all the handbooks and
19   manuals of the new farm bill?
20   A.  I had all the handbooks.  The program
21   technician had given me all the handbooks of the
22   different programs.
23   Q.  And you had time to read those in your
24   office?
25   A.  And I had started reading them.

OZETTA THOMAS v. MIKE JOHANNS                                    11/29/2007
DEPOSITION OF  OZETTA THOMAS

46 (Pages 178 to 181)

Page 178

1    Q.  Now, do you recall, I guess, on February
2  24th, 2003, sending an email that morning retiring?
3    A.  Yes.
4      MR. DuBOIS:  I've got one copy of this.  I
5  told you some copies are -- that's #28, right?
6      THE WITNESS:  This is #27.
7    Q.  Let me hand you #28.  And tell me, is this
8  the email you sent to Mr. Crawford on February 24th,
9  2003, announcing your retirement?
10    A.  Yes.
11    Q.  Now, prior to sending this email -- looks
12  like you sent it 5:57 a.m. that morning?
13    A.  Yes.
14    Q.  Did you talk to anybody about your decision
15  to retire?
16    A.  I had not made a decision to retire.
17    Q.  When did you make the decision to retire?
18  When you sent this email that's marked as Defendant's
19  Exhibit #28?
20    A.  Yes.  I got up sick, too ill to go, and I was
21  tired of trying to be on sick leave.
22    Q.  And that morning you decided to retire?
23    A.  I decided that I was just forced out.
24    Q.  Had you --
25    A.  And there was nothing else I could do.  They

Page 179

1  wouldn't give me a reassignment.  They wouldn't extend
2  my detail.  They wouldn't let me work outside the
3  state office.  And my health just meant more to me.
4    Q.  When you made this decision, prior to making
5  it, had you consulted any of the OPM documents or
6  sites regarding the amount of payment you would get
7  for retiring?
8    A.  None whatsoever.
9    Q.  And you hadn't filled out a retirement
10  application?
11    A.  No, sir.
12    Q.  Now, on February 24th, 2003, did you go see a
13  doctor?
14    A.  No.
15    Q.  What kind of symptoms do you claim you were
16  experiencing that morning?
17    A.  Same symptoms that I've always had, sick and
18  tired of being sick and tired.
19    Q.  Did you discuss this retirement decision with
20  any of your family?
21    A.  No.  That was a spur of the moment thing.
22    Q.  Now, after your retirement, did you ever
23  return to the office to fill out any paperwork or get
24  your belongings?
25    A.  I did.

Page 180

1    Q.  Do you know when that was?
2    A.  No, I don't.  I don't remember when it was.
3    Q.  Did you speak to anyone when you came back to
4  the office?  Do you recall having conversations with
5  Mr. Crawford, Ms. Williams, Mr. Peterson, anyone
6  else?
7    A.  No.  No.  No.  I only talked to Verdell
8  Zeigler.
9    Q.  And Ms. Zeigler would process your paperwork
10  for your retirement?
11    A.  Yes.
12    Q.  When you went back to the office, did you
13  fill out a retirement application?
14    A.  Well, I had to, yes.
15    Q.  Did you talk to anyone besides Ms. Zeigler
16  about the retirement process or any paperwork?
17    A.  No.
18    Q.  Now, after you retired, did you notify
19  anybody of your decision to retire?
20    A.  Just this.
21    Q.  Just this?
22    A.  Just this.
23    Q.  Mr. Crawford?
24    A.  Yes.
25    Q.  You already have a copy of this, but let me

Page 181

1  make this an exhibit, although technically I don't
2  need to.  This is a copy of the complaint, of the
3  lawsuit.  This is Defendant's Exhibit #29.  Tell me,
4  have you seen that document before?
5    A.  I'm sure my attorney supplied me with this.
6    Q.  Is it your understanding this is, I guess,
7  your third amended complaint, which is the complaint
8  that is the lawsuit we're talking about today?
9    A.  Oh, yes.  Yes.
10    Q.  And in this lawsuit, you are alleging that
11  Mr. Crawford discriminated against your race, your
12  gender, and reprisal for filing an EEO claim?
13    A.  Yes.
14    Q.  Are you claiming anyone besides Mr. Crawford
15  discriminated against you on any of these bases?
16    A.  I -- I -- I'm saying Mr. Crawford because he,
17  as the SED, is responsible.  I do feel that others --
18  it was a conspiracy with others.
19    Q.  Who are those others you're referring to?
20    A.  Debbie Williams, Richard Burge, Jack Crawley,
21  and maybe, indirectly, Johnny Raby.
22    Q.  Anybody else?
23    A.  That's it.
24    Q.  Now, during your employment with FSA, you
25  never heard Mr. Crawford or any other supervisors make

OZETTA THOMAS v. MIKE JOHANNS                                11/29/2007
DEPOSITION OF  OZETTA THOMAS

47 (Pages 182 to 185)

Page 182

1    any racially offensive or sexually offensive jokes or
2    comments, correct?
3        A.  To me?
4        Q.  Yeah.  Did you ever hear any of those
5    individuals make a racially offensive or sexually
6    offensive comment to you?
7        A.  No.  Yes, I do recall.
8        Q.  Okay.  Who -- which of those individuals did
9    you hear?
10       A.  I -- I recall Richard Burge.
11       Q.  What did Richard Burge say?
12       A.  It wasn't what he said.  It was really what
13   happened during a NAP training meeting that went so
14   wild down in Tuscaloosa.
15       Q.  When was this meeting?
16       A.  In either September or October of 2001.  It
17   was prior to -- it was prior to my being detailed.
18       Q.  What did you hear Mr. Burge say or see that
19   you found racially or sexually offensive?
20       A.  When we went out to lunch that day, we
21   went -- we were at Tuscaloosa.  And as we were driving
2    back to the motel for the meeting, Richard said, Let
23   me take you by someplace and show you some history,
24   not that it was good, but yet it was history.  So he
25   drove me to the entrance of the University of Alabama

Page 183

1    and reminded me that that was the door that George
2    Wallace stood in when he said, Segregation now and
3    segregation forever.  And I found that to be offensive
4    to me.
5        Q.  What did you find offensive about that?
6        A.  Because I already knew that.  He didn't have
7    to bring that to my attention.  With all the turmoil
8    that he had put me through during his training me, I
9    didn't need anything else to remind me of segregation.
10   And, of course, my response to him was, I've been
11   through that door.  My son attended and graduated the
12   University of Alabama.
13       Q.  Did you say anything else to him at the time?
14       A.  No.
15       Q.  And who else was in the car?
16       A.  Walda Messer was in the car, Jeff Knotts and
17   Marie Headley.
18       Q.  And you were all going to lunch?
19       A.  We had gone to lunch and on our way back.
20       Q.  And whose idea was it to go to lunch, this
21   group of people?
22       A.  It was Walda's vehicle.  Richard Burge was
23   driving it.  And we all just went as a group since we
24   were all trainers, Jeff and Walda.  And Ms. Headley
25   was a PT from Dallas County that also assisted us in

Page 184

1    the training.
2        Q.  Did Mr. Burge point out any other University
3    of Alabama law marks -- or landmarks, provide any
4    University of Alabama trivia, or talk about the
5    University of Alabama any other time that weekend?
6        A.  No.  No.  That was all that was said about
7    Alabama.
8        Q.  I'm talking about during the training as
9    well.  Did he provide any more University of Alabama
10   trivia in training?
11       A.  He may have because they were -- they were
12   playing games.  They were playing games all during the
13   training meetings.
14       Q.  Do you have any evidence that Mr. Burge
15   was -- strike that.
16       Did anyone else in the car say anything after he
17   pointed out the stairs?
18       A.  Nobody else said a word.
19       Q.  And you didn't tell him you found it
20   offensive?
21       A.  No.  That's the only thing I told him was
22   that my son graduated there.
23       Q.  Other than that incident you just told me
24   about, have you heard any other comments that you
25   found racially or sexually offensive by Mr. Crawford

Page 185

1    or any other supervisor?
2        A.  No.
3        Q.  Have you ever seen any sexually or racially
4    offensive emails?
5        A.  No.
6        Q.  And have you ever heard Mr. Crawford or any
7    other supervisor make any derogatory comment about any
8    of your EEO activities?
9        A.  No.  Never said anything to me.
10       Q.  And you never heard any supervisor say any
11   decisions or actions challenged in the lawsuit were
12   taken due to race, gender, or alleged activities?
13       A.  No.  Not to me, no.
14       Q.  To anybody else?  Are you aware of them
15   saying that to anybody else?
16       A.  Oh, no.  I don't know.  I didn't hear any.
17       Q.  Now, let me direct your attention to your
18   complaint in this lawsuit.  I want to ask you about
19   some of the allegations.  If you go to paragraph 13
20   and 20.
21       A.  In this document here?
22       Q.  Yeah, in Defendant's Exhibit #29.
23       A.  Okay.
24       Q.  All right.  You have an allegation now in
25   paragraph -- let's see -- looks like 13 -- about a

Page 186

1  removal of your computer from your office. Do you see
2  that?
3    A.  Yes.
4    Q.  Start there. And to kind of facilitate this,
5  I will give you another exhibit. This is Defendant's
6  Exhibit #30. And if you can tell me if Defendant's
7  Exhibit #30 is a letter that you submitted to
8  Mr. McKenzie on or about January 3rd, 2002.
9    A.  Yes.
10   Q.  Did you write this letter that is marked as
11 Defendant's Exhibit #30?
12   A.  I sure did, yes.
13   Q.  Now, the second paragraph of this document
14 refers to removal of your computer.
15   A.  First paragraph?
16   Q.  Second paragraph in Defendant's Exhibit #30,
17 you talk about removal of a computer from your
18 office. Do you see that?
19   A.  Yes.
20   Q.  And I'm going to ask you about -- let's see.
21 Towards the end of that second paragraph is a
22 reference that says, It was quite demoralizing,
23 embarrassing, and humiliating to find out that my
24 supervisor had carried or caused some travail act to
25 be carried out against me. Do you see that? Was

Page 187

1  travail supposed to be trivial?
2    A.  Yes. Trivial. It's just misspelled.
3    Q.  All right. Now, according to this letter,
4  going down a little further, you mention on -- you see
5  the last paragraph? It talks about December 6th,
6  2001, you return to your office to read email
7  messages; and then you send out a blanket email
8  expressing my appreciation to those employees for
9  having worked with them through the years. You see
10 that?
11   A.  Yes.
12   Q.  What kind of blanket message were you
13 planning on sending out?
14   A.  We have an email address to address all FSA
15 employees to send information when they want every
16 person in the state to receive it. It's got one --
17 one email address that goes to everybody. And that's
18 what I was -- I was going to do.
19   Q.  What kind of message were you going to send
20 out?
21   A.  I was just going to let them know that I was
22 leaving and enjoyed working with them.
23   Q.  Now, your email address remained the same
24 when you transferred over to Office of Civil Rights,
25 didn't it?

Page 188

1    A.  She had to reactivate. She had to give me --
2  it remained the same, but she had to reactivate it.
3    Q.  But it did remain the same email address?
4    A.  I believe so.
5    Q.  Is there any reason you couldn't have sent
6  out this email, when you went to the office on
7  December 6th, from the Office of Civil Rights when you
8  reported to work there?
9    A.  I could have. Yes, I could have, which would
10 have been a week and a half later.
11   Q.  But you wanted to send it out that day?
12   A.  That's what I was going to do.
13   Q.  Did you tell anyone you were coming in the
14 office that day?
15   A.  No.
16   Q.  All right. And what happened when you --
17 when you arrived at the FSA office?
18   A.  Well, when I -- that was the first thing I
19 noticed, that my computer was not there.
20   Q.  And you had a laptop computer assigned to
21 you?
22   A.  Yes. And the laptop, you could plug into a
23 monitor that sits -- you know --
24   Q.  Docking station?
25   A.  Docking station. Yes, that's what it was.

Page 189

1    Q.  So your computer -- your laptop wasn't
2  there?
3    A.  Right.
4    Q.  Did you ask someone where it was or talk to
5  anybody about it?
6    A.  I did.
7    Q.  Who did you talk to?
8    A.  Well, I asked -- well, Karen asked -- heard
9  me say where is my computer. Karen Melton. She sits
10 right there.
11   Q.  Okay. She's a farm loan program
12 specialist --
13   A.  Yes.
14   Q.  -- who sat outside your office?
15   A.  Yes. And she told me she saw Mary Reynolds
16 with my laptop.
17   Q.  Did she say anything else?
18   A.  No. She told me she saw Mary Reynolds take
19 it out.
20   Q.  So then did you go talk to Ms. Reynolds?
21   A.  I did.
22   Q.  And what do you recall from that
23 conversation?
24   A.  I recall asking her if I could have my laptop
25 back, and she told me that I would have to see Debbie.

Page 190

1    Q.  Do you recall anything else in that
2  conversation?
3    A.  I don't recall anything else from Mary from
4  that conversation.
5    Q.  So then did you --
6    A.  I called Debbie. I don't know if I called
7  her or went to go see her, but she told me that she
8  would have Mary bring it back to me.
9    Q.  Did she say anything about why your laptop
10  was missing?
11    A.  Not at that time. I only found out after the
12  counselor's report.
13    Q.  But she did say she would have Ms. Reynolds
14  get you your laptop?
15    A.  Yes.
16    Q.  Did she in fact call Ms. Reynolds and ask her
17  to get your laptop?
18    A.  I don't know if she called her or went to see
19  her, but Mary did bring me my laptop back.
20    Q.  You were in your office and Mary Reynolds
21  brought it by?
22    A.  Yes.
23    Q.  Did she set it up for you?
24    A.  All you have to do is --
25    Q.  Slide it in?

Page 191

1    A.  -- slide it in. That's when I realized my
2  password had been changed.
3    Q.  How did you find that out?
4    A.  Because when I went to go in and put my
5  password in, it wouldn't accept it.
6    Q.  When your screen opens up, does it have your
7  user name automatically entered and then you put in
8  your password?
9    A.  You have to type in -- the user name is
10  already there. You have to type in your password.
11    Q.  Do you know whether or not when a machine is
12  transferred to another individual, another person's
13  user name may become the automatic default? Do you
14  know how that works? Do you have any knowledge?
15    A.  No, I have no knowledge of how that works.
16    Q.  Do you know what user name came up when you
17  tried to log in on your computer?
18    A.  No. I didn't get anyone else's.
19    Q.  So it was your user name that came up on the
20  screen?
21    A.  Now, you're asking me something I don't
22  really know. I think the user name was all one, FSA.
23  Everybody had the same user name.
24    Q.  Everyone had the same user name is your
25  belief?

Page 192

1    A.  Yes. Just a different password.
2    Q.  And your password, when you typed it in, it
3  didn't work?
4    A.  It didn't work.
5    Q.  Did you let someone know it wasn't working?
6    A.  Yes.
7    Q.  Who did you let know?
8    A.  Mary.
9    Q.  What did she do?
10    A.  Supposedly, she came back and reactivated it,
11  but --
12    Q.  She told you she had reactivated it?
13    A.  Yes. But I still couldn't get in.
14    Q.  Couldn't get in?
15    A.  No.
16    Q.  Did you tell anyone?
17    A.  No, because it was late evening. And then I
18  just left it there on my desk. And when I came back
19  again the next time, everything was gone, monitor and
20  all.
21    Q.  Did you tell anyone you would be coming back?
22    A.  No. I -- no. I didn't think I needed to
23  tell anyone. I was just -- I was on administrative
24  leave at the time, so I was just like coming back, you
25  know, at any time.

