# DEPOSITION OF DANNY CRAWFORD

## January 10, 2008

## Pages 1 through 174

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
     NORTHERN DIVISION

5   OZETTA THOMAS,
6       Plaintiff,
7   Vs.                CIVIL ACTION NO.
                        2:05-CV-411-WKW
8   MIKE JOHANNS,
9       Defendant.
10
11
12          * * * * * * * * * * * * *
13
     DEPOSITION OF DANNY CRAWFORD, taken pursuant
14
to stipulation and agreement before Haley A.
15
Phillips, Certified Court Reporter, ACCR # 151, and
16
Commissioner for the State of Alabama at Large, in
17
the Law Offices of The U.S. Department of Justice,
18
131 Clayton Street, Montgomery, Alabama, on
19
Thursday, January 10, 2008, commencing at
20
approximately 9:15 a.m.
21
22
            * * * * * * * * * * * * *
23

**Page 2**

2       APPEARANCES
3   FOR THE PLAINTIFF:
4   Collins Pettaway, Jr., Esq.
     Chestnut, Sanders, Sanders & Pettaway
5   Attorneys at Law
     One Union Street
6   Selma, Alabama 36702
7   FOR THE DEFENDANT:
8   James J. DuBois, Esq.
     Assistant United States Attorney
9   U.S. Attorneys Office
     U.S. Department of Justice
10  131 Clayton Street
     Montgomery, Alabama 36104
11
     Craig G. Cornwell, Esq.
12  Attorney at Law
     Suite 205
13  4121 Carmichael Road
     Montgomery, Alabama 36106
14
     ALSO PRESENT:
15
     Ms. Ozetta Thomas
16
17          * * * * * * * * * * * * *
18       EXAMINATION INDEX
19  BY MR. PETTAWAY . . . . . . . . . . 7
     BY MR. DUBOIS . . . . . . . . . . 170
20
21       PLAINTIFF'S EXHIBIT INDEX
22  1   Statement of Discussion with Ozetta      162
     Thomas regarding Performance Appraisal
     Rating

**Page 3**

1       PLAINTIFF'S EXHIBIT INDEX (cont'd)
2   2   Statement by Pamela Polke             162
3   3   Alabama State FSA Office Organization   172
     Charts
4
         DEFENDANT'S EXHIBIT INDEX
5
     2   Letter to Ozetta Thomas from Danny     64
6       Crawford regarding Counseling
         Confirmation
7
     3   Letter to State Executive Director from   82
8       John Chott, Jr., regarding Geneva County
         Payment Limitation Review
9
     4   Letter to John Chott, Jr., from Danny    83
10      Crawford regarding Geneva County Payment
         Limitation Review
11
     6   Letter to Joan Grider from Ozetta Thomas   84
12      regarding review of Farm Operating Plan
         - Ronnie Hales, Geneva County
13
     7   Summary of Discussion between Danny      85
14      Crawford and Ozetta Thomas concerning
         John Chott's letter of August 15, 2001
15      and other related matters
16  8   Letter to Claude McKenzie from Ozetta    87
         Thomas
17
     9   Performance Work Plan                 87
18
     10  Memo regarding Ozetta Thomas -        116
19      Performance Appraisal
20  11  Memo regarding Ozetta Thomas - OTI    122
         Follow-up Review
21
     12  Agreement to Participate in the Early   118
22      Resolution Program
23  13  Resolution Agreement             120

**Page 4**

1       DEFENDANT'S EXHIBIT INDEX (cont'd)
2   16  Letter to Ozetta Thomas from Danny     129
         Crawford regarding Performance
3       Evaluation
4   17  Letter to Ozetta Thomas from Danny     124
         Crawford dated January 23, 2002
5
     18  Agenda                          41
6
     19  Letter to Danny Crawford from Ozetta   134
7       Thomas dated December 31, 2002
8   20  Letter to Ozetta Thomas from Danny     136
         Crawford regarding Request For Sick
9       Leave
10  22  Letter to Ozetta Thomas from Danny     135
         Crawford regarding Termination of Detail
11
     23  Alabama State FSA Office Organizational   24
12      Chart
13  27  Work Schedule Log                  68
14  31  Letter to All Alabama FSA Employees from   131
         Danny Crawford regarding Acting Chief
15      PA/CP
16  41  Letter to Danny Crawford from Ozetta    142
         Thomas regarding BIG Conference
17
     42  Letter to Applicable Employees from    144
18      Danny Crawford regarding Blacks in
         Government's 24th Annual National
19      Training Conference
20  43  Letter to Ozetta Thomas from Danny     148
         Crawford regarding BIG Conference
21
     44  E-mail regarding Blacks in Government   150
22      Conference
23

Page 5

1       DEFENDANT'S EXHIBIT INDEX (cont'd)

2   49  Letter to All Alabama FSA Employees, RD  157
      Employees and Retirees from Danny

3       Crawford regarding Wellness Day and
      Retirement Party

4

5       * * * * * * * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 6

1          STIPULATION

2    It is hereby stipulated and agreed by and

3  between counsel representing the parties that the

4  deposition of DANNY CRAWFORD is taken pursuant to

5  the Federal Rules of Civil Procedure and that said

6  deposition may be taken before Haley A. Phillips,

7  Certified Court Reporter, ACCR # 151, and

8  Commissioner for the State of Alabama at Large,

9  without the formality of a commission, that

10  objections to questions other than objections as to

11  the form of the question need not be made at this

12  time but may be reserved for a ruling at such time

13  as the said deposition may be offered in evidence

14  or used for any other purpose by either party

15  provided for by the Statute.

16    It is further stipulated and agreed by and

17  between counsel representing the parties in this

18  case that the filing of said deposition is hereby

19  waived and may be introduced at the trial of this

20  case or used in any other manner by either party

21  hereto provided for by the Statute regardless of
   the waiving of the filing of the same.

22    It is further stipulated and agreed by and

Page 7

1 between the parties hereto and the witness that the

2 signature of the witness to this deposition is

3 hereby not waived.

4       * * * * * * * * * * * * *

5       DANNY CRAWFORD

6    The witness, after having first been duly

7 sworn to speak the truth, the whole truth and

8 nothing but the truth testified as follows:

9        EXAMINATION

10 BY MR. PETTAWAY:

11 Q.  Good morning.

12 A.  Good morning.

13 Q.  State your name, please, sir.

14 A.  Danny Crawford.

15 Q.  How do you spell it?

16 A.  D-A-N-N-Y, C-R-A-W-F-O-R-D.

17 Q.  No middle name?

18 A.  Farrell, F-A-R-R-E-L-L.

19 Q.  F-E-R-R-E-L-L (sic).

20     All right, Mr. Crawford. Have you ever

21  had your deposition taken before?

22 A.  Yes.

23 Q.  And so as you know, this is a part of what

Page 8

1  we call the discovery process. And so we

2  are trying to discover or, in essence, find

3  out different things about the lawsuit

4  that's been filed against the department.

5  And so, of course, I represent Ms. Thomas,

6  who you know. And I want to ask you some

7  questions. And don't assume that I know

8  anything, because I don't. I mean, I

9  wasn't there. I didn't see anything,

10  didn't hear anything. I'm here to find

11  out. And that's part of this process.

12    And so if you don't understand a

13  question -- because that is important --

14  please just speak with me about it, and

15  I'll try to rephrase it or try to get a

16  better understanding. All right?

17 A.  Thank you.

18 Q.  And try to always speak in response to each

19  question because, like, head nods and

20  grimaces, things of that nature can't be

21  recorded. So a yes or no or maybe so or

22  however. And the -- And oftentimes when I

23  speak and others, sometimes we do the

Page 9

1   uh-huh and huh-uh and all that, but a
2   verbal response is needed rather than that
3   type of response, because she has to take
4   it down.
5       And if you need a break, let me know.
6   This is not a -- Although, you know, you
7   are under oath and your answers are under
8   oath and they are being recorded. But we
9   are still not in court, and so if you need
10  to do anything, let me know. If you need
11  to talk with your attorney, let me know.
12  We can work all that out. All right?
13  A.  Yes, sir.
14  Q.  Good.
15      And with that in mind, let me get some
16  background information on you. Now, you
17  are employed where?
18  A.  USDA Farm Service Agency in Montgomery.
19  Q.  And what is the Farm Service Agency?
20  A.  It's one of the branches of USDA that
21  administers farm programs.
22  Q.  In what capacity are you employed?
23  A.  State executive director.

