Page 89

1    element number one, execution of duties.
2    Now, in the left-hand corner, there is no
3    check there. What does that indicate?
4    A.  It indicated that wasn't one of the five
5        tiers that was selected. You only -- You
6        only -- You can select five or more but at
7        least five.
8    Q.  Well, let's see. It says a critical
9        result -- At the top number seven. Check a
10       minimum of two, maximum of five applicable
11       elements.
12   A.  Okay.
13   Q.  Is that right?
14   A.  Uh-huh (positive response). It's changed
15       now, but --
16   Q.  I got you.
17   A.  -- back at this time, yeah.
18   Q.  So back then it was two to five? Now it's,
19       what, five or --
20   A.  Or -- It's a five-tier plan and there's
21       critical elements and non critical elements
22       and different levels of each one of them.
23   Q.  So any of these, then -- What you're doing

Page 90

1    as a supervisor with the subordinate,
2    you're going to check various elements that
3    you want them to be cognizant of and work
4    on doing that year?
5    A.  No.
6    Q.  What are you doing, then?
7    A.  You select the five that will achieve
8        the -- that will cover the areas to make
9        them successful employees.
10   Q.  Now, who determines what five or what two
11       you --
12   A.  The supervisor sits down and looks at it
13       and determines one and the employee -- Of
14       course, now it's a little bit different,
15       but back then the employee agrees to it and
16       you drive on.
17   Q.  And the elements state what they're doing,
18       and I guess there's space to add anything
19       else that would be relevant to that
20       element; is that right?
21   A.  I don't know what that space is for.
22   Q.  Well, I'm looking here at Exhibit 9 on the
23       second page. Element nine is attached --

Page 91

1    and then there's see attachment. Is
2    that -- And what's attached to here, if I
3    can flip my page, is an opportunity to
4    improve or an OTI.
5    A.  Uh-huh (positive response).
6    Q.  And so what I'm saying, do this extra space
7        allow for you to add extra comments or
8        something?
9    A.  I don't know.
10   Q.  Now, in this particular document about the
11       fourth page in, yeah, it has certification
12       on it. And -- Now, this was signed October
13       24, 2000 by Ozetta C. Thomas and then by
14       Daniel Robinson. So that would be the
15       employee supervisor at that time.
16   A.  Yes, sir.
17   Q.  So before you came, this was in place and
18       what was selected was elements two, three,
19       eight -- no -- five, eight and nine; is
20       that right?
21   A.  I think that's what's checked.
22   Q.  Yeah.
23       And so Mr. Robinson would have checked

Page 92

1    those?
2    A.  I suppose he did.
3    Q.  Is that how you do them? You would check
4        the ones?
5    A.  Yes, sir.
6    Q.  So element two is talking about
7        communications. Now, on the right side, it
8        has achieved and not achieved. Is this
9        what's checked at the end?
10   A.  At the end. That's correct.
11   Q.  So this is what would be checked -- what
12       you would have done?
13   A.  Yes, sir.
14   Q.  And so you checked achieved. What does
15       that mean?
16   A.  That means that that element was achieved.
17   Q.  And then number three is checked not
18       achieved. What does that mean?
19   A.  It means it was not achieved.
20   Q.  Now, had you looked at prior performance
21       work plans on Ms. Thomas before you came?
22   A.  No.
23   Q.  Were you aware that she always received an

Page 93

1    achieved rating?
     A.  I had no idea.
3    Q.  Now, on the supervision element number
4        three, what criteria -- how do you base
5        your decision to put not achieved?
6    A.  Okay.  If you read the element, work is
7        assigned in a fair and effective manner.
8        Technical guidance to subordinate staff is
9        ordinarily provided in a timely manner.
10       Performance management is implemented in
11       accordance with procedure.  Issues,
12       concerns or problems are handled promptly
13       and fairly.  To the extent possible, staff
14       is properly trained and complies with
15       occupational health and safety programs.
16       Management decisions are supported and
17       implemented within appropriate time frames,
18       so ...
19   Q.  And further clarification as needed?
20   A.  That is right.
21   Q.  Now, explain why not achieved.
22   A.  Okay.  The handling of issues, the
23       employees not doing their assignments and

Page 94

1        things or sharing in to work.  Those kind
2        of things.  Lack of guidance and direction
3        on a daily basis.
4    Q.  Let's do this.  The first one says, work is
5        assigned in a fair and effective manner.
6        The work was not assigned in a fair manner?
7    A.  I don't know.  She assigned -- referred
8        everything in that -- in her section to
9        these other employees, and she maintained
10       payment limitations.  So she would -- She
11       rarely would have any interaction with
12       people she needed to on those other areas.
13       She deferred them to the other employees.
14   Q.  Were the programs handed out effectively?
15   A.  Was what now?
16   Q.  Were the programs in her division handled
17       effectively as with the producers and
18       farmers and whatnot?
19   A.  Well, the people we deal with are the
20       county office staff as a general rule.
21   Q.  Right.  That's right.
22   A.  So dealing with the county office staff,
23       you know, you don't supervise those

Page 95

1    people.  So as far as how effective that
2    program is implemented in the counties, you
3    know, that wouldn't fall under supervision.
4    Q.  Let's see.  Work is assigned in a fair and
5        effective manner.
6    A.  Uh-huh (positive response).
7    Q.  Now -- And I'm trying to see what was not
8        fair and what was not effective of her
9        handling the NAP and letting other people
10       handle other things.  Would that more or
11       less make somebody more of an expert in a
12       certain area, so they wouldn't be confused
13       with a lot of areas?
14           MR. DUBOIS:  Object to the form.
15   A.  Is NAP what she handles?
16   Q.  I mean, you said she kept the NAP for
17       herself?
18   A.  Payment limitations.
19   Q.  I'm sorry.  You're right.  The payment
20       limitations.  I'm sorry.  She kept the
21       payment limitations and had other people
22       doing other things.
23   A.  Uh-huh (positive response).

Page 96

1    Q.  Would not that more or less develop some
2        type of expertise for a person, that I'm
3        handling only this and not four or five
4        things?
5    A.  Oh, I guess if you were just a specialist
6        and that was the only program you had, you
7        might can be really proficient in that
8        program.
9    Q.  Well ...
10   A.  But we've got numerous programs.
11   Q.  Right.
12       And maybe -- Was she trying to -- Do
13       you think she was trying to get the people
14       under her to handle only a few programs so
15       they could be more proficient in those than
16       spread abroad?
17           MR. DUBOIS:  Object to the form.
18   A.  Her -- The people under her would be --
19       have responsibility for programs.
20   Q.  Right.
21   A.  Every chief should know every program --
22   Q.  Right.  I understand.
23   A.  -- and be able to answer and function

Page 97

1    within those programs; provide support,
2    provide information, guidance within those
3    programs. And when you have one program
4    and that's the only interest you take in it
5    and everything else you deflect to other
6    people, you will never be able to support
7    those people because you don't know what
8    those programs are.
9  Q. But the element was supervision?
10 A. Yep.
11 Q. So work is assigned in a fair and effective
12    manner?
13 A. Uh-huh (positive response).
14 Q. So you're saying that that was not fair and
15    effective?
16        MR. DUBOIS: Object to the form.
17 Q. Or was it fair and effective? Maybe she
18    was just something else that didn't meet.
19 A. The fair and effective manner. You know,
20    there's a whole bunch of things here
21    involved in this supervision element.
22    And -- You know, and I talked to them about
23    problems with handling properly and fairly,

Page 98

1    implementing in accordance with procedures,
2    issues, those kinds of things.
3        You've got to be able to know the
4    programs and converse with people as a good
5    manager to be able to supervise those
6    people.
7  Q. Now, how is it you determine whether or not
8    Ms. Thomas knew or didn't know a program?
9  A. Oh, I had numerous complaints about the
10    answers she gave were incorrect. I've
11    experienced --
12 Q. Complaints from who?
13 A. I experienced that myself.
14 Q. Complaints from who?
15 A. Well, from different DDs, different CEDs
16    and stuff around the state.
17 Q. Name some of them.
18 A. Just about all of the DDs.
19 Q. Okay.
20 A. But I experienced that when I was a CED.
21 Q. And what did you experience?
22 A. That she didn't know the answers to the
      questions.

