OZETTA THOMAS v. MIKE JOHANNS
DEPOSITION OF DEBORAH WILLIAMS

2/14/2008

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


OZETTA THOMAS,

    Plaintiff,

vs.                     CASE NO. 05-CV-411

MIKE JOHANNS, Secretary,
Pine States Department of
Agriculture, Farm
Service (FSA)

    Defendants.


* * * * * * * * * *


    DEPOSITION OF DEBORAH TEEL WILLIAMS, taken
pursuant to stipulation and agreement before Wendy
Lewis, Certified Court Reporter and Commissioner for
the State of Alabama at Large, at the Office of the
United States Attorney for the Middle District of
Alabama, 131 Clayton Street, Montgomery, Alabama, on
Thursday, February 14, 2008, commencing at 8:40 a.m.


* * * * * * * * * *

OZETTA THOMAS v. MIKE JOHANNS                                    2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

2 (Pages 2 to 5)

---

**Page 2**

```
1              APPEARANCES
2  FOR THE PLAINTIFF:
3  Mr. James J. DuBois
   Assistant United States Attorney
4  OFFICE OF THE UNITED STATES ATTORNEY
   FOR THE MIDDLE DISTRICT OF ALABAMA
5  131 Clayton Street
   Montgomery. Alabama  36104
6
   FOR THE DEFENDANTS:
7
   Mr. Collins Pettaway
8  CHESTNUT. SANDERS. SANDERS.
   PETTAWAY. CAMPBELL & ALBRIGHT
9  Attorneys at Law
   One Union Street
10 Selma. Alabama 36702
11 ALSO PRESENT:
12 Ms. Ozetta Thomas
13         * * * * * * * * * *
14       EXAMINATION INDEX
15 DEBORAH TEEL WILLIAMS
      BY MR. PETTAWAY          3
16
17         * * * * * * * * * * *
18        STIPULATIONS
19    It is hereby stipulated and agreed by and
20 between counsel representing the parties that the
21 deposition of DEBORAH TEEL WILLIAMS is taken pursuant
22 to the Federal Rules of Civil Procedure and that said
23 deposition may be taken before Wendy Lewis. Certified
24 Court Reporter and Commissioner for the State of
25 Alabama at Large, without the formality of a
```

---

**Page 3**

```
1  commission; that objections to questions other than
2  objections as to the form of the questions need not be
3  made at this time but may be reserved for a ruling at
4  such time as the deposition may be offered in evidence
5  or used for any other purpose as provided for by the
6  Federal Rules of Civil Procedure.
7       It is further stipulated and agreed by and
8  between counsel representing the parties in this case
9  that said deposition may be introduced at the trial of
10 this case or used in any manner by either party hereto
11 provided for by the Federal Rules of Civil Procedure.
12         * * * * * * * * * * *
13       DEBORAH TEEL WILLIAMS
14      The witness, having first been duly sworn to
15 speak the truth, the whole truth and nothing but the
16 truth, testified as follows:
17            EXAMINATION
18 BY MR. PETTAWAY:
19    Q.  Good morning. Could you please state your
20 name, please, ma'am?
21    A.  Deborah T. Williams.
22    Q.  Could you spell that for us?
23    A.  D-E-B-O-R-A-H, T., W-I-L-L-I-A-M-S.
24    Q.  All right. And what does the T. stand for?
25    A.  Teel.
```

---

**Page 4**

```
1     Q.  Teel? Is that your middle name or maiden
2  name?
3     A.  That's my maiden name.
4     Q.  All right. Where do you live?
5     A.  In Tallassee. Alabama.
6     Q.  Your address there?
7     A.  682 Old Barn Road.
8     Q.  682 --
9     A.  Old Barn Road.
10    Q.  Vaughn, V-A-U-G-H-N?
11    A.  B-A-R-N.
12    Q.  Oh, barn. Okay. Old Barn Road.
13    A.  Uh-huh.
14    Q.  And that's Tallassee, Alabama?
15    A.  Yes.
16    Q.  Zip code?
17    A.  36078.
18    Q.  How long have you lived there?
19    A.  34 years.
20    Q.  Oh, wonderful. All right. My name is
21 Collins Pettaway, and I don't think I've had the
22 pleasure before. I represent Ms. Ozetta Thomas. And
23 we're doing your deposition here today regarding a
24 lawsuit she's brought against the USDA FSA state
25 office. Have you ever had your deposition taken
```

---

**Page 5**

```
1  before?
2     A.  Yes, I have.
3     Q.  Because I wanted to kind of go over some
4  things. So you understand that what this is, is what
5  we call a discovery process. It's a process whereby,
6  on her behalf, I'm asking you questions. And I'm
7  trying to find out things, so don't assume I know the
8  answer or know things, because I don't. And I really
9  don't. So I really want to find out. And so this is
10 not an antagonistic process. I'm really trying to
11 find out.
12      And so if you need to take some time or if you
13 don't understand what I'm saying or what I ask you or
14 if I'm not clear, just feel free to have a free
15 exchange so we can work that out. All right?
16    A.  Okay.
17    Q.  Good. So now let me get some background
18 information. And, of course, I'm trying to find out
19 who might be on a jury or whatnot that might have some
20 relationships or that might be important for us to
21 know. Now, you say Teel is your maiden name?
22    A.  Yes, sir.
23    Q.  So I assume you're married.
24    A.  Yes, sir.
25    Q.  And your husband's name?
```

OZETTA THOMAS v. MIKE JOHANNS                                          2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

3 (Pages 6 to 9)

Page 6

1     A. Richard Williams.
2     Q. And y'all live up in Tallassee?
3     A. Yes, sir.
4     Q. All right. And your maiden name is Teel. Do
5  you have any relatives living here in Montgomery
6  County?
7     A. I do.
8     Q. All right. And -- well, let me do
9  this first. This is federal court, so we're in that
10 whole district. Tell me about your husband. Where
11 does he work?
12    A. He's retired.
13    Q. Retired from where?
14    A. Alabama Power.
15    Q. And how long did he work at Alabama Power?
16 Do you know?
17    A. He worked there for 34 years and 11 -- eight
18 months.
19    Q. What did he do?
20    A. He's an operator electrician.
21    Q. Y'all have any children?
22    A. We have three children.
23    Q. Any 18 or older?
24    A. All of them are.
25    Q. And where do they live?

Page 7

1     A. The oldest one lives in Tallassee. She's --
2  she's married.
3     Q. What's her name?
4     A. Kelly Wallace.
5     Q. And what -- is she working?
6     A. She is a medical assistant at Eclectic Family
7  Care.
8     Q. And what about her husband?
9     A. He is an engineer with Neptune in Tallassee.
10    Q. What is Neptune?
11    A. They manufacture water meters.
12    Q. All right. What's the next one?
13    A. Michelle Smith.
14    Q. Where does she live?
15    A. She lives in Wetumpka.
16    Q. Is she married or single?
17    A. She's married.
18    Q. Where does Michelle work, if she does?
19    A. She works for Colonial Bank.
20    Q. Doing what?
21    A. A loan originator.
22    Q. Which branch? Do you know?
23    A. It's off Taylor Road. It's not a branch in a
24 bank. It's a loan -- it's a mortgage office.
25    Q. Taylor Road here in Montgomery?

Page 8

1     A. Yes.
2     Q. All right. What about her husband? What's
3  his name?
4     A. His name is Casey Smith.
5     Q. And he works where?
6     A. He plays professional baseball with the
7  Philadelphia Phillies.
8     Q. How long has he been playing?
9     A. This will be his eighth season.
10    Q. What does he play?
11    A. Shortstop.
12    Q. Oh, okay. Casey Smith. Did he start at
13 shortstop?
14    A. No. He's -- he's with AAA. He's --
15 actually, he's leaving this weekend, but --
16    Q. Okay. What team does he play with?
17    A. Philadelphia Phillies.
18    Q. Now, you said he's with AAA in the farm
19 system, I assume.
20    A. Right. It's in Allentown, Pennsylvania.
21    Q. How about your other child?
22    A. Tiffany Williams. She's single.
23    Q. Where does she live?
24    A. In Eclectic.
25    Q. Okay. What does she do, if anything?

Page 9

1     A. She's a school teacher.
2     Q. What school?
3     A. Eclectic Elementary.
4     Q. Are your parents still living?
5     A. Yes.
6     Q. And where do they live?
7     A. My dad lives in Montgomery.
8     Q. What's his name?
9     A. Kenneth Roger Teel, Sr.
10    Q. And does he work or retired now or what?
11    A. He works.
12    Q. Where?
13    A. He owns United Lighting here in Montgomery.
14    Q. Is that a wholesaler or retailer?
15    A. Both.
16    Q. Where is that located?
17    A. On the Eastern Boulevard.
18    Q. United Lighting?
19    A. Uh-huh.
20    Q. What about your mom?
21    A. My mom is retired.
22    Q. What's her name?
23    A. Her name is Jean Freeman. My parents are
24 divorced.
25    Q. Is that with a J. or a G.?

OZETTA THOMAS v. MIKE JOHANNS                     2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

4 (Pages 10 to 13)

Page 10

1    A.  J-E-A-N.
2    Q.  Where is she retired from?
3    A.  She worked for the State, and then she worked
4  for a -- some electrical engineering company in
5  Kansas.
6    Q.  What are -- do you attend church?
7    A.  Yes, I do.
8    Q.  What church?
9    A.  Good Hope Baptist.
10   Q.  Where is that located?
11   A.  In Eclectic.
12   Q.  Are you a member of any social organizations
13  or professional organizations or civic organizations?
14   A.  No.
15   Q.  A member of none?
16   A.  No.
17   Q.  What about any -- any groups or any other
18  kind of nonprofit organizations or anything of that
19  nature?
20   A.  Member of them?
21   Q.  Yeah.
22   A.  No.
23   Q.  So the only affiliation you have is your job,
24  your church, and that's it?
25   A.  And my family.

Page 11

1    Q.  And your family.  All right.  So let's turn
2  to your job.  Where are you employed?
3    A.  United States Department of Agriculture Farm
4  Service Agency in Montgomery.
5    Q.  What is your position?
6    A.  Executive officer.
7    Q.  What is an executive officer?
8    A.  It's a management specialist type position,
9  deputy to the state executive director.
10   Q.  What are your duties?
11   A.  I handle personnel operations, budget
12  functions.  If there is an issue that crosses division
13  lines, I coordinate those.  I supervise the county
14  operations reviewers, who are like internal auditors.
15  I handle audits and investigations.  I do employee
16  misconduct investigations for the national office and
17  management reviews in other states.
18   Q.  Now, when you talk about personnel
19  operations, what are you talking about?
20   A.  If there are any personnel issues with
21  employees in the state, I handle those operations,
22  processing, whatever actions need to be processed,
23  advising managers on how to handle situations, that
24  type of thing.
25   Q.  When you talk about employee misconduct

Page 12

1  investigations, what did you mean?
2    A.  I was trained by the Office of Inspector
3  General to conduct employee misconduct investigations,
4  and I'm called upon from time to time by the national
5  office to investigate incidents of alleged employee
6  misconduct.
7    Q.  Give me an example of employee misconduct.
8    A.  Substance abuse on the job, somebody that's
9  been accused of misusing government funds or
10  equipment, that type of thing.
11   Q.  Do you handle any personnel investigations?
12   A.  That -- that's what I was talking about.
13   Q.  Okay.  Like with staff, about job-related
14  functions and whatnot?
15   A.  Yes.
16   Q.  How long have you had that position?
17   A.  As executive officer?
18   Q.  Yes.
19   A.  Since '99.
20   Q.  Prior to 1999, what did you do?
21   A.  I was the administrative officer.
22   Q.  Now, what is that, an administrative officer?
23   A.  The administrative officer is in charge of
24  all of the administrative functions for the agency
25  within the state of Alabama, administrative services

Page 13

1  including leasing and purchasing and that type of
2  thing; personnel as it relates to like processing
3  documents and budget, keeping up with expenses.  Lots
4  of different things fall under the administrative
5  purview.  The administrative officer directs those
6  operations for the state.
7    Q.  And how long did you have that office --
8  serve in that capacity?
9    A.  I was the chief administrative officer for
10  nine years.
11   Q.  So that would be from --
12   A.  1990.
13   Q.  Yeah.  1990 to 1999, you was the chief?
14   A.  Uh-huh.
15   Q.  Is that a yes?  I forgot to mention this.
16   A.  Yes.
17   Q.  She's taking this down; so all those uh-huhs
18  and unh-unhs, you have to verbalize.
19   A.  Sorry.
20   Q.  And so prior to 1990, what did you do?
21   A.  I was the assistant administrative officer
22  for probably five years or so.
23   Q.  All right.  And prior to that, what did you
24  do?
25   A.  I was the budget technician in the

OZETTA THOMAS v. MIKE JOHANNS                                    2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

5 (Pages 14 to 17)

Page 14

1    administrative division. At one time, I held the
2    position of secretary to the state executive director,
3    just different support positions.
4        Q. When did you start with the office here?
5        A. In 1978.
6        Q. And was that your first job?
7        A. No. I worked for the Department of Defense
8    for four years prior to coming to USDA.
9        Q. And at what city or what branch?
10       A. At Maxwell and Gunter Air Force bases.
11       Q. So all here in Montgomery?
12       A. Yes.
13       Q. Now, was that on the civilian side or were
14   you --
15       A. Yes.
16       Q. All right. So going back to your work here
17   with the Farm Service Agency, you served in various
18   capacities under different state executive directors?
19       A. Yes.
20       Q. And if I understand you, you've dealt with
21   personnel issues for a good bit of time?
22       A. That's right.
23       Q. Now, do you know Mr. Daniel Crawford?
24       A. I do.
25       Q. All right. And how do you know him?

Page 15

1        A. He's my supervisor.
2        Q. Did you know him prior to him becoming your
3    supervisor?
4        A. I did.
5        Q. And when you say he's your supervisor, as far
6    as that goes, he's the state executive officer?
7        A. That's right.
8        Q. How did you know him prior to being state
9    executive director?
10       A. He was a county executive director in one of
11   our county offices.
12       Q. And did you have any action with him?
13       A. Periodically.
14       Q. Now, during your tenure with personnel
15   operations and whatnot, do you recall ever receiving
16   any complaints regarding Mr. Crawford while he worked
17   as an employee with the department?
18       A. Yes.
19       Q. Would those be documented in the personnel
20   system?
21           MR. DUBOIS: Object to the form. You can
22   answer.
23       A. They would have been at the time.
24       Q. Now, when you say they would have been at the
25   time, is there some period to where matters are

Page 16

1    expunged or deleted or redacted?
2        A. Yes.
3        Q. What is that procedure?
4        A. When a complaint is made against an employee
5    and the situation is investigated or explored,
6    depending on what the situation is, a file is
7    developed. And if no action is taken against the
8    employee, then after a short period of time, the file
9    is destroyed. If action is taken, then the file may
10   be maintained for longer.
11       Q. Now, what is the short period of time?
12       A. If no action is taken, I would say three
13   years.
14       Q. What do you mean by no action is taken? What
15   do you mean?
16       A. Well, we receive complaints against employees
17   sometimes that have no merit. And once you look into
18   a situation, if there is no merit to the complaint,
19   then no action is taken against the employee.
20       Q. So as long as there is no adverse action
21   taken against the employee, that's what you're talking
22   about?
23       A. That's right.
24       Q. Now, what if there is a counseling or if
25   there is any letters, anything like that, would that

Page 17

1    be action against an employee?
2        A. A letter of counseling is not considered
3    adverse action.
4        Q. So if a letter of counseling is given, then
5    that file would be destroyed in that three-year
6    period?
7        A. Yes.
8        Q. What is considered an adverse action?
9            MR. DUBOIS: Object to the form.
10       A. An adverse action is a letter of -- official
11   letter of reprimand, a suspension, a downgrade. It
12   could be a reassignment to another position or
13   removal.
14       Q. So if it does not -- well, let me ask you
15   this. What's the lowest form of adverse action?
16       A. An official letter of reprimand.
17       Q. So if it does not approach an official letter
18   of reprimand, then it's not considered adverse; is
19   that right?
20       A. That's correct.
21       Q. So, therefore, after three years, it would --
22   the file would be destroyed?
23       A. That's right.
24       Q. However, but isn't there a computer
25   database? I forgot what it's called. But don't they

OZETTA THOMAS v. MIKE JOHANNS
DEPOSITION OF DEBORAH WILLIAMS

2/14/2008

6 (Pages 18 to 21)

---

**Page 18**

1  still maintain some type of record there that
2  something was filed and something had been deleted?
3      MR. DUBOIS: Object to the form.
4      A.  I'm not aware of any record like that,
5  automated record.
6      Q.  Right. Yeah. And the reason I ask that,
7  I've gotten a lot of records in the past dealing
8  with -- from the USDA about various matters, and
9  although the official file might be destroyed, there
10  still is an electronic record kept showing that
11  something was filed and this action was taken, like
12  whether it was an expungement or deletion or
13  whatever. Are you aware of that?
14      A.  If it was an adverse action, say a
15  suspension, then that would probably remain in an
16  automated file somewhere; but a letter of reprimand
17  would not. Even a letter of reprimand is removed from
18  the office -- I mean from the official personnel
19  folder after a period of -- I think it's two years.
20  It could be three.
21      Q.  Well, what I was asking you about, though, is
22  that even though a file or information might be
23  removed or taken out, is there some type of avenue
24  where that is recorded, showing that this matter was
25  taken out or this matter was removed or this matter

---

**Page 19**

1  was deleted or this matter was expunged?
2      MR. DUBOIS: Object to the form.
3      A.  Not that I'm aware of.
4      Q.  Who would be in charge of keeping those kinds
5  of records, or who would be the custodian of like
6  those files and any automated information on a
7  person's personnel record?
8      A.  The automated information?
9      Q.  Any automated and the hard copy.
10      A.  Okay. The administrative division is
11  responsible for maintaining the official personnel
12  files. And they are the only ones who have access to
13  the automated personnel files.
14      Q.  All right. So the administrative division
15  then would handle all of that?
16      A.  They would maintain the files.
17      Q.  Whether they were hard copies or automated?
18      A.  That's right.
19      Q.  Now, what complaints do you recall were filed
20  against Mr. Crawford?
21      A.  There was a complaint that he was hunting on
22  a producer's land. And there was a complaint at one
23  time that he was purchasing unapproved items with
24  county office funds, like --
25      Q.  Were both of these like when he was a county

---

**Page 20**

1  executive director?
2      A.  Yes.
3      Q.  You were just giving me an example, and I
4  kind of cut you off. What was that example you were
5  going to give me?
6      A.  The things that he was accused of purchasing
7  were paper plates and toothpicks.
8      Q.  What about any EEO complaints?
9      A.  There have been some EEO complaints.
10      Q.  Who would keep those or keep a record of
11  those?
12      A.  I maintain those records.
13      Q.  You have a record now in your possession? I
14  don't mean physically with you, but I mean --
15      A.  Yes, in my office.
16      Q.  So when I ask -- I can send a written
17  request, and you can compile those and provide those;
18  is that right?
19      A.  I can --
20      MR. DUBOIS: Object to the form.
21      A.  I can provide what I have. The national
22  office maintains the official EEO complaint records.
23      Q.  And as it relates to Mr. Crawford, what EEO
24  complaints do you recall now that were filed against
25  him and what action, if any, was taken?

---

**Page 21**

1      A.  Okay. You want specific names of employees?
2      Q.  Yes, ma'am.
3      A.  Gaylynn Mann has filed several complaints
4  against the agency.
5      Q.  Who is Gaylynn Mann?
6      A.  She's a program technician -- former program
7  technician in North Alabama.
8      Q.  Do you know what county?
9      A.  She's been in several counties. Madison,
10  Etowah. Marshall may have been another one. I'm not
11  sure.
12      Q.  What time period have these complaints been
13  filed?
14      A.  Oh, I don't recall. Over a period of years,
15  she's filed several complaints.
16      Q.  Do you know how to spell Gaylynn's name?
17      A.  G-A-Y-L-Y-N-N, one word.
18      Q.  So G-A-Y-L-Y-N-N.
19      A.  Uh-huh.
20      Q.  And Mann, M-A-N-N?
21      A.  Yes, sir.
22      Q.  All right. What would the complaints be
23  about?
24      A.  Her complaints were for nonselection and then
25  reprisal. I think she had a noncompliance on a

OZETTA THOMAS v. MIKE JOHANNS                                2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

7 (Pages 22 to 25)

Page 22

1    settlement agreement. I think that covers hers.
2        Q.  Now, this noncompliance on settlement
3    agreement, was this while Mr. Crawford was state
4    executive director or as a county executive director?
5        A.  State executive director.
6        Q.  Do you recall the results of some of these
7    complaints?
8        A.  There was a finding of no discrimination in
9    all of her complaints, and the agency was found to be
10   in compliance with the settlement agreement.
11       Q.  Now, when it was determined that the agency
12   was in compliance with the settlement agreement, who
13   made that determination?
14       A.  The Department of Agriculture.
15       Q.  Now, other than Ms. Mann, any other
16   complaints?
17       A.  Sharrie Peterson filed a complaint against
18   him for nonselection.
19       Q.  What was the result of that?
20       A.  She withdrew her complaint.
21       Q.  Who else?
22       A.  Let me see.
23       Q.  And, of course, that Sharrie, that's
24   S-H-A-R-R-I-E, I think, right?
25       A.  That's right.

Page 23

1        Q.  And then Peterson.  Anyone else you can think
2    of?  I mean, I know we got complaints regarding
3    Ms. Thomas, but -- take your time.  Take your time.
4        A.  There have been other complaints filed
5    against the agency, but I don't know that they
6    specifically were against Mr. Crawford.  I don't
7    recall anything else specifically against him off the
8    top of my head.
9        Q.  But you said there have been other complaints
10   filed against the agency since -- and I assume since
11   he's been state executive director?
12       A.  Yes.
13       Q.  But they may not specifically involve him?
14       A.  Yes.
15       Q.  Do you recall Mr. Daniel Robinson?
16       A.  Yes, I do.
17       Q.  And I think there was a time when he was
18   state executive director; is that right?
19       A.  Yes.
20       Q.  Do you recall any complaints filed against
21   Mr. Robinson?
22           MR. DUBOIS:  Object to the form.
23       A.  That -- I don't recall any.
24       Q.  What about while Mr. Robinson was state
25   executive director, do you recall any EEO complaints

Page 24

1    filed against the agency?
2        A.  Yes.
3        Q.  All right.  So, as you recall -- and this is
4    what you remember -- there were EEO complaints filed
5    against the agency while Mr. Robinson was state
6    executive director but none, you think, that
7    specifically involved him and his conduct?
8        A.  Not that I can just recall.
9        Q.  Right.  I got you.  Now, are you familiar
10   with a Ms. Pam Polke?
11       A.  Yes.
12       Q.  Or Pamela Polke?
13       A.  Yes.
14       Q.  Do you know whether or not she ever filed a
15   complaint regarding Mr. Robinson -- I'm sorry --
16   Mr. Crawford?
17       A.  Yes, she did.  Yes, she did.
18       Q.  What was the result of that?
19       A.  Her complaints are still pending as far as I
20   know.
21       Q.  Do you know what her complaints involve?
22       A.  Nonselection or -- I don't know if it was
23   nonselection, but she filed discrimination based on
24   race, and I think she might have a reprisal complaint
25   as well.

Page 25

1        Q.  Now, during my investigations of this matter,
2    I ran across the term "hotline complaint."  Are you
3    familiar with that?
4        A.  Yes, I am.
5        Q.  What is that?
6        A.  That's if somebody becomes aware of something
7    or thinks they are aware of something that's gone on
8    that's not proper, they can dial a 1-800 number and
9    file what we call a hotline complaint and report the
10   incident or the situation anonymously.
11       Q.  Now, since Mr. Crawford has been state
12   executive director, have there been any such
13   complaints?
14       A.  Not that I'm aware of or not that I can
15   recall.
16       Q.  What about when Mr. Robinson was state
17   executive director, was there any such complaint?
18       A.  Against Mr. Robinson?
19       Q.  Well, yes, let's start with that.  Against
20   Mr. Robinson.
21       A.  Not that I -- I don't remember.
22       Q.  What about just against the -- or involving
23   someone within the agency?
24       A.  We periodically get hotline complaints; and
25   most of those complaints are about program matters,

OZETTA THOMAS v. MIKE JOHANNS                    2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

8 (Pages 26 to 29)

**Page 26**

1   you know, producers who are disgruntled with the
2   agency or have been disapproved for a loan or
3   something like that.
4       Q. I got you. Now, as it relates to those
5   hotline complaints, while Mr. Crawford has been state
6   executive director, have there been any such filed
7   within the agency?
8       A. There probably have, but I can't say for
9   sure.
10      Q. I got you. But when you responded earlier,
11  you were thinking about against Mr. Crawford directly?
12      A. Yes.
13      Q. That you don't recall any?
14      A. I don't recall any.
15      Q. And I'll try to do a better job being clear
16  with my questions.
17      A. I may not be aware of them either.
18      Q. Are you aware of any investigations of any
19  activities of Mr. Crawford while he was a county
20  director or state executive director that
21  were conducted by the Office of Inspector General?
22      A. No.
23      Q. And I think they use the acronym OIG. Have
24  you ever been involved in any discussions or any
25  meetings with a state executive director whereby

**Page 27**

1   Mr. Crawford, prior to him becoming state executive
2   director, was the subject of any disciplinary
3   investigations or anything?
4       A. Repeat your question.
5       Q. Were you -- or have you ever been involved in
6   any discussions or investigations or meetings with a
7   state executive director prior to Mr. Crawford
8   becoming state executive director, whereby
9   Mr. Crawford was the subject of any disciplinary
10  actions or investigations?
11          MR. DUBOIS: Object to the form.
12      A. Nothing is coming to my mind.
13      Q. However, if there were such investigations
14  and on any type of disciplinary action, they should be
15  reflected in his personnel file if not past that
16  three-year period?
17      A. Yes.
18      Q. Now, during your tenure with the Farm Service
19  Agency, have you come across or known of a female
20  employee by the name of Carolyn Brown?
21      A. Yes.
22      Q. Who is Ms. Brown?
23      A. Carolyn Brown was a county operations
24  reviewer.
25      Q. And for a particular county or for the state

**Page 28**

1   office?
2       A. She worked out of the state office. I
3   supervised her in her last position. And she traveled
4   to different counties and conducted reviews of county
5   office -- county office operations. Prior to that,
6   she was a program technician in the county office.
7       Q. Do you recall whether or not she ever made
8   any complaints regarding Mr. Crawford?
9       A. Yes, she did.
10      Q. What did they involve?
11      A. That was many years ago, and I wasn't in a
12  position to know the details.
13      Q. Do you know whether or not there was any
14  findings or any dispositions of that?
15      A. I don't think so. If I recall correctly, she
16  was transferred to another office.
17      Q. Now, was this while Mr. Crawford was county
18  executive director or state executive director?
19      A. County executive director.
20      Q. Limestone County?
21      A. Yes.
22      Q. Is Ms. Brown still working with the agency?
23      A. No.
24      Q. Do you know where she lives?
25      A. Somewhere in North Alabama.

**Page 29**

1       Q. Do you know where about in North Alabama?
2       A. Maybe Decatur or somewhere around Decatur.
3       Q. Do you know whether or not Ms. Brown had made
4   any complaints against anyone else in the agency, like
5   a district director or anything like that?
6       A. Yes.
7       Q. Okay. Tell me what you know.
8       A. She filed a sexual harassment complaint
9   against a district director.
10      Q. Who is that?
11      A. Richard Burge.
12      Q. Do you recall what that involved?
13      A. Yes.
14      Q. What did it involve?
15      A. She was in attendance at a meeting and he
16  showed an inappropriate video during that meeting.
17      Q. Was there an investigation regarding that?
18      A. There was no investigation. The executive
19  director looked into it, and disciplinary action was
20  taken.
21      Q. Against who?
22      A. The district director.
23      Q. Mr. Burge?
24      A. Yes.
25      Q. Do you know what that disciplinary action

Page 30

```
 1   was?
 2       A.  He was suspended.
 3       Q.  You don't know how long?
 4       A.  I think it was five days.
 5       Q.  Anyone else you know of that she made a
 6   complaint against?
 7       A.  She filed a complaint against me.
 8       Q.  What did that involve?
 9       A.  She filed one complaint against me for
10   harassment. I had to counsel with her on her travel
11   claims, and she said that I was harassing her because
12   she had filed a complaint against Mr. Burge. She
13   filed another complaint against me because she applied
14   for a position and -- I think I'm getting this right.
15   Let me think for a minute. I think it was a
16   nonselection complaint. I think that may be all.
17       Q.  So those two complaints regarding you?
18       A.  Uh-huh.
19       Q.  Is that a yes?
20       A.  Yes. I'm sorry.
21       Q.  So the first one you talked about was what?
22       A.  It was a harassment complaint. We went all
23   the way to an EEOC hearing on that one.
24       Q.  What was the allegation?
25       A.  That I counseled her about her misuse of
```

Page 31

```
 1   government travel because she had filed a complaint
 2   against Richard Burge.
 3       Q.  Okay. She was trying to say that you were
 4   harassing or retaliating against her because of that?
 5       A.  Retaliating. Exactly.
 6       Q.  What was the disposition on that?
 7       A.  There was no finding of discrimination or
 8   harassment.
 9       Q.  And the second one you said was a
10   nonselection?
11       A.  Right. And there was a finding of no
12   discrimination on that one as well.
13       Q.  What did that involve, nonselection of what?
14       A.  I think that was a -- I can't remember what
15   position she was applying for. It had to have been a
16   COR position. She was eventually selected, though.
17   And I may be getting that one confused with another
18   employee. Actually, I think that was Gaylynn Mann
19   instead of Carolyn Brown, the nonselection.
20       Q.  Okay. So Carolyn may have just had only one,
21   harassment?
22       A.  Yeah, it may have been.
23       Q.  And the next question I was going to ask you,
24   have there been any other complaints filed against you
25   or regarding you by any other employees?
```

Page 32

```
 1       A.  Not that I'm aware of.
 2       Q.  Other than Gaylynn Mann?
 3       A.  Right.
 4       Q.  And was that the only complaint Gaylynn filed
 5   that supposedly involved you or anything done by you,
 6   the nonselection?
 7       A.  Yes. Yes.
 8       Q.  Do you recall what that nonselection was?
 9       A.  She applied for the county operations
10   reviewer position and was not selected.
11       Q.  And what was the result of that?
12       A.  No discrimination.
13       Q.  And as relates to Mr. Richard Burge, we
14   talked about this complaint by Ms. Carolyn Brown. Do
15   you know of any other complaints filed against
16   Mr. Burge?
17       A.  Yes.
18       Q.  What were they and what do they involve?
19       A.  It was another sexual harassment complaint
20   against him filed by an employee by the name of Myra
21   Ellison.
22       Q.  How do you spell that Myra?
23       A.  M-Y-R-A.
24       Q.  All right. Do you recall when that was?
25       A.  No, I don't.
```

Page 33

```
 1       Q.  Do you recall what the disposition was?
 2       A.  He was suspended.
 3       Q.  Do you know how long?
 4       A.  No, I don't.
 5       Q.  Any other complaints regarding Mr. Burge that
 6   you recall?
 7       A.  Not that I'm aware of.
 8       Q.  Are you aware of any complaints filed against
 9   Mr. Burge that might have been untimely or not dealt
10   with?
11           MR. DUBOIS: Object to the form.
12       A.  Untimely or not dealt with?
13       Q.  Right. Like, for instance, someone there
14   filing a complaint but the complaint was filed too
15   late, like maybe beyond a particular limitations
16   period. For instance, there might be a 45-day limit
17   to file a complaint. Regardless of it, somebody may
18   have made --
19       A.  Ms. Brown's -- Ms. Brown's complaint against
20   him was untimely, but it was accepted anyway. I'm not
21   aware of any others.
22       Q.  Who was state executive director when that
23   complaint was filed and dealt with?
24       A.  Albert McDonald.
25       Q.  Ms. Brown?
```

OZETTA THOMAS v. MIKE JOHANNS
DEPOSITION OF DEBORAH WILLIAMS

2/14/2008

10 (Pages 34 to 37)

Page 34

1    A.  Yes.
2    Q.  I'm still asking about Mr. Burge so I can
3  finish with that. I think when he was district
4  director, there have been occasions, as I understand,
5  where he has had two counties removed from his
6  review. I think Greene County at one point and/or
7  Chilton County at another point. Do you recall that
8  or are you aware of that; and if so, explain what you
9  recall under those circumstances.
10    A.  The Chilton County one was because of the
11  complaint from Ms. Ellison. And Daniel Robinson was
12  SED at the time; and he felt that because of the
13  nature of the complaint, it would be best to remove
14  that county from Mr. Burge's supervision.
15    Q.  What was the nature of the complaint again?
16    A.  It was a sexual harassment complaint. The
17  Greene County situation occurred several years ago.
18  And I don't know that I really know the details of
19  that. I wasn't in a position at that time to know the
20  details of that, but I think it involved a conflict
21  between Mr. Burge and the CED in that county.
22    Q.  Now, how does a person become a district
23  director?
24    A.  They apply for the position and are selected
25  by the state executive director.

Page 35

1    Q.  Now, once they get that position, is that a
2  merit position or is that an appointed position?
3    A.  Well, they're career.
4    Q.  So they have all the job protections and all
5  that kind of stuff?
6    A.  Yes.
7    Q.  Are you aware of any other district director
8  that has had the kind of complaints involving a sexual
9  nature or things of that nature or conflicts with
10  other county officers -- office -- county executive
11  directors like Mr. Burge has had but is still working
12  in that position?
13      MR. DUBOIS:  Object to the form.
14    A.  We have conflicts between county executive
15  directors and district directors quite often. There
16  has been other district director that has had counties
17  removed from their supervision, and they remained with
18  the agency until they retired.
19    Q.  What about anyone having any sexual
20  harassment complaints or complaints of a sexual nature
21  like Mr. Burge? Anyone else you can recall?
22    A.  We did have another district director to have
23  sexual harassment complaints filed against him, yes.
24    Q.  And who was that?
25    A.  Eli Pope.

Page 36

1    Q.  And what was that about?
2    A.  It was alleged that he inappropriately
3  touched a female employee.
4    Q.  And what happened with that?
5    A.  He was suspended.
6    Q.  Is he still working?
7    A.  No. He's retired.
8    Q.  How long after the incident with Mr. Pope did
9  he retire?
10    A.  I don't recall.
11    Q.  But basically, the career position of the
12  district director has all the various merit
13  protections and whatnot?
14    A.  Yes.
15    Q.  So it just ain't so easy to do something with
16  the person once they get the job.
17      MR. DUBOIS:  Object to the form.
18    Q.  Is that about right?
19    A.  They're just like any other federal employee.
20    Q.  So now -- and lastly, dealing Mr. Burge, so I
21  understand that Ms. Carolyn Brown filed a complaint of
22  harassment and/or retaliation or retaliation, whatever
23  it was, alleging that you were getting back at her for
24  filing a complaint against Mr. Burge?
25    A.  That was the allegation.

Page 37

1    Q.  Right. Have there been any other complaints
2  by her or anyone else alleging that you or anyone was
3  trying to cover up something regarding Mr. Burge?
4    A.  No.
5    Q.  Now, specifically, do you know Ms. Ozetta
6  Thomas?
7    A.  Yes, I do.
8    Q.  And how do you know Ms. Thomas?
9    A.  We worked together for a long time before she
10  retired.
11    Q.  And what working together did you-all do?
12    A.  We just worked in the same office.
13    Q.  Now, during your working with Ms. Thomas, did
14  you ever receive any complaints from any employees
15  about Ms. Thomas's work?
16    A.  Yes, I did.
17    Q.  What about any complaints about Ms. Thomas
18  other than work, like something she may have done
19  other than pertaining to her job -- her work or job
20  performance?
21      MR. DUBOIS:  Object to the form.
22    A.  I don't know what you're asking.
23    Q.  Okay. Well, like for instance, like some of
24  those complaints filed regarding Mr. Burge considering
25  the harassment or sexual nature. I'm assuming that

OZETTA THOMAS v. MIKE JOHANNS                    2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

Page 38

1   was outside his work or job assignment. But, of
2   course, you may have had complaints involving his
3   work, which might have been conflicts with some of the
4   county office workers or the county executive
5   director. So I'm asking -- you received some
6   complaints regarding Ms. Thomas about her work or job
7   performance, and I'm trying to find out did you
8   receive any other kind of complaints about Ms. Thomas
9   while she was working with the agency?
10      MR. DUBOIS: Object to the form.
11      A.   There was one complaint about her time and
12   attendance that I can recall.
13      Q.   Okay. So Ms. Thomas -- you received work --
14   I'm sorry -- you received complaints about her time
15   and attendance, and what else outside job --
16      A.   There were no other conduct-related
17   complaints against Ms. Thomas that I can recall.
18      Q.   And then other things were work-related or
19   job performance?
20      A.   Right.
21      Q.   All right. So what were the complaints about
22   her time and attendance?
23      A.   Her time and attendance report reflected that
24   she was in the office, when, in fact, she wasn't.
25      Q.   And who made that complaint?

Page 39

1      A.   I believe it was Pamela Polke.
2      Q.   Was that complaint investigated or looked
3   into?
4      A.   Yes, it was.
5      Q.   What was the result of it?
6      A.   There was a counseling session with
7   Ms. Thomas conducted by Mr. Crawford, who was her
8   supervisor; and she agreed that she was out of the
9   office at those times, but stated that that was an
10   unintentional error on her part when she completed her
11   time and attendance. He gave her the opportunity to
12   correct her T&A and cautioned her about that in the
13   future, and no action was taken against her.
14      Q.   Now, as far as job performance or what I
15   term job-related, what complaints have you received
16   about Ms. Thomas that you talked about?
17      A.   Some of the district directors in management
18   meetings have complained to me that they couldn't get
19   assistance from Ms. Thomas. And I reported those
20   complaints to the state executive director.
21      Q.   So, now, what district directors complained?
22      A.   Phil Thrower was one, and Jack Crawley was
23   the other one that I specifically remember.
24      Q.   Do you recall when these complaints were
25   made?

Page 40

1      A.   I don't. It was during Mr. Crawford's tenure
2   as SED, but I don't remember specifically the timing.
3      Q.   You referred them on to Mr. Crawford?
4      A.   I did.
5      Q.   Did you have to do an investigation or
6   anything, or did Mr. Crawford handle it?
7      A.   Mr. Crawford handled it.
8      Q.   Do you know what the disposition was?
9      A.   She was placed on an opportunity to improve.
10   And I think that was back up to some of the issues in
11   the OTI.
12      Q.   Now, other than the complaints from the
13   district director, anything else?
14      MR. DUBOIS: Object to the form.
15      A.   There have been times when I've talked to
16   county office employees and they would indicate that
17   they did not want to ask questions from Ms. Thomas,
18   they would rather talk to somebody else; but I can't
19   recall specifically who those people were.
20      Q.   Do you recall why they said this, or did you
21   go and inquire further as to why?
22      A.   I didn't. They would just make comments that
23   if Ozetta was the only person available, they would
24   rather call back later.
25      Q.   Did you do anything about that or --

Page 41

1      A.   No.
2      Q.   -- refer that on? Ma'am?
3      A.   No, I did not.
4      Q.   Did you keep any written record of that or
5   anything?
6      A.   No, I did not.
7      Q.   Any other complaints?
8      A.   Not that I can recall.
9      Q.   Were you asked to do any investigation or get
10   any statements from any employees regarding
11   Ms. Thomas?
12      A.   At one time, I was. I had forgotten about
13   that. I was asked to take some statements from
14   Ms. Thomas's employees because they complained that
15   they felt she was threatening them during their
16   performance evaluation reviews.
17      Q.   So do you recall when this was?
18      A.   This was probably sometime in October,
19   November of the 2001 -- I'm thinking October, November
20   of 2001.
21      Q.   And how were you approached about these
22   complaints?
23      A.   Pamela Polke wrote a complaint about her
24   counseling session with Ms. Thomas. And the basic
25   allegation was that when Ms. Thomas was conducting the

OZETTA THOMAS v. MIKE JOHANNS                    2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

12 (Pages 42 to 45)

Page 42

1    performance review with her employees, when she got to
2    the EEO Civil Rights element, she indicated to them
3    that because they had been talking to her supervisor
4    about problems they had with her performances as
5    supervisor, that she might give them an unacceptable
6    rating in that element. And when Pamela put her
7    concerns in writing, Mr. Crawford asked me to speak to
8    all of Ms. Thomas's employees. I did.
9        Q. When you say all Ms. Thomas's employees,
10   you're talking about the people working --
11       A. All the people --
12       Q. -- under her?
13       A. -- that worked under her at the time.
14       Q. All right.
15       A. I spoke to each one of them. I got a
16   statement from them. The statements that they gave me
17   did not indicate that there was any kind of threat.
18   And no action was taken.
19       Q. Were those statements kept or --
20       A. Yes.
21       Q. And are those statements still available
22   or --
23       A. Yes.
24       Q. -- were they destroyed?
25       A. No. I have them.

Page 43

1        Q. Now, this was more than three years ago?
2        A. Yes.
3        Q. Why wouldn't they have been destroyed or
4    removed?
5        A. Anytime I do something as a misconduct
6    investigator in that official capacity, I have all
7    those records in my office.
8        Q. Okay. So as far as the misconduct
9    investigations, you would keep those?
10       A. Right. I keep those as reference material in
11   my office.
12       Q. What would be termed misconduct?
13       A. Misconduct is any conduct that doesn't comply
14   with the federal employee responsibilities and conduct
15   guidelines.
16       Q. And those complaints regarding Mr. Burge, as
17   far as the inappropriate sexual acts and whatever,
18   that would be termed misconduct, wouldn't it?
19       A. It would be.
20       Q. So y'all should still have those records?
21       A. I did not conduct an investigation. See, my
22   duties as employee misconduct investigator are
23   separate and apart from my duties in the Alabama State
24   FSA office.
25       Q. I got you. But similarly, someone should

Page 44

1    have conducted such an investigation in the capacity
2    that you have now?
3        A. They may or may not have. There -- you know,
4    sometimes management handles a misconduct issue
5    without a formal investigation, many times.
6        Q. What times can you think of that that has
7    happened?
8        A. Well, in the case of Mr. Burge, there was no
9    question that he did what he did. He admitted it.
10   There was no need for an official investigation.
11       Q. But wouldn't there be some kind of record of
12   his admission or some statement or some memo somebody
13   did, whether it's Mr. Burge or the state executive
14   director, someone, regarding that?
15       A. There may have been some records of that, but
16   I don't know how long those would have been
17   maintained. Now, the record of his suspension I'm
18   sure is still in his personnel file.
19       Q. Now, is it the agency's procedure that you
20   have to keep those records of a misconduct
21   investigation and/or a misconduct disposition?
22           MR. DUBOIS: Object to the form.
23       A. You're talking about my personal records on
24   investigations that I've conducted?
25       Q. Yes.

Page 45

1        A. No. I keep those because I want to.
2        Q. Well, now, doesn't the agency have policies
3    and procedures on what records ought to be maintained
4    and how records ought to be kept and destroyed?
5        A. The official copies of those records -- when
6    I do an investigation report and I send a report to
7    the person that requested the investigation, that's
8    the official copy. And they're responsible for
9    maintaining it and destroying it according to
10   disposition records. My copies that I have are my
11   working copies that I keep of the work that I have
12   done. They're not the official agency copies.
13       Q. Isn't there a policy on even working copies
14   and things of that nature?
15       A. Not that I'm aware of.
16       Q. Has the agency given you any training
17   regarding Freedom of Information Act requests?
18       A. Yes.
19       Q. And are you aware that if you had working
20   copies of anything, it's subject to a Freedom of
21   Information Act request?
22       A. Yes.
23       Q. And does not the agency have a policy that
24   deals with even working copies or notes or logs and
25   diaries on how they're supposed to be kept and

OZETTA THOMAS v. MIKE JOHANNS                                    2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

13 (Pages 46 to 49)

Page 46

1  maintained?
2       MR. DUBOIS: Object to the form.
3    A.  I'm not -- I'm not aware of anything that
4  says that I cannot maintain working copies of my work.
5    Q.  Where do you keep those working copies?
6    A.  In a locked cabinet in my office.
7    Q.  Now, have you had any discussions with
8  Mr. Danny Crawford about Ms. Ozetta Thomas and her
9  position and/or job performance while she was working
10  with the agency?
11    A.  I did.
12    Q.  And what were those conversations about?
13    A.  His concerns with her performance, his desire
14  to place her under an opportunity to improve.
15    Q.  And during those conversations, at any time,
16  did Mr. Crawford express a desire to get rid of
17  Ms. Thomas or move her to another position?
18    A.  No.
19    Q.  Were you in a meeting in the early portion,
20  maybe January, February, of 2001, if you recall, where
21  Mr. Crawford and other district directors were
22  discussing Ms. Thomas and what they needed to do about
23  her?
24    A.  I don't recall such a meeting.
25    Q.  Have you ever been to any trainings where

Page 47

1  maybe after the training sessions or whatnot, while
2  everyone might have been socializing, where there may
3  have been conversations about Ms. Thomas, where
4  Mr. Crawford was present and/or leading or
5  participating in the discussion, talking about trying
6  to move or replace Ms. Thomas?
7    A.  No.
8    Q.  Have you ever been to any out-of-state
9  meetings, and possibly one in Florida, where
10  Ms. Thomas was discussed by Mr. Crawford and other
11  district directors?
12    A.  No.
13    Q.  Do you recall at any other time where there
14  was discussion, where Mr. Crawford was present, about
15  trying to get Ms. Thomas out of her position as chief?
16    A.  No.
17    Q.  Now, as I understand the way the Department
18  was set up and the hierarchy, you have your state
19  executive director, then the executive staff; then, of
20  course, you have the different divisions or different
21  programs; and you have chiefs of those different
22  divisions. Is that right?
23    A.  That's right.
24    Q.  Now, when the state executive director needs
25  something from a particular division, does that person

Page 48

1  normally contact a chief in that division to see about
2  facilitating or getting something done?
3       MR. DUBOIS: Object to the form.
4    A.  Not necessarily.
5    Q.  Why not necessarily?
6    A.  Because different people specialize in
7  different areas. And he may go directly to whoever
8  specializes in a particular program or whatever it is
9  that he's looking for guidance on.
10    Q.  Now, as it relates to the administrative
11  division, are you aware whether or not, while
12  Mr. Crawford has been state executive director, that
13  he's gone to other people directly in that division
14  rather than -- before stopping first at the chief of
15  that division?
16       MR. DUBOIS: Object to the form.
17    A.  Sure.
18    Q.  Ma'am?
19    A.  Yes.
20    Q.  Do you know of any instances specifically?
21    A.  He would go directly to Jacqueline Watson if
22  he needs something on a budget issue. He may go
23  directly to Debra Jenkins or Valerie Moses if he has a
24  question on a time and attendance issue. It just
25  depends on what his needs are.

Page 49

1    Q.  Let me see. I was trying to find my list of
2  different departments. What are some of the other
3  divisions there?
4    A.  The Conservation Price Support, Farm Loan
5  Program, Production Adjustment Compliance, and
6  Administrative are our divisions.
7    Q.  Give me some examples on those other
8  divisions where he may go directly to somebody else
9  other than checking with the chief of that division.
10    A.  Conservation Price Support, he may go
11  directly to Susan Tranum on a conservation issue,
12  because that's her speciality. And Production
13  Adjustment Compliance, he may go to Judy Norris on a
14  compliance issue; or he may go to Walda Malone on a
15  NAP issue.
16    Q.  Now, as it relates to trainings in
17  different -- or that may be conducted by different
18  divisions, different departments, is it the chief of
19  that department who would put that together and
20  coordinate that?
21    A.  Yes.
22    Q.  Now, are you aware of instances in which
23  while Ms. Thomas was chief of her division, that there
24  were trainings put together that were not coordinated
25  through Ms. Thomas?

OZETTA THOMAS v. MIKE JOHANNS                                    2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

14 (Pages 50 to 53)

Page 50

1    A.  No.
2    Q.  So you're not aware of that?
3    A.  I'm not aware of that.
4    Q.  Do you know whether or not that happened?
5    A.  I'm not aware of that.
6    Q.  All right.  Just a few questions here about
7  Ms. Thomas.  Were you aware that Ms. Thomas had
8  initially filed a complaint regarding Mr. Crawford and
9  there was a mediation that resolved that situation?
10   A.  Yes.
11   Q.  And were you aware that after that mediation,
12 Ms. Thomas made another complaint saying that
13 Mr. Crawford had not complied with the mediation?
14   A.  Yes.
15   Q.  And, now, during all that time period, did
16 you ever have any conversations or were you ever privy
17 to any conversations where Mr. Crawford indicated that
18 he wanted to make some type of reprisal against
19 Ms. Thomas for making those complaints?
20   A.  No.
21   Q.  Now, Ms. Thomas has alleged in this case that
22 Mr. Crawford created a hostile working environment for
23 her and based on that, she was forced to retire.  Are
24 you aware of that?
25   A.  I'm aware of the allegation.

Page 51

1    Q.  Do you know of anything that happened that
2  supported those allegations?
3    A.  No, I'm not.
4    Q.  Now, Ms. Thomas has charged in this complaint
5  that while she was on her detail as a result of the
6  mediation settlement, that her computer was removed
7  from her office and also her password was deleted and
8  she was also taken off the register as chief of that
9  division.  Are you aware of whether or not those
10 things actually happened?
11   A.  While she was on her detail?
12   Q.  Yes.
13   A.  No.
14   Q.  What about when she came back from detail?
15   A.  No.
16   Q.  So you're not aware that her computer had
17 been removed and her password was deleted?
18   A.  Not while she was on her detail.
19   Q.  Well, when did that happen?
20   A.  On the day of the mediation session, it was
21 agreed that Ms. Thomas would be given administrative
22 leave from that day until the day of her detail.  And
23 that afternoon, her computer was removed out of her
24 office and assigned to another employee because we did
25 not anticipate her returning to the office.

Page 52

1    Q.  Now, who made that decision?
2    A.  I did.
3    Q.  And why did you make that decision?
4    A.  Because we had a need for another computer --
5  for a computer for another employee.  At that time, we
6  didn't have enough computers to replace one if
7  something happened to one.  And the PC of the employee
8  who did time and attendance records had crashed, and
9  we were desperately seeking a resolution to that
10 situation because our employees' time and attendance
11 records needed to be processed.
12        And so when I learned that Ms. Thomas was not
13 going to be in the office any longer, I suggested that
14 we take her laptop, give it to the SED secretary, and
15 give that PC to the time and attendance employee.  And
16 I suggested that to Mr. Crawford.  He thought it was a
17 good idea.  And that's what we did.
18   Q.  Now, who gave you the understanding that
19 Ms. Thomas was not going to be there anymore?
20   A.  The mediator and the resolving official.
21   Q.  Said Ms. Thomas is not going to be there
22 anymore?
23   A.  She was being placed on administrative
24 leave.  We had no expectation that she would be in the
25 office if she was on administrative leave.

Page 53

1    Q.  But you were not informed that the leave was
2  for a definite period and she would be returning?
3    A.  She wasn't to return to our office.  The
4  leave was from that day to the effective date of her
5  detail.  When the detail was effective, then she would
6  be working in another office.
7    Q.  And after that detail was over, you did not
8  understand she would be returning?
9    A.  Yes.  But that was a year from that date.
10 The detail was for a year.
11   Q.  Right.  But that did indicate to you she
12 would be returning at some point; is that right?
13   A.  Yes.
14   Q.  But was it your understanding she wasn't
15 going to be coming back at all?
16   A.  Not until the detail was over.
17   Q.  Well, now, when she came back after the
18 detail was over, why didn't she have a computer to
19 work with?
20   A.  I'm not aware that she didn't have a computer
21 at that time.
22   Q.  So what you're saying, then, is that the day
23 of the mediation, you were under the impression that
24 she was not coming back to the office at all?
25   A.  Until after the detail.

OZETTA THOMAS v. MIKE JOHANNS                2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

Page 54

1    Q.  But were you aware that she actually did come
2  back to the office?
3    A.  Yes, I am.
4    Q.  But you had already taken that action already
5  to have her computer removed?
6    A.  That's right.
7    Q.  And, of course, you said you talked it over
8  with Mr. Crawford.
9    A.  Right.
10   Q.  And all this happened the same day of
11  mediation?
12   A.  That's right.
13   Q.  And you're saying that one of the other
14  employees' computer had crashed?
15   A.  That's right.
16   Q.  Now, when that computer crashed, was there
17  some kind of work order done to have a technician to
18  come in and try to repair it or do anything?
19   A.  I don't know what action was taken by the IT
20  staff.
21   Q.  Now, whose computer crashed?
22   A.  Valerie Moses.
23   Q.  All right.  And does Ms. Moses still work
24  there?
25   A.  Yes, she does.

Page 55

1    Q.  What does she do?
2    A.  She's an HR assistant, human resources
3  assistant.
4    Q.  What was she doing back at that time?
5    A.  The same thing.
6    Q.  And so it's your testimony that when her
7  computer crashed, you-all were desperately looking for
8  a resolution because you didn't have any other
9  computer, any other backups or anything like that?
10   A.  That's right.
11   Q.  And so since it was your understanding from
12  the mediator and Mr. Crawford that Ms. Thomas was not
13  coming back, you felt there was a vacant computer and
14  PC available?
15       MR. DUBOIS:  Object to the form.
16   Q.  Not a laptop.  Another PC available?
17       MR. DUBOIS:  Object to the form.
18   A.  No.
19   Q.  Tell me.
20   A.  There was a vacant laptop in Ms. Thomas's
21  office that could be given to another employee, and
22  their PC could be given to the PC that needed it for
23  the T&As.
24   Q.  Well, why was there a need to deactivate
25  Ms. Thomas's password?

Page 56

1    A.  I have no knowledge of that.
2    Q.  So you only asked that her computer, the
3  laptop, be taken and given to Ms. Moses so she could
4  use it to do her work?
5    A.  No.
6    Q.  Okay.
7    A.  The laptop was not given to Ms. Moses.
8  Ms. Moses needed a PC.  The laptop was given to Irene
9  Bennett, and Irene's PC was given to Ms. Moses.
10   Q.  And Irene Bennett worked where?
11   A.  She's the executive secretary.
12   Q.  Why was Ms. Bennett's PC given to Ms. -- I
13  mean laptop -- wait a minute.  I'm getting --
14   A.  She didn't have a laptop.  She had a PC.
15   Q.  I see now.  So you took Ms. Bennett's PC and
16  gave to Ms. Moses?
17   A.  That's right.
18   Q.  And let Ms. Bennett use Ms. Thomas's PC -- I
19  mean Ms. Thomas's laptop?
20   A.  Laptop.
21   Q.  All right.  Now, Ms. Thomas had a PC in her
22  office, didn't she?
23   A.  She had a laptop.
24   Q.  Oh, she didn't have a PC --
25   A.  No.

Page 57

1    Q.  -- just a laptop; is that right?
2    A.  That's right.  She had a docking station that
3  went with her laptop, but she didn't have a PC and a
4  laptop.
5    Q.  Okay.  I got you.  So why not just give
6  Ms. Moses Ms. Thomas's laptop with the docking station
7  and all of that?  Why not just do that?
8    A.  Because Ms. Bennett does a lot of work at
9  home; and a laptop would have been more beneficial to
10  her than it would have been to Ms. Moses, who didn't
11  have a need for a laptop.
12   Q.  Well, Ms. Bennett didn't have a laptop?
13   A.  No, she didn't.  She had requested one, but
14  she didn't have one at that time.
15   Q.  Was that request in writing?
16   A.  No.
17   Q.  Also, Ms. Thomas has charged that
18  Mr. Crawford denied her going on various training
19  trips or instead of her going, letting some of her
20  other staff go instead of her, or not let her make
21  that decision to go.  Are you aware of that?
22   A.  No, I'm not aware of that.
23   Q.  You're not aware of any instances like that?
24   A.  No, I'm not.
25   Q.  Ms. Thomas has also charged that Mr. Crawford

OZETTA THOMAS v. MIKE JOHANNS                      2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

16 (Pages 58 to 61)

Page 58

1   denied her attending a Blacks in Government conference
2   that she normally attends. Are you aware of that?
3       A.  I am aware of that.
4       Q.  And how did you become aware of that?
5       A.  Mr. Crawford discussed it with me.
6       Q.  Okay. Well, when did y'all have this
7   discussion, where was it, who was present, and what
8   was it about?
9           MR. DUBOIS: Object to the form.
10      A.  I don't recall when we had a discussion. I
11  can only assume it was at some time around the time of
12  the request. Ms. Thomas had attended the year before
13  that. When the request came in from her to attend the
14  next year, he thought that it would be best to give
15  other employees an opportunity to attend. And that's
16  what he told me. It's my understanding that other
17  employees wanted to go, and he authorized them to go
18  instead of Ms. Thomas.
19      Q.  And when you say it was your understanding
20  other employees wanted to go, was this something that
21  other employees had expressed they wanted to go or was
22  this something that after being asked about going,
23  other employees said they would go?
24      A.  I think when the issue of the conference came
25  up the second year, he asked the administrative

Page 59

1   officer to see who was interested in going.
2       Q.  Okay. So no one had asked about going prior
3   to that time other than Ms. Thomas and maybe one other
4   employee?
5       A.  I don't know.
6       Q.  Well, were you aware that Ms. Thomas had
7   actually attended this conference in other years also
8   other than just the year before?
9       A.  No.
10      Q.  Ma'am?
11      A.  I was not aware of that.
12      Q.  So you're only just aware that she attended
13  the year before; is that right?
14      A.  That's correct.
15      Q.  Who brought that to your attention?
16      A.  Mr. Crawford.
17      Q.  So what you knew about this is what
18  Mr. Crawford brought to your attention?
19      A.  That's correct.
20      Q.  And he discussed it with you?
21      A.  That's correct.
22      Q.  And this was after Ms. Thomas had made her
23  request to go?
24      A.  As far as I know.
25      Q.  Now, are you aware of any other instances

Page 60

1   where an employee made a request to go on a trip or to
2   a conference where Mr. Crawford decided to just open
3   it up to everybody else?
4           MR. DUBOIS: Object to the form.
5       A.  Not specifically.
6       Q.  Now, I kind of skipped over, but let me go
7   back. Back when Ms. Thomas was on her detail after
8   her mediation and then when she was getting ready to
9   come back at the end of that detail, were you aware
10  that Ms. Thomas had made a request to stay and remain
11  I think in the Office of Civil Rights, where she was
12  on that detail?
13      A.  Yes.
14      Q.  How did that come to your attention?
15      A.  Discussions with Mr. Crawford.
16      Q.  And how did that come up? Do you recall?
17  Like who initiated those discussions?
18      A.  He and I discuss lots of management issues in
19  the office, and I don't -- sometimes I initiate them;
20  sometimes he does. I don't recall specifically that
21  discussion.
22      Q.  But when that discussion came up, what was
23  discussed?
24      A.  The concern was that if the detail was
25  extended, that it would tie up our full-time

Page 61

1   equivalent position, our slot. And we were opposed to
2   tying that slot up and not being able to fill that
3   position for an additional period of time.
4       Q.  Did you-all discuss whether or not to just
5   let her transfer and just stay over there?
6       A.  That -- that would not have been our
7   decision.
8       Q.  Whose decision would that have been?
9       A.  The Office of Civil Rights.
10      Q.  Well, now, did you-all call over to Civil
11  Rights and talk to them about what their feelings were
12  or what their thoughts were on the situation?
13      A.  Now, I don't know about that.
14      Q.  Okay. Now, when this request was made by
15  Ms. Thomas to stay over there or extend the detail or
16  whatever, did she make that to you at first?
17      A.  Not that I recall.
18      Q.  So you don't know whether or not she actually
19  handed you her written request?
20      A.  No. I don't recall. She may have.
21      Q.  But would not that have been an option for
22  her to just transfer there?
23          MR. DUBOIS: Object to the form.
24      A.  If there was a position there.
25      Q.  But you don't know whether or not that was

OZETTA THOMAS v. MIKE JOHANNS                                          2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

17 (Pages 62 to 65)

Page 62

1  explored or talked about?
2      A.  I have no idea.
3      Q.  Also, when the request to extend the detail
4  was denied, are you aware of whether or not Ms. Thomas
5  made a request to take some sick leave or some
6  extended sick leave?
7          MR. DUBOIS:  Object to the form.
8      A.  Yes, I'm aware of that.
9      Q.  How did you become of that?  Well, how did
10  you become aware of that?
11     A.  We received a letter from Ms. Thomas with a
12  leave request attached to it for indefinite sick
13  leave.
14     Q.  And what happened with that?
15     A.  It was denied.
16     Q.  Do you know why it was denied?
17     A.  Because there was no medical documentation to
18  support an indefinite sick leave request.
19     Q.  And is that the normal procedure?
20     A.  Normal procedure is that if a supervisor --
21  for absences of three days or more, if the supervisor
22  feels that there is need for medical documentation,
23  they can request it.
24     Q.  Do you know of instances where that was
25  actually done?

Page 63

1      A.  Yes.
2      Q.  When?  Tell me some.
3      A.  There -- I can't give you specifics, but I
4  know there is medical documentations in employees'
5  leave records.
6      Q.  Do you know of any employee specifically?
7      A.  No.
8      Q.  Do you know of any employee that you can
9  think of while you're sitting here that I could ask
10  the Department to give me a copy of their record
11  showing where they requested sick leave over three
12  days and the supervisor asked them to produce medical
13  documentation?
14     A.  Pamela Polke.
15     Q.  Anyone else?
16     A.  No.  There may be others where they submitted
17  medical documentation, but I don't recall any
18  specifically.
19     Q.  Do you know what Ms. Polke's situation
20  involved?
21     A.  Sick leave abuse.
22     Q.  What do you mean by sick leave --
23     A.  She was suspected of abusing her sick leave,
24  and the supervisor required medical documentation for
25  her absences.

Page 64

1      Q.  She requested sick leave a number of times?
2      A.  Yes.
3      Q.  Who was her supervisor?
4      A.  Ronald Davis.
5      Q.  All right.  So she was suspected of sick
6  leave abuse.
7      A.  Yes.
8      Q.  And you can't think of anyone else where I
9  could ask, that might be similar to Ms. Thomas, where
10  they requested sick leave -- or for the first time or
11  so?
12     A.  I don't -- I don't recall any --
13         MR. DUBOIS:  Object to the form.
14     A.  I don't recall any other employee requesting
15  indefinite sick leave.
16     Q.  Now, during the same time period and I think
17  right before this sick leave request, do you recall
18  Ms. Thomas actually making her request not necessarily
19  to extend her detail but, really, to be reassigned to
20  the Office of Civil Rights?
21         MR. DUBOIS:  Object to the form.
22     A.  That request would not have come to our
23  office.
24     Q.  Where would it have come to?
25     A.  It would have gone to the Office of Civil

Page 65

1  Rights.
2      Q.  Are you sure about that?
3      A.  Well, it should have.  If it came to our
4  office, I'm not aware of it.
5      Q.  Because I was going to ask you.  It is my
6  understanding that such request did go to y'all's
7  office, but there was not a response.
8          MR. DUBOIS:  Object to the form.
9      A.  I'm not -- I'm not aware of that.
10     Q.  You're not aware of that?
11     A.  Unh-unh.
12     Q.  Would that have been something Mr. Crawford
13  would have talked over with you?
14     A.  I would think so.  That would not have been
15  something he would have had the authority to act on.
16     Q.  Now, when Ms. Thomas made that sick leave
17  request, did you ever review it or did you just pass
18  it on?
19     A.  No.  I reviewed it.  I faxed it to our
20  personnel office and asked for guidance on how to
21  respond to it.
22     Q.  Now, when you reviewed that, you don't recall
23  also in that sick leave request there was also the
24  request for reassignment to the Office of Civil
25  Rights?

OZETTA THOMAS v. MIKE JOHANNS
DEPOSITION OF DEBORAH WILLIAMS

2/14/2008

18 (Pages 66 to 69)

Page 66

1    MR. DUBOIS: Object to the form.
2    A.   That also included a request to work in an
3  alternate workplace, but I don't recall that saying be
4  reassigned. I would have to look at it again. It's
5  been a long time.
6    Q.   I'm going to show you what has been marked as
7  Defendant's Exhibit #19 in a prior deposition. We are
8  trying to keep a running tally so we don't have to
9  keep redoing it. And I ask you to take time to look
10  at that and see if you recognize that document.
11    A.   Okay. I do recall seeing this.
12    Q.   And do you recall whether or not there was
13  any discussion between you and Mr. Crawford about that
14  document?
15    A.   Yes.
16    Q.   What was the discussion?
17    A.   Our discussion was relating to two things.
18  One was her request to work at a location outside of
19  the state office. Mr. Crawford said he was not
20  willing to approve that request.
21    Q.   Did he say why?
22    A.   Because she occupied the position of chief of
23  a division, and he felt like the chief needed to be
24  present with the employees in that division.
25    The other request is this indefinite sick leave

Page 67

1  beginning on January the 6th. And that is what I
2  requested advice on from the Kansas City Personnel
3  Division, and we responded according to their advice.
4    Q.   And what was the advice that they were --
5    A.   To deny the request due to the lack of
6  supporting medical documentation.
7    Q.   And did they say that in writing?
8    A.   Yes, they did.
9    Q.   And so there should be a written document --
10  a written memo or notice from Kansas City saying that?
11    A.   I say it was in writing. It could have been
12  a telephone conversation, but there should be some
13  notes or something there.
14    Q.   Okay. What was the other thing you said?
15    A.   Those -- those were the two things that we
16  acted on in this memo. This memo says that her
17  attorney had recently requested an indefinite
18  extension of the detail from the Department of Civil
19  Rights, but that request was not made to our office.
20    Q.   Well, what about a reassignment?
21    A.   There is no mention of a reassignment in here
22  that I see.
23    Q.   Now, as it relates to Ms. Thomas's request
24  for the sick leave, did y'all ever ask her to provide
25  any medical documentation or did you just make the

Page 68

1  decision to deny based on lack of medical
2  documentation?
3    A.   I don't recall. I would have to look at the
4  letter.
5    Q.   Well, I'm going to show you what's been
6  marked as -- that same exhibit, Defendant's Exhibit
7  #19. The second page I think is the request for sick
8  leave. And right behind it is Exhibit #20, which is a
9  response to Ms. Thomas with an attached request for
10  sick leave. Look at those two to help you refresh
11  your memory.
12    A.   Okay. In reviewing this, it looks like the
13  request was denied. It was disapproved due to the
14  lack of supporting medical documentation.
15    Q.   Right. My question to that was, did you ever
16  contact Ms. Thomas and tell her or ask her to provide
17  any supporting medical documentation?
18    A.   This letter says, You must provide medical
19  documentation to substantiate any request of sick
20  leave in excess of three days in accordance with
21  Handbook 17PM. So this is the only response that we
22  gave to her regarding that sick leave.
23    Q.   Right. And that's when you were denying her
24  request; is that right?
25    A.   That's correct.

Page 69

1    Q.   So my question, then, if I follow what you're
2  saying, she was never asked, prior to being denied, to
3  provide the medical documentation --
4    MR. DUBOIS: Object to the form.
5    Q.   -- was she?
6    A.   No, not prior to this letter.
7    Q.   All right. Now, one last thing toward the
8  end. I recall -- well, a couple of other things.
9  Mr. Crawford indicated that he had a counseling
10  session, maybe one or two, with Ms. Thomas about
11  various matters and that you might have been present.
12  Do you recall any of those?
13    A.   I was present in one or two counseling
14  sessions.
15    Q.   And would you have been the one that kept the
16  minutes or kept some type of -- some kind of record or
17  something of it?
18    A.   Yes.
19    Q.   So you would have done that for him?
20    A.   Yes.
21    Q.   And, now, there was an instance where
22  Mr. Crawford went over Ms. Thomas's performance rating
23  with her. Were you present with him when he did that?
24    A.   I don't know.
25    Q.   Do you recall a situation where an employee

OZETTA THOMAS v. MIKE JOHANNS                                    2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

Page 70

1  other than -- Mr. Crawford would have been
2  Ms. Thomas's supervisor -- would have gone over
3  Ms. Thomas's performance rating with her; or did you
4  ever do that outside Mr. Crawford's presence with
5  Ms. Thomas, go over her performance rating with her?
6      MR. DUBOIS: Object to the form.
7      A. Did I ever go over her performance with her
8  without Mr. Crawford's presence?
9      Q. Yeah.
10     A. No, I did not.
11     Q. Are you aware of any instances where that has
12  happened, where an employee other than a supervisor
13  would have gone over another employee's performance
14  rating or performance evaluation?
15     A. No.
16     Q. Do you recall a situation where you may have
17  taken a performance rating to Ms. Thomas and asked her
18  to sign it --
19     MR. DUBOIS: Object to the form.
20     Q. -- when Mr. Crawford would not have been
21  present?
22     A. I don't specifically recall that.
23     Q. Have you ever had the authority or was asked
24  to sign a performance rating on behalf of Mr. Crawford
25  regarding Ms. Thomas?

Page 71

1      MR. DUBOIS: Object to the form.
2      A. I think I know what you're talking about.
3  Are you referring to the performance rating that
4  replaced her performance rating as a result of the
5  resolution agreement?
6      Q. Yes.
7      A. Yes, I did sign that.
8      Q. And how did it come to pass that you signed
9  that?
10     A. I was -- I was carrying out the terms of the
11  resolution agreement. Mr. Crawford was out of the
12  office, and I was acting on his behalf as acting state
13  executive director.
14     Q. Did he ask you to do that, or you just took
15  it upon yourself to do it since he was out of the
16  office?
17     MR. DUBOIS: Object to the form.
18     A. What, carry out the settlement agreement --
19     Q. Yes.
20     A. -- or sign that particular form?
21     Q. Carry out the settlement agreement and sign
22  that form.
23     A. The -- generally, I am responsible for
24  ensuring that those resolution agreements are carried
25  out. Whatever action is taken by the agency, I either

Page 72

1  take it or ensure that the person that needs to take
2  it, takes it. In that case, it was a matter of
3  replacing one form with another, and I took it upon
4  myself to complete that form and sign it for him
5  because he was out of the office.
6      Q. And was he out of the office for an extended
7  time or just for that day or --
8      A. I don't know. I would have to look at the
9  calendars.
10     Q. Was there an urgent need for you to have done
11  that instead of waiting on him to do it himself, to
12  sign it?
13     MR. DUBOIS: Object to the form.
14     A. I would have to look at the dates and times
15  to know if it was urgent or not.
16     Q. Okay. Now, when that was done, do you recall
17  whether or not it was beyond the 30-day period that
18  was specified in the resolution agreement that it was
19  supposed to have been done?
20     MR. DUBOIS: Object to the form.
21     A. There is a misconception about the 30 days.
22  The agreement doesn't say that that had to have been
23  done within 30 days. The resolution agreement said
24  that Ms. Thomas had to be notified within 30 days of
25  the last action taken of what action was taken on the

Page 73

1  resolution agreement. And that was done.
2      Q. All right. And so you said the 30 days only
3  apply for her being notified of the last action taken,
4  not 30 days from the resolution agreement being put
5  into place?
6      A. To the best of my memory, yes. And I would
7  have to know specifically what you're asking about and
8  look at the agreement, but --
9      Q. All right. So if I follow what you're
10  saying, the last action taken could take a year?
11     MR. DUBOIS: Object to the form.
12     A. We -- we would have to look at the resolution
13  agreement.
14     Q. But I'm saying -- we can look at it in a
15  minute.
16     A. It takes some time to carry some of those
17  things out.
18     Q. And I'm saying the last action taken could be
19  a year.
20     A. It could be, depending on the agreement.
21     Q. And the case involving Ms. Thomas, let's look
22  at the resolution agreement.
23     A. Okay.
24     Q. And let's figure out what actions would be of
25  such that it would take more than 30 days to carry

OZETTA THOMAS v. MIKE JOHANNS                                    2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

20 (Pages 74 to 77)

Page 74

1   out.
2     A.  Okay.
3     Q.  I'm going to refer you to what is Defendant's
4   #13; that is, Defendant's Exhibit #13 in prior
5   deposition.  You can take your time to look at that
6   and see what action was done.
7         MR. DUBOIS:  While she's reading that, can we
8   take a short break?
9         MR. PETTAWAY:  Yeah.
10          (Brief recess)
11    Q.  Did you have a chance to review that
12  resolution exhibit, which is Defendant's Exhibit #13,
13  Ms. Williams?
14    A.  I did.
15    Q.  And are there any items in there that you see
16  that the agency was supposed to do that would have
17  taken more than 30 days to do?
18        MR. DUBOIS:  Object to the form.
19    A.  If the agency had everything they needed,
20  no.  If I recall, the attorney was -- the attorney was
21  supposed to submit a detailed bill to the SED within
22  30 days; and we had to wait to get that bill.  It was
23  sent to the mediator rather than to our office.  And
24  then there was a problem with the -- when we got ready
25  to process the in-grade increase, there was a problem

Page 75

1   with the step in here.  The resolution agreement said
2   she was to be processed from a 13/Step 6 to a 13/Step
3   7.  And she was already a 13/Step 7.  So because we --
4   we had to contact the mediator, who had to contact
5   everybody and get them in agreement to amend that from
6   a 13/Step 7 to a 13/Step 8.
7     Q.  Well, that didn't take long, though.
8     A.  It took a few days.
9     Q.  Right.  But not beyond 30 is what I'm talking
10  about.
11    A.  No.
12    Q.  And I think when the attorney sent that bill,
13  that bill was sent in within a matter of a couple of
14  days, and albeit to the mediator.
15        MR. DUBOIS:  Object to the form.
16    A.  Right.  And a payment was made, I think, if I
17  remember correctly, within just a few days.
18    Q.  That's correct.
19    A.  But the agreement says after the agreement is
20  fully implemented, the agency will, within 30 calendar
21  days, provide the complainant with a written notice
22  explaining the specific actions taken to implement the
23  agreement.
24    Q.  I follow you.
25    A.  Okay.

Page 76

1     Q.  Now, I know I asked you a few things about
2   Ms. Thomas and some other people and about your duties
3   and whatnot.  Is there anything that you've thought of
4   since we started and I've asked you some questions
5   that you need to add to anything or that you may need
6   to clarify or correct in anything that you said?
7     A.  No, I don't --
8         MR. DUBOIS:  Object to the form.
9     A.  -- think so.
10    Q.  Ma'am?
11    A.  No.
12    Q.  Is there anything that you feel that you may
13  want to just add or tell me based on what we talked
14  about today so far?
15        MR. DUBOIS:  Object to the form.
16    A.  No, sir.
17    Q.  And you do understand that your answers were
18  all given under oath; is that right?
19    A.  I do.
20    Q.  And have you given me answers as complete as
21  possibly you could?
22    A.  Yes, sir.
23    Q.  Now, have you ever been arrested for any
24  crimes or violations of any laws or anything of that
25  nature?

Page 77

1     A.  No.
2     Q.  And have you ever been diagnosed or had any
3   mental health issues that require some type of medical
4   report or medical hospitalization?
5         MR. DUBOIS:  Object to the form.
6     A.  No.
7     Q.  And I may have asked you earlier; but are you
8   under any influence of any drugs, alcohol, or medicine
9   that may affect your ability to hear, understand, and
10  relate answers to questions?
11    A.  No.
12    Q.  And were you able to understand everything I
13  asked you?
14        MR. DUBOIS:  Object to the form.
15    A.  Yes.
16    Q.  And you answered the best you could; is that
17  right?
18    A.  Yes, sir.
19        MR. PETTAWAY:  I don't have anything else if
20  you have any questions.
21        MR. DUBOIS:  I don't have any questions.
22        MR. PETTAWAY:  Okay.  Well, thank you very
23  much, Ms. Williams.
24        THE WITNESS:  Thank you.
25          (The deposition concluded at 10:27 a.m.)

OZETTA THOMAS v. MIKE JOHANNS                          2/14/2008
DEPOSITION OF DEBORAH WILLIAMS

21 (Pages 78 to 79)

Page 78

1        * * * FURTHER DEPONENT SAITH NOT * * *
2              REPORTER'S CERTIFICATE
3    STATE OF ALABAMA
4    CHILTON COUNTY
5       I, Wendy Lewis, Certified Court Reporter and
6    Commissioner for the State of Alabama at Large, hereby
7    certify that on Thursday, February 14, 2008, I
8    reported the deposition of DEBORAH TEEL WILLIAMS, who
9    was first duly sworn or affirmed to speak the truth in
10   the matter of the foregoing cause, and that pages 3
11   through 77 contain a true and accurate transcription
12   of the examination of said witness by counsel for the
13   parties set out herein.
14      I further certify that I am neither of kin nor of
15   counsel to any of the parties to said cause, nor in
16   any manner interested in the results thereof.
17      This 4th day of March, 2008.
18
19
20
21
                    _____
22                  WENDY LEWIS, Court Reporter
                    Alabama License No.: 444
                    Commissioner for the State
23                  of Alabama at Large
24                  MY COMMISSION EXPIRES: 7/16/11
25

Page 79

1             SIGNATURE OF WITNESS
2        I, DEBORAH TEEL WILLIAMS, hereby certify that
3    I have read the transcript of my deposition consisting
4    of pages 3 through 77, and except for the corrections
5    listed below, certify that it is a true and correct
6    transcription.
7
8        _____
              DEBORAH TEEL WILLIAMS
9
10   SWORN TO AND SUBSCRIBED before me
     this _____ day of _____, 2008.
11
12   _____
     NOTARY PUBLIC
13
14        * * * * * * * * * * *
15   Page  Line  Correction and reason therefor
16
17
18
19
20
21
22
23
24
25