# DEPOSITION OF IREAN BENNETT

## January 10, 2008

## Pages 1 through 54

### PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

D

Page 1

```
1    IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3             NORTHERN DIVISION
4
5    OZETTA THOMAS,
6         Plaintiff,
7    Vs.                    CIVIL ACTION NO.
                            2:05-CV-411-WKW
8    MIKE JOHANNS,
9         Defendant.
10
11
12              * * * * * * * * * * * *
13
         DEPOSITION OF IREAN BENNETT, taken
14
     pursuant to stipulation and agreement before
15
     Haley A. Phillips, Certified Court Reporter,
16
     ACCR # 151, and Commissioner for the State of
17
     Alabama at Large, in the Law Offices of The U.S.
18
     Department of Justice, 131 Clayton Street,
19
     Montgomery, Alabama, on Thursday, January 10, 2008,
20
     commencing at approximately 3:50 p.m.
21
22
                * * * * * * * * * * * *
23
```

Page 2

```
1            APPEARANCES
2
3    FOR THE PLAINTIFF:
4    Collins Pettaway, Jr., Esq.
     Chestnut, Sanders, Sanders & Pettaway
5    Attorneys at Law
     One Union Street
6    Selma, Alabama 36702
7    FOR THE DEFENDANT:
8    James J. DuBois, Esq.
     Assistant United States Attorney
9    U.S. Attorneys Office
     U.S. Department of Justice
10   131 Clayton Street
     Montgomery, Alabama 36104
11
     Craig G. Cornwell, Esq.
12   Attorney at Law
     Suite 205
13   4121 Carmichael Road
     Montgomery, Alabama 36106
14
     ALSO PRESENT:
15
     Ms. Ozetta Thomas
16
17              * * * * * * * * * * * *
18
            EXAMINATION INDEX
19
     BY MR. PETTAWAY . . . . . . . . . . 4
20   BY MR. DUBOIS . . . . . . . . . . . 50
21
22              * * * * * * * * * * * *
23
```

Page 3

```
1              STIPULATION
2        It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of IREAN BENNETT is taken pursuant to
5    the Federal Rules of Civil Procedure and that said
6    deposition may be taken before Haley A. Phillips,
7    Certified Court Reporter, ACCR # 151, and
8    Commissioner for the State of Alabama at Large,
9    without the formality of a commission, that
10   objections to questions other than objections as to
11   the form of the question need not be made at this
12   time but may be reserved for a ruling at such time
13   as the said deposition may be offered in evidence
14   or used for any other purpose by either party
15   provided for by the Statute.
16       It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23       It is further stipulated and agreed by and
```

Page 4

```
1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby not waived.
4              * * * * * * * * * * * *
5              IREAN BENNETT
6        The witness, after having first been duly
7    sworn to speak the truth, the whole truth and
8    nothing but the truth testified as follows:
9              EXAMINATION
10   BY MR. PETTAWAY:
11   Q.  Could you state your name, please, ma'am.
12   A.  Irean Bennett.
13   Q.  Spell that for us.
14   A.  I-R-E-A-N.
15   Q.  And last name is Bennett?
16   A.  Bennett.
17       (Off-the-Record discussion.)
18   Q.  And how are you employed?
19   A.  Secretary to the state executive director.
20   Q.  And what do you do there?
21   A.  You mean my --
22   Q.  Your job.
23   A.  -- exact job, what I do?
```

Page 5

```
 1  Q.  Yeah.
 2  A.  I do memos. I do the correspondence. I
 3      proof all correspondence; open, separate
 4      the mail; set up meetings; keep the SED's
 5      calendar.
 6  Q.  How long have you been so employed?
 7  A.  With this agency for 15 years.
 8  Q.  Now, have you ever had your deposition
 9      taken before?
10  A.  No.
11  Q.  Let me explain what we're doing. My name
12      is Collins Pettaway, and I'm an attorney.
13      And I represent Ms. Ozetta Thomas. And we
14      have a lawsuit pending in court. And part
15      of that process -- We're in what's called
16      the discovery phase. That's where we
17      discover; that is, we want to find out
18      information. And so we're trying to find
19      out reliable information. That's why we
20      put you under oath. It's for you to speak
21      the truth.
22          But at the same time, this is not in
23      court. We're outside of court. The judge
```

Page 6

```
 1      is not here, so all the hearsay, he say,
 2      she say is okay. Because I want to know,
 3      because I want to discover. And we'll sort
 4      out what's good or bad later on. Now, in
 5      doing so different lawyers here might
 6      interpose or make an objection. Now,
 7      they're only doing that to help preserve
 8      the Record so we can deal with something
 9      later. But you still try to -- Don't let
10      that distract you. Try to concentrate on
11      the question so you can answer. Because I
12      want to ask you questions that you can
13      understand, because I want us to
14      communicate.
15          If you don't understand a question,
16      please feel free to stop me and ask me or
17      have me revise something or ask for some
18      definitions, because it's the information
19      that I want. So I want you to answer me as
20      best you can. And we're not in a race, not
21      in a fight. We're not being antagonistic
22      or anything. I just want to know.
23          Now, I will be asking you some personal
```

Page 7

```
 1      questions, but that's only to deal with
 2      certain things relevant to this lawsuit,
 3      some necessary things that we need to find
 4      out and know and for the purpose of this
 5      lawsuit. So I'll be dealing with that.
 6      But, also, it's important that you
 7      verbalize all your responses, because all
 8      the head shakes, the grimaces, the eye
 9      winks, it's hard for her to take that
10      down. And all the uh-huh, huh-uh -- well,
11      you need to verbally speak yes or no or
12      however. Okay.
13  A.  Okay.
14  Q.  Now, do you have any questions?
15  A.  No.
16  Q.  If you need any breaks or do anything or
17      you need a snack or something, let us
18      know. You know, we'll try to work all that
19      in.
20  A.  Okay.
21  Q.  You know, a drink of water or something.
22      All right.
23  A.  All right.
```

Page 8

```
 1  Q.  So with that in mind, I want to ask you a
 2      few things, and then I'll come back to the
 3      job, or whatnot.
 4          Now, are you married?
 5  A.  Yes.
 6  Q.  Where do you live, first?
 7  A.  In Wetumpka. North of Wetumpka.
 8  Q.  So up in Elmore County?
 9  A.  Elmore County. Wallsboro.
10  Q.  And that's within our geographical
11      district. So let me ask you, what's your
12      husband's name?
13  A.  Donald Bennett, Jr.
14  Q.  And does he work?
15  A.  Yes.
16  Q.  Whereabouts?
17  A.  International Paper.
18  Q.  Which one?
19  A.  Prattville.
20  Q.  So he -- You said y'all live north of
21      Wetumpka?
22  A.  Yes.
23  Q.  So he's about -- What's that, about an
```

Page 9

1  hour, 45 minutes to work every day?
2  A. About 45 minutes.
3  Q. And how long has he been working there?
4  A. Since 1992.
5  Q. Do y'all attend church in that area?
6  A. Yes.
7  Q. Whereabouts?
8  A. In Slapout.
9  Q. What's the name of the church?
10 A. Cain's Chapel United Methodist.
11 Q. King's Chapel?
12 A. Cain's.
13 Q. Cain's, C --
14 A. C-A-I-N, apostrophe S.
15 Q. Cain's Chapel United Methodist?
16 A. Right.
17 Q. Do either of you have any positions in the
18    church that you --
19 A. I'm on the finance committee and the
20    education committee. And I work with the
21    youth.
22 Q. Are y'all members of any -- Is your church
23    a member of any district or statewide

Page 10

1     associations, fellowships or anything?
2  A. No.
3  Q. Do you have any children that are 18 years
4     or older?
5  A. Yes.
6  Q. What are their names, the ones that are 18
7     or older?
8  A. Stephen and Brian Bennett.
9  Q. They live in this area?
10 A. One is Atlanta, north -- the other side of
11    Atlanta, and the other one is Montgomery.
12 Q. The one in Montgomery, what's that name?
13 A. Brian Bennett.
14 Q. Is he married --
15 A. Yes.
16 Q. -- or single?
17    What's his wife's name?
18 A. Adrienne.
19 Q. Is that with an A?
20 A. Right. A-D-R-I-E-N-N-E.
21 Q. E-N-N. Okay.
22    Adrienne. What's the last name?
23 A. Bennett.

Page 11

1  Q. Bennett. Okay.
2     Where do they work, if they do?
3  A. He works for Polycom, and she works for
4     Jenkins Brick.
5  Q. And do you have any close personal friends
6     that you associate with that are real
7     tight?
8  A. No. Family.
9  Q. Now, do you have any other family that's
10    within this area around Montgomery or --
11 A. Yes.
12 Q. -- Elmore County?
13    Who all is it?
14 A. My mother and four brothers.
15 Q. What's your mom's name?
16 A. Alice Jarmon.
17 Q. And where does she live?
18 A. She lives in Slapout.
19 Q. And what about your brothers?
20 A. They all live in that area. Well --
21 Q. What are their names?
22 A. I take that back. One of them has moved to
23    Montgomery now.

Page 12

1  Q. That's good. I'll include him too. What
2     are their names?
3  A. Henry, Lewis, Barney and Teddy McCormick.
4  Q. What are their last names?
5  A. McCormick, M-C-C-O-R-M-I-C-K.
6  Q. And your mom's name is what?
7  A. Alice Jarmon.
8  Q. Now, what's your maiden name?
9  A. McCormick.
10 Q. McCormick. Okay.
11    Now, Ms. Bennett -- How do you prefer
12    to be called, Ms. Bennett or Irean?
13 A. Irean is fine.
14 Q. What's good for you?
15 A. Irean.
16 Q. Irean. Okay. I'll do Irean. Makes me
17    feel young.
18    Now, you said you had been the
19    executive secretary for 15 years?
20 A. Since 1991. I may have been off on my
21    math.
22 Q. Okay.
23 A. 16 years.

Page 13

1  Q. What executive directors have you worked
2     under or worked with?
3  A. I started out with Albert McDonald, Robert
4     Springer, Daniel Robinson and Danny
5     Crawford.
6  Q. And have your duties been pretty much the
7     same with each or have they been varied?
8  A. Pretty close.
9  Q. Now, during your tenure working there, did
10    you know Ozetta Thomas?
11 A. Yes.
12 Q. How did you know Ms. Thomas?
13 A. She was working in the production
14    adjustment/compliance division.
15 Q. Now, I'm going to show you what has been
16    marked as Defendant's Exhibit Number 23,
17    and this is an organizational chart of the
18    State FSA Office as of December 30, 2002.
19    And it shows the state committee, then goes
20    down to state executive director and
21    whatnot. I think at that time it was Danny
22    Crawford. Then it shows you --
23 A. Yes.

Page 14

1  Q. -- Irean Bennett, executive secretary. And
2     then Deborah Williams, executive officer
3     and then Vicki Lane, public
4     relations/outreach specialist. And it goes
5     through all the various divisions.
6  A. Yes.
7  Q. Is that about right?
8  A. Yes.
9  Q. Now, did you have any supervisory
10    responsibilities?
11 A. No.
12 Q. Now, did you have anyone who would back you
13    up or help you -- any other assistant or
14    secretary who would help you do duties if
15    you had overflow or something?
16 A. No. If I was out, I had backup, but ...
17 Q. Who was your backup when you were out?
18 A. It changed different times. Leda Walker,
19    Pamela Polke, Valerie Moses, Yolanda
20    Farrier, Caryn Melton.
21 Q. Now, were all those various secretaries of
22    different divisions?
23 A. They were -- Yes.

Page 15

1  Q. Was there a point in time in where -- in
2     when -- I'm sorry -- a particular secretary
3     or a particular program technician may have
4     been strictly assigned to be your backup?
5  A. We had -- I've always had someone assigned
6     and then a backup for that person. We've
7     had as many as four backups -- someone to
8     back up my back up, you know, depending on
9     if somebody is out.
10 Q. Let me ask you about Ms. Pamela Polke. Was
11    she one of those backups directly under
12    you?
13 A. She wasn't under me, but she was a backup.
14 Q. Was there ever a point in time in which she
15    was assigned to be your specific backup and
16    specifically had to do all your overflow
17    work?
18 A. No. I've never had anyone do all my
19    overflow work.
20 Q. Some of the overflow work?
21 A. No. Only if I was out they would answer
22    the phone, log faxes, open the mail.
23 Q. Now, as part of your duties, would you help

Page 16

1     coordinate convention assignments and
2     whatnot?
3  A. Yes.
4  Q. Now, is that something that you would
5     coordinate and put together for the state
6     executive director to sign off on, or is
7     that something you would do after being
8     instructed on how to do it?
9        MR. DUBOIS: Object to the form.
10 A. Yeah. I don't ...
11 Q. Okay. Is that a job that you would do --
12    In essence, you would have complete
13    autonomy to put it together and make
14    assignments, or would you be following
15    instructions from someone on how to make
16    those assignments and determinations?
17 A. My --
18       MR. DUBOIS: Object to the form.
19          You can answer.
20 A. My part would be to locate the facility,
21    get the contract, what we're going to need,
22    tell them what audio equipment we need, the
23    breaks that we would need, the size rooms

Page 17

1   we would need, the number of hotel rooms.
2   But as far as agenda, I didn't plan the
3   agenda.
4   Q. What about the personnel?
5   A. As --
6   Q. Like speakers or people to be on programs?
7   A. No.
8   Q. Now, as far as trainings or conferences,
9   would you have any input in setting those
10  up?
11  A. I set them up but not the agenda.
12  Q. What about recordkeeping?
13          MR. DUBOIS: Object to the form.
14  Q. Did you have any responsibilities with any
15  recordkeeping?
16  A. What do you mean by recordkeeping?
17  Q. Like any of the records from the state
18  offices or anything.
19          MR. DUBOIS: Object to the form.
20  Q. Like any of the meeting minutes, any of the
21  memorandums, any of the files or ...
22  A. I would do memorandums about the meeting,
23  but we didn't keep minutes of a conference

Page 18

1   or training meetings. There wouldn't be
2   minutes for those.
3   Q. But there would be minutes of, like, staff
4   meetings?
5   A. Yes.
6   Q. And who would keep those minutes?
7   A. I do.
8   Q. So you have those minutes to the staff
9   meetings?
10  A. Yes.
11  Q. Now, if I understand better, the state
12  executive director -- Well, let's talk
13  about during Mr. Crawford's tenure. That's
14  now. You may can remember now. It's my
15  understanding he has staff meetings with
16  the district directors.
17  A. We have a meeting approximately every four
18  to six weeks where he and the state
19  specialists meet with the district
20  directors.
21  Q. Now, are there minutes or synopsis of those
22  meetings?
23  A. No.

Page 19

1   Q. There is no written --
2   A. No.
3   Q. -- synopsis or minutes of those?
4       What about minutes of staff meetings
5   for the different divisions?
6   A. Yes.
7   Q. So there's minutes of those?
8   A. Yes.
9   Q. What about minutes of the management team,
10  or are there -- Well, let me ask you this.
11  Are there meetings -- staff meetings that
12  Mr. Crawford has just of his executive
13  staff which would be you and --
14  A. Yes.
15  Q. -- Ms. Williams and all them?
16      Do y'all keep minutes?
17  A. Yes.
18  Q. So those minutes are there?
19  A. Right.
20  Q. And you keep those --
21  A. Yes.
22  Q. -- in a file and they're under your
23  purview?

Page 20

1   A. Right.
2   Q. You defend them and you ward off all
3   whatever?
4           MR. DUBOIS: Object to the form.
5   A. They're in a file.
6   Q. We've been here all day. Got to have some
7   light.
8       Now, have there been occasions in which
9   people would make complaints to the
10  executive director, Mr. Crawford, about
11  other personnel performance of their
12  duties?
13          MR. DUBOIS: Object to the form.
14  A. I wouldn't know. That would be between
15  them.
16  Q. Now, who keeps the personnel files?
17  A. Admin.
18  Q. The administrative division?
19  A. Right.
20  Q. And are you aware of any statements that
21  may have been typed up or put together of
22  any employees who addressed any concerns,
23  concerning Ms. Ozetta Thomas?

Deposition of Irean Bennett                                          January 10, 2008

Page 21

1       MR. DUBOIS: Object to the form.
2   A.  Possibly. We do have those sort of notes
3       that they take the minutes from the
4       meetings.
5   Q.  And who has those?
6   A.  I don't know.
7   Q.  Would that be something that would go in a
8       person's personnel file, or does
9       Mr. Crawford keep a separate file on such
10      complaints or such issues about employees
11      performing?
12          MR. DUBOIS: Object to the form.
13  A.  I don't know. If it was something I had
14      done, then I would have a copy. But the
15      ones where they sign in on the meeting, I'm
16      not sure.
17  Q.  Now, what would you have done? What types
18      of things have you done in that nature?
19  A.  As far as sitting in on things -- on
20      meetings with staff?
21  Q.  Yeah. Or receiving any type of complaints
22      or typed up any type of memos or complaints
23      about employee performance.

Page 22

1           MR. DUBOIS: Object to the form.
2   A.  I've sat in and taken notes during those
3       type meetings occasionally.
4   Q.  Now, would those be, like, employee
5       performance review type meetings and/or
6       counseling sessions?
7   A.  It would be counseling sessions.
8   Q.  And who would keep those -- the records of
9       those counseling sessions?
10          MR. DUBOIS: Object to the form.
11  A.  I would think maybe Ms. Williams. Like I
12      said, if it was some that I did, then I
13      would have kept them in Mr. Crawford's
14      supervisor's file.
15  Q.  Now, were you ever instructed to keep time
16      and attendance records on any employees?
17  A.  No.
18  Q.  Did you ever have to keep any type of time
19      and attendance records regarding
20      Ms. Thomas?
21  A.  No.
22  Q.  I'm going to show you what's been marked as
23      Defendant's Exhibit Number 27, which is a

Page 23

1       work schedule log or I guess a time
2       sheet reflecting that time.
3   A.  Right.
4   Q.  This is one regarding Ms. Ozetta Thomas.
5       When these things are turned in, are
6       they turned in to you or are they turned in
7       in a special place where Mr. Crawford gets
8       them directly himself?
9   A.  No. They come to me, and then I give them
10      to him and put them in a signature file.
11  Q.  Now, in reference to this particular work
12      schedule log, there was an allegation that
13      Ms. Thomas incorrectly filled in some time
14      or that she reported to work later than
15      what she put down. Are you familiar with
16      anything of that nature --
17          MR. DUBOIS: Object to the form.
18  Q.  -- back in 2001?
19          MR. DUBOIS: Object to the form of
20          the question.
21  A.  I know there were -- there have been times
22      when we've had employees that they may have
23      questioned their time.

Page 24

1   Q.  What employees?
2   A.  I wouldn't know exactly right now. I know
3       that there have been times, but ...
4   Q.  Now, here is a memo from Danny Crawford to
5       Ozetta Thomas, which is Defendant's Exhibit
6       Number 2, regarding a counseling session.
7       Would this be something like you would type
8       up for Mr. Crawford?
9   A.  That's not one that I did.
10  Q.  Let's see. Now, I'm trying to see if
11      there's any signature thing, but there's
12      not. If you didn't type this document up,
13      who would have?
14          MR. DUBOIS: Object to the form of
15          the question.
16  A.  Yeah. I would have to guess. But I know
17      that's not the style that I used.
18  Q.  Have you seen this kind of style before?
19  A.  We have some people probably that do it
20      that way. As far as the -- Now, we all use
21      the same basic format, but there's some
22      differences.
23  Q.  Right.

**Page 25**

1   You knew Ms. Pamela Polke; right?
2   A. Yes.
3   Q. Did Ms. Polke ever complain to you that
4      Ms. Ozetta Thomas in -- during June of 2001
5      was not reporting to duty on time?
6   A. I can't respond to the date, but I know she
7      did make those complaints.
8   Q. Do you know what the substance of those
9      complaints were or what specifically did
10     she say?
11  A. Well, she would just say that she would
12     come in late or not show up and that she
13     was having to turn her time sheet in and
14     she knew that it wasn't right.
15  Q. And she made that complaint to you?
16  A. To me.
17  Q. Did you keep any kind of record of that?
18  A. No.
19  Q. What did you do with it?
20  A. Just listened. Pam complained about a lot
21     of things.
22  Q. Well, did you pass the complaint on to
23     anyone or you just listened?

**Page 26**

1   A. I just listened.
2   Q. And so it just dropped right there?
3         MR. DUBOIS: Object to the form.
4   A. Unless she took it further.
5   Q. So you didn't take any of her complaints
6      further --
7   A. No.
8   Q. -- regarding Ms. Thomas' time?
9   A. No.
10  Q. So if it went further, Pam had to take it
11     further with someone else?
12        MR. DUBOIS: Object to the form.
13  A. Yes.
14  Q. I want to show you what's a part of
15     Defendant's Exhibit 49, which is a memo
16     about a wellness day and retirement party
17     from Mr. Crawford. Is this something you
18     would have typed up?
19  A. No. I was actually out of town, out of
20     state during that time.
21  Q. During April 17, '03?
22  A. Right. I didn't attend that party. I
23     wasn't there.

**Page 27**

1   Q. Now, this talks about a wellness day and
2      retirement party. I guess retirement party
3      for -- his name is -- I'm trying to read
4      upside down. It's in here somewhere.
5   A. It's Richard Nazary.
6   Q. Did you know him?
7   A. Yes.
8   Q. Now, did you-all at the state office have
9      retirement parties when people retired?
10  A. It's up to the section to plan them for
11     their sections. Mr. Sewell planned that
12     one.
13  Q. Okay.
14  A. Each section handles it for their section.
15  Q. So what does the state office do?
16     I mean, what does the -- Let me go back
17     to it. What do the people working under
18     the state executive director do?
19  A. As far as ...
20  Q. The retirement party.
21  A. Well, the same as any other employee. They
22     would either go or contribute or ...
23  Q. Now, would Mr. Crawford on his behalf send

**Page 28**

1      out any notices about retirement parties?
2         MR. DUBOIS: Object to the form.
3   A. If they typed it up, he would sign it. All
4      correspondence goes out under the SED
5      signature.
6   Q. Now, let me show you what's been marked as
7      Defendant's Exhibit Number 9. This is a
8      performance work plan regarding Ms. Ozetta
9      Thomas. I think it started out with
10     Mr. Daniel Robinson and ended up after his
11     tenure with Mr. Danny Crawford. And I have
12     that there's an OTI that was put together.
13     Did you type any of that up?
14  A. I didn't do any of the OTI. I could
15     possibly have typed in this information
16     here. I used to do it for all the
17     employees.
18  Q. On the performance work plan?
19  A. Right.
20  Q. And then the rest of the stuff you'd put
21     together?
22        MR. DUBOIS: For the Record,
23     you're pointing to the top

Deposition of Irean Bennett                                                January 10, 2008

Page 29

1    part, which would be the name?
2  A. The name. Right. Just the name, the dates
3    of the evaluation.
4  Q. Title, duty location, organization?
5  A. Right. Nothing to do with the actual
6    evaluation.
7  Q. Now, did you have the occasion to ever
8    deliver to Ms. Thomas a performance work
9    plan?
10 A. Possibly. I delivered them to different
11   employees once they were signed.
12 Q. Now, particularly when they are signed and
13   you deliver them to them, are they put in
14   envelopes and are they sealed or are they
15   just delivered to the employee unopened, or
16   what?
17 A. It depends if I hand carry them to the
18   employee or if they're put in their box.
19 Q. Now, if you put it in the box, how are they
20   placed?
21 A. Then they would possibly be sealed so that
22   no one could pick it up and look at it.
23   But if I handed it to them, then, no, I

Page 30

1    wouldn't seal it up.
2  Q. Now, as it relates to Ms. Thomas -- I know
3    she went on a detail back in December
4    2001. I'm going to show you a memo here
5    from Mr. Crawford to all employees. Does
6    this look like a memo you may have typed?
7  A. Yes.
8  Q. And this is Exhibit 31.
9  A. Yes, I typed that.
10 Q. Now, when you typed this, did
11   Mr. Crawford -- does he dictate this to you
12   or does he write something out or how?
13 A. No. He normally would just say, send a
14   memo to whoever for, you know -- I do my
15   own memos. He just says send a memo for
16   whatever subject.
17 Q. Now, do you recall this particular memo in
18   particular independently?
19 A. Yes.
20 Q. Now, of your independent recollection, how
21   did this memo come about? And I'm
22   referring to Defendant's Exhibit 31.
23 A. Mr. Crawford -- I don't remember exactly,

Page 31

1    but I would assume he said, send a memo out
2    to everybody letting them know that Ozetta
3    is detailed and that Jeff will be taking
4    the calls.
5  Q. And so you're saying that you then would
6    put together the wording and style and send
7    it out?
8  A. Right.
9  Q. And that's why you would put like here as
10   if it's signed by Mr. Crawford?
11 A. Right. Because it was e-mailed. Yeah. He
12   signed the original copy and then that's an
13   e-mailed copy. The slashes -- slash
14   indicates I sent an e-mail out to
15   everybody.
16 Q. Right.
17   Did Mr. Crawford ever share to you why
18   Ms. Thomas was being detailed?
19 A. No. He just said she was detailed to the
20   civil rights staff.
21 Q. And he never said why or indicated why?
22 A. I don't recall ever discussing it.
23 Q. And, now, after that did he instruct you to

Page 32

1    put together her performance work plan
2    and -- or her performance work evaluation
3    and deliver it to her?
4  A. I wouldn't have put it together.
5  Q. I'm going to show you what is marked as
6    Defendant's Exhibit 16, which is a memo to
7    Ms. Thomas regarding her performance
8    evaluation and attached to the performance
9    evaluation for October 1, 2000 through
10   September 30, 2001. Do you recall this
11   document?
12 A. No.
13 Q. Is this something you would have typed up
14   the memo or someone else?
15 A. I don't remember that memo.
16 Q. Do you recall delivering this to
17   Ms. Thomas in an unsealed envelope?
18 A. I could have. I know I did deliver things
19   to her and possibly in an unsealed
20   envelope.
21 Q. How would you have gotten it?
22 A. It would have come from either Mr. Crawford
23   or Ms. Williams.

Page 33

1  Q. And you would have been instructed to just
2     deliver this to Ms. Thomas?
3  A. To hand carry it. Right.
4  Q. Now, I think during this time she had taken
5     that detail over to the office of civil
6     rights. And so that would be something
7     different than what you usually do. So do
8     you recall going over there to take such a
9     memo to her?
10 A. I know I did take something to her in civil
11    rights, yes.
12 Q. Do you know what it was?
13 A. I believe it was a performance evaluation
14    or a performance plan or something.
15 Q. And how did you know that's what it was?
16 A. I believe Ms. Williams gave it to me and
17    asked me to take it to her.
18 Q. Did she share with you anything about it
19    before giving it to you?
20 A. No. She wouldn't have talked about it.
21 Q. So how do you know it was a performance
22    plan? Was it just given to you like this
23    and you had to put it in an envelope?

Page 34

1  A. I think so.
2  Q. Now, as it relates to this performance
3     evaluation -- and this would be prior to
4     this one being delivered in January '02.
5     Back in November 2001, there was a meeting
6     about a performance appraisal with
7     Mr. Crawford and Ms. Thomas in the presence
8     of Ms. Williams. Would those be the kind
9     of meetings you would be at sometimes to
10    help take notes and transcribe?
11 A. No. If Ms. Williams was there, I wouldn't
12    have been there.
13 Q. Now I want to show you a document which was
14    a memorandum of a November 6, 2001
15    performance appraisal about Ms. Thomas.
16    Does this look like something you remember
17    seeing or something you may have typed up
18    or some record you may have in your file?
19 A. No. I don't remember that one.
20 Q. This one is unsigned. Now, here is another
21    one dated November 28 regarding the same
22    thing. I know the style is a little
23    different and the type is a little

Page 35

1     different. But is this something you might
2     have put together that you know of or looks
3     like something on your style or type --
4  A. This is possible.
5  Q. And I think this one is signed by
6     Mr. Crawford when I get to it back here.
7  A. Yeah. I could have typed it.
8  Q. But would these be some of the things you
9     would keep in your file, or would it just
10    be just the minutes from those staff
11    meetings?
12 A. I may have --
13    MR. DUBOIS: Object to the form.
14 A. -- had that in her -- Mr. Crawford's
15    supervisor's file. He has one for each
16    employee that he supervises.
17 Q. Now, what is -- Tell me more about this
18    supervisor's file.
19 A. It has the supervisor's copies of personnel
20    papers, their WGI forms, ratings, things
21    like that. Each supervisor keeps a file on
22    each employee they have.
23 Q. Okay. I want to show you a document which

Page 36

1     is Defendant's Exhibit 13, which is a
2     resolution agreement of a complaint
3     involving an employee. Do you ever see
4     these type of agreements?
5  A. No. That's the type thing that would come
6     in in a to be opened by addressee only, I
7     would think.
8  Q. Open by who?
9  A. Addressee only.
10 Q. And do things come in like that?
11 A. Yes.
12 Q. And so when it's addressee only, only that
13    person is supposed to get it?
14 A. Right.
15 Q. And then that person is supposed to
16    exercise whatever discretion in
17    disseminating the information?
18    MR. DUBOIS: Object to the form.
19 A. Yes.
20 Q. Were you familiar with any complaints that
21    Ms. Thomas may have made while she was
22    working at the office about Mr. Crawford?
23    MR. DUBOIS: Object to the form.

Page 37

1   A.  I don't recall any.
2   Q.  Were you present or at any meetings,
3       whether that be staff meetings or district
4       director meetings or just water fountain
5       meetings where Ms. Thomas was discussed at
6       all?
7           MR. DUBOIS: Object to the form.
8   A.  No.
9   Q.  Did you ever hear Mr. Crawford make
10      statements when he first came in that he
11      wanted to deal with or get rid of
12      Ms. Thomas?
13  A.  No.
14  Q.  Now, you answered that kind of fast with a
15      certain flare that can't be recorded. Now,
16      are you communicating to me that that's
17      something Mr. Crawford just wouldn't do?
18  A.  I can't imagine him saying he wanted to get
19      rid of anybody.
20  Q.  Now, let me direct your attention to a
21      certain meeting that was in Florida in the
22      Panhandle on the beach down there. It was
23      a meeting of the Southern Peanut Growers in

Page 38

1       July 2001. Do you recall attending that
2       meeting?
3   A.  No. I wouldn't have gone to a meeting out
4       of state.
5   Q.  Do you recall going to -- Oh, no. I'm
6       sorry. This is one that would have been in
7       Dothan. I apologize. At the Peanut
8       Festival down there. This would have been
9       in Dothan. Do you recall attending any of
10      those meetings and being in the presence of
11      Mr. Crawford in which Ms. Thomas was
12      discussed at all?
13  A.  No. I recall the meeting. But, no, I
14      don't remember any discussions like that.
15  Q.  So no discussions about Ms. Thomas or about
16      having to do something with Ms. Thomas?
17  A.  No.
18  Q.  Do you recall this same meeting, though,
19      down there in Dothan in which various
20      employees came but -- and Ms. Thomas came
21      but wasn't allowed to stay overnight and
22      had to travel back where the other
23      employees were allowed to stay overnight

Page 39

1       and stayed?
2           MR. DUBOIS: Object to the form.
3   A.  I don't recall that one in particular. We
4       do have meetings where people go back if
5       they're on the program early enough in the
6       day. And I believe that meeting, we had
7       three people that went back that day.
8   Q.  Do you know what three people?
9   A.  I can't remember right off.
10  Q.  Would Ms. Thomas have been one of them?
11  A.  Could have been.
12  Q.  Were those people who went back more closer
13      to Dothan as opposed to being further away?
14  A.  I don't remember for sure who all went
15      back, so I don't know. It would have been
16      state office staff. That happens regularly
17      at meetings when we have them finishing up.
18  Q.  So there was a time period when Ms. Thomas
19      took a detail and, I think, went over to
20      the office of civil rights for a year --
21  A.  Right.
22  Q.  -- and then came back?
23      And here is a memo from Mr. Crawford to

Page 40

1       Ms. Thomas about the termination of the
2       detail. Is this something that you may
3       have put together? Is this kind of like
4       your style or somebody different?
5   A.  No, I didn't do that one.
6   Q.  Now, were you aware that Ms. Thomas had
7       made a request for sick leave?
8       Well, actually, she made a request to
9       extend her stay at civil rights. Were you
10      aware of that?
11          MR. DUBOIS: Object to the form.
12  A.  No.
13  Q.  Were you aware that she made a request for
14      sick leave that was --
15  A.  I did hear that, yes.
16  Q.  I'm going to show you Exhibit Number --
17      Well, I showed you Exhibit Number 22
18      earlier about the termination of the
19      detail. Now, Exhibit 20. Is this a
20      document you may have typed? Does it look
21      like your style?
22  A.  No.
23  Q.  But she did make a request for sick leave

Page 41

1  and was denied. You heard of that?
2  A. Yes.
3  Q. How did you hear of that?
4  A. I believe that Ms. Williams and
5     Mr. Crawford were talking and I heard
6     discussion of that.
7  Q. They were talking where?
8  A. Mr. Crawford's office.
9  Q. Was this something you were invited to or
10    you just happened to just be there?
11 A. I sit right outside the door.
12 Q. Have there been any other conversations you
13    just happened to have overheard by being
14    right outside the door about Ms. Thomas?
15 A. Not that I can recall right off.
16 Q. Any conversations regarding anyone in
17    Mr. Crawford's office about trying to make
18    Ms. Thomas leave or --
19 A. No.
20 Q. -- retire early or get out?
21 A. No.
22 Q. Are you aware of anyone who made complaints
23    about Ms. Thomas' work performance?

Page 42

1  A. Yes.
2  Q. Tell me about that.
3  A. Well, I would get phone calls sometimes and
4     people would ask to speak to someone in
5     PA. And if I would say she was the only
6     one there, they would say they'll call
7     back.
8  Q. And who would do that?
9  A. County office employees.
10 Q. Do you know any of them particularly?
11 A. That's too far back to remember. But, yes,
12    that did happen.
13 Q. Well, now, would they make a complaint or
14    they say they'll just call back?
15 A. They'd say they'd just call back.
16 Q. But what about any complaints?
17       MR. DUBOIS: Object to the form.
18 A. That's so far back I can't remember
19    specifics.
20 Q. Now, were you aware of what's called the
21    Blacks in Government conference or the BIG
22    conference?
23 A. Yes.

Page 43

1  Q. What is it, to your knowledge?
2  A. Blacks in Government, it's an
3     organization -- well, not necessarily for
4     blacks but mostly organized for blacks who
5     are in government positions.
6  Q. And, to your knowledge, was there anyone or
7     people in the state office who would
8     regularly attend those conferences?
9  A. No, not regularly.
10 Q. Were you aware that Ms. Ozetta Thomas
11    attended them yearly?
12 A. I remember one time she went. I don't
13    remember yearly.
14 Q. You only remember one time?
15 A. I remember she did go one time. I think to
16    somewhere in California.
17 Q. Do you recall whether or not she made a
18    request to go but it was denied?
19 A. Yes.
20 Q. I'm going to show you Exhibit 41. Is this
21    the request that you recall?
22 A. Yes.
23 Q. And this was while she was detailed to the

Page 44

1  office of civil rights?
2  A. Right.
3  Q. And, now, when this came in, did it go to
4     you first to get to Mr. Crawford?
5  A. Yes.
6  Q. What did you do with it when you got it?
7  A. I gave it to Mr. Crawford.
8  Q. And what, if anything, happened from there,
9     or do you know?
10 A. I know he had someone send out a request to
11    see who else might want to go. He wanted
12    to give other employees an opportunity to
13    go.
14 Q. Did he discuss that with you?
15 A. No.
16 Q. But you know he wanted to send out requests
17    for others to go?
18 A. Yeah. We got an e-mail or some sort of
19    correspondence asking if there were any
20    other employees who wanted to go to give
21    them an opportunity.
22 Q. Now, you say you got an e-mail --
23 A. I believe it was by e-mail. Yes, I'm sure

Page 45

1   it was.
2   Q.  -- saying that if there was anybody else
3       who wanted to go --
4   A.  Anyone who wanted to go was eligible to
5       go. If they wanted to go that he would
6       make a decision on who could go, I think,
7       or something like that.
8   Q.  Now, this e-mail came from someone?
9   A.  I believe Verdell Zeigler.
10  Q.  And I know it's been a while, but as far as
11      this e-mail, was this an e-mail where
12      Ms. Zeigler or someone would have sent
13      saying if anyone wants to go they need to
14      have the opportunity to go, or is this an
15      e-mail just asking if anyone wanted to go?
16  A.  It was giving them the opportunity to go
17  Q.  Say that again.
18  A.  I believe it was to give anyone an
19      opportunity. They wouldn't necessarily get
20      to go, but to express their desires if they
21      wanted to go.
22  Q.  Now, was this an e-mail directed to
23      Mr. Crawford telling him how to manage this

Page 46

1   situation?
2   A.  No. This was one he talked to her about to
3       send out to the employees to see who might
4       be interested in going.
5   Q.  That's what I'm trying to find out.
6       So after receiving Ms. Thomas' request,
7       Defendant's Exhibit 41, Mr. Crawford talked
8       with Ms. Zeigler, then instructed her to
9       send out an e-mail to all other employees
10      to see who was interested in going?
11  A.  Now, I don't know if it was before or after
12      the request but sometime in that time. I
13      don't remember the time frame.
14  Q.  I'm going to show you what is a part of
15      Defendant's Exhibit 42. Exhibit 42 is an
16      e-mail. The date on that e-mail is April
17      5, 2002.
18  A.  Uh-huh (positive response).
19  Q.  And I think Ms. Thomas' request was April
20      3, 2002. But then attached to this -- And
21      I think the question came up by counsel
22      here as to whether or not this -- the
23      attached memo went along with this e-mail

Page 47

1   or whether it was a separate one. But this
2   one is dated April 22, '02 asking anyone if
3   they wanted to go.
4   A.  That's the one that I saw.
5   Q.  The one dated April 22, 2002?
6   A.  I believe so.
7   Q.  But if you go -- at least go by this e-mail
8       that's in Exhibit 42, the e-mail sent from
9       Ms. Zeigler -- or out by Ms. Zeigler would
10      have been after the request of Ms. Thomas.
11      Do you agree with that? Based on these
12      documents.
13  A.  Not necessarily. It depends on when this
14      came in and if Mr. Crawford was in on that
15      day to look at it. It could have come in
16      and been on his desk and this went out
17      before. I couldn't say when they went
18      out. Other than this one. I see the
19      date. But the other one I don't know.
20  Q.  Talking about the one dated April 22, '02?
21  A.  No. The April -- This one is the only one
22      that's guaranteed the date it went at
23      because it's an e-mail. Sometimes things

Page 48

1   are typed but they're not mailed or
2   delivered on the day they're typed.
3   Q.  So do you know the circumstances of what
4       happened with this Blacks in Government
5       conference attendance?
6   A.  I believe two employees went, but I'm not
7       sure which two.
8   Q.  I'm going to show you what's marked as
9       Defendant's Exhibit Number 43, which is a
10      memo dated April. It's from Mr. Crawford
11      to Ms. Thomas about the Blacks in
12      Government conference.
13  A.  Uh-huh (positive response).
14  Q.  Is this the one you would have typed up?
15  A.  No.
16  Q.  I think in this one it talks about the --
17      Ms. Thomas' attendance, and I think on the
18      second page it shows where he denied the
19      request.
20  A.  He denied it the 23rd of April.
21  Q.  So that's dated a day after the April 22nd
22      one about asking people about going?
23  A.  Right.

Deposition of Irean Bennett                                                                          January 10, 2008

Page 49

1  Q. This is the one you saw dated April 22,
2     2002?
3  A. Yes.
4  Q. Now, at any time during Ms. Thomas' tenure
5     there at the state office and even after
6     she left the state office, were you privy
7     to or a part of gathering any statements
8     from any employees about Ms. Thomas?
9  A. No.
10 Q. Did you give any statements to anyone about
11    Ms. Thomas?
12         MR. DUBOIS: Object to the form.
13 A. Not that I recall.
14 Q. No written statements or anything of that
15    nature?
16 A. I don't think so.
17 Q. Did you assist Ms. Debbie Williams in
18    getting any statements?
19 A. I don't think so. I don't remember that.
20 Q. Since we're sitting here talking and I may
21    have asked you a few questions, has
22    anything jogged your memory that you may
23    want to add to or change or correct?

Page 50

1  A. I can't think of anything.
2  Q. Anything you think I need to know that may
3     change anything?
4         MR. DUBOIS: Object to the form.
5  A. No.
6  Q. Anything you want to just tell me?
7         MR. DUBOIS: Object to the form.
8  A. No.
9  Q. Not even if I smile?
10        All right. Well, no. Yeah. One last
11    thing. I do need to ask you this. Have
12    you been arrested for anything?
13 A. No.
14        MR. PETTAWAY: And that's all I
15    have.
16        Do you have any
17    questions?
18        MR. DUBOIS: Yes, I have a
19    question I want to clarify.
20        EXAMINATION
21 BY MR. DUBOIS:
22 Q. Let me direct your attention to this
23    document that's been marked Defendant's

Page 51

1     Exhibit 43. I'm sorry. That's the wrong
2     one. 42. Do you know what document was
3     attached to this April 5, 2002 e-mail from
4     Ms. Zeigler?
5  A. No. That one didn't come to me.
6  Q. And turning to the second page. Did you
7     write this memo?
8  A. No.
9  Q. Do you know when it was prepared or when it
10    went out?
11 A. No.
12 Q. And do you know if there are templates in,
13    I guess, USDA documents of sometimes the
14    date that's on the document when it was
15    printed out as opposed to when it's
16    written? Or can a date change depending
17    upon when it's printed out?
18 A. Oh, yes, definitely.
19 Q. Do you know if the second page was attached
20    to this April 22, 2002 e-mail that went
21    from Ozetta Thomas to Verdell Zeigler, cc'd
22    to Danny Crawford? Do you have any
23    knowledge one way or the other?

Page 52

1  A. No.
2  Q. That's all.
3         MR. PETTAWAY: Hold on one
4     second.
5         No further questions.
6         MR. DUBOIS: I'm done.
7
8     * * * * * * * * * * * *
9
   FURTHER DEPONENT SAITH NOT

     * * * * * * * * * * * *

Page 53

1        REPORTER'S CERTIFICATE
2   STATE OF ALABAMA:
3   ELMORE COUNTY:
4        I, Haley A. Phillips, Certified Court
5   Reporter, ACCR # 151, and Commissioner for the
6   State of Alabama at Large, do hereby certify that I
7   reported the deposition of:
8        IREAN BENNETT
9   who was first duly sworn by me to speak the truth,
10  the whole truth and nothing but the truth, in the
11  matter of:
12       OZETTA THOMAS,
13       Plaintiff,
14       vs.
15       MIKE JOHANNS,
16       Defendant.
17       In The U.S. District Court
18       For the Middle District of Alabama
19       Northern Division
20       Case Number 2:05-CV-411-WKW
21  on Thursday, January 10, 2008.
22       The foregoing 52 computer-printed pages
23  contain a true and correct transcript of the

Page 54

1   examination of said witness by counsel for the
2   parties set out herein. The reading and signing of
3   same is hereby not waived.
4        I further certify that I am neither of kin
5   nor of counsel to the parties to said cause nor in
6   any manner interested in the results thereof.
7        This 30th day of January 2008.
8
9
10
11       _____
         Haley A. Phillips, ACCR #151
         Expiration Date: 9/30/08
12       Certified Court Reporter and
         Commissioner for the State
13       of Alabama at Large
14
15
16
17
18
19
20
21
22
23

I, **Irean Bennett,** hereby certify that I have read the foregoing transcript of my deposition given on Thursday, January 10, 2008, and it is a true and correct transcript of the testimony given by me at the time and place stated with the corrections, if any, and the reasons therefor noted on a separate sheet of paper and attached hereto.

_____
**Irean Bennett**


SWORN TO AND SUBSCRIBED before me this 11th day of February, 2008.

_____
NOTARY PUBLIC

## CORRECTION SHEET

| PAGE | LINE | | CORRECTIONS |
|------|------|---|-------------|
| 10 | 8 | | Steven |
| 11 | 16 | | Jarmon |
| 12 | 3 | | Jarmon |
| 13 | 23 | | 19 years |
| 14 | 13 | | as to |
| 21 | 15 | | days where I am not in the meeting, I'm |
| 21 | 16 | | not sure where they would |
| 38 | 13 | | a State Committee meeting |

_____
(Witness)