IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| OZETTA THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 2:05-CV-411-WKW |
| | ) |
| | ) |
| MIKE JOHANNS, SECRETARY, | ) |
| UNITED STATES DEPARTMENT OF | ) |
| AGRICULTURE, FARM SERVICE, | ) |
| AGENCY, (FSA), | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF DANNY F. CRAWFORD

I, Danny F. Crawford, pursuant to 28 U.S.C. § 1746(2), declare under penalty of perjury that the following statement is true and correct based on my personal knowledge:

1.

I am currently the State Executive Director ("SED") for the United States Department of Agriculture ("USDA"), Farm Service Agency ("FSA") in Alabama. I was appointed SED in May 2001. I am responsible for overseeing the administration of FSA programs in Alabama. In my position, I supervise State Office employees divided into five divisions (the Executive Division, the Administrative Division, the Farm Loan Program Division, the Conservation/Price Support Division, and the Production Adjustment/Compliance Division). I also supervise four District Directors assigned to four regions of counties in Alabama. The four District Directors in turn supervise County Executive Directors ("CEDs") and employees in FSA county field offices throughout Alabama. In 2001 through 2003, the District Directors were Johnny Raby, Phillip Thrower, Richard

*E*

Burge, and Jack Crawley.

2.

As SED, I hold periodic meetings with Debbie Williams, my Executive Assistant and Acting

SED when I am out of the office, and the four District Directors. I also hold SED staff meetings,

generally attended by the four Chiefs who supervise the  Administrative Division, the Farm Loan

Program  Division,  the  Conservation/Price  Support  Division,  and  the  Production

Adjustment/Compliance Division, as well as Ms. Williams and Vicki Lane, the FSA Public

Relations/Outreach Coordinator, and my Executive Secretary, Irean Bennett. Ms. Bennett takes

notes of the SED staff meetings and prepares the official minutes.

3.

I also spend considerable time traveling throughout Alabama attending meetings and training

sessions on various FSA programs. I am now generally out of the State Office 35% of the time;

however, during my first two years of being SED (from about May 2001 through May 2003), I was

out of the office approximately 50% of the time visiting all the county offices in Alabama and

meeting county committees.

4.

Ms. Thomas was Chief of the Production Adjustment/Compliance Division when I was

appointed SED in May 2001.  In this position, she supervised a staff of agricultural program

specialists who answered questions and trained county office employees in Alabama about the

administration of FSA farm programs to farmers. The program specialists in her Division at the time

were Jeff Knotts, Sharrie Peterson, and Walda Messer. The programs her section were responsible

for included Payment Limitations ("PL"), reconstitutions, the Agricultural Marketing Transition Act

("AMTA") (which includes cotton), peanuts, tobacco, common provisions, compliance, disaster, and the Non-Insured Assistance Program ("NAP").

5.

After I became SED in May 2001, I begin receiving numerous complaints about Ms. Thomas from the District Directors. The District Directors complained that the CEDs and county office employees in their Districts had no confidence in Ms. Thomas's knowledge of the Program areas in her Division or in her training abilities. They told me that Ms. Thomas would give them wrong or inaccurate answers or information on Payment Limitations ("PL") and other programs in her Division. I also received similar complaints about Ms. Thomas's lack of knowledge directly from various CEDs. I had been CED in Limestone County prior to becoming SED, and I personally had similar problems with Ms. Thomas providing wrong or inaccurate information about PL.

6.

Ms. Thomas's staff in the State Office also complained to me that Ms. Thomas was not helpful in giving them knowledge or guidance regarding the programs in her Division.

7.

I did not receive complaints from District Directors, CEDs, or State Office Staff about other Chiefs lacking knowledge of the areas in their Division or failing to provide guidance.

8.

In May 2001, there was a PL operations review in Geneva County, Alabama, by Keith Ellis. During the review, Mr. Ellis found many serious problems with PL in Geneva County. Based on complaints I had received, I believed we had similar PL problems in other parts of Alabama. Mr. Chott, Acting Director for State Operations for the USDA/FSA and my supervisor at the time,

requested a plan by the Alabama State Office as to how these problems would be corrected in Geneva County and throughout Alabama. I provided him a copy of my plan. Mr. Chott responded that my proposals addressed the problems, but he still had concerns about "an apparent weakness" in my State Office's lack of expertise and handling of PL matters. He suggested reassignment of duties or much additional training at the State Office level. True and accurate copies of my plan and Mr. Chott's response memorandum are attached to this declaration as Exhibit A.

9.

On August 20, 2001, I spoke to Ms. Thomas about Mr. Chott's memorandum expressing concerns with PL in the State Office and the complaints I had received about her from District Directors and her own staff. A true and accurate copy of a memorandum that accurately describes the discussion I had with Ms. Thomas on that day is attached to this declaration as Exhibit B.

10.

On November 6, 2001, I gave Ms. Thomas a "not achieved" PWP and placed her on an Opportunity to Improve ("OTI"). The ratings were based on the numerous complaints I had received about Ms. Thomas, as well as my personal experiences with her performance. Ms. Williams, my Executive Assistant, was in attendance at the meeting and prepared a memorandum that accurately describes what was discussed at the meeting. A true and accurate copy of this memorandum is attached to this Declaration as Exhibit C. I subsequently had a follow-up meeting with Ms. Thomas on her OTI on November 29, 2001. The substance of this follow-up meeting is accurately described accurately in a memorandum prepared by my Executive Secretary who attended the meeting, and a true and accurate copy is attached as Exhibit D. By placing Ms. Thomas on an OTI, I hoped that she would improve her performance, learn the programs in her section, and become a better Chief.

11.

On December 5, 2001, the USDA entered into a Settlement Agreement with Ms. Thomas. Under the Agreement, Ms. Thomas's "not-achieved" PWP and all performance-related documents relating to Ms. Thomas since I became SED were expunged from her official personnel files. The "not-achieved" PWP was also replaced with an "achieved" PWP. Under the Agreement, the USDA also placed Ms. Thomas on paid administrative leave from December 6, 2001, through December 16, 2001, and then detailed her to the Office of Civil Rights, where she had previously worked for a period of time, from December 16, 2001, through January 5, 2003.

12.

This Settlement Agreement was between the USDA and Ms. Thomas. I was not personally responsible for implementing it or deciding what USDA employees had to have knowledge to ensure that the agency carried out each requirement of the Agreement. The task of ensuring that the Agreement was fully implemented was assigned to Ms. Williams, my Executive Assistant, who handles these types of personnel matters for the FSA State Office in Alabama. A document signed by Ms. Williams for me has the same force and effect as if I had personally signed my name. I did not share any terms of this Agreement with anyone in the Agency who did not have a need to know to implement it. I did not talk to Ms. Thomas about any aspect of the Agreement to implement it because I did not need to talk to her about the Agreement for the USDA to implement it.

13.

While Ms. Thomas was on administrative leave prior to her detail, I was informed that the desktop computer assigned to Valerie Moses, a State Office employee who handled time and attendance, was having problems and needed to be repaired. It was proposed to me that Ms.

Thomas's laptop be given to my Secretary Ms. Bennett, who had asked for a laptop instead of a desktop so she could work when she was away from the office, and that Ms. Bennett's desktop be given to Ms. Moses until Ms. Moses's computer could be repaired. It was my understanding that the office had no spare computers and that Ms. Thomas would not be returning to the office because she was on administrative leave until December 16, 2001, and then would report to the OCR for her detail. This seemed like a good use of the Office's limited resources, and I agreed with this plan and told Ms. Williams to carry it out. I did not tell anyone to deactivate Ms. Thomas's password.

14.

About a week later, Ms. Williams told me that Ms. Thomas had come to the office seeking her computer, and the computer was returned to her so she could access her email. I had no reason to believe that Ms. Thomas was not able to access her email when she was given her computer back.

15.

After the mediation, I had Ms. Bennett prepare a memorandum to FSA employees in Alabama informing them that Ms. Thomas had been detailed to the Office of Civil Rights and that Mr. Knotts would be acting chief in her absence. I did not tell Ms. Bennett the reason for this detail. I believe the language used accurately described what happened because the USDA had detailed Ms. Thomas to the OCR. I did not think the language had any negative connotations. The reason I sent the memorandum was because the employees in the field needed to know who to contact with program questions in Ms. Thomas's absence. Because Ms. Thomas was on detail, and had not been reassigned, her "full time equivalent" Chief position in the FSA State Office could not be permanently filled and her duties had to be handled by existing employees in addition to their own job responsibilities. I initially selected Mr. Knotts as acting chief based on my assessment of his

experience. Ms. Thomas never discussed with me who she wanted as acting chief during her detail, and it was my decision to make as SED.

16.

While Ms. Thomas was on her detail, she requested to attend a Blacks in Government Conference ("BIG") in Atlanta, Georgia, at government expense. I had previously authorized federal funding for Ms. Thomas and Ms. Lane to attend the BIG Conference in California in 2001, shortly after I became SED. At the time, I was told that each State was authorized to pay for two FSA employees to attend the conference, which was an optional training opportunity held by a third-party organization. I decided the fairest way to allocate this funding was to allow the employees with the most seniority, who had not previously attended a BIG Conference, the first chance to attend.

17.

When I learned about the BIG Conference in 2002, I asked Verdell Zeigler, Chief of the Administrative Division, to draft a memorandum on the BIG Conference and send it to Black FSA employees in the State to see who might be interested in attending. I told her to review the responses and select the two who had the most seniority who had not previously attended a BIG Conference. Ms. Zeigler later told me that Ms. Heard and Ms. Frazer were the two most senior employees who had not been to a BIG Conference who had asked to attend, and I authorized both of them to attend at government expense. Ms. Thomas and Ms. Lane were not selected because they both had attended the 2001 BIG Conference, and other employees wanted to attend in 2002 who had not previously attended a Big Conference.

Page 7 of 12

18.

Under the terms of the Settlement Agreement, Ms. Thomas's detail ended and the USDA was to return Ms. Thomas to her Chief position on January 5, 2003. As that date approached, my office processed the necessary paperwork for her to return and sent her a memorandum telling her I was looking forward to seeing her and asking her to call me if she had any questions.

19.

While Ms. Thomas had been on detail, Congress passed a new farm bill in May 2002, the Farm Security and Rural Investment Act of 2002. This new farm bill significantly changed several FSA programs that were covered by Ms. Thomas's Division. Among other things, the new farm bill added the Quota Buy-Out on Peanuts ("QBOP"), and its Direct and Counter-Cyclical Program ("DCP") replaced AMTA and changed the entire method for calculating production history. The changes were the most significant FSA program change since the mid 1980s, as the 1996 farm bill had essentially rolled over the prior farm bill. There had never been any program like DCP, and it was very confusing for FSA to administer. Tobacco was also replaced by the Tobacco Buy-Out Program, and other commodities were added such as soybeans. Due to the significant changes brought about by the new farm bill, I needed a full-time Chief of Production Adjustment/Compliance back as soon as possible, and I could not continue to have Ms. Thomas on detail, her position unfilled, and her staff handling her Chief duties with their own work.

20.

Right before Ms. Thomas's detail was about to end, I received a letter from Ms. Thomas indicating her attorney was alleging non-compliance with the Settlement Agreement and seeking an indefinite extension of her detail from the USDA's Employment Compliance and Technical

Assistance Division. She also indicated that she did not want to return to the FSA State Office, and she requested that until this matter was resolved she be allowed to work at a location outside the State Office or, if that was not feasible, to be placed on indefinite sick leave. I discussed this letter with Ms. Williams. We interpreted the first part of this letter as a request by Ms. Thomas to work as Chief from a location other than the State Office in Montgomery. I did not think that it was feasible for Ms. Thomas to work at a county office or other satellite office, because as Chief she had to be physically present and available to her staff in the State Office. I had never authorized a Chief to work from a satellite office. I had also never had an employee request indefinite sick leave. After consultation with Ms. Williams, I denied Ms. Thomas's sick leave request because she had not provided a doctor's note as required by policy. If she had provided a doctor's note, I would have granted it. In fact, when she provided a doctor's note in February 2003, with a request to take more than 3 days of leave, I approved the requested leave.

21.

After Ms. Thomas returned from her detail, I did not ignore her, prevent her from attending any meetings, or tell anyone not to call her. I never ignored any telephone calls or emails from Ms. Thomas, or made any deliberate effort not to speak to her. I was extremely busy in early 2003, and I was focused on my own obligations. On Thursday, January 9, 2003, the first day Ms. Thomas was back from her sick leave, I was in State Committee and District Director meetings for most of the day. On Friday, January 10, 2003, I had a District Director meeting, and then was on leave in the afternoon and on the following Monday, January 13, 2003. A true and accurate copy of my calender showing all my commitments during the first two months of 2003 is attached as Exhibit E.

22.

I expected Ms. Thomas would have to devote considerable time her first few months back learning all the significant changes in the new farm bill. I told Ms. Thomas after she returned from her detail to take as much time as necessary to learn the new farm bill and to talk to the specialists in her staff who had been working with the changes. It was my understanding after she returned that she had all the handbooks on the new farm bill and that she was spending her time learning all the changes. I did not receive any complaints about her or have any problems with her performance after she returned. Ms. Thomas never came to me with any questions or concerns.

23.

It is my understanding that Ms. Thomas has raised complaints in this lawsuit about not being invited to a farm loan meeting in the State Office after she returned from her detail. I was not present at this meeting, did not schedule it, and did not know the exact issues that would be discussed. I did not tell anyone to exclude Ms. Thomas from it, and did not ask Ms. Messer to attend it. I did ask Ms. Messer, before Ms. Thomas had returned to work in the State Office from her detail, to attend a separate meeting with a group of farmers in Autauga County that I anticipated might cover some farm loan and NAP issues. I asked Ms. Messer to attend because Ms. Thomas was still on detail, Ms. Messer specialized in NAP, and Ms. Messer had been handling the type of NAP issues that the farmers might raise at the meeting. I would have expected Ms. Thomas to learn about this meeting from her staff when she returned, and she could have attended if she wanted to attend. I was extremely busy the first few days after Ms. Thomas's return, and I did not make any deliberate decision not to tell Ms. Thomas about the meeting and did not exclude or prevent her from attending any meetings. Ms. Thomas never came to talk to me about any of these meetings.

24.

Ms. Thomas attended the only two SED staff meetings I held in January and February 2003, and issues pertaining to her Division were discussed at those meetings. I welcomed Ms. Thomas back at the first SED staff meeting on January 23, 2002, as indicated in the minutes from that meeting prepared by Ms. Bennett, my Executive Secretary.

25.

On January 14, 2003, I emailed Ms. Thomas and asked her to speak at a Cotton Expo in Dothan on February 28, 2003, on the DCP changes in the new farm bill or any issue pertaining to cotton, since I did not anticipate being able to attend. These issues both related to programs in Ms. Thomas's Division that were directly assigned to Ms. Peterson. Ms. Thomas wrote me back indicating that she would be glad to attend, but that she was still learning the changes to the new farm bill, which she found hard to decipher, and said she would place someone on standby to speak. I had no problem with her delegating the speaking to someone else, as she was Chief of her Division and was still learning the new farm bill, and I wrote back "that would be fine, thanks."

26.

Without any advance notice, I received an email from Ms. Thomas announcing her retirement on the morning of February 24, 2003. As SED, I do not personally plan retirement parties for Chiefs who retire, and have not planned one for anyone in the past. No one asked me to help plan, participate, or organize any retirement party for Ms. Thomas.

27.

I have received annual Equal Employment Opportunity training by USDA. I never discriminated against Ms. Thomas based on her race or gender, and I did not retaliate against her for filing any Equal Employment Opportunity Complaints.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statement of 27 paragraphs is true and correct.

_____
Danny F. Crawford

Executed this 27 day of February 2008.

# EXHIBIT A



**USDA**

1 States
rtment of
Agriculture

AUG 1 5 2001

Farm and Foreign
Agricultural
Services

Farm Service
Agency

TO:    State Executive Director
           Alabama State FSA Office

1400 Independence
Avenue, SW
Stop 0501
Washington, DC
20250-0501

FROM:   John W. Chott, Jr
            Acting Executive Director for State Operations

SUBJECT:   Geneva County Payment Limitation Review

Thank you for your proposals to take corrective action after the above review by Keith Ellis.

Your proposals directly address the problems, although I am concerned about an apparent weakness in your State Office's lack of expertise in and handling of payment limitations matters. This is an area you should look at carefully when you take corrective actions. The latter could include reassignment of duties or much additional training at the State Office level.

cc:    Chott
       EDSO

*Exhibit K*
*Pg. 21*

United States
Department of
Agriculture

August 13, 2001

Farm and Foreign
Agricultural
Services

Farm Service Agency

Alabama State Office
P. O. Box 235013
Montgomery, AL
36123-5013

Tel: (334) 279-3500
Fax: (334) 279-3550

TO:        John W. Chott, Jr.
           Acting Executive Director for State Operations

FROM:      Danny F. Crawford, State Executive Director

SUBJECT:   Geneva County Payment Limitation Review

Thank you for allowing Keith Ellis to conduct a review of payment limitation operations in Geneva County, Alabama. The review confirmed many of our concerns when we requested assistance. Keith did a superb job on the review. The thoroughness and professionalism used in Keith's analysis gives Alabama management the opportunity to correct many of our deficiencies. He pointed out the need for training of county office personnel. I do believe we have similar problems in other county offices in certain areas of the State. I agree with Keith's evaluation and propose the following to assure you Alabama will alleviate this problem:

- Complete, thorough statewide payment limitation training of all CED's, PT's, and State Office Specialists involved with Payment Limitations

- Have Geneva County complete a query to cross reference all payments to name and address file to help identify producers in question

- Develop a checklist for use by county offices to assure all necessary forms are filled out properly and required system updates are done correctly

- Develop a Payment Limitation team, after training, to review all 502's and related documents in Geneva County to identify incorrect forms used in determining person determinations and actively engaged producers

- New 502's and related payment limitation documents will be completed in a timely manner by producers found to have filed wrong and incomplete forms, before 2002 payments are issued, to protect overpayments by county office

USDA Is an Equal Opportunity Employer

Exhibit K
Pg.2

John Chott, Acting EDSO                                          Page 2

- Subsidiary files will be reviewed and corrections implemented by county office

- District Directors will use a STO developed checklist and complete all 502 status reviews (open estates) and report findings to the STO

- STO staff, to assure compliance of PL operations in all counties of Alabama, will complete annual P/L reviews of various counties

- Emphasize to county committees importance and concerns when determining persons and active engagements of county producers

- Implement any other recommendations by EDSO.

cc:
Ozetta Thomas, Chief STO PA/Compliance Division

# EXHIBIT B

Date August 20, 2001

Subject:        Memorandum for Record - Summary of Discussion Between Danny F.
               Crawford and Ozetta Thomas Concerning Mr. John Chott's Letter of
               August 15, 2001 and Other Related Matters

As I walked through the FSA State Office greeting people this morning, Ms. Ozetta
Thomas asked me, after our greeting, to discuss an item she had concerns about,
specifically a letter from John Chott. She stated the letter indicated concerns by EDSO
with the programs for which she has responsibility as Chief of PA/Compliance. I
explained to Ms. Thomas that she should be concerned with Mr. Chott's letter. It is
apparent from Mr. Chott's letter that he has concerns with the State Office pertaining to
payment limitation operations throughout Alabama county offices, as well as an evident
lack of knowledge of and failure to monitor payment limitation operations from the State
Office level. Ms. Thomas also was disturbed that a State Office Specialist from North
Dakota was going to train Alabama employees on Payment Limitation Operations rather
than her. Arrangements for this training resulted from a Payment Limitation review in
Geneva County, Alabama that revealed many shortcomings by that county office. Those
shortcomings were credited to a lack of training and understanding of payment limitation
operations. (These concerns are a reflection of Ms. Thomas' performance under
Performance Element #5, Program Management.)

I expressed to Ms. Thomas my concern over her apparent lack of knowledge of many
programs under her responsibility, and the need for her to be an expert in all the programs
under her supervision and management. I also shared with her many complaints from the
field about her training techniques and the lack of confidence many employees have in
her, including her own staff in the State Office. (These concerns are a reflection of Ms.
Thomas' performance under Performance Element #3, Supervision.)

We discussed the need to maintain control of training meetings. The recent NAP training
in Tuscaloosa was given as the example of lack of consistent answers, knowledge and
control during meetings. I reminded Ms. Thomas that we had previously discussed
effective training techniques during a State Committee meeting in North Alabama.

I emphasized to Ms. Thomas that her knowledge and expertise is critical for these
programs to be implemented properly throughout the State. Staffers and county offices
must be able to rely on her, as the expert, for support and confidence that the programs
are being implemented correctly. (These concerns are a reflection of Ms. Thomas'
performance under Performance Elements #5, Program Management and #8, Customer
Service.)

I discussed my displeasure with Ms. Thomas' lack of participation and concern during a
recent NAP Task Force meeting. The task force was developed to assist her in
establishing criteria (yields, planting dates, harvest dates, etc.) to determine producer
participation in this critical program.

Ms. Thomas offered a lack of communication and change in management style as the reason of the problems mentioned above. I explained that I believe improved leadership skills, better knowledge of programs, and closer oversight of assigned operations, etc. would have prevented these problems.

I recently requested Ms. Thomas' input into the corrective action plan for Geneva County. Her only response to my request was to refer me to her letter of May 9th to the Acting SED, Joan Grider, and a letter to Geneva County CED, Art Lynn. She indicated to me that, in her opinion, the recommendations she set forth in those memorandums mirrored the corrective plan I submitted to EDSO. I told Ms. Thomas that I have thoroughly reviewed those documents and they address very little, if any, of the corrective action plan I submitted EDSO. I expressed my disappointment in her failure to provide me with detailed input to such an important matter when requested.

Ms. Thomas offered that the number of programs under her responsibility was much to large and complicated for her to be an expert in each or to gain the knowledge needed to mirror the performance of other sections in our State Office. I agreed with her that this might truly be some of the problem. We discussed Mr. Chott's evaluation of Alabama's State Office organization and his recommendation that reorganization or reassignment of programs should be considered as a part of our corrective action plan. I related to Ms. Thomas that we would discuss this further at a later date.

I instructed Ms. Thomas to be more involved in the day-to-day operations of the programs for which she serves as chief. I directed her to provide more leadership and make an effort to develop more confidence in her staff in her knowledge and abilities. I explained that I expect her to monitor her assigned programs in county offices and have a handle on training needs in the future. This will require that she develop more knowledge of her assigned programs. I also told Ms. Thomas that I expect her to be prepared when making presentations or delivering training and to utilize more effective training techniques. These are my expectations of all section chiefs in the Alabama State Office, and I expressed to Ms. Thomas that I expect no less from her.


Danny F. Crawford
State Executive Director


Received and acknowledged.


_____                    _____
Ozetta C. Thomas                                              Date

*This was received by me on 09/12/01 in my metal room. I refuse to sign, as this is not inclusive of our conversation on 08/20/01.    cc/ 09/14/01*

# EXHIBIT C

Memorandum for Record                                              November 6, 2001

Subject: Ozetta Thomas - Performance Appraisal

SED, Danny Crawford, met with Ozetta Thomas, Program Specialist, to discuss Ms. Thomas' performance and finalize her appraisal for the period October 1, 2000 through September 30, 2001. The plan developed by Daniel Robinson, former SED, and Ms. Thomas on October 24, 2000 was carried forward when Mr. Crawford was appointed as SED on May 21, 2001. Mr. Robinson did not leave a rating of record on Ms. Thomas for Mr. Crawford's information when he left the position.

Mr. Crawford requested the presence of Deborah Williams, Executive Staff Assistant, as a witness to the meeting.

Mr. Crawford reviewed the Performance Plan and discussed each element. As the elements were read, concerns and deficiencies were discussed. Mr. Crawford reminded Ms. Thomas of their meeting of August 20, 2001, during which he addressed some of his concerns with her performance. Ms. Thomas received a Results Not Achieved rating on the following performance elements: Program Management, Customer Service, and Supervision.

Mr. Crawford informed Ms. Thomas that she was being placed on an Opportunity to Improve for a period of 120 days. He will provide closer supervision during the OTI and will meet with her every three weeks to evaluate her progress and discuss any problem areas. Mr. Crawford will also attend Ms. Thomas' staff meetings. She will be scheduled for training in the areas of supervision, management, and effective training techniques; as well as program training when deemed appropriate.

Mr. Crawford allowed Ms. Thomas time to review the evaluation and the OTI. After a few minutes, Ms. Thomas asked if the counseling confirmation letter would be attached to the evaluation. Mr. Crawford responded that it would not. That letter would be maintained in his supervisory file.

Ms. Thomas asked why she was not being allowed an opportunity to respond to the evaluation. Mr. Crawford reminded her again of their meeting of August 20, 2001, during which he outlined specific areas of concern. He discussed those concerns again in detail by taking each element with a "not achieved" rating and outlining the deficiencies and required improvement for each. After each element was discussed, he asked if she had any comments. She did not.

Mr. Crawford advised Ms. Thomas that she would be scheduled to attend two training sessions, one on November 15-16 and another on December 3. She indicated that she would be unavailable to attend the November 15-16 session due to personal reasons. Mr. Crawford agreed to reschedule the training.

At this point, Ms. Thomas stated that she feels she should have been given an opportunity to respond to Mr. Crawford's concerns before being placed on an Opportunity to Improve. Mr. Crawford told Ms. Thomas that he had given her an opportunity to respond when he met with her on August 20. At that time, she refused to acknowledge receipt of the memorandum, and did not choose to respond further. They have had several conversations since that date concerning issues that are being addressed at this time.

Mr. Crawford expressed that he expects Ms. Thomas to be the authority on all the programs for which she is responsible. He pointed out that, as discussed earlier, the NAP training conducted in Tuscaloosa was not acceptable to him. Just after that training began, Ms. Thomas was asked the same question three different times and each time, she gave a different answer. He told her it

would have been more appropriate for her to say, "I don't know, but I will find out" rather than guess. The manner in which she handled that situation caused her to loose respect of the participants almost immediately and had a negative impact on the overall training.

Mr. Crawford said that he would take several actions to compliment the OTI process and expected her to do the same. One: He expects her to study procedure and make a concerted effort to improve her program knowledge. Specific program training will be provided whenever feasible during the OTI. Two: Mr. Crawford will monitor Ms. Thomas' staff meetings in order to observe how she interacts with her staff on a first-hand basis. He asked that she work with him on scheduling her staff meetings to ensure that he is available. Three: Mr. Crawford will meet with Ms. Thomas every three weeks to discuss her progress and outline any concerns.

Mr. Crawford told Ms. Thomas he wants her to make an effort to develop confidence in her by her subordinate staff as well as field employees. He wants her to gain, or regain, their support. He would like her to be more effective in dealing with programmatic issues. This, in itself, will help increase confidence in her. He told her he expects her to delegate tasks, but it is not acceptable for her to delegate the requirement to maintain knowledge of programs for which she is responsible. In order words, it is not acceptable to him for her to expect her staff to maintain knowledge of the programs and not do the same herself. He reminded her of times that she has told both him and the State Committee that she is not an expert in any of her programs expect Payment Limitations. As the Chief of the Production Adjustment/Compliance Section, that is unacceptable to him. He will not exempt her from knowing her programs or being involved in key elements of the programs.

Mr. Crawford signed the performance appraisal and Opportunity to Improve. However, Ms. Thomas refused to sign either. Mr. Crawford told her she was not required to sign. However, her refusal to sign did not mean that the OTI would not be put in place. It is effective November 6 and will end on March 5, 2002.

Ms. Thomas stated that she will do whatever Mr. Crawford says she must to improve her performance, but she will not place her signature on any document because she does not believe her performance is that bad. She stated Mr. Crawford is using one training session to base his actions on. She told him she was very intimidated at the beginning of that training and she lost before she ever got started. She did not believe he was being fair to her. Mr. Crawford asked her why she was intimidated before the training started. Ms. Thomas stated that people have been "at her" right and left since he came on board as SED. She asked how she could have gone 30 years not knowing the programs. She stated his allegations on her performance were not true. She stated that people don't like her and that is her problem. Mr. Crawford asked who does not like her. She responded, "Evidently, no one." She said she could not see how, after all these years, her performance has gone down so fast, that she would receive a "not achieved" on three of her five elements.

Mr. Crawford told Ms. Thomas that he did not know about the past. He could only respond to her performance since he became SED. He is not basing this OTI on strictly the one NAP meeting. He is using that incident as an example of how she must comply with his instructions and make an effort to improve. Ms. Thomas told him that she had no control even before that meeting started. Mr. Crawford explained that in order for her to achieve the goals he had established for her, she must agree there is a need for improvement. She stated that when people don't like you, nothing you do is right. She feels the NAP meeting was destined to be against her. She has no idea why problems with her performance are just now coming to light.

Mr. Crawford told Ms. Thomas that he hopes she sees and understands the need for a Chief Program Specialist to be able to answer questions during a training session. The fact that she felt intimidated, but cannot identify why, is not an acceptable answer as to why she was unable to effectively carry out her duties during that training session. He reminded her that she had 30

days to prepare for the training, which is unusual for FSA. Guessing and giving incorrect answers are not caused by intimidation. That is caused by a lack of knowledge.

He also reminded her that well before the meeting in question, he told her to utilize more examples and not simply read off the screen to the participants. However, reading is exactly what she did. In fact, he told her that he is aware she told her staff that she had no intentions of changing her training techniques at his direction.

Ms. Thomas again stated that no one likes her. Mr. Crawford told her she should admit her weaknesses and attempt to improve rather than look for excuses. He told her it is not acceptable for her to ignore his instructions simply because she has always done something a particular way. He suggested that might be part of the problem.

Mr. Crawford told her to schedule a staff meeting on November 20 in order for him to attend. Their first follow-up meeting will be scheduled the week of November 27.

Mr. Crawford asked if Ms. Thomas had any further questions or comments. She did not. He stressed to her that he believes they can achieve her goals if they work together.


Danny F. Crawford
State Executive Director

# EXHIBIT D

Memorandum for Record

November 28, 2001

Subject:  Ozetta Thomas – OTI Follow-Up Review

SED Danny Crawford met with Ozetta Thomas for the first three-week progress review after implementation of an Opportunity to Improve (OTI).

Mr. Crawford explained that he had been unable to attend Ms. Thomas' staff meeting on November 27 due to an Alabama Agribusiness Council meeting. However, he has received positive feedback from her previous staff meeting. He felt the meeting was very organized. Employees in Ms. Thomas' section have indicated her efforts in that meeting gave them more of a sense of leadership on her part. He felt the written agenda was a positive change and her staff had responded positively. He told her those are the kinds of things he thought she should do to ensure her staff knows she is in charge and familiar with subject matter to be discussed during the staff meetings. He acknowledged that she was scheduled to attend workshops and indicated he thought she would discover other simple techniques that would help her regain confidence of her staff.

One area of concern was training techniques, and in the past three weeks, he has not had the opportunity to observe any improvement in that area. He encouraged her to seek workshops that would help her improve training techniques as discussed in the past.

Mr. Crawford asked Ms. Thomas if she has taken the opportunity to review any program handbooks. She responded that she reviews procedure on an every day basis. She stated that she reviews all handbook amendments before they are filed in the basic handbook. She has always made this a routine practice when amendments are received. Mr. Crawford asked if she is able to retain the information. He asked if she compares the phone calls she receives to the changes outlined in the amendments. Ms. Thomas responded that she sometimes has to refer to the handbook when she receives calls to make sure she is giving the right answer. If she is still unable to answer a question, she contacts the National Office. She stated that she would never know everything and Mr. Crawford explained that no one expects her to know everything, but he does expect her to handle questions appropriately and follow-up when she is unable to give an immediate answer.

Mr. Crawford asked how Ms. Thomas is managing the programs under her supervision. Has she made any assignment changes, etc? She responded that program assignments have not changed. The employees are performing the same duties they were when she was selected as chief. The one exception is Walda Messer who had just been hired when Ms. Thomas became chief. She waited until Ms. Messer obtained the GS-12 level before she assigned the NAP

and LAP programs to her. Ms. Thomas pointed out that Ms. Messer works only 60% of her time in the Production Adjustment section. The remainder of her time is spent working in the Conservation/Price Support section. Jeff Kotts is assigned the compliance program along with GIS and GLS. Sharrie Peterson is assigned reconstitutions, peanuts, tobacco, and name and address. She has not assigned payment limitations because no one wanted it. Mr. Crawford asked what exactly did she mean when she says programs are assigned to an employee. What does she expect the employee to do with the program? Ms. Thomas responded that when she assigns a program, the employee is in charge of the program. If a county office has a question, she expects the employee to handle the problem with her assistance only if needed.

Mr. Crawford asked if she received a question on peanuts or Loss Adjustment, would she refer the questions to Sharrie or Jeff. She responded that if a question comes directly to her, she answers it. She stated that she has never been very familiar with peanuts, but if Sharrie is not in the office she attempts to find the answer in the handbook or calls the National Office for guidance. She stated this also applies to questions on tobacco. Mr. Crawford pointed out that these were two areas that she should be focusing on if she is aware that she is weak in those areas.

Mr. Crawford asked if Ms. Thomas ever defers questions to her specialists. She again stated that if the question comes directly to her, she handles it. He asked if it was common for county office personnel to come to her directly with questions on peanuts and tobacco. She said they usually contact the specialist assigned to the program. Ms. Thomas stated that since employees have individual phone numbers that are published to county offices, field employees usually contact the specialists instead of her. She gets calls if the specialists are not available. Most payment limitation questions come directly to her since the program is not assigned to any of the specialists. Mr. Crawford asked how she was made aware of problems if the questions go directly to the specialists. She responded that she had asked her staff members to keep her informed.

Mr. Crawford asked if she had implemented a telephone log to keep up with unresolved issues. She responded that she had. He pointed out that the telephone log would be a good management tool for her to keep informed on problem issues and to ensure that her employees were responding appropriately to questions. He expressed concern that she relied solely upon her employees to bring things to her attention. This created a very real potential for her to be unaware of potentially serious problem areas. He told her that closer interaction with her employees and daily reviews of the telephone logs would help resolve this concern. He suggested that rather than tell her staff to come to her with problems, she should make it a habit to visit their workstations on a regular basis and ask what they were working on and what problems they were encountering. He told her that weekly staff meetings were good, but they were not sufficient for a manager to keep on top of issues and know what was going on in the section.

He told her to get out into the section more and not just tell her staff that if they need her, they should come to her. Ms. Thomas indicated that she has always interacted with her staff. Mr. Crawford said that some of her staff had indicated they needed and wanted more interaction from her. He told her to visit their workstations more, share one-on-one with them, and show them that she is knowledgeable and in control of the section. This will also help to promote teamwork in the section.

Mr. Crawford returned to the telephone log issue and asked if the phone calls were logged daily. Ms. Thomas responded that the logs are placed in a binder weekly. The number of logs turned in depends on the amount of activity in the county offices and the number of questions received. As of this date, they have received quite a few. Mr. Crawford asked if she reviewed the logs on a daily basis and she responded that she did not. He indicated that a weekly review was not sufficient for her to stay on top of issues in a timely manner. Ms. Thomas indicated that all calls are not problem cases and the specialists can answer the call immediately. They only come to her with problem cases. If they have a problem and cannot answer a question, they write it down and put it in the binder. He asked if she was notified of such problems immediately. She responded that she was usually notified within the same day. Once again, Mr. Crawford told Ms. Thomas that he was not satisfied with her telling the specialists to come to her. He wants her to take the initiative as chief, go to them daily, and ask what problems they are having. He wants her to let them know that she can and will help them.

Mr. Crawford asked that if all specialists are in the office and the majority of calls go directly to them, what duties does she perform on a typical day. Ms. Thomas responded that she receives calls too and handles a lot of paperwork. She spends some time on the telephone with National Office personnel discussing procedure and problems. She receives the majority of payment limitation calls and receives calls on other areas as well. Mr. Crawford reminded her that she had previously stated that most calls go to the specialists. She acknowledged that they do, but she does receive some calls because the specialists are often tied up on the phone with other calls. Mr. Crawford asked if she advised the specialists of the problem cases she handles. She indicated they discuss these issues during staff meetings. Ms. Thomas also stated that she handles all the appeals for her division as well as ineligibility claims. These issues take a lot of time and concentration.

Mr. Crawford moved the discussion to State Committee meetings. He has observed that the specialists handle their appeals on their program areas. He asked what type of appeals she handled. She responded that she handles appeals where the producer goes to the county office as well as NAD appeals and STC appeals when the producer comes before the Committee. Ms. Thomas indicated that Sharrie Peterson handles authorization codes. Mr. Crawford asked how State Committee minutes were written. Ms. Thomas responded that

each specialist writes their own minutes and the Program Technician compiles them for the SED's secretary to incorporate into the final minutes. Mr. Crawford asked since specialists do not attend off-site State Committee meetings, does she write the minutes for those meetings since she is the only employee from the section to attend. She responded that the specialists write those minutes as well based on information she gives them. Mr. Crawford asked if she saw a problem with the specialists writing minutes for a meeting they did not attend. She responded that she has always handled minutes in this manner and did not see a problem. She indicated that there are not very many off-site State Committee meetings anyway. Mr. Crawford told Ms. Thomas he thought it would be more efficient for her to write the minutes rather than relaying information to each specialist and them writing minutes. Mr. Crawford also reminded Ms. Thomas that the State Committee has requested agenda items in advance in order for them to review issues prior to the meeting and it appears that her section has not complied with that request on several occasions. He indicated that it is also common for his secretary to have to wait on her section's minutes. It could be that the manner in which minutes are written is contributing to this problem. Ms. Thomas stated that most of the minutes are pre-written except for the State Committee's decisions and they just fill in the decision and who made the motions, etc.

Mr. Crawford told Ms. Thomas that they would work together on building the confidence of her staff and improving her training techniques as opportunities arise. He told her that, as he had indicated before, she is welcome to attend any training that she thinks would be beneficial to her. He asked her to let him know if she has identified any workshops or courses she feels would be helpful. He also indicated that he would continue to review programs and identify those he thought she should attend. Ms. Thomas told him that she receives leaflets on training and she is watching for workshops to attend. She has checked out two videos from the administrative division and has one more to watch.

Mr. Crawford asked Ms. Thomas if she has noticed any change, positive or negative, in her staff resulting from her recent efforts to be more involved in their work. She said she has noticed no change. They are the same as far as she knows. She indicated she was not aware there was a problem until he told her. She said the only things she has done differently were to have them log in their phone calls and document everything in writing. She has always told her staff if they have a problem with her, they should let her know and they would work on whatever the problem is. If they do not tell her about problems, she has no way of knowing. Mr. Crawford said it is only human nature to be reluctant to tell your superior that you have a problem with them or their performance. He feels the confidence level is still not what it should be with her staff. Her attitude has always been that if they have a problem with her or with their work, they should come to her. He stressed again the importance of her going to them and working to build the confidence. They need guidance with setting priorities. They are sometimes very frustrated because they may have 100 things to get done and

time to do only 80. What do they do? This is where she should be aware of the issue, setting priorities, and managing the staff in order to get the work done. He wants her to "roll up her sleeves" and spend a lot of time with her staff. She said she goes to their workstations many times whether they admit it or not. Mr. Crawford said that she must have not been doing enough of this because there appears to be a problem with the staff. He also indicated that since becoming SED, he has not observed her working at any employee's workstation. She is always in her office, many times with the door closed.

Mr. Crawford asked if she had discussed any of these issues with her employees, particularly during recent performance evaluations. She replied that she asked them if they thought the section was working as a team and she got a totally different picture than he obviously has. Mr. Crawford told Ms. Thomas that some members of her staff indicated to him that they do not even know if she is in the office unless they go to her office. He emphasized that he is attempting to help her with issues her employees had brought to his attention. His personal observations tend to indicate that the employees have reason for concern.

Mr. Crawford stressed to Ms. Thomas that confidence in her is a major concern to him. He hopes that questions are not going directly to the specialists because county offices lack confidence in her. Both county office employees and District Directors have told him this is the case. He stressed again the importance of being knowledgeable in program areas. He said a county office employee should be glad to get the chief on the telephone because that person should be the most knowledgeable one in the office. Ms. Thomas stated that more people did call her before he became the SED and since he came into the State Office, they do not call. She believes the confidence level fell when he became the SED. Mr. Crawford explained that he had a good working relationship with many county office people because he had been a CED. This may be why they are so willing to share concerns with him when they were reluctant to share with former SEDs.

Mr. Crawford stated that Ms. Thomas evidently does not believe there is a problem. He reminded her that she has told him and the State Committee that she is not an expert in her programs. She relies on her specialists to handle the details. He told her that if he asks any other chief a question in any of their areas of responsibility, they can help. If he asks her a question, she has to rely on her specialists for help. He wants to fix that. He wants it to be that when someone asks her a question, she knows the answer and does not have to refer most questions to a specialist under his supervision. He is not talking about every little detail, but she should have a good knowledge of all her areas of responsibility. He stressed that her opinion of the problems was not as important to him as what the field offices and District Directors think. Everyone but her is telling him that there is a problem, and from his personal observation, he agrees. Ms. Thomas stated that before voice mail was installed in the office, all calls came into the main section number. The Program Technician referred calls to

the specialists. When voice mail was installed and every specialist got their own number, county offices began calling the specialists directly. She stated county office employees hardly ever call her directly because they know what specialist handles the program. It is not like she is referring the calls to the specialists. Mr. Crawford told her that he had received complaints that even when someone did talk to her, she had to obtain assistance from Sharrie or Jeff to get the answer. Ms. Thomas admitted that if it was a question on peanuts, that was probably so.

Mr. Crawford asked to see the telephone logs for each person in her section, including her own. She advised him they were all in the same binder. He asked when the logs were placed in the binder and she said each Monday. He asked to see it along with the logs that were on each employee's desk. Ms. Thomas went to retrieve the logs and returned. Mr. Crawford reviewed each log and commented that Walda Messer received quite a number of calls. Ms. Thomas commented that Ms. Messer works in three different divisions and that is why she receives so many calls. Mr. Crawford asked if all problems had been resolved and no one was to be called back. Ms. Thomas responded yes, for the most part. However, if a question could not be answered, the employees write out the details so they will remember when they have to get back on the issue. Mr. Crawford asked if they indicate a date to make a follow-up contact. Ms. Thomas responded no. Mr. Crawford expressed concern about this because if the employee who made the notation was not available, no one else would know how or when to follow up. Mr. Crawford asked if the logs were maintained on each employee's desk until placed in the binder. She responded yes and that they are available for anyone to review if the employees is not in the office. Mr. Crawford asked if she had assigned someone to review the logs of those who were out of the office to ensure contacts are made timely. She responded that she had not, but she would have the Technician do this. Mr. Crawford asked if someone maintains the binder and follows up on any outstanding calls after the logs are placed there. She said no, but she would either assign someone to do that or she would do it herself, depending upon who was available. Mr. Crawford suggested that the specialists notate their calendars to remind them they have committed to calling someone back. Ms. Thomas responded that "she guessed she should address that; she did not know." Mr. Crawford told her to establish a policy and administer it consistently.

Mr. Crawford told Ms. Thomas that he felt they were making progress and he had no reason to believe it would not continue. He feels they will meet their objective and reach the standard of performance he expects. He said they would schedule the three-week reviews as closely as possible, but that adjustments in the schedule may be needed with the holidays coming up. He told her to come to him anytime she needs assistance and he would make a point to visit with her more often during the OTI period to observe and make suggestions for improvement. They will try to conduct another progress review the week of December 18. If she has leave scheduled for that week, she should let him know

in advance.  He also asked if she had any use or lose leave.  She responded that she did not.

Mr. Crawford asked Ms. Thomas if she had anything to add or any suggestions to make.  She replied that she did not.  She was proud he thought things were working better and she would continue to do her best.  She added that he had only 11 more months to put up with her because she would be retiring.


Danny F. Crawford
State Executive Director

# EXHIBIT E

# SED CALENDAR

# JANUARY 2003

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | 1 **HOLIDAY - NEW YEAR'S DAY** | 2 *A/LEAVE* | 3 *A/LEAVE* Irean Off Day | 4 |
| 5 | 6 2003 Beltwide Cotton Conference - Nashville Ozetta Returns *1:00 DAFA Teleconference on 2002 COC Election & Media Outreach* | 7 *Pike COC Meeting* | 8 | 9 *8:15 am - STC MEETING - STO* *DDs in STO* | 10 *8:15 am– SED & EO Meet with DDs* *10:00 FAC & SEB Meetings* PM A/Leave | 11 |
| **PP 1** | 13 **A/LEAVE** CC | 14 *AUTAUGA CO* 9:30 Ala. Forestry Planning Committee Meeting - Auburn | 15 **10:00 District Meeting - Dallas/Lowndes CO** | 16 **1:00 - Willie James Brown - Room 201- STO** Irean A/Leave | 17 **A/LEAVE** Irean Off Day | 18 |
| 19 | 20 **HOLIDAY – MARTIN LUTHER KING, JR's BIRTHDAY** | 21 **MADISON CO** | 22 9:00 Wheat, Corn & Soybean Meeting - Talladega | 23 *8:15 Staff Meeting* | 24 **PM - A/LEAVE** | 25 |
| 26 *Duck Season Closes* '2 | 27 *A/LEAVE* CC | 28 9:30 Alabama Forestry Council Winter Meeting - Millbrook **A.M. - LEAVE** **1:00 - CRP Teleconference** **5:00 -8:00 pm Knology Service** | 29 **1:00 - SEA SED Teleconference** Mail @ [illegible handwriting] Chilton Co | 30 10:00 - 11:30 *FLOT Interviews - Coffee CO* **3:30 Sharon Holmes & Carlton O'Neal - 2nd Floor Conference Room** | 31 *9:00 - 1:00 FLOT Interviews - STO* Irean Off Day | |

# SED CALENDAR

# FEBRUARY 2003

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | | | | **1** |
| **2** | **3** 9:30 Tour - Pat Dye's Farm - Auburn<br><br>1:00 - STC *Meeting – Opelika* | **4** *8:30 - STC Tours – Auburn & Opelika Area* | **5** *8:00 - STC Meeting* 1:00 - Black History Tour *3:30 State Conference Planning Meeting – Opelika* | **6** *8:00 State Conference Planning Meeting - Opelika*<br><br>*12:00 FLP Teleconference* | **7** 6:30 pm - Dinner Alabama Soybean Assn. Board of Directors - Huntsville | **8** *Speak at Alabama Soybean Assn. Annual Meeting - Huntsville* |
| **9**<br><br>PP3 | **10**<br><br>**9:30 - District Meeting Lawrence CO**<br><br>*CC* | **11** 9:00 W.J. Brown Prehearing Teleconference<br><br>**12:30 –5:00 FLP Training – Hilton Perimeter South - Birmingham** | **12** *FLP Training – Hilton Perimeter South - Birmingham* | **13** FLP Training – Hilton Perimeter South - Birmingham<br><br>12:00 SED Only Teleconference<br><br>*6:30 PM - Speak at S&WCD Meeting - Livingston* | **14** *Valentine's Day*<br><br>**Greene/Sumter County Office**<br><br>*Irean Off Day* | **15** |
| **16** | **17** HOLIDAY - GEORGE WASHINGTON'S BIRTHDAY<br><br>3:30 SHELBY TOWN MEETING - ATHENS | *18* 9:00 SPEAK SESSION | *19* 8:00 Dr. Oneal - STO 10:00 George Hall - STO<br><br>9:00 - Electronic Funds Control Training Net Meeting | *20* Annual Farmers Conference - Tuskegee | *21* Annual Farmers Conference - **Tuskegee** Ala. Cattlemen's Assn. Annual Meeting - Montgomery 10:00 Annual Meeting Alabama Peanut Producers Assn.- Ozark | **22** Ala. Cattlemen's Assn. Annual Meeting - Montgomery<br><br>12:15 ACA Legislative Luncheon - Civic Center |
| **23**<br><br>PP 4 | *24*<br><br>**A/LEAVE**<br><br>National CRP Farm Bill Training - KC<br><br>Irean A/Leave<br><br>*CC* | **25** CRP/GIS Training - Opelika<br><br>National CRP Farm Bill Training - KC<br><br>10:30 Annual UAP Southeast Cotton Meeting - Madison<br><br>**11:30 Cotton Production Meeting - Harpersville** | **26** CRP/GIS Training - Opelika<br><br>National CRP Farm Bill Training - KC<br><br>1:00 - SEA SED Teleconference<br><br>**AAC Annual Meeting - Montgomery (7:30 Breakfast) (9:00 Business Meeting) Speakers : 10:00 Riley, 10:30 Sparks** | **27** CRP/GIS Training - Opelika<br><br>National CRP Farm Bill Training - KC<br><br>12:00 Homeland Security Teleconference<br><br>O/N Dothan? | **28** Ala. Forestry Assn. Mid-Winter Meeting – Pt. Clear<br><br>National CRP Farm Bill Training - KC<br><br>**9:00 a.m. - Cotton Expo - Peanut Festival Bldg. on Hwy 231 - Dothan**<br><br>*Irean Off Day* | |