IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| OZETTA THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 2:05-CV-411-WKW |
| | ) |
| MIKE JOHANNS, SECRETARY, | ) |
| UNITED STATES DEPARTMENT OF | ) |
| AGRICULTURE, FARM SERVICE, | ) |
| AGENCY, (FSA), | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF SHARRIE PETERSON

I, Sharrie Peterson, pursuant to 28 U.S.C. § 1746(2), declare under penalty of perjury that the following statement is true and correct based on my personal knowledge:

1.

I am currently employed as an Agricultural Program Specialist with the Farm Services Agency ("FSA"), United States Department of Agriculture ("USDA"), in Montgomery, Alabama, until my retirement on January 3, 2008. I have held this position for approximately 20 years. From 1986 to 1998, my direct supervisor was Daniel Robinson, who was Chief of the Production Adjustment/Compliance Division. Ozetta Thomas served as my direct supervisor, and Chief of Production Adjustment/Compliance, from October 1998 until she was detailed to the Office of Civil Rights, and for a brief period when she returned from her detail in January 2003 until her retirement. I consider Ms. Thomas a friend.



2.

When I worked for Mr. Robinson, the program areas under my responsibility included peanuts, tobacco, AFIDA, farm records, name and address, and reconstitutions. When Ms. Thomas was hired into the Office of Civil Rights in 1998, I assumed the additional areas of payment limitations ("PL") and ~~wheat and feed~~ Production Flexibility Program (PFC) pgp. Mr. Robinson was a subject-matter expert in PL and a valuable resource of information, and I was able to go to him with questions when I was learning the PL area. I continued to work in these areas when Ms. Thomas returned to FSA as Chief of Production Adjustment/Compliance in October 1998, after Mr. Robinson became State Executive Director.

3.

While performing my job, I would receive calls directly from county office employees with questions or issues concerning the program areas under my responsibility, and I would do my best to answer them. Some of the county employees who called regarding PL would tell me that they were glad that they could talk to me about their PL questions instead of Ms. Thomas. I never told Ms. Thomas about these statements.

4.

In 2002, Congress passed a new farm bill, the Farm Security and Rural Investment Act of 2002. This new farm bill significantly changed several of the program areas that were under my responsibility. Among other things, the Quota Buy-Out on Peanuts ("QBOP") took away the peanut quota program and put peanuts under Direct and Counter Cyclical payments like other commodities. Direct and Counter-Cyclical Payment ("DCP") replaced ~~wheat and feed~~ PFC program agp and changed the entire method for calculating production history. Since these were drastic changes from the prior farm bill,

*and* ~~and~~ I devoted considerable time to learning the changes in 2002, attended training, and read handbooks and training materials. I had to learn these changes to be able to perform my job. After I learned the details of the new farm bill, I provided training on multiple occasions to producers and USDA employees on the new farm bill. My training sessions on the new farm bill included ones in Birmingham and another in Tuscaloosa in September 2002. Ms. Thomas and some other members of the Office of Civil Rights attended some of this training.

5.

In January 2003, Ms. Thomas returned to her Chief position in Production Adjustment/Compliance, from her detail. Ms. Thomas stayed in her office most of the time, and I did not see her that often. I was very busy during the first few months of 2003 working on parts of the new farm bill, and had little time to talk to anybody about non-work issues. One of the big issues in early 2003 concerned QBOP, as peanut producers had to sell their quota. There were also DCP issues relating to reviewing production histories of producers. If Ms. Thomas asked me any questions about the new farm bill, and the areas within my responsibility, I would have answered them. Ms. Thomas did ask me to speak in Dothan, Alabama, at the Cotton Expo in February 28, 2003, and I did speak on the DCP program at that event.

6.

I have received annual Equal Employment Opportunity training by USDA. I have near heard Mr. Crawford (the current SED), Ms. Williams, or any other supervisor make any racially or sexually offensive comments or any negative comments about anyone using the EEO process. I have never used any racially or sexually offensive language, nor made any negative comments about Ms. Thomas' use of the EEO process. I have no problem reporting to an African-American, female



supervisor, and I never discriminated against Ms. Thomas in any way.

7.

I never observed any interactions between Mr. Crawford or Ms. Williams and Ms. Thomas, other than a few times when Mr. Crawford attended section staff meetings. I do not recall when these meetings were or how many he attended. I never saw anyone treat Ms. Thomas with anything but respect. I never heard or observed anything that made me think that anyone at USDA had a problem with Ms. Thomas due to her race, gender, or EEO activities.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statement of _7_ paragraphs is true and correct.

*Sharrie B. Peterson*
Sharrie Peterson

Executed this _18_ day of December, 2007.