Page 193

1    Q.  Now, according to -- go back to Defendant's
2  Exhibit #30. You mentioned you came back on the
3  30th -- no, not on the 30th. On December 11th. Is
4  that right?
5    A.  The day after the mediation.
6    Q.  Oh, the 6th is when you came in the first
7  time; and then you said Mary Reynolds reset the
8  password, it didn't work, and then you left and came
9  back another day. Would that have been December 11th?
10    A.  I don't remember the date.
11    Q.  Now, on that date, when you came back in and
12  you said everything was missing, did you talk to
13  anybody?
14    A.  I don't recall. I don't remember talking to
15  anybody.
16    Q.  Did you -- do you recall asking anybody for
17  your computer back or for the password or telling
18  anybody your password hadn't worked the last time you
19  came in?
20    A.  I don't know. I don't remember doing that.
21    Q.  You didn't see Mr. Crawford on either
22  December 6th or December -- on either of the two days
23  you came into the office, did you see Mr. Crawford?
24    A.  No.
25    Q.  Ms. Williams. You saw her the first time.

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF OZETTA THOMAS

50 (Pages 194 to 197)

---

Page 194

1   Did you see her the last time?
2       A.  The first time.  I don't recall if I saw her
3   the second time.
4       Q.  Never talked to Mr. Crawford about any
5   computer or password issues?
6       A.  No.
7       Q.  Now, are you claiming in this lawsuit that
8   your laptop was removed while you were on
9   administrative leave because of your race, gender, and
10  in retaliation?
11      A.  Yes.
12      Q.  What makes you believe that it was removed
13  because of your race?
14      A.  Because, as I before stated, I was not wanted
15  in that position as a black person.
16      Q.  All right.  And is there any basis for that
17  belief other than what you've already told me?  Did
18  you understand my question?
19          MR. PETTAWAY:  Did you understand it?
20      A.  Are there any other bases?
21      Q.  Yeah.  Previously, I had asked you -- you had
22  made a claim of race and what made you think any of
23  the actions were based on race.  And you told me some
24  things.  Now I'm asking, I guess, is there anything in
25  addition to what you previously told me that made you

Page 195

1   think your laptop had been taken away because of your
2   race?
3       A.  The only thing I can think of is they didn't
4   want a black person to hold a supervisory position.
5       Q.  Any other reason you thought it was due to
6   your race?
7       A.  Well, there -- there were no other blacks in
8   those positions ever.  So that -- that's my reason is
9   it just -- it was just unlikely for a black to hold a
10  high position within that agency.
11      Q.  Well, going back to your laptop computer, my
12  question is what made you think your laptop was
13  removed or why do you allege in this lawsuit that your
14  laptop was removed because of your race?
15      A.  Because I'm saying that these whole issues,
16  all of these issues concerning all of my complaints
17  stems from the issue of when I started filing
18  complaints.
19      Q.  Now, you had a laptop -- Mr. Robinson was
20  chief before you, correct?
21      A.  Yes.
22      Q.  And you were chief for, what, two -- several
23  years?
24      A.  From '98 through 2001.
25      Q.  No one ever told you they didn't want you to

Page 196

1   be chief because you're African-American?
2       A.  I don't think anyone would tell a person
3   directly, as -- as Mr. Crawford informed me when I
4   told him that I didn't know other people had a problem
5   with me, why didn't they come to me with the problem.
6   He also informed me that, well, you know, they --
7   people can talk to someone else about somebody's
8   problem, but they don't go to the source.  So --
9       Q.  So to answer my question, no, no one ever
10  told you that?
11      A.  No.
12      Q.  No one ever told you that?  We're doing a
13  double negative here.  No one ever told you that they
14  didn't want you to be supervisor because of your
15  race?
16      A.  No.  No, they didn't tell me that in words,
17  no.  In actions, yes.
18      Q.  What do you mean when you say in actions?
19      A.  Because everything they did was against me.
20      Q.  Is it your position that anything anybody did
21  that was against you was due to your race?
22      A.  At that time, yes.
23      Q.  Now, you had a laptop throughout your
24  employment as chief, correct?
25      A.  Yes.

Page 197

1       Q.  And did you have any problems with Mary
2   Reynolds providing technical support if she was
3   accessible?
4       A.  No.  Because when I went back, it was two
5   weeks before I got a computer set up; and Verdell had
6   to intervene then.
7       Q.  This is when you returned from --
8       A.  When I returned --
9       Q.  -- from detail?
10      A.  -- from detail.
11      Q.  Did you bring your laptop from the Office of
12  Civil Rights back from your detail?
13      A.  Well, I didn't bring anything.  After two
14  weeks and I still didn't have one, then Mr. Crawford
15  said that Civil Rights said that I could use that
16  computer, but that was weeks later.
17      Q.  You weren't involved in any conversations
18  about your computer, where your computer was supposed
19  to come from?
20      A.  Well, what happened, when he said that, he
21  had asked Dr. O'neal if I could use that computer.  So
22  when I went back to talk to Dr. O'neal about getting
23  the computer, I asked him what about the sensitive
24  information that was on that computer.  Because I used
25  it for complaints.

Page 198

1    Q. Civil Rights issues?
2    A. Civil Rights issues. So he asked that I
3  delete that information. And he told me -- and he
4  said, And Mr. Crawford didn't ask me to let you use
5  that computer. He said, Ms. Holmes asked me.
6    Q. So Dr. O'neal told you Ms. Holmes had asked
7  him to let you use the Office of Civil Rights'
8  computer?
9    A. Uh-huh. Mr. Crawford had got permission from
10 Ms. Holmes.
11   Q. Did you -- were you able to use that
12 computer, the Office of Civil Rights' computer?
13   A. Yes, after -- but it was nothing, really, I
14 had in there, because I didn't have the program for
15 the DCP loaded on there yet.
16   Q. Did you ask to have that loaded in at some
17 point?
18   A. By the time it was loaded in, I was gone.
19   Q. Did you ask them to load it in?
20   A. Well, Mary was supposed to load it in.
21 Verdell asked Mary to load it, to set it up.
22   Q. When did she ask her to do that? Do you
23 know?
24   A. Like I said, it was more than two weeks
25 later.

Page 199

1    Q. Were you involved in that conversation?
2    A. I wasn't involved in the conversation, but
3  Verdell told me she was having Mary come over. She
4  said, I told Mary that they must treat you like they
5  treat any other employee. So it was kind of like
6  everybody felt like it was a hands off, you know.
7    Q. And Ms. Reynolds, she had been the computer
8  person for OCR as well, right? She was in charge?
9    A. Yes. Yes.
10   Q. And she did eventually come and load that
11 software?
12   A. Yes.
13   Q. All right. Let's go back to this allegation
14 about removal of the computer in paragraph 13 of the
15 complaint. What makes you believe that your computer
16 was removed while you were on leave due to your
17 gender?
18   A. What makes me think it was --
19   Q. Due to your gender. You have an allegation
20 in your lawsuit that it was removed because of your
21 gender. What's the basis of that?
22   A. Where do you see that?
23   Q. I guess what I'm asking, are you alleging
24 that the laptop was removed in regard to your race,
25 gender, retaliation. And now I'm on to gender.

Page 200

1    A. Oh, okay. Because, you know, I told you
2  initially I thought I had filed all of it based on
3  gender, black female.
4    MR. PETTAWAY: The complaint speaks for
5  itself, but go ahead.
6    Q. On this particular issue, you allege the
7  laptop was removed while you were on leave due to your
8  gender. What's the basis? What makes you believe it
9  was due to your gender?
10   A. Here again, I think it was a retaliation
11 because I had filed previous complaints based on race.
12   Q. And your --
13   A. And that now that I was a black female and
14 that's the reason I wanted that position, because I
15 would have been inspired to be the first black female
16 to hold that position. And I concluded that because
17 there had been supervisory males prior, but no
18 females.
19   Q. So what is it that made you -- you're
20 alleging in the lawsuit the laptop was removed because
21 you're female. Can you point me to anything besides
22 your belief that people did not want an
23 African-American female in that position?
24   MR. PETTAWAY: Object to the form of that
25 question. You can go ahead and answer it.

Page 201

1    THE WITNESS: Huh?
2    MR. PETTAWAY: Answer his question if you
3  can.
4    THE WITNESS: I don't know if I can or not.
5    A. If what I said already is not acceptable, I
6  don't know what else to say.
7    Q. So you can't -- no other -- I'm just trying
8  to understand the allegation.
9    A. All I can say is just because I was a black
10 female and was not wanted in that position.
11   Q. And have you told me the reasons that you
12 have that belief?
13   A. Have I told you the reasons?
14   Q. Yeah. Have you told me everything that made
15 you believe --
16   A. I think I have.
17   Q. -- that they didn't want a black female or
18 that there was --
19   A. Yes. They didn't want black females in
20 higher positions, period.
21   Q. And you told me all the facts or things that
22 you believe led you to reach that conclusion?
23   A. Yes.
24   Q. Now, let's move on. You also allege the
25 laptop was removed in retaliation?

OZETTA THOMAS v. MIKE JOHANNS                                11/29/2007
DEPOSITION OF OZETTA THOMAS

52 (Pages 202 to 205)

Page 202

1    A. Yes.
2    Q. What is your basis for making that
3 allegation?
4    A. Because of all the complaints I had filed.
5    Q. Now, at this point, you had filed the
6 complaint September 2001; is that right?
7    A. Yes.
8    Q. Had you filed any other complaint besides
9 that one?
10    A. No. I had gone through the mediation.
11    Q. Do you contend the laptop was removed in
12 retaliation for your EEO complaint or for settlement
13 in the EEO complaint?
14    A. I think it was just for filing, period.
15    Q. What makes you think that other than the fact
16 that you filed one? Is there anything else?
17    A. No.
18    Q. Now, when you reported to the Office of Civil
19 Rights, you got a new computer and you were given --
20 your email address was reactivated; is that right?
21    A. Yes.
22    Q. Is that --
23    A. Well, initially, I used someone else's.
24    Q. Until they got a computer for you?
25    A. Right. Until Mary came and -- and

Page 203

1 reactivated my password, I was going on someone else's
2 password.
3    Q. How long did you do that for?
4    A. I'll say two weeks approximately.
5    Q. Now, how do you allege that you were harmed
6 by this removal of the computer while you were on
7 leave?
8    A. I was harmed because it sent a message to the
9 field that we are now rid of her.
10    Q. All right. And how do you know the field
11 knew anything about whether or not there was a laptop
12 sitting in your office?
13    A. They know we have laptops. They knew chiefs
14 had laptops.
15    Q. Okay. But what's your basis --
16    A. And every employee have computers.
17    Q. But do you have any evidence -- I mean,
18 what -- is your assertion that the field knew that the
19 laptop had been taken out of your office while you
20 were on administrative leave?
21    A. They -- they didn't know. I don't assume
22 they would have known, but --
23    Q. You didn't tell anybody?
24    A. No.
25    Q. You said they sent a message. Who do you

Page 204

1 believe they sent a message to?
2    A. To the employees in the field.
3    Q. But you don't know whether or not the
4 employees in the field knew about your laptop being
5 removed?
6    A. They may -- I don't think they knew the
7 laptop had been moved, but they knew there were
8 complaints filed.
9    Q. Did you tell them there were complaints
10 filed?
11    A. Well, I didn't personally tell them, but that
12 was known statewide, national wide.
13    Q. That you had filed an EEO complaint?
14    A. Yes.
15    Q. All right. How else do you claim you were
16 harmed by removal of this computer? Anything else?
17    A. No.
18    Q. Let's go back to your complaint now. I want
19 to ask you about paragraph 13. I'm fixing to move on
20 to C, C of paragraph 13. Do you see that? You have
21 an allegation that Crawford notified FSA employees you
22 "had been detailed" to OCR instead of "had accepted
23 detail." You see that allegation?
24    A. Yes.
25    Q. I hand you a document marked as Defendant's

Page 205

1 Exhibit #31. Can you tell me, is this the memo that
2 has the "had been detailed" language that you have
3 objected to in your lawsuit?
4    A. Yes, this is it.
5    Q. Were you involved in any discussion about the
6 wording of this memo with Mr. Crawford or Ms. Williams
7 or anybody else?
8    A. No.
9    Q. Prior to this memo coming out, had there been
10 any discussion with anyone about how anyone would be
11 notified about your detail?
12    A. No.
13    Q. Did you receive a copy of this memo?
14    A. No, I didn't.
15    Q. How did you become aware of it?
16    A. It was given to me by one of the employees in
17 the Office of Civil Rights.
18    Q. And who was that? Do you know?
19    A. I believe it was Sharon, Sharon Irving.
20    Q. Do you know when she provided that to you?
21    A. Well, what happened was this went out while I
22 was on detail, and she printed it again on January
23 3rd. That's why it's lined through and put December
24 13th. That's why I didn't get a copy of it. So she
25 just printed me a copy, and the system automatically

OZETTA THOMAS v. MIKE JOHANNS                                    11/29/2007
DEPOSITION OF  OZETTA THOMAS

Page 206

1   put the date on it that it was printed.
2       Q.  Let me see.  Mine doesn't have the date that
3   was -- so you believe you got it on January 3rd,
4   2002?
5       A.  That's when she printed it out.  That's why I
6   scratched through that, because this went out on the
7   13th of December.
8       Q.  Now, you agree that the memo was accurate and
9   you had, in fact, been detailed, correct?
10          MR. PETTAWAY:  Object to the form of the
11  question.
12      Q.  You just wanted it to be worded differently?
13      A.  I wanted it to be worded differently, that I
14  had accepted and not that I had been put out.
15      Q.  Well, it didn't say you had been put out.
16      A.  Yeah, I know, but just the wording of it was
17  like I had been thrown out.
18      Q.  Who do you believe you are accepting a detail
19  from?  I mean, having accepted a detail implies that
20  someone offered you a detail and you accepted it.
21      A.  Right.
2       Q.  Who do you believe you accepted a detail
23  from?
24      A.  From the national office.
25      Q.  Now, this memo doesn't say that Crawford had

Page 207

1   detailed you, does it?
2       A.  No, but it's signed by Crawford.
3       Q.  Do you have any idea who came up with this
4   language?
5       A.  Either he or Debbie.
6       Q.  Is that based on just guessing?
7       A.  No.  Because a lot of the correspondence,
8   Debbie writes, but I'm not saying she did this.  Just
9   usually.
10      Q.  You're aware of Ms. Williams writing
11  correspondence for Mr. Crawford; and based on that,
12  you think she may have written this?
13      A.  Right.
14      Q.  But you were not present and don't know for
15  sure?
16      A.  No, I was not.
17      Q.  Do you know of any other individuals under
18  Mr. Crawford that had been detailed to any other
19  positions?
0       A.  Not that I know of.
21      Q.  Is a detail a fairly infrequent occurrence?
2   Did you experience details before when you were
23  working as chief for other people?
24      A.  For other people?
25      Q.  Yeah.

Page 208

1       A.  Yes, there have been details from people in
2   the county offices.  They would be detailed to another
3   county office.
4       Q.  Detailed between county offices?
5       A.  Yes.
6       Q.  Do you know who would write those memos or
7   would any memos go out talking about those details?
8       A.  It would come from their supervisor.
9       Q.  The supervisor, which would be the CED?
10      A.  The CED, yes.  So that we would be aware of
11  where that person is for that particular day or week
12  or however long it is.
13      Q.  Now, you're claiming that the term, use of
14  the phrase, "had been detailed" instead of "accepted
15  detail" in this memo was due to your race, gender,
16  retaliation?
17      A.  Yes.
18      Q.  Are there any other reasons supporting those
19  beliefs other than what you've told me?
20      A.  Other than what I've already told you.
21      Q.  The same --
22      A.  That.
23      Q.  Same thing where you --
24      A.  It all stems from the beginning.
25      Q.  Now, how do you claim you were harmed by the

Page 209

1   fact that this memo states that "had been detailed"
2   instead of "accepted detail"?
3       A.  I think it had a reflection on my change that
4   I was put out rather than just accepting to leave.
5       Q.  In your opinion, "has been detailed" suggests
6   you have been put out?
7       A.  Yes.
8       Q.  All right.  Any other way that you believe
9   you were harmed by this memo -- by this language in
10  this memo?
11      A.  I think that's all.
12      Q.  All right.  Now, you also have a complaint in
13  your lawsuit -- going back to paragraph 13D, there is
14  an allegation that Mr. Crawford designated a different
15  person other than the person selected by Ms. Thomas to
16  serve as acting while she's on detail.  Do you see
17  that?
18      A.  Yes.
19      Q.  And that's also -- if you go back to this
20  memo, there is a designation of Jeff Knotts as the
21  acting chief.  Is that what you're complaining about?
22      A.  Yes.
23      Q.  Now, did you ask Mr. Crawford to have a
24  certain person act as acting chief while you were on
25  detail?

OZETTA THOMAS v. MIKE JOHANNS                         11/29/2007
DEPOSITION OF OZETTA THOMAS

54 (Pages 210 to 213)

Page 210

1    A.  No, I didn't ask him.
2    Q.  Did you ask Ms. Williams or anybody else over
3  at FSA to have anybody in particular act as acting
4  chief while you were on detail?
5    A.  No.  It was normal practice that each
6  division chief name a person in that division to act
7  on their behalf when they were out, when they were
8  absent.
9    Q.  Are you aware of any other chief being absent
10 for a year for that period of time?
11   A.  No.
12   Q.  Who did you generally have as acting when you
13 were chief?
14   A.  Sharrie.
15   Q.  And how often would you have Ms. Peterson act
16 as acting chief?
17   A.  Whenever I was absent.
18   Q.  How often would that be?
19   A.  Like when I was -- when I was off on
20 meetings, you know, when we would have meetings on
21 different programs, and when I'm on annual leave,
22 which was not often until I got sick.  And then when I
23 was on sick leave, then it was a lot.  So to average
24 it out, it was -- if you want to put it between low,
25 medium, and high, I'll say medium.

Page 211

1    Q.  And what was the longest period of time that
2  she served as acting chief when you were chief?
3    A.  Just those days I were on sick leave.
4    Q.  Was it ever more than a week?
5    A.  No, no more than a week at a time.
6    Q.  Now, when she served in that capacity, did
7  you send out a written notice to the field?
8    A.  No.  It was just a standard.
9    Q.  Standard understanding?
10   A.  Standard understanding, right, that she was
11 my acting whenever I'm out.
12   Q.  Was that ever communicated to the field?
13   A.  Yes.  The field knew who the acting chiefs --
14 I mean, the acting chiefs were in all of the
15 divisions.
16   Q.  Do you know how that would have been
17 communicated to the field?
18   A.  It was not a written procedure that went out
19 to the field, but it was just a known.  When we would
20 have meetings, we would let that be known.  And when
21 they would call in to the office and the chief is not
22 available, they'll ask for the acting chief.  So it
23 was just a known standard.
24   Q.  Now, you're not aware of any other chiefs who
25 are detailed or absent for a year who are able to

Page 212

1  select an acting chief when they are absent, right?
2    A.  No.  I don't know any that were on detail for
3  that length of time.
4    Q.  And you claim this designation of a different
5  acting chief that you had used in the past was due to
6  your race, gender, and retaliation?
7    A.  Yes.  It -- maybe not race, but it was due to
8  gender and retaliation, because they didn't want a
9  female in it, period.  And it's still retaliation from
10 all the other complaints that had been filed.
11   Q.  And what's your basis for asserting that they
12 didn't want a female in that position?  What you told
13 me previously or is there anything different?
14   A.  What I told you previously.
15   Q.  And who are you referring to when you say
16 "they"?
17   A.  Mr. Crawford and Debbie.
18   Q.  Now, Jeff Knotts, after a few months, left
19 the state office; is that right?
20   A.  Yes.
21   Q.  At that point, there was a rotating -- it is
22 your understanding there was a rotation of acting
23 chief among Ms. Peterson, Ms. Messer, and I guess
24 Ms. Norris when she came on board?
25   A.  So I understand.

Page 213

1    Q.  Do you know who held that position last
2  before you returned from your detail in January 2003?
3    A.  No, I don't recall.
4    Q.  Now, do you claim you were harmed by the fact
5  that Mr. Crawford designated Jeff Knotts to be acting
6  in your absence while you were on detail?
7    A.  No, I was not harmed for that particular
8  issue.  No.
9    Q.  I'm going to go now to Defendant's
10 Exhibit #32.  Defendant's Exhibit #32, can you tell me
11 if you've seen this document before?
12   A.  Oh, yes.  Yes.
13   Q.  This is a copy of the formal complaint that
14 you filed alleging discrimination, retaliation,
15 relating to issues we just talked about in paragraph
16 13 of the complaint; is that right?
17   A.  Yes.
18   Q.  And if you look, the third page is actually
19 the formal compliant; is that right?
20   A.  Yes.
21   Q.  And you signed the fourth page?  Is that your
22 signature there?
23   A.  Yes.
24   Q.  And the date you signed it was March 4th,
25 2002?

OZETTA THOMAS v. MIKE JOHANNS                                    11/29/2007
DEPOSITION OF  OZETTA THOMAS

55 (Pages 214 to 217)

Page 214

1    A.  Yes.
2    Q.  And attached to it as Exhibit 1 is a letter
3  that we previously talked about?
4    A.  Right, yes.
5    Q.  And Exhibit 2 is that mediation agreement?
6    A.  Yes.
7    Q.  And during, I guess, the administrative
8  process, you were represented by Mr. Robinson, who
9  wrote the cover letter of this particular exhibit?
10   A.  Yes.
11   Q.  Now, did you receive a final agency decision
12  at some point on the complaint that you filed?  Do you
13  recall receiving one?
14   A.  I did.
15   Q.  And you recall appealing that decision?
16   A.  Yes.
17   Q.  And you recall, I guess, the reconsideration
18  being denied?
19   A.  Yes.
20   Q.  Let me hand you Defendant's Exhibits #33 and
21  #34.  Then you can tell me is #33 a copy of I guess
22  the EEOC decision on your appeal, and then #34 is a
23  decision on your request for reconsideration; is that
24  right?
25   A.  Let's see.  #33 is the decision with the

Page 215

1  right to appeal for reconsideration, and #34 is the
2  denial.
3    Q.  Okay.  So #33 is a decision on your appeal,
4  and #34 is a denial of reconsideration; is that right?
5    A.  Yes.
6    Q.  Directing your attention to #33, if you'll
7  turn to the last page, it indicates the decision was
8  made on September 29th, 2004.  Do you see that?
9    A.  Yes.
10   Q.  Do you know when you received this document?
11   A.  I would have it in my records; but off the
12  top of my head, I don't remember.
13   Q.  Do you know when your attorney received it?
14   A.  No, I don't, not off the top of my head.
15   Q.  If in one of your declarations dated
16  December 29th, 2004, you stated you received this
17  document on October 4th, 2004, does that sound right?
18  That would be about seven days after it was mailed or
19  something.
20   A.  If it's in my documentation, then I guess it
21  would be right.  I'm not looking at that, so I can't
22  say.
23   Q.  And going to Defendant's Exhibit #34, which
24  this document was mailed to you on January 13th, 2005,
25  do you know when you received this document?

Page 216

1    A.  Again, I have it recorded in my records, but
2  not off the top of my head.
3       MR. PETTAWAY:  Defendant's #34 which one?
4       THE WITNESS:  Is the denial.
5       MR. DuBOIS:  #34 is the denial for
6  reconsideration.  That's #34.  That's #33.
7    Q.  Do you know where in your records you have
8  that?
9    A.  I have noted it in my records.  Everything I
10  received, I would write on the outside of it what it
11  is and received on that specified date.
12   Q.  I -- I don't believe I've seen that document
13  produced in discovery.  I would have requested it.
14   A.  These documents here?
15   Q.  Yeah, with any notations by you.
16   A.  Oh, no, no, no.  It wouldn't be on any
17  documents.  I would write that on the envelopes, so I
18  know what it is.
19   Q.  Do you have copies of the envelopes?
20   A.  I got it all at home, not with me.
21       MR. DuBOIS:  I think that would fall under
22  the scope of document requests regarding all the EEO
23  documents and discovery back and forth.  I would like
24  to get copies.  We can talk about that.
25       MR. PETTAWAY:  Envelopes?

Page 217

1    Q.  Maybe the thing to do is to bring that to
2  your attorney so I can come by and look through that
3  and set up a time.
4    All right.  Now let's move on.  I want to ask you
5  next about paragraph 11 and 19 of your complaint.
6    A.  Back to --
7    Q.  We're going back to Defendant's Exhibit #29,
8  the complaint right there.
9    A.  Okay.
10   Q.  Paragraph 11 and 19, they both refer to the
11  same thing.  I believe that there's an allegation
12  about Ms. Bennett hand-delivering a letter in an open,
13  unsealed envelope to you.  Do you see that?
14   A.  Yes.
15   Q.  Now, are you referring here to her delivery
16  of the achieved performance work plan that was carried
17  over, I guess, in January 2002?
18   A.  Yes.
19   Q.  And that is a document that we talked about
20  earlier, which -- let me see which exhibit that is.
21   A.  The performance rating.
22   Q.  #16, which I think a couple of pages have
23  your initials.
24   A.  Yes.
25   Q.  And did you write that when she brought it

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF OZETTA THOMAS

56 (Pages 218 to 221)

Page 218

1   by, the initials and the date on Exhibit #16 on the
2   last page on the top?
3       A.  I wrote the January 2nd, 2002.
4       Q.  And your initials?
5       A.  Yes.
6       Q.  On the day that Ms. Bennett brought it by?
7       A.  Yes.
8       Q.  Now, when you allege that she brought it by
9   in an open, unsealed envelope, what do you mean?  What
10  do you mean by an open, unsealed envelope?
11      A.  It was just in an envelope, not sealed.
12      Q.  So open and unsealed is the same?
13      A.  Yes.
14      Q.  So what kind of envelope was it?  Was it, I
15  guess, a letter size or an interoffice?
16      A.  It was more than a -- it was larger than a
17  letter size.  It was a blue envelope.
18      Q.  Blue envelope?
19      A.  Yes.
20      Q.  When she brought it to you, did she say
21  anything?
22      A.  I believe she said, This is your performance
23  rating.
24      Q.  Anything else?
25      A.  No.

Page 219

1       Q.  Did you say anything back to her?
2       A.  I don't believe so.
3       Q.  Did you initial it and give it back to her,
4   or did -- because your initials are on Exhibit #16.
5   Do you know if she carried it back to put it in your
6   file?
7       A.  I don't know if I gave it back to her right
8   then or I carried it back to her.  I'm not sure.  I
9   can't remember if I gave it back to her right then or
10  not.
11      Q.  You have not any evidence as to who asked her
12  to deliver the performance work plan in this manner,
13  do you?
14      A.  Either Danny or Debbie.
15      Q.  You're not sure which?
16      A.  I'm not sure.
17      Q.  Do you have any evidence that anybody saw
18  that document?
19      A.  I don't know who saw that before she handed
20  it to me, but my --
21      Q.  Do you know --
22      A.  -- my coworkers saw her hand it to me.
23      Q.  They saw her hand it to you, but did they see
24  what was in it?
25      A.  No.

Page 220

1       Q.  Who was around at the time she delivered the
2   envelope?
3       A.  All of the employees in the Office of Civil
4   Rights.
5       Q.  Well, who -- I guess, were you in your office
6   or a cubicle at that point?
7       A.  Well, the -- it was -- it was cubicles, but
8   it was open.  It was -- we're not just divided off
9   from people.  You just -- some people you couldn't
10  see, and some you could.
11      Q.  Do you know who was in the office at the time
12  that day she delivered it?
13      A.  I don't remember who were around at that
14  particular time.
15      Q.  Do you recall having any conversations with
16  anybody about the document being delivered or how it
17  was delivered after Ms. Bennett left?
18      A.  No.
19      Q.  Now, in your opinion, what is wrong with her
20  delivering the performance work plan in a closed -- or
21  I guess an unsealed envelope?
22      A.  Because it was a private matter when it comes
23  to my performance rating.
24      Q.  How would you have preferred it to be
25  delivered?

Page 221

1       A.  As the others had been, sealed.
2       Q.  Do you have any evidence that she knew what
3   your rating was?
4       A.  I believe she knew what it was.  She knew I
5   was on OTI.  She knew I was detailed.
6       Q.  Do you know, in her position of secretary,
7   whether she knows or whether she works on all the
8   performance plans of all the employees?  Do you know
9   if she has a position acting as secretary?
10      A.  I don't know.
11      Q.  Do you know if Daniel Robinson -- if she
12  basically typed up the performance work plans or
13  worked up the performance work plans under his
14  supervision?
15      A.  I don't know.
16      Q.  Now, you further complain here that the
17  signature of Danny Crawford -- signature was signed by
18  another third party, Ms. Debbie Williams.  You see
19  that allegation in the lawsuit?
20      A.  Yes.
21      Q.  Now, Ms. Williams was the acting SED when
22  Crawford was out of the office; is that right?
23      A.  She was not the next person in line.  I don't
24  know if she was the acting that day.  I guess she
25  could have been.

Page 222

1    Q. At this point in time, what's your basis for
2  believing that she wasn't the next person to be acting
3  SED?
4    A. I'm saying I don't know.
5    Q. You don't know one way or the other?
6    A. No.
7    Q. Now, as acting SED, she had full authority to
8  sign his name on his behalf; is that right?
9    A. Yes, she does, but I believe regulations also
10 state that in -- in a performance rating, you have to
11 be that person's supervisor for a time frame, I
12 believe, of 90 days.
13   Q. All right. Mr. Crawford had been your
14 supervisor for more than 90 days, correct?
15   A. Yes. But Debbie Williams was the one that
16 signed Mr. Crawford's name.
17   Q. But she was signing for Mr. Crawford, not on
18 her own behalf?
19   A. Are you asking me?
20   Q. Yeah, I'm asking you. I mean, do you know
21 one way or the other?
2    A. I don't know.
23   Q. Is it your position that your performance
24 work plan was not valid because it had Danny
25 Crawford's signature written at his direction by

Page 223

1  Ms. Williams?
2    A. I -- I think a private matter as a
3  performance should be dealt with between the employee
4  and the supervisor and not a second party.
5    Q. Now, Ms. Williams was present when you got
6  your original performance work plan back in November
7  6th, 2001, that was removed as part of mediation; is
8  that right?
9    A. Yes.
10   Q. She was present at mediation?
11   A. Yes.
12   Q. Did you have any knowledge one way or the
13 other whether she was present when Mr. Crawford gave
14 performance evaluations to other employees in the
15 office?
16   A. I don't know.
17   Q. All right. And how do you -- are you
18 claiming that, I guess, Ms. Bennett delivering your
19 performance work plan and Ms. Williams signing for
20 Mr. Crawford was due to your race, gender, and
21 retaliation?
2    A. All stemming from the same complaints.
23   Q. So the answer is yes?
24   A. It's just a continuation, yes.
25   Q. And the reason for that is the same

Page 224

1  reasons --
2    A. Same.
3    Q. -- you've previously given me?
4    A. Same, yes.
5    Q. All right. And how do you claim you were
6  harmed by the manner in which this performance work
7  plan was delivered or by how it was signed?
8    A. Again, it affected my character.
9    Q. How did it affect it?
10   A. Someone -- someone could have seen that and
11 determined that I didn't know my job, made a
12 determination that I didn't know my job because she
13 was given a not-achieved rating.
14   Q. But this document, when it was delivered to
15 you, was achieved, correct? This is the achieved
16 rating that is part of the rating agreement.
17   A. Yes. But the rating period is like
18 November -- October, November, not January.
19   Q. What evidence do you have that anybody knew
20 that you had been given this performance work plan in
21 this manner in January 2002?
22   A. They knew because I had been put on OTI.
23 They knew I had been off on training. I had talked
24 with Verdell and received instructions, tapes and all,
25 and carried it home to --

Page 225

1    Q. You're talking about the original performance
2  back in November 2001?
3    A. Yes.
4    Q. I'm talking about now -- my question is how
5  are you claiming you were harmed by the delivery of
6  this performance review in January 2002 when the
7  results are achieved performance?
8    A. Well, I initially thought that it was
9  delivered to me late based on the -- on the contract.
10   Q. You thought it was late?
11   A. Yes.
12   Q. Okay.
13   A. Because that's why I filed on the lateness.
14 The contract said that all these things should be done
15 within 30 days of implementation. And --
16   Q. Can you take the contract -- can you point me
17 to the language in that resolution agreement you
18 believe says everything should be done within 30 days?
19   A. Number four on page 2.
20   Q. The agency will within 30 calendar days
21 provide complainant with a written notice explaining
22 the specific actions taken?
23   A. Yes.
24   Q. Is that the language you're referring to?
25   A. Yes.

OZETTA THOMAS v. MIKE JOHANNS                                    11/29/2007
DEPOSITION OF OZETTA THOMAS

58 (Pages 226 to 229)

Page 226

1    Q.  All right.  Going back to the delivery of the
2  performance work plan January 2002, is there any other
3  way you claim you were harmed by the manner in which
4  it was delivered or about how it was signed other than
5  what you told me?
6    A.  No, none other than -- than that.
7    Q.  And did you tell anybody about your
8  performance work plan and your rating?  Did you share
9  it with anybody?
10    A.  I didn't share it personally, but it was
11  known.
12    Q.  When you say it was known, what do you base
13  that on?
14    A.  I didn't tell anyone personally, but everyone
15  knew I guess from other people talking -- I don't
16  know -- that I was given an achieved rating and was
17  put on an OTI.  And --
18    Q.  When you say everybody knew, though, what are
19  you basing that on?  Did someone tell you that?  If
20  so, who?
21    A.  Well, when I was out of the office, my staff
22  knew where I was.
23    Q.  What are you referring to?
24    A.  When I was out of the office on training.
25    Q.  Okay.  You're saying --

Page 227

1    A.  They knew I was gone on training because of
2  the OTI.
3    Q.  Did you tell them you were going on the
4  training?
5    A.  I didn't tell them.  No, I didn't tell them.
6    Q.  Did they tell you they knew you were going on
7  the training because of your OTI?
8    A.  No.  They didn't tell me that they knew I was
9  going on OTI, but it would have been on my itinerary.
10  And knowing that was just a training just for me, that
11  no one else was going on the training but me.  That's
12  not the way we do trainings for programs.
13    Q.  Okay.  So you're saying because you were
14  going on train -- certain training by yourself, you
15  think your staff could have inferred from that, that
16  you were on OTI?
17    A.  That was one way, yes.
18    Q.  How else?
19    A.  They just knew.
20    Q.  Can you point me to anything specific?
21    A.  I can't point to anything specifically.
22  People just talk.
23    MR. PETTAWAY:  Well, he wants those specific
24  instances about when folks talk, who told you.
25    THE WITNESS:  Well, see, nobody told me.

Page 228

1  They didn't talk to me.  It's just how gossip gets
2  out.
3    MR. PETTAWAY:  But he's asking you, how did
4  the gossip get back to you.
5    THE WITNESS:  Oh.  How did it get back to
6  me?
7    MR. PETTAWAY:  Yeah, how it get back to you.
8    THE WITNESS:  Because I would just hear from
9  different people.
10    MR. PETTAWAY:  He's asking you who, when, and
11  how.  He wants to know all of that.  So if you're
12  telling him you don't know, he's going to say later,
13  in the deposition she said she don't know.
14    THE WITNESS:  You want me to name people that
15  I heard it from?
16    MR. PETTAWAY:  Yes, that's what he's asking
17  you.  I'm only saying this because I know.
18    A.  Well, I know I heard it from all of my staff,
19  all of the members of my staff:  Verdell Zeigler,
20  Debbie Williams, Irean Bennett.
21    Q.  When you say you heard it, what are you
22  saying you heard?
23    A.  That they knew I was gone on training for
24  OTI.
25    Q.  And who's the "they" you're referring to?

Page 229

1    A.  These people that I'm naming.
2    Q.  Ms. Zeigler, Debbie Williams and Ms. Bennett.
3    A.  Yes.  And my staff, Sharrie Peterson, Walda
4  Messer, Pamela Polke.
5    Q.  They all told you, in your statement, we know
6  you're going to training because of your OTI?
7    A.  Yes.  Is that I had to tell them I would be
8  out of the office for training, and they knew it
9  was -- I was going to my training for the OTI, because
10  it was not for a program area.
11    Q.  But did they specifically say -- I mean, I --
12  you're making a statement everybody knew.  I'm just
13  saying, did anybody come to you and say, Ms. Thomas, I
14  know you're going to training because of the OTI, or
15  Ms. Thomas, you're on an OTI, or Ms. Thomas, it's
16  around the office that you're on an OTI?  Did anyone
17  come to you and say that, or is it just that you came
18  to that belief?
19    A.  Even in the -- in my staff meeting, they
20  would say we know you're going on OTI.
21    Q.  Now, your staff meeting --
22    A.  When we would have staff meeting.  Because,
23  in my staff meeting, Mr. Crawford was a part of
24  my staff meetings.
25    Q.  He attended one staff meeting to observe it

Page 230

1  after your OTI; is that right?
2      A.  No.  He attended more than one staff meeting.
3  He attended --
4      Q.  How many staff meetings did he attend?
5      A.  I would say at least three or four.
6      Q.  And this is between November 1st and December
7  5th, 2001?
8      A.  It was between -- no.  He started the staff
9  meetings after that first, not the second counseling
10  session is when he started.  And that was in -- I
11  forget what day that was.  You gave it to me as an
12  exhibit.  After August the 20th.
13      Q.  After August 20 -- between August 20, 2001,
14  and December 5th, 2001?
15      A.  Yes.
16      Q.  You're saying he attended four or five staff
17  meetings?
18      A.  Yes.  Because I would have weekly staff
19  meetings.
20      Q.  So he attended some before and after you went
21  on the OTI?
2      A.  He attended them before, yes.  And I think it
23  was maybe just one or -- after the OTI.
24      Q.  Are you saying the meeting after the OTI,
25  your staff told you they knew you were on an OTI?

Page 231

1      A.  They knew by him being in my staff meeting,
2  because he was coming to my staff meeting so that he
3  could see how I was performing in my staff meetings,
4  and they knew that.  And he had them reporting to
5  him.  Because he told me in one of the sessions that
6  my staff had said things had gotten better since he
7  had been coming to them.
8      Q.  You weren't present during any conversation
9  with Mr. Crawford and any of your staff?
10      A.  No.  No.
11      Q.  All right.  And going back to the delivery in
12  January of 2002 of the results achieved letter, you're
13  claiming everyone knew about that letter.  The
14  allegation in the complaint is that it was signed and
15  delivered by Ms. Bennett for Mr. Crawford.  Are you
16  claiming anyone knew about those things, the manner of
17  delivery or how it was signed?
18      A.  No.  I'm not saying that they knew that was
19  on that particular document.
20      Q.  Now, let me direct your attention to
21  paragraph 18 of the complaint.  This is Defendant's
22  Exhibit #29.
23      A.  Okay.  I got so many here.  I'm through with
24  these, right?
25      Q.  Paragraph 18, there is an allegation

Page 232

1  regarding Danny Crawford violating the settlement
2  agreement.  Do you see that?
3      A.  Yes, I see that.
4      Q.  Are you alleging in this lawsuit that
5  Mr. Crawford violated the December 5th, 2001,
6  settlement agreement because of your race, gender, and
7  retaliation?
8      A.  Yes.
9      Q.  Okay.  And are the bases for believing that
10  the same as you have previously told me supporting
11  other actions?
12      A.  Yes.
13      Q.  Now, how do you allege Mr. Crawford breached
14  the settlement agreement?
15      A.  As before stated, it was my understanding
16  that implementation had to be within 30 days.
17      Q.  Okay.  You mentioned that previously.
18  Anything else besides that?
19      A.  Okay.  Not initially.  Initially.  But when
20  they denied my appeal or the right for
21  reconsideration, by that time, I had another attorney
22  and there were new allegations that they called new
23  allegations that were not mentioned before.  And that
24  was a violation of my privacy.  And he was not
25  carrying the agreement out in good faith because it

Page 233

1  said we should be able to communicate and talk
2  together, and we didn't do any of that.  So,
3  therefore, EEOC noted new allegations and gave me the
4  right to file to the agency again on these new
5  allegations.
6      Q.  Let me go through a couple of documents with
7  you.  Let me give you a document marked as Defendant's
8  Exhibit #35.  Have you seen this document before?
9      A.  Yes.
10      Q.  Okay.  Is this a January 11th, 2002, letter
11  from your attorney to Ms. Lombardino raising some, I
12  guess, breach allegation?
13      A.  Yes.
14      Q.  All right.  And this -- if you look at the
15  last page, it seeks reinstatement of your complaint,
16  reassignment to OCR, and 300,000 in damages or
17  retirement with a grade to benefit her to receive 80
18  percent, and attorney's fees.  Do you see that?
19      A.  Yes.
20      Q.  Where did you get the 80 percent figure?
21      A.  The 80 percent --
22      Q.  Do you know?
23      A.  The 80 percent came about because if you have
24  41-plus years of service, you retire at 80 percent of
25  your salary.

OZETTA THOMAS v. MIKE JOHANNS                                    11/29/2007
DEPOSITION OF OZETTA THOMAS

᠊᠊ (Pages 234 to 237)

Page 234

1     Q.  When you reach a certain age, or is it if you
2  retire early?
3     A.  No.  You have to be over the age 55.
4     Q.  Over age 55?
5     A.  55.
6     Q.  And 41 years of service?
7     A.  And 41-plus years.
8     Q.  To get 80 percent of your salary?
9     A.  Yes.
10    Q.  All right.  And then let me hand you another
11 document.  This is marked as Defendant's Exhibit #36.
12 Tell me if you've seen that document before.
13       MR. DuBOIS:  And I don't have an extra copy
14 of that.  So --
15       MR. PETTAWAY:  Put a sticky on it.
16       MR. DuBOIS:  Put this on there.
17    A.  Yes, I remember this.
18    Q.  All right.  And is --
19    A.  I got a copy of this.
20    Q.  And is Defendant's Exhibit #36 another letter
21 from your attorney to Ms. Lombardino regarding your
2  noncompliance allegations dated December 9th, 2002?
23    A.  Yes.
24    Q.  And this seeks, I guess, on the first page,
25 reinstatement of your complaint, extension of your

Page 235

1  detail to OCR, and all the previous requests in the
2  prior letter.  Do you see that?
3     A.  Yes.
4     Q.  And your document marked as Defendant's
5  Exhibit #37, can you tell me if you've seen that
6  document before?
7     A.  I don't recall seeing this.
8     Q.  You don't recall seeing this document?
9     A.  I don't recall seeing this.
10    Q.  Any reason to believe it wasn't sent to your
11 attorney?
12    A.  I don't know.
13    Q.  You don't know one way or another?
14    A.  I don't know.
15    Q.  Okay.
16    A.  I don't -- didn't receive a copy of it.
17    Q.  Now, Mr. Winningham, on December 23rd, 2002,
18 issued a final agency decision finding no breach of
19 the resolution agreement, right?
20    A.  Yes.
21    Q.  You received a copy of that?
22    A.  I received his letter.
23    Q.  All right.  And tell me --
24    A.  He sent a copy directly to me.
25    Q.  Tell me if Defendant's Exhibit #38 is a copy

Page 236

1  of that decision.  That's the final agency decision
2  from Mr. Winningham on your final noncompliance
3  allegation, correct?
4     A.  Yes, I got a copy of this.
5     Q.  Do you know when you received it?
6     A.  Not off the top of my head.
7     Q.  Is this another document where you would have
8  the envelope?
9     A.  Yes.  Anytime I received documents, I would
10 note when I received it.
11    Q.  Now, do you recall appealing Mr. Winningham's
12 decision?  It doesn't show there.  Do you recall
13 appealing it?
14    A.  Did I appeal this?  Let's see.
15       THE WITNESS:  Did we appeal this?  You don't
16 know.  You weren't there then.
17       MR. PETTAWAY:  Y'all appealed something.
18       THE WITNESS:  I know we appealed the --
19    Q.  Well, let me just show you.
20    A.  Noncompliance.  Yes, we appealed this.  We
21 appealed it.
22    Q.  Do you have a copy of the appeal?  I have not
23 seen a copy of the appeal.  Do you have a copy in your
24 records?
25    A.  Yes.

Page 237

1     Q.  That's another document I would like to see.
2  When you bring it by your attorney, I'll look at
3  that.
4        MR. PETTAWAY:  I think you looked at that.
5        MR. DuBOIS:  I don't recall seeing it, but --
6        MR. PETTAWAY:  This appeal five.
7        MR. DuBOIS:  Is that the noncompliance one?
8        MR. PETTAWAY:  I think so.
9           (Off-the-record discussion)
10    Q.  I just gave you #39.  Can you tell me, is #39
11 the October 23rd, 2003, I guess, decision from the
12 EEOC affirming Mr. Winningham's final agency decision
13 on the noncompliance issue?
14       MR. PETTAWAY:  Yeah.  Because I think that
15 went along with it.  Yeah, I think you looked at
16 these, and you said you had all of these.
17       MR. DuBOIS:  Yeah.  There's so many
18 complaints.  There's been a number of administrative
19 proceedings.  I've seen these.  But I'm talking about
20 the appeal regarding the noncompliance.
21       MR. PETTAWAY:  I think that's it.
22       MR. DuBOIS:  I don't think the numbers match.
23    Q.  Have you had a chance to look at Defendant's
24 Exhibit #39?
25    A.  Hold on just a minute.  Yes.  Yes.  This is

OZETTA THOMAS v. MIKE JOHANNS                          11/29/2007
DEPOSITION OF  OZETTA THOMAS

61 (Pages 238 to 241)

Page 238

1   the one that I brought about the new claims.
2       Q.  This is EEOC's decision affirming a decision
3   from Mr. Winningham, which I guess was issued on
4   October 23rd, 2003.
5       A.  Yes.
6       Q.  Did you receive a copy of Defendant's Exhibit
7   #39?
8       A.  Yes.
9       Q.  Do you know when you received it?
10      A.  Again --
11      Q.  You believe it would be in your records?
12      A.  -- it's in my records.
13      Q.  Did you seek reconsideration of this
14  decision?  Do you know?
15      A.  I did.
16      Q.  Do you remember submitting the request for
17  reconsideration?
18      A.  I did, yes.
19      Q.  All right.
20      A.  This is the one.  Look at page 28 of 133, the
21  paragraph before the Statement of Rights, with the
2   note, on appeal --
23      Q.  Someone wrote a little star there.
24      A.  Yeah -- raises new breach allegations and if
25  complainant wishes to pursue those new claims through

Page 239

1   the agency, the EEO director?
2       Q.  In accordance with 29 CFR Section 1614-504e?
3       A.  Yes.  And I did that.
4       Q.  Okay.  So you're submitting -- I'm just
5   trying to figure out the history of this thing.  But
6   let me give you Defendant's #40.  So when you say --
7           MR. PETTAWAY:  You had #40?
8       Q.  Let me give you #40.  When you say you seek
9   reconsideration, do you -- I mean, are you talking
10  about an official request for the EEOC to reconsider
11  this October 23rd, 2003, decision; or are you talking
12  about filing something else regarding other breach
13  allegations?
14      A.  Yes, filing new breach allegations.
15      Q.  But you didn't file anything regarding these
16  original breach allegations?
17      A.  No.  No.  No.  It was new breach allegations.
18      Q.  And I handed you Defendant's Exhibit #40.
19  And tell me, is this the document that I guess looks
0   like your attorney sent and then you resent --
21      A.  Yes.
22      Q.  -- regarding these new breach allegations?
23      A.  Yes, this is it.
24      Q.  And the first page is a fax.  Is this your
25  handwriting on the first page?

Page 240

1       A.  Yes.
2       Q.  And you faxed it to an individual in the
3   Employment Compliance and Technical Assistance
4   Division?
5       A.  Yes.  Leslie Lightner.
6       Q.  And attached to it, you included a letter
7   from your attorney dated November 26, 2003?
8       A.  Yes.
9       Q.  And I guess it says, Please accept this
10  formal complaint.  And this raises some other breach
11  allegations you hadn't raised before?
12      A.  Right.
13      Q.  Okay.  And did you ever receive a decision?
14      A.  No response whatsoever.  After I faxed this
15  to him, I did not receive a response at all.
16      Q.  Did you ever talk to Ms. Lightner again about
17  this issue?
18      A.  No.  I talked to him prior to faxing this to
19  him because I was trying to find out the status.
20      Q.  Oh, is it mister, Mr. Lightner?
21      A.  It's Mr. Lightner.
22      Q.  Mr. Leslie Lightner?
23      A.  Yes.  And, evidently, he couldn't find a copy
24  and asked that I fax it to him; and I did so.
25      Q.  And you haven't heard anything further --

Page 241

1       A.  No, I did not.
2       Q.  -- on that point?
3       A.  And I did this -- faxed this on September the
4   9th of '04, wherein, the letter went to them November
5   26th of '03.
6       Q.  All right.  And in this 26 November 2003
7   letter, the relief requested is you ask the original
8   EEO complaint be reinstated at the point at which it
9   was closed.  Is that the relief you seek?
10      A.  Yes.  Yes, what's what we get -- I had.
11      Q.  And it looks like these new breach
12  allegations you raise relate to the delivery of your
13  revised performance review in January 2002?
14      A.  Yes.  Due to the violation of my private --
15  privacy and the spirit of cooperation as the -- the
16  agreement stipulated that we did not have.
17      Q.  I want to direct your attention now to
18  paragraph 22 of your complaint in this lawsuit, which
19  is Exhibit #29.  And you have an allegation there that
20  Mr. Crawford denied you an opportunity to attend the
21  Blacks In Government conference in 2002.  Do you see
22  that?
23      A.  That's paragraph what, now?
24      Q.  22.
25      A.  22?

OZETTA THOMAS v. MIKE JOHANNS
DEPOSITION OF OZETTA THOMAS
11/29/2007

62 (Pages 242 to 245)

Page 242

1    Q.  I believe.
2    A.  No.
3    Q.  I got the wrong paragraph?  You see that
4  allegation?
5    A.  Yes.
6    Q.  Now, as we previously talked about, you
7  attended in August 2001 a BIG conference in Los
8  Angeles with Vicki Anthony.  Is that right?
9    A.  Yes.
10    Q.  And is Vicki Anthony -- is she also Vicki
11  Lane?  Is that the same individual?
12    A.  Yes.  She -- Anthony is her maiden name, and
13  it's kind of hard to say Lane.
14    Q.  Does she go by Lane now?
15    A.  Yes, she's Lane now.  She was Anthony.  And I
16  still say Vicki Anthony.
17    Q.  Had you previously gone to a BIG conference
18  before August 2001, or was that the first one you had
19  attended?
20    A.  No.  I had gone before.
21    Q.  How many times before had you attended?
22    A.  Twice before.
23    Q.  What years?
24    A.  Ooh, wow.
25    Q.  If you recall.

Page 243

1    A.  I don't recall.
2    Q.  Now, BIG is not affiliated in any way with
3  the federal government, is it?  Is it a private
4  organization?
5    A.  No.  It's -- it's with any state government
6  employee.
7    Q.  Would it be state, federal, or local?
8    A.  State, federal, or local, yes, as long as
9  it's government.
10    Q.  Now, since you were on detail to the Office
11  of Civil Rights when the BIG conference in 2002 came
12  up, what was your understanding as to who you needed
13  to talk to, to get, I guess, approval of a request to
14  attend?
15    A.  I thought I was supposed to go through my
16  supervisor to get approval.
17    Q.  Who at that time would have been Dr. O'neal?
18    A.  Yes.  And then referred on to Mr. Crawford,
19  since I was an employee of his, to give me the final
20  approval in order to --
21    Q.  Did someone tell you that you had to go
22  through both channels like that?
23    A.  That was just my understanding.  Because,
24  see, I was not a part of Civil Rights.  I was just
25  detailed there.

Page 244

1    Q.  Even though you were just there on detail,
2  did you ever explore whether you could have gone to
3  the BIG conference from the Office of Civil Rights and
4  obtained approval through that channel as opposed to
5  using FSA?
6    A.  Well, at that time, I was informed by
7  Dr. O'neal that the allotment had already been taken
8  care of for the Office of Civil Rights, which included
9  the satellite office along with the national office.
10  That would have been Alabama, Kansas City, and
11  Washington.
12    Q.  So there were a number of spots for employees
13  to go to BIG conferences from the Office of Civil
14  Rights?
15    A.  Yes.
16    Q.  They would come from that pool of Montgomery
17  office, Kansas City, D.C., and he said the allotments
18  had already been taken?
19    A.  Yes.  Because they had already sent up their
20  notice from Dr. O'neal's office that no one was
21  interested.
22    Q.  Okay.  Had anyone asked you before that was
23  sent off saying nobody was interested?  Was this
24  before your detail, or do you know if anyone asked
25  you?

Page 245

1    A.  Well, no, no one asked me.  I just knew it
2  was time when I got my information from BIG that it
3  was time for the conference, to sign up to attend.  By
4  that time, all the allotments were gone for Civil
5  Rights.
6    Q.  Civil Rights?
7    A.  Yes.
8    Q.  Let me hand you Defendant's Exhibit #41.  I
9  only have one copy, so I've got it tabbed.  Can you
10  tell me, did you prepare this memorandum?
11    A.  Yes, I did.
12    Q.  All right.  And this is a memo requesting, I
13  guess, approval to go to the BIG conference in 2002.
14  It's addressed to both Danny Crawford and Carlton
15  O'neal; is that correct?
16    A.  That's correct.
17    Q.  Did you give this first to Dr. O'neal?
18    A.  Yes.
19    Q.  And ask him to forward it on to
20  Mr. Crawford?
21    A.  Yes.
22    Q.  Did you have any conversations yourself with
23  Mr. Crawford about going to this conference?
24    A.  No.  Only this through this letter.
25    Q.  And was it your understanding that there were

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF  OZETTA THOMAS

63 (Pages 246 to 249)

Page 246

1  only two -- or that I guess FSA, the state office, was
2  only authorized to send two employees from Alabama?
3      A.  Yes.
4      Q.  All right.  And after you gave this memo to
5  Dr. O'neal, do you recall receiving -- let me hand you
6  Defendant's Exhibit #42.  At some point do you recall
7  receiving an email from Verdell Zeigler with a memo
8  attached regarding the BIG conference?
9      A.  Yes.
10      Q.  And this went out to all the African-American
11  FSA employees in Alabama, seeing if any of them are
12  interested in attending?
13      A.  Yes.
14      Q.  All right.  And did you respond to this?
15      A.  No.  This was after.  This was after my
16  letter.
17      Q.  Oh.  This is dated, let's see, Friday,
18  April -- Friday, April 5th, is the date of
19  Ms. Zeigler's email.  My question is, you received
20  Ms. Zeigler's email?
21      A.  Yes, I did.
22      Q.  And did you respond to it?
23      A.  I believe I spoke to her about this.
24      Q.  You believe.  What do you recall from the
25  conversation?

Page 247

1      A.  I believe my words to her were, was this just
2  sent out because I asked to attend?  And I said that
3  because no one from Alabama had ever gone before.  No
4  one in Alabama -- when I mean Alabama, I mean Alabama
5  FSA -- was not a member expect Vickie -- Vicki Lane,
6  myself, and Daniel Robinson.  No one have ever
7  expressed an interest.  We have called meetings,
8  called meetings, and called meetings to try to get
9  some -- some other members interested in the
10  organization.  No one was ever interested.
11      Q.  Had you ever contacted anybody to ask them if
12  they wanted to go to a BIG conference at government
13  expense?
14      A.  Yes.  That's what I'm saying.  Nobody was
15  ever interested.
16      Q.  Interested in joining BIG or going to a
17  conference or both?
18      A.  Joining BIG or going to a conference.
19      Q.  So you had never, in your past experience,
20  been able to get anyone else to go, to be interested
21  in BIG?
22      A.  That's right.  That's right.
23      Q.  And do you recall talking to Ms. Zeigler
24  about this?
25      A.  Yes.

Page 248

1      Q.  What did she say in response?
2      A.  She did what Mr. Crawford asked her to do.
3      Q.  That's what she said:  I'm doing what
4  Mr. Crawford asked me to do?
5      A.  Yes, uh-huh.
6      Q.  All right.  And let me direct you to the
7  third page of Defendant's Exhibit #42, which appears
8  to be an email you sent to Ms. Zeigler dated April
9  22nd, 2002.  Do you see that?
10      A.  Yes, uh-huh.
11      Q.  Do you believe you had a conversation her in
12  addition to this email, or you just communicated by
13  email?
14      A.  I had a conversation -- I'm pretty sure I
15  sent this email first, because I had been out of town,
16  and then I talked to her.
17      Q.  Afterwards?
18      A.  I remember talking to her personally, yes.
19      Q.  Do you recall anything else from your
20  conversation with her personally?
21      A.  Not at this time, but I -- later on she sent
22  out another notice as to who was selected to -- to
23  go.  And I talked with her again, and I let her know
24  that I felt that this was just done to deny me,
25  because it hadn't never been done in the history of

Page 249

1  FSA.
2      Q.  Well, there had been -- strike that.
3      All right.  So after you received Ms. Zeigler's
4  email asking if African-American employees are
5  interested in going to BIG, you wrote this response
6  which is dated April 22nd.  And you believe you had a
7  conversation with her at some point?
8      A.  Yes.
9      Q.  And after that -- or at some point, do you
10  recall receiving a response from Mr. Crawford
11  regarding the request you had sent through Dr. O'neal?
12      A.  I did.  I got a copy of this same letter,
13  disapproved.
14      Q.  I'm going to mark this as Defendant's Exhibit
15  #42.  Take that back.  Let's make that #43,
16  Defendant's Exhibit #43.
17      Did you receive a copy of Defendant's Exhibit
18  #43?
19      A.  Yes.
20      Q.  All right.  And this advises you since you
21  visited the conference last year, your request to
22  attend this year was denied?
23      A.  Yes.
24      Q.  And it says if for some reason, the other
25  interested employees are unable to attend, he will

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF OZETTA THOMAS

64 (Pages 250 to 253)

Page 250

1  withdraw the denial and you will be authorized to
2  attend. Do you see that?
3      A.  Yes.
4      Q.  Now, how did you receive this document? Did
5  it come in the mail or was it hand-delivered?
6      A.  I'm not sure.
7      Q.  If it was hand-delivered, do you know who --
8  I guess you don't know one way or the other how it was
9  delivered, so you wouldn't know who might have
10 delivered it.
11     A.  No.  I'm not -- I can't remember how I
12 received it.
13     Q.  All right.  Let me hand you Defendant's
14 Exhibit #44.  Tell me if you recall receiving this
15 email dated May 21st, 2002, from Ms. Zeigler.
16     A.  Yes.  This was the second email that she
17 sent.
18     Q.  And this indicates that Ms. Heard and
19 Ms. Fraser were selected to attend the conference in
20 Atlanta this year?
21     A.  Yes.
22     Q.  Now, both Ms. Heard and Ms. Fraser are
23 African-American females, correct?
24     A.  Yes.
25     Q.  And neither of them had gone to the BIG

Page 251

1  conference in 2001?
2      A.  Ever before, no.
3      Q.  Did you talk to either Ms. Heard or
4  Ms. Fraser about their decision to go to the BIG
5  conference this year in 2002?
6      A.  I talked to Ms. Fraser because she called
7  me --
8      Q.  What did she --
9      A.  -- and asked me about what the expectations
10 were for the BIG conference.
11     Q.  When did she call you?
12     A.  And it was after -- after the selection.  I
13 don't recall the date, but it was after the selection,
14 because I believe -- oh, yeah.  Verdell did tell them
15 that if they had any questions, to call us, Vicki and
16 Ozetta.
17     Q.  In this email?
18     A.  And they will be happy to answer your
19 questions.  So it was after this date when Beverly
20 called.
21     Q.  You talked to them about what was involved?
22     A.  What was involved and what to expect and the
23 classes that she could take that would help her in her
24 position.  And that's what my intentions were, to go
25 for the management classes.  Since I had done so bad

Page 252

1  in managing my division.  I said, well, maybe this will
2  be some more training for me.
3      Q.  Do you know if Vicki Anthony also asked to
4  attend the BIG conference in 2002?
5      A.  I -- I don't know.  I don't know if Vicki
6  asked to go or not.
7      Q.  Did you ever have any conversations with her
8  about not being authorized to attend the BIG
9  conference in 2002?
10     A.  Yes, I let her know.  I let her know that I
11 was not able to attend because of the disapproval.
12     Q.  Do you have any reason to think that she did
13 not request to attend the BIG conference?
14     A.  I -- yes, I do have reasons to believe
15 that -- that she probably wouldn't have because of --
16 she knew I had requested to go and the response that I
17 had received.  I don't think she would have asked.
18     Q.  But you don't know one way or another?
19     A.  But I don't know.
20     Q.  She would know whether or not, I guess, she
21 asked to attend.
22     A.  She would know whether she asked to attend or
23 not.
24     Q.  And I guess Ms. Zeigler would know who
25 responded to her email and expressed interest in

Page 253

1  attending?
2      A.  Yes, she would know.
3      Q.  Did you ever talk to Ms. Zeigler about that
4  to see who else besides Ms. Heard and Ms. Fraser may
5  have written to her in response to her email, saying
6  we want to go to BIG?
7      A.  No.  Because when I talked to her and asked
8  her what was the basis, and she said based on
9  seniority, and I told her -- because I told her, I
10 said, well, if that was the case, I would have gone
11 because I had more seniority.  Then she told me that
12 seniority for those who had never -- did not go in
13 2001.
14     Q.  Who had never attended.
15     A.  Yes.
16     Q.  When did you have that conversation with
17 Ms. Zeigler?
18     A.  After this date.  I -- I don't remember the
19 date right off.
20     Q.  This date being the date of the memo
21 indicating Ms. Heard and Ms. Fraser had been selected?
22     A.  Yes.  Yes.
23     Q.  Do you recall anything else in that
24 conversation with Ms. Zeigler?
25     A.  No.

OZETTA THOMAS v. MIKE JOHANNS                          11/29/2007
DEPOSITION OF OZETTA THOMAS

65 (Pages 254 to 257)

Page 254

1    Q. Now, do you claim that Mr. Crawford's
2  decision regarding who was authorized to attend the
3  BIG conference from Alabama was made due to your race,
4  gender, or retaliation?
5    A. Yes. And there we go again. It was -- all
6  this was retaliation for all of my filing from the
7  beginning.
8    Q. All right. And is there any --
9    A. I use -- I use the same basis.
10   Q. Is there any other factors that made you
11  believe that it was due to your race, gender, or
12  retaliation other than the ones you've told me about?
13   A. No.
14   Q. I show you Defendant's Exhibit #45. If you
15  can tell me if you recognize that document.
16   A. Yes. This is -- this is -- yes, this is my
17  document.
18   Q. All right. And is this the administrative
19  complaint you filed on May 29th, 2002, regarding
20  Mr. Crawford's decision as to who could attend the BIG
21  conference?
22   A. Yes.
23   Q. Now, did you end up going to the BIG
24  conference?
25   A. No, I didn't go.

Page 255

1    Q. Did you consider taking any annual leave to
2  go or driving to Atlanta to attend it?
3    A. I had considered that, but I just felt like I
4  just -- just wouldn't worry about it. I just -- I
5  didn't do it. I had thought -- it was in my thoughts,
6  but I didn't carry it out.
7    Q. Do you know if any other employees --
8    A. Because it would have been quite expensive.
9    Q. Do you know if any other employees from
10  Alabama took leave and went by themselves?
11   A. Not that I know of, definitely not from
12  Alabama.
13   Q. How do you claim you were harmed by this
14  denial of your request to attend this training?
15   A. Well, as I just stated, I thought this would
16  give me some extra training in management so that if I
17  had to go back, I would have been a better employee
18  for Mr. Crawford.
19   Q. Now, this BIG conference was an optional
20  training opportunity, right? It wasn't required or
21  mandatory.
22   A. No, it's not required or mandatory. It just
23  gives you an opportunity to take training in areas
24  that you may need some assistance with. It's a very
25  good program.

Page 256

1    Q. How often -- or have you submitted requests
2  to attend other optional trainings besides BIG
3  conference?
4    A. This is the only optional training that we
5  have other than what's required on your farm
6  programs. You have mandatory training for your farm
7  programs.
8    Q. Now, after Mr. Crawford made this decision as
9  to who would be going to the BIG conference from
10  Alabama FSA, did you make any effort or submit any
11  requests to attend the BIG conference through the
12  Office of Civil Rights?
13   A. By that time, it was too late.
14   Q. So you did not have any conversation with
15  anybody?
16   A. I -- I -- you know what I did. I -- I
17  faxed -- at the time, Dr. Dubose was the director.
18  And I faxed him a letter, you know, expressing my
19  concern and to go and how I had been disapproved, but
20  I didn't get a response from him.
21   Q. What was the name of this individual?
22   A. Dr. Dubose. I can't remember his first name,
23  but he was the director of Civil Rights at the time.
24   Q. Would he have been the individual that
25  replaced Mr. Winningham?

Page 257

1    A. No. No, no. For FSA. Mr. Winningham was
2  for USDA.
3    Q. Okay. You're saying --
4    A. This was just for Farm Service Agency.
5    Q. Okay. You sent a fax to someone at FSA?
6    A. Yes.
7    Q. Did you ever submit anything to anyone prior
8  to -- you never heard back from that fax?
9    A. No.
10   Q. Did you ever submit any letter or request to
11  the Office of Civil Rights to attend a BIG training?
12   A. Yeah. That's what I'm saying. That's the
13  only thing I did. He wasn't the director of OCR.
14  Dr. Dubose was. But no response.
15   Q. All right. Let me now turn to paragraph 25
16  of the complaint. You have an allegation there that
17  due to the atmosphere and hostility in the work
18  environment, you resigned by retirement effective
19  March 1st, 2003. Do you see that?
20   A. Yes.
21   Q. Now, no one told you that you had to retire;
22  is that right?
23   A. No, no one told me.
24   Q. No one told you you were not welcome at FSA?
25   A. No.

Page 258

1    Q. Now, when you say -- do you recall having a
2  conversation with Sharon Holmes in January 2003 when
3  she advised you Mr. Crawford was ready to have you
4  back and was willing to work with you?
5    A. I do recall that conversation.
6    Q. Where was that conversation held?
7    A. It was held in Dr. O'neal's office.
8    Q. Do you recall approximately when it was?
9    A. It was late December, just prior to -- no,
10  no. no. I had already gone back. It was January of
11  2003, because I had just gone back to the program
12  side.
13    Q. Was Ms. Holmes visiting, I guess, Montgomery?
14    A. Yes. She was new. She was the new director
15  of latter part of October, and she came to Alabama
16  to meet and greet.
17    Q. Is this the first time you met her?
18    A. Face-to-face, yes. I had talked with her and
19  spoken to her by phone.
20    Q. And what was -- how did this meeting with her
21  come about? I mean, did you request to meet with her
22  when she was in town, or did she ask to talk to you?
23    A. No. I requested to meet with her.
24    Q. What do you recall from the conversation with
25  her?

Page 259

1    A. I recall meeting with her. Because when she
2  first came on board, Dr. O'neal and I spoke with her,
3  trying to get a reassignment so that I wouldn't have
4  to go back to Danny Crawford's side. And at that
5  time, she asked Dr. O'neal to send some justification
6  as to why he needed me; and he did that.
7    Q. All right. Now, just to interrupt you for a
8  second, do you know if that request you made with
9  Dr. O'neal was for a reassignment or an extension in
10  detail?
11    A. Either/or.
12    Q. You believe it was for either/or?
13    A. Either/or, yes.
14    Q. And do you understand the distinction between
15  reassignment and extension?
16    A. Yes, I do. Yes, I do.
17    Q. With extended detail, you remain as a state
18  employee and they can't fill that spot. With
19  reassignment, you would be transferred over to OCR
20  permanently.
21    A. Yes, I do now. I think there was some
22  confusion early on with that.
23    Q. All right. So you had made a request with
24  Dr. O'neal. She asked Dr. O'neal to put something in
25  writing?

Page 260

1    A. Yes.
2    Q. Did he do that?
3    A. Yes.
4    Q. Did he tell you he sent that up?
5    A. He did.
6    Q. Did you hear a response to it?
7    A. He said he didn't get a response. He didn't
8  get a written response, I think is what he said.
9    Q. Did he tell you he got any type of response?
10    A. No, not personally.
11    Q. And so when Ms. Holmes was in town, did you
12  ask to meet with her to discuss this?
13    A. Yes. I already talked with him when I found
14  out she was coming, and I had already asked Dr. O'neal
15  to tell her I would like to meet with her.
16    Q. Was anyone else present when you met with
17  her?
18    A. Not in the office. It was just -- you know.
19    Q. Was Dr. O'neal there?
20    A. He was there but not in the office with us.
21    Q. Whose office -- you were in his office?
22    A. We were in his office.
23    Q. But he was not in the office?
24    A. But he was not in there.
25    Q. What do you recall from the conversation?

Page 261

1    A. I recall telling her, you know, how hard it
2  was for me to go back and I was experiencing the same
3  problems and that I really wish that she would just
4  move me back to OCR on a permanent basis. And she
5  informed me that she had spoken with Mr. Crawford and
6  that he was willing for me to come back and that he
7  would treat me right and that she would make sure of
8  that.
9    Q. Okay. Do you recall anything else?
10    A. And then I -- I remember telling her that I
11  just could not work with him. And then her words to
12  me was stay there -- stay there and do your work,
13  something on that line. I don't remember word for
14  word what she said, but she was asking me to stay
15  there. Because of being a black female, she was
16  encouraging me to stay there.
17    Q. Is Ms. Holmes an African-American female?
18    A. Yes, she is. And then she said -- she said,
19  Because it's nothing that I can do to help you.
20    Q. At that time, were you aware of any vacancy
21  announcements in the Office of Civil Rights?
22    A. No, there were none, but I had heard there
23  would be one, just grapevine talk. There's -- they're
24  going to be hiring.
25    Q. There was a rumor there was going to be a

Page 262

1  vacancy announcement at some point?
2      A.  Yes.
3      Q.  Do you recall anything else in the
4  conversation with Ms. Holmes?
5      A.  That's about all I can recall; because when
6  she told me it was nothing I can do to help you, my
7  heart just fell.  And I wouldn't have remembered
8  anything else then anyway.
9      Q.  Okay.  Going back to paragraph 25, what do
10  you mean when you say that due to the atmosphere and
11  hostility of the work environment, you retired?
12      A.  Because I had gone back to the same thing on
13  intimidation, ostracized, humiliated.  My character
14  had been defamed by the field.  No one had any
15  confidence in me.  And it created a hostile
16  environment for me to be in, to be sitting there
17  chief, doing anything -- nothing but reading
18  handbooks, not communicating with anybody, people not
19  even calling me on the phone because they figured,
20  hey, I didn't know what I was talking about.
21      Q.  What's your basis for saying that -- strike
22  that.
23      Did you make any efforts to contact the field or
24  talk to your staff?
25      A.  I talked to my staff.

Page 263

1      Q.  And you would agree that learning the new
2  farm bill was important, wouldn't you?
3      A.  Yes.
4      Q.  And you couldn't answer questions until you
5  understood the farm bill?
6      A.  That's -- that's correct, yes.
7      Q.  Now, when you say you were ostracized, what
8  are you basing that allegation on?  Talking about
9  when -- and I'm just referring to the time period when
10  you returned from detail.
11      A.  Okay.
12      Q.  Do you claim you were ostracized when you
13  returned from detail?
14      A.  Yes.  Ostracized from going to meetings that
15  pertained to my programs again.  There was a meeting
16  held when Walda came to my office and told me that she
17  was going to a meeting in Autauga County, that
18  Mr. Crawford had asked her to go to this meeting with
19  him, and that she would be meeting with some black
20  farmers concerning NAP payments.
21      Q.  And when did you have this conversation with
22  her?
23      A.  I don't recall the date; but it was soon
24  after I came back, which would have been after the
25  9th.

Page 264

1      Q.  Do you know if this meeting was scheduled
2  when you were still on your detail?
3      A.  I understood later that it was scheduled
4  before.
5      Q.  Before you returned from detail?
6      A.  Before my return, yes, but in the same -- at
7  the same time, Mr. Crawford asked the state committee
8  person, a state committee man, who's African-American,
9  to go just for some black representation, when I was
10  already familiar with that program.  That was -- that
11  was a carryover.
12      Q.  What do you base your statement that
13  Mr. Crawford asked -- is it Mr. Moore who is the
14  committee man -- to attend that meeting?
15      A.  Yes, uh-huh.
16      Q.  What do you base that allegation on?
17      A.  Because he called him.
18      Q.  How did you find out he called him?
19      A.  He came by the state office.
20      Q.  Mr. Moore?
21      A.  Mr. Moore did.
22      Q.  And he told you Mr. Crawford asked him?
23      A.  He didn't tell me, no, but he came by the
24  state office and rode to the meeting with Mr. Crawford
25  and Walda.

Page 265

1      Q.  You saw them drive off together?
2      A.  Yes.  Not really drive off, but I saw them
3  going downstairs.
4      Q.  Did you ask Mr. Crawford if you could attend
5  this meeting?
6      A.  No.
7      Q.  Did you tell Ms. Messer that you would rather
8  go instead of her?
9      A.  No.  Because she told me Mr. Crawford had
10  asked her to go, and I could not overrule, you know.
11      Q.  But that had been before -- when you were
12  still on detail.  Now that you were back, did you
13  think that, well, now maybe I'll go, and say, I think
14  it's better if I go or I prefer to go?
15      A.  Well, she didn't tell me he asked her while I
16  was on detail.
17      Q.  Do you know when he asked her?
18      A.  I don't know when he asked her.  She just
19  told me he had asked her to attend this meeting with
20  him.
21      Q.  Then you never made any request to attend the
22  meeting?
23      A.  No.  There were no communications.
24      Q.  And is all your knowledge of this meeting
25  based on what Ms. Messer told you?

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF OZETTA THOMAS

68 (Pages 266 to 269)

---

Page 266

1    A. Yes.
2    Q. Did she later tell you what happened at the
3  meeting?
4    A. She later told me that the producer -- there
5  was a conflict with the producer and they didn't have
6  the meeting.
7    Q. The meeting didn't take place?
8    A. The meeting didn't take place, no.
9    Q. What else do you base your allegation that
10  you were ostracized when you returned to the office
11  from your detail?
12    A. Okay. That same meeting, that farmer was
13  confused with the date. They rescheduled it, the
14  meeting. This time they had it in the state office.
15  But I learned later, according to Mr. Crawford, the
16  meeting was this time on Farm Loan Program and there
17  were no need for me to attend. But these black
18  farmers became hostile because of not receiving their
19  NAP payments, so one of the farm loan specialists --
20  when the meeting was held downstairs, he called by
21  telephone upstairs and asked that I come down to the
2  meeting. He had --
23    Q. Who was that that asked you?
24    A. That -- that was Richard Nazary. He's
25  retired now.

---

Page 268

1  that was their problem.
2    Q. And you didn't know the answer to that
3  question?
4    A. I didn't know the answer because I -- I -- I
5  had been away. I didn't know what the problem was.
6    Q. So what happened at that point?
7    A. At that point, Richard Burge asked me to --
8  he said, When you go upstairs, would you tell Walda to
9  come back down here? And you can come if you want to.
10    Q. Okay. So --
11    A. That humiliated me in the presence of those
12  black farmers.
13    Q. What part of that?
14    A. That. His tone that he used. And -- and --
15  it sounded as, well, you don't know what you're
16  talking about anyway, you know, we don't -- we don't
17  need you, is the impression that I got.
18    Q. What is it about the tone that gave you that
19  impression? Did he raise his voice at all?
20    A. No. He just said it that way. He said, You
21  can come back if you want to.
22    Q. But you had been unable to answer the
23  question. Ms. Messer was a specialist in your section
24  who might be able to answer it. Is there anything
25  wrong with him requesting you to go get her?

---

Page 267

1    Q. And he's with the Farm Loan section?
2    A. He's a farm loan specialist, yes.
3    Q. And what did he say when he called you?
4    A. He said that there was some upset farmers
5  down here wanted to know about their NAP payments.
6  And he said he had phoned Walda, but Walda was out of
7  her cubicle at that time. She was not there. So,
8  therefore, he called me.
9    Q. He said he tried to call?
10    A. Walda.
11    Q. Walda. But she didn't answer.
12    A. Right. She didn't answer her phone.
13    Q. And Ms. Messer, she was the one who was
14  assigned the NAP area?
15    A. Yes.
16    Q. So what happened after you talked to
17  Mr. Nazary?
18    A. I went down. And, of course, by my not
19  knowing what the issue were, I was no help to them. 1
20  didn't know what the problems were.
21    Q. What was the question they had?
22    A. They -- they -- the question was there were
23  other counties who had got paid their NAP payments,
24  and they were farmers in multi counties. Why would
25  one county pay them and another county would not? And

---

Page 269

1    A. No, there was nothing wrong with him
2  requesting to send Walda down there, but it's just the
3  way he did it.
4    Q. Do you have any knowledge one way or another
5  whether Ms. Messer even knew this meeting was taking
6  place or this issue would come up? Because she wasn't
7  there to begin with, right?
8    A. She wasn't there. She was there, but she was
9  just out of the office at the time.
10    Q. She was?
11    A. She just wasn't there at the time.
12    Q. She wasn't at the meeting, but she was in the
13  office?
14    A. Right. She was away from her desk.
15    Q. Did you go up and get her?
16    A. When she got back to her office. When she
17  got back into her office. I don't know whether she
18  had gone to the ladies' room or had gone -- stepped
19  out someplace. I don't know. But she's --
20    Q. Did you have a conversation with her when you
21  went to get her? Did you say anything to her?
22    A. Yes. I told her that Richard Burge was
23  asking for her presence downstairs in the meeting.
24    Q. Did you tell her what the issue was?
25    A. I told her there was some black farmers down

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF OZETTA THOMAS

69 (Pages 270 to 273)

Page 270

1  there wanting to know why they had not received their
2  NAP payments.
3      Q.  Did you ask her why they didn't receive the
4  NAP payments?
5      A.  I asked -- I went back down with her, and
6  then that's when I found out why they had not received
7  the payments.  It had to do with some codes.
8      Q.  So she was able to answer their question?
9      A.  Yes.  But it still didn't satisfy those
10 farmers.
11     Q.  Now, do you know one way or another whether
12 this was -- strike that.
13     Who was present at the meeting?  Do you know who
14 was there?
15     A.  A group of black farmers.  I listed some of
16 their names, those that I could recall.
17     Q.  But from FSA, Richard Burge was there?
18     A.  From FSA, it was Richard Burge.  That's the
19 district director.  It was Richard Nazary, farm loan
20 specialist.
21     Q.  Was Bill Savage there?
22     A.  I believe Bill Savage were there in that
23 meeting.
24     Q.  And he's with farm loans as well?
25     A.  He was -- yes, he was a farm -- he was not in

Page 271

1  the state office at that time.  He was in the county
2  office.  He's a farm loan manager, I believe is his
3  title.
4      Q.  Okay.  Who else?
5      A.  And I believe that was all other than the
6  farmers.
7      Q.  Okay.  And there were some African-American
8  farmers there?
9      A.  Yes.
10     Q.  And you listed them, I think, in the
11 discovery response.
12     A.  Yes.
13     Q.  Was anything else said at that meeting?
14     A.  No, not while I was in there.
15     Q.  Okay.  How long did it last?
16     A.  After that, I went back to my office.
17     Q.  Ms. Messer answered the question, and then
18 you went back to your office?
19     A.  Yes.  Yes.
20     Q.  Do you know if she stayed there or not?
21     A.  I can't recall whether she stayed or came
22 back upstairs.  I can't recall.
23     Q.  Did you consider, I guess, getting the answer
24 from her upstairs and then going down yourself and
25 telling them the answer?

Page 272

1      A.  No.  No.  I did what Richard asked me to do.
2      Q.  Do you think that it makes you, as a chief,
3  look good when your staff can answer questions?
4      A.  Yes, because I was not there.  I -- I mean,
5  that was a legitimate excuse.  I was not there.  I was
6  not aware.  I was not aware a meeting was going to
7  take place.
8      Q.  Well, did you know Ms. Malone -- I mean
9  Ms. Messer was also not aware?  Do you know one way or
10 the other whether Ms. Messer knew the meeting was
11 going to take place?  I mean, she wasn't present.
12     A.  She -- she -- she knew it was -- she was
13 prepared for the meeting when she went to Autauga
14 County.
15     Q.  And do you have any knowledge one way or the
16 other whether it was a farm loan meeting, whether that
17 was the primary purpose?
18     A.  Well, I would think it was the farm loan
19 meeting, because you had farm loan specialists that
20 were in attendance.
21     Q.  Do you expect the farm loan section to give
22 you notice of all farm loan meetings in advance?
23     A.  Well, initially, it must have been the NAP
24 meeting, you know, for the Autauga County office,
25 based on what Walda told me, that she was going to a

Page 273

1  NAP meeting.  So I assume since they rescheduled in
2  the state office, they would have both together.
3      Q.  And what's your basis for saying that these
4  are the same meetings?
5      A.  Because this is the same -- these are the
6  same farmers that was supposed to be at the meeting in
7  Autauga County.
8      Q.  But at the second meeting, Mr. Crawford
9  wasn't there?
10     A.  Mr. Crawford wasn't there the second meeting.
11     Q.  And Mr. Moore wasn't there?
12     A.  No.
13     Q.  And when you went down there, obviously,
14 Ms. Messer wasn't there.
15     A.  No.
16     Q.  All right.  Did you ever have any
17 conversations with Mr. Crawford about this meeting?
18     A.  No.
19     Q.  Is there any other -- any other incident that
20 you base your claim you were ostracized when you
21 returned from your detail other than what you told me?
22     A.  Other than not receiving any calls, nobody
23 talking to me.
24     Q.  Now, you have no evidence that anyone told
25 people not to call you, right?

OZETTA THOMAS v. MIKE JOHANNS                                11/29/2007
DEPOSITION OF  OZETTA THOMAS

(Pages 274 to 277)

Page 274

1    A.  No, I don't.
2    Q.  And nothing --
3    A.  I just -- I just feel like my character had
4  been defamed and nobody had confidence to talk to me.
5    Q.  And what do you base that conclusion on?
6    A.  On what had transpired from the beginning of
7  filing these complaints and by Mr. Crawford telling me
8  that all of the CEDs had a problem with me.
9    Q.  This is all back prior to the detail?
10   A.  All back before, yes.
11   Q.  After your detail, what made you think that
12 your character had been defamed?
13   A.  Same thing, same reason.  It all stems from
14 the beginning.
15   Q.  What made you --
16   A.  By that time -- like I said, by that time, my
17 character was destroyed.
18   Q.  What made you -- strike that.
19     Did you have any conversations or did you make
20 any calls to field employees when you got back as
21 chief?
22   A.  No.  We don't make calls to the field unless
23 we got a follow-up call from some problem they may
24 have had.  They always call us.
25   Q.  But nothing prevented you from calling the

Page 275

1  field saying you were back and seeing if they had any
2  issues or setting up meetings yourself to go out to
3  county offices; is that true?
4    A.  Well, the district directors would always
5  determine if their county offices needed some
6  assistance.  Specialists didn't call county offices to
7  see their problems were or what they needed.  We
8  got that through their district directors.
9    Q.  Did you call any district directors when you
10 returned from your detail?
11   A.  No.
12   Q.  Did you talk to them at any point in time?
13   A.  No.  They didn't believe in me either.
14   Q.  How about the county executive directors?
15 Did you talk to any of them?
16   A.  That's the CEDs.  They didn't believe in me
17 either.
18   Q.  All right.  Is there anything that
19 Mr. Crawford did in particular that made you decide
20 that you had to retire after you returned from your
21 detail?  You returned from your detail on January
22 6th.  January 9th, you returned from your sick leave,
23 2003.  You decided to retire February 24th, 2003.  Is
24 there anything in particular you can point to that
25 Mr. Crawford did that made you decide to retire?

Page 276

1    A.  I can point to things that he didn't do.
2    Q.  And what are those?
3    A.  He didn't welcome me back.  He didn't do
4  anything to mend the broken feelings.
5    Q.  All right.  And what --
6    A.  He didn't talk to me.  He didn't come by and
7  say good morning, speak to me.
8    Q.  Did you go by his office as well?
9    A.  No, I -- I didn't, because I felt better
10 being away from him.
11   Q.  So you didn't want him to come by?
12   A.  No, I'm not saying that.  I'm saying I didn't
13 go to him because I didn't feel wanted by him; so,
14 therefore, I didn't -- I didn't approach him for
15 anything.
16   Q.  And when you say he didn't welcome you
17 back --
18   A.  Because, see, anytime -- anytime I knew
19 Mr. Crawford wanted to talk to me, it's a problem.  We
20 have never gotten together to just discuss issues or
21 programs, program issues.  There were just -- there
22 was just no chief-specialist relationship.
23   Q.  When you returned, you never made any request
24 to go talk to him about any program issues, though,
25 did you?  Is that right?

Page 277

1    A.  No.
2    Q.  And when you say he didn't welcome you back,
3  what are you referring to?
4    A.  Because when I went in to let him know I was
5  back and he told me that he would get Mary to set up
6  my computer and get with me later, he never did that.
7    Q.  And you don't know -- you don't know what he
8  was doing at that time, do you?
9    A.  No, I don't know what he was doing.
10   Q.  On a day-to-day basis, you have no personal
11 knowledge as to what he was doing?
12   A.  No.  No.
13   Q.  And you have, I guess, no personal knowledge
14 of how much he interacted with the other chiefs during
15 the first couple months of 2003?
16   A.  Now, I know he communicated with the other
17 chiefs on a regular basis.  This was prior to the
18 detail.  And after coming back, see, I was really not
19 there really long enough to observe a whole lot of
20 visitations.
21   Q.  After the detail?
22   A.  After the detail.
23   Q.  No knowledge one way or the other?
24   A.  No.
25   Q.  Let me direct your attention to -- I guess

Page 278

1   February 18th, 2003, is when you were in the office;
2   and then you took two days off; and then you retired
3   on February 24th, 2003. Is there anything in
4   particular that happened on February 18th or before
5   February 24th that was like the straw -- I guess the
6   proverbial straw that broke the camel's back that made
7   you decide to retire?
8       A. Just sick.
9       Q. You felt sick that morning?
10      A. I was sick the whole time, just sick. And
11  it -- each time I would get up to get dressed and get
12  sick, I just -- I -- my mind just couldn't take no
13  more of it.
14      Q. Was there anything different on February 24th
15  than previously in terms of your sickness?
16      A. No. I believe that was February 26th, wasn't
17  it?
18      Q. February 24th is the date of the email.
19      A. Is it 24th?
20      Q. Yeah.
21      A. Oh, okay. I was thinking it was the 26th.
22      Q. Is there anything different about your
23  sickness on that day?
24      A. Just sick. No difference. Just sick and
25  just tired, just couldn't take no more.

Page 279

1       Q. All right. And you claim that this alleged
2   atmosphere in the office that you say forced you to
3   retire was due to your race, gender, and retaliation?
4       A. Yes.
5       Q. And is the basis, I guess, of that the same
6   as what you previously told me?
7       A. Yes.
8       Q. Is there anything else that you haven't told
9   me about?
10      A. I use the same basis for every complaint that
11  I've filed.
12      Q. Is there any other basis you haven't told me
13  about?
14      A. No.
15      Q. Let me hand you Defendant's Exhibit #46. Do
16  you recognize this document?
17      A. Yes, I do.
18      Q. Is this a copy of I guess your EEO complaint
19  regarding your alleged forced retirement?
20      A. Yes.
21      Q. And it's dated April 7th, 2003?
22      A. Yes.
23      Q. And turning to, let's see, the third page,
24  that's your signature there?
25      A. Yes.

Page 280

1       Q. Prior to sending this document that is dated
2   April 7th, 2003, did you talk on -- did you make any
3   other complaint or talk to anybody else about the work
4   environment when you returned or your, allegedly,
5   forced retirement?
6       A. The only other person I talked to was my
7   counselor, my spiritual counselor. I talked with him
8   constantly throughout the whole ordeal.
9       Q. Is this the first complaint -- this April
10  7th, 2003, complaint, the first complaint you filed
11  regarding your retirement or anything that occurred
12  after your return from detail?
13      A. I didn't understand.
14      Q. I'm just asking if Defendant's Exhibit #46 is
15  the first complaint you filed regarding anything you
16  claim happened to you after you returned from your
17  detail.
18      A. Yes.
19      Q. And referring to, let's see, the second page,
20  what evidence or who are you referring to on that
21  second page that says, did not want me to return to
22  the position. First, who are the co-conspirators
23  there?
24      A. Debbie Williams, Richard Burge, Jack Crawley.
25      Q. Anyone else?

Page 281

1       A. And my staff.
2       Q. And when you say your staff, who are you
3   referring to?
4       A. Walda Messer, Sharrie Peterson. And I'm not
5   sure about Judy Norris because she was hired after I
6   left. And -- and Pamela Polke.
7       Q. You're not sure about Ms. Norris, but you're
8   including in that reference to your staff
9   Ms. Peterson, Ms. Messer, and Ms. Polke?
10      A. Yes.
11      Q. And what is your basis for saying that your
12  staff did not want you to return as chief?
13      A. Because I'm -- I was under the impression
14  that they thought I was going to retire and not come
15  back.
16      Q. Where did you get that impression from?
17      A. Because that's what Mr. Crawford said.
18      Q. Mr. Crawford told you that?
19      A. No. He -- he told me that I said I was going
20  to retire during the mediation hearing, but I didn't
21  say that.
22      Q. But going back to your staff, what makes you
23  think your staff didn't want you to return?
24      A. What makes me think that is because of the
25  information that I don't have a record of right now

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF OZETTA THOMAS

72 (Pages 282 to 285)

---

Page 282

1  that they had given Mr. Crawford against me.
2    Q. You're talking about complaints that had been
3  filed that Mr. Crawford told you about back in 2001?
4    A. Yes.
5    Q. Are you aware of anything else, any
6  complaints by any of them about you after you returned
7  from detail?
8    A. No, not after I returned.
9    Q. Are you aware of any negative comments of
10 anyone about you after you returned?
11   A. I'm not aware, no.
12   Q. What else do you base your allegation here
13 that your staff didn't want you to return?
14   A. That's it.
15   Q. And what do you base your allegation that
16 Mr. Crawford and these individuals you identified or
17 alleged are co-conspirators didn't want you to return?
18   A. As I have aforestated, it is my belief that
19 they worked to get rid of me. They worked very hard
20 to get rid of me. And they didn't want me to come
21 back. They really wanted me to retire so that I
2  wouldn't have to come back.
23   Q. Well, what do you base that allegation on?
24 No one said that to you, right? There were no
25 statements?

---

Page 283

1    A. It was no statements made; but it was the way
2  I was being treated, with the intimidations that I had
3  been receiving in the past.
4    Q. Well, I'm referring now to the period when
5  you returned from your detail.
6    A. Well --
7    Q. What intimidations did you -- are you
8  claiming that you suffered any intimidations when you
9  returned from your detail? And if so, what are you
10 referring to?
11   A. I'm saying it's a rollover. It's just a
12 rollover, that they thought they were rid of me.
13   Q. But did anything in particular happen when
14 you returned from your detail?
15   A. No, didn't anything in particular happen
16 other than what we just talked about, not being
17 included on meetings, those meetings.
18   Q. Those two meetings you mentioned earlier?
19   A. And then not being -- not being able to
20 receive calls from anyone.
21   Q. Well, no one prevented you from receiving
22 calls.
23   A. They just -- no, no one prevented me. I'm
24 saying they just didn't have that -- that confidence
25 in me to call me.

---

Page 284

1    Q. Well, you have no idea one -- you have no
2  knowledge one way or another why you didn't receive
3  calls. Is that a fair statement?
4    A. I don't even know if the field -- all of the
5  field knew I was back, because there was nothing went
6  out saying I had returned.
7    Q. You're not aware of anything?
8    A. No, I'm not aware of anything.
9    Q. Do you know if any of your staff informed
10 people in the field that you were back?
11   A. I -- I didn't see anything in writing.
12   Q. And you don't know whether or not they told
13 people over the phone that Ms. Thomas is back?
14   A. I don't know if they told anyone on the phone
15 other than I had one call from one CED.
16   Q. Who was that?
17   A. Gary Terry.
18   Q. And what was that call about?
19   A. It -- it was about Disaster and NAP Program.
20   Q. And did you answer his questions?
21   A. Yes.
22   Q. And you have no evidence that people were
23 prevented from calling you. You said not being able
24 to call.
25   A. No, I don't.

---

Page 285

1    Q. You just did not get calls and you don't know
2  why.
3    A. Don't know why.
4    Q. All right. Is there anything else that
5  occurred when you returned from your detail that you
6  took into account when you made your decision to
7  retire that you haven't told me about?
8    A. No. I mentioned all of it that I can think
9  of.
10   Q. Let me hand you -- let's see -- Defendant's
11 Exhibit #47. And tell me if you've seen that document
12 before. Can you place this tab on the side?
13   Wait a minute. Take that off.
14   Defendant's Exhibit #47. Can you tell me if you
15 recognize this document?
16   A. Yes, it's the formal complaint.
17   Q. This is the formal complaint that you filed
18 on June 18, 2003, regarding your retirement; is that
19 correct?
20   A. Forced retirement?
21   Q. Regarding your, allegedly, forced
22 retirement.
23   MR. PETTAWAY: Forced retirement.
24   A. Forced retirement, yes.
25   Q. And that's your signature and you dated it

Page 286

1    June 18th, 2003?
2    A. Yes.
3    Q. And the basis here is race, sex, and age. Do
4    you see that on the first page?
5    A. Yes.
6    Q. Let me show you Defendant's Exhibit #48. And
7    tell me if this is a copy of an acceptance letter
8    regarding your formal complaint that was Defendant's
9    Exhibit #47.
10   A. Yes.
11   Q. All right. And this is dated December 9th,
12   2003?
13   A. Yes.
14   Q. And do you know why this acceptance letter
15   accepts your complaint for investigation on reprisal
16   only, but is not accepted on sex, race, and age, when
17   your complaint was based on sex, race, and age, but
18   not reprisal?
19   A. Are we sure this is the same one for this
20   particular number since we don't have a number on
21   here? I don't believe this is -- is this the same
2    one?
23   Q. Well, the number on both of them is 030475.
24   That's on the second page of Exhibit #47.
25   A. On the second page of #47. That's where I

Page 287

1    was looking. Oh, it's written in at the top up
2    there. Okay. I don't know who wrote that.
3    Q. Do you have any --
4    A. I don't know who wrote that.
5    Q. Do you know why these issues were accepted
6    for retaliation and not the other bases?
7        MR. PETTAWAY: Wasn't there some attachments
8    to this?
9    A. I don't know what this is.
10       MR. PETTAWAY: Hold on. Yeah, I think there
11   were some attachments to it.
12       MR. DuBOIS: There may have been.
13   A. I can't say that is the same.
14   Q. You're not sure it's the same?
15   A. I'm not sure it's the same.
16   Q. Did you have any discussion after receiving
17   this December 9th, 2003, acceptance letter about
18   having the agency investigate these claims on the
19   basis of race or gender or anything besides
0    retaliation?
21   A. No. It -- it was based on retaliation.
22   Q. That's what the investigation was accepted
23   for?
24   A. Yes.
25   Q. But did you have any conversation with anyone

Page 288

1    about expanding it to include race or gender, or did
2    you agree -- did you have any discussion at all about
3    it?
4    A. No. I -- I don't recall any discussions.
5    I -- I don't recall any discussions at all.
6    Q. All right. Let me run through a few things
7    on this acceptance letter, which is Defendant's
8    Exhibit #47. You have the first page -- let's see.
9    Number three in the middle is, On January 6th, 2003, a
10   request for definite sick leave was denied. Do you
11   see that?
12   A. Yes.
13   Q. Are you claiming it was denied due to your
14   retaliation on this complaint?
15   A. Now, these -- these are the -- the issues as
16   accepted by the agency in this -- in this letter here,
17   December the 9th.
18   Q. Yeah. Well, my question is, are you alleging
19   that that request for indefinite sick leave January
20   6th, 2003, was denied because of retaliation?
21   A. Yes, I do, because he only addressed -- he
22   only addressed my request for sick leave and did not
23   address the contents of my entire letter.
24   Q. That makes you believe it was retaliatory?
25   A. It was retaliated against me and didn't want

Page 289

1    to help me in any kind of way.
2    Q. Anything else to support your allegation that
3    that was retaliatory?
4    A. No.
5    Q. Are you aware of any other chiefs who worked
6    under Mr. Crawford who submitted requests for
7    indefinite sick leave without a doctor's note who had
8    their request granted?
9    A. As aforestated, to my knowledge, there have
10   never been doctor's excuses presented to any SED for
11   sick --
12   Q. To Mr. Crawford. You're not aware of any
13   request to Mr. Crawford that he granted that didn't
14   have doctor's excuses?
15   A. No, I'm not aware of any.
16   Q. All right. Now, let me direct your attention
17   now to number two on here. It says, Request to be
18   indefinitely detailed to OCR has been denied. You see
19   that reference?
20   A. Yes.
21   Q. Do you know what that's referring to?
22   A. Yes. Because in my letters, I had been --
23   been requesting to be reassigned or extend my detail
24   until these issues had been resolved.
25   Q. And have you told me about the requests you

OZETTA THOMAS v. MIKE JOHANNS                                    11/29/2007
DEPOSITION OF OZETTA THOMAS

(Pages 290 to 293)

Page 290

1  made already today, or is it --
2      A.  Yes.
3      Q.  Any requests you haven't told me about?
4      A.  No, no, no.  This is the request that I made
5  by letter to Mr. Crawford.
6      Q.  On number two, you believe that request --
7  that refers to your request to work at a location
8  outside the state office, which was in that memo.
9      A.  Well, yes.  See, as I stated before,
10 initially, we were thinking -- at least I was
11 thinking reassignment, extension of detail, one and
12 the same; but I learned later it's not.
13     Q.  When did you find out that they were not the
14 same?
15     A.  After filing my complaint.
16     Q.  But what is -- do you know what number two
17 here refers to?
18     A.  It would have to be in the -- in the letter
19 to Mr. Crawford, because January 6th was the day that
20 I was to return to work.
21     Q.  Are you aware of any other chiefs who worked
22 under Crawford who were given details from FSA to the
23 Civil Rights Office?
24     A.  No.
25     MR. PETTAWAY:  Let me ask you.  How much more

Page 291

1  do you have?
2      MR. DuBOIS:  Ten minutes.  I think I can wrap
3  it up.
4      (Off-the-record discussion)
5      Q.  Now, when you returned from your detail, you
6  weren't aware of any vacancies in the Office of Civil
7  Rights; is that right?
8      A.  No, other than the grapevine.
9      Q.  And then when one vacancy announcement did
10 come open at a subsequent time after your retirement,
11 you submitted a formal application for that position?
12     A.  Yes, the following week.
13     Q.  And that nonselection is not part of the
14 current lawsuit?
15     A.  No.
16     Q.  Are you aware of any other FSA employees who
17 were reassigned to the Office of Civil Rights at any
18 point in time?
19     A.  In Alabama?
20     Q.  Yes.
21     A.  No.
22     Q.  Let me ask you briefly about -- let's see.
23 There is an allegation in paragraph six that the
24 agency did not provide you with a retirement
25 celebration.  Do you see that?

Page 292

1      A.  I see that.
2      Q.  All right.  Did you ask for a retirement
3  celebration?
4      A.  No.
5      Q.  Would you have attended a retirement
6  celebration if they threw one?
7      A.  I don't know.  I can't say that at this
8  point.
9      Q.  Did any of your staff talk to you at any
10 point in time about a retirement celebration?
11     A.  No.
12     Q.  Are you aware of any other chiefs or
13 employees of FSA who retired by means of an email,
14 without any advance notice to their staff or anybody
15 else?
16     A.  No, I'm not aware of any.
17     Q.  All right.  And you --
18     A.  I am aware of some out in the field, in the
19 county offices.
20     Q.  And who generally -- to your understanding,
21 who throws retirement parties for employees?
22     A.  Usually, it's the supervisor that -- or he
23 gets a committee of people to plan retirements.
24 During my years of service, the supervisor also
25 selects a committee to plan retirement celebrations.

Page 293

1      Q.  Let me give you Exhibit #49.  I don't have a
2  copy.  Let me tab it.  This is a document provided I
3  think in the EEO process relating to the retirement of
4  Richard Nazary.
5      A.  Yes.
6      Q.  Now, who was Mr. Nazary's supervisor?
7      A.  Bill Sewell.
8      Q.  And that was -- he was chief of Farm Loans?
9      A.  Chief of Farm Loans Program.
10     Q.  Do you have any idea how much advance notice
11 Mr. Nazary gave about his retirement?
12     A.  Have no idea.
13     Q.  And do you have any knowledge one way or
14 another whether Mr. Crawford had any involvement in
15 planning this retirement?
16     A.  Yes, he did.
17     Q.  What do you base that on?
18     A.  On this attachment here, where he sent out a
19 notice to the field.
20     Q.  All right.  The fact that there is, I guess,
21 his electronic signature on this attachment?
22     A.  Yes.
23     Q.  Do you know who drafted this attachment?
24     A.  He or Debbie.
25     Q.  And what do you base that on?

Page 294

1    A.  As I stated before, she always sent
2  correspondence for him.
3    Q.  But have you --
4    A.  I don't know that.
5    Q.  You don't know for sure who drafted it?
6    A.  No, I don't.
7    Q.  But it's under his signature.  And you
8  weren't involved in any conversations regarding
9  Mr. Nazary's retirement celebration?
10    A.  I'm sorry.  I didn't understand.
11    Q.  You weren't involved in any conversations
12  relating to Mr. Nazary's retirement celebration?
13    A.  No.
14    Q.  Who did Ms. Colvin forward this to in
15  Exhibit #49?
16    A.  She is in Office of Civil Rights.
17    Q.  Are you claiming that you weren't thrown a
18  retirement celebration because of your race, age, and
19  retaliation?
20    A.  I would say so, but really it didn't.  I put
21  that in there just to show disparity.
2    Q.  So you're not alleging that?
23      MR. PETTAWAY:  Object to the form of the
24  question.
25    A.  I -- I'm alleging that I was treated

Page 295

1  disparately.
2    Q.  You're alleging you were not thrown a
3  retirement celebration because of your race, gender,
4  or retaliation against you?
5    A.  Yes.
6    Q.  What is your basis for alleging that?
7    A.  Because it has been a normal practice that
8  retired -- retiring employees would receive some type
9  of celebration.
10    Q.  All right.  So because you did not receive
11  one, you claim it was because of your race, gender,
12  and retaliation?
13    A.  Yes.
14    Q.  Any other reason?
15    A.  No.
16    Q.  Have we covered today all the ways you were
17  subjected to race, retaliation, and discrimination in
18  this lawsuit?
19    A.  I believe so.  I believe this is the last
0  thing.
21    Q.  And have you told me about all the evidence
22  to support your claims that you're aware of?
23    A.  Yes.
24    Q.  One document here.  Let me hand you
25  Exhibit #50.

Page 296

1      MR. DuBOIS:  I don't have a copy of this.
2  You'll have to tab it.
3    Q.  Do you recognize Defendant's Exhibit #50?
4    A.  Yes.
5    Q.  All right.  And these are a copy of the
6  annuity payments that you received since you have
7  retired?
8    A.  Yes.  As of the date forwarded to you I
9  believe in June.
10    Q.  Through June 2007?
11    A.  Yes.
12    Q.  These are the annual retirement benefit
13  payments you receive?
14    A.  Yes.
15    Q.  And have you told me about all of the doctors
16  you have visited regarding, I guess, any symptoms you
17  claim were caused by your -- what you encountered
18  during your employment?
19    A.  Yes.  I told you about all of those other
20  than the one I visited when I was in the state of
21  Georgia.
22    Q.  Is that when you were on detail to the Office
23  of Civil Rights?
24    A.  Yes.  It was my very first trip after being
25  detailed.

Page 297

1    Q.  What doctor was that?
2    A.  I don't remember his name, but it's in the
3  records.
4    Q.  What kind of symptoms did you experience?
5    A.  Same kind of symptoms I've always had before
6  I -- before leaving.
7    Q.  Is that the anxiety and nausea, with the
8  nausea and the dizziness and the vomiting?  Did you
9  get any treatment for that?
10    A.  Sure.  That doctor, he treated me at the
11  emergency room.
12    Q.  What kind of treatment did he provide?
13    A.  He provided medication.
14    Q.  What type of medication?
15    A.  Medication for -- he gave me an eardrop for
16  the dizziness, and there were some type -- I don't
17  know the name of the pills that he prescribed for me.
18    Q.  Have you received any other medication or
19  prescriptions from any medical providers for any
20  medical condition you attribute to your employment?
21    A.  No.
22    Q.  And you also, I guess, have been seeing
23  Reverend Pettaway as spiritual counsel?
24    A.  Yes.
25    Q.  Are you still seeing him today?

OZETTA THOMAS v. MIKE JOHANNS                    11/29/2007
DEPOSITION OF OZETTA THOMAS

(Pages 298 to 301)

## Page 298

1    A.  Yes.
2    Q.  How often do you see him?
3    A.  Twice -- about -- average about twice a
4  month.
5    Q.  And how long have you been seeing him?
6    A.  Since filing -- well, prior to filing this
7  first -- as soon as I started receiving problems on my
8  job, which was 2001, summer -- late summer of 2001.
9    Q.  And is that spiritual counsel -- what kind
10 of -- does that involve -- does he pray with you?
11   A.  Yes.  And we read scriptures.  He talks to me
12 based on what I'm going through and compare it with
13 the scriptures.
14   Q.  Someone refer --
15   A.  To give me encouragement.
16   Q.  Did someone refer you to him?
17   A.  No.  I knew him as a family friend for a long
18 time, years.  And he was specialized in that area.
19        MR. DuBOIS:  Give me one minute, and I think
20 we're done.
21   Q.  I've just got one question.  Are there any
2  questions I asked you earlier where you could not
23 recall the answer to, that you have recalled since I
24 asked them?
25   A.  Other than Bubba Trotman.  I told you about

## Page 299

1  that one.
2    Q.  Other than that one?
3    A.  I don't think so.  It's been a long day.
4    Q.  And I believe you told me about all of the
5  evidence that supports your claim in this lawsuit?
6        MR. PETTAWAY:  Object to the question.  You
7  can answer it.  Go ahead.
8    A.  Yes, you have --
9        MR. PETTAWAY:  You can answer it if you can.
10   A.  You have all the evidence except you wanted
11 the envelopes where I received them, the dates that I
12 received them.
13   Q.  But I want to see if you would provide to
14 your attorney a copy of your administrative file with
15 your envelopes, and you will bring that to your
16 attorney?
17   A.  I will.
18   Q.  And then the other is I want to bring up this
19 medical release, if we can have that signed.  But,
20 actually, I guess I have nothing further with
21 questions.
22        (The deposition concluded at
23         6:15 p.m.)
24     * * * * * * * * * *
25     FURTHER DEPONENT SAITH NOT

## Page 300

1        REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  CHILTON COUNTY
4        I, Wendy Lewis, Court Reporter and Commissioner
5  for the State of Alabama at Large, hereby certify that
6  on Thursday, November 29, 2007, I reported the
7  deposition of OZETTA CAVER THOMAS, who was first duly
8  sworn or affirmed to speak the truth in the matter of
9  the foregoing cause, and that pages 3 through 299
10 contain a true and accurate transcription of the
11 examination of said witness by counsel for the parties
12 set out herein.
13       I further certify that I am neither of kin nor of
14 counsel to any of the parties to said cause, nor in
15 any manner interested in the results thereof.
16       This 7th day of January, 2008.
17
18
19
20
        WENDY LEWIS, COURT REPORTER
21      ACCR NO. 444, Expires 9/30/08
        Commissioner for the
22      State of Alabama at Large
23      MY COMMISSION EXPIRES: 2/4/08
24
25

## Page 301

1        SIGNATURE OF WITNESS
2        I, OZETTA CAVER THOMAS, hereby certify that I
3  have read the transcript of my deposition consisting
4  of pages 3 through 299, and except for the corrections
5  listed below, certify that it is a true and correct
6  transcription.
7
8
        OZETTA CAVER THOMAS
9
10 SWORN TO AND SUBSCRIBED before me
   this _____ day of _____, 2008.
11
12
   NOTARY PUBLIC
13
14      * * * * * * * * * *
15 Page  Line  Correction and reason therefor
16
17
18
19
20
21
22
23
24
25