Page 10

1   Q.  And how long have you been the state
2   executive director?
3   A.  Since May 21, '01.
4   Q.  And what does a state executive director
5   do?
6   A.  He provides oversight for the administering
7   of the programs.
8   Q.  Now, what other positions have you held
9   with USDA or FSA prior to this?
10  A.  I was county executive director in
11  Limestone County for 25 years.
12  Q.  Limestone?
13  A.  Yes, sir.
14  Q.  And what does the county director do?
15  A.  They provide oversight at the county level
16  to administer the programs that are
17  offered.
18  Q.  While you were working with the county in
19  Limestone, did you ever do any work with
20  the state or for the state office?
21  A.  Yes, sir. We would be detailed from time
22  to time to other parts of the state when
23  disasters occurred, like hurricanes, to do

Page 11

1   inspections.
2   Q.  Now, prior to working in Limestone, what
3   did you do?
4   A.  Prior to working ... I was assistant
5   county agent in Jefferson County.
6   Q.  Now, do you know what years you were in
7   Limestone?
8   A.  I would have to guess at it.
9   Q.  Okay.
10  A.  About 1978 to 2001. Or it could have been
11  '77. Somewhere along in there.
12  Q.  Or '76, somewhere like that?
13  A.  Somewhere along in there.
14  Q.  Now, you were assistant county agent in
15  Jefferson County?
16  A.  Yes, sir.
17  Q.  How long did you serve there?
18  A.  About ten months.
19  Q.  What does the county agent do?
20  A.  They answer a lot of questions from the
21  public about various agricultural things or
22  ornamental problems or questions or
23  situations that a taxpayer or individual

Page 12

1   might have, like how to prune the Azalea or
2   how to water my plant or things like that.
3   Q.  What -- And what did the assistant county
4   agent do?
5   A.  That's what I was. I was assistant county
6   agent.
7   Q.  I know. Right. I'm sorry. And I may have
8   didn't make myself clear. I was trying to
9   find out what the county agent did. Then
10  I want to know what the assistant did.
11  A.  You know, I never was one.
12  Q.  Okay.
13  A.  But they have the breakdown; the assistant
14  county agent, the associate county agent
15  and the county agent coordinator. And the
16  assistant was the lowest rung on the
17  ladder.
18  Q.  Okay. Now, prior to that what did you do?
19  A.  In school.
20  Q.  In school where?
21  A.  Auburn University.
22  Q.  All right. And did you obtain a degree
23  from Auburn?

Page 13

1    A.  I got my bachelor's of science degree and
2        my master's degree.
3    Q.  When did you get your bachelor's?
4    A.  '74.
5    Q.  What about your master's?
6    A.  '76.
7    Q.  Did you work while you were in school?
8    A.  Yes, sir.
9    Q.  Whereabouts?
10   A.  At a swine, boar testing station at Auburn
11       University, 20 hours a week.  And then I
12       was a cotton scout during the summer.
13   Q.  Cotton scout?
14   A.  Yes, sir.
15   Q.  What does a cotton scout do?
16   A.  They examine fields to determine pest
17       problems and make recommendations to the
18       farmer.
19   Q.  What grade school did you attend?
20   A.  Tanner High School.
21   Q.  Tanner.  Okay.
22   A.  And then Bell Manor Junior High.
23            (Off-the-Record discussion.)

Page 14

1    Q.  Now, do you live here in Montgomery?
2    A.  I live here during the week and go home on
3        weekends.
4    Q.  So you still claim your home up in
5        Limestone County?
6    A.  My permanent residence is in Athens.
7    Q.  Okay.  So do you -- Okay.  So if I follow
8        you right then -- So you claim Athens as
9        your permanent residence?
10   A.  Yes, sir.
11   Q.  But if we have to, like, subpoena you for
12       court or something, where could we find
13       you?  Or will Mr. DuBois accept any service
14       for this trial or anything?
15            MR. DUBOIS:  Given Mr. Crawford's
16            position, you wouldn't have to
17            subpoena him.
18            MR. PETTAWAY:  Okay.
19   Q.  All right.  Now, are you married?
20   A.  Yes, sir.
21   Q.  Your wife's name.
     A.  Mary Kay.
23   Q.  Mary Kay Crawford?

Page 15

1    A.  Yes, sir.
2    Q.  Is that K-A-Y-E, or K-A-Y?
3    A.  Y.  Just the Y.
4    Q.  K-A-Y.  Okay.
5            How long have y'all been married?
6    A.  Well, let me see.  29 or either 30.
7    Q.  Okay.
8    A.  I'm glad she's not here.  It's just slipped
9        my head.
10   Q.  Well, the good thing about the Record --
11       And I didn't interrupt while you were
12       thinking.  It doesn't show how long you
13       pause.
14   A.  Oh, okay.
15   Q.  It just shows ...  It just shows 29 or 30
16       years.
17   A.  I think it's going to be 30 this year.
18   Q.  Okay.  Now -- So does she live permanently
19       in Athens?
20   A.  Yes, sir.
21   Q.  So do you have any relatives or -- that
22       live here in -- Well, it's not just
23       Montgomery County, I guess.  Well, let me

Page 16

1        ask you.  Are you familiar with the Middle
2        District of Alabama, the counties that
3        compose it?
4    A.  No, sir.
5    Q.  I guess it would be, like, from Chilton
6        County going over across to Lee County and
7        Chambers and all that and coming on down.
8        We would take in Autauga and then kind of
9        come on down, going down to Dothan and that
10       area.  Any relatives?
11   A.  No, sir.
12   Q.  What about close personal friends that
13       might be around here?
14   A.  No.  You know, I sort of work and go
15       home --
16   Q.  So none --
17   A.  -- go back to work and then go to Athens on
18       the weekends.
19   Q.  Now, who works with you in the office where
20       you're at now?
21   A.  In the administrative division?
22   Q.  Yes.
23   A.  Irean Bennett.

Page 17

1   Q. Hold on. Irean Bennett. Now, what does
2      she do?
3   A. Executive secretary.
4   Q. All right. She's the executive secretary.
5      Now, is that, like, your secretary?
6   A. Yes, sir.
7   Q. How long has she been in that position?
8   A. Lord, I don't know. Ever since I've been
9      there.
10  Q. Okay.
11  A. And then some.
12  Q. I got you. But at least since you've been
13     there?
14  A. Yes, sir.
15  Q. And does she handle your -- all of your
16     administrative needs that you have?
17  A. Yes, sir.
18  Q. Does she carry out any verbal directives or
19     commands for you like to give instructions
20     to other people for you, or do you do that
21     in writing?
22  A. No, she doesn't give instructions.
23  Q. Does she answer any questions or -- about

Page 18

1      any programs or anything like that?
2   A. No, sir.
3   Q. So she does your typing and memos and all
4      that stuff, filing?
5   A. Calendars and does meetings and does
6      planning for the meetings and contracts and
7      things like that.
8   Q. All right. Who else?
9   A. Debbie Williams.
10  Q. And what does Ms. Williams do?
11  A. She's executive officer and assistant SED,
12     state executive director.
13  Q. So what does she do in her capacity?
14  A. She assists me in the duties that the SED
15     has, and she also works with the national
16     office on cases of complaints and things
17     around other states.
18  Q. So she does interact with the employees and
19     people?
20  A. Yes, sir.
21  Q. Answering any questions about programming,
22     administration or anything of that nature?
23  A. Very limited on program knowledge.

Page 19

1   Q. Okay.
2   A. She used to be administrative officer, so
3      the personnel functions is her main
4      responsibility.
5   Q. And how long has she been in that capacity?
6   A. About ten years.
7   Q. Who else is in the office?
8   A. In the administrative section, executive
9      section where I am that's all.
10  Q. So just those -- just the three of you work
11     in that area?
12  A. In that particular area, yes, sir.
13  Q. Do you have any close friends within the
14     agency that you consider?
15  A. Oh, I've been around a long time, so we've
16     got, you know ...
17  Q. And what I meant by -- Like within the
18     state office or anything?
19  A. Most of my relationships are strictly
20     working relationships.
21  Q. Now, the close friends you do have that
22     you've been around -- you said you've been
23     around for a long time -- are any of them

Page 20

1      with any middle district counties?
2   A. You know, I would think Cherokee County --
3      Billy Joe Johnson and I came along at work
4      at the same time, and he's probably the
5      closest of a friend within the agency.
6   Q. Billy Joe Johnson?
7   A. Yes, sir.
8   Q. He's in Cherokee County.
9      What does he do?
10  A. He's a -- Well, now he's a district
11     director. He was a CED in Cherokee County.
12     Now he's district director.
13  Q. Anyone else?
14  A. No.
15  Q. Do you know a Mr. Ronnie Davis?
16  A. Uh-huh (positive response).
17  Q. Does he fall in that close personal friend
18     category?
19  A. No, sir.
20  Q. What does he do? Do you know?
21  A. Well, he's -- Right today he's the chief of
22     the PA/compliance section. He's taking a
23     position and been hired as the CED in Henry

Page 21

1      County. He just hasn't reported yet.
2   Q.  Okay. If you could, kind of go over with
3      me the hierarchy of the state FSA. Where
4      do we start with that?
5   A.  Well, the state executive director.
6   Q.  That's the first person. All right.
7   A.  And then there's a state committee.
8   Q.  Okay.
9   A.  That's appointed by the administration.
10  Q.  Now, who's the administration that appoints
11     the committee?
12  A.  The administration that's in power at the
13     White House. At the White House.
14  Q.  Okay.
15  A.  Federal.
16  Q.  Who comprises this state committee?
17  A.  Today?
18  Q.  No. I mean, what kind of people serve on
19     it?
20  A.  They are from different parts of the state;
21     farm background, active farmers.
22  Q.  Oh, active farmers?
23  A.  Yes, sir.

Page 22

1   Q.  Okay.
2   A.  Politically connected.
3   Q.  And then after that?
4   A.  That's sort of the top. Then the executive
5      officer, which is Ms. Williams.
6   Q.  Okay.
7   A.  And then you have the chiefs of each
8      division and the district directors.
9   Q.  Hold on. So those division chiefs are
10     before the district directors or they're
11     kind of parallel?
12  A.  They're sort of parallel. You know,
13     they're the same grade, same pay scale.
14  Q.  Then who?
15  A.  I don't know the next level that you would
16     say of any pecking order. They -- You
17     know, there -- we have a county office
18     employee and we have a GS employee.
19  Q.  Uh-huh (positive response).
20  A.  So the GS employee or federal employee at
21     the county office is a county office
22     employee civil service but not federal. So
23     they -- You know, one is not over the

Page 23

1      other. So there's not a, you know, pecking
2      order there.
3   Q.  Okay.
4   A.  So I don't know. Your CEDs, they have
5      people that they supervise. So there's
6      another line downward from the county
7      within the county office.
8   Q.  Okay.
9   A.  And then there's a federal farm loan
10     manager who has people he or she supervises
11     and like that.
12  Q.  Okay.
13  A.  The specialists that work with the chiefs,
14     they're all equally specialists. And then
15     there's a support personnel for the -- for
16     the sections sometimes in certain
17     situations.
18  Q.  Okay. Let's see. We took the deposition
19     of Ms. Thomas a while ago and Mr. DuBois
20     used several exhibits. And what I'm going
21     to do, I'm going to try to use his exhibits
22     as best I can, so I can kind of keep a
23     running order.

Page 24

1         Now, in one of those exhibits, which
2      was Defendant's Exhibit 18 -- No. No.
3      Wrong one. Wrong one.
4          (Off-the-Record discussion.)
5          (Defendant's Exhibit 23 was marked
6          for identification.)
7   Q.  I want to show you what is marked in the
8      deposition as Defendant's Exhibit 23.
9          (Off-the-Record discussion.)
10  Q.  And this was a document -- an
11     organizational chart of the state office as
12     of December 30, 2002. Do you recognize
13     that?
14  A.  Yes, sir.
15  Q.  And was this how it existed at that time?
16  A.  It looks like it is.
17  Q.  Now, how did you get appointed as state
18     director -- state executive director?
19  A.  It's a political appointment.
20  Q.  Did you have to make an application or
21     anything, or did somebody just call and
22     say, hey, man, I know Danny; put him in
23     there? Or how did they do it?

Page 25

1  A.  You go online and fill out an application
2      that you want to serve with the Bush
3      Administration, and then that's the way it
4      goes. And you put in the capacity that you
5      want to serve as.
6  Q.  And then what?
7  A.  Sometime down the road somebody is
8      selected, and if they're interested in you,
9      they contact you and ask for information
10     and things like that.
11 Q.  They didn't have to -- They didn't have to
12     interview you or anything like that?
13 A.  No.
14 Q.  So you just put in that you want to serve
15     in the administration and someone would
16     just look at that and make selections from
17     the application? No interviews, no calls,
18     anything like that?
19 A.  The first time I talked with the USDA White
20     House liaison, he offered me the position.
21 Q.  Well, someone did call you, then, about it?
22 A.  And offered me the job.
23 Q.  Oh. So they just called and just offered

Page 26

1      you the job. They didn't, like, go over
2      your application or your resume or
3      anything?
4  A.  I have no idea what they did.
5  Q.  And I guess you accepted?
6  A.  Yes, sir.
7  Q.  Now, in here -- Let's see. Now, as of
8      December 30, 2002, it shows under state
9      executive director yourself and Irean
10     Bennett; Deborah Williams, executive
11     officer; then Vickie Lane, public
12     relations/outreach specialist. Who is
13     that?
14 A.  She is one of the employees in the state
15     office that handles outreach, public
16     relations and things like that.
17 Q.  Does she still work there?
18 A.  Yes, sir.
19 Q.  Oh, so she works in the office with you,
20     too, then?
21 A.  Not in the executive branch of the office,
22     but she's -- All these folks were working
       in the building except the committee. They

Page 27

1      didn't work in the building.
2  Q.  Now -- Then, of course, you've got the
3      administrative division. We've got
4      different people listed. Like the woman
5      here, the first one, Verdell Zeigler, chief
6      administrative officer. What is that?
7  A.  She handles all the administrative
8      functions and runs that section --
9      administrative section or division.
10 Q.  So what do they do?
11 A.  Lord. They handle human resource issues.
12     They handle pay and budgets and stuff like
13     that.
14 Q.  And then over across from the Farm Loan
15     Program division, Bill Sewell, farm loan
16     chief. What do those people do?
17 A.  They handle the farm loan programs.
18 Q.  Like what?
19 A.  Making farm ownership loans or beginning
20     farmer loans or operating loans. Things
21     like that.
22 Q.  And so -- Now, people don't make loans
23     through the state, do they? Do they do

Page 28

1      them through each county?
2  A.  They have -- We have farm loan teams. And
3      we don't have a farm loan person in every
4      county. So the producers go to the
5      personnel, and that personnel makes the
6      loan. But there's certain amounts that
7      they have authority to make loans in. And
8      sometimes that authority -- that amount of
9      loan exceeds the authority, and you have to
10     go to a higher level.
11 Q.  Give me an example.
12 A.  Oh, say a million dollar loan, it has to go
13     to the state.
14 Q.  And then you've got production
15     adjustment/compliance division. Like here
16     at that time it said Ozetta Thomas, chief
17     agriculture program specialist. What do
18     those people do, or did?
19 A.  They handle programs authorized by Congress
20     that dealt with the production adjustment
21     and compliance of those programs.
22 Q.  Like what?
23 A.  You know, every farm bill it changes. But

Page 29

1    in the current farm bill, direct
2    counter-cyclical programs that are involved
3    with crops that are -- They're guarantee
4    payments for each crop based on an acreage
5    base that that farm will have. And then
6    the counter-cyclical will kick in based on
7    the prices -- the national 12-month price,
8    you know, that's an Olympic average of
9    prices. And it could be -- If it doesn't
10   reach a certain target level, then they pay
11   the difference. So that's one of the
12   programs.
13       Noninsured Assistant Program, that's
14   very similar to risk management, Crop
15   Insurance Program. It's one of the
16   programs that falls in that authority, that
17   farmers can indemnify some of his input by
18   having certain payments -- certain crops
19   have more or less a low level guarantee on
20   that.
21   Q.  Okay.
22   A.  Disaster programs that are ad hoc disaster
23   programs that are not part of the farm bill

Page 30

1    that are individual programs are
2    administered quite often in that section
3    just according on what it dealt with.
4    Q.  And also the next, conservation support
5    division.
6    A.  Price support.
7    Q.  Yeah. Conservation price support division
8    here, what do they do? Joan Grider at that
9    time.
10   A.  They handle the guarantee loans. Not
11   guarantee loans. They guarantee that if
12   the commodity has grown they'll loan money
13   on it through the price support program.
14   And then it's a nonrecourse loan, and the
15   individual is not obligated to pay the
16   money back.
17       The government can assume the
18   commodity, and the loan is paid in full.
19   Or he can or she can buy the commodity back
20   at the price. It goes up at any particular
21   time within a nine to ten-month period and
22   then pay that money back plus interest
23   unless it's adjusted World Market prices

Page 31

1    below the loan rate, and then they didn't
2    have to pay interest back.
3    Q.  Okay.
4    A.  And they also deal with market gain in that
5    program, that if you loan it at a certain
6    amount and then it goes above that amount,
7    then that's a market gain by having it in
8    loan. That is an income, taxable income
9    item.
10       The conservation side of this section
11   deals with the conservation reserve program
12   or the agriculture conservation program.
13   That program now is part of NRCS,
14   National Resource -- Natural Resource
15   Conservation Service. And it's a
16   cost-share program that the farmers, owners
17   of land use to help build terraces or
18   things like that, slow down pastures,
19   different things.
20       The conservation reserve is geared to
21   erosion or wildlife needs or environmental
22   benefits. And it's competitive. You get
23   so many points for each one of those things

Page 32

1    that your land -- if it goes in the program
2    will offer. And it's a national
3    competition to get in those programs.
4        They handle those kind of programs as
5    well as the milk program. When milk prices
6    drop, the government has a holdup price on
7    milk. And then the government takes over
8    that milk, and that's where some of your
9    cheeses and dried powder milk comes from
10   that are in the commodity program in the
11   division.
12   Q.  Okay. Now, under here it has district
13   directors, and there were one, two,
14   three -- four. And I see there's a
15   district one, district two, district three,
16   district four, and there's a county by each
17   person's name. But is that just where that
18   person was located?
19   A.  Yes, sir.
20   Q.  But his district includes several counties?
21   A.  Yes, sir.
22   Q.  Got you.
23       What did the district directors do or

Page 33

1   what do they do?
2   A.  They are an arm of the state.  They're sort
3   of eyes and ears of the state office.
4   They're federal employees and supervised by
5   the SED.
6   Q.  Now, management and program analyst.  There
7   were two people listed.  What do those ...
8   A.  They review programs and determine if the
9   staff in the offices are implementing those
10  programs, filling out the forms properly
11  and things like that, various programs
12  throughout the state.  And they also use
13  the national office to review county office
14  programs in other states.
15  Q.  Okay.
16  A.  But it's -- like, it's a small-scale review
17  or a snapshot, like, if everything in every
18  block has been filled out.
19  Q.  So what's the relationship between a state
20  office and your different county offices?
21  How does that work?
22  A.  Well, the state is the support people.
23  Provide information and things to the

Page 34

1   county office.  The application process
2   occurs at the county level.
3   Q.  So, basically, then the state, then, is
4   kind of like the resource for the county if
5   the county has questions or needs some help
6   on something or needs to understand how to
7   administer a farm bill or a program or
8   something like that?
9   A.  Yes.
10  Q.  So therefore -- So when those county people
11  call in, I guess they have to have
12  confidence in who they're talking to,
13  knowing they got the right information?
14  A.  I would say yes.
15  Q.  Does the state office conduct trainings for
16  the different counties?
17  A.  They have statewide training, then
18  occasionally district-wide trainings.
19  Q.  And who selects the people to do the
20  trainings?
21  A.  It's based on whether or not -- You know,
22  the district-wide training, sometimes
23  they'll have people within that district

Page 35

1   that will do some district training for
2   them.  If it's statewide training, then the
3   state office staff.
4   Q.  So is that you who would make that
5   decision?
6   A.  The section --
7   Q.  I know you're nodding.  You have to say yes
8   or no.
9   A.  The section that it is responsible for is
10  involved in that training process.
11  Q.  Okay.
12      (Brief interruption.)
13      (Mr. Cornwell now present.)
14      (Off-the-Record discussion.)
15  Q.  So, for instance, if there's a -- like a
16  training that's going to be done dealing
17  with -- in the conservation price support
18  division, then as of December 30, 2002, I
19  guess, Ms. Grider would, then, figure out
20  how does she want to handle that training?
21  A.  As a general rule, whatever the training
22  needs -- if that section has the expertise,
23  then they'll figure out how to do it.

Page 36

1   Q.  What do you mean if that section has the
2   expertise?
3   A.  If there's certain programs sometimes that
4   are brand new --
5   Q.  Uh-huh (positive response).
6   A.  -- and sometimes they're only isolated to
7   particular areas of the country or areas of
8   the state.  And sometimes the district
9   directors get involved in the training.  So
10  sometimes they determine who they would
11  like to have in their districts, or
12  whatever.
13  Q.  But at least there's some input from that
14  division on, you know, whether they can
15  handle it or can't handle it?
16  A.  As a general rule, yes.
17  Q.  So you don't make that call as state
18  executive director?
19  A.  Of what?
20  Q.  If it's a state-offered training.
21  A.  No.  No.  The SED makes those final
22  decisions.
23  Q.  Okay.  You make the final decision.  I got

Page 37

1    you.
         And now I want to refer you to an
3    exhibit in the documents, and it's -- Now,
4    this is -- was the report of
5    investigation. This one right here that
6    was for 0203318 and 0204419. That was
7    done -- It's labeled final. That was done
8    for USDA Farm Service Agency. And this
9    report, I think, was done by -- E. Cannon
10   Hassell was the investigator.
11        And in here there's an exhibit that
12   I tabbed on page 268, Exhibit -- It should
13   be part of Exhibit 19. Yeah, 268 and 269,
14   270. Right. These are also some
15   organizational charts from the state
16   office. And I notice on these as it
17   relates to Defendant's Exhibit 23, which is
18   dated December 30, 2002, it shows -- And I
19   want to go to the production
20   adjustment/compliance division.
21        On Exhibit 23 it shows Ozetta Thomas,
22   chief agriculture program specialist. Do
23   you see that? But on the one on -- that's

Page 38

1    dated June 17, 2002, page 268 of that
2    document and the one on August 27, 2002,
3    page 269 of that document and September 9,
4    2002, page 270 of that document, they all
5    show vacant. Are these something you
6    prepared?
7    A. No.
8    Q. Who would prepare these documents?
9    A. Irean.
10   Q. Now, during the time of June 17, '02
11      through September 9, 2002, Ms. -- was not
12      Ms. Thomas employed there as chief
13      agriculture program specialist?
14   A. I don't know. Give me those dates again.
15   Q. June 17, 2002 through September 9, 2002.
16   A. I don't know when the detail started. I
17      just don't know.
18   Q. Now, when you say when the detail started,
19      what are you talking about?
20   A. I don't know when she, you know, left that
21      section and went on the detail.
     Q. Okay.
2ͻ   A. I don't remember the dates.

Page 39

1    Q. So at some point Ms. Thomas was detailed
2       where?
3    A. Civil rights division. I think that's what
4       it's called.
5    Q. Now, was that part of the settlement that
6       was made in a case she had brought after a
7       mediation, that she would detail for a year
8       and then come back?
9    A. It was a settlement.
10   Q. Sir?
11   A. It was a settlement. I don't remember a
12      mediation. You know, there was people
13      involved. I don't know the official name
14      of whatever it was.
15   Q. So there was a point in time in which she
16      was detailed and you think that the office
17      might have been listed vacant, but when she
18      came back her name would have been placed
19      back?
20   A. Uh-huh (positive response). I guess.
21   Q. Well, I'm just trying to get this. Would
22      she have been placed back on the chart as
23      chief agriculture program specialist prior

Page 40

1    to her detail ending?
2    A. You know, I don't know. Irean handles
3       that, and I get an e-mail with that
4       attached to it. And I don't know.
5    Q. You didn't give Ms. Irean any instruction
6       on --
7    A. No, sir.
8    Q. -- how she handled that?
9    A. No, sir.
10   Q. So she just was able to make that decision
11      on her own and run it how she saw fit?
12   A. That's how --
13           MR. DUBOIS: Object to the form.
14   Q. Go ahead. You can answer.
15   A. That's how it's always done, I guess. It's
16      nothing that we ever talked about.
17   Q. So while Ms. Thomas was detailed during
18      that time period, she would not have had
19      any responsibilities with the program
20      adjustment/compliance division; is that
21      right?
22   A. That's how I understand it.
23

**Page 41**

1       (Defendant's Exhibit 18 was marked
2       for identification.)
3  Q.  And I want to show you what we marked in
4     that previous deposition as Defendant's
5     Exhibit 18 and ask do you recognize that
6     document?
7  A.  Uh-huh (positive response).
8  Q.  Sir? You've got to speak up.
9  A.  Yes, I do.
10  Q.  And this is an agenda for a state farm bill
11     training. A new farm bill came out or
12     something?
13  A.  Yes.
14  Q.  Now, would you be the one to make the final
15     decision on who instructs in what area?
16  A.  Yes, sir.
17  Q.  And -- Now, this, of course, was one that
18     was done in district three. But, of
19     course, did you-all do one in each district
20     or was just one done for the whole state?
21  A.  This was -- If I'm not mistaken, it was a
22     statewide training. It just happened to be
23     conducted in Tuscaloosa.

**Page 42**

1  Q.  All right. I got you. That's all right.
2     And I know I just jumped ahead a little
3     bit there. But you know Ms. Ozetta Thomas;
4     right?
5  A.  Yes.
6  Q.  How did you come to know her?
7  A.  Well, I've been with the agency several
8     years and she's been with the agency
9     several years.
10  Q.  Did you know her before you became state
11     executive director?
12  A.  Yes.
13  Q.  How did you know her?
14  A.  Through work. Through work.
15  Q.  And did y'all ever have to work together on
16     any projects or anything?
17  A.  What do you mean about work together?
18  Q.  Prior to you coming to the state office.
19     Did y'all ever have to work on any
20     programs or any projects or any details
21     together prior to you coming to the state
22     office?
23  A.  I don't remember any.

**Page 43**

1  Q.  Now, still looking at Exhibit 23 and
2     looking at these different divisions and
3     whatnot, do these divisions conduct staff
4     meetings?
5  A.  Yes, sir.
6  Q.  And what's the purpose of those staff
7     meetings?
8  A.  To interact with their staff, get their
9     work organized, talk about different
10     concerns and problems and bills and things,
11     get on the same page more or less.
12  Q.  Who conducts these meetings?
13  A.  Within the sections?
14  Q.  Yeah.
15  A.  The chief.
16  Q.  Now, do you conduct the meetings or have
17     you conducted any?
18  A.  I have staff meetings, yes, myself.
19  Q.  As far as within these different divisions,
20     have you conducted meetings for the
21     different chiefs?
22  A.  No.
23  Q.  Now, Ms. Thomas in her deposition testified

**Page 44**

1     that you would come to her staff meetings
2     and that you would even conduct some. Is
3     that true?
4  A.  No.
5     MR. DUBOIS: Object to the form of
6     the question.
7  Q.  Sir?
8  A.  If the question requires one answer --
9     That's two questions.
10  Q.  Well, she said you would come to some of
11     her staff meetings.
12  A.  Yes.
13  Q.  Is that true?
14     What was the purpose of that?
15  A.  To observe how they were doing it, how she
16     was functioning.
17  Q.  Did you do that in any other divisions?
18  A.  Yes.
19  Q.  Which ones?
20  A.  I've been in the administrative section and
21     listened to their things.
22  Q.  Uh-huh (positive response).
23     What about the Farm Loan Program

Page 45

1    division?
2    A.  No.
3    Q.  What about the conservation support
4    division?
5    A.  I don't remember.  I might have.  I think I
6    have, but I don't even remember.
7    Q.  Now, why not go to the Farm Loan Program
8    division to see what they were doing?
9    A.  I'm not very familiar with farm loans and
10   they were an area that I wasn't very
11   familiar with.
12   Q.  You didn't find it useful to go and see
13   what they're doing and what's going on so
14   you could administer better?
15   A.  Oh, they -- The farm loan chief constantly
16   comes to the office and updates me on
17   everything.
18   Q.  Now, what occasioned you to go to staff
19   meetings Ms. Thomas was having?
20   A.  The staff wasn't -- had complained to me
21   about not getting information and not
22   having interaction with Ms. Thomas and
23   that -- And I felt it's important to have

Page 46

1    staff meetings and to see how she conducted
2    her staff meetings.  I'm her supervisor,
3    and I need to know if she's functioning in
4    that process properly.
5    Q.  And when you went to those meetings, what
6    did you find?
7    A.  We discussed things.  She and I talked
8    about agendas and things like that, and she
9    was doing a better job after we had
10   discussions.
11   Q.  What did you find when you went to observe
12   the meetings?
13       MR. DUBOIS:  Object to the form.
14   A.  I thought I just answered that.
15   Q.  Well, no.  You said that you got some
16   complaints --
17   A.  Uh-huh (positive response).
18   Q.  -- that some of these people, individuals
19   said they were not getting information and
20   whatnot so you went to observe the
21   meetings.
22   A.  We talked about -- Her and I talked about
23   the importance of having staff meetings and

Page 47

1    what to do and cover and all in staff
2    meetings and then have an agenda and have
3    interactions and so --
4    Q.  So you did that first?
5    A.  Yes.
6    Q.  Okay.
7    A.  And then they had staff meetings.  I
8    attended, you know, a couple of them to see
9    how things were going.  And then after
10   that, I didn't.
11   Q.  Did you ever conduct any of her --
12   A.  No.
13   Q.  -- staff meetings?
14   A.  No.
15   Q.  So you never conducted any?
16   A.  No.
17   Q.  Now, who replaced Ms. Thomas after she
18   left?
19       MR. DUBOIS:  Object to the form.
20   A.  Ronnie Davis was selected as chief after
21   she retired.
22   Q.  Did you get any complaints about Mr. Davis?
23   A.  No.

Page 48

1    Q.  You didn't?
2    A.  About what?
3    Q.  Mr. Davis' work performance.
4    A.  Staff meetings?
5    Q.  Or staff meetings or ...
6    A.  No.
7    Q.  So you said you got no complaints?
8    A.  I haven't, no.
9    Q.  So did you ever go and observe any of
10   Mr. Davis' staff meetings?
11   A.  Yes.
12   Q.  How often?
13   A.  I've been a couple of times.
14   Q.  Did you ever conduct any of the staff
15   meetings he had?
16   A.  No.
17   Q.  Now, you say you went to some staff
18   meetings in the administrative division.
19   A.  (Witness nods head.)
20   Q.  For what purpose?
21   A.  Oh, they were discussing different things,
22   and I went in to listen to some of the
23   things they were talking about.  It

Page 49

1  wasn't -- I don't remember now the subject
2  matters.
   Q.  Now, as I understand you came on board May
4      21, 2001.
5  A.  Uh-huh (positive response).
6  Q.  Is that about right?
7  A.  Yes, sir.
8  Q.  And -- Now, when you came on board, had you
9      talked with anyone about Ms. Ozetta Thomas?
10 A.  No.
11 Q.  So shortly after you got on board -- Well,
12     let me ask you this way.  When did you
13     first get complaints about Ms. Thomas?
14 A.  When -- First that I got complaints in my
15     capacity of Ms. Thomas?
16 Q.  Yeah.
17 A.  It would have been within a few weeks of
18     being there.
19 Q.  And what were the complaints?
20 A.  Lack of knowledge, not getting back with
21     them timely.  I had complaints from the --
22     her staff.
23 Q.  Now, who made these complaints?

Page 50

1  A.  Just about all of them, I guess.  All of
2      her staff members.
3  Q.  Would Sharrie Peterson be one of the
4      people?
5  A.  Yes.
6  Q.  What complaints did Sharrie Peterson make?
7  A.  Numerous complaints.  About not being
8      helpful, not being able to intermingle with
9      them.  Her door was shut; don't know -- you
10     know, doesn't have any things going on to
11     help them; defers everything to them; can't
12     answer questions and things like that.
13     That was the general of all their
14     specialist staff.  The support staff --
15 Q.  Hold on.  I don't want you to lose your
16     thought either.
17     So, now, would Ms. Peterson make these
18     complaints in writing or verbal or how?
19 A.  Verbal.
20 Q.  All of them verbal?
21 A.  (Witness nods head.)
22 Q.  Sir?
   A.  Yes.

Page 51

1  Q.  None in writing?
2  A.  I don't remember any in writing.
3  Q.  How would she make these complaints?  Come
4      to your office, call you or how?
5  A.  Come to the office.  Or I would go by and
6      speak to folks every day and greet them
7      every morning, and sometimes, you know, she
8      would make comments at that time.
9  Q.  Now, did you keep any record or log of
10     these complaints?
11 A.  No.
12 Q.  And then Walda Messer, did she make any
13     complaints?
14 A.  Yes.
15 Q.  What complaints did Ms. Messer make?
16 A.  Similar.
17 Q.  Sir?
18 A.  Similar.
19 Q.  How did she make the complaints?
20 A.  Verbally.
21 Q.  In the same fashion?
22 A.  Yes, sir.
23 Q.  What about Judy Norris?

Page 52

1  A.  I don't think Judy was there at that time.
2  Q.  Okay.  Who was there or was anyone there in
3      that position?
4  A.  Jeff Knotts was there.
5  Q.  Did Jeff Knotts make any complaints?
6  A.  Yes.  But not as many.
7  Q.  What kind of complaints he made?
8  A.  Similar.
9  Q.  How did he make his complaints?
10 A.  Verbally.
11 Q.  All verbally?
12 A.  Yes, sir.
13 Q.  What about Pamela Polke?
14 A.  Yes.
15 Q.  What kind of complaints did she make?
16 A.  About she's having to do all this stuff for
17     Ozetta.  It's her job and she has to keep
18     her this, that and the other and reports
19     and remind her all the time about stuff and
20     things like that.
21 Q.  Any of them in writing?
22 A.  No.
23 Q.  All verbal?

Deposition of Danny Crawford

---

Page 53

1   A. (Witness nods head.)
2   Q. Well, now, was Ms. Polke given some other
3     assignments by you to troubleshoot and back
4     up Ms. Bennett?
5   A. Ms. Polke would act in Ms. Bennett's place
6     when Ms. Bennett was out of the office.
7     Not -- There was a pecking order so to
8     speak, and there were different people who
9     handled things when she was out.
10   Q. Did you tell Ms. Polke that if Ms. Bennett
11     had something to do that had priority over
12     anything Ms. Thomas had to do?
13   A. No. No, sir.
14   Q. You don't recall saying that or just, no,
15     you didn't do nothing like that?
16   A. Ms. Bennett is the kind of person that
17     never had any need for anybody to help her.
18   Q. So you say Ms. Bennett is the kind of
19     person that didn't have any need for
20     anybody to help her?
21   A. No. She did her own work.
22   Q. So Ms. Polke would not have complained to
23     you that you were trying to give her too

---

Page 54

1     many duties, that she couldn't do
2     Ms. Thomas' work and Ms. Polke's and
3     Ms. Bennett's work also?
4   A. I have never had any complaints from
5     Ms. Polke about that.
6   Q. Who else was working in that division when
7     you came?
8     You know, Sharrie Peterson, Walda
9     Messer, Jeff Knotts, Pamela Polke.
10   A. I think that's all of them. I don't
11     remember.
12   Q. So when you -- A few weeks after you got
13     in, you was getting all these verbal
14     complaints about Ms. Thomas?
15   A. (Witness nods head.)
16   Q. Is that right?
17   A. Yes.
18   Q. Did you go back and look at her performance
19     ratings?
20   A. No, sir.
21   Q. Did you contact the prior state executive
22     director and talk with him about --
23   A. No, sir.

---

Page 55

1   Q. -- Ms. Thomas?
2     Did you talk with any of the district
3     directors about Ms. Thomas?
4   A. Within the first few weeks?
5   Q. Yes, sir.
6   A. No, sir.
7   Q. So did you make a decision on what to do
8     about these complaints?
9   A. Oh, more or less just observing, you know,
10     to see and to document that these were
11     true.
12   Q. And what did you -- Did you make any
13     findings or conclusions?
14   A. Yes.
15   Q. And what were they?
16   A. In the end that she did not know her
17     programs and she didn't manage the -- Her
18     knowledge of the programs impeded the
19     implementation of those programs in the
20     state.
21   Q. Did you make any notes or anything of that?
22   A. When we discussed it, I made notes and
23     shared with her later.

---

Page 56

1   Q. And when you say we, you're talking about
2     you and Ms. Thomas?
3   A. Yes.
4   Q. Now, prior to discussing this final
5     resolution with Ms. Thomas, who all did you
6     talk with about this?
7   A. Ms. Williams.
8   Q. Debbie Williams?
9   A. Uh-huh (positive response).
10   Q. Who else?
11   A. Probably the deputy administrator for field
12     operations, because those were people we
13     got advice from.
14   Q. And who would that be? Who was that?
15   A. I think the acting DAFO was John Chott.
16     I'm not sure if Mr. Frago had been
17     appointed yet or not.
18   Q. Now, John Chott, who is he and what did he
19     do?
20   A. He was the acting deputy administrator for
21     field operations in Washington D.C.
22   Q. So a higher up person?
23   A. Yes, sir. The DAFO is my supervisor.

---

Page 57

1  Q.  Now, you're using acronyms. DAFO, what
2     does that mean?
3  A.  Deputy administrator for field operations.
4  Q.  So you would have discussed it with
5     Ms. Williams and Ms. Chott -- Mr. Chott.
6     Anyone else?
7  A.  No, sir.
8  Q.  What about Richard Burge?
9  A.  No, sir.
10 Q.  Now, did you have any discussions with any
11    employees about Ms. Thomas or about whether
12    or not you wanted to get rid of her?
13 A.  No.
14 Q.  Did you ever do that during your tenure
15    there?
16 A.  That I wanted to get rid of her?
17 Q.  Yeah.
18 A.  No, sir.
19 Q.  Let me direct your attention to an
20    out-of-state training meeting in Florida in
21    late July 2001. I think y'all might have
22    been down there on the beach or something.
23    Do you remember that?

Page 58

1  A.  Peanut --
2  Q.  Right.
3  A.  Southern Peanut Conference.
4  Q.  That's exactly the one.
5        Do you recall having a conversation
6     with some other people there about
7     Ms. Thomas?
8  A.  Yes.
9  Q.  Who all was there?
10 A.  Ms. Peterson was there and the district
11    directors were there.
12 Q.  Now, Ms. Peterson and you said the district
13    directors?
14 A.  Uh-huh (positive response).
15 Q.  Who would that be?
16 A.  Johnny Raby, Philip Thrower, Richard Burge,
17    Jack Crawley.
18 Q.  Okay. And what was said?
19 A.  Ms. Peterson started complaining about
20    Ms. Thomas, and then the district directors
21    started. And it was a round-robin
22    complaint session.
   Q.  So Ms. Peterson started complaining?

Page 59

1  A.  (Witness nods head.)
2  Q.  And that's what you related; is that right?
3  A.  What did you say?
4  Q.  You said Ms. Peterson started complaining;
5     right?
6  A.  Yes, sir.
7  Q.  So she initiated this conversation?
8  A.  Yes, sir.
9  Q.  And then everybody else chimed in?
10 A.  (Witness nods head.)
11 Q.  Is that right?
12 A.  Yes, sir.
13 Q.  Now, what, if anything, did you do in
14    response to all of that, or say?
15 A.  Just listened and said, you know, we're,
16    you know, going to try to make sure she
17    does her job, and we'll continue the
18    process that she does her job.
19 Q.  Did you make a statement to the effect that
20    you haven't quite decided what you were
21    going to do with Ms. Thomas?
22 A.  No, sir.
23 Q.  Did you make the statement to the effect

Page 60

1     that you haven't quite decided how you were
2     going to get rid of Ms. Thomas?
3  A.  No, sir.
4  Q.  Now, you answered that kind of fast, so you
5     definitely -- you never said nothing like
6     that?
7        MR. DUBOIS: Object to the form.
8  A.  I never said nothing like that, no.
9  Q.  Now, what was the purpose of that meeting
10    with the Southern Peanut Growers in Florida
11    in July of 2001?
12 A.  It was -- The meeting did not involve our
13    agency. We try to make a presence to show
14    support for the peanut producers.
15 Q.  Now, how did it come to pass that
16    Ms. Peterson attended the meeting?
17 A.  I guess Ms. Thomas allowed her to go.
18 Q.  Now, were you aware that Ms. Thomas did not
19    allow her to go, didn't even know she was
20    going?
21 A.  It was up to Ms. Thomas on who went. It
22    wasn't up to me.
23 Q.  Oh, Ms. Thomas could have gone herself?

Page 61

1  A.  If she would have wanted to.
   Q.  Now --
3  A.  Only one person from the section could have
4      gone.
5  Q.  And the chief should have picked that
6      person; is that right?
7  A.  That's right.
8  Q.  What -- But isn't it true that you actually
9      picked Ms. Peterson for this?
10 A.  No.
11 Q.  Did Ms. Bennett pick Ms. Peterson for this?
12 A.  Ms. Bennett?
13 Q.  Yeah.  Irean Bennett in your office.
14 A.  No.
15 Q.  Well -- So the procedure should have been
16     that Ms. Thomas would have been allowed to
17     pick who would go and could even include
18     herself?
19 A.  Or herself.
20 Q.  Right.
21     Well, has it come to your attention
22     that Ms. Thomas was not even aware that
23     Ms. Peterson or anyone was selected to go

Page 62

1      to this particular meeting?
2  A.  I don't know what --
3          MR. DUBOIS:  Object to the form.
4  A.  -- Ms. Thomas was aware of.
5  Q.  I said, did it come to your attention or
6      has it come to your attention that she was
7      not aware of that?
8  A.  No.
9  Q.  Now, you were Ms. Thomas' direct
10     supervisor?
11 A.  Yes, sir.
12 Q.  So now -- And in turn you would do
13     performance ratings for her; is that right?
14 A.  Yes, sir.
15 Q.  Do you recall when you did the first
16     performance rating or when that would have
17     been?
18 A.  No, sir.
19 Q.  Do you recall what your performance rating
20     was of Ms. Thomas?
21 A.  No, sir, not off the top of my head.  It
22     was four or five elements to a performance,
23     and I don't remember.

Page 63

1  Q.  Okay.  When did you start talking to
2      Mr. Chott about Ms. Thomas and Ms. Thomas'
3      performance?
4  A.  Sometime before I started the OTI.
5      Sometime before that.  I don't know exactly
6      when.
7  Q.  What do you mean by OTI?  What's that?
8  A.  When we were going to talk about improving
9      her performance.
10 Q.  Opportunity to improve?
11 A.  Yes, sir.
12 Q.  And what was that conversation about?  What
13     did it deal with between you and
14     Mr. Chott?
15 A.  Just what to do and how, you know -- what
16     all is covered in those things and setting
17     things up to review and setting benchmarks
18     to achieve and things like that.
19 Q.  What was the result of that conversation?
20 A.  The actions that were taken.
21 Q.  Meaning ...  Actions that were taken?
22     What --
23 A.  Meaning that when we sat down with

Page 64

1      Ms. Thomas about her performance and how to
2      improve it.
3  Q.  Did Mr. Chott send you any written
4      correspondence in reference to that?
5  A.  I don't remember.
6          (Defendant's Exhibit 2 was marked
7          for identification.)
8  Q.  Let me show you what has been marked as
9      Defendant's Exhibit 2, which is -- appears
10     to be a memo from you to Ms. Thomas.
11 A.  Uh-huh (positive response).
12 Q.  Do you recall this?
13 A.  Yes, sir.
14 Q.  Now, what occasioned this memo?
15 A.  I'm sorry?
16 Q.  What brought this memo up?  What occasioned
17     this memo?
18 A.  Ms. Polke, who was -- who handled the time
19     sheets for her section, brought to my
20     attention or either brought to
21     Ms. Bennett's attention and -- that these
22     times she showed as being at work and she
23     was not.

Page 65

1  Q.  So, now, you said that Ms. Polke handles
2      time sheets?
   A.  For her section.
4  Q.  Tell me how that works.
5  A.  I don't really know in her section how it
6      works.
7  Q.  But as far as time sheets go, what
8      generally -- how does that work in the
9      agency, time sheets?
10 A.  The people who have authority -- authority
11     to approve the time sheets receive those
12     time sheets and the supervisor approves
13     them and then they're processed.
14 Q.  So let me help you and see if I'm following
15     you right. Employees would fill out time
16     sheets when they report to work or clock in
17     or clock out, if I can say that term?
18 A.  We don't have clocks.
19 Q.  Right.
20 A.  But they would --
21 Q.  But sign in --
22 A.  It's their responsibility to fill out their
23     work sheet, their schedule.

Page 66

1  Q.  And they would sign in and sign out?
2  A.  No.
3  Q.  What would they do?
4  A.  They would write it down on their time
5      sheet when they came in, when they left.
6  Q.  I had a time sheet. These are -- Time
7      sheets are something that each employee
8      would fill out?
9  A.  (Witness nods head.)
10 Q.  And file on a weekly basis or biweekly?
11 A.  Every two weeks.
12 Q.  They're filed every two weeks.
13     And they would -- And they're supposed
14     to go to the supervisor?
15 A.  The supervisor approves them.
16 Q.  Now, who would the supervisor be?
17 A.  For who?
18 Q.  Any of the divisions.
19 A.  The division chief.
20 Q.  Now, who approves the division chief's?
21 A.  I would.
22 Q.  So the employee would fill out their time
       sheets and submit them to their division

Page 67

1      chief and the division chief would review
2      and approve them and then submit them
3      where?
4  A.  I don't know in the division who they
5      submitted them to. I just know who I get
6      them from.
7  Q.  You get them from who?
8  A.  The chief who I supervise. I get their
9      time sheets.
10 Q.  Wait a minute. I'm trying to follow you.
11     The time sheets of the employees in the
12     division go where?
13 A.  I don't know where they go. But the
14     supervisor is -- has the authority to
15     approve them.
16 Q.  But you get the time sheets that --
17 A.  I approve the chief's time sheets.
18 Q.  -- that the chief gets?
19     Then after you get them, what do you do
20     with them?
21 A.  They process them through the
22     administrative division.
23 Q.  Well, you send them to Ms. Bennett or to

Page 68

1      the administrative division?
2  A.  I sign it and put it back in the out box
3      and Ms. Bennett takes care of it.
4          (Defendant's Exhibit 27 was marked
5          for identification.)
6  Q.  Let me show you what was previously marked
7      as part of -- It should be Exhibit 27 and
8      ask do you recognize that?
9  A.  I recognize it as a log schedule.
10 Q.  Is this one of these time sheets or
11     something different?
12 A.  Time sheet.
13 Q.  Sir?
14 A.  Time sheet.
15 Q.  All right.
16 A.  They've changed since then, but that's what
17     we were using then.
18 Q.  And so like on this one Ms. Thomas would
19     fill in the time in and out and the hours
20     and whatnot and then she would submit this
21     to you and you would sign off on it?
22 A.  All I know is I would get it filled out. I
23     don't know who filled it out, whether she

Page 69

1  filled it out or someone -- I don't know.
   Q.  But you would get this?
3  A.  I would get it.
4  Q.  And it's signed by her at the bottom,
5     signature of the employee?
6  A.  Uh-huh (positive response).
7  Q.  Is that your signature where the supervisor
8     initials?
9  A.  Uh-huh (positive response).
10 Q.  Is that a yes?
11 A.  Yes.
12 Q.  Okay.  I'm sorry.
13 A.  Sorry.
14 Q.  Now, was there anyone assigned to monitor
15    or look at what Ms. Thomas was doing with
16    her time sheet?
17 A.  No.
18 Q.  Well, how did it come to pass -- You said
19    that Ms. Polke complained to you about
20    Ms. Thomas's time sheet?
21 A.  Ms. Polke --
22        MR. DUBOIS:  Object to the form.
23 A.  Ms. Polke -- I don't know the loop as I

Page 70

1  said.  Each section does things
2  differently.  I don't know what -- how it
3  was done in that section.  But Ms. Polke
4  brought it to the attention that Ms. Thomas
5  was not there those days.
6  Q.  But the time sheet was submitted to you,
7     not Ms. Polke?
8  A.  The time sheet was submitted to me for
9     approval.
10 Q.  What did Ms. Polke say to you exactly, or
11    do you recall?
12 A.  I don't recall.
13 Q.  Well, how did she approach you?  How did
14    this come up?
15 A.  Either Ms. Bennett was told by Ms. Polke
16    and she brought it to my attention or
17    either Ms. Polke told me -- I don't
18    remember which one it was -- but that
19    Ozetta had put down on her time sheet
20    inaccurate information.
21 Q.  Do you know how they got possession of
22    Ms. Thomas' time sheet?
23 A.  I have no idea.

Page 71

1  Q.  So what do you do in response to that?
2  A.  I ask Ms. Thomas about it, and she agreed
3     that those were errors and allowed her to
4     change them.
5  Q.  Was that before this memo, Defendant's
6     Exhibit 2, or not?
7  A.  Exhibit 2.  It was -- I don't remember if
8     it was the same day or if this came a few
9     days after we discussed it.  I don't
10    remember.  It could very well have been
11    July 5th, the day it was discussed, and
12    then signed it on the 9th.  I don't know.
13 Q.  Now, had you got any reports about any
14    other employees who had not --
15 A.  No, sir.
16 Q.  -- come in right or filled out inaccurate
17    information on their time sheets?
18 A.  No, sir.
19 Q.  Since Ms. Thomas has been gone -- and I
20    think the person who is in the position she
21    had is Mr. -- You said it was Ronnie
22    Davis --
23 A.  Uh-huh (positive response).

Page 72

1  Q.  -- is that right?
2  A.  Yes, sir.
3  Q.  Did you get any complaints about him on his
4     time sheets?
5  A.  I have not.
6  Q.  You have not.  Not any?
7  A.  Not that I remember.
8  Q.  How did Mr. Davis get that job?
9  A.  There was an announcement made by the human
10    resource people opening up that position,
11    and then applicants were received.  And
12    then a panel of three people interviewed
13    the applicants and recommended to me who
14    was the best one for the job.
15 Q.  Do you know who was on that panel?
16 A.  I don't remember.
17        MR. DUBOIS:  When you find a good
18        place to break, can we take a
19        short break?
20        MR. PETTAWAY:  Okay.  No problem.
21        Yeah, we can take a break.
22        (Brief recess was taken.)
23        MR. PETTAWAY:  Let's get back on

Page 73

1        the Record here. Thank you.
2   Q. Returning back after our break here. Let
3      me finish up some questions here. All
4      right. Now, prior to Mr. Davis being hired
5      in that position, was that position filled
6      temporarily right after Ms. Thomas
7      departed?
8   A. Right after Ms. Thomas departed, we
9      selected an acting chief, and then that
10     person then took a position -- another
11     position. And there wasn't but a few
12     months left before the end of the detail,
13     so they alternated amongst the staff who
14     was going to be the chief.
15  Q. So who was selected as the acting chief?
16  A. Jeff Knotts.
17  Q. Now, how did that come about?
18  A. Through an interview process.
19  Q. That same type process where --
20  A. Panel.
21  Q. And who keeps those records on what -- on
22     how the panel makes those interviews,
23     selections, recommendations?

Page 74

1  A. There is something in the personnel file.
2     I'm sure Ms. Verdell would be -- Zeigler
3     would be in charge -- custodian of those
4     records. If anything, it would be in her
5     shop.
6  Q. So Verdell Zeigler would have those
7     documents?
8  A. As far as I know. If there were any
9     documents.
10  Q. So after Ms. Thomas left, the interview
11    process went through and Jeff Knotts was
12    selected?
13  A. Yes, sir.
14  Q. Now, did you get any complaints from any of
15    the employees at any time about Mr. Knotts
16    being selected, that they -- somebody might
17    have felt they should have been selected or
18    was discriminated against or didn't get the
19    position?
20  A. Ms. Peterson complained. I don't remember
21    if it was then or when Mr. Davis was
22    selected. I don't remember.
23  Q. And what was the nature of her complaint?

Page 75

1  A. Non selection.
2  Q. And so the sequence -- After Ms. Thomas
3    left, Jeff Knotts was hired as acting
4    chief?
5        MR. DUBOIS: Can I ask a
6        question?
7        MR. PETTAWAY: Yes.
8        MR. DUBOIS: When you say
9        Ms. Thomas left, are you
10       referring to when she went on
11       detail or after she retired?
12       MR. PETTAWAY: After she retired.
13       MR. DUBOIS: I think there's a
14       little bit of confusion here.
15       MR. PETTAWAY: Oh. I'm sorry.
16  A. I was assuming you were talking about the
17    detail when Jeff Knotts ...
18  Q. Okay. So after Ms. Thomas left the agency,
19    there was no acting chief; it was Ronnie
20    Davis?
21  A. When she left the agency -- Between the
22    time she left and the time Mr. Davis was
23    hired, there was an acting chief.

Page 76

1  Q. And who was that?
2  A. It was rotating. I don't know what
3    month -- who it was that month. It rotated
4    with the staff people who were there -- was
5    rotating it. Each month one of them would
6    share in those responsibilities. And I
7    don't know who it was that month.
8  Q. Who set up that procedure?
9  A. I did.
10  Q. Was an interview process put in place to
11    hire someone permanently --
12  A. Yes.
13  Q. -- or you just rotated it?
14  A. No.
15  Q. Permanently. So --
16  A. Permanently it was the interview process
17    and someone hired. There was no rotation
18    involved after they were hired.
19  Q. Right. That's what I mean.
20    But prior to that time is what I'm
21    saying.
22  A. There was a rotation.
23  Q. Now, was this rotation during the time of

Page 77

1    the search or was it just a rotation period
2    and then later on the position was posted?
3  A.  The rotation occurred from the time
4    Mr. Knotts left and went to the county
5    office till the time Mr. Davis was hired.
6  Q.  And so -- And then that's where I thought
7    we were.  So Mr. -- So after Ms. Thomas
8    left the agency, the position was posted
9    and Mr. Knotts was hired as an acting --
10  A.  No.
11  Q.  Okay.
12  A.  You're back again mixing them.
13  Q.  Okay.
14  A.  Ms. Thomas left the agency.
15  Q.  Okay.
16  A.  We posted the job, interviewed and hired.
17    Between the time she left the agency and
18    the time Mr. Davis was hired and reported
19    to duty, there was an acting chief.
20  Q.  And how did the acting chief get appointed?
21  A.  They were rotating.  Within the staff
22    members --
23  Q.  So the staff was rotating.  Okay.

Page 78

1        And that -- That is what I'm trying to
2    figure out, is whether or not the job was
3    posted after Ms. Thomas left or whether
4    there was just a period of acting -- I'm
5    sorry -- of rotating people on the
6    acting --
7  A.  We could not post the job until Ms. Thomas
8    left.
9  Q.  I understand.
10        And so after Ms. Thomas left the
11    agency, was the job posted then or was
12    there a period before the job was posted?
13  A.  After she left the agency, we posted the
14    job.
15  Q.  And so -- And after -- And what I'm trying
16    to find out is how did the acting rotation
17    come up between the time someone was hired
18    to fill the position and the time
19    Ms. Thomas left?
20  A.  Left, meaning the agency?
21  Q.  Yeah.
22  A.  Then the people -- The people who were in
23    those -- on that staff were rotating

Page 79

1    monthly as acting until a new chief was
2    hired.
3  Q.  And this was being done while the selection
4    process was in play -- was ongoing?
5  A.  Yes.  This was being done from the day she
6    left until Mr. Davis reported.
7  Q.  Now, while -- And moving back.  While
8    Ms. Thomas was on the detail -- I think
9    that was with the office of civil rights
10    pursuant to the mediation agreement -- is
11    that when Mr. Knotts was put in place?
12  A.  Yes.  After she was detailed.
13  Q.  So Mr. Knotts was selected as acting chief?
14  A.  Yes.
15  Q.  Now, who made that selection?
16  A.  I did.
17  Q.  And how did you make that selection?
18  A.  If I'm not mistaken, a panel selected it
19    and hired the -- It involved a promotion.
20    It involved more money, so you have to
21    advertise and go through that process.
22  Q.  Well, now --
23  A.  And a panel of three people --

Page 80

1  Q.  Right.
2  A.  -- that are grade 13s or above makes the
3    selection.
4  Q.  What was the difference in that selection
5    during the detail Ms. Thomas was doing and
6    the time period from after she left the
7    agency and Mr. Davis was hired?
8  A.  None except the first selection was only a
9    temporary chief position.  That's the only
10    difference.  The process is the same.
11  Q.  Temporary chief position when Mr. Knotts
12    was hired?
13  A.  Yes.
14  Q.  And since it involved more money, a panel
15    had to be involved?
16  A.  You had to advertise it.
17  Q.  But when it was the staff rotating, that
18    didn't involve more money?
19  A.  No.
20  Q.  Why not?
21  A.  Because they were acting and there wasn't
22    enough time left to re-advertise and go
23    through that process again.  We just -- I

Page 81

1  decided that we would rotate it amongst the
2  people that were remaining each month.
   Q.  They were doing the job as chief, but they
4  wouldn't be compensated for it?
5  A.  That's correct.
6  Q.  Now, when Mr. Knotts came during the detail
7  while Ms. Thomas was gone, did he stay the
8  entire year detail?
9  A.  No.
10  Q.  What happened with that?
11  A.  He was selected as a county executive
12  director in his home county, and he went to
13  Pike County.
14  Q.  So while he was gone, what happened?
15  A.  On what?
16  Q.  With that position.
17  A.  We rotated it.
18  Q.  With the staff?
19  A.  With the staff.
20  Q.  The same way you rotated the other -- the
21  second time, the staff members just rotated
22  with no grade in pay or anything like that;
23  they just rotated?

Page 82

1  A.  That's correct.
2  Q.  And let's see.  Let me go through these
3  exhibits, and we'll probably get all our
4  questions in.  And then there may be some
5  that I don't cover, and I'll just go
6  through them, and we'll be jumping around
7  the dates, but sometimes that helps us
8  remember better.
9         (Defendant's Exhibit 3 was marked
10         for identification.)
11  Q.  Defendant's Exhibit 3, this is a memo from
12  John Chott apparently to you.  Do you
13  recall this document?
14  A.  Yes, sir.
15  Q.  What were the circumstances regarding this?
16  A.  A review had been done in the county office
17  and the reviewer indicated weaknesses in
18  his report to Mr. Chott, and he sent this
19  memo to see what my actions was going to
20  be.
21  Q.  Now, he says, thank you for your proposal
22  to take corrective actions.  What proposals
   was that?

Page 83

1  A.  Those were the weaknesses in the report and
2  the proposal of how to address the
3  weaknesses.
4  Q.  Did that involve Ms. Thomas in any way?
5  A.  Did it involve Ms. Thomas?  What, the
6  report, or what?
7  Q.  Your proposals.
8  A.  We had an opportunity for the district
9  directors and Ms. Thomas to have input, if
10  I remember right.  I may be getting the ...
11         (Defendant's Exhibit 4 was marked
12         for identification.)
13  Q.  Okay.  Well, let me do this.  Look at
14  Exhibit 4.
15  A.  I'm not sure if the information was on the
16  training needs or if the information was on
17  the report.  I don't remember.  I think it
18  was the training needs that we solicited
19  Ms. Thomas.
20  Q.  Look at Exhibit 4, which I think attached
21  is probably some of your recommendations.
22  A.  Uh-huh (positive response).
23  Q.  Are these the recommendations referring to

Page 84

1  that?
2  A.  To report, yes.
3  Q.  Now, had Ms. Thomas made some of these or
4  suggested to you some of these
5  recommendations you had made prior to this
6  report?
7  A.  I don't recall her making any
8  recommendations to me.  There was some
9  recommendations made by Ms. -- to
10  Ms. Grider.
11         (Off-the-record discussion.)
12  Q.  Had you reviewed that letter to Joan
13  Grider?
14  A.  I don't recall.  I remember -- I
15  remember --
16         (Defendant's Exhibit 6 was marked
17         for identification.)
18  Q.  Defendant's Exhibit 6 may help you.
19  A.  I think I remember seeing this at some
20  point.
21  Q.  Now, in reference to Defendant's Exhibit 3,
22  this memorandum was put together, which is
23  Defendant's Exhibit 7.

Page 85

1          (Defendant's Exhibit 7 was marked
2          for identification.)
3    Q.  See if you recognize that.
4    A.  Yes.
5    Q.  Now, how did this come about?
6    A.  Like it says here.  Walking to the office
7        greeting people and Ms. Thomas wanted to
8        talk about items.
9    Q.  Why did you feel it was necessary to do a
10       written memorandum?
11   A.  That's just what we do.
12   Q.  And you wanted Ms. Thomas to sign it?
13   A.  Uh-huh (positive response).
14   Q.  Sir?
15          MR. DUBOIS:  Say yes or no.
16   A.  Yes, sir.  Sorry.
17   Q.  Now, at the bottom -- My copy cut off.  But
18       at the bottom of the second page there's
19       some handwritten note here.  Ms. Thomas'
20       signature is not on it, but it says this
21       was received by me on 9/12/01 in my motel
22       room.  Did you give this to Ms. Thomas in
23       a -- someplace else?

Page 86

1    A.  We had statewide training during that
2        period of time.
3    Q.  Now, this is dated August 20, 2001.  Why
4        several weeks later deliver this to
5        Ms. Thomas?  What happened to that?
6    A.  It just takes a while to get everything
7        written down and -- with schedules.  And
8        everybody has got so much going on.  It
9        takes a while for everybody -- the parties
10       to get together.
11   Q.  Now, do you have any similar memorandums
12       for any other employees or for other chiefs
13       about their programs or expertise or
14       anything of that nature?
15          MR. DUBOIS:  Object to the form.
16   A.  I don't remember anybody that I supervise
17       having gone into an OTI.  We do have other
18       employees that we have letters of
19       counselings that we put in their files.  Or
20       sometimes it's not a requirement to put it
21       in the files, according to what level
22       discipline it is.

Page 87

1          (Defendant's Exhibit 8 was marked
2          for identification.)
3    Q.  I want to show you what is marked as
4        Defendant's Exhibit Number 8.  This is a
5        letter from Ms. Thomas to Mr. Claude
6        McKenzie, who is CEO counselor.  Have you
7        ever seen this letter?
8    A.  Let's see.  I don't remember if I've seen
9        it or not.
10          (Defendant's Exhibit 9 was marked
11          for identification.)
12   Q.  Now, I'm going to show you what's marked as
13       Defendant's Exhibit Number 9.  Do you
14       recognize what that is?
15   A.  Performance work plan.
16   Q.  Now, do you recognize this document?
17   A.  Yes, sir.
18   Q.  Now, would this be the first work plan or
19       evaluation that you would have had with
20       Ms. Thomas?
21   A.  We do not do these evaluations that I know
22       of until after the fiscal year, September
23       30th, so -- And we only do them once a

Page 88

1        year.
2    Q.  Right.
3          And when I say -- Would this be the
4        first one you would have done with
5        Ms. Thomas?
6    A.  As far as I know, yes.
7    Q.  Now, what's the purpose of this document?
8    A.  You look at weaknesses.  You look at if you
9        have achieved what you say you're going to
10       achieve, if you have performed the way you
11       say you're going to perform and determine
12       if you have met your plan for the year.
13   Q.  Now -- So if I'm looking at this right, at
14       the beginning of the fiscal year, you would
15       go over this with the employee?
16   A.  Performance plans are such that you review
17       them the first of the year and then you do
18       a progress review at six months and then
19       you do it again at the end of the year, the
20       final.
21   Q.  Now, going through this document, the one
22       that's in Defendant's Exhibit Number 9, I
23       see it has certain elements here.  Like