Page 99

1  Q. What questions?
2  A. Questions I would ask.
3  Q. What question specially?
4  A. Lord, I don't remember a question
5    specifically. Dealing with her program is
6    all I know.
7  Q. So you're saying when you were a CED that
8    when you called the state office to get
9    some resource help on an issue that
10    Ms. Thomas gave you the wrong information?
11 A. Quite often.
12 Q. Did you ever record that in any way?
13 A. No. I just quit talking to her about
14    things and started talking with other folks
15    about it.
16 Q. Well -- So you had worked with Ms. Thomas
17    in some type of capacity prior to you
18    coming to the state office?
19 A. Working with her in some kind of capacity?
20 Q. Yeah.
21 A. Just a normal CED. We weren't on any
22    details like you asked earlier.
23 Q. Well, that was a separate question, but I

Page 100

1    understand now. No. No. That's no
2    problem. You didn't understand. If I
3    didn't communicate good, you can't help it.
4  A. Okay.
5  Q. And so now -- So you had already formed an
6    opinion prior to coming to the state office
7    that Ms. Thomas didn't know what she was
8    doing?
9  A. I had an opinion that she was not
10    knowledgeable in payment limitations.
11 Q. Now, had you expressed that to anyone?
12 A. Well, let's see. The district director.
13    Herschel Waldrip was our district director
14    then, and he covered the Tennessee Valley
15    area. And we had a lot of payment
16    limitation questions up there. But it
17    was -- I think the CEDs who had those
18    concerns were the ones, you know, in
19    meetings as you talked one-on-one about
20    situations and things.
21 Q. Well, when you became state executive
22    director, had you made any assurances to
23    anyone that you were going to get rid of

| | Page 101 | | Page 103 |
|---|---|---|---|
| 1 | Ms. Thomas? | 1 | made all those verbal complaints? |
| | A.  No.  I just knew in payment limitations she | 2 | A.  Yes. |
| 3 | was weak.  I didn't know what else. | 3 | Q.  And they should be able to come in and -- |
| 4 | Q.  So knowing that she was weak in payment | 4 | just like you're testifying and say, yeah, |
| 5 | limitations, what plan did you have when | 5 | I made those complaints? |
| 6 | you came in as state executive director to | 6 | A.  I don't know what they're going to tell |
| 7 | deal with that? | 7 | you.  You'd have to ask them. |
| 8 | A.  Most of those questions and things that | 8 | Q.  But I'm saying, they should be able to come |
| 9 | came through I handled myself.  People | 9 | in and tell you because you said they made |
| 10 | would call me about them. | 10 | the complaints to you. |
| 11 | Q.  Did you tell people to call you about them? | 11 | MR. DUBOIS:  Object to the form. |
| 12 | A.  No. | 12 | A.  I'm telling you what my experience and |
| 13 | Q.  Well, how did they call you about them? | 13 | the facts that I know. |
| 14 | A.  I was SED. | 14 | Q.  Right. |
| 15 | Q.  And ... | 15 | But if I ask Sharrie Peterson, she |
| 16 | A.  And ... | 16 | should be able to back up that, yes, she |
| 17 | Q.  How is it that people call you about those | 17 | complained to you about Ms. Thomas? |
| 18 | questions and not call the division? | 18 | MR. DUBOIS:  Object to the form. |
| 19 | MR. DUBOIS:  Object to the form of | 19 | A.  I don't know.  That's between you and |
| 20 | the question. | 20 | Sharrie.  I don't know what she'll tell |
| 21 | A.  If they had the experience that, you know, | 21 | you. |
| 22 | I had had, then, you know, that particular | 22 | Q.  Well, if she testifies truthfully under |
| 23 | program you were limited on what you were | 23 | oath, she should say that, shouldn't she? |

| | Page 102 | | Page 104 |
|---|---|---|---|
| 1 | going to get if you asked a question. | 1 | A.  That's exactly right. |
| 2 | Q.  And you're still telling us under oath that | 2 | Q.  Same thing with Walda Messer, Pamela Polke, |
| 3 | you had not expressed to anyone prior to | 3 | Jeff Knotts? |
| 4 | becoming state executive director and | 4 | A.  That's right. |
| 5 | shortly after you become a state executive | 5 | Q.  And performance management is implemented |
| 6 | director that you were going to deal with | 6 | in accordance with procedure.  Was that |
| 7 | Ms. Thomas and get rid of her? | 7 | done? |
| 8 | MR. DUBOIS:  Object to the form. | 8 | A.  Performance management ... I don't know. |
| 9 | A.  No. | 9 | Q.  Issues, concerns or problems are handled |
| 10 | Q.  And so still looking at element three on | 10 | promptly and fairly. |
| 11 | Defendant's Exhibit 9, technical guidance | 11 | A.  They were not handled promptly. |
| 12 | to subordinate staff is ordinarily provided | 12 | Q.  How do you know they were not handled |
| 13 | in a timely manner.  That was not done? | 13 | promptly? |
| 14 | A.  No. | 14 | A.  Ms. Polke complained about things and |
| 15 | Q.  How do you know that? | 15 | waiting to the deadline.  She could call me |
| 16 | A.  Because they weren't getting any guidance. | 16 | and this has got to be done today; Ozetta |
| 17 | Q.  Well, how do you know they weren't getting | 17 | hasn't done it; what am I supposed to do. |
| 18 | any guidance? | 18 | Q.  To the extent possible, staff is properly |
| 19 | A.  They complained about not having any | 19 | trained and complies with occupational |
| 20 | interaction with her and her door was | 20 | health and safety programs.  That was not |
| 21 | closed and stuff like that.  And they | 21 | done or done? |
| 22 | handled the programs. | 22 | A.  No.  Properly trained.  I don't think they |
| 23 | Q.  So all those people we talked about before | 23 | were trained in all the areas that they |

**Page 105**

1      need to be trained in.

2   Q.   Management decisions are supported and

3      implemented within appropriate time

4      frame.

5   A.   Things were done timely by people but

6      Ms. Thomas -- In getting those things done,

7      we're talking about supervision here which

8      provides supervising those people to make

9      sure you get things done timely. She did

10      not provide the supervision. They were on

11      their own.

12   Q.   Element number five, program management,

13      she's got a not achieved rating. Why?

14   A.   She didn't know the programs and didn't

15      manage them very well.

16   Q.   Okay. Element number eight, customer

17      service, she got a not achievement rating.

18      Why?

19   A.   The customer service and the people in the

20      county office needing answers and needing

21      timely things handled, they were not

22      getting it.

23   Q.   And who told you that?

**Page 106**

1   A.   In the complaints and things that people

2      were complaining about.

3   Q.   What people?

4   A.   Different CEDs and DDs.

5   Q.   Are there any written -- Were there any

6      written complaints or all of them just

7      verbal?

8   A.   Verbal.

9   Q.   Now, element nine, equal opportunity and

10      civil rights, she got an achieved for that

11      and then says see attachment. That's the

12      OTI. What does that mean?

13   A.   I don't know.

14   Q.   Well, this is what you would have put;

15      right?

16          MR. DUBOIS: Object to the form of

17          the question.

18   A.   I don't know what that was.

19   Q.   Element number nine, you checked achieved

20      and you got typed see attached statement.

21   A.   I don't know if this see attached statement

22      was typed in there by Daniel Robinson when

23      they looked at it. I don't know where they

**Page 107**

1      came from.

2   Q.   Well, this opportunity to improve

3      commencement is number six, and it's

4      supposed to end March 5, '02. And then --

5      Now, this was signed by you on November 6th

6      on page four, which is 156 of the ROI of

7      this exhibit. And that's the same date the

8      opportunity to improve started. I'm trying

9      to see how that ...

10   A.   I don't know what that see attached

11      statement refers to. This is the

12      opportunity to improve that was -- that was

13      done. The --

14   Q.   I'm --

15   A.   All -- The opportunity to improve deals

16      with all the non achieved items, not the

17      achieved items. So I don't know -- see

18      attached statement, what that refers to.

19   Q.   Okay.

20   A.   It could have been something Mr. Robinson

21      had on there when they sat down and dealt

22      with this element back in October.

23   Q.   So there may be a statement missing?

**Page 108**

1   A.   I don't know what -- You know, this is -- I

2      don't know what that refers to. I have no

3      idea.

4   Q.   So as you look at this, there well may be a

5      statement missing?

6   A.   I don't know. I don't know what see

7      attached statement would mean.

8   Q.   And there is no statement attached. We

9      have the OTI that was done the same day

10      that you did this -- did your portion of

11      the performance plan; is that right?

12          MR. DUBOIS: Object to the form.

13   A.   And you have an OTI and you have the

14      performance plan, yeah.

15   Q.   And what I'm saying, of this performance

16      plan, this OTI is what's attached to this

17      in this exhibit?

18   A.   It is attached to that there.

19   Q.   And this OTI was done the same day you did

20      your portion of the performance work plan?

21   A.   Okay.

22   Q.   Is that right? I mean, you can look at it.

23          MR. DUBOIS: I want to note an

Page 109

1        objection. You're using the
2        exhibit that I used in the
3        plaintiff's deposition. These
4        two documents are one exhibit
5        that I stapled together. I
6        just wanted to object to that.
7    Q.  But you can look at it.
8        MR. PETTAWAY: That's fine.
9    Q.  You can look at the dates. The OTI was
10       done the same day and I think presented
11       with this performance work plan, wasn't
12       it? I mean, you recall that --
13   A.  Yes.
14   Q.  -- don't you?
15   A.  Yes. But I don't know what this see
16       attached statement is.
17   Q.  Right. That's what I'm trying -- And I'm
18       saying that apparently attached to this
19       performance work plan we apparently must be
20       missing the attached statement, then.
21   A.  I don't know. Possible. I don't know. I
22       don't know what was on there dealing with
23       that element. None of the OTI deals with

Page 110

1        that element, so I don't know.
2    Q.  Right. Exactly.
3        So who would keep these records,
4        Ms. Zeigler?
5    A.  Ms. Thomas would have a copy of it and it
6        would also be in the personnel folder.
7    Q.  Now, on this performance work plan after it
8        is submitted and done and it goes into her
9        personnel folder, there is space for
10       comments from the rating official, which at
11       that time would have been you. And the
12       employee was Ms. Thomas.
13   A.  (Witness nods head.)
14   Q.  You're shaking your head. Is that yes?
15   A.  Yes, that is correct.
16   Q.  And then, of course, there's the
17       certification where it's supposed to be
18       signed?
19   A.  Yes, sir.
20   Q.  And on the summary rating when the rating
21       is complete -- Now, there's written in
22       refused to sign. And I guess that's the
23       employee, Ms. Thomas?

Page 111

1    A.  Yes, sir.
2    Q.  Now, what conversations, if any, did
3        you-all have when this was presented to
4        her?
5    A.  The -- Discussing all these shortcomings,
6        and, you know, I think she offered some of
7        these things as to why they were
8        occurring. And we just discussed them.
9    Q.  What was said?
10   A.  I don't remember exactly what was said, but
11       we went over each one of those things and
12       where she was deficient in and addressed
13       those areas.
14   Q.  And you do not recall what was said or what
15       reasons or comments Ms. Thomas gave?
16   A.  No, I don't recall.
17   Q.  And then next it shows rating official
18       signature. Is that your signature?
19   A.  Yes, sir.
20   Q.  Dated 11/6/01; is that right?
21   A.  Yes, sir.
22   Q.  Then it says reviewing official that's
23       required for the summary rating of results

Page 112

1        not achieved. That's blank. Is that
2        right?
3    A.  Yes, sir.
4    Q.  Now, at the time that should have been
5        Mr. John Chott, shouldn't it?
6    A.  Probably.
7    Q.  Why was this not signed?
8    A.  I don't know.
9    Q.  Did you submit it to Mr. Chott?
10   A.  I don't recall.
11   Q.  But it should have been submitted to
12       Mr. Chott because he's supposed to look
13       over this to sign off on this since the
14       results were not achieved.
15       MR. DUBOIS: Object to the form.
16   A.  Whoever the reviewing official was. It
17       could have been -- Mr. Frago could have
18       been on board at the time. I don't know.
19       But the deputy administrator for field
20       operations -- somebody is the reviewing
21       official.
22   Q.  Right. But that's procedure?
23       Sir? Is that a yes?

Page 113

1   A.  I would -- Yeah.
2   Q.  And by this not being signed, does not that
3       indicate you didn't follow procedure?
4   A.  It's just an error, omission.
5   Q.  And it's an error and/or omission as you
6       state; right?
7   A.  (Witness nods head.)
8   Q.  Yes?
9   A.  Yes.
10  Q.  You have to verbalize that.
11      So that means that you didn't follow
12      procedure?
13          MR. DUBOIS:  Object to the form of
14          the question.
15  Q.  Does not that mean that?
16  A.  It means that we should have gotten the
17      review official signature.
18  Q.  And that's the procedure?
19  A.  I would assume that's the procedure.
20  Q.  I was going to try to find the completed
21      one, but let me ask you this before I
22      overlook asking you this.  And I think in
23      here I may get to the completed OTI.  But

Page 114

1       the way this opportunity to improve works,
2       on the commencing date, you write down the
3       improvement plan and you go over these
4       various deficiencies like three, five and
5       eight that were not achieved; is that
6       right?
7   A.  Yes, sir.
8   Q.  Then during your review -- and this is
9       dated March 5, 2002 -- you write down what
10      specifics there are and what might need to
11      be done?  Or is all this done on November
12      6, 2001 --
13  A.  Say that last part again.
14  Q.  I'm trying to figure out on the
15      deficiencies and required improvement.  Is
16      all that done on November 6, 2001 or is
17      that done after the end of March 5, 2002,
18      the end of the plan duration period?
19  A.  You have the deficiencies elements and then
20      you -- every so many weeks you sit down and
21      review each one of those things as to how
22      you are achieving or not achieving and
23      things like that.  And certain things in

Page 115

1       the OIT (sic) involves off site training
2       and different things.
3       So you know, as things are achieved,
4       you know, within that OTI, it could occur
5       at different times.  At the end of the
6       period, then you determine if -- if the
7       complete opportunity to improve was
8       achieved, or if there's still a weakness,
9       that you could extend it or things like
10      that.
11  Q.  Now, as it relates to item number eight
12      under the elements, the customer service
13      issue, were there any deficiencies or
14      required improvement regarding that?
15  A.  Oh, I don't know if these bottom paragraphs
16      should have been over there.  I don't know.
17  Q.  Now, this is something you would have
18      prepared; is that right?
19  A.  Well, my executive officer might have
20      prepared it, or some of these OTIs have to
21      be written and done by Kansas City office
22      and everything we have to do has to be
23      approved by them.

Page 116

1       (Defendant's Exhibit 10 was marked
2       for identification.)
3   Q.  Let me show you Defendant's Exhibit Number
4       10, which is a November 6, 2001 memorandum
5       that was done.  And this may have been a
6       draft.  When it was done, this wasn't
7       signed.  Is this something you did?
8   A.  Well, let's see.  It was something I did.
9       My name is on the bottom of it.
10  Q.  And this says, in regard to the performance
11      appraisal, the document we were just
12      looking at; is that right?
13  A.  Could have been.  It was November 6th it
14      says.
15  Q.  And so is this a synopsis or recanting of
16      what happened when the memorandum -- when
17      the performance work plan was presented to
18      Ms. Thomas?
19  A.  Let me read it and I'll see.
20  Q.  Sure.
21  A.  What was your question again?
22  Q.  Is this a report of what happened during
23      the meeting with Ms. Thomas when she was

29 (Pages 113 to 116)

Page 117

1    presented the performance work plan?
     A.   Yes. From my understanding.
3    Q.   Did you actually prepare this?
4    A.   No.
5    Q.   Who prepared it?
6    A.   Probably Ms. Williams, I would think.
7    Q.   Why is it not signed?
8    A.   I don't know. I guess -- I don't know.
9    Q.   Do you know whether or not this was
10        prepared shortly after your meeting with
11        Ms. Thomas or was this prepared sometime
12        later after Ms. Thomas filed a complaint?
13   A.   It had to be prepared after the meeting,
14        because it refers to the things that were
15        being said.
16   Q.   The date says November 6, 2001 as date of
17        preparation, you know -- That's the date,
18        November 6, 2001.
19   A.   It's a memorandum of record of that date,
20        November 6, 2001.
21   Q.   Now, Ms. Thomas filed a formal complaint
22        that ended up being resolved through
23        mediation; isn't that right?

Page 118

1    A.   Yes.
2    Q.   And in response to that, several documents
3        had to be provided about what happened and
4        even talk about this performance work plan;
5        isn't that right?
6    A.   Yes.
7    Q.   And my question to you is that was this
8        document already prepared prior to
9        Ms. Thomas filing her complaint or was it
10        prepared after?
11            MR. DUBOIS:  Object to the form of
12            the question.
13   A.   I don't -- When did she file the complaint
14        or when did I know about it, I guess,
15        is ...
16   Q.   Yeah.
17   A.   I don't know when I knew about it.
18            (Defendant's Exhibit 12 was marked
19            for identification.)
20   Q.   I'm going to show you what's marked as
21        Defendant's Exhibit 12, which is a fax from
22        Ms. Thomas to Deborah Lombordino. Do you
23        know who Deborah Lombordino is?

Page 119

1    A.   Yes, I do.
2    Q.   Is that a yes? Okay. Who is she?
3    A.   She's in the division in Washington with
4        civil rights or something like that.
5    Q.   And this is an agreement to participate in
6        the early resolution program --
7    A.   Uh-huh (positive response).
8    Q.   -- which is a complaint -- a resolution
9        program within the CEO office; is that
10        right?
11   A.   I don't know what this is. That's -- I'm
12        not sure what that is.
13   Q.   Well, are you familiar with the early
14        resolution program?
15   A.   I've heard of it.
16   Q.   I'm sorry. That's in the Farm Service
17        Agency's office in D.C.
18   A.   I've heard of it. I never have used it, so
19        I don't know.
20   Q.   Now, this was recorded on November 1, 2001,
21        which would mean that Ms. Thomas had filed
22        a complaint prior to that time.
23   A.   I have no idea what she did prior to that.

Page 120

1    Q.   Okay. Well, now, when you presented
2        Ms. Thomas with this performance work plan,
3        were you aware that she had already filed a
4        complaint of discrimination by you against
5        her?
6    A.   Not to my knowledge.
7            (Defendant's Exhibit 13 was marked
8            for identification.)
9    Q.   Now, I'm going to show you Exhibit 13,
10        which is a resolution agreement. If you
11        could look at that and see if you are
12        familiar with that document.
13   A.   Yes, sir.
14   Q.   Now, in that resolution agreement, that's a
15        document that you actually participated in;
16        is that right?
17   A.   Yes, sir.
18   Q.   Now, in that document if you look at the
19        top body of it, it talks about that a
20        formal EEO complaint was filed September
21        14, 2001, before EEO mediator, Hope C.
22        Light by Ms. Ozetta Thomas. Do you see
23        that?

Page 121

1          MR. DUBOIS:  Object to the form.
2     A.   Uh-huh (positive response).
3     Q.   But do you see that?
4     A.   Yes, sir.
5     Q.   And the issues of the complaint are non
6          sexual harassment and performance
7          evaluation based on race of being black?
8     A.   Yes, sir.
9     Q.   And from that you-all made an agreement
10         and, of course, you signed off on it?
11    A.   Yes, sir.
12    Q.   Is that right?
13         So -- But, now, are you saying that at
14         the time of November 6, 2001 when the
15         performance appraisal -- the performance
16         work plan was presented to Ms. Thomas you
17         were not aware that she had filed that
18         complaint or you just don't remember?
19    A.   I don't remember what the time frame was of
20         that.
21    Q.   But she had filed a complaint by these
22         documents September 14, '01, and the
23         performance work plan or performance

Page 122

1          evaluation should I say at the end of that
2          work plan was given November 6, '01; is
3          that right?
4     A.   Yes, sir.
5     Q.   And she was also given an OTI, an
6          opportunity to improve at that time?
7     A.   Yes, sir.
8     Q.   And also -- Now, it's dated a memorandum of
9          what transpired during that meeting; is
10         that right?
11    A.   Yes, sir.
12    Q.   But the one I have is unsigned?
13    A.   Yes, sir.
14         (Defendant's Exhibit 11 was marked
15          for identification.)
16    Q.   Now, I'm going to show you Defendant's
17         Exhibit Number 11, which is a memorandum of
18         record, November 28, 2001, a follow up
19         where you were supposed to have met with
20         Ms. Thomas the first few weeks to discuss
21         the OTI.  And if you look at that one --
22         And I know it's rather lengthy, but if you
23         look at the end, that one is signed --

Page 123

1     A.   Yes, sir.
2     Q.   -- is it not?
3     A.   It is.
4     Q.   And even the typeset looks a little
5          different, does it not, or the pitch?
6     A.   Yes, sir.  Font or something.
7     Q.   Yeah.
8     A.   This is a progress review.
9     Q.   Right.
10         Do you have any reason or recollection
11         why the November 28th memorandum of record
12         is signed by you and the November 6, 2001
13         is not signed by you?
14    A.   No.  I do not know why.
15    Q.   But at any rate, we get to -- back to
16         Defendant's Exhibit 12 where after that
17         complaint was filed -- the formal complaint
18         was filed on September 14, '01, Ms. Thomas
19         agreed to participate in the mediation
20         program or the early resolution program, is
21         that right, according to these documents?
22    A.   It appears that's a document that says she
23         is accepting something to -- from somebody

Page 124

1          in Washington to do something.
2     Q.   Yeah.
3          And do you recall that on September 5,
4          2001 you-all did have such a meeting and
5          you were there and a resolution of her
6          complaint --
7     A.   Yes, sir.
8     Q.   -- was entered?
9     A.   Yes, sir.
10    Q.   And that would get us to Defendant's
11         Exhibit 13, the resolution agreement.
12    A.   Yes, sir.
13         (Defendant's Exhibit 17 was marked
14          for identification.)
15    Q.   All right.  And -- Now, I'm going to show
16         you Defendant's Exhibit 17 and ask you have
17         you ever seen that document, which is --
18         which comes from the -- your office about
19         compliance with the resolution agreement?
20    A.   Yes, sir.
21    Q.   Okay.  And let me see.  Yes, this bears
22         your signature; is that right?
23    A.   Yes, sir.  Someone signed it for me.

Page 125

1   Q.  Well, who signed it for you?
     A.  I think it's Debbie Williams' initials.
3   Q.  Okay. Now, was that the appropriate
4     procedure for Debbie Williams to sign that
5     for you?
6   A.  She signs a lot of stuff for me.
7   Q.  Now, this -- as part of this resolution
8     agreement, which is Defendant's Exhibit 13,
9     there were certain items that were to be
10    done and some expungement of records and
11    whatnot done in a light to be sure that the
12    strictest confidence was kept, wasn't that
13    right?
14        MR. DUBOIS: Object to the form of
15        the question.
16   A.  Just the people that did that process would
17    be involved -- needed to be involved.
18   Q.  Well, how would Ms. Williams be involved in
19    that?
20   A.  She's in the process.
21   Q.  She's in the process?
22   A.  Yeah. She handles -- I told you earlier
23    she handles employee issues and stuff.

Page 126

1   Q.  Now, when you agreed to this resolution
2     agreement, which is Defendant's Exhibit 13,
3     did you intend to comply with it?
4   A.  Yes, sir.
5   Q.  Did you comply with it?
6   A.  Yes, sir.
7   Q.  Well, now, are you aware that Ms. Thomas
8     has alleged and is alleging in the current
9     lawsuit that you didn't comply with it?
10   A.  Yes, sir, I'm aware.
11   Q.  And I know -- Because one thing she is
12    alleging is that you breached some of this
13    confidence by having documents delivered to
14    her in unsealed envelopes. Are you aware
15    of that allegation?
16   A.  Oh, I just know she says it was -- things
17    were not achieved in the agreement. I
18    don't know what all she says wasn't done.
19   Q.  Now, as part of that resolution agreement
20    item four, she was to expunge all
21    references in all records maintained by the
      agency of the performance related matters
23    concerning the complainant since May 21,

Page 127

1     2001. Was that done?
2   A.  Yes, sir.
3   Q.  Remove the opportunity to improve dated
4     November 6, 2001 and replace the
5     performance work plan dated November 6,
6     2001 with a performance work plan rating of
7     achieved in all performance plan elements.
8     Was that done?
9   A.  Yes, sir.
10   Q.  And, now, Ms. Thomas was supposed to have
11    been detailed to the civil rights and small
12    business utilization program complaints
13    branch in Montgomery. Was that done?
14   A.  Yes, sir.
15   Q.  Now, when that was done, did you send out a
16    memo to any of the workers about that?
17   A.  We sent out something that said she had
18    been detailed to civil rights something. I
19    don't remember the exact wording.
20   Q.  Now, when you did that, did you express to
21    anyone or tell anyone that Ms. Thomas was
22    being moved as part of a complaint
23    resolution agreement?

Page 128

1   A.  No.
2   Q.  Well, did you try to do that in the most
3     least intrusive way as possible so no one
4     would glean anything from her detail?
5        MR. DUBOIS: Object to the form.
6   A.  I don't know if I know what you're saying.
7    But I tried to -- Ask me that question
8    again. Let me --
9   Q.  When you sent your memo out about
10    Ms. Thomas being detailed, did you attempt
11    to do that in the least intrusive way
12    possible so no one could glean anything
13    from her being detailed other than she was
14    just being detailed?
15   A.  Just -- I sent it out dealing with what had
16    happened, and as far as I know, it was not
17    anything other than she had been detailed
18    to the civil rights section.
19   Q.  Now, on the second page of that resolution
20    agreement where it talks about both parties
21    to agree, number one, it says to respect
22    the privacy rights of all individuals
23    involved in the matter. You understood

Page 129

1    that, didn't you?
2    A.  Yes, sir.
3    Q.  And then it goes down to say in the third
4        line, explicit terms of the agreement will
5        not be discussed with, disclosed or
6        released to anyone who does not need the
7        information to implement the agreement --
8    A.  Yes, sir.
9    Q.  -- without the expressed permission of the
10       other party.  You were aware of that?
11   A.  Yes, sir.
12   Q.  Now, who all would have been needed to
13       implement the agreement?
14   A.  Ms. Williams, Ms. Zeigler would have been
15       needed to implement the agreement.
16              MR. DUBOIS:  Object to the form of
17          the question.
18          (Defendant's Exhibit 16 was marked
19          for identification.)
20   Q.  I'm going to show you what's marked as
21       Defendant's Exhibit 16.  Do you recognize
22       that document?
23   A.  Uh-huh (positive response).

Page 130

1    Q.  Is that a yes?
2    A.  Yes, sir.  Sorry.
3    Q.  What is it?
4    A.  It's a letter.  Please find enclosed
5        performance plan 2001.  Reflects a rating
6        of achieved in all elements.
7    Q.  And, now, in here on the back page where
8        employee signature, it says see remarks and
9        it's typed in employee is on extended
10       detail; attempted to obtain her signature
11       on January 22, 2002 but she refused to
12       sign.  Who put that there?
13   A.  I don't know.
14   Q.  Is that what happened, she refused to sign?
15   A.  I don't know.
16   Q.  Well, who would have done this or whose --
17       Well, let me ask you this.  Would it have
18       been your job to get Ms. Thomas to sign
19       this since this was confidentially
20       sensitive information?
21   A.  No.  It would have been whoever, you know,
22       is Ms. Williams' assistant SED.  She could
23       have been involved in that.  She was

Page 131

1    involved in the process in the meetings
2    those days and would implement -- She's one
3    of the players that would implement parts
4    of the plan.
5    Q.  Okay.  So Ms. Williams could have been
6        involved in it?
7    A.  Yeah.  And I said earlier she was involved
8        in it.
9          (Off-the-Record discussion.)
10         (Defendant's Exhibit 31 was marked
11         for identification.)
12   Q.  I'm going to show you what's marked as
13       Defendant's 31.  That exhibit was pulled
14       from Ms. Thomas' deposition.  Is this a
15       memo that you sent to all the state
16       employees about Ms. Thomas's detail?
17   A.  Yes, sir.
18   Q.  Now, did you send out anything else?
19   A.  I don't remember anything else.
20   Q.  Now, this one, of course, is to all FSA
21       employees, and it's got, like, the little
22       electronic signature Danny Crawford, which
23       means somebody else did this.  Who did this

Page 132

1    for you?
2    A.  You know, I don't know if that means
3        somebody did it for me or not.  If it went
4        out electronically -- attachment and you
5        can't sign it, so it's a signature that
6        says you have accepted signature
7        electronically.  I don't know.
8          But who typed it --
9    Q.  Yeah.
10   A.  -- and sent it out?
11         I know Irean does everything in my
12       office, all the executive functions.
13   Q.  Now, when a person is detailed somewhere,
14       do you always send out a memo?
15   A.  I don't remember.  Let's see.  We sent
16       out -- We have sent out things to people
17       that it affects when they're being
18       detailed.  We send out memorandums to the
19       people that it affects.
20   Q.  Well, now, if --
21   A.  It rarely ever happens, but sometimes we
22       do.
23   Q.  Well, Jeff Knotts was detailed when he was

Page 133

1    acting chief, was he not?
     A.  I don't remember.
3    Q.  Did he just accept another position?
4    A.  I'm sorry?
5    Q.  I said, what happened with Jeff Knotts when
6        he was acting chief while Ms. Thomas was on
7        detail?
8    A.  He performed as acting chief.
9    Q.  Was not he detailed and that left a period
10       when there was no acting chief --
11   A.  Not that I know of.
12   Q.  -- and the people rotated?
13   A.  Not that I know of.
14   Q.  I thought you told me earlier --
15   A.  He accepted another position and left and
16       went to that position.
17   Q.  Oh, okay.  So he was not detailed; he
18       accepted another position?
19   A.  Right.
20   Q.  But, now, when you say that rarely happens
21       when people are detailed, I thought that
22       happened quite often.  Earlier you told me
23       people are detailed to do different things

Page 134

1        around the state.
2           MR. DUBOIS:  Object to the form.
3    A.  We had folks that help out in certain
4        areas, and they're gone a week or two.  And
5        everybody is aware of it that is affected
6        by that.  If I leave my county in Limestone
7        County, I tell the people I'm going
8        somewhere and that I'll be back in a week
9        so all the folks are aware of it.  It
10       doesn't require a memorandum to go out to
11       all the state, because that person deals
12       with the rest of the state.
13   Q.  So after the completion of this detail, you
14       receive some correspondence from Ms. Thomas
15       that it was time for her to return but she
16       wanted to go somewhere else; is that
17       right?
18          MR. DUBOIS:  Object to the form.
19   A.  We got a request at some time from her
20       requesting some things.
21          (Defendant's Exhibit 19 was marked
22          for identification.)
23   Q.  I've given you Defendant's Exhibit 19 to

Page 135

1        see if you are aware of that.
2    A.  Yes.
3    Q.  And is that the request she made?
4    A.  Yes.
5    Q.  Now, how did you respond to that request?
6    A.  In her letter here, she says if this
7        request is unfeasible, then I am enclosing
8        a signed request for sick leave for your
9        approval.  We sent her the forms to let
10       her -- telling her what she needed to do to
11       request.
12          We never -- She had requested
13       indefinite, or something like that, sick
14       leave or something.  Anyway -- And if you
15       are going to go on sick leave, you're
16       required by policy within three days if you
17       have a doctor's excuse.  She did not have
18       one or she did not present one.
19          (Defendant's Exhibit 22 was marked
20          for identification.)
21   Q.  Let me ask you.  This is a memo dated
22       December 31, 2002, which is Exhibit 22.
23       That memo you sent to her about the

Page 136

1        termination of the detail and expected to
2        see her on Monday January 6, '03.
3    A.  Uh-huh (positive response).
4    Q.  Is that a yes?
5    A.  Yes.
6           (Defendant's Exhibit 20 was marked
7           for identification.)
8    Q.  And so now after that and after you got
9        Exhibit 19 -- Let me show you Exhibit 20.
10       Is that the form you sent her asking her to
11       request for leave?
12   A.  Uh-huh (positive response).
13          MR. DUBOIS:  You've got to
14          answer.
15   A.  Yes.  I'm sorry.
16   Q.  And this one you said this has been
17       disapproved due to lack of supporting
18       medical documentation; is that right?
19   A.  Yes, sir.
20   Q.  Now, how many of these requests for leave
21       have people submitted to you?
22          MR. DUBOIS:  Object to the form.
23   A.  People that I approve their leave --

Page 137

1    Everyone that takes a leave longer than
2    three days without medical evidence, then
3    they all have done it.
4    Q. And so now are you -- Well, are you saying
5    that all of the requests for sick leave
6    that you have received from people where
7    they requested more than three days had to
8    have a doctor's excuse?
9    A. The policy based on the regulations that
10   you can request something -- doctor excused
11   after three days if you -- if there aren't
12   any evidence of anyone being sick or
13   anything. You can request a doctor's, you
14   know, thing for that. We have done that as
15   a policy.
16   Q. And my question to you is, is that how you
17   have administrated that?
18   A. Yes.
19        MR. DUBOIS: Object to the form.
20   Q. So when I asked to get a copy of all of the
21   requests for sick leave that have been
22   requested during your tenure, all of them
23   should show that have been approved of more

Page 138

1    than three days?
2    A. Every one of them that was not evidence of
3    a medical reason would have a request.
4    That's exactly right.
5    Q. Say that again.
6    A. The regulations say that if an employee is
7    out longer than three days you can request
8    a doctor's thing to say -- say the employee
9    is sick if the -- if there isn't any
10   evidence of any medical reason.
11       If somebody had surgery or out for six
12   weeks and you knew they had surgery, you've
13   got evidence. If somebody says I want to
14   be out from now on; I'm sick, then there
15   isn't evidence. You would request it. So
16   every one of those that are in that
17   situation would be requested.
18   Q. And you, in fact, requested it on each one?
19       MR. DUBOIS: Object to the form.
20   A. I think I've answered the question already.
21   Q. I'm trying to be clear on it.
22   A. I thought I was clear. I'll try it again.
     Okay. Every employee that I supervise I am

Page 139

1    in charge -- responsible of approving their
2    leave. Any case that is longer than three
3    days that I am unaware of any medical
4    condition of that employee I have requested
5    the employee to produce a doctor's
6    certification.
7    Q. Now, what do you mean that you are unaware
8    of a medical condition?
9    A. That I don't know of any sickness that they
10   have.
11   Q. So are you saying there may be some
12   occasions where people request sick leave
13   beyond three days and there is no medical
14   documentation in their file but you're
15   saying that in each of those instances --
16   A. There's knowledge.
17   Q. -- you would have --
18   A. Yes. There is knowledge of the conditions
19   that wouldn't require that.
20   Q. Now, how would you have such knowledge or
21   how did you get such knowledge?
22   A. You would know that they're having, you
23   know, surgery and they're -- go to the

Page 140

1    hospital to see them, or whatever. You
2    know, there's knowledge that they've got
3    these conditions that merit it.
4    Q. Well, now, you were aware that Ms. Thomas
5    had some issues working in the office with
6    you, did you not?
7        MR. DUBOIS: Object to the form.
8    A. I don't know what issues she had.
9    Q. Well, that's why y'all agreed to the
10   detail?
11   A. No.
12       MR. DUBOIS: Object to the form.
13   A. That's not why we agreed to detail.
14   Q. Why did you agree to the detail?
15   A. That was a settlement.
16   Q. Right.
17       And why during the settlement
18   discussions was it agreed that detail would
19   be done?
20   A. Yes.
21   Q. I mean -- But why? What circumstance?
22   A. That's just the agreement, settlement of
23   the resolution.

Page 141

1  Q.  But the ultimate result of Ms. Thomas'
2       request for extended leave was denied?
3  A.  The ultimate request for extended leave was
4       denied, yeah.
5  Q.  Medical leave.
6  A.  She would -- She could not produce the
7       doctor's documents.
8  Q.  Now, Ms. Thomas later on asked to attend
9       the Blacks in Government conference, a
10      conference that she attended regularly --
11           MR. DUBOIS:  Object to the form.
12  Q.  -- back in August -- I mean, back in April
13      of 2002.  Are you aware of that?
14  A.  Later on meaning later on what?  Later on
15      from what we just talked about?
16  Q.  In April of 2002 were you aware that she --
17  A.  Before what we just talked about.  So it
18      was prior to what we just talked about.  So
19      you said later on.
20  Q.  No.  No.
21  A.  Yes.  You said later on Ms. Thomas did
22      this.
23  Q.  Okay.  Well, I'm sorry.  After the -- After

Page 142

1       she returned back from the detail and was
2       denied --
3  A.  No.  She did not request that.
4  Q.  Sir?
5  A.  No.
6  Q.  I apologize.  I'm sorry.  That's right.
7       While she was on detail.  I'm sorry.
8       That's right.  Hold on.  And I meant to
9       have dealt with that earlier.  I've got
10      some of these out of place.  Let me back up
11      and deal with a few things before
12      Ms. Thomas came back from the detail.
13           While Ms. Thomas was on detail, she
14      requested to attend a Blacks in Government
15      conference back in April of 2002.  Are you
16      aware of that?
17  A.  Yes, sir.
18           (Defendant's Exhibit 41 was marked
19            for identification.)
20  Q.  I'm going to show you Exhibit 41.  That was
21      her request.  And I think -- And I think
22      she went through the chief over where she
23      was who approved it.  Then when it got to

Page 143

1       you, you disapproved it; is that right?
2  A.  I don't know if I ever disapproved this
3       particular request.
4  Q.  Well, what did you do with it?
5  A.  It doesn't show I ever signed or anything.
6       But what we did was every year we give
7       opportunities for folks to attend the BIG
8       conference, and two over people were
9       selected to attend the BIG conference.
10  Q.  How did that come about?  I mean, what was
11      the rationale and reasoning?
12  A.  The deputy administrator for field
13      operations said that two people -- up to
14      two people a year they would approve and
15      pay the expenses to attend the BIG
16      conference.  That was the policy that we
17      had.
18  Q.  Now, who was the deputy --
19  A.  Mr. Chott.
20  Q.  Mr. Chott.
21  A.  Or either whoever was there in that
22      capacity.  You know, Mr. Frago has been
23      there and also now Mr. Colony has been

Page 144

1       there.  So we've had -- In my tenure we've
2       had three DAFOs.
3  Q.  So you get this request that comes in from
4       Ms. Thomas while she's on the detail --
5  A.  Uh-huh (positive response).
6  Q.  -- is that right?
7  A.  Yes, sir.
8  Q.  And when it comes in, you don't act on it
9       right then; you talk with Mr. Chott about
10      it?
11  A.  No.
12  Q.  What happened?
13  A.  When it came in, we sent out -- not --
14      About three months later we sent out a
15      notification to employees who wanted to
16      attend the BIG conference.
17  Q.  You said three months later?
18  A.  Or whenever it was.
19           (Defendant's Exhibit 42 was marked
20            for identification.)
21  Q.  I'll tell -- Let me help.  Let me show you
22      Exhibit 42 if that will help.  This is a
23      memo dated April 5, 2002 --

Page 145

1   A. Right.
2   Q. -- which is three days after the memo from
        Ms. Thomas dated April 3rd.
4   A. Okay. April 22nd, that's the date of the
5       event.
6   Q. And another memo dated April 22nd from
7       you.
8   A. Okay.
9   Q. All right.
10  A. And when that went out, we had responses,
11      and I don't remember how many people
12      responded.
13  Q. Now, let me ask you this. Prior to this,
14      were you aware that the only person from
15      your agency -- well, from your state office
16      who had been attending this conference was
17      Ms. Thomas every year?
18          MR. DUBOIS: Object to the form.
19  A. Prior to what?
20  Q. Prior to the April 3rd memo that Ms. Thomas
21      sent.
22  A. No. I think Ms. Lane had attended one
23      prior to this.

Page 146

1   Q. Other than those two people, were you aware
2       that no one else was even asking about
3       going?
4   A. I have no idea. I wasn't there at that
5       time.
6   Q. But after getting the memo from Ms. Thomas,
7       you apparently investigated this particular
8       conference, did you not?
9   A. No.
10  Q. Well, what did you do?
11  A. Which memo are you talking about?
12  Q. The Exhibit 41, the April 3rd --
13  A. No.
14  Q. -- 2002 memo.
15  A. She attended one the year in Los Angeles.
16      I was the SED then.
17  Q. All right.
18  A. And that was when Mr. Chott told me what
19      the policy was, two per state and that was
20      all. And then Ms. Lane made a request to
21      go, and that was the only request I know
22      of. And they both went to the thing. The
        next year we sent out this.

Page 147

1   Q. Hold on. But next year Ms. Thomas made her
2       request first, did she not?
3   A. Yes.
4   Q. But you didn't respond to her request; you
5       went ahead and sent out a memo asking -- or
6       seeking other people to go.
7   A. To see who all wanted to go in addition to
8       Ms. Thomas.
9   Q. And did you get any responses?
10  A. Yes.
11  Q. What responses did you get?
12  A. I don't remember who all submitted, but two
13      people were selected. I think Cozia Heard
14      and Beverly Fraser.
15  Q. And who made the selection?
16  A. I did.
17  Q. And why did you make the selection of those
18      two people other than Ms. Thomas who asked
19      first.?
20  A. I made the selection for those two people
21      because they have not attended yet and they
22      were the next seniority people who had made
23      requests.

Page 148

1          (Defendant's Exhibit 43 was marked
2           for identification.)
3   Q. Now, here is a memo from you which is
4       Defendant's Exhibit 43 in regards to that
5       conference. Do you recall that?
6   A. Yes, sir.
7   Q. And this is where you denied the request?
8   A. Yes.
9   Q. Now, you denied it the day after you sent
10      that memo out dated April 22nd inviting
11      people --
12          MR. DUBOIS: Object to the form.
13  Q. -- isn't that right?
14  A. If it went out and we got, yeah, responses,
15      then, you know, I could notify her to tell
16      her. Had we not got a response, she would
17      have got to go.
18  Q. In this memo you said, attached is your
19      request of April 3, 2002 to attend the
20      Blacks in Government, acronym BIG,
21      conference on August 26th through August
22      30, 2002 in Atlanta, Georgia.
23          Now, you say here, I was advised last

Page 149

1    year that we could authorize only two
2    employees from our state to attend this
3    conference. Is this what you were talking
4    about what Mr. Chott told you?
5  A.  Yes.
6  Q.  Then you said as discussed with you at that
7    time. You discussed something with
8    Ms. Thomas then?
9  A.  When -- I had a question about her going to
10    that and the government paying for it.
11  Q.  Because it wasn't a conference that
12    involved African-Americans?
13  A.  I just, you know, had a question. I
14    never -- hadn't heard that before. And
15    called Mr. Chott to find out what's the
16    policy; what are we doing here. And he
17    told me at that time that we're allowing
18    two per year to go and spread it around
19    where everybody has a chance to go. And I
20    shared that.
21  Q.  Then you say, I would like to afford any
22    other interested employees the opportunity
23    to attend. Therefore, since you attended

Page 150

1    the conference last year, the attached
2    request is denied. Now, this is before
3    anybody responded, isn't it?
4  A.  I don't know.
5  Q.  Do you know when other people did finally
6    respond?
7  A.  No, I don't. They could have responded
8    within minutes of when the notice went
9    out. I don't know.
10        (Defendant's Exhibit 44 was marked
11          for identification.)
12  Q.  Let me show you Defendant's Exhibit 44.
13    This is a memo dated May 21st, almost a
14    month later. And it's from Verdell
15    Zeigler. And it's two different people
16    here thanking them for their response and
17    interest in the conference.
18       And she is apologizing for the delay in
19    notifying them of the selection but they
20    are now being notified almost a month later
21    of their selection.
22  A.  Notify the ones that weren't selected,
23    yeah.

Page 151

1  Q.  And so now as we sit here you are trying to
2    impart that you got some responses and made
3    a selection prior to sending your memo to
4    Ms. Thomas denying her request?
5        MR. DUBOIS:  Object to the form.
6  A.  I don't know what impart meant.
7  Q.  Sir?
8  A.  I don't know what impart meant.
9  Q.  You're trying to imply or you're trying to
10    state that as of April 23, 2002 you had
11    some responses and made a selection of who
12    was going to the BIG conference?
13  A.  Yes. That's most likely possible, yes.
14  Q.  Now, when you say it's most likely
15    possible, isn't --
16  A.  Yeah. That's most likely what happened.
17  Q.  Well -- But now if I check with Cozia Heard
18    and Beverly Fraser and they indicate that,
19    no, they were not notified or they didn't
20    even make -- submit an interest until some
21    weeks later, would you dispute that?
22        MR. DUBOIS:  Object to the form.
23  A.  I don't know what they'll tell you.

Page 152

1  Q.  But isn't it a fact as you look at this and
2    your memory now prompts you that you denied
3    Ms. Thomas before anybody else applied?
4  A.  No.
5  Q.  So your answer under oath is no?
6  A.  To that question you just asked me.
7  Q.  Right. That somebody else had already
8    applied prior to you denying Ms. Thomas.
9  A.  I don't remember. But you said that I'm
10    saying that it was definitely done before,
11    and I said no.
12  Q.  Well, then is it more than likely you
13    denied Ms. Thomas prior to --
14  A.  No.
15  Q.  -- anybody else applying?
16  A.  No.
17  Q.  So then are you saying that -- then that
18    you had some other people to apply prior to
19    denying Ms. Thomas?
20        MR. DUBOIS:  Object to the form.
21  A.  I'm saying that we had people who applied
22    who had shown interest before, and I'm sure
23    they responded immediately. And I think

Page 153

1  that's what happened.
2  Q. Do you have record of those responses?
   A. I don't, no.
4  Q. Who would have that record?
5  A. I don't know if anyone would have it. It
6     was sent out by Verdell, so they would
7     respond back to her. But I don't know how
8     they responded, whether it was by phone or
9     e-mail. I do not know.
10 Q. So let's go back now where Ms. Thomas came
11    back from her detail. Did you have a
12    conference or interview with her about her
13    duties and assignments and her detail?
14 A. We talked about it, yes.
15 Q. When and how?
16 A. I don't remember when. In the next --
17    first day or two we discussed she had
18    concerns about behind the curve on programs
19    and stuff. She had been gone a while. And
20    we discussed it and talked about take her
21    time, dig in the handbooks, learn about
22    it. When you feel comfortable, or
23    whatever, you know, we'll go on to the next

Page 154

1  area.
2  Q. Was this a face-to-face conference or
3     was --
4  A. Yes.
5  Q. -- it or by phone?
6  A. Face-to-face.
7  Q. Are you aware that Ms. Thomas has alleged
8     that you did not have such conference with
9     her?
10       MR. DUBOIS: Object to the form.
11 A. No, I'm not aware.
12 Q. But according to your recollection you did?
13 A. Yes.
14 Q. Now, did Ms. Thomas complain to you about
15    her computer being removed from her office
16    and the password deleted?
17 A. Are we going back to before the detail
18    started --
19 Q. No. After she --
20 A. -- or what are we talking about now?
21 Q. Well, I'm sorry. You're right. This would
22    have been -- This would have been right
      before the detail started.

Page 155

1  A. Yes.
2  Q. I apologize.
3        MS. THOMAS: The day after.
4  Q. Sorry.
5  A. What's the question now?
6  Q. Were you -- Did Ms. Thomas complain to you
7     that her computer had been removed and her
8     password deleted?
9  A. No. She did not complain to me.
10 Q. Well, now, was her computer removed and her
11    password deleted?
12 A. I don't know if her password was deleted.
13    Irean was using the computer that she was
14    using.
15 Q. And why that was that?
16 A. We had a PC in the administrative division
17    that broke down and we had to have Windows
18    started loading for payroll. And I think
19    Valerie Moses -- And payroll was pretty
20    important to get loaded to get paid. And
21    Debbie and Irean and Verdell and them
22    talked about it and asked was it all right,
23    and I said sure.

Page 156

1        Irean wanted to use -- wanted to have a
2     laptop, because she works off site when
3     we're on meetings and stuff. She does a
4     lot of work at home.
5  Q. What about the password being deleted? Why
6     was that necessary?
7  A. I don't know. I'm not an IT person.
8        (Mr. Cornwell no longer present.)
9  Q. Now, Ms. Thomas submitted a resignation to
10    you letting you know she would be retiring,
11    did she not?
12 A. I got an e-mail that said she was retiring.
13 Q. Now, did you -- did other people know in
14    the department that she was retiring?
15 A. No one knew, to my knowledge.
16 Q. Did you send out or afford her a retirement
17    celebration or anything of that nature?
18 A. I don't do that.
19 Q. You don't do that at all?
20 A. No. That's not our responsibility.
21    Section people within their sections handle
22    retirement parties.
23 Q. They don't check with you to get approval?

Page 157

1  A.  It's usually off site.  Sometimes it could
2      be in coordination with other things, and
3      if it's in coordination with other things,
4      then we would allow lunches or something
5      another to occur while we were doing other
6      things that deal with --
7              (Defendant's Exhibit 49 was marked
8          for identification.)
9  Q.  Now, here is part of Defendant's Exhibit
10     49, a memo from you to all of the employees
11     about a wellness day and retirement party
12     on behalf of an employee.
13 A.  Uh-huh (positive response).
14 Q.  Now, that's something you did, isn't it?
15 A.  Yes.
16 Q.  Well, why did you do this for him and not
17     for Ms. Thomas?
18 A.  The wellness outing is our part of it.  The
19     retirement party was the section folks
20     putting together as I was saying.  We
21     couple with other things we'll allow them
22     to couple with us if it doesn't have any
23     affect on the agency.

Page 158

1  Q.  So going back to the computer that was
2      removed from Ms. Thomas' office.  And this
3      would have been -- You-all had that
4      mediation hearing December 5, '01.  And I
5      think it was, like, the very next day her
6      computer was removed.
7  A.  Yes, sir.
8  Q.  You're saying that you-all had some payroll
9      issues at that point?
10 A.  Yes, sir.  Her computer, you know, tore up
11     that day.  And under the agreement, you
12     know, we didn't know if Ms. Thomas was
13     coming back to do anything.  We had granted
14     her administrative leave where she didn't
15     have to come back.
16 Q.  But the detail was for one year.
17 A.  This is administrative leave prior to the
18     detail.
19 Q.  Right.
20         But you had the mediation hearing and
21     you agreed at the mediation hearing what
22     the results would be.
23 A.  And we agreed at that day she ain't got to

Page 159

1      come back before the detail started.
2  Q.  She didn't have to come back before the
3      detail started?
4  A.  Yeah.
5  Q.  But you knew she was coming back, though --
6  A.  No.  At that day.
7  Q.  -- after that year was over?
8  A.  The hearing officers or the resolving
9      officials indicated to us when they talked
10     to us about the agreement that we were to
11     accept that she -- her agreement.  She
12     wanted it through November.  And so from
13     the hearing officers' discussions or the
14     resolving officials with us, we were of the
15     opinion she would not be coming back.
16 Q.  Hold on one second.  There's a couple of
17     things.  Well, it's my understanding that
18     you left the meeting -- the mediation
19     before the agreement was finally reached.
20         MR. DUBOIS:  Object to the form.
21 A.  That's correct.  And then they called us
22     and discussed it with us and were we in
23     agreement to it.  And then they modified

Page 160

1      the agreement to some things that we asked
2      them what was best for Ms. Thomas.  Giving
3      her administrative leave where she has not
4      got to come back was the part that we
5      suggested.  And it was incorporated into
6      the agreement.
7  Q.  Now, at any time during Ms. Thomas' tenure
8      there or after she was gone, did you have
9      any employees give any statements about
10     Ms. Thomas' work there or anything she may
11     have done while she was working there?
12 A.  Working where?
13         MR. DUBOIS:  Object to the form.
14 Q.  With the Farm Service Agency.
15 A.  I don't understand your question.
16 Q.  Well, I'm trying to find out if at any time
17     during Ms. Thomas' tenure with the agency
18     while you were state executive director did
19     you authorize or instruct any employees to
20     obtain statements about Ms. Thomas --
21 A.  No.
22 Q.  -- to obtain any written statement?
23 A.  No.  I have no idea what you're talking

Page 161

1    about.
2    Q.  Did you authorize Debbie Williams to go
3        talk to any of the employees within Ms.
4        Thomas' division to get statements from
5        them about Ms. Thomas' work?
6    A.  What are we talking about?  What's our time
7        frame we're talking about?  I don't
8        understand --
9    Q.  At any time since you've been --
10   A.  -- the question.
11   Q.  -- state executive director.
12   A.  Have I authorized Ms. Williams to go get
13       statements from anybody about Ms. Thomas'
14       work?
15   Q.  Ms. Thomas' work or about her period.
16   A.  I would say no, but I do not remember.  But
17       I don't know why I would.  You know, I
18       don't -- If there was something or another
19       going on or someone had some complaint, she
20       might have been told to tell them to put it
21       in writing.  I don't know.  But that would
22       have been the only statement that I would
23       know that Ms. Williams would have.

Page 162

1    Q.  Are you aware of any of the employees
2        within Ms. Thomas' division that work with
3        her who gave any statements about
4        Ms. Thomas since you have been state
5        executive director?
6    A.  I'm unaware of any.
7    Q.  Are you aware of any complaints that
8        Ms. Thomas made any racial slurs?
9    A.  That Ms. Thomas made any racial slurs?
10   Q.  Yeah.
11           MR. DUBOIS:  Object to the form.
12   A.  No, I'm not.
13   Q.  I will probably go ahead and -- I will get
14       a copy, because I thought I had made copies
15       of everything but I didn't.  But I'll make
16       two exhibits.  One will be Exhibit 1 and
17       the other Exhibit 2.  One is going to be --
18       I'm going to show you what is marked as --
19       I'll just say Plaintiff's Exhibit 1 to this
20       deposition.
21           (Plaintiff's Exhibits 1 and 2 were
22           marked for identification.)
             (Off-the-Record discussion.)

Page 163

1    Q.  I'll make this 1.  This is a statement of
2        discussion of Ms. Ozetta Thomas regarding
3        performance appraisal rating signed on
4        November 17, '01 by Pamela E. Polke.  Are
5        you familiar with this statement, ever seen
6        or ever authorize anyone to gather or get
7        such statement?
8    A.  I haven't seen that statement.
9    Q.  Also, I'm going to show you what I'm going
10       to mark as Exhibit 2, which is another
11       statement by Pamela E. Polke signed on
12       November 20, 2001.  And at the top it says
13       it was prepared by Debbie Williams for her
14       signature.  Are you familiar with such
15       statement or ever authorize Ms. Williams to
16       get any statements?
17   A.  No.
18           MR. DUBOIS:  Object to the form.
19   Q.  Sir?
20   A.  No, I'm not.
21   Q.  Okay.  And this would have been November
22       2001, of course, after the time that
23       Ms. Thomas had filed her formal complaint

Page 164

1        and after her performance ratings.
2            Would Ms. Williams have authority to go
3        and get statements from employees about
4        performance ratings?
5            MR. DUBOIS:  Object to the form.
6    A.  I don't know what the statement says.  I
7        don't know what you're talking about.
8    Q.  Would you like to read them?
9    A.  Sure.  Have we got time?
10   Q.  We will take a little time.  Then I've got
11       about two more questions, and I'll be
12       finished, so ...
13   A.  Yes.
14   Q.  Sir?
15   A.  Yes, I am aware of that.  It isn't dealing
16       with her work.  It is a performance plan.
17   Q.  Now, that -- You're talking about Exhibit
18       2, the one where it says prepared by Debbie
19       Williams.  You are aware of this?
20   A.  I am aware of this situation that they
21       complained and came to us about this
22       element on their performance plan.
23   Q.  Oh, you're you aware of the situation?

Page 165

1   A.  Yes.
    Q.  But you're not aware of authorizing any
        written statement?
4   A.  Well, like I said earlier, if somebody
5       complained about something, we authorized
6       Debbie to go and get a statement from
7       them.  This is a statement that she got.
8   Q.  Okay.  So if someone complained, you
9       authorize them to go get a statement?
10  A.  Yeah.  Or they could give their statement
11      anyway.  But in this situation that her
12      performance plan -- And she brought up
13      something Ms. Thomas did to this employee
14      that upset her about not performing her
15      performance plan.  And I said, okay, get
16      her to put it in writing.  This is what
17      this is.  It has nothing to do with
18      Ms. Thomas' work as you asked.  This is
19      dealing with Ms. Polke's work.
20  Q.  So this is dealing with Ms. Polke's work?
21  A.  Her performance plan.
22  Q.  Now, Exhibit 1 is -- it says at the top is
23      my statement prepared by me and is signed

Page 166

1       by Ms. Polke on November 17, '01.  And so
2       you're saying this would be a response
3       Ms. Polke is making to her performance
4       plan?
5   A.  This right here deals with the elements.
6   Q.  Now, you're pointing at Exhibit 2 now.
7   A.  Yeah, that's what I'm talking about.  I am
8       familiar with this right here.  I don't
9       know what Ms. Polke did.
10  Q.  That's Exhibit 1, the one she did.  Then
11      the one Ms. Williams did is Exhibit 2.
12          And now when you say respond to the
13      elements, you're talking about the elements
14      in Ms. Polke's performance or Ms. Thomas'
15      performance plan?
16  A.  Ms. Polke's.  These are dealing with
17      Ms. Polke.
18  Q.  Ms. Polke's performance plan; is that
19      right?
20  A.  Yes.
21  Q.  I got you.
    A.  That Ms. Thomas went over with her.
    Q.  Now, lastly, let's see.  Now, as state

Page 167

1       executive director, I think you said that's
2       a political appointment?
3   A.  Yes, sir.  Schedule C.
4   Q.  And so when you made your application, did
5       you have to claim to be a member of the
6       Republican Party?
7   A.  You know, I don't remember if I had to or
8       not.
9   Q.  Are you a member of the Republican Party or
10      claim to be?
11          MR. DUBOIS:  Object to the form of
12          the question.
13  A.  I would say I claim to be.
14  Q.  But you don't know whether or not that's in
15      the application for the Bush Administration
16      that you have to be a member of the
17      Republican Party?
18  A.  I answered your question as of right now.
19  Q.  Okay.  You just don't recall back then.
20  A.  I don't recall back then.  But it was an
21      administrative appointment, so they would
22      assume you were.
23  Q.  Now, going back to the response in

Page 168

1       Plaintiff's Exhibits 1 and 2, particularly
2       Plaintiff's Exhibit 2 that you are familiar
3       with about Ms. Polke complaining about her
4       performance plan.  Was Ms. Thomas afforded
5       that same opportunity to put it in writing
6       complaints or disagreements she had?
7           MR. DUBOIS:  Object to the form.
8   A.  She did put it in writing.
9   Q.  Did you write any memos to your file
10      regarding Ms. Polke's performance plan?
11  A.  I don't recall any.
12  Q.  All right.  One second.  Hold on one
13      second.
14          Well, I think I covered all five sheets
15      in different ways.  So is there anything
16      you need to add that you've thought of that
17      we may need to be clarified or anything on
18      any of the questions that I asked that have
19      come to your attention?
20  A.  Not that I --
21          MR. DUBOIS:  Object to the form.
22  A.  Not that I understand if I understood your
23      questions right.  I may not have understood

Page 169

1      your questions right.
2    Q.  Okay.
     A.  But I thought I did when I answered them
4        the way I answered them, but I don't know.
5    Q.  I got you.
6          But anything that may have come to your
7        attention as we sit here now that you may
8        have refreshed or remembered something
9        about a question that was asked and the
10       response you gave or you may want to alter
11       or amend or change?
12   A.  I haven't had time to think about what I've
13       said.
14   Q.  Anything right now that comes to your mind
15       that you may need to add to anything?
16   A.  I can't think of anything right now.
17   Q.  Anything you want to just tell me.
18            MR. DUBOIS:  Object to the form.
19   A.  I have enjoyed meeting you.
20   Q.  My pleasure.
21            (Off-the-Record discussion.)
22            MR. DUBOIS:  I've got one thing I
23            want to clarify.

Page 170

1                 EXAMINATION
2    BY MR. DUBOIS:
3    Q.  Exhibit 42, is that an e-mail that was sent
4        out by Verdell Zeigler on April 5, 2002?
5    A.  That's what that looks like.
6    Q.  And to your understanding, there was a memo
7        attached to this e-mail regarding the BIG
8        conference?
9    A.  No.  I'm not sure what that is.  I don't
10       know what that means.
11   Q.  Well, let me direct you to the second page
12       of Exhibit 42.
13   A.  Uh-huh (positive response).
14   Q.  Are you familiar with this memo?
15   A.  Yes.  Uh-huh (positive response).
16   Q.  Do you know if Ms. Zeigler sent out this
17       memo, which is the second page of Exhibit
18       42, with her April 5, 2002 e-mail which is
19       the first --
20   A.  This indicates it's coming later.
21   Q.  What indicates that?
22   A.  Being forwarded for your information and
         response.  The attached memo is being

Page 171

1        forwarded.
2    Q.  The attached memo.  Do you know what the
3        attached memo refers to?
4    A.  No.
5    Q.  Directing your attention to the second
6        page, do you see where it says, we are
7        requesting you e-mail Verdell Zeigler if
8        you are interested in attending by COB
9        April 12, 2002?
10   A.  Yes.
11   Q.  Do you have any reason to believe this
12       second page was not sent out before April
13       12, 2002?
14   A.  That it was not sent out?
15   Q.  Yeah, it was not sent out.
16   A.  That would be unlikely for Verdell to send
17       something out after the date.
18   Q.  And you see it's dated April 22, 2002 at
19       the top?  Do you know why that's there?
20   A.  No, I do not.
21   Q.  And if you turn to the last page, do you
22       see this being an April 22, 2002 e-mail
23       from Ozetta Thomas?  And it looks like

Page 172

1        you're cc'd on it.
2    A.  Yes.
3    Q.  Is it possible that the second page of
4        Defendant's Exhibit 2 was attached -- or I
5        guess this is the attachment of the April
6        22nd, 2002 e-mail and that's why it's got
7        the April 22, 2002 date?
8             MR. PETTAWAY:  Object to the form
9             of the question.  All things
10            are possible through the
11            Lord.
12   A.  It is possible.  The same date.  It infers
13       that.
14   Q.  So I guess Ms. Zeigler would know what she
15       sent and when?
16   A.  Yes, she should know.
17            MR. DUBOIS:  That's all.
18            (Plaintiff's Exhibit 3 was marked
19            for identification.)
20
21            * * * * * * * * * * * *
22            FURTHER DEPONENT SAITH NOT
23            * * * * * * * * * * * *

Page 173

1        REPORTER'S CERTIFICATE
STATE OF ALABAMA:
2    ELMORE COUNTY:
4        I, Haley A. Phillips, Certified Court
5    Reporter, ACCR # 151, and Commissioner for the
6    State of Alabama at Large, do hereby certify that I
7    reported the deposition of:
8        DANNY CRAWFORD
9    who was first duly sworn by me to speak the truth,
10   the whole truth and nothing but the truth, in the
11   matter of:
12       OZETTA THOMAS,
13       Plaintiff,
14       vs.
15       MIKE JOHANNS,
16       Defendant.
17       In The U.S. District Court
18       For the Middle District of Alabama
19       Northern Division
20       Case Number 2:05-CV-411-WKW
21   on Thursday, January 10, 2008.
22       The foregoing 172 computer-printed pages
23   contain a true and correct transcript of the

Page 174

1    examination of said witness by counsel for the
2    parties set out herein.  The reading and signing of
3    same is hereby not waived.
4        I further certify that I am neither of kin
5    nor of counsel to the parties to said cause nor in
6    any manner interested in the results thereof.
7        This 30th day of January 2008.
8
9
10
11       _____
         Haley A. Phillips, ACCR #151
         Expiration Date:  9/30/08
12       Certified Court Reporter and
         Commissioner for the State
13       of Alabama at Large
14
15
16
17
18
19
20
21
23