### Affidavit of Ozetta Thomas

| | |
|---|---|
| In the matter of EEO complaint of: | ) |
| **Ozetta Thomas** | ) |
| Complainant | ) |
| | ) |
| V. | ) |
| | )     **Case No. 040175** |
| **USDA-FSA** | ) |
| Respondent | ) |

I, **Ozetta Thomas,** hereby solemnly swear that the information given in response to the following questions are true and complete to the best of my knowledge and belief, so help me God:

Q.:     Please state your full name for the record.

A.:     Ozetta C. Thomas

Q.:     I understand you are no longer employed with the federal government. Please provide your complete dates of federal service.

A.:     I have thirty-five years of Federal service. (April 1968-March 2003)

Q.:     What was your last position title and grade?

A.:     I was Chief Agricultural Program Specialist for the Farm Service Agency (FSA) in Montgomery, AL.

Q.:     What did you do on a day-to-day basis?

Page 1 of 13

**EXHIBIT**
1

initial _Ot_

034

Exhibit 6
Page 1 of 133

A.:    I administered farm programs within forty-seven counties in the state. I was Chief Specialist in the Production Adjustment/Compliance Division of the State Office. Our state office served as the liaison between the county office and the national office. I administered the programs within my division such as the AMTA Payments, Farm Disaster Program, NAP Programs, Reconstitutions, Payment Limitation, Common Provisions, AFIDA, Peanut and Tobacco programs, as well as the Compliance Program. Two months prior to my forced retirement, I served as Program Complaints Specialist in the Office of Civil Rights, PCIB, Montgomery, AL. I investigated program complaints filed by farmers all over the United States, and performed State Reviews within the U.S.

Q.:    What is your race?

A.:    African American

Q     What were your GS, title and Grade prior to retirement?

A.:    GS-13- step 8

Q.:    When was your last promotion or step increase prior to retirement?

A.:    In December 2001, I received my last promotion.

Q.:    Who was your first and second line supervisor, prior to retirement?

A.:    My first line supervisor was Danny Crawford, State Executive Director (SED). I had no second line supervisor.

Q.:    What is his race?

A.:    White

Page 2 of 13

initial _____

Exhibit ____

Page _2_ of _133_

Q.:    You have had prior EEO activities, which is the basis of your reprisal claim, is that correct?

A.:    Yes.

Q.:    Please provide a brief history of each EEO claim, including the dates of the claims, nature of the claim, RMO, and the disposition of each.

A.:    The first complaint (#AL-01-001E Appeal #01A31795) was initially filed in August 2001. It was filed on non-sexual harassment, intimidation, humiliation, retaliation and disparate treatment (hostile work environment) and eventually a "not achieved" job performance rating. It was against Danny Crawford, the SED. The case was settled in mediation. As part of the mediation I was temporally detailed to the Office of Civil Rights where I worked as a Program Complaints Specialist for a year. I requested a reassignment to the Office of Civil Rights during my caucus with the mediator. When I returned, and after the caucus with Danny Crawford and his Executive Officer, Debbie Williams, the mediator informed me and my attorney that she could not get the reassignment approved from the Washington Office. Therefore, she could place me on detail for one year (See attachment I-Resolution Agreement. pgs. 1-3). I was detailed there supposedly to give me enough time to get old enough to retire or, I could go back to my current position. Retiring was nothing I wanted to do, it was something they wanted me to do. I accepted the arrangement because I believed once I was detailed I would be able to get into a permanent position within the Civil Rights Office. There was never an agreement that I would actually retire. The mediation arrangement was created merely to give me the option to retire, if I desired.

Q.:    Were you represented by an attorney?

A.:    Yes.

Q.    Were you happy with the meditation results?

A.:    I wasn't happy, but I would have taken anything at the time to get rid of the emotional stress from working under Danny Crawford. Later I filed another EEO

complaint for noncompliance with the mediation agreement because in my opinion, they did not carry out the contract as agreed upon. As part of the settlement agreement, they were required to expunge all references in all records maintained by the Agency of the performance related matters since May 21, 2001 when Danny Crawford came on board, and issue my "achieved" performance rating in a timely manner. In my opinion, they failed to do so. The performance rating was delivered late and by a third party open (not sealed in an envelope), and not signed by Danny Crawford, who was my immediate supervisor, and was therefore in violation of the privacy act. The initial filing of the non-compliance was due to lateness. Although, the Civil Rights Department Director, David Winningham, ruled in favor of the agency on the very last day of my detail. I appealed that decision to EEOC/OFO and stated additional allegations that were not previously mentioned. The Administrative Law Judge found no discrimination. He ruled it was filed timely. I received notice of denial on October 28, 2003. This denial notice gave me the option to raise my new breach allegations to the agency's EEO Director in accordance with 29 C.F.R. § 1614.504(a). My attorney forwarded a letter to the Employment Compliance and Technical Assistance Division on November 26, 2003 regarding the new allegations of Violation of Privacy and Failure to Act in Good Faith as stipulated in the contract. I spoke with Mr. Leslie Lightning of this division on September 08, 2004 to inquire about the status of this case. Evidently, this letter was misplaced; therefore, he requested a copy and I forwarded a copy to him by fax on September 09, 2004 (See Attachment II-Pages 1-15). As of to date, I have not heard anything concerning the new allegations in this case.


Q.:    Your next EEO complaint?


A.:    Cases #020318 & 020419 were consolidated. Case #020318 was filed on January 03, 2002 against Danny Crawford, SED based on reprisal. The Mediation Hearing on the first case was held on December 05, 2001. As a result of the first complaint I was detailed to the office of Civil Rights as I mention before. The detail was to be effective on December 17, 2001. To get rid of me immediately, I was placed on administrative leave by Mr. Crawford until such time to report to Civil Rights. The following day (December 06, 2001), I returned to the office to complete some unfinished work. When I got there Mr. Crawford had removed my computer and deactivated by password. This was the primary reason for filing the complaint. Also, he had sent a notice out to the field (county offices) that he had detailed me to the Office of Civil Rights and the context of the notice sent the wrong signal to the field that I had been fired (See Attachment III-pgs. 1-2).

initial *O⁴*

Exhibit    6
Page 4 of 133

Q.:   Why did he remove your computer and deactivate your password.

A.:   He said he did it because a clerk in the administrative office needed a computer to do payroll (even though it was not the week of payroll). At the time, he said her computer was broken. Since he thought I was gone for good, he took the computer out of my office.

Q.:   What was the next one, or third complaint, filed?

A.:   The third case #020419 was filed on May 29, 2002 against Danny Crawford based on reprisal. As a member of USDA Chapter of Blacks In Government (BIG), I requested to attend the BIG Conference, which is a training program (See Attachment IV-pgs. 1-11). I intended to take the management-training program that was being offered. I was on detail at the time, but still an employee of Alabama State Office. My request for training was denied even though Mr. Crawford had placed me on an Opportunity to Improve (OTI) and selected training courses for me to take prior to the mediation.

Q.:   Do you know why?

A.:   In my opinion, it was retaliation, but Mr. Crawford stated that because I attended the year before (2001), he wanted to allow some others to attend. He was not interested in anyone else attending until he received my request. There were only two BIG members state wide, and the two of us attended in 2001 as delegates, which did not count against the allotted number allowed to attend. There had never been any request from any other person in the history of BIG in the state of Alabama ever interested in the organization. Danny Crawford solicited interest from the few black employees within the state only to deny me. This was confirmed when he did not solicit, nor did anyone request to attend the year (2003) I retired, but apparently he thought about it or someone reminded him for the 2004 year. It is my understanding two different employees attended.

Q.:   The last two complaints you spoke of have been consolidated, it that correct?

A.:   Yes.

Q.:   What is the status of the claims?

Page 5 of 13                                                        initial _O/_

Exhibit _6_
Page _5_ of _133_

A.:    I requested an EEOC Hearing on these cases. There were several motions filed
by the agency and responded to by my attorney. I received Administrative Judge
Clarence Bell's decision in favor of the Agency's Summary Judgment on
February 10, 2004. The notice informed me that the agency would issue final
notice within 30 days. I received agency's final notice on May 24, 2004
upholding AJ's denial of discrimination. I filed an appeal to EEOC/OFO on June
23, 2004. Then, on October 04, 2004, I received EEOC/OFO's denial of appeal.
I requested EEOC/OFO to reconsider, which was filed on November 01, 2004. I
also requested a consolidation of all cases again on the same date. Therefore, they
are under reconsideration right now (See Attachment V-pgs. 1-2).

Q.:    Any others.

A.:    Yes, there is a fourth one involving my forced retirement, and denial of
reassignment request. Case #030475 was filed on April 07, 2003 against Danny
Crawford, SED, on a Hostile Work Place Environment (Forced Retirement) based
on race (black), sex (female), and age (55yrs.) (See Attachment VI-pgs. 1-13). An
addendum to this complaint was filed on May 19, 2003 (See Attachment VII-pgs.
1-11). At the end of the detail on January 6, 2003 I didn't want to retire,
therefore, I had to go back to my old office and position under Danny Crawford.
Prior to going back I requested to be reassigned on several occasions so that I
would not have to work under Mr. Crawford. I conversed with Mrs. Sharon
Holmes on several occasions when she came on board as Director of Civil Rights
sometimes in November 2002. Dr. Carlton Oneal conversed with her also about
extending my detail until such time my EEO cases were resolved. Mrs. Holmes
requested justification for the extension. On December 13, 2002, Dr. Oneal
addressed her request in a memorandum to her (See Attachment VI-pg. 6). After
Mrs. Holmes started meeting and conversing with the FSA Administrator Little,
Deputy Administrator of Field Operations (DAFO) Doug Frago and John Chott,
and Danny Crawford, she did not respond to the request. I submitted a letter
dated December 31, 2002 to Danny Crawford requesting to work outside the State
Office because of my poor health due to the harassment, humiliation and
intimidation that I had to endure during his tenure as SED. I informed him that I
could not subject myself to such an uncomfortable environment to cause further
detriment to my physical and mental health. I sent a courtesy copy of this
memorandum to Frago and Chott as well since they had supervisory authority
over Danny (See Attachment VI-pg. 7). In this letter, I attached a request for
indefinite sick leave just in case my first request was unfeasible (See Attachment
VI-pg. 8). On January 07, 2003, I received Danny's memorandum dated January
06, 2003 (See Attachment VI-pgs. 10-11) by federal express returning my sick
leave request and informing me of the disapproval due to the lack of supporting
medical documentation. That memorandum was written as if he only received a
sick leave request. He did not address any of the contents of my letter. He did

initial _O/_

Exhibit ___6___

Page _6_ of _133_

not address my first request to work at a location outside the State Office, nor did he assure me of a pleasant working environment. I had made several similar requests before. I did not get a response from anyone. When I went back, the stress was so great that for the two months I was back I had to take sick days off. I was seeing a doctor for stress. My doctor would only provide sick leave for one week, therefore, I could only take three days without a doctor's excuse, or I would be placed on AWOL, so I had to go back. Finally, on February 24, 2003, I was so stressed out I sent him an email informing him I was retiring immediately. I filed an EEO complaint from that action.

Q.:    What is the status of the complaint?

A.:    I don't know. I received the initial acceptance letter (unsigned) to be assigned to an investigator in November of 2003. One month later (December 2003), I received the second acceptance letter revising the acceptance date to that date because of the previous unsigned letter. This is the same letter that informed me it its footnote that based upon the Commission's guidance regarding reprisal allegations, the denial request for reassignment to OCR/PCIB issue is also being **accepted and processed as a "new" complaint** (See Attachment VIII-pgs. 1-5). In early September 2004, I called Mr. Phillip Newby, Assistant to Director of Civil Rights for FSA to inquire about the status of the last two cases (#'s 030475 on Forced Retirement and 040175 on Non-selection for Program Complaints Specialist). He informed me that they were being investigated as we speak and they had been assigned to an investigator since July 27, 2004 (See Attachment IX-pgs. 1-3). After finding this letter that had gone to the wrong place, I found that the issues they said were attached, were not. Mr. Newby informed me that they could not find the acceptance letters. Therefore, on September 13, 2004, I forwarded Mr. Newby copies of all the acceptance letters on both cases by fax. But yet, the case on the forced retirement is not being investigated. I have not heard from anyone since then.

Q.:    Does that represent all of your prior EEO activity?

A.:    Yes.

Q.:    That brings us to your current case of which I am investigating. In your complaint you allege you were discriminated based on race and reprisal in your nonselection for the position of Program Complaint Specialist. Tell me about it.

Page 7 of 13

initial _____

Exhibit ___

Page 7 of 133

A.:  My letter of complaint to the EEO Counselor dated September 10, 2003 indicates the basis as reprisal. I did not file this complaint based on race. Although, I did feel the need to include Danny Crawford and DAFO officials, who are white, because of their involvement and influence over the Office of Civil Rights. I feel it was a joint effort to rid me of the workplace because there had been a conspiracy since day one that included Mr. Chott. Others included in the conspiracy to get rid of me after the former SED, Daniel Robinson, retired due to the change in the administration were my staff, Executive Officer Debbie Williams, the District Directors, and some of the CEDs. After I realized they all were demanding Crawford to remove me, which I think started before he came on board, I started a chronology of incidents. These incidents include Chott's involvement as well. I am also in receipt of a negative memorandum from Chott to Crawford dated August 15, 2001, criticizing my ability to do my job on a program in my shop (see Attachment X - Chronology of Incidents to include the long drawn-out counseling sessions, which I considered interrogations – pages numbered at bottom of page from 163-264). Although Mr. Frago was not on board at this time, I consider it an inheritance on his part. He came on board while I was on detail in 2002. I did forward copies of my request for reassignment to him, but yet, management failed me from all angles. All of the co-conspirators were white. Mr. Crawford admitted that there were others during all of the counseling sessions (see Attachment X-Chronology of Incidents. Exhibit N. Pgs. 233-234. Memorandums for Record dated November 6, 2001-Pgs. 248-250 and dated November 28, 2001-Pgs. 259-264).

A few days after I retired, and on March 03, 2003, the Office of OCR/PCIB announced a vacancy #F3 FSA 048 for the position of Program Complaints Specialist, the same job I had just worked while on detail with PCIB under Dr. Carlton Oneal. Now, I recall Oneal informing me that a vacancy would be opening up, because we were in constant conversation on my being able to stay on with PCIB. I tried to hold out until such announcement was made, but was not sure when it would be made. I even recall a conversation with Oneal to make sure he made the announcement external, giving me an opportunity to apply. And, he did that. The approval of the announcement had to come down from the national level.

Q.:  Why did you apply for the position after you had just retired?

A.:  I wasn't really ready to retire. I only retired because I could not work for Danny Crawford any more. This position was in a different office and different supervisor. He would not have been my first line supervisor. This is why I went back to the program side because I knew the announcement was forthcoming, but didn't know how soon. I just could not physically, mentally, and emotionally handle the stress any longer.

Page 8 of 13                                                    initial _____

Exhibit ___
Page ___ of 133

Q.:    Was the position an inside or outside announcement?

A.:    It was an outside announcement open to the general public. It was for a Program
Complaint Specialist GS-.11-13. I applied as a GS -13 since I was all ready one.


Q:    Why did you apply for the position?


A.:    As I have fore-stated, I was not ready to retire, not even financially. I wanted the
position because I really loved what I was doing, and thought I was the best-
qualified person for the vacancy, because I was the only applicant who had
worked the position and had first hand knowledge and experience. Yes, I wanted
to return to federal service, as long as it was not under the supervision of Danny
Crawford. I worked in the Montgomery office of Civil Rights when it was
originally created in 1998. In fact, I was the first person hired out of the 15
available slots. I applied for the position back then because it was a promotion for
me from a grade 12 to 13. After seven months I went back to the program side
because I wanted to be a chief, which was also a grade 13. The Chief, Daniel
Robinson who was over me at the time I was on the program side was promoted
to the SED. When the chief's slot was announced, I applied because I had been
his assistance, and he hired me back. This was when I found out I had made a big
mistake, because resentment set in among my staff and others all over the state
(not a black woman in supervisory authority!!!). This brought back the memory
of 1986 when I was successful in winning an EEO complaint when I applied for
the Specialist position in the State Office in 1984.  I believe Dr. Oneal knew I
was the best qualified because while I was on detail there as a Program Complaint
Specialist, he wrote a letter of justification to Sharon Holmes in the national office
requesting that I be allowed to stay there. Some of his justifications were because
they were short staff, one of the Complaint Specialists had recently been deployed
to Iraq and another suddenly died. I also made several request on my own to the
national office and the state SED, Danny Crawford, asking to remain on detail
with PCIB beyond the original mediation agreement. They never responded to
any of the request.


Q.:    Do you know why they decided to make an announcement to fill the vacant
Program Complaint Specialist on a permanent basis after you left?

A.:    I have no idea. I can't answer that. I do believe they had labeled me a trouble-
maker by filing all of the complaints, and they wanted me out.


Page 9 of 13

Q.:    Describe the application process.

A.:    It was a standard process. The job announcement was posted on Internet. I applied for the position, and provided the mandatory Knowledge, Skills and Abilities (KSA's) required. I received the certificate where I made the Best Qualified list. I was interviewed on June 13, 2003, by Dr. Carlton Oneal; Chief of OCR/PCIB, and Sharon Holmes; former Director of Civil Rights for the Farm Service Agency (FSA).

Q.:    What are their races?

A.:    They are both black.

Q.:    Who was selected for the position?

A.:    John Smith, he is also black.

Q.:    How did the interview go?

A.:    I was interviewed by phone. You could tell from the interview that Dr. O'Neil was just there and that Ms. Holmes was calling all the shots. They sort of interacted in asking the questions. Dr. O'Neil already knew my ability since I had just previously worked under him doing the very same job. Ms. Holmes didn't seem interested at all. The interview was just a formality for her. She told me the candidates that made the BQ list would first be interviewed by phone and that the top three or four applicants based on their interview would be interviewed a second time in person. Ms. Holmes went through the interview so fast I could tell she wasn't interested in me and knew whom she was going to hire.

Q.:    How long did the interview last?

A.:    Approximately 15 minutes.

Q.:    When and how were you notified that you were not selected?

A.:    Actually I first learned I was not selected from my former supervisor, Daniel Robinson. He called me to say he had received a call back for an in-person

initial _____

043

Exhibit ___
Page ___ of 133

interview. He had applied for the same position. He assumed I was also scheduled for a second interview. When I learned I didn't make the final cut, I called Dr. Oneal and asked him if that meant I was out of the selection process? He indicated to me that he didn't think so, and that I had talked to Mrs. Holmes several times already, and there was no need for me to go to Washington to talk to her again. Finally, on August 08, 2003, I got a call from Oneal informing me that a selection had been made, and he thought Mrs. Holmes had informed me. He then said to me, "I know you have to do what you have to do". Then, on September 06, 2003, I received the FSA-337, Notice to Applicant indicating that I was among those referred to the selecting official for consideration; however, I was not selected.

Q.:     What were the requirements for the position?

A.:     You had to meet the requirements of the mandatory KSAs for the position. I can't recite them all now off the top of my head, but I met the requirements by the mere fact I made the BQ list, and had a total of 18 months of experience in the particular position. You also had to have knowledge of farm programs, farm loan programs, investigative skills, analytical skills, and writing and computer skills.

Q.:     Why do you feel you were the most qualified for the position?

A.:     Again, I perform the job back in 1998 when it was first created and on the last detail before I retired. I was the only Program Complaint Specialist with a vast knowledge of farm programs. My level of performance in all areas was equal to the other specialists in the office. Furthermore, it could have been greater. While there Dr Oneal had me to develop a work sheet and train the other specialists on farm programs. This was to give them knowledge of what to look for in their reviews to eliminate the appearance of discrimination to farmers on the county level. They had knowledge of farm loan programs, but not farm programs.

Q.:     Do you know how many made the BQ list?

A.:     No, I'm not sure. I know a few of the people but not all.

Page 11 of 13                                                    initial _O/_

Exhibit __6__
Page __11__ of __133__

Q.:    Why do you think you were better qualified than the selectee, John Smith?

A.:    As I have fore-stated, and if I may use the old cliché "been there, done that". John Smith had not. It is my understanding that Mr. Smith was a State Civil Rights Coordinator in the State of Texas with only about five years of service with FSA. It is also my understanding that Mr. Smith was in some type of trouble with the Texas SED with some wrongdoings with the black farmers in the consent decree. The SED requested an investigation on him, but could not enough evidence to fire him; therefore; they shipped him out of Texas by selecting him for this position. I am told by some of the employees that even my work ethics and habits far exceed that of Mr. Smith.

Q.:    You have testified that the selectee, John Smith, and those involved in the selection process, Dr. O'Neil and Sharon Holmes are all black, what is the basis of your claim of racial discrimination?

A.:    As I have fore-stated, the basis for my claim is reprisal. Also as I stated, I included the white officials because of the conspiracy to rid me of my job. The black officials had to meet the mandate of Danny Crawford, John Chott and Doug Frago. They are all white. They wanted to get rid of me, like they did Daniel Robinson. We were the only two blacks in positions on the program side in the state office.

Q.:    Do you have any evidence you can point to support your claim of conspiracy.

A.:    Yes, I have documents to show Danny Crawford's and John Chott's actions from the beginning of my complaints (see Attachment X-Chronology Pgs. 215, 233-234, 248-250, 259-264). As I stated before, Frago was not on board at the time, but I have forwarded copies of request for reassignments to Frago and he never responded. Also, Frago became Crawford's immediate supervisor when he came on board in 2002 while I was on detail. It all started in 1986 with Danny Crawford. I filed an EEO complaint for non-selection to Agricultural Program Specialist in 1986 and won. Danny Crawford was a County Executive Director at the time. I eventually was in a higher position than he and the other CED's. None of them wanted a black female in a position above them. This was payback. I believe they influenced Sharon Holmes who had to answer to both Chott and Frago.

Page 12 of 13

initial _Cl_

Exhibit  6
Page 12 of 33

Q.:    Was Sharon Holmes, Dr. Charles O'Neil, Danny Crawford, Doug Frago, and John Chott all aware of your prior EEO activity?

A.:    Yes.

Q.:    What remedy are you seeking?

A.:    A consolidation of all filed EEO complaints, re-computation of my retirement at the highest-grade level, GS-13-step 10, and $300,000 (three hundred thousand dollars).

Q.:    Do you wish to add anything else?

A.:    No.

*I have read the above affidavit consisting of 13 pages. It is true and complete to the best of my knowledge and belief. I have made all necessary corrections and additions, initialing next to each, I have also signed or initialed each page. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties. In accordance with 28 U.S.C. Section 1746, I declare under penalties of perjury that the above statements are true and correct to the best of my knowledge, information and belief.*

_____        12/29/2004
Signature                                              Date

*I hereby certify that I obtained the above affidavit in connection with a duly authorized EEO complaint investigation.*

DEC 31, 2004                                 _____
Dennis J. Redic                                                  Date
EEO Investigator

Page 13 of 13                                               initial ___

Case # 040175
Attachment I
Pgs. 1-3

## RESOLUTION AGREEMENT

This agreement made by and between Ozetta Thomas, (hereafter referred to as Complainant) and the U. S. Department of Agriculture, Farm Service Agency (hereafter referred to as the Agency), constitutes a full, complete, and final resolution of all the employment concerns raised in the Complainant's informal EEO complaint filed on September 14, 2001, before EEO mediator, Hope C. Light. The issues and basis of complaint #AL-01-001E are: non-sexual harassment and performance evaluation based on race (black)

This resolution agreement does not prevent the Agency from pursuing any issues of alleged misconduct raised in the complaint, nor from initiating any preventive corrective or disciplinary action against Agency officials, if warranted.

The parties wish to set forth the terms of the agreement in writing. This neither determines nor implies a finding of or admission that discrimination occurred.

This agreement is authorized under 29 C.F.R. §1614, regulations on processing EEO complaints in the Federal Government, and the EEOC's Management Directive (MD)-110.

The Agency agrees to:

1. Detail the complainant to the Civil Rights and Small Business Utilization Staff, Program Complaints Branch in Montgomery, Alabama, effective December 16, 2001, as a Program Complaint Specialist, GS-301-13. The duration of the detail to be effective through January 4, 2003 to return to her former position effective January 5, 2003. The State Executive Director will process the SF-52 within (10) ten days of the signing of this agreement.

2. Pay the complainant the sum of $1,500 (one thousand five hundred dollars). The parties agree that this sum represents a total and complete settlement of all money issues payable to the complainant or to her attorney in this matter. The State Executive Director agrees to process the payment of attorney fees within 30 days of receipt of the detailed bill.

3. Grant the complainant a Within-Grade-Increase from a Supervisory Program Specialist GS-1145-13/6 to a GS-1145-13/7 with an effective date of January 13, 2002. The State Executive Director will process the SF-52 within ten (10) days of the signing of this agreement.

4. Expunge all references in all records maintained by the Agency of the performance related matters concerning the complainant since May 21, 2001. Remove the Opportunity to Improve dated November 6, 2001 and replace the Performance Work Plan dated November 6, 2001, with a Performance Work Plan rating of achieved in all performance plan elements.

5. Place the complainant on paid administrative leave effective December 6, 2001 through December 15, 2001.

Exhibit 1. 6
Page 14 of 133

The Complainant agrees to:

1. Withdraw the informal EEO complaint initiated on September 14, 2001 and agrees not to raise any new complaint about the above cited issues.

2. Submit a detailed bill for attorney's fees to the State Executive Director within ten (10) days of the signing of this agreement.

3. Release, waive and withdraw any and all complaints, grievances, appeals or civil actions against the Agency, its employees and officers in their individual or official capacities for any concerns arising out of these (or related) employment situations prior to the signing of this agreement. This agreement does not prevent the Complainant from exercising their rights under 29 C.F.R. §1614, in any other matter that arises after the signing of this agreement.

Both parties agree:

1. To respect the privacy rights of all individuals involved in the matter. The fact that the case was voluntarily resolved in a manner acceptable to both sides may be communicated to others. Explicit terms of the agreement will not be discussed with, disclosed or released to anyone who does not need the information to implement the agreement, without the express permission of the other party.

2. To cooperate and communicate in good faith to complete implementation of this agreement and to abide by the terms of this agreement.

3. To declare this complaint resolved through this resolution agreement. There are no other agreements between the parties, either expressed or implied, oral or written.

4. That after the agreement is fully implemented, the Agency will within 30 calendar days, provide the Complainant with a written notice explaining the specific actions taken to implement the agreement. A copy of the notice will be provided to: FSA-CR&SBUS, Attn: Debbie Lombardino, 1400 Independence Avenue, SW, Stop Code 0509, Washington, D.C. 20250. If the Complainant has any questions about the implementation actions after receiving the notice, and the questions are not satisfactorily addressed by the Agency, the Complainant may raise these questions with the FSA-CR&SBUS at the address above or by calling FSA-CRSBUS at (202) 401-7220.

5. That if the terms of this agreement are not carried out, through no fault of the Complainant, the Complainant may request enforcement of the terms of the agreement, or that the complaint be reinstated at the point at which it was closed by this agreement. This request must be filed within 30 calendar days of the alleged failure to implement this agreement with the Employment Complaint Division, Office of Civil Rights, Employment Compliance and Technical Assistance Division, 1400 Independence Avenue, SW, Stop 9440, Washington, D.C. 20250-9440. The request should include a copy of this agreement, an explanation of which particular term(s) of the agreement have not been implemented, why the Complainant believes the term(s) have not

been implemented, and any relevant documents. A copy of the request should also be provided to the individual who signed this agreement on behalf of the Agency.

6. That they are entering into this agreement voluntarily, without coercion or duress, and fully understand the terms of this agreement.

_Ozetta C. Thomas_

Ozetta Thomas
Complainant

12/05/01
DATE

_Jeffrey C. Robinson_

Jeffrey C. Robinson
Attorney-at-Law

12/05/01
DATE

_Danny F. Crawford_

Danny F. Crawford
State Executive Director

12/05/01
DATE

_William A. March_

William A. March
Resolving Official

12/05/01
DATE

3.
Exhibit 6
Page 16 of 133

09/08/04

Attachment II.
Case # 040175
Pgs. 1-15

# Ozetta Thomas
## 2629 Highway 14, East
## Selma, AL 36703
## (Phone) 334-875-3947
## (FAX) 334-872-6941

E-Mail
Ozettat @ yahoo. Com

# FACSIMILE

**TO: (Name)** OCR
Employment Compliance + Technical Assistance DIV.
Attn: Leslie Lightner

**(Fax Number)** 202-690-2345

**NOTES:** Per our telephone Conversation on Yesterday, Sept. 8, 2004 I am submitting my letter of new allegations to you dated 11/26/03.

# NUMBER OF PAGES: 14



Exhibit ⑥
Page 17 of 133

# CHESTNUT, SANDERS, SANDERS, PETTAWAY, & CAMPBELL, L.L.C.

### ATTORNEYS AND COUNSELORS AT LAW

#### ONE UNION STREET — SELMA, ALABAMA 36702-1290

J. L. CHESTNUT, JR.
HENRY SANDERS
ROSE M. SANDERS
COLLINS PETTAWAY, JR.
KATY SMITH CAMPBELL

JEFFREY C. ROBINSON
PRINCE D. CHESTNUT
MARILYN M. GARNER
KINDAKA J. SANDERS
CHRISTMAS Y. GREEN

MAILING ADDRESS:

P. O. BOX 1290
SELMA, ALABAMA 36702-1290
(334) 875-9264
TELECOPIER: (334) 875-9375
TELECOPIER: (334) 875-9853

November 26, 2003

Department of Agriculture
Office of Civil Rights
Employment Compliance and Technical Assistance Division
1400 Independence Avenue, S.W. – Mail Stop 9403
Washington, DC 20250-9403

RE:   *Ms. Ozetta Thomas*
      *Employment Complaints*

To Whom It May Concern:

Please accept this as a formal complaint regarding the breach of the December 5, 2001, Resolution Agreement (Agreement) reached between Mrs. Ozetta Thomas and the U.S. Department of Agriculture, the Farm Service Agency Division, attached hereto as Exhibit 1 (one).   Please note that the subject complaints were initially raised as part of an appeal of related claims.  (See Exhibit 2.)  Per the recommendation of a Decision from the U.S. Equal Employment Opportunity Commission, dated October 23, 2003, concerning the appealed claims, Mrs. Thomas now brings the subject complaints before this Agency.

I.    <u>Violation of Privacy</u>

In the third section of the Resolution Agreement, both parties agree:

(1) To respect the privacy rights of all individuals involved in this matter. The fact that the case was voluntarily resolved in a manner acceptable to both sides may be communicated to others.  Explicit terms of the agreement will not be discussed, disclosed or released to anyone who does not need the information to implement the agreement, without the express permission of the other party.

Exhibit 6¹
Page 18 of 133

Mrs. Thomas maintains that the explicit terms of the Agreement have been disclosed and/or released to someone who did not need the information to implement the agreement, without Mrs. Thomas' express permission and in violation of the Agreement.    Specifically, when the performance rating was delivered to Mrs. Thomas on January 22, 2002, it was hand-delivered by Ms. Irean Bennett, secretary to State Executive Director, Mr. Danny Crawford, the primary party against whom Ms. Thomas filed her complaint.    Indeed, the letter was delivered in an open envelope – exposed for Ms. Bennett's reading pleasure. Furthermore, Ms. Debbie Williams, assistant to Mr. Crawfore, signed his signature to the substituted performance rating as achieved, which clearly afforded opportunity for the Agreement to be read by unnecessary third parties.    To be sure, Mr. Crawford could have signed the rating himself anytime from the date of the signing of the Resolution on December 5, 2001 through the time of delivery of the rating to Mrs. Thomas on January 22, 2002. Instead, Mr. Crawford chose to willfully violate the Agreement by involving his assistant and secretary in a sensitive matter that easily could have been handled by him personally. Indubitably, this was a clear violation of the privacy rights of Mrs. Thomas.  Moreover, this was a blatant violation of the spirit of the agreement, in addition to the Agreement's technical aspects.

II.    **Failure to Act in Good Faith**

Under the same above-referenced section, paragraph 2 of the Agreement, both parties agree:

(2)  To cooperate and communicate in good faith to complete implementation of this agreement and to abide by the terms of this agreement.

The Agency has breached this provision.  Please note that not even once during the implementation of the Agreement did Mr. Crawford attempt to communicate with Mrs. Thomas.  In fact, he completely ignored her, as evidenced by the delivery of the performance rating by Ms. Bennett and the signature on the same by Ms. Williams.  That is, Mr. Crawford made no effort to contact Mrs. Thomas to see if she would consent to Ms. Bennett's delivering the performance rating.  In short, Mr. Crawford has not exhibited good faith in dealing with Mrs. Thomas.

The violations in I and II of this letter were done in a discriminatory manner based upon Mrs. Thomas' race, Black, and her sex, female.  She has been discriminated against in violation of Title VII.

For the foregoing reasons, Complainant requests, pursuant to paragraph five (5) of the Resolution, that the original complaint be reinstated at the point at which it was closed by this Agreement.

Exhibit 6.
Page 19 of 133

Sincerely,

CHESTNUT, SANDERS, SANDERS,
PETTAWAY & CAMPBELL, L.L.C.

Christmas Y. Green

CYG/ba
Enc.: Resolution Agreement,
        Notice of Appeal

*3.*

Exhibit ____6____
Page 20 of 133

# RESOLUTION AGREEMENT

This agreement made by and between Ozetta Thomas, (hereafter referred to as Complainant) and the U. S. Department of Agriculture, Farm Service Agency (hereafter referred to as the Agency), constitutes a full, complete, and final resolution of all the employment concerns raised in the Complainant's informal EEO complaint filed on September 14, 2001, before EEO mediator, Hope C. Light. The issues and basis of complaint #AL-01-001E are: non-sexual harassment and performance evaluation based on race (black)

This resolution agreement does not prevent the Agency from pursuing any issues of alleged misconduct raised in the complaint, nor from initiating any preventive corrective or disciplinary action against Agency officials, if warranted.

The parties wish to set forth the terms of the agreement in writing. This neither determines nor implies a finding of or admission that discrimination occurred.

This agreement is authorized under 29 C.F.R. §1614, regulations on processing EEO complaints in the Federal Government, and the EEOC's Management Directive (MD)-110.

The Agency agrees to:

1. Detail the complainant to the Civil Rights and Small Business Utilization Staff, Program Complaints Branch in Montgomery, Alabama, effective December 16, 2001, as a Program Complaint Specialist, GS-301-13. The duration of the detail to be effective through January 4, 2003 to return to her former position effective January 5, 2003. The State Executive Director will process the SF-52 within (10) ten days of the signing of this agreement.

2. Pay the complainant the sum of $1,500 (one thousand five hundred dollars). The parties agree that this sum represents a total and complete settlement of all money issues payable to the complainant or to her attorney in this matter. The State Executive Director agrees to process the payment of attorney fees within 30 days of receipt of the detailed bill.

3. Grant the complainant a Within-Grade-Increase from a Supervisory Program Specialist GS-1145-13/6 to a GS-1145-13/7 with an effective date of January 13, 2002. The State Executive Director will process the SF-52 within ten (10) days of the signing of this agreement.

4. Expunge all references in all records maintained by the Agency of the performance related matters concerning the complainant since May 21, 2001. Remove the Opportunity to Improve dated November 6, 2001 and replace the Performance Work Plan dated November 6, 2001, with a Performance Work Plan rating of achieved in all performance plan elements.

5. Place the complainant on paid administrative leave effective December 6, 2001 through December 15, 2001.

Exhibit 6

Page 21 of 133

The Complainant agrees to:

1. Withdraw the informal EEO complaint initiated on September 14, 2001 and agrees not to raise any new complaint about the above cited issues.

2. Submit a detailed bill for attorney's fees to the State Executive Director within ten (10) days of the signing of this agreement.

3. Release, waive and withdraw any and all complaints, grievances, appeals or civil actions against the Agency, its employees and officers in their individual or official capacities for any concerns arising out of these (or related) employment situations prior to the signing of this agreement. This agreement does not prevent the Complainant from exercising their rights under 29 C.F.R. §1614, in any other matter that arises after the signing of this agreement.

Both parties agree:

1. To respect the privacy rights of all individuals involved in the matter. The fact that the case was voluntarily resolved in a manner acceptable to both sides may be communicated to others. Explicit terms of the agreement will not be discussed with, disclosed or released to anyone who does not need the information to implement the agreement, without the express permission of the other party.

2. To cooperate and communicate in good faith to complete implementation of this agreement and to abide by the terms of this agreement.

3. To declare this complaint resolved through this resolution agreement. There are no other agreements between the parties, either expressed or implied, oral or written.

4. That after the agreement is fully implemented, the Agency will within 30 calendar days, provide the Complainant with a written notice explaining the specific actions taken to implement the agreement. A copy of the notice will be provided to: FSA-CR&SBUS, Attn: Debbie Lombardino, 1400 Independence Avenue, SW, Stop Code 0509, Washington, D.C. 20250. If the Complainant has any questions about the implementation actions after receiving the notice, and the questions are not satisfactorily addressed by the Agency, the Complainant may raise these questions with the FSA-CR&SBUS at the address above or by calling FSA-CRSBUS at (202) 401-7220.

5. That if the terms of this agreement are not carried out, through no fault of the Complainant, the Complainant may request enforcement of the terms of the agreement, or that the complaint be reinstated at the point at which it was closed by this agreement. This request must be filed within 30 calendar days of the alleged failure to implement this agreement with the Employment Complaint Division, Office of Civil Rights, Employment Compliance and Technical Assistance Division, 1400 Independence Avenue, SW, Stop 9440, Washington, D.C. 20250-9440. The request should include a copy of this agreement, an explanation of which particular term(s) of the agreement have not been implemented, why the Complainant believes the term(s) have not

5.

Exhibit 6
Page 22 of 133

been implemented, and any relevant documents.  A copy of the request should also be provided to the individual who signed this agreement on behalf of the Agency.

6.  That they are entering into this agreement voluntarily, without coercion or duress, and fully understand the terms of this agreement.

Ozetta Thomas
Complainant

12/05/01
DATE

Jeffrey C. Robinson
Attorney-at-Law

12/05/01
DATE

Danny F. Crawford
State Executive Director

12/05/01
DATE

William A. March
Resolving Official

12/05/01
DATE

Exhibit ___6___
Page 23 of 133

6.



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P.O. Box 19848
Washington, D.C. 20036

Ozetta Thomas,
Complainant,

v.

Ann M. Veneman,
Secretary,
Department of Agriculture,
Agency.

Appeal No. 01A31795

Agency No. AL-01-001E

## DECISION

Complainant filed a timely appeal with this Commission from a final decision by the agency dated December 23, 2002, finding that it was in compliance with the terms of the December 5, 2001 settlement agreement into which the parties entered.

The settlement agreement provided, in pertinent part, that:

(A)    The agency agrees to:

(1)    Detail the complainant to the Civil Rights and Small Business Utilization Staff, a Program Complaints Branch in Montgomery, Alabama, effective December 16, 2001, as a Program Complaint Specialist, GS-301-13. The duration of the detail to be effective through January 4, 2003 to return to her former position effective January 5, 2003. The State Executive Director will process the SF-52 within (10) ten days of the signing of this agreement.

(2)    Pay the complainant the sum of $1,500 (one thousand five hundred dollars). The parties agree that this sum represents a total and complete settlement of all money issues payable to the complainant or to her attorney in this matter. The State Executive Director agrees to process the payment of attorney fees within 30 days of receipt of the detailed bill.



Exhibit 6
Page 24 of 133

2                                  01A31795

(3)    Grant the complainant a Within-Grade-Increase from a Supervisory
Program Specialist GS-1145-13/6 to a GS-1145-13/7 with an effective date
of January 13, 2002. The State Executive Director will process the SF-52
within ten (10) days of the signing of this agreement.

(4)    Expunge all references in all records maintained by the Agency of the
performance related matters concerning the complainant since May 21,
2001. Remove the Opportunity to Improve dated November 6, 2001 and
replace the Performance Work Plan dated November 6, 2001, with a
Performance Work Plan rating of achieved in all performance plan
elements

(5)    Place the complainant on paid administrative leave effective December 6,
2001 through December 15, 2001.

(B)    Both parties agree:

(1)    To respect the privacy rights of all individuals involved in the matter. The
fact that the case was voluntarily resolved in a manner acceptable to both
sides may be communicated to others. Explicit terms of the agreement will
not be discussed with, disclosed or released to anyone who does not need
the information to implement the agreement, without the express permission
of the other party.

(2)    To cooperate and communicate in good faith in complete implementation
of this agreement and to abide by the terms of this agreement.

(4)    That after the agreement is fully implemented, the Agency will within 30
calendar days, provide the complainant with a written notice explaining the
specific actions taken to implement the agreement . . . .

(5)    That if the terms of this agreement are not carried out, through no fault of
the Complainant, the Complainant may request enforcement of the terms
of the agreement, or that the complaint be reinstated at the point at which
it was closed by this agreement . . . .

By letter to the agency dated January 11, 2002, complainant alleged that the agency was in breach
of the settlement agreement, and requested that the agency reinstate her complaint from the point
where processing ceased. Specifically, complainant alleged that the agency failed to comply with
provisions (A)(4) and (B)(4) of the agreement. Complainant states that although the agency had
thirty (30) calendar days to adhere to the agreement and forward a written copy of such
adherence, she has not been informed of such adherence. Complainant claims that the specified



Exhibit _8_

Page 25 of 133

3                                    01A31795

records have not been expunged and the Opportunity to Improve has not been replaced with a Performance Work Plan rating of achieved. Further, complainant notes that one of the issues cited during mediation was a Non-Insured Crop Disaster Assistance Program (NAP) Training Session. Complainant states that she was recently given a NAP award but omitted from a memorandum prepared by Person B, State Executive Director. Finally, complainant notes that her computer was removed immediately after the mediation hearing. Complainant states that this was a violation of the spirit of the mediation agreement when the agreement was not to take place until two weeks later.

In its December 26, 2002 decision, the agency concluded that it complied with the terms of the December 5, 2001 settlement agreement. The agency stated that it processed the last action required under the agreement on December 26, 2001 and provided complainant notice of all corrective action taken and when it was implemented as prescribed in provision (A)(4). The agency noted that the new replacement Performance Work Plan was dated November 6, 2001, the same as the old one, the Opportunity to Improve had been removed, and that complainant and her attorney were free to review her Official Personnel File and her Performance File at any time. Further, with regard to the issue of Non-Insured Crop Disaster Assistance Program (NAP) training, NAP awards, and the complainant's computer, the agency noted that none of these are mentioned in the settlement agreement at issue.

Complainant filed the present appeal on January 24, 2003.[1] In her appellate brief, complainant states that the letter delivered to her on January 24, 2002, noting that her file was expunged of the Opportunity to Improve, was hand delivered by Person A, assistant to Person B, the "prime culprit" against whom she filed her complaint. Complainant claims that the letter was in an open envelope. Complainant alleges that Person A, the assistant, signed Person B's signature to the substituted Opportunity to Improve. Complainant claims this was a clear violation of her privacy rights and provision (B)(1). Further, complainant claims that provision (B)(2) was breached when Person B failed to contact her once during the implementation of the agreement and as evidenced by the delivery of the letter expunging the Opportunity to Improve and Person A's signature on the letter. Finally, complainant claims that the agency breached provision (B)(5) since Person A delivered the achievement rating on January 22, 2002.

---

[1] On her Notice of Appeal form, complainant lists that she is appealing formal complaint numbers 020419 and 020318. Complainant also indicates on the appeal form and in her brief on appeal that she is alleging a breach of settlement agreement. The record reveals that complainant filed formal complaints for Agency Numbers 020419 and 020318 on July 15, 2002 and March 4, 2002 respectively. The record reveals that the agency has not yet issued final decisions on these two formal complaints. Thus, to the extent complainant is attempting to file an appeal on agency numbers 020419 and 020318, such an appeal would be premature. Thus, this decision only addresses complainant's breach of settlement claim.

Exhibit  C

Page 2b of 133

4                                                                01A31795

The record contains a January 30, 2002 memorandum to complainant from the State Executive Director (Person B) regarding her Performance Evaluation. Attached to this memorandum was a copy of complainant's Performance Work Plan for the rating period of October 1, 2000, through September 30, 2001. A review of the Performance Work Plan reveals that complainant was rated as Achieved on all applicable elements. The Performance Work Plan is signed by the rating official on November 6, 2001. The Performance Work Plan contains a typed note that it was presented to complainant on January 22, 2002; however, she refused to sign it.

The record contains a January 23, 2002 letter to complainant signed by the State Executive Director informing her of the actions taken to implement the December 5, 2001 settlement agreement. With regard to provision (A)(1), the agency noted that the SF-52 was processed on December 7, 2001, and forwarded to Washington, DC for further processing. With regard to provision (A)(2), the agency noted that payment for $1,500.00 was processed on December 26, 2001. With regard to provision (A)(3), the agency noted that due to the discovery of erroneous information concerning complainant's grade and step level at the time of mediation, the within-grade increase was processed to the GS-13-8 level. With regard to provision (A)(4), the agency noted that a new Performance Work Plan was prepared reflecting a rating of achieved in all performance plan elements and was placed in complainant's performance file. The agency noted that the Performance Work Plan is dated November 6, 2001, which was the date of the original rating. Further, the agency stated that the opportunity to improve rating has been removed from all records maintained by the agency of performance related matters. With regard to provision (A)(5), the agency noted that complainant was placed on administrative leave for the specified period.

EEOC Regulation 29 C.F.R. § 1614.504(a) provides that any settlement agreement knowingly and voluntarily agreed to by the parties, reached at any stage of the complaint process, shall be binding on both parties. The Commission has held that a settlement agreement constitutes a contract between the employee and the agency, to which ordinary rules of contract construction apply. *See Herrington v. Department of Defense*, EEOC Request No. 05960032 (December 9, 1996). The Commission has further held that it is the intent of the parties as expressed in the contract, not some unexpressed intention, that controls the contract's construction. *Eggleston v. Department of Veterans Affairs*, EEOC Request No. 05900795 (August 23, 1990). In ascertaining the intent of the parties with regard to the terms of a settlement agreement, the Commission has generally relied on the plain meaning rule. *See Hyon v. United States Postal Service*, EEOC Request No. 05910787 (December 2, 1991). This rule states that if the writing appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature. *See Montgomery Elevator Co. v. Building Eng'g Servs. Co.*, 730 F.2d 377 (5th Cir. 1984).

In the present case, we find that complainant failed to show that the agency breached the December 5, 2001 settlement agreement. According to provision (A)(4), the agency was to expunge all references in all records regarding the performance related matters concerning the

Exhibit _10._ 6

Page 27 of 133

5                                          01A31795

complainant since May 21, 2001. The agency was required to remove the Opportunity to Improve dated November 6, 2001, and replace the Performance Work Plan dated November 6, 2001, with a Performance Work Plan rating of achieved in all performance plan elements. The record contains a copy of complainant's November 6, 2001 Performance Work Plan rating complainant as achieved in all performance plan elements. We note that complainant acknowledges receipt of the Performance Work Plan rating of achieved on January 22, 2002. Also, the record contains a January 23, 2002 letter to complainant signed by the State Executive Director informing her of the removal of the Opportunity to Improve rating from all records maintained by the agency of performance related matters. Upon review, we find that complainant has failed to show that the agency breached provision (A)(4).

Similarly, we find that complainant failed to show that the agency breached provision (B)(4) of the agreement. According to provision (B)(4), after the agreement is fully implemented, within 30 calendar days, the agency was required to provide complainant with a written notice explaining the specific actions taken to implement the agreement. The agency notes that the last action taken to implement the agreement was taken on December 26, 2001, and states that it provided complainant with written notice explaining the actions taken to implement the agreement on January 23, 2002. The record reveals that a check was issued to payment for $1,500.00 on December 26, 2001. The record shows that on January 23, 2002, the agency sent a letter to complainant signed by the State Executive Director informing her of the actions taken to implement the December 5, 2001 settlement agreement. Thus, we find that complainant failed to show that the agency breached provision (B)(4) of the agreement.

With regard to complainant's claims regarding the NAP training, NAP awards, and the removal of complainant's computer, we find that these issues are beyond the scope of the December 5, 2001 agreement.

 Finally, we note that on appeal complainant raises new breach allegations. If complainant wishes to further pursue new breach claims, she is advised to contact the agency's EEO Director in accordance with 29 C.F.R. § 1614.504(a).

Accordingly, the agency's final decision is AFFIRMED.

## STATEMENT OF RIGHTS - ON APPEAL

### RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

Exhibit 11.6
Page 28 of 133

6                                                    01A31795

1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.    The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision or **within twenty (20) calendar days** of receipt of another party's timely request for reconsideration. *See* 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. *See* 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. *See* 29 C.F.R. § 1614.604(c).

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0900)

You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint.**

## RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney to represent you and that the Court permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the**

Exhibit __6__
Page _29_ of _133_

7                                                01A31795

sole discretion of the Court. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

*[signature]*

_____
Carlton M. Hadden, Director
Office of Federal Operations


_____OCT 2 3 2003_____
Date


## CERTIFICATE OF MAILING

For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed. I certify that this decision was mailed to complainant, complainant's representative (if applicable), and the agency on:


_____OCT 2 3 2003_____
Date

*[signature]*

_____
Equal Opportunity Assistant


Exhibit __6__
Page 30 of 133
       13.



EXHIBIT
1

2629 Highway 14, East
Selma, AL 36703
January 03, 2002

Mr. Claude McKenzie, EEO Counselor
355 East Hancock Avenue – Stop 105
Athens, GA 30601



RECEIVED JAN 07 2002

Dear Mr. McKenzie,

This letter will confirm my telephone conversation with you on December 07, 2001, and also the voice message I left you on January 02, 2002, concerning my filing an official reprisal against Alabama's FSA State Executive Director, Danny F. Crawford.

This is being filed due to the removal of my equipment (computer) from my office immediately after a mediation hearing under the Early Resolution Program (ERP) held on December 05, 2001. In addition to the removal of my laptop, my password was also deactivated. The fast removal of the equipment from my office was continued intimidation, and an attempt to isolate me from the State Office workforce. The denial of my free access to the assigned computer equipment was a clear case of violation of my due civil rights. I maintain that the action was taken due to my filing the EEO complaint against the State Executive Director. After having faced the whole ordeal of filing and going through the EEO process, I did not need this type of humiliation the day after the ERP. It was quite demoralizing, embarrassing and humiliating to find that my supervisor had carried or caused such travail act to be carried out against me. It all can be summed up as racism to the inch degree to supposedly show how triumphant they (management) had been.

As you are aware, I had previously filed an EEO complaint against Mr. Crawford on non-sexual harassment based on race. Soon after the mediation hearing was conducted on December 05, 2001, an agreement was accepted to end this complaint. I was immediately placed on paid administrative leave through December 16, 2001. I was to be detailed to the Office of Civil Rights, PCIB, effective December 16, 2001-January 3, 2003. Since the detail was not until that date, nothing should have been removed from my office by management prior to that date. I am still an FSA employee and should be treated no different.

I had been out of the office during the first part of that week (December 2-4, 2001) on a training Mr. Crawford had required I take, due to the opportunity to improve (OTI) he had placed me on. On December 06, 2001, I returned to my office to read my e-mail messages for the week. It was also my intentions to send out my own blanket e-mail message expressing my appreciation to those employees for having worked with them through the years. As I went to turn on my computer, I found that my laptop had been confiscated. After inquiring who had borrowed my laptop, I was informed by Caryn Melton, Farm Loan Program Technician, that she saw Mary Reynolds, Computer Specialist, with my laptop early that morning. As I approached Mary's office to

Exhibit 6
Page 31 of 133

REPRISAL – OZETTA THOMAS                                              Page 2.

get my laptop, she looked very stunned. I asked her if there was a problem that I could not get my laptop, and she told me that I had to ask Debbie Williams, Executive Staff Assistant. I did so, and Debbie called Mary by telephone and told her to give me the laptop. After the Computer Assistant, Marlys Oliver, came to my office to reactivate my password, I still could not get into the system. Therefore, I left the laptop connected in my office, and when I returned again on December 11 to get my messages and clean out my desk drawers, I found the entire computer system (laptop and monitor) had been taken. One of the Program Specialists, Sharrie Peterson, informed me that all the equipment was removed on December 07, 2001. Again, I maintain that this equipment should have stayed intact until December 17, 2001.

My next concern is that management has not carried out the ERP agreement in good faith. The e-mail (see attached) that went out on the detail was worded to denote and imply that such detail was a continuation of Danny's attempt to deal with my so-called non-performance on the job. He simply stated that I (Ozetta Thomas) had been detailed to the Civil Rights Unit effective December 16. There was no reference to the duration. The phrase "has been detailed" should have read Ozetta Thomas has accepted a detail to Civil Rights Unit, because the SED had not detailed me anywhere. But again, he used this opportunity to "save face" and sent the wrong signal to the field as to my true status with the agency. His handling of this matter has further caused for my integrity to be unnecessarily questioned with the field that has already been brained washed. Therefore, if or when I return as Chief of Production/Compliance, I will have an uphill battle attempting to work with them. Evidently, they have no intentions of my returning, but that is a decision of mine to make. This is also said, because Danny has named an acting chief different from the employee I had named acting in my absence.

Among other compensations, I am requesting that appropriate actions be taken to clear that there was no winner in this matter, as this e-mail message would lead you to believe. I do request that a letter be written by a Human Resource Specialist in Washington and mailed out under the signature of the SED. This letter should reflect the maximum duration of my detail, along with the window of opportunity for my return as Chief at the end of the detail. The whole tone of the e-mail message is very distasteful. We would hate for these types of treatment to get to the media on FSA again, which is crystal clear discrimination.

Sincerely,

*Ozetta C. Thomas*

Ozetta C. Thomas

Attachment

CC: Jeffrey C. Robinson, Esq.
    Chestnut, Sanders, Sanders, Pettaway, Campbell & Albright, P.C.

Exhibit  6
Page 32 of 133

Case # 040175
Attachment IV
Pgs. 1-11



2629 Highway 14, East
Selma, Alabama 36703
May 29, 2002.

Mr. Claude McKenzie, EEO Counselor
355 E. Hancock Avenue
Athens, Georgia 30601

Dear Mr. McKenzie:

Please consider this as my official complaint (reprisal) based on race (black), color and sex against the Alabama Farm Service Agency. Mr. Danny Crawford, State Executive Director continues to retaliate against me since the mediation on December 5, 2001.

I am a member of USDA Chapter XI of Blacks in Government (BIG) based in Washington D.C. As you may recall, I attended the BIG Conference last year (August 2001) in Los Angeles. Vicky Anthony and I attended as delegates. We had been approved to run for delegate by the former SED, Daniel Robinson, before he retired. Although, by the time for the BIG Conference, I had a new SED (Danny Crawford) due to the change in Administration. This is to say that, when you are chosen as a delegate to BIG, its mandated that you attend the conference for the voting of BIG's business.

The BIG Conference will be held on August 26-30, 2002, in Atlanta, GA. On April 3, 2002, I submitted a request (**Exhibit 1, Pp. 1-2**) to attend to Mr. Crawford, through my immediate supervisor, Dr. Carlton O'neal. My immediate supervisor approved the request and forwarded it to Mr. Crawford to approve disbursement of funds (advanced travel authorization) since I was still employed by the State Office.

On April 5, 2002, the Administrative Officer, Verdell Zeigler, under the directives of SED Danny Crawford, forwarded an e-mail message (**Exhibit 2, Pp. 1-2**) to all African American employees within the State. I believe, and I maintain that this message was sent out only to seek other blacks that may have been interested deliberately to deny me after receiving my request. If I had not requested to attend, this message would have never gone out. There were only **two** BIG members within the State, which included Vickie Anthony Lane and I, which were the only two requesting to attend last year. And, as stated above, we both served as delegates. I realize that the BIG Conference is also open to non-members, the registration fees are just considerably higher. I responded (**Exhibit 3**) to Ms. Zeigler's e-mail message on April 22, 2002, with a CC to Mr. Crawford. I noted for informational purposes in my response that the e-mail could be considered discriminatory, because it only went out to African American employees when it should have gone to all government employees. I also indicated that BIG is open not only to African Americans.

Exhibit 1. 6
Page 33 of 133

REPRISAL, cont'd.                                                    Page 2.

On April 24, 2002, I received a response **(Exhibit 4)** of denial since I attended last year. Mr. Crawford informed me that he was advised last year that we could authorize only two employees from our State to attend the conference, but the memorandum attached to the e-mail message indicated that we were authorized for two to attend this year. So, which one is correct, last year, or this year? Again, I believe the SED used this process to invite other blacks solely to deny me. This only shows his continued pattern of retaliation, and isolation

Mr. Crawford initially left the disapproval open to withdraw the denial if other interested employees were unable to attend. My Chapter President informed me that authorization for the conference (training) depends on the budget for training. On May 21, 2002, I received the e-mail message **(Exhibit 5)** from Mrs. Zeigler, naming the employees who were selected to attend. Ms. Cozia Heard, County Office Reviewer, is a federal employee (State Office), wherein her training will come from the State Office budget, but Ms. Beverly Fraser is a Program Technician in the County Office (Limestone) where Mr. Crawford was former CED. Ms. Fraser's training will come from the County Office budget, and will not have any affect on the State Office budget at all. Also, Ms. Fraser's supervisor (County Executive Director) could have approved her to attend the training, and only needed the SED's approval because the training was outside her district. This scenario is so crystal clear, any one can see that these actions were clearly to deny me. And, it's all because I have filed several complaints. I don't consider myself as a habitual complainer; I am only after Justice.

Mr. Crawford was not really interested in blacks being interested in BIG. And, I am sad to report that BIG is obviously not a favorite of Mr. Crawford and some of his white employees, especially his State Office white employees, and field cronies who are conspiring along with him to get me out of the workforce. I say this because BIG was downplayed by some of the white employees (to include those same co-conspirators in my EEO complaint), during a State Conference held in September 2000. Apparently, they were so irritated that the former SED (who is black) issued an apology in a State Office Newsletter **(Exhibit 6)**. I understand that there were some threats to file a discrimination complaint against him (former SED) because he invited the black employees to his room after hours to discuss BIG.

I am submitting this to you because my attorney is out of the Country, and when he returns, I will be out of State, and I don't want time to pass us by, for I received the notice of disapproval on April 24, 2002. Everything should be forwarded through my attorney. I am hopeful that he does not 'mine me doing this, but he knows I am an aggressor.

2.

Exhibit 6
Page 34 of 133

REPRISAL, cont'd.                                    Page 3.

Always,


Qeetta C. Thomas                              05/29/02
                                                (Date)

CC:  Jeffery Robinson, Attorney at Law
One Union Street
Selma, AL 36701


*3.*

Exhibit ___6___
Page 35 of 133

*(Exhibit 11 pg.1)*

Copy To   SED
          Verdell

April 03, 2002


TO:      Danny Crawford, FSA State Executive Director
THRU :   Carlton O'neal, Branch Chief, CR & SBUS

FROM:    Ozetta Thomas, Chief Production Adjustment/Program Complaints
         Specialist

SUBJECT: BIG Conference

I am very much interested in attending the Blacks In Government (BIG)
Conference again this year. The conference is held in Atlanta, GA on
August 26-30, 2002.

I am submitting this request to you as my immediate supervisor for your
approval of my attending. Then, please forward this request to Danny for
approval of disbursement of funds. I have attached Form AD-202 for
advance travel authorization.

Please indicate your decision below and return to me. This must be done
before I can submit my pre-registration form to Washington, D. C.

Your favorable consideration will be greatly appreciated.


Approved: /✓/ Disapproved: /‾/   *Carlton O'neal*    04-03-02
                                  Carlton O'neal        (Date)


Approved: /‾/ Disapproved: /✓/   *Danny Crawford*  4/23/02
                                  Danny Crawford          (Date)


4.

(Exhibit 1, Pg. 2)

**Note:** Traveler is liable for the value of the tickets issued until all tickets or coupons are properly accounted for on the Travel Voucher.

## ACTION CODE (Indicate one type only)

E = Establish C = Cancel
A = Amend V = Advance Only (Complete Sections A, E, and F Only)

2. AUTHORIZATION DATE — MONTH / DAY / YEAR: 04/03/02

## SECTION A - IDENTIFICATION

| 1. TRAVEL AUTHORIZATION NO. | 4. SOCIAL SECURITY NO. | 5. NAME (Last) | (First) | (Middle Initial) | 6. AGENCY CODE |
|---|---|---|---|---|---|
| | | THOMAS, | OZETTA | C. | FA |

7. AGENCY OON: AGFAFA0513
8. TRAVELER OON:
9. ESTIMATED DATES OF TRAVEL EXPENSES — FROM (Month / Day / Year): 8/25/02 — THRU (Month / Day / Year): 8/31/02
10. TYPE TRAVEL (Indicate one type only): DM
DM = Domestic; FO = Foreign; FT = Foreign Transfer; RT = Return Travel; GR = Escorted Group; OC = Outside Cont. U.S.; TS = Transfer of Station; OT = Outside CONUS ToS
11. GOVERNMENT CREDIT CARD HOLDER: Y (Y = Yes, N = No)
12. TRAINING DOCUMENT NO. (For Purpose of Travel Code 3 Only)
13. OFFICIAL DUTY STATION CITY AND STATE: MONTGOMERY, AL
14. RESIDENT CITY AND STATE (If other than official station): SELMA, AL

## SECTION B - EMPLOYMENT STATUS (Check the appropriate employment status block.)

✔ 15. PAYROLLED BY NFC | 16. NOT PAYROLLED BY NFC | 17. NEW HIRE | 18. SPECIAL APPOINTEE | 19. NONGOVERNMENT

## SECTION C - ITINERARY AND ESTIMATED EXPENDITURES

| 20. FROM CITY | ST | 21. TO CNTRY CD | CITY CD | CITY, COUNTY or REGION | ST | Subsistence Codes | 23. CODE | LODGING | M and IE | RATE | NO. DAYS | ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SELMA | AL | | | ATLANTA | GA | | P | $ 93.00 + | 38.00 = | 131.00 x | 6.0 = | $ 786.00 |
| | | | | | | P=Per Diem | | + | = | 0.00 x | = | 0.00 |
| | | | | | | A=Actual Subsistence | | + | = | 0.00 x | = | 0.00 |
| | | | | | | | | + | = | 0.00 x | = | 0.00 |
| | | | | | | S=Special Rate | | + | = | 0.00 x | = | 0.00 |
| | | | | | | | | + | = | 0.00 x | = | 0.00 |
| | | | | | | | | + | = | 0.00 x | = | 0.00 |

22. PURPOSE OF TRAVEL (Give explanation)

| | |
|---|---|
| Total Subsistence | $ 786.00 |
| ✔ POV: Rate .365 | |
| Rate | |
| Rate | |
| Rate | 164.25 |
| ✔ Other (Specify) Tr. Fee, Rm. Tax. et | 465.00 |
| Unaccompanied Baggage | |
| Car Rental | |
| Common Carrier Tickets | |
| Transportation Mode / Method of Purchase | |
| Use of Non-contract Airline / Insert Code | |
| Excess Fare | |
| Excess Baggage | |
| GSA Auto | |
| 24. Total Est. Expenditures Authorized | $ 1,415.25 |

## SECTION D - ACCOUNTING CLASSIFICATION

25. Distribute Total Estimated Expenditures from Section C to the applicable Purpose of Travel Code and Accounting Classification line.

PURPOSE TRAVEL CODE:
1 = Site Visit; 2 = Information Meeting; 3 = Training attendance; 4 = Speech or presentation; 5 = Conference attendance; 6 = Relocation; 7 = Entitlement/Home leave; 8 = Special mission travel; 9 = Emergency travel; 10 = Other travel; 11 = Pre-employment; 12 = First post of duty; 13 = Rest & Recuperation; 14 = Educational; 15 = Informal training

| PURPOSE CODE | ACCOUNTING CLASSIFICATION | PERCENTAGE |
|---|---|---|
| | | % |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | THESE PERCENTAGES MUST EQUAL | 100% |

## SECTION E - TRAVEL ADVANCE

26. ADVANCE REQUEST METHOD (Select one method only)
C = Check or DD/EFT; T = Travelers Checks; I = Imprest Fund; E = Emergency (Wire); W = Wire Confirmation; S = Embassy Issued Advance; L = Embassy Collect. Advance

32. ADVANCE MAILING ADDRESS OPTIONS: SALARY ADDRESS | T&A CONTACT POINT | SPECIAL ADDRESS (Required for new hires, special appointees, and nonGovernment travelers) | FOREIGN ADDRESS | TRAVEL EFT ACCOUNT
1. (35)
2. (35)
3. (City) (20) State (2) Zip Code (9)

27. AMOUNT OF ADVANCE APPLIED FOR $
33. IMPREST FUND CASHIER — SOCIAL SECURITY NO. | SIGNATURE

Exhibit 6

28. BALANCE FROM PREVIOUS ADVANCE $
34. ADVANCE RECEIVED (Cash or Travelers Checks) — DATE RECEIVED Month / Day / Year | APPLICANT'S SIGNATURE

Page 37 of 133

29. TOTAL ADVANCE AMOUNT $ 0.00
30. APPLICANT'S SIGNATURE
31. DATE APPLIED FOR Month / Day / Year
SEE PRIVACY ACT STATEMENT ON REVERSE

## SECTION F - AGENCY APPROVAL

35. APPROVING OFFICER'S NAME AND TITLE (Last, First, Middle Initial) (Type or Print) | AGENCY CODE | 36. SOCIAL SECURITY NO. | 37. DATE APPROVED Month / Day / Year | 38. PHONE (Area Code & No.)
APPROVING OFFICER'S SIGNATURE | 40. CONTACT PERSON'S NAME | 41. PHONE (Area Code & No.) 5
42. REMARKS

070

Upon completion and approval, submit original to:
USDA – National Finance Center, P.O. Box 60,000, New Orleans, LA 70160

FORM AD-202 (USDA) (Rev. 11/96)
Exception to SF 1038 approved by GSA 11/20/96
This form was electronically produced by National Production Services Staff

(Exhibit 2, Pg.1)

**Subject: Memo - Blacks In Government Conference**
Date: Fri, 05 Apr 2002 11:26:11 -0600
From: Verdell Zeigler <verdell.zeigler@al.usda.gov>
Organization: USDA-FSA
To: "Moses, Valerie" <valerie.moses@al.usda.gov>,
"Watson, Jacqueline" <jacqueline.watson@al.usda.gov>,
"Colvin, Jesse" <jesse.colvin@al.usda.gov>,
"Thomas, Ozetta" <ozetta.thomas@al.usda.gov>,
"Anthony, Vickie" <vickie.anthony@al.usda.gov>, chantae.alfred@al.usda.gov,
shelia.dove@al.usda.gov, "McInnis, Mary" <mary.mcinnis@al.usda.gov>,
"cliff.warren" <cliff.warren@al.usda.gov>, "Braggs, Mary" <mary.braggs@al.usda.gov>,
gretchen.thomas@al.usda.gov, michelle.simmons@al.usda.gov,
sandra.coolie@al.usda.gov, faye.woods@al.usda.gov, beverly.fraser@al.usda.gov,
"Sanders, Lillie" <lillie.sanders@al.usda.gov>, cozia.heard@al.usda.gov,
"Fitzpatrick, Stephanie" <stephanie.fitzpatrick@al.usda.gov>,
james.currington@al.usda.gov, minnie.hudgins@al.usda.gov,
"Bryant, Belinda" <belinda.bryant@al.usda.gov>, johnnie.spain@al.usda.gov,
sheryl.dansby@al.usda.gov
CC: "Crawford, Danny" <danny.crawford@al.usda.gov>

```
The attached memo is being forwarded for your information and response.
If you have any questions, please feel free to contact me.  Also, if you
see that a name is missing, please let me know.  Thanks
Verdell
```

| BIG.doc | Name: BIG.doc |
|---------|---------------|
|         | Type: Winword File (application/msword) |
|         | Encoding: base64 |

6.

**Exhibit** 6
Page 38 of 133

4/22/02 11:21 AM



(Exhibit 2, Pg.2)

United States
Department of
Agriculture

April 22, 2002

Farm and Foreign
Agricultural
Services

Farm Service Agency

Alabama State Office
P. O. Box 235013
Montgomery, AL
36123-5013

Tel: (334) 279-3500
Fax: (334) 279-3550

TO:        Applicable Employees

FROM:    /s/Danny F. Crawford, State Executive
Director

SUBJECT: Blacks In Government's 24th Annual National
Training Conference

Blacks In Government (BIG) will hold its 24th Annual Training Conference
in Atlanta, Georgia, on August 26-30, 2002. This year's theme is *"Accept
the Challenge, Exceed the Standard through Professional Development."*

BIG is an employee support and advocacy organization whose primary
mission is to promote and enhance educational and training opportunities
for African Americans in government. With chapters throughout the United
States and abroad representing more than 2.5 million public employees,
BIG continues to be the largest organization dedicated to the preservation
and enhancement of African American civil servants.

This year's sessions will feature noted lecturers, elected officials, national
leaders, and policy makers.   Some of the topics covered include
information technology, communication skills, career development,
personal performance and productivity, management and leadership skills,
and EEO/human resource management.

Our agency supports BIG's efforts and considers the conference as an
effective way to meet the training needs of the Federal workforce. We
have been approved for two employees to attend this year's conference;
therefore, in an attempt to afford an opportunity to interested employees,
we are requesting that you email Verdell Zeigler if you are interested in
attending by COB April 12, 2002. Negative responses are required.

If you would like to find out more about BIG, you may access their website
at www.bignet.org/ntc/index.htm. Also, if you have questions, feel free to
contact me at 334-279-3500.

Re: Memo - Blacks In Government Conference

(Exhibit 3)

**Subject: Re: Memo - Blacks In Government Conference**
**Date:** Mon, 22 Apr 2002 13:29:54 -0500
**From:** Ozetta Thomas <ozetta.thomas@al.usda.gov>
**Organization:** USDA-FSA
**To:** Verdell Zeigler <verdell.zeigler@al.usda.gov>
**CC:** Danny.Crawford@al.usda.gov

Hi Verdell,

I just received this today (April 22, 2002). I was off on Friday, April
5, when you sent it, then I was out of the state the past two weeks.
Although, I am sure this resulted from my request to Danny to attend the
BIG Conference in a memo dated April 3, 2002. So, you would already
have my response.

Just FYI, this could be considered discriminatory, it should have gone
to all government employees. BIG is open not only to African
Americans. I do hope this will increase the interest in other
employees.

Ozetta

Verdell Zeigler wrote:
>
> *The attached memo is being forwarded for your information and response.*
> *If you have any questions, please feel free to contact me. Also, if you*
> *see that a name is missing, please let me know. Thanks*
> *Verdell*
>
> ------------------------------------------------------------------------
>                 *Name: BIG.doc*
> *BIG.doc    Type: Winword File (application/msword)*
>            *Encoding: base64*

8.

Exhibit 6
Page 40 of 133

## USDA

*(Exhibit 4)*

United States
D_____ ment of
_____ ture

Farm and Foreign
Agricultural
Services

Farm Service Agency

Alabama State FSA
Office
P. O. Box 235013
Montgomery, AL
36123-5013

334-279-3500
334-279-3550 (FAX)

**Date:** April 24, 2002

**TO**       :    Ozetta C. Thomas

*Danny F. Crawford*

**FROM**    :    Danny F. Crawford, State Executive Director

**SUBJECT** :    BIG Conference

Attached is your request of April 3, 2002 to attend the Blacks In Government (BIG) Conference on August 26-30, 2002 in Atlanta, Georgia.

I was advised last year that we could authorize only two employees from our state to attend this conference. As discussed with you at that time, I would like to afford any interested employees the opportunity to attend. Therefore, since you attended the conference last year, the attached request is denied.

If, for some reason, the other interested employees are unable to attend, I will withdraw the denial and you will be authorized to attend.

cc:  Carlton O'neal, Branch Chief, CR&SBUS

9.

USDA is an Equal Opportunity Provider and Employer

074

Exhibit  6
Page 41 of 133

(Exhibit 5)

**Subject: Blacks In Government Conference**
**Date:** Tue, 21 May 2002 14:53:51 -0500
**From:** Verdell Zeigler <verdell.zeigler@al.usda.gov>
**Organization:** USDA-FSA
**To:** "Moses, Valerie" <valerie.moses@al.usda.gov>,
"Watson, Jacqueline" <jacqueline.watson@al.usda.gov>,
"Colvin, Jesse" <jesse.colvin@al.usda.gov>,
"Thomas, Ozetta" <ozetta.thomas@al.usda.gov>,
"Anthony, Vickie" <vickie.anthony@al.usda.gov>, chantae.alfred@al.usda.gov,
"McInnis, Mary" <mary.mcinnis@al.usda.gov>,
"cliff.warren" <cliff.warren@al.usda.gov>, "Braggs, Mary" <mary.braggs@al.usda.gov>,
gretchen.thomas@al.usda.gov, michelle.simmons@al.usda.gov,
sandra.coolie@al.usda.gov, faye.woods@al.usda.gov, beverly.fraser@al.usda.gov,
"Sanders, Lillie" <lillie.sanders@al.usda.gov>, cozia.heard@al.usda.gov,
"Fitzpatrick, Stephanie" <stephanie.fitzpatrick@al.usda.gov>,
james.currington@al.usda.gov, minnie.hudgins@al.usda.gov,
"Bryant, Belinda" <belinda.bryant@al.usda.gov>, sheryl.dansby@al.usda.gov
**CC:** "Crawford, Danny" <danny.crawford@al.usda.gov>

Thank you for your response and interest in the upcoming BIG
Conference. Please accept my apologies for the delay in notifying the
rest of you of the selections. Cozia Heard and Beverly Fraser were
selected to attend the conference in Atlanta this year. The selections
were based on seniority and after receiving some declinations, we were
pleased to offer the opportunity to Cozia and Beverly. If you have any
questions, please feel free to contact me. Thanks again for your
interest. Also, if you have specific questions about the conference,
Vickie and Ozetta attended the conference last year in California and
I'm sure they would be more than happy to answer your questions.

10.

Exhibit 6
Page 42 of 133

(Exhibit 6)

---

Page 2            October 2000



# From The Desk of The SED

*"Whodunit?" You did it; and you did it with pride and enthusiasm!*

*As I take a few minutes to reflect on our recently held statewide training, I have a zeal to give credit to whom credit is due—you did it, the Alabama FSA employees. I cannot take the sole credit for the statewide training becoming a reality.*

*By following the path of our "flat-footed dancer" Michael Schryer (CED for Macon and Tallapoosa/Coosa counties), recognition and other accolades that go along with it so often come at the expense of other people. As has already been announced, I presented Mike with the Administrator's Award, which is the highest award that is given within our Agency. Hence, a strange thing happened after Mike received the award and the shock had passed. I received a letter from Mike. Basically, Mike, through his own style of freelance penmanship and great choice of words, gave way (credit) to many others for his accomplishments. He named several State Office employees, along with many county office employees, for assisting the Macon County Office during the transition period, a period of time that perhaps was by far the worst aftermath in the history of Alabama ASCS/FSA. Because of the successful transition and his accomplishments, Mike felt that the award bestowed upon him should be shared with those that worked behind the scenes or on the front line to make things right again.*

*Once more I ask, "whodunit?" Who actually caused the training to come about? You gave me a "standing ovation" to reflect your approval and appreciation for the training. But, I need to salute you, for you've earned and deserved the right to be trained in a relaxed atmosphere, along with other amenities to enjoy. So, the credit lies with you, not me.*

*While traveling through the Nation's Capitol last month, I saw a sign that read, "Work should not be work." I pondered over this statement and reached my own conclusion as to what the author was attempting to convey. Seemingly, if we enjoy our job to the extent work is really not the dirty word, "work," and even if we get dirty sometimes, the job can still be enjoyable with a happy landing. Speaking of being happy on the job, the Secretary even took note of its importance. Agriculture Secretary Dan Glickman recently told the SEDs not to expect a substantial increase in the number of full time employees (FTEs), but he did challenge us to do more to make our employees HAPPY. In that vein, we have attempted to follow his challenge by providing special training, incentive awards, etc. Now, did I hear a "motion" from the field to plan another statewide training in 2001? If I did, I'm waiting for someone to second the motion. And remember, according to Robert's Rule of Order, a motion will die in the field without receiving a proper second. The seconds are ticking on my watch . . . . . . . Who will keep the motion alive? When the second to the motion is received, I'll carry it through.*

**Special Notation for the Record:** Even with all the high spirit of appreciation during the statewide training, I've learned that a few employees were offended by my action to invite the black employees to my room. I sincerely trust that it was indeed only a few, because 99.9% of the employees that know my commitment, along with my sense of fairness for both the employees and farmers, would not be engaged in such an incursion. First of all, it was not a party. But, it was announced as a called meeting in MY room at 5:00 p.m. to have a continued dialogue relative to membership in "Big." BIG (BLACKS IN GOVERNMENT) is a national organization that is recognized for career enrichment of its members. Any government (city, county, state and federal) employee can join for a fee ranging from $30 to $40, depending on the chapter in which one chooses to obtain membership. At this junction, I'm somewhat surprised that I find it necessary to defend my action. However, I offer my sincere apology for even the perception of a racial overtone for having had such a meeting without clearly defining its purpose, along with inviting ALL employees to attend and join BIG. You may find additional information on BIG at www.big@.bignet.org.

/s/Daniel Robinson
**State Executive Director**

11.

Exhibit 6
Page 43 of 133

## CHESTNUT, SANDERS, SANDERS, PETTAWAY, & CAMPBELL, L.L.C.

### ATTORNEYS AND COUNSELORS AT LAW

#### ONE UNION STREET — SELMA, ALABAMA 36702-1290

J. L. CHESTNUT, JR.
HENRY SANDERS
ROSE M. SANDERS
COLLINS PETTAWAY, JR.
KATY SMITH CAMPBELL

November 1, 2004

MAILING ADDRESS:

P. O. BOX 1290
SELMA, ALABAMA 36702-1290
(334) 875-9264
TELECOPIER: (334) 875-9375
TELECOPIER: (334) 875-9853

PRINCE D. CHESTNUT
KINDAKA J. SANDERS

Director
Office of Federal Operations
Equal Employment Opportunity Commission
P. O. Box 19848
Washington, D. C. 20036

RE:   **Agency Nos. USDACR020318 and USDACR020419**
      **Ozetta Thomas, Complainant**

Dear Sir/Madam:

I request that the Equal Employment Opportunity Commission reconsider its decision dated September 29, 2004, summarily affirming the Agency's final order without a hearing in the above referenced matter. I support thereof the Complainant states the following:

1. The Agency has determined that the Investigative Record is adequate to make a fair finding of no discrimination.

2. The Agency's decision assumes certain material facts as undisputed which are, in fact, disputed by the Complainant, one such finding being that Complainant asked for a detailed position, when she actually did not.

3. The Complainant's claims involve allegations, which though individually may appear insignificant or trivial on their face, constitute discriminatory conditions of employment actionable under Title VII of the Civil Rights Act of 1964.

4. There exists a genuine issue of material fact as regards whether Complainant was constructively eliminated from her job when the Employer deactivated her computer password, the facts and circumstances of which are disputed by the parties.

*1.*

Director, Office of Federal Operations
November 1, 2004
Page Two
_____

5.  Complainant has other claims pending against the Employer which remain to be investigated by the Commission, some of which ultimately lead to her forced, early retirement, which said claims grew from the pending claims. An evidentiary hearing would show the nexus of all Complainant's charges of employment discrimination.

6.  The consolidation of all of Complainant's pending claims would expedite matters and save valuable time of the Commission and ultimately the courts, should Complainant decide to further pursue her charges in Federal District Court.

Respectfully submitted,

CHESTNUT, SANDERS, SANDERS,
PETTAWAY & CAMPBELL, L.L.C.

By: _____
    Collins Pettaway
    Attorney for Ozetta Thomas, Claimant

CPjr:at

cc: Ozetta Thomas

2.
Exhibit 6
Page 45 of 133

EXHIBIT

EU 751411083 US

2629 Highway 14, East
Selma, AL 36703
April 07, 2003

Director, Office of Civil Rights
1400 Independence Ave., S.W., Rm. 326W
Washington, D. C. 20250-9410

Re:    EEO Complaint -- Hostile Work Place Environment (Forced Retirement)
       based on race (black), sex (female), and age (55yrs.)

Dear Sir/Madam

As referenced above, please accept this as my official EEO complaint filed against Danny
Crawford, State Executive Director of the Alabama Farm Service Agency. I am a 55
year-old black female with 35 years of service with the Alabama Farm Service Agency.

Unfortunately, due to a hostile working environment, which caused physical and
emotional stress, I retired on February 24, 2003. I served as Chief Agricultural Program
Specialist of the Production Adjustment/Compliance Division of the Alabama State
Office since October 1998. Due to a settlement agreement from a Mediation Hearing on
December 05, 2001, I was detailed to the Office of Civil Rights/Program Complaints
Inquiry Branch (OCR/PCIB) in Montgomery, AL as a Program Complaints Specialist.
The detail ran from December 17, 2001 to January 03, 2003. I was forced to return to a
hostile working environment at the end of the detail. I am sure the year detail was given
as an agreement with the Mediator, Hope Light and SED, Danny Crawford to allow me
the opportunity to reach the age of retirement. During my caucus with Ms. Light, I
requested a reassignment to OCR/PCIB. After she caucused with Mr. Crawford and his
Executive Officer, Debbie Williams, Ms. Light informed me that she could not get the
approval from Washington to reassign me, but she could detail me for that timeframe. At
that time, I would have accepted anything to get out of the environment I was in. Even
after the detail, I filed several complaints (reprisals), and requested a reassignment each
time.

At the end of the detail, I was not emotionally ready to return to the State Office to the
same environment I had just gotten out of, and to work with an all white staff that had
conspired with the SED in the first place to rid me of my position, nor was I financially
ready to retire. Despite all the effort made to stay with OCR/PCIB, management failed
me again (when they could have done something) and didn't acknowledge any of my
requests. The efforts made were:

   On December 09, 2002, my attorney requested (see attachment 1, item 2) an
   indefinite extension of the detail along with the non-compliance request to Ms.
   Carol Fields, Chief Employment Compliance and Technical Assistance Division.
   On January 03, 2003 (the very last day of the detail), I received a response from
   Mr. David Winningham, Director OCR, addressing the non-compliance, but made

EEO COMPLAINT – Ozetta C. Thomas                                    Page 2.

no mention of the extension of the detail. Remind you, I had filed other complaints requesting reassignment that were, and still is pending.

On December 13, 2002, Dr. Carlton Oneal, Chief of OCR/PCIB requested (see attachment 2) an extension of my detail and forwarded justification for the extension to Ms. Sharon Holmes, MS, Director, OCR. Dr. Oneal informed me that he did not receive any written response to his letter. I verbally spoke with Ms. Holmes during the week of January 12, 2003, when she visited the Alabama Office, but she informed me that it was nothing she could do to help me.

On December 31, 2002, I wrote SED Danny Crawford a letter (see attachment 3) and personally hand delivered it to Debbie Williams. I reminded him of my return to the State Office. On the same date (see attachment 4), I received a letter reminding me that the detail had ended. I received the letter by regular mail and certified mail the very next day. In my letter to Danny, I informed him that I did not want to come back to the same hostile environment to cause further detriment to my physical and mental health. I requested that he allow me to work at a location outside the State Office (which he could have done), or place me on sick leave if the first request was unfeasible and I attached a Request for Leave or Approved Absence.

On January 07, 2003, I received Danny's memorandum dated January 06, 2003 (see attachment 5) by federal express returning my sick leave request and informing me of the disapproval due to the lack of supporting medical documentation. That memorandum was written as if he only received a sick leave request. He did not address any of the contents of my letter. He did not address my first request to work at a location outside the State Office, nor did he assure me of a pleasant working environment.

Now, I know and anyone else who has access to all of my complaints know that Mr. Crawford and his co-conspirators including my staff did not want me to return to that position. He and those that conspired with him to rid me of the workplace never acknowledged me in the Chief's position. After returning, the SED never had a conference with me one time, he never personally communicated with me with the exception of one email (see attachment 6) the second week I was back. And, that was to show further humiliation and intimidation by assigning a task that I knew nothing about. It was a meeting to speak on the new Farm Bill. Remind you, I was on detail during the National Farm Bill Training, therefore, I was not familiar enough with the subject matter to speak on it.

The SED and others never intended for me to return to work in the State Office. He wanted that position for a younger white male. As soon as I was detailed, Danny named Jeff Knotts; a younger white male on my staff as Acting. Then, he announced the

Exhibit ___6___
Page _47_ of _133_

EEO COMPLAINT – Ozetta C. Thomas                    Page 3.

position temporarily for one year or it could become permanent. Danny hired Jeff Knotts in the position to give him some supervisory experience to prepare him for a vacancy in his home county as a County Executive Director (CED). After about three months, Jeff applied and was hired as CED in his home county, and that left an all white female staff in the State Office. Mr. Crawford did not refill the vacancy with one of the females after Jeff left.

My return to the State Office for those two months was a confirmation on how much damage was done on my reputation and integrity. From January 6 through February 24, I received one official call from the field. Although, I was out on sick leave approximately 10 to 12 days due to anxiety from the hostile environment. Due to little to no involvement, I deemed my service as chief was useless, and I was playing no active role for the salary I was being paid. This within itself was demoralizing, stifling my ability and further under minding my supervisory responsibilities to the staff, and most of all, the loss of my livelihood (MY JOB).

To settle this complaint, I am asking that management first discipline the SED and co-conspirators (to be named at a later date). This disciplinary action should include some accountability as well. I am also asking for monetary compensation ($300,000.00) for compensatory damages, plus attorney fees.

Sincerely,

*Ozetta C. Thomas*

Ozetta C. Thomas

Cc:     Jeffrey Robinson, Esq.

Exhibit  3. 6
Page 48 of 133

*Attachment 1.*
*Pg.1*

# CHESTNUT, SANDERS, SANDERS, PETTAWAY, CAMPBELL & ALBRIGHT, L.L.C.
## ATTORNEYS AND COUNSELORS AT LAW
### ONE UNION STREET — SELMA, ALABAMA 36702-1290

J. L. CHESTNUT, JR.
HENRY SANDERS
ROSE M. SANDERS
COLLINS PETTAWAY, JR.
KATY SMITH CAMPBELL
APRIL ENGLAND-ALBRIGHT

December 9, 2002

MAILING ADDRESS:

P. O. BOX 1290
SELMA, ALABAMA 36702-1290
(334) 875-9264
TELECOPIER: (334) 875-9375
TELECOPIER: (334) 875-9853

JEFFREY C. ROBINSON
PRINCE D. CHESTNUT
MARILYN M. GARNER

*Jim Little. 202-720-3467*
*FAX 202-720-91*

Ms. Carol A. Fields, Chief Employment
Compliance and Techinal Assistance Division
Suite 250, Room 246
300 7th Street, S.W.
Washington, D.C. 20024

*David Winningham. 202.720.5212*
*FAX 202.205-2*

RE:    Ozetta Thomas/non-compliance request

Dear Ms. Fields:

This letter is written relative to the above-referenced matter. Please note the following:

On September 13, 2001, Ms. Thomas filed a verbal EEO complaint against the Alabama FSA Executive Director, Mr. Danny Crawford. Subsequently, on or about September 19, 2001, she formally filed her complaint with Mr. Claude McKenzie, EEO Counselor in Athens, Georgia. Mediation was held on December 5, 2001, at 8:30am in Montgomery, Alabama. After the mediation, an agreement was issued (see attached agreement). Then, on or about January 11, 2002, Ms. Ozetta Thomas requested a reinstatement for non-compliance, asking the EEO to revisit her complaint. This brings us to where we are now. (See attached letter of January 11, 2002)

After the agreement was issued, Mr. Danny Crawford failed to comply with and adhere with several things specified therein. Thus, Ms. Thomas now seeks the following:

1.    Reinstatement of her complaint;
2.    An indefinite extension on her present detail in the Civil Rights and Small Business Utilization Staff, Program Branch in Montgomery, Alabama;
3.    All of her previous requests in her January 11, 2002 letter;

Exhibit 64.
Page 49 of 133

*Attachment 1.*
*B. 2*

4.     All other relief equitably possible.

Finally, please note that the EEO has failed to respond timely to Ms. Thomas' request for reinstatement of her complaint as more than 180 (one hundred and eighty) days has elapsed.

If you have any questions, do not fail to give me a call.

With kindest regards, I am…

Yours truly,

Jeffrey C. Robinson, Esq.

JCR/tth

Enclosures

CC:    Ms. Ozetta Thomas
       Claude McKenzie
       Debra Lambardino

Exhibit  *5,*
         *6*
Page *50* of *133*



Attachment 2.

December 13, 2002

United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

Farm Service Agency

Office of
Civil Rights
4121 Carmichael Rd
Suite 603, Sterling Ctr
Montgomery, AL
36106

Tel: (334) 279-3601
Fax: (334) 279-3698

TO:     Sharon L. Holmes, MS
        Director, Office of Civil Rights

FROM:   *Carlton O'neal*
        Carlton O'neal
        Chief, Program Complaints Inquiry Branch

SUBJECT: Ozetta C. Thomas
         Program Complaints Specialist

Ozetta C. Thomas was detailed to the Program Complaints Inquiry Branch on December 17, 2001. Mrs. Thomas was detailed to this branch from the FSA State Office in Alabama as part of a resolution to an EEO complaint. It is my understanding that a final resolution to Mrs. Thomas complaint has not been determined at this time. The detail of Ozetta Thomas is scheduled to terminate on January 3, 2003.

During the past fiscal year, the PCIB completed 85 investigations; and conducted 11 EEO/CR Management and Compliance Reviews. Mrs. Thomas is the only Program Complaints Specialist in this branch with an extensive career background with the legacy ASCS programs. As a result, the PCIB utilized Mrs. Thomas in the completion of seven investigations; and five EEO/CR Management Reviews. In my opinion, it would be advantageous to the Agency if the detail of Mrs. Thomas was extended until a final decision was reached regarding the EEO complaint for the following additional reasons: 1) personnel shortage in PCIB. Roy C. Brown, Program Complaints Specialist is presently on a military assignment; and the recent death of Barbara Estes, Program Complaints Specialist, and 2) the projected increase in the number of complaints that will be filed by clientele that involves farm program issues.

Please advise if additional information is needed by PCIB.

cc: Deborah Lombardino
    Chief, Counseling and Mediation Branch

USDA is an Equal Opportunity Provider and Employer

Attachment 3.
B.1

2629 Highway 14, East
Selma, AL 36703
December 31, 2002

Dear Mr. Crawford,

As you are aware, I am to return to my role as Chief of Production Adjustment/Compliance Division on Monday, January 6, 2003 as a result of the Mediation Agreement we made from my EEO complaint against you as State Executive Director of the Alabama Farm Service Agency. You are also aware that I have requested a reinstatement of this complaint due to noncompliance, along with other acts of reprisal against me.

When I left the State Office a year ago, I was a nervous wretch and in poor health due to the harassment, humiliation and intimidation that I had to endure. I really was hoping for a resolution to the situation before such time of the expiration of the agreement, and that has not happened. My attorney also recently requested an indefinite extension of the detail to OCR/PCIB from the Department of Civil Rights, Employment Compliance and Technical Assistance Division.

In the event we have not received a response to our request by Friday, January 3, 2003, I am requesting that you allow me to work at a location outside of the State Office. I cannot subject myself to such an uncomfortable environment to cause further detriment to my physical and mental health. If this request is unfeasible, I am enclosing a signed request for sick leave for your approval. I am requesting leave beginning January 6, 2003 until such time a resolution can be reached. I do plan to stay on board until some favorable resolution is reached. Your immediate attention is needed, and your cooperation with me in this matter will be appreciated.

Sincerely,

Ozetta C. Thomas

Enclosure

Cc: Doug Frago, DAFO
    John Chott, Deputy DAFO
    Jeffrey C. Robinson, Esq.

7.

*Attachment 3, pg. 2*

## Request for Leave or Approved Absence

| 1. Name (Last, first, middle) | 2. Employee or Social Security Number |
|---|---|
| Thomas, Ozetta C. | |

| 3. Organization |
|---|
| USDA/FSA |

**4.** Type of Leave/Absence

| Check appropriate box(es) and enter date and time below | Date From | To | Time From | To | Total Hours |
|---|---|---|---|---|---|
| ☐ Accrued annual leave | | | | | |
| ☐ Restored annual leave | | | | | |
| ☐ Advance annual leave | | | | | |
| ✓ Accrued sick leave | 01-06-03 | -- | 7:30 a.m. | 5:00 p.m. | |
| ☐ Advance sick leave | | | | | |

Purpose:
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

- ☐ Compensatory time off
- ☐ Other paid absence (specify in remarks)
- ☐ Leave without pay

**5.** Family and Medical Leave

If annual leave, sick leave, or leave with pay will be used under the Family and Medical Leave Act of 1993 (FMLA), please provide the following information:

- ☐ I hereby invoke my entitlement to family and medical leave for:
  - ☐ Birth/Adoption/Foster care
  - ☐ Serious health condition of spouse, son, daughter, or pa[...]
  - ☐ Serious health condition of se[...]

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements a[...] responsibilities under the FMLA. Medic[...] certification of a serious health conditi[...] may be required by your agency.*

**6.** Remarks

**7. Certification:** I certify that the leave/absence requested above is for the purpose(s) indicated. I understand that I must comply with [...] employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| 7a. Employee signature | 7b. Date signed |
|---|---|
| *Ozetta C. Thomas* | 12/31/2002 |

| 8a. Official action on request | ☐ Approved   ☐ Disapproved | *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* |
|---|---|---|

**8b.** Reason for disapproval

Exhibit 6
Page 53 of 133

| 8c. Signature | 8d. Date signed |
|---|---|

**Privacy Act Statement**

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office processing a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well a[...] other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnish[...] on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes[...]

Office of Personnel Management
5 CFR 630                    Local Reproduction Authorized                    8.

080



United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

Farm Service Agency

Alabama State FSA
Office
P. O. Box 235013
Montgomery, AL
36123-5013

334-279-3500
334-279-3550 (FAX)

Attachment 4.

**Date:** December 31, 2002

**TO** : Ozetta Thomas, Agricultural Program Specialist

**FROM** : Danny F. Crawford, State Executive Director

**SUBJECT** : Termination of Detail

In accordance with the resolution agreement made by and between you and the U. S. Department of Agriculture, Farm Service Agency, dated December 5, 2001, your detail to the Civil Rights and Small Business Utilization Staff, Program Complaints Branch in Montgomery, Alabama, as a Program Complaint Specialist will terminate on January 4, 2003.

Our office has processed a SF-52, Notification of Personnel Action, to return you to your former position effective January 5, 2003. We look forward to seeing you on Monday, January 6, 2003.

If you have any questions or need assistance, please feel free to contact me.

Exhibit 6
Page 54 of 133

USDA is an Equal Opportunity Provider and Employer

9.

United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

Farm Service Agency

Alabama State FSA
Office
P.O. Box 235013
Montgomery, AL
36123-5013

334-279-3500
334-279-3550 (FAX)

*Attachment 5, B.1*

**Date:** January 6, 2003

**TO** : Ozetta Thomas, Agricultural Program Specialist

**FROM** : Danny F. Crawford, State Executive Director

**SUBJECT** : Request for Sick Leave

Attached is the Request for Leave or Approved Absence, SF-71, you submitted for

indefinite sick leave beginning January 6, 2003. This request has been disapproved

due to the lack of supporting medical documentation. You must provide medical

documentation to substantiate any request for sick leave in excess of three days in

accordance with Handbook 17-PM. Failure to provide adequate medical

documentation will result in a charge of Absence Without Leave (AWOL) beginning

Thursday, January 9, 2003.


Attachment


Exhibit  6
Page 55 of 133

*10.*

USDA is an Equal Opportunity Provider and Employer

Attachment 5, Ps. 2

## Request for Leave or Approved Absence

| 1. Name *(Last, first, middle)* | 2. Employee or Social Security Number |
|---|---|
| Thomas, Ozetta C. | |

3. Organization

   USDA/FSA

| 4. | Type of Leave/Absence | | | | | 5. | Family and Medical Leave |
|---|---|---|---|---|---|---|---|
| Check appropriate box(es) and enter date and time below | Date | | Time | | Total Hours | If annual leave, sick leave, or leave withor pay will be used under the Family and Medical Leave Act of 1993 (FMLA), pleas provide the following information: | |
| | From | To | From | To | | | |
| ☐ Accrued annual leave | | | | | | | |
| ☐ Restored annual leave | | | | | | | |
| ☐ Advance annual leave | | | | | | | |
| ☑ Accrued sick leave | 01-06-03 | -- | 7:30 a.m. | 5:00 p.m. | | ☐ I hereby invoke my entitlement to family and medical leave for: | |
| ☐ Advance sick leave | | | | | | ☐ Birth/Adoption/Foster care | |

Purpose:
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

- ☐ Serious health condition of spouse, son, daughter, or par
- ☐ Serious health condition of se

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the FMLA. Medical certification of a serious health condition may be required by your agency.*

- ☐ Compensatory time off
- ☐ Other paid absence *(specify in remarks)*
- ☐ Leave without pay

6. Remarks

7. Certification: I certify that the leave/absence requested above is for the purpose(s) indicated. I understand that I must comply with employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| 7a. Employee signature | 7b. Date signed |
|---|---|
| *Ozetta C. Thomas* | 12/31/2002 |

| 8a. Official action on request | ☐ Approved    ☒ Disapproved | *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* |
|---|---|---|

8b. Reason for disapproval

   Lack of medical documentation for timeframe requested

| 8c. Signature | 8d. Date signed |
|---|---|
| *Danny J. Crawford* | 1/6/03 |

Privacy Act Statement
Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployme compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Fede agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the Genera Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnish on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purpose

| Office of Personnel Management 5 CFR 630 | Local Reproduction Authorized | OPI |

Exhibit 11.6

Page 3 of 22

085

Subject: Re: [Fwd: Cotton Expo]
Date: Thu, 16 Jan 2003 09:46:34 -0600
From: Danny Crawford <danny.crawford@al.usda.gov>
Organization: USDA-FSA
To: Ozetta Thomas <ozetta.thomas@al.usda.gov>

Attachment 6

That will be fine, thanks.

Ozetta Thomas wrote:
>
> I would be glad to attend this meeting.  However, I was not in on the
> ground floor of the DCP program, and have only focused on it since my
> return last week.  I found that the program is a lot to decipher, and I
> am reading the handbook and talking to the staff in familiarizing myself
> with it; although, I will put someone on standby just in case.
>
> Ozetta
> Danny Crawford wrote:
> >
> > If I'm not available, national CRP training is scheduled that week,
> > could you handle this meeting in Dothan?
> >
> > --------------------------------------------------------------------
> >
> > Subject: Cotton Expo
> > Date: Tue, 14 Jan 2003 13:19:19 -0600
> > From: Virginia Payne <virginia.payne@al.usda.gov>
> > Organization: USDA-FSA
> > To: danny.crawford@al.usda.gov
> >
> > Danny,
> >
> > Eric Crowder, Dale County CES, asked me this morning if I would invite
> > someone from our agency to speak at the Cotton Expo.  The meeting will
> > be February 28, 2003 at 9:00 A.M. at the Peanut Festival Building in
> > Dothan, Alabama.
> >
> > Will you be able to attend (and speak) this meeting or will you get
> > someone from the STO to attend?  He wants somebody to speak about the
> > DCP Program or anything pertaining to cotton.  Please let me know as
> > soon as you can.
> >
> > Thank you so much.
> >
> > Virginia

12.
Exhibit 6
Page 57 of 133

of 1

EXPRESS
MAIL
~TED STATES POSTAL SERVICE®

**POST OFFICE TO ADDRESSEE**

\*EU751411083US\*

Customer Copy
Label 11-B  June 2002

**SEE REVERSE SIDE FOR
SERVICE GUARANTEE AND
INSURANCE COVERAGE LIMITS**

| ~IN POSTAL USE ONLY | Day of Delivery | Flat Rate Envelope | |
|---|---|---|---|
| P Code | ☑ First ☐ Second | Postage $ 13.65 | |
| 6703 | ☑ 12 Noon ☐ 3 PM | | |
| Day  Year | Military | Return Receipt Fee | |
| AM ☑ PM | ☐ 2nd Day ☐ 3rd Day | | |
| Lbs. | Int'l Alpha Country Code | COD Fee | Insurance Fee |
| Delivery 4 | Acceptance Clerk Initials | Total Postage & Fees $ 13.65 | |

~USTOMER USE ONLY

~THOD OF PAYMENT

~ress Mail Corporate Acct. No.

FROM: (PLEASE PRINT)  PHONE (334) 876 3947

~ta C. Thomas
~9 Hwy 14 East
Selma, AL 36703

Federal Agency Acct. No. or
Postal Service Acct. No.

TO: (PLEASE PRINT)  PHONE

Director
Office of Civil Right
~400
Room 536 W
Washington DC

SELMA AL
APR - 7 2003
USPS · 36703

ZIP + 4  | 2 | 0 | 2 | 0 | • | 9 | 7 | 7 | 0 |

**FOR PICKUP OR TRACKING CALL 1-800-222-1811    www.usps.com**  EMS

---

Exhibit 6

Page 58 of 133

SELMA POSTAL STORE
SELMA, Alabama
367033802

04/07/2003    (334)874-4678    02:15

------ Sales Receipt ------
Product      Sale   Unit         Fi
Description  Qty    Price        Pi

WASHINGTON DC 2025D                $1
Express Mail PO-ADD
  Serial Number   EU751411083US
  Next Day Noon  / Normal
  Delivery
                        -----
            Issue PVI:        $

Total:                            $

Paid by:
Cash                              $
Change Due:                       -

Bill#: 1000400875398
Clerk: 21

Refunds only per DMM P014
------ Thank you for your business
       Customer Copy

091                    13.

*Attachment VII*
*Pgs. 1-11*

2629 Highway 14, East
Selma, AL 36703
May 19, 2003

Mr. Claude McKenzie, EEO Counselor
355 East Hancock Avenue – Stop 105
Athens, FA 30601

Dear Mr. McKenzie,

This letter will serve as an addendum to my EEO complaint dated April 07, 2003, and forwarded to the Director, Office of Civil Rights, Washington D.C. It also contain additional comparative data to show a continued pattern of how I was treated different from other FSA employees from the time I returned to my duties as Chief of Production Adjustment/Compliance Division of the Alabama State Office from January 06, 2003 through February 24, 2003.

As I stated to you in our telephone conversation on Wednesday, May 14, 2003, I could no longer endure the hostile working environment that I suffered before being detailed to the Office of Civil Rights, Program Complaints Inquiry Branch, Montgomery, AL. I maintain that management could have worked with me to avoid the situation I was forced to go back to, then eventually forcing me to retire.

In addition to my letter of complaint against Alabama's FSA State Executive Director, Danny F. Crawford, I wish to include the following events in disrespect to me as Chief:

On my first day back (January 09, 2003), I reported to Danny's office to inform him that I was back. Danny told me that he had spoken with Dr. Carlton Oneal, Chief, OCR/PCIB about using the laptop that I had been using while I was detailed there, and that he had already spoken to the Information Technician, Mary Reynolds, about setting it up for me, and that he would get with me later. Well, Danny never got back with me and it took several days before the Information Technician set the computer up with a printer that wouldn't work. It took some intervention from the Administrative Officer, Verdell Zeigler, to inform them (Mary & Marlys) that I was to be treated just like any other employee before I received working equipment. I questioned Dr. Oneal about letting the laptop go outside of OCR with the sensitive information on it. Dr. Oneal responded that OCR, Washington D.C. directed that he let the laptop go. Therefore, Danny lied because he had not spoken with Carlton, so there had to have been some conversation between Danny Crawford and Mrs. Sharon Holmes, Director, OCR/FSA concerning me as well as the laptop.

On or about Tuesday, January 21, 2003, my employee, Walda Messer, informed me that Danny wanted her to go to the Autauga County Office to meet with a black farmer about the 2002 NAP payments. I am also aware that Danny called

*1.*
Exhibit *6*
Page *59* of *133*

EEO COMPLAINT – Ozetta C. Thomas                                        Page 2.

the black State Committeeman, Douglas Moore to attend the meeting with them. I can't understand why I was not invited to attend the meeting since I was the Chief of the program and knew more about the program than Mr. Moore.

On Thursday, January 23, 2003, there was a meeting held at the State Office with the same black farmer and a group of other black farmers. It was my understanding that the black farmer had confused the date of the meeting when the meeting was scheduled in Autauga County, and it was rescheduled for the following Thursday in the STO. I was not aware of this scheduled meeting until Richard Nazary, Farm Loan Specialist, called me on telephone and asked me to come downstairs and call Washington because they had a group of black farmers distraught about not being paid their 2002 NAP payment. Richard informed me that he had called for Walda to meet with them, but she had stepped out of the office. I informed Richard that I would come downstairs, but I was not calling Washington because I didn't know what was going on and I didn't know what I would be calling Washington for. I did go downstairs, and there were a group of black farmers around the table discussing their farm loan activities, and they wanted to know why they had not received their NAP payments. To show further disrespect for me, the District Director, Richard Burge, in the presence of the farmers, stated that the counties had not received the payment codes and asked that I send Walda back to the meeting, and stated that I could come back if I wanted to. My reply to him was that I would be back because I was the Chief of the program and I needed to know what was going on.

Working under the stressful conditions kept me so physically and mentally drained that the week of February 10, 2003, I presented a five-day doctor's excuse to take a week sick leave. I went back to work one day after the holiday, February 18, 2003, and was not ready to go back. Therefore, I took sick leave for the rest of that week. Then on Monday, February 24, 2003, I still was not physically or mentally well, therefore, I made the decision to retire because I felt that my health was more important to me.

When I returned from the detail, there was no official notice to the field on my return as it is normally done, but when I was detailed back in December 2001, a notice was sent out naming Jeff Knotts as the Acting Chief (see attachment 1). Jeff is a younger white male. When I retired, Debbie Williams, Executive Officer, immediately sent an e-mail message to the field (see attachment 2). I then e-mailed Debbie with a CC to Danny inquiring about the rush to inform the field that I had retired, but they didn't inform the field that I was back in the STO. Danny's response to me was "what are you talking about?" (see attachment 3). Verdell Zeigler, Administrative Officer, then followed up with an e-mail forwarding my home and e-mail address (see attachment 4). This also confirmed the drastic impact on my integrity for I received a total of 12 responses (seven e-mails and five cards).

2.

Exhibit ___6___
Page _60_ of _133_

EEO COMPLAINT – Ozetta Thomas                                    Page 3.

It has always been traditional to honor all retirees with a retirement celebration, but it did not happen for me. To show comparison, Richard Nazary, FLP Specialist, retirement is being honored and considered a wellness day (see attachment five, pgs. 1 & 2). What a difference, Richard is a white male.

Now that I am retired, Danny made sure that I couldn't change my mind and apply to go back to work. He restricted the vacancy announcement to permanent employees. This is discriminatory within itself. This was done strictly to keep me and another former employee, who is black, out who were interested in getting back into the workforce (see attachment 6). Now that the vacancy has been filled, Danny has fulfilled his goal, and that was to rid me of the workforce and give the position to a younger white male as I have always stated. And, the field has been notified (see attachment 7).

I am sure this can show the disparity, for it is crystal clear that I have been discriminated against over and over again. I may be reached at the above address, and my home telephone number is 334-875-3947 or you may reach me on my cell at 334-419-5158.

I am still represented by the Chestnut, Sanders, Sanders, Pettaway, Campbell & Albright Law Firm, Jeffrey Robinson, Esq.

Sincerely,

Ozetta C. Thomas

Cc: Jeffrey Robinson, Esq.

3.

Exhibit 6
Page 61 of 133

**USDA**

(Attachment 1.)

December 15, 2001
~~January 3, 2002~~

United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

Farm Service Agency

Alabama State Office
P. O. Box 235013
Montgomery, AL
36123-5013

Tel: (334) 279-3500
Fax: (334) 279-3550

TO:        All Alabama FSA Employees

FROM:    /s/Danny F. Crawford, State Executive Director

SUBJECT:  Acting Chief, PA/CP

Ozetta Thomas has been detailed to the Civil Rights and Small
Business Utilization Staff effective December 16, 2001. Jeff
Knotts has been appointed to serve as Acting Chief of the
Production Adjustment/Compliance Division in the STO. All
calls or correspondence in that program area that would
normally be routed to the Chief of the Division should be
forwarded to Jeff.

USDA is an Equal Opportunity Employer

4.

Exhibit  6
Page 62 of 133

# YAHOO! Mail ✉

(Attachment 2)

Close Window

**Date:** Thu, 27 Feb 2003 09:53:50 -0600
**From:** "Sharon S. Ervin" <Sharon.Ervin@al.usda.gov>
**To:** ozettat@yahoo.com
**Subject:** [Fwd: Retirement]

### Forwarded Message

**Date:** Mon, 24 Feb 2003 14:46:07 -0600
**From:** "Deborah Williams" <deborah.williams@al.usda.gov>
**To:** "All Employees" <allfsaemp@al.usda.gov>
**Subject:** Retirement

### Plain Text Attachment

Ozetta Thomas has decided to retire from her position with FSA
effective
today, February 24, 2003.  Walda Messer has been designated Acting
Chief
of the Production Adjustment/Compliance Division through March 31,
2003.

We wish Ozetta the best in her retirement and thank her for her many
years of service to FSA.

Exhibit __6__
Page __63__ of __133__
__5.__

096

Yahoo! Mail - ozetat@yahoo.com

# YAHOO! Mail ✍

(Attachment 3)

Close Window

**Date:** Mon, 24 Feb 2003 21:25:05 -0600
**From:** "Danny Crawford" <danny.crawford@al.usda.gov>
**To:** "ozetta thomas" <ozettat@yahoo.com>
**CC:** deborah.williams@al.usda.gov
**Subject:** Re: Retirement

What are you talking about?

ozetta thomas wrote:
>
> Why the mad rush to inform the field that I was
> retiring? They don't know I am back from the detail
> yet.  You didn't send a notice out on that!
>
> Ozetta
>
>
> _____
> Do you Yahoo!?
> Yahoo! Tax Center - forms, calculators, tips, more
> http://taxes.yahoo.com/

Exhibit 6

Page 64 of 133

6.

097

Yahoo! Mail - ozetta@yahoo.com

Page 1 of 1

(Attachment 4.)

Close Window

**Date:** Thu, 27 Feb 2003 09:52:53 -0600
**From:** "Sharon S. Ervin" <Sharon.Ervin@al.usda.gov>
**To:** ozettat@yahoo.com
**Subject:** [Fwd: Retirement - Ozetta Thomas]

**Forwarded Message**

**Date:** Tue, 25 Feb 2003 11:20:56 -0600
**From:** "Verdell Zeigler" <verdell.zeigler@al.usda.gov>
**To:** "All FSA Employees" <allfsaemp@al.usda.gov>
**Subject:** Re: Retirement - Ozetta Thomas

**Plain Text Attachment**

For those who would like to extend congratulations to Ozetta, we are
forwarding her home address as well as her email address:

Ozetta Thomas
2629 Hwy 14, East
Selma, Alabama   36703

email:  ozettat@yahoo.com

Exhibit __6__
Page __65__ of __133__
7.

(Attachment 5, pg.1)

# YAHOO! Mail

Close Window

**Date:** Tue, 22 Apr 2003 10:37:38 -0500
**From:** "Katherine Colvin" <katherine.colvin@al.usda.gov>
**To:** Ozettat@yahoo.com
**Subject:** [Fwd: Retirement of Richard Nazary]

---

### Forwarded Message

**Date:** Thu, 17 Apr 2003 14:32:51 -0500
**From:** "William Sewell" <william.sewell@al.usda.gov>
**To:** "All FSA Employees" <allfsaemp@al.usda.gov>, allrdemp@al.usda.gov, "Spencer Swann" <sswann@farmcreditbank.com>, "Camp Powers" <rpowers@firstsouthfarmcredit.com>, "Roger Chappell" <rchappell@firstsouthfarmcredit.com>, "David Howse" <dhowse@farmcreditbank.com>, "Veldon Hall" <Veldon_Hall@wdc.usda.gov>, "Jim Radintz" <jim_radintz@wdc.fsa.usda.gov>
**Subject:** Retirement of Richard Nazary

---

### Plain Text Attachment

Attached is a copy of the letter announcing the retirement of Richard E.
Nazary, FLP Specialist. Some of you have known Richard for years and
have worked with him before. You might just want to write him a note
saying farewell or you may want to contribute to his retirement gift.
Whatever, you feel like doing.

If you know of any retirees that have worked with Richard in the past,
please see that they are aware of his forthcoming retirement.

Thanks,

Bill Sewell


**Attachment**



**z_Richard_Nazary_Outing.doc**
.doc file

Exhibit __6__
Page __66__ of __133__

8.

099



(Attachment 5, Pg2)

April 17, 2003

United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

Farm Service Agency

Alabama State Office
P. O. Box 235013
Montgomery, AL
36123-5013

Tel: (334) 279-3500
Fax: (334) 279-3550

TO:        All Alabama FSA Employees, RD Employees and Retirees

FROM:      /s/ Danny F. Crawford, State Executive Director

SUBJECT:   Wellness Day and Retirement Party

The State Office is planning a "Wellness Outing and Retirement Party"
on May 28, 2003, from 10:00 a.m. - 2:00 p.m. in Montgomery.  It will
be at the Ida Bell Young Park, which is located on Vaughn Road
between St. James and Catholic High Schools.  A walking path and
other outdoor activities are available at the park.  The outing is to help
reduce some of the stress at the State Office and to recognize the
retirement of Richard E. Nazary, FLP Specialist.  Richard is retiring on
June 3, 2003, after 35 years of service.  He will surely be missed!
Farewell cards, letters and cash contributions should be sent to Caryn
Melton at the State Office.  Checks should be made payable to Caryn
Melton.  A gift certificate will be purchased with the funds provided;
and I will present the gift certificate, cards and letters to Richard at the
"Wellness Outing."

The Farm Loan Program Staff will cook hamburgers during this outing.
The price of the meal will be $5.00 per person.  If you plan to eat lunch
with us, please contact Caryn Melton at (334) 279-3438, so that we will
know how much food to buy.

If you have any questions, please contact the State Office, Farm Loan
Division.

(Attachment 6)

# UNITED STATES DEPARTMENT OF AGRICULTURE
## FARM SERVICE AGENCY

## VACANCY ANNOUNCEMENT
## MERIT PROMOTION

**VACANCY IDENTIFICATION NUMBER:** UK170957AL-RB

**OPENING DATE:** Mar 28, 2003

**CLOSING DATE:** Apr 10, 2003

**POSITION TITLE, SERIES AND GRADE:** Supervisory Agricultural Program Specialist, GS-1145-13

**PROMOTION POTENTIAL:** None

**SALARY:** GS-13, $61,251.00 pa., an additional 8.64% locality pay is applicable.

This is a Career/Career Conditional position.

**DUTY LOCATION:** MONTGOMERY, AL - 1 vacancy

**EMPLOYING AGENCY:** ALABAMA STATE FSA OFFICE

**AREA OF CONSIDERATION:** Restricted to permanent Alabama FSA federal/county employees.

**VOLUNTARY APPLICATIONS:** Voluntary applications from FSA employees outside the area of consideration stated above will not be accepted.

**FARM SERVICE AGENCY (FSA) COUNTY EMPLOYEES:** Permanent County Employees without prior federal tenure who are selected for a Civil Service position under Pub.L. 105-277 will be given a career-conditional appointment and must serve a 1-year probationary period. After 3 years of service, employees will be eligible for conversion to career status.

**CONTACT:** Any questions should be directed to (816) 926-6669. TDD number (800) 735-2966.

**APPLICATION MATERIALS MUST BE RECEIVED BY THE CLOSE OF BUSINESS (5:00 P.M. CENTRAL TIME) ON THE CLOSING DATE OF THE ANNOUNCEMENT. YOU WILL LOSE CONSIDERATION IF YOUR APPLICATION PACKAGE DOES NOT PROVIDE ALL THE INFORMATION REQUESTED IN THIS ANNOUNCEMENT. DO NOT ATTACH POSITION DESCRIPTIONS, AWARDS, MANUSCRIPTS, PERSONAL ENDORSEMENTS, OR OTHER UNSOLICITED MATERIAL.** Your application materials will not be returned. Do not submit original documents that you may need in the future.

**Probationary Period:** Section 303 of the Civil Service Reform Act (P.L. 95-454) established a probationary period of one year for newly appointed managers and supervisors.

Exhibit 16
Page 68 of 133



(Attachment T)

United States
Department of
Agriculture

May 6, 2003

Farm and Foreign
Agricultural
Services

Farm Service Agency

Alabama State Office
P. O. Box 235013
Montgomery, AL
36123-5013

Tel: (334) 279-3500
Fax: (334) 279-3550

TO:        All Alabama FSA Employees

FROM:      /s/Danny F. Crawford, State Executive Director

SUBJECT:   STO Production Adjustment/Compliance Chief Selection

Interviews were conducted for the vacant STO Production Adjustment/Compliance Chief on April 30. Those who applied and interviewed for the position were Ronnie Davis, CED in the Henry CO; Walda Messer, STO Agricultural Program Specialist; and Sharrie Peterson, STO Agricultural Program Specialist. I would like to thank each of them for applying for the position.

The interviewing panel has rated the applicants, and Ronnie Davis has been selected to be the new Chief of the STO Production Adjustment/Compliance Division. Ronnie comes to the STO with 13 years of experience with NRCS and 11 years with FSA. He will be a valuable asset to the STO, and we are happy to welcome him.

I appreciate the work of those who served on the interviewing panel with me. They were Kevin Kelley, SED in the Florida STO, and Bobby Tidwell, PA/CP Chief in the Tennessee STO. Verdell Zeigler was the minority observer.

Exhibit  11/6
Page 69 of 133

*Case #030475*
*Attachment VIII*
*Pgs. 1-5*



**USDA**

United States
Department of
Agriculture

Office of the
Assistant Secretary
for Civil Rights

Office of
Civil Rights

1400 Independence
Avenue SW

Washington, DC
20250

Mr. Jeffrey C. Robinson, Esquire
Chestnut, Sanders, Sanders, Pettaway &
Campbell, L.L.C.
Attorneys and Counselors At Law
One Union Street
Selma, Alabama 36702-1290

DEC 9 2003

Re: Acceptance Letter for Ozetta Thomas
Complainant No. 030475

Dear Mr. Robinson;

The Acceptance Letter dated November 7, 2003, for Complaint No. 030475 was mailed to you without signature. As a result of this error, we have prepared the enclosed signed Letter of Acceptance. Please substitute this Letter of Acceptance for the one previously sent to you. The date of the substitute letter will be the date of acceptance for record purposes.

Please accept our apology for this error.

Sincerely Yours,

*Elvia Mata*

Larry W. Newell
Chief, Employment Complaints Division
Office of Civil Rights

cc:    Civil Rights Director, FSA

Ms. Ozetta Thomas
2629 Highway 14, East
Selma, AL 36703

*k. 1.*

Exhibit 6
Page 70 of 133

103



**United States
Department of
Agriculture**

Mr. Jeffrey C. Robinson, Esquire
Chestnut, Sanders, Sanders, Pettaway &
Campbell, L.L.C.
Attorneys and Counselors At Law

**Office of the
Assistant Secretary
for Civil Rights**

One Union Street
Selma, Alabama 36702-1290

DEC  9 2003

**Office of
Civil Rights**

<p align="center">Re: EEO Complaint of Ozetta Thomas #030475</p>

**1400 Independence
Avenue SW**

Dear Mr. Robinson:

**Washington, DC
20250**

The subject Equal Employment Opportunity (EEO) complaint of discrimination against the Farm Service Agency (FSA) dated June 18, 2003 is considered filed on June 18, 2003.    It has been assigned the complaint number shown above. Please refer to this complaint number in any future communication on the subject EEO complaint.

We are accepting[1] and referring for investigation the following claim:

Whether the agency subjected the complainant to discrimination based on reprisal for prior EEO activity when:

1. on or about January 3, 2003 her request for an extension for the reassignment to the Office of Civil Rights/Program Complaints Inquiry Branch (OCR/PCIB) in Montgomery, Alabama was denied;

2. since January 6, 2003, her request to be indefinitely detailed to OCR/PCIB has been denied;

3. on January 6, 2003, her request for indefinite sick leave was denied;

4. her supervisor undermined her ability to perform her duties as a Branch Chief when:

   a. on January 21, 2003, she was not asked to attend a meeting concerning a 2002 NAP payment, in spite of the fact that she was serving as the Chief of the Program;

   b. on January 23, 2003, her supervisor undermined her when during a meeting with black farmers concerning NAP   payments the District Director in the presence of the farmers asked her to send a subordinate employee back to the meeting and told her the she (complainant) could come back to the meeting if she wanted to;

**Exhibit  6**
**Page 71 of 133**

<p align="center">104</p>

---

[1] This complaint raises an allegation of non-compliance with a Negotiated Settlement Agreement which has been dismissed for having been addressed in a prior EEO complaint. Further, based upon the Commission's guidance regarding reprisal allegations, the denial of request for reassignment to OCR/PCIB issue is also being accepted and processed as a "new" complaint.

**2.**

AN EQUAL OPPORTUNITY EMPLOYER

   b. on or about January 5, 2003, when she returned from her detail to OCR/PCIB, field activities were not notified that she had returned;

5. on or about February 24, 2003, she was "forced" to retire; and

6. the agency did not provide her with a retirement celebration as they did a similarly situated employee?

The Department of Agriculture (Department) is required, under 29 C.F.R. §1614.108 to complete an impartial, factual and appropriate investigation of the accepted claim(s) within 180[2] days of the date the subject EEO complaint was filed. An appropriate factual record is one that allows a reasonable fact finder to draw conclusions as to whether discrimination occurred. The complainant and the Department may voluntarily extend the 180-day time period not to exceed an additional 90 days. In addition, the Department may unilaterally extend the 180-day time period or any period of extension for not more than 30 days where it must sanitize a complaint file that contains classified information.

When the investigation begins, the complainant will be contacted by an investigator. The complainant is required to fully cooperate with the investigator. Failure to do so may result in dismissal of this EEO complaint. The complainant must present to the investigator all information (s)he wishes considered relevant to the accepted claim(s). Also, the complainant must provide the investigator with the names of any witnesses (s)he believes should be contacted.

The complainant must keep the agency informed of their and your current address. If the Department is unable to locate the complainant, it may dismiss this EEO complaint under 29 C.F.R. §1614.107(a)(6).

When the complainant receives the investigation report, (s)he will be notified of their right to elect either an agency decision based on the record or a hearing with a decision from an Equal Employment Opportunity Commission (EEOC) administrative judge. The notification will provide the complainant with specifics on how to exercise their election rights.

If the complainant has not received the investigation report after 180 days from filing the last of the subject EEO complaints or 360 days after filing the first of the subject EEO complaints, (s)he has the right to request a hearing from an EEOC administrative judge. Should the complainant request a hearing, (s)he must send the request to the EEOC office designated in the initial letter we sent acknowledging receipt of this complaint. As instructed in that letter, the complainant must also certify to the EEOC that a copy of the hearing request was sent to the following address:

Exhibit _6_
Page _12_ of _133_
_8.3._

[2] All references to days refer to calendar days unless specified otherwise.

3

United States Department of Agriculture
Farm Service Agency
Civil Rights Director
Mail Stop: 0509
1400 Independence Avenue, SW
Washington, DC  20250

In the instant case, you also raised a claim of non-compliance with a Negotiated Settlement Agreement.   However, on your formal discrimination complaint you also stated that on December 9, 2002, you requested an indefinite extension of a detail along with a non-compliance request to the Chief Employment Compliance and EEO Technical Assistance Division.  You further stated that on January 3, 2003, you received a response from the Director of Civil Rights that addressed the non-compliance issue.   Inasmuch as the issue of non-compliance has been previously addressed in complaint number AL-01-001E, filed on September 14, 2001 and is pending before or has been decided by the agency, the allegation is dismissed.  The regulatory basis for this decision is found at 29 C.F.R. §1614.107(a)(1).

If the complainant desires, he may submit a written statement concerning the agency's articulation of the claim.  Any such statement must be submitted within 7 calendar days from receipt of this letter and will be included in the complaint file.  The statement should be sent to the following address:

United States Department of Agriculture
Office of Civil Rights
Employment Complaints Division
**Intake, Accept/Dismiss Branch**
1400 Independence Avenue, S.W.
Stop Code 9440
Washington, DC  20250-9440

Please also be advised that, consistent with EEOC Regulations and the Secretary of Agriculture's strong commitment to the early resolution of EEO complaints, parties are encouraged to seek resolution to complaint(s) at any stage of the EEO complaint process.  Settlement discussions may take place throughout the administrative complaint process.  If a resolution is achieved, a copy of the settlement agreement must be provided to this office promptly to avoid unnecessary confusion and additional cost.  Likewise, if at any stage of the EEO complaint process if you wish to voluntarily withdraw your complaint, you must promptly provide to this office, a written request to withdraw their EEO complaint.  The withdrawal request must be signed, dated, and include the EEO complaint number.  To ensure prompt receipt, please fax a copy of the voluntary settlement agreement or voluntary withdrawal directly to the **Employment Adjudication Division, at Fax Number (202) 401-8035.**

4

If you have any questions or concerns regarding the status of your complaint, you may submit them in writing or call 1-800-795-3272. All written status requests **must be marked ATTN: CUSTOMER SERVICE UNIT.**

Sincerely,

Larry W. Newell
Chief, Employment Complaints Division
Office of Civil Rights

cc:    Ms. Ozetta Thomas
       2629 Highway 14, East
       Selma, AL 36703

       Civil Rights Director, FSA

10. 5.

Exhibit ___6___
Page _74_ of _133_

Case # 040175
Attachment IX
Pgs. 1-3

FSA Office of Civil Rights
1280 Maryland Avenue, SW
Mail Stop 0509, Suite 580-B
Washington, DC 20250

# facsimile transmittal

| To: | Ms. Ozetta Thomas | Fax: | (334) 872-6941 |
|---|---|---|---|
| From: | Philip L. Newby | Date: | 10/19/2004 |
| Re: | Documents Sent to Your Lawyer | Pages: | 8 (including the cover sheet) |
| CC: | N'A | | |

X Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Ms. Thomas:

Per your request, attached are documents FSA sent to your lawyer in reference to
your complaint.

Also attached is a Fedex receipt showing that your lawyer's office did receive
the documents.

I hope this information is helpful to you.

Respectfully,

*Philip L. Newby*
Phil. Newby.

Exhibit 16
Page 75 of 133



**United States
Department of
Agriculture**

Farr and Foreign
Agricultura
Services

Farm Service
Agency

'est Independence
Avenue, SW
Stop 0574
Washington, DC
20250-0574

Ms. Christmas Y. Green. Esq.
One Union Street
Selma, Alabama 36702-1290

'JUL 2 7 2004

Re: Complaint Number: 040175

Dear Green, Esq.:

The Farm Service Agency Office of Civil Rights has contracted with JDG & Associates to investigate your client's (Czetta Thomas) case of alleged discrimination. Ms. Quoquise Jackson, a contract investigator with JDG & Associates will be contacting you within seven days after receiving this letter to establish an interview date.

Your client alleged has alleged discrimination based on reprisal (prior EEO activity). Attached is the letter of acceptance outlining the details of the complaint.

JDG & Associates will be conducting the investigation pursuant to Equal Employment Opportunity Commission regulations at 29 CFR Part 1614, applicable Department Regulations, and the provisions of their contract.

Thus, when Ms. Jackson identify herself to your client, she will expect your client's complete cooperation in this investigation, since she has been given the authority to investigate all aspects of the complaint. Your client is required to furnish sworn or affirmed testimony by affidavit, without pledge of confidence, about matters pertaining to the complaint, and to provide access to your files and records, as required, to answer the complaint.

The information obtained by the investigation is protected by the Privacy Act of 1974 (PL. 93-579), and the information collected for use in resolving the complaint of discrimination filed by the aforementioned complainant. The information will be incorporated into a report of investigation to be distributed to the USDA Office of Civil Rights, the Agency EEO Officer, you as the representative and possibly to Federal appeal and court systems.

JDG is an Equal Opportunity Employee

**Exhibit** ___6___
**Page** 76 **of** 133
2.

If your client refuses to cooperate or furnish the necessary documents during the investigative process, she is advised that such refusal may result in the agency dismissing her complaint for failure to prosecute.

Sincerely,

Johnny R. Toles, Jr.
Acting Director, Farm Service
   Agency
Office of Civil Rights

Cc:
JDG & Associates
Investigator Ms. Quoquise Jackson

Mr. Danny Crawford
4121 Carmichael Road
Montgomery, AL 36123
(334) 279-3501

Exhibit ___6___
Page _77_ of _133_
   3.

Attachment II - A Case #010175

Exhibit A
pg.1

OZETTA C. THOMAS (~~~~~~~~~~)    ANNOUNCEMENT NUMBER F1-FSA-249

The following job related courses, certificates, honors, and awards further demonstrate my abilities for the position:

| | | |
|---|---|---|
| May 25, 2001 | <u>Certificate of Merit</u><br>For sustained superior performance of duties in service to the Farm Service Agency and the farmers of Alabama (QSI) | |
| June 2000 | <u>Certificate of Merit</u><br>For exemplary service to the Farm Service Agency and the Farmers of Alabama | |
| September 1999 | Certificate in Recognition of Outstanding Service and Tireless Dedication of USDA Personnel Devoted to Assisting America's Farm and Ranch Families through the Natural Disasters and Decline in Farm Income of 1998 and 1999 | |
| April 1998 | <u>Certificate of Training</u><br>Conducting Fact Finding Inquiries | |

Exhibit ___6___
Page 78 of 133

Exhibit A
Pg. 2

OZETTA C. THOMAS (~~~~~~~)    ANNOUNCEMENT NUMBER: FI FSA 249

The following job related courses, certificates, honors and awards further demonstrate my abilities for the position:

| | |
|---|---|
| October, 1997 | <u>Certificate of Appreciation from the Alabama State FSA Office</u> Awarded for sustained superior performance of duties in service to the Farm Service Agency and farmers of Alabama (QSI) |
| September, 1995 | <u>Certificate of Training from Universal Data Information Consultants</u> - Awarded for successfully completing the Intermediate WordPerfect 6.0a for Windows |
| September, 1995 | <u>Certificate of Training from Universal Data Information Consultants</u> - Awarded for successfully completing the Advanced WordPerfect 6.0a for Windows |
| March, 1995 | <u>Certificate of Training from the United States Department of Agriculture</u> - Awarded for successfully completing Crop Reform Loss Adjustment Training for corn, grain sorghum, small grains and soybeans |
| December, 1994 | <u>Certificate of Training from the United States Department of Agriculture</u> - Awarded for successfully completing Crop Insurance Certification Training for Catastrophic Risk Protection Coverage |
| April, 1994 | <u>Certificate of Appreciation from the State of Alabama</u> In recognition of outstanding service for helping meet the needs of others through unselfish involvement |
| April, 1993 | <u>Certificate of Accomplishment from USDA/ASCS</u> Awarded for successfully completing the course "The Promotable Woman" |
| March, 1993 | <u>Certificate of Accomplishment from USDA/ASCS</u> Awarded for successfully completing the course "Power Talk" |
| February, 1993 | <u>Black Heritage Achievement Award from the National Association of Negro Business and Professional Women's Club</u> Awarded for outstanding achievement |
| January, 1993 | <u>Certificate of Merit from Alabama State ASCS Office</u> Awarded for sustained superior performance of duties in service to ASCS and the farmers of Alabama (QSI) |

Exhibit 6
Page 79 of 133

Exhibit A
pg. 3

**OZETTA C. THOMAS** ~~████████~~

Page 2.

| | |
|---|---|
| October, 1992 | Certificate of Accomplishment from USDA/ASCS<br>Awarded for successfully completing the course "Taking Control of Your Career" |
| July, 1992 | Certificate of Training from the United States Department of Agriculture - Awarded for satisfactorily completing Developing Procedures, Policies and Documentation |
| June, 1992 | The Administrator's Award for Service to Agriculture<br>Awarded for Distinguished Individual Achievement for exhibiting dedication and significantly superior knowledge and for performing duties in an accurate and untiring manner |
| June, 1992 | The Administrator's Award for Service to Agriculture<br>Awarded for Distinguished Group Achievement for outstanding team effort in implementing the 1990 Farm Bill resulting in better service to Agriculture |
| December, 1990 | Certificate of Accomplishment - Awarded for successfully completing the course "Powerful Communication Skills for Women" |
| January, 1990 | Certificate of Merit from USDA/ASCS<br>Awarded for performance of duties with ASCS worthy of special recognition (QSI) |
| January, 1986 | Certificate of Appreciation from USDA<br>Awarded for outstanding performance as a trainer in Advanced Skills for Program Assistants |
| January, 1985 | Certificate of Accomplishment from USDA/ASCS<br>Awarded for successfully completing the Advance Skills for Program Assistants Train-The-Trainer Session |
| April, 1984 | Certificate of Accomplishment from USDA/ASCS<br>Awarded for successfully completing the Counter Skills Training for Program Assistants Train-The-Trainer Session |
| November, 1983 | Certificate of Merit from USDA/ASCS<br>Awarded for unusual dedication to the farmers aand ASCS in assuming additional work on the Payment-In-Kind program (QSI) |

Exhibit 6
Page 80 of 133

*Exhibit A*
*Pg. 4*

# JUSTIFICATION FOR QUALITY STEP INCREASE AWARD

Name:                                              Ozetta Thomas
Position, Title, Grade:                            Supervisory Agricultural Program Specialist, GS 13/6
Division:                                          Alabama FSA State Office
Period of Performance:                             10/01/99 - 09/30/00
Awards Granted in the Last 52 Weeks:               $1,000 Cash Award

Ms. Ozetta Thomas serves as the Chief Program Specialist for the Production Adjustment/Compliance Division of the Alabama FSA State Office. And as such, she must be able to prepare notices and/or correspondence that conform to State/National policies. In addition, these procedures must be written to the extent they can readily be understood. This assignment has been Ms. Thomas's strongest "suit" and perhaps can be attributed in part to her county office experience. She can readily relay how the application can best be applied on the county level. Ms. Thomas prepares the State directories or other form of correspondence in a highly efficient manner. Because of her ability to interpret program provisions, she always performs this task in a very timely manner, and to the extent the accomplishment exceeds normal expectations. Ms. Thomas's log of calls is numerous; however, she is still able to maintain a high level of efficiency. Because of the capacity in which she serves, Ms. Thomas regularly explains program changes to the STC, DDs and SED as deemed necessary. Meetings are held monthly with the DDs and STC. It is during these meetings that she exhibits her outstanding performance by explaining program changes and researching regulations to make recommendations to the STC for resolving problems. Since the STC's involvement with programs is mainly during their monthly meetings, the briefings must be done in such a manner as to enable a timely and proper determination. Ms. Thomas performs admirably in this area of responsibility.

This employee does a superb job with training/communication. Her ability to communicate effectively is an added plus. Ms. Thomas organizes and presents her material in such a manner that it generates interest, understanding, and very productive feedback. Her assistance has been requested to do one-on-one training in select county offices.

Ms. Thomas is required to handle appeals before the STC. This requires the ability to research regulations and obtain a thorough knowledge of the case in order to make recommendations and proper disposition. Also, knowledge of the program is equally important to be an advisor to the STC. Because of her expertise in many technical areas of program operations, Ms. Thomas accomplishes this task with ease. She puts forth an extra effort to anticipate the overall concerns the reviewing body will have concerning the case and prepares information accordingly. Also, she anticipates what questions the appellant may ask and prepares data or information for that need. Very few cases, if any, are reversed by a higher reviewing authority for improper action or lack thereof. Even under the National Appeals Division (NAD), all cases have been upheld by the Hearing Officer and/or under the Director's Review. The credit, to a large degree, goes to the preparation that was done prior to and after the case went before the STC. Ms. Thomas presented and/or assisted with many of these appeal cases. Also, she reviews reports and COC minutes and

Exhibit 6
Page 81 of 133

Exhibit A
Pg. 5

*QSI Justification - Ozetta Thomas*

*Page 2*

calls attention to any program irregularities. Such involvement further lessens the number of appeals and/or reduces the chance for reversal by a higher authority.

Ms. Thomas is being recognized for her outstanding leadership in the implementation of the various crop disaster programs. Within the past year, Ms. Thomas's division has administered the 1999 Crop Disaster Program and the Oilseed Program, along with the stand alone NAP (Noninsured Assistance Program). The direct training she provided, conference calls, and day-to-day answering inquiries paved the way for timely payments and/or uploads. When problems surfaced, Ms. Thomas moved aggressively with corrective action. With farmers being stretched financially, an orderly implementation of disaster relief programs is a must for their survival. To that end, Ms. Thomas went beyond the call of duty to ensure that the farmers were first.

Other assignments continued to flow into Ms. Thomas's division, which could not go undone. She still met the expectations with producers' appeals, STC/DD meetings and other routine work. The Marketing Loss Assistance (MLA) Payments were authorized by Congress to compensate producers due to low commodity prices. These payments, along with the regular AMTA payments, were all targeted to be made by September 30, 2000. Due to the leadership Ms. Thomas displayed in ascertaining that all files had been properly updated, 99% of the payments were issued by September 30, 2000.

Exhibit 6
Page 82 of 133

 United States
Department of
Agriculture

Agricultural
Stabilization and
Conservation Service

Exhibit A
Pg. 6

Ozetta,

Just a note of thanks for doing such a great job of preparing and presenting some difficult training material this week. You did a super job!!

I fully realize that crop insurance has been extremely hard with the rules being written as we go, but you & Daniel have done so good with what you were given to work with.

Thanks again!!

Robert D. Sprenger

Exhibit 6
Page 83 of 133

116

ASICS

*Case # 040172-B*
*Chronology — Pages*
*Numbered at bottom of*
*Page - 163-264*

# CHRONOLOGY OF INCIDENTS

| | |
|---|---|
| February 26, 2001 | Former State Executive Director, Daniel Robinson, retired effective February 23, 2001 due to a change in administration. Mrs. Joan Grider, Chief Program Specialist, Conservation and Price Support Division, was appointed Acting State Executive Director. |
| April 26, 2001 | Mrs. Joan Grider, Acting State Executive Director, brought to my attention a problem that District Director Jack Crawley had in his district concerning a producer he thought had received disaster payment on watermelons fraudulent. Mrs. Grider instructed me to go to Geneva County and review the operation of Mr. & Mrs. Ronnie Hales and the disaster payments they had received. I visited the Geneva County Office on this date and reviewed the Farm Operating Plan for Mr. & Mrs. Ronnie Hales. |
| May 7, 2001 | In a staff meeting of May 7, 2001, I informed Mrs. Joan Grider of my findings in Geneva County. Met briefly with Mrs. Grider and Mrs. Debbie Williams after the joint meeting. Joan had informed me to set up a review team within the State to review Payment Limitation in the entire county. Debbie insisted that she would get someone else to review Payment Limitation in Geneva County. Joan indicated that I would assist the person. |
| May 9, 2001 | I submitted a memorandum to Joan Grider and Art Lynn – Review of Farm Operating Plan for Ronnie Hales, along with recommendations. (See Exhibit B). |
| Week of May 21, 2001 | Mr. Danny F. Crawford came on board as new State Director. I met with him twice during this week to inform him of what was going on in PA including the Geneva County case. A full staff meeting was held during this week also. Danny informed the entire staff that we would keep communication open for an effective teamwork. The most important thing, he said, was communication. He said that if there was a problem, "let's sit down and talk about it". He reminded the staff to go to their chiefs first with any problems.<br><br>Even though Mr. Crawford made the above statements, there has been very little communication between us. After that first week, I lost all communication with him. He deliberately avoids communicating with me. Rather, I get messages through one of my employees or from one of his lower level staff. And, |

Exhibit __6__
Page __84__ of __133__

**117**

<u>CHRONOLOGY</u>                                                          Page 2.

occasionally he may leave a voice message. How can we have an effective SED and chief relationship?

Loss Adjuster Contractors (LAC) Training – I attended this training last year because as Chief of the PA/CP Section, we (SED and I) concluded that I should be a part of the training since LA C was under my section. For 2001 and prior to Danny's arrival as SED, we had tentatively planned this training. Once Danny became SED, I discussed these plans with him. He questioned the nature of the meeting, and gave his approval with the understanding it would be held in more of a central location such as Chilton County rather than in the extreme south part of the state. I had given him the reasons for having the training in that location, and that it was not that much difference in the cost to the government. Later, Jeff Knotts and I went back to talk with the SED relative to the disapproval of the original training site (south Alabama). Jeff (the White male employee in my section) discussed with the SED the reasons (which were the same as I had covered) for the selection of south Alabama. The SED reconsidered and approved the south Alabama training site. I was glad he reconsidered, but it made me feel very small and embarrassed that it apparently took a white man to convince him. But, the treatment gets worse. I had made plans for both Jeff and I to attend the training.

On July 9, 2001, the SED visited my office two days prior to the training and asked me "what was in the training for me." I told him that since the program was in my shop, I was going for the training and to learn how to appraise specialty crops. He informed me that I did not need to attend the training, as it was not cost effective. However, I later learned that he allowed Jeff to start travel duty the day before the meeting. The meeting was scheduled to start at *See attached Agenda* ← 1:00 p.m. on a Wednesday, July 11, 2001. Jeff lives approximately 180 miles from the training site, and the State Office is about the same distance. The SED permitted him to start his travel status at 7:30 a.m. Tuesday morning, July 10. The results were an extra night of lodging and about 15 hours of travel time for a trip that could have easily been done (allowing for lunch) in four hours. Jeff stated that he asked Danny, "did you tell Ozetta?" Danny told Jeff to tell me that "if I didn't like it, to call him". Was this really cost effective? To me, this constitutes a total disrespect to me as the Chief, disparate treatment, and undermining my management of the section. In fact, I hold that for the most part, it should have been at my discretion on the attendees for this training.

Exhibit ___ 6

Page 85 of 133

118

<u>CHRONOLOGY</u>

Page 3.

I think Mr. Crawford came in as SED with a negative view on black people. Seemingly, everything the former black SED had put in place, he is removing it, and that includes me. He also has a negative view on Blacks In Government (BIG) training. During his first week on board, another black employee, Vickie Anthony and I went into his office to talk to him about the former SED having approved for us to attend the BIG Conference held in Los Angeles, CA. When we discussed with him relative to finalizing our plans, he said he had to look into the cost effectiveness of it. He stated that we could properly get the same type of training at some closer location. I informed him that we had been tentatively approved by the former SED, and that some of the classes could be credited. He said that didn't mean he would look at it the same next time. He also said, "well, there is something in it for you and something for the Government, it may be that we will look at it on a cost share basis, with you paying part of the cost". His rationale was that such training was more for the employee than the Government. Does Mr. Crawford not realize that a well round trained employee is a better employee for the Government? Since he feels that I am so incompetent; he should have been very pleased for me to attend. I maintain that Danny's negative comment was based upon race because it (BIG) is primarily for blacks, and the two black employees were requesting to attend.

Another reason why this may have been looked at so negatively was because in September 2000 during the state wide training, the former SED, Daniel Robinson, invited all black employees in his motel room after work hours to discuss BIG. There was such a big out cry and supposedly resentment from select white employees for not being a part of this meeting. The SED issued an apology in the STO newsletter (The Mainland) in the event he had offended any one. I believe Danny was using these feelings of others (if not himself) to be less supportive of BIG. After he checked with the National Office, he later left a voice message approving the training.

June 26-28, 2001

I attended the 2001 National Noninsured Assistance Program (NAP) and Quality Loss Program (QLP) Training in Houston, Texas during the week of June 3, 2001. Due to the amount of program material to be covered for the state training, I was allowed to bring two Program Technicians; Marie Headley from Dallas County and Judy Norris from Geneva County to assist in training the field. I conducted a train-the-trainer workshop on June 26-28,

119

Exhibit  6
Page 86 of 133

## CHRONOLOGY

Page 4.

2001. In my conversation with Danny on August 20, 2001, this was one of the areas he accused me of not taking an active part with the training and refusing to help put the training books together. First of all, I remained with the train-the trainer session the entire time and was an active participant with the training. However, I did not help with putting training packages together because NAP was not the only program that my section was working on. Therefore, as Chief, I made a management decision to work on other priority items. I thought I had the authority to delegate such an assignment to my support staff. I also thought that is one of the things I am being paid for, being a manager. This is another proven act of a conspiracy to include my staff. Danny was not in the office during this week, but yet he knows everything that supposedly happened.

The SED is also using command from my staff, for this is one of the ways he is being informed of my daily activities. The SED is not blind, and he was an insider and knew that two of the employees (Sharrie Peterson & Jeff Knotts) I now supervise also applied for the Chief position. He also knew that they resented the fact that I returned to the division as Chief. Therefore, any assessment he gets from them on my job performance would be bias to say the least. I have a weekly staff meeting, which normally last two hours or more. I use this time to plan our activities for the week along with discussion of any problem areas. And also, each one of my employees know that I have an open-door policy for them to discuss any problems, disregarding whether it is a problem with me, personal or in the program areas. I have told them this over and over again. Prior to the SED advising me in that conversation of August 20, 2001, that they were dissatisfied with their chief and they could not get any guidance from me, no one had brought a concern to my attention. By the SED communicating with my staff rather than me has had a drastic reduction on my ability to supervise the section.

July 3, 2001

Danny called me in his office for counseling session with the presence of Debbie Williams. Danny's comments to me were: "when I first got here, you know how people tell you everything about someone else, right? I don't know why people do that, but they do, don't they? Well, I was told that Ozetta is coming in late and not taking leave for it. I said, not Ozetta and they said yeah. So, I decided to put a monitor on it." Danny had copies of my T & A along with a computer record for the past two pay periods (June 3-30). One of the days I was off sick after a STC meeting in

Exhibit 6

Page 87 of 133

<u>CHRONOLOGY</u>

Page 5.

Huntsville, AL was inadvertently marked as being at work. Danny proudly told me that my falsifying (although I knew it was an inadvertently error on my part) on the T & A could be considered fraud. All of the discrepancies were unintentionally and was attributed to not keeping a daily record of it. The comp time earned for travel on Sunday was due to not being aware that this was not permissible. It comes to my memory that this was taken during the time I was out sick when my Program Technician, Pamela Polke, called me at home to find out about my T & A so she could turn it in for the pay period. I remembered telling her to find out if I could earn comp time and use it during the same pay period, and if so, to use the comp time. Why this was not brought to my attention at this time? (See Exhibit C). I also wonder why only my T & A was monitored, which had to be done by either Danny's subordinate or mine, for he was in the office only four days out of the two pay periods (that was the week I was in Houston for NAP training) to observe me himself. I do believe that if the records were checked, there would be others who are actually abusing their leave. I also believe his approval for Jeff to start travel almost 14 hours before training started is indeed a serious violation. I received a memorandum of this counseling session from Danny and I signed it regretfully on July 9, 2001. (See Exhibit D) The isolation of the T & A for monitoring was done strictly on race and resentment by my staff along with others in the state office.

It was also during this first week of July when Danny left me a voice message telling me that he had talked to Joan and that I did not have to go to Geneva County to assist in the Payment Limitation Review. He did not say who was doing the review, nor was my input requested, even though I am Chief of the program. I later learned that Keith Ellis, District Director in the state of Nebraska would do the review. I had informed Danny that Joan had indicated to me that she wanted me to go assist in the review since Debbie wanted to get someone else to do the review instead of me getting a review team as Joan had instructed earlier. This was the first time I heard anything concerning the Payment Limitation Review in Geneva County since the meeting with Joan and Debbie earlier as I have indicated. This is another indication of conspiracy and discrimination. Disregarding whether the Acting SED had agreed or not agreed for me to assist with the review, as chief, SED Crawford should have allowed me to participate.

Exhibit __6__
Page __88__ of __133__

<u>CHRONOLOGY</u>

Page 6.

July 9, 2001

Danny traveled to Geneva County to be with Mr. Keith Ellis to review Payment Limitation. I don't know if he traveled along with Keith, or if he met Keith there. I do know that I did not meet him, nor did I ever see him. I was never included on any of the plans. I never received a copy of Keith's report of findings. I did not get a copy of the memorandum to EDSO requesting assistance from Keith. Danny was to leave Geneva County the next day and meet Jeff in Foley for the Loss Adjuster's training mentioned earlier.

The SED requested my comments on his proposal to Mr. John Chott, Acting EDSO, concerning the Geneva County findings by Keith Ellis by way of an email message from his Secretary, Irean Bennett (See Exhibit E). I responded by referring him to a letter I had given to Joan Grider, Acting SED, and the Geneva County CED, Art Lynn (See Exhibit F). He deemed my response a joke. Well, that is just about how I feel about the assertion that it is a weakness on my part that the PT responsible for Payment Limitation had not been properly trained. The record will reflect the following:

- The PT in question is a member of the Payment Limitation Year-End-Review Team. I was accused of putting her on that team in that conversation of August 20, 2001. The SED indicated to me that the PT, Lynn Mills, said she knew nothing about payment limitation. Ms. Mills told me the same thing when I did the review in Geneva County on Producer Ronnie Hales. The District Director, Jack Crawley, put her on that team. District Director Jack Crawley, who was the CED in Geneva County for many years, hired her.

- The CED is responsible for training his staff.

- Payment Limitation Training was conducted on March 23-25, 1998. I was on my brief departure to the Civil Rights Division.

- The PT, Judy Norris, who attended the National training, assisted with the payment limitation training is a PT in the Geneva County Office. I believe Judy was assigned payment limitation before it was assigned to Lynn. (See Exhibit G).

Exhibit 6

<u>CHRONOLOGY</u>                                                    Page 7.

- A COR was done on several programs whereas payment limitation (CCC-502's) should have been looked at in Geneva County in 2001. There were no reported findings noted.

- I inquired to former SED Robinson in August 2000 as to why some of my programs were not on the agenda for the state wide training scheduled for September 2000. I mentioned that payment limitation as a subject for update training. Robinson advised later that the district directors were asked about the need for training in 2000, and they all said we did not need any training on payment limitation because there had been no changes. I polled them again in May 2001 after Danny came on board during the ALASCOE Convention in Orange Beach. By that time, they all wanted training. I informed them and had also informed Danny that I needed to find some time before October 1, 2001 to get some payment limitation training done. I did not know at the time that some training was already being planned with a specialist from another state by the SED. This is another conspiracy.

I have responded to several cases on behalf of other SED's and I have never been told that my offered assistance was a joke before. Most recently (November or December 2000), the SED at that time requested my comments for corrective action on a COR finding in a county office. My reply was used as a basis for placing the CED on an Opportunity To Improve (OTI).

For many years as a specialist, I had the assigned task of reviewing complex payment limitation cases and those with six or more "persons", which were required to be reviewed by the STO for a determination. My chief, at that time agreed with all my determinations and recommendations for the STC. Mr. Danny Crawford, who was the CED for Limestone County, submitted several such cases to us for review. Further, I have responded to many of his inquiries since I have been a state specialist.

It was a conspiracy to get specialists from other states to train on payment limitation. Mr. Brian Oshloger, North Dakota State Office and Mr. Tommy Weldon, Georgia State Office were selected to do the training. I have no ill feelings toward these guys, I am sure they thought that they were just helping out. I could have easily done the training, for I had trained on the same

CHRONOLOGY

Page 8.

information that they trained on. Nothing has changed on payment limitation since its implementation. It certainly was not right, nor cost effective to have specialists from other states to conduct training sessions in Alabama.

The conspiracy of having outside specialists to come into the state and conduct payment limitation training has had and will have a devastating effect on my integrity. This alone will give DD's, CED's and PT's a non-validated reason for not talking to me on this subject. Their rationale will be if she can't train on the subject, how can she give me an answer to any of my questions. The SED told me in that August 20 conversation that I was going to have to know the answer to all of their questions. Again, this training should have never happened in the matter by which it did. However, this practice falls in line with the SED and others intent.

Payment Limitation has been one of my strongest program areas and perhaps one of my favorites. And, I detest those who say that I do not know this program. The chief relied heavily on me for guidance in this area. And, when the two of us could not figure it out, we would call the National Office. After all, the purpose of the Washington Specialists is to assist the State Specialists with inquiries. However, Danny said to me in that conversation of August 20, 2001, that he expects me to be an expert in all programs in my division. He also expects me to answer all questions coming from the field on all programs, and stop looking to Jeff, Sharrie and Walda for the answers. I took that to be a racist statement because they are all white. Therefore, indicating that they are more intelligent. I can only say that he needs to go to a National training where there are instances when the presenters will consult with legal council or others before giving an answer. Furthermore, we were approved for two specialists to attend the NAP training. Needless to say, the purpose of allowing more than one to attend is for each person to assist with state training. To say it is a weakness on my part when I turn to one of my specialist for a clarification, reflect that the SED does not know the state office operation. Better yet, his criticism of me is just another way for him to belittle and question my competence level as a black employee.

July 17-19, 2001     NAP Training – Tuscaloosa, AL – This was indeed the worst training meeting I have ever encountered during my tenure. This is also the training that Mr. Crawford alluded to in our conversation of August 20, 2001. He used this particular training in judging that

Exhibit 6
Page 91 of 133

## CHRONOLOGY

Page 9.

my training techniques were bad. He also indicated that he had gotten this from the field (another conspiracy). Danny told me that I did the overview okay and then I lost it. That meeting was lost from the beginning. The SED sat in the back of the room and allowed District Director, Richard Burge to take controlled of the meeting the entire period. The training was incomplete because I scheduled the timeframe based on previous meetings, and I, as chief of the program was not allowed to control the flow of the meeting at all.   Richard immediately rebutted any comment I made concerning the flow. He communicated with my employee, Specialist Walda Messer, and totally ignored my presence. When Walda would ask me what time to start the meeting, break for lunch, and end the meeting, my comments were overruled by Richard every time.

Walda had informed me that they would give away some door prizes. During my opening comment, I said that since there was so much material to cover, we might not break every 30 minutes as Richard had indicated. There again, I was overruled. These door prizes (called dirty DD) were very disruptive. Other prizes of balls being thrown (one almost hit the SED on the head) all over the classroom, which was meant for a good time, I assume, became so unprofessional. I had nothing but complete intimidation.

There was a big outburst and hostility directed at me when I covered the area of production without verifiable or reliable records. This same little nucleus group of DD's and CED's were so disrespectful to me. And, admittedly they got me off track as well, which were their intentions from the on set. During this whole ordeal, they were addressing questions to Jeff Knotts, the white male employee on my staff. The SED looked on, but never attempted to be a sergeant-at-arm. In the past, other SED's have intervened to bring more order back to meetings. I have also witnessed during a National training that the highest-ranking official in attendance would rise and restore a more orderly fashion. And, this is not to say that the attendees at the National training were rude or unprofessional to the presenter(s). But, rather, the ranking official sensed the issue had been discussed enough and/or the issue would be looked at a later time.

The NAP training meeting was scheduled for 2 ½ days providing the meeting starting the first day at 8:30 a.m., and 8:00 a.m. on the following days, and ending at 4:30 p.m. There was a one-hour

Exhibit ___6___
Page __92__ of __133__

CHRONOLOGY

lunch period in the schedule. But, Richard had the meeting starting at 8:30 a.m. each morning, with a 1-½ hour lunch period. I overheard Richard tell Walda that we were ending the first day at 3:45 p.m., because the SED wanted to play a game of golf (I don't know if he went golfing, but he had gone to his room and changed into his golf attire when I saw him in leaving the meeting room. I also overheard Burge tell Walda the second day that he was doing what the boss told him to do. And, that was to not go beyond 4:00 p.m. If I had been informed prior to the meeting of what their schedule would be, I could have planned it differently.

Yes, I did lose the meeting as the SED stated, but I lost it before it even got started. The above outlined reasons are the contributing factors. However, I want the record to reflect that I could be unprofessional and take charge of such training meeting. But, I have chosen not to get that low to achieve what should already be in place, and that is respect.

There was another discriminating act imposed on me by DD Richard Burge. On the second day of the training, after eating lunch and on our way back to the training site, Richard was driving Walda's automobile, and I was sitting on the front seat besides him. Walda, Jeff and Marie (all white trainers) were sitting on the back seat. As Richard was driving, he said, "I'm going to show ya'll a little bit of history. Of course, it's nothing to be proud of, but it's still history." Richard drove into the parking lot of the administration building on the campus of the University of Alabama (once an all white school). He pointed to the doors and said; "you see those doors over there? they are the doors that Wallace (governor of Alabama) stood in during desegregation". After being intimidated by him during the entire meeting, I was very uncomfortable with that situation that was imposed upon me, not giving me an option of whether I wanted to participate. My response to him was that my son graduated from that school, and I entered those doors when we registered to attend.

To cap the meeting off at noon the third day, and to further show disrespect, District Director Jack Crawley asked the group to give Richard Burge a hand of applaud for the good job he had done. He had to be talking about a good job of harassing and intimidating me.

I have always been involved in trainings, and never had the disrespect like I had in this training. Over the last two years as

126

Exhibit 6
Page 93 of 133

<u>CHRONOLOGY</u>                                                    Page 11.

chief, I have conducted two statewide training. I trained on the 1998 Crop Loss Disaster Assistance Program (CLDAP), and the 2000 Crop Disaster Program (CDP). (See Exhibit H). These trainings were considered some of the best. Of course, we didn't have Mr. Crawford as SED. What is so disappointing, he has sat in on all of my trainings as CED, including payment limitation and update training. If he had a problem then, he never addressed it.

The district directors have always resented me, and I guess fuel was added to the fire because of a temporary assignment I accepted as district director for Chilton County, which is a county in Richard's district. In March 2000, the SED asked me if I could assume the DD's role for Chilton County because of a personal problem between DD Richard and PT Myra Ellison. My reply was that it would be an honor, but I had almost too much on my plate. However, he asked me to think about it and let him know. Reluctantly, I later accepted the temporary assignment with the understanding that my visitation to the county office would be limited. The SED said the appointment would last until December 31, 2000, thereby providing for a "cooling off period".

During my visit to the Chilton County Office, I discovered there was a lot of resentment and distrust on the part of the PT's with their permanent DD. I also learned from the PT's that the county was being temporarily taken from DD Burge because of an incident that occurred in a Birmingham, AL hotel after hours of a training session. PT Myra and CED Mike Schryer visited DD Burge's room late during the night. DD Burge answered the door in the nude. He later threatened her if she filed a complaint on him. Some type of disciplinary action was taken, but I don't know the extent. I do know that the PT's and the county committee did not want the county back in the permanent DD's district. They wanted me to continue to serve because they indicated that they had gotten more out of me than they ever gotten from DD Burge. The county committee wanted guidance as to how they could keep me on. At that time, an announcement had been made for a fifth district, which would encompass Chilton County. I advised the county committee of this pending action and perhaps this may address their concern relative to the DD for their county.

DD Burge is known for disrespecting women, and only getting a slap on the hand. He was suspended for showing a video with nudity scenes during a district meeting when a woman was present. Some how, that incident was printed in his hometown local

127

Exhibit 6
Page 94 of 133

CHRONOLOGY

newspaper. Therefore, he has a proven record of being disrespectful and intimidating.

Sometimes around the June county committee meeting, I apprised the SED of my Chilton County Committee meeting. SED Crawford, in turn, informed me that he would be meeting with the PT and CED David Moody relative to the DD. In the meantime, I was scheduled to visit the county the next day for the county committee meeting. Danny instructed me to go on to the county committee meeting and CED Moody would talk to the committee in my presence, and then I would hear what was going on. I was on leave the day Danny visited with the PT and CED, and was going to the county the next day. However, I received a phone call from Danny's secretary, Irean Bennett, to inform me not to go to Chilton County the next day, because he had taken care of that, and he would expect me to be in the STO the next day. Danny did not discuss anything with me as to the status of the DD assignment for Chilton County. I only learned that he had reassigned Chilton to the permanent DD by way of a memorandum that had gone out with an attached map denoting the original four districts as they originally were. I later mentioned it in a staff meeting after the notice had gone out. I considered his lack of communicating with me on this important matter was isolation, embarrassment, and disparate treatment. For the record, I didn't mind giving up the DD's responsibility, but I do think that I was due the respect from the SED to apprise me of his decision before it was mailed to the county office.

July 22-24, 2001    Peanut Association Conference held in Panama City FL – During Danny's first week on board, I informed him of this conference, but I did not have any details on it. He told me that he would talk to the Peanut Specialist about that. All of the details were given to Peanut Specialist, Sharrie Peterson. I heard nothing else about that Peanut meeting until I was given a copy of the agenda on July 6, 2001, because peanuts were in my shop. (See Exhibit I). Even though, I am the chief of the program, I was not involved in any discussion of who would attend. The SED is so conscious of cost effectiveness, but he allowed Specialist Sharrie Peterson, all four District Directors, and one County Executive Director, to attend the meeting along with him. Now, one of the DD's has no peanut quota in his district at all, and two of them, have no peanut marketing at all in their districts. If the travel records are checked, I am almost certain that all six attendees drove separate vehicles and claimed mileage accordingly. I would ask is it more cost

128

Exhibit 6
Page 95 of 133

<u>CHRONOLOGY</u>                                                Page 13.

effective for a DD, who has no peanuts in his district, to attend a peanut meeting over the chief who is held responsible for administering the program?  This is bold discrimination and a pattern to undermine or undercut my role as chief.  I did not attend last year, but the former SED did consider me as managing the program, and I agreed to let Sharrie attend in my place because of a prior commitment.

August 7, 2001

When I got to work on this morning, the SED had left me a voice message that some Payment Limitation training had been scheduled for September 11 and 12 in Birmingham.  He informed me at that time that Brian Oshloger of North Dakota would conduct the training.  He also told me that Debbie Williams, his Supervisory Executive Staff Assistant, had a report on the Payment Limitation Review in Geneva County that I needed to see her about.  This report had gone up to Mr. Chott (EDSO), and he wanted to know what we were going to do about it.  Debbie was not in the office that day, but Irean Bennett, Secretary to the SED, e-mailed a memorandum addressed to John W. Chott, Jr., Acting Executive Director for State Operations to me, and to all of the DD's for review, and provide any comments, suggestions, etc. on it.  My comment was that these proposals were pretty much the same as I had recommended to Joan Grider, Acting SED, on a Payment Limitation Review I had previously done on a producer in Geneva County.  I was totally excluded from the reviews done in the County Office, and had no input in the training.  Payment Limitation was targeted because I am the only specialist in the state office who knows that program.  Since the white specialists didn't have knowledge, this made it easier to attack only me.

*See attached memos on Training (I 1)*

As I have previously stated, the whole process of getting someone from another state to train on payment limitation was all a conspiracy in an attempt to validate the allegations that I cannot do proper training.  I have been involved on payment limitation training since August 1988, when we attended a National training in Orlando, FL.  The DD's were in attendance also.  We in turn trained the county office employees including county committees. The chief and I did about 90% of the training, and the DD's did the other 10%.  Although, very little changes have occurred since 1988 (the beginning of the "Actively Engaged in Farming Concept"), I have played a major role in update training for the field with the exception of the one in March 1998, of which I previously mentioned.  Therefore, if we have any PT's that are considered

129

Exhibit ___6___
Page 96 of 133

<u>CHRONOLOGY</u>

Page 14.

experts (the CO 7 grade notes that 90% are), I contributed to their level of competence where payment limitation is applicable.

An example of my good strengths are: In the mid 90s, I was assigned the task of reviewing a payment limitation case from Lauderdale County whereas Kenneth Winter had created fictitious entities over the years, and created a scheme of device to defraud the government. I made the recommendation to the chief and STC for proper disposition. The case was later referred to OIG, which resulted into Kenneth Winter being convicted in federal court for defrauding the government over $500,000 in payments. I worked very closely with OIG on this case up to the trial date.

Most recently, I worked with a very complicated case in Colbert County whereas an overpayment was made to an entity (Harris & Harris). Payments had been made to several trusts embedded in the entity. The beneficiaries of the trust were also members on the entity. All records had to be reviewed due to revisions that had been done within the entity to determine how the overpayment occurred. One can readily tell that an incompetent person would not know where to start in such complicated cases. Also, an attorney from North Alabama (Danny's home territory) who is well recognized as an expert on preparing farm operating plans for many large operations, on many occasions has contacted me for clarification on payment limitation procedures.

August 9, 2001        As the FSA Representative for all programs in the Production Adjustment/Compliance Division of the State Office, I attended a mediation hearing in the Washington County Office. This county is located in Richard Burge's district (the same DD again). The Mediator always set the place for the meeting. I assume he selected the County Office. District Director Richard Burge showed up for the hearing without informing me. I feel that he came to intimidate and scrutinize me or take control of the mediation. He didn't get his chance this time because the appellant did not show up for the mediation.

August 13, 2001       I received a copy of the memorandum to Keith E. Ellis, District Director, Nebraska State FSA Office, on Payment Limitation Assessment of Geneva County. This memorandum was an expression of appreciation for his assistance. (See Exhibit J).

I also received a copy of the memorandum to John W. Chott, Jr., Acting Executive Director for State Operations, on this date

Exhibit ___6___
Page _97_ of _133_

<u>CHRONOLOGY</u>

Page 15.

concerning the proposals on the Geneva County payment limitation review. Debbie Williams for Danny Crawford signed the two memorandums. (See Exhibit K).

August 15-16, 2001    State Committee Meeting – It was during our meeting with the State Committee when I informed Danny along with the STC that we were in receipt of more procedure on the QLP Program. I informed Danny that some of the DD's had requested a conference call, but I didn't think a conference call would suffice. It would need to be a face-to-face meeting to go over the examples we had done for training. Sharrie had informed me earlier in the week that Jack Crawley wanted a conference call for his district. My response to her was that "Jack could talk to me, I am not going to bite him". I am sure Sharrie delivered the message because Jack did call me later. Evidently, they (the conspiracy) told Danny because he took over my meeting with the DD's.

I was scheduled to meet with the DD's at 4:00 p.m. that day. It was approximately 3:15 that evening; Debbie came by my office and told me that Danny wanted my division to meet with them and the DD's in about five minutes. I said okay. I did not realize that this was to be my scheduled meeting with the DD's in which I had planned to talk to them about the QLP Program, and give them the examples we had worked up for them. Danny conducted the meeting, while Debbie was in attendance. They first talked about some type of meetings the CED's may attend, and when they should take leave. (I really don't know what this was all about). Then Danny turned the meeting into the QLP Program. So, I asked if this was my scheduled meeting with the DD's because I did not bring my material in the meeting with me because I thought it was a called meeting by the SED. Danny responded, "it's all of it". This was a Thursday evening, and he scheduled QLP training for the following Tuesday, August 21, in Greenville for the combined districts of Crawley and Burge. And, then again on Thursday, August 23 in Guntersville for Raby and Thrower's districts. This was all done without any prior discussion with me. Therefore, Sharrie and I had to immediately prepare for additional QLP training immediately after being scolded by him in that conversation we had on August 20, 2001. The overview of the QLP was done during the NAP training in Tuscaloosa. Here I was again, with my meeting totally taken over by the SED this time. After the meeting was over, Sharrie came to my office and told me how rude she thought Danny was to take over my meeting. She said if it had been her, she would have to have a little talk with

Exhibit ____6____
Page 98 of 133

## CHRONOLOGY

Page 16.

him. I took this with a grain of salt, and my comment to her was, "he is the boss, he has the authority".

August 20, 2001

This is the morning I received a copy of the memorandum from Mr. John Chott expressing his concern of the weakness of the Alabama State Office in the area of payment limitation. (See Exhibit L). When Danny came in late that morning and came around to speak, I asked to talk to him about some concerns I had. It had been my intentions to talk to Danny earlier, but he was very seldom in the STO. Immediately after I read this memo, my feelings were so hurt, I felt like a bolt of lightning had hit me. The first thing that came to my mind was that now my integrity has been destroyed on the National level. I have been called to the National Office on three occasions to review NAP Trigger Area requests. And, evidently they thought I was competent enough to be called on three times, I definitely did not want someone who had been on board just 90 days to the day of the conversation, to destroy my integrity with the National Office. Out of the 90 days on board, Danny was in the STO a total of 13 full days according to the itinerary, although the week of July 4 is missing. (See Exhibit M). Out of that week, I can only recall him being there only one day, and that was July 3, the day I was called in on the T & A. Debbie typed the letter of counseling on July 5, and Danny did not bring a copy to my office until Monday, July 9. I have already covered in some detail, the context of this meeting, so I will only discuss those areas that have not been covered.

This was the most unprofessional, demeaning, condemning, and condescending conversation I have ever experienced. In addition, Danny's voice was harsh with racial overtones. When I told him that I felt that I was being treated different from everybody else, and that my intelligence had been insulted, he seemed to have gotten angry. He told me that I should have some concerns, and the bomb exploded. Everything he said to me was so derogatory. When he held me responsible for the problems in Geneva County, and with the lack of knowledge of the PT responsible for payment limitation, I asked him how should I know when there are problems unless someone tells me. He said, "open that door up, and get your self (as if he wanted to say something else) out there and find out". I wanted to tell him that I was not the DD. As I have stated before, why would the CED and DD assign such a complex program to a PT who has never been trained? And, why didn't the CED train her? I believe the procedure on the CED's responsibilities is to train his/her staff. And, furthermore, if this



Exhibit _6_
Page _99_ of _133_

CHRONOLOGY

PT has had this program for six years; it should have surfaced before now. And again, why would the DD select this PT to be on the End-of-Year Payment Limitation Review Team. She should have even learned something from that for the past several years. I don't understand how Geneva County, all of a sudden get so bad when a PT, Judy Norris, received the last National training on payment limitation in March 1998, and then trained the field. This is the same PT that was sent to Washington to work with the task team on the 2001 NAP, and the same PT that helped with the state wide 2001 NAP training, which is also the same PT that Danny told me was the one who knew more about NAP than I did.

This is crystal clear for anyone to see how this conspiracy was started. And I am the target. They want my job and will do whatever it takes to get it.

Danny told me that I did not know my programs. He said of me in the NAP training, and I quote, "I can just look at you and tell you don't know your programs". I took him to mean that since I am a black female, I don't have the intelligence to know my programs. He told me that I was going to have to be an expert in all my programs. And, almost in the same breath, he commented, "I don't know if you ever been in a meeting with Joan Grider and Bill Sewell, they are experts in their programs, and they can take the slides and make a presentation without reading". I responded that they didn't have as many programs in their shop as I had, and I could too, if I had the same programs. He then commented that Joan has had new programs and she didn't read. Both of these employees are white, and I strongly resent this implication that they are more superior. Moreover, I have been in attendance when all the chiefs have given presentations, and we all have to read at some point, as our National presenters will do also. There is a practice in Alabama for the field employees to shower select state specialists and/or presenters with praise disregarding whether they read from a piece of paper or a handbook.

September 12, 2001    On this date after the payment limitation training, which was conducted by the out-of-state specialists, I received a call in my motel room from the SED's Secretary, Irean Bennett. She informed me that Danny wanted to meet with me. I wondered what have I done now? I asked Irean where was Danny, she replied that he was here in the lobby. Then I asked her where did he want me to meet him? Irean asked me if it would be okay for Danny and Debbie to meet in my room. So, I said okay, that

**133**

Exhibit ___6___
Page 100 of 133

<u>CHRONOLOGY</u>                                                      Page 18.

would be fine. As I opened the door for Danny and Debbie, he handed me a memorandum of the conversation we had on August 20, and asked for my signature. Danny told me I was not signing agreeing to it, but that was his recollection of the conversation. As I scanned the memorandum, I asked if I would have the opportunity to read it before I sign it. The SED said yes, and again, the SED stated that my signature would not be an indication that I was agreeing to the contents. He informed that he needed to get it back to the state office because he would not be returning until October 1. But, he said, he could give it to Irean to take back. After they left the room, I read the memorandum (see Exhibit N), and could not believe at a time like this (Terrorism of September 11), along with the frustration and embarrassment I had endured through this training, he was bringing me a record of this bad conversation we had in my office on August 20. It certainly was not inclusive of all that was discussed. However, I don't believe he could even attempt to put his unprofessional manner, along with his discriminating and condescending acts in writing. After clearly understanding his letter and reading my written notes from our meeting, I refused to sign it and so noted my refusal.

At this point, I would ask the question as to why did the SED find it necessary to come to my room to bring such letter of record to me? If it was just for his file, it could have been done at a later date. But, I submit there were other hidden motives for this urgency. I think he wanted to further add agony to me for he had to have known that I was not happy (but cordial to everybody) that someone from other states had come in to do what I could have done, have already done, and is paid to do.

On September 13, 2001, after finishing with my presentation with the state committee, the SED asked me if I brought the memo back. I replied that it was in my hotel room, but I would go get it and bring it back.

Prior to Danny's inquiry about the letter, State Committeeperson, Hood Harris gave me a compliment on a good presentation I had made to the state committee. Normally, the SED keep the state committee abreast of ongoing problems with personnel. Although, I don't consider myself a problem, he may have, and I strongly believe he did discuss this letter with the state committee. The negative affect will be that SED Danny Crawford's demagogue will mislead a member(s) of the state committee, who had a favorable opinion of me.

Exhibit 6
Page 101 of 133

**USDA**

Exhibit B
Pg. 1

United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

May 9, 2001

Farm Service
Agency

TO:       Mrs. Joan G. Grider
          Acting State Executive Director

Alabama State FSA
Office
P. O. Box 235013
Montgomery, AL
36123-5013

FROM:     Ozetta C. Thomas
          Chief, Program Specialist

SUBJECT:  Review of Farm Operating Plan – Ronnie Hales, Geneva County

This is to inform you that I, along with Sharrie Peterson, met with District Director, Jack Crawley; CED, Art Lynn, and Program Technicians Judy Norris and Lynn Mills concerning subject matter on Thursday, April 26, 2001. The meeting was held at the Geneva County FSA Office.

There was a lengthy discussion on Mr. Hales' past participation on various programs, and alleged fraudulent acts. The one in particular, was the 1999 Crop Disaster Program (CDP). Mr. Hales received the maximum $80,000.00, and his wife Lisa received approximately $29,000.00 on the loss of watermelons. It was a concern of Mr. Crawley's that Mr. Hales revised his 1999 certification (FSA-578), with his wife's name and changed some invoices for seed and/or fertilizer to her name, in order that she may receive the disaster payment.

To determine if this was a fraudulent act, I reviewed the Farm Operating Plan (CCC-502) for the Hales. I found that the Hales had submitted the most simple form (CCC-502EZ) for an over 7000 acres operation. A CCC-502EZ was submitted for each of the Hales, which is too brief, and the incorrect form for an operation as a joint venture. The County Office staff admitted that Mr. Hales was given these forms, and the PT that filled them out was not knowledgeable on the Payment Limitation Program. The County Committee approved these operating plans, and the Hales were notified that they were approved as separate "persons" for Payment Limitation Purposes. They have been operating on incorrect operating plans since 1996.

I cannot determine what Mr. Hales have done illegal in the past, but due to the above circumstances, I cannot determine that Mr. Hales' actions were fraudulent. We have allowed him to operate illegal (without the proper form) since 1996. An actively engaged in farming determination or a "person" determination could not be made on the CCC-502EZ for the size of operation Mr. Hales has. Mr. Crawley suggests that a Payment Limitation Review Team review his farming operation. I do not recommend this at this time, because a review by the team is to determine if the operation was carried out as submitted. Mr. Crawley also informed me that OIG instructed him that we could go forwarded with a review of Mrs. Hales, but not touch Mr. Hales. So, it

USDA is an Equal Opportunity Employer



Exhibit B
Pg. 2

Joan G. Grider – Geneva County Review, continued:                    Page 2

would be impossible for us to review her records without reviewing his, because they farm as a joint venture in actuality.

The revision of the acreage report to Mrs. Hales was not improper. According to regulations, an acreage report can be revised at any time as long as it does not negate a spot check. Therefore, since the Hales were jointly farming as a husband/wife team (even though, the wrong forms were submitted), one can contribute for the other.

Ironically, as Art, Sharrie, and I were pulling up in the parking lot from lunch, I received a call on my cell phone from Judy Norris that Mr. Hales was in the office. Since he was in the office, Art asked him if we could meet with him. This gave us an opportunity to hear his side of the story. Mr. Hales brought some strong allegations of wrong doings in the Geneva County Office. He admitted that there was a big personality conflict between he and Mr. Crawley. He commended the County Office staff and indicated that they had done nothing wrong to him and treated him good. If I can describe him, he was very angry with Mr. Crawley, and said that he was tired of him (Mr. Crawley) picking on him. Mr. Hales called names of other producers in the County that was treated differently than he was. With such allegations, Payment Limitation reviews may need to be done on the larger farmers in the County.

During the meeting with Mr. Hales, he was aware of how many letters had gone out to producers concerning the LAP Program. After a discussion concerning his applications for LAP, he withdrew his applications. He said the PT accepting his application, informed him that we were looking at his gross revenue for the year 2000 instead of 1999. He indicated that he told her that if it was for 1999, he would not qualify, but he would, if it was for 2000.

I recommend that a COR review the entire County for Payment Limitation. It was brought to my attention that many of the Farm Operating Plans might not be correct. The PT currently in charge of Payment Limitation requests training. It is my intention to survey the State for the number of new PT's for the program and set up training sessions.

cc:
Debbie Williams
Executive Staff Assistant


USDA

*Exhibit B*
*Pg. 3*

May 9, 2001

**United States
Department of
Agriculture**

**Farm and Foreign
Agricultural
Services**

**Farm Service
Agency**

**Alabama State FSA
Office
P. O. Box 235013
Montgomery, AL
36123-5013**

TO:     Mr. Art Lynn, County Executive Director
        Geneva County FSA Office

FROM:   Joan G. Grider, Acting State Executive Director

SUBJECT:   Payment Limitation Review – Ronnie and Lisa Hales

The attached report was submitted to me from Ozetta Thomas, Chief Program Specialist, Production Adjustment/Compliance Division concerning subject matter.

Ms. Thomas's review of Mr. & Mrs. Hales Payment Limitation was to determine what type of farming operation, and the number of "persons" for payment limitation purposes. The main concern was that the Hales Payment Limitation under the 1999 Crop Disaster Program (CDP) may have been exceeded due to fraudulent actions.

Based on Ms. Thomas's report, she could not determine that any fraudulent acts had occurred due to the incorrect Farm Operating Plans (CCC-502EZ's) that were submitted by the Hales. These were the forms given to Mr. Hales by County Office personnel, and approved by the Geneva County Committee as separate "persons" since 1996. Ms. Thomas also did not recommend that a Review Team be called in at this time, because a review team is to determine if the operation was carried out as submitted. And, also that we could not review the records of Mrs. Hales without looking at the records of Mr. Hales, as requested by OIG since they actually operate as a joint venture.

I am aware that Mr. Hales withdrew the 2000 LAP applications during the meeting with him on Thursday, April 26, 2001, since he was not eligible due to meeting the gross revenue ($2.5,000,000) for 1999. The withdrawal will clear this particular matter, and no other actions are required.

We can not, at this time, request Mrs. Hales to refund the approximate $29,000.00 received for 1999 CDP. However, I do request that you supply Mr. & Mrs. Hales the proper form (CCC-502B) for his farming operation. Also, inform him that it must be filled out in its entirety and returned for the County Committee's determination for the balance of this crop year, and subsequent years.

This is also to inform you that some type of review will be conducted on the entire County on Payment Limitation Operating Plans.

If you have any questions, please contact this office.

cc: Jack Crawley, DD

USDA is an Equal Opportunity Employer

Exhibit   6
Page 104 of 133

137



*Exhibit D*

United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

Farm Service Agency

Alabama State FSA
Office
P. O. Box 235013
Montgomery, AL
36123-5013

334-279-3500
334-279-3550 (FAX)

**Date:** July 5, 2001

**TO**      :   Ozetta Thomas, Chief Program Specialist

**FROM**  :   Danny F. Crawford, State Executive Director

**SUBJECT** :   Counseling Confirmation

This is to confirm in writing the counseling session held on July 3, 2001 regarding your failure to report to work on time and falsifying the sign-in/sign-out sheet.

On Thursday, June 14, 2001, you were observed reporting for work at 9:00 a.m. You signed in as if you had reported for work at 8:00 a.m.

On Friday, June 22, 2001, you did not report for duty at all. You signed in as if you had reported for work at 7:30 a.m. and worked until 4:00 p.m.

On Tuesday, June 26, 2001, you were observed reporting for work at 8:25 a.m. You signed in as if you had reported for work at 8:00 a.m.

On Wednesday, June 27, 2001, you were observed reporting for work at 8:15 a.m. You signed in as if you had reported for work at 7:30 a.m.

You hold a supervisory position and are expected to set an example for your employees. In addition to being punctual and accurately recording your time, I expect you to be supportive of your staff by being present for duty on a regular basis and having more communication with your staff.

Personnel Bulletin Number 735-1, Employee Responsibilities and Conduct, Subpart B, §735-203 (a), states in pertinent part, "employees must observe designated duty hours and be punctual in reporting for work..."

I am allowing you the opportunity to correct your time and attendance reports for the above-cited incidents. However, any future incidents will be charged to absence without leave (AWOL). In the counseling session, I indicated that I was putting you on notice and if you continued to ignore these instructions, I would recommend disciplinary action be taken.

If you are experiencing difficulties which fall under the purview of the Employee Assistance Program, you should contact an Employee Assistance Counselor at 1-800-523-5668. In the meantime, I will continue to hold you responsible for your conduct and performance.

**138**

Receipt Acknowledged: _Ozetta C. Thomas_
Ozetta C. Thomas
USDA is an Equal Opportunity Employer

Exhibit ____6____

Page 105 of 133

07/09/01
Date

Memo to Review

*Exhibit E*
*Pg. 1*

**Subject:** Memo to Review
**Date:** Tue, 07 Aug 2001 07:09:21 -0500
**From:** Irean Bennett <irean.bennett@al.usda.gov>
**Organization:** USDA-FSA
**To:** "deborah.williams" <deborah.williams@al.usda.gov>,
Richard Burge <Richard.Burge@al.usda.gov>,
Jack Crawley <Jack.Crawley@al.usda.gov>,
Johnny Raby <Johnny.Raby@al.usda.gov>,
Phil Thrower <Philip.Thrower@al.usda.gov>,
"ozetta.thomas" <ozetta.thomas@al.usda.gov>

```
Danny would like for you to review the attached memo and provide any
comments, suggestions, etc. on it.
```

```
Thanks
```

| | Name: Chott Re Ellis.doc |
|---|---|
| Chott Re Ellis.doc | Type: Microsoft Word Document (application/msword) |
| | Encoding: base64 |

**139**

Exhibit ___6___
Page 06 of 133

8/7/013:

**USDA**

Exhibit E
Pg. 2

United States
Department of
Agriculture

August 7, 2001

Farm and Foreign
Agricultural
Services

Farm Service Agency

Alabama State Office
P. O. Box 235013
Montgomery, AL
36123-5013

Tel: (334) 279-3500
Fax: (334) 279-3550

TO:         John W. Chott, Jr., Acting Executive Director for State Operations

FROM:     Danny F. Crawford, State Executive Director

SUBJECT:   Geneva County Payment Limitation Review

Thank you for allowing Keith Ellis to conduct a review of payment limitation operations in Geneva County, Alabama. The review revealed much of our concern when we requested assistance. Keith did a superb job on the review. The thoroughness and professionalism used in Keith's analysis gives Alabama management the opportunity to correct many of our deficiencies. Keith pointed out the need for training of county office personnel. I do believe we have similar problems in other county offices in certain areas of the State. I agree with Keith's evaluation and propose the following to assure you Alabama will alleviate this problem:

- Complete, thorough statewide payment limitation training of all CED's, PT's, and State Office Specialists involved with Payment Limitations
- Have Geneva County complete a query to cross reference all payments to name and address file to help identify producers in question
- Develop a Payment Limitation team, after training, to review all 502's and related documents in Geneva County to identify incorrect forms used in determining person determinations and actively engaged producers
- New 502's and related payment limitation documents will be completed in a timely manner by producers found to have filed wrong and incomplete forms, before 2002 payments are issued, to protect overpayments by county office
- Subsidiary files will be reviewed and corrections implemented by county office
- District Directors will use a STO developed checklist and complete all 502 status reviews (open estates) and report findings to the STO
- STO staff, to assure compliance of PL operations in all counties of Alabama, will complete annual P/L reviews of various counties
- Emphasize to county committees importance and concerns when determining persons and actively engagements of county producers
- Implement any other recommendations by EDSO.

**Subject: Re: Memo to Review**
**Date:** Tue, 07 Aug 2001 17:07:05 -0500
**From:** Ozetta Thomas <ozetta.thomas@al.usda.gov>
**Organization:** USDA-FSA
**To:** Irean Bennett <irean.bennett@al.usda.gov>

*Exhibit F*

These recommendations are pretty much the same as my letter to Joan Grider as Acting SED, with a courtesy copy to Debbie Williams dated May 9, 2001. And, also my letter to Art Lynn, CED in Geneva County, informing him of some type of review on Payment Limitation.

Ozetta

Irean Bennett wrote:
>
> *Danny would like for you to review the attached memo and provide any*
> *comments, suggestions, etc. on it.*
>
> *Thanks*
>
> -------------------------------------------------------------------
>                          Name: Chott Re Ellis.doc
>      Chott Re Ellis.doc    Type: Microsoft Word Document (application/msword)
>                       Encoding: base64

Exhibit 6
Page 108 of 132

USDA

*Exhibit K*
*Pg. 21*

United States
Department of
Agriculture

August 13, 2001

Farm and Foreign
Agricultural
Services

Farm Service Agency

TO:        John  W. Chott, Jr.
           Acting Executive Director for State Operations

Alabama State Office
P. O. Box 235013
Montgomery, AL
36123-5013

Tel: (334) 279-3500
Fax: (334) 279-3550

FROM:     Danny F. Crawford, State Executive Director

SUBJECT:  Geneva County Payment Limitation Review

Thank you for allowing Keith Ellis to conduct a review of payment limitation operations
in Geneva County, Alabama. The review confirmed many of our concerns when we
requested assistance. Keith did a superb job on the review. The thoroughness and
professionalism used in Keith's analysis gives Alabama management the opportunity to
correct many of our deficiencies. He pointed out the need for training of county office
personnel. I do believe we have similar problems in other county offices in certain areas
of the State. I agree with Keith's evaluation and propose the following to assure you
Alabama will alleviate this problem:

- Complete, thorough statewide payment limitation training of all CED's, PT's, and
  State Office Specialists involved with Payment Limitations

- Have Geneva County complete a query to cross reference all payments to name and
  address file to help identify producers in question

- Develop a checklist for use by county offices to assure all necessary forms are filled
  out properly and required system updates are done correctly

- Develop a Payment Limitation team, after training, to review all 502's and related
  documents in Geneva County to identify incorrect forms used in determining person
  determinations and actively engaged producers

- New 502's and related payment limitation documents will be completed in a timely
  manner by producers found to have filed wrong and incomplete forms, before 2002
  payments are issued, to protect overpayments by county office

Exhibit K
Pg. 2

John Chott, Acting EDSO

Page 2

- Subsidiary files will be reviewed and corrections implemented by county office

- District Directors will use a STO developed checklist and complete all 502 status reviews (open estates) and report findings to the STO

- STO staff, to assure compliance of PL operations in all counties of Alabama, will complete annual P/L reviews of various counties

- Emphasize to county committees importance and concerns when determining persons and active engagements of county producers

- Implement any other recommendations by EDSO.

cc:
Ozetta Thomas, Chief STO PA/Compliance Division

Exhibit 6
Page 110 of 133



*Exhibit L*

United States
Department of
Agriculture

AUG 1 5 2001

Farm and Foreign
Agricultural
Services

Farm Service
Agency

TO:         State Executive Director
            Alabama State FSA Office

1400 Independence
Avenue, SW
Stop 0501
Washington, DC
20250-0501

FROM:       John W. Chott, Jr.
            Acting Executive Director for State Operations

SUBJECT:    Geneva County Payment Limitation Review

Thank you for your proposals to take corrective action after the above review by Keith Ellis.

Your proposals directly address the problems, although I am concerned about an apparent weakness in your State Office's lack of expertise in and handling of payment limitations matters. This is an area you should look at carefully when you take corrective actions. The latter could include reassignment of duties or much additional training at the State Office level.

cc:    Chott
       EDSO

Exhibit ___6___
Page _111_ of _133_

Exhibit N
Pg. 1

Date August 20, 2001

Subject:    Memorandum for Record - Summary of Discussion Between Danny F.
Crawford and Ozetta Thomas Concerning Mr. John Chott's Letter of
August 15, 2001 and Other Related Matters

As I walked through the FSA State Office greeting people this morning, Ms. Ozetta
Thomas asked me, after our greeting, to discuss an item she had concerns about,
specifically a letter from John Chott. She stated the letter indicated concerns by EDSO
with the programs for which she has responsibility as Chief of PA/Compliance. I
explained to Ms. Thomas that she should be concerned with Mr. Chott's letter. It is
apparent from Mr. Chott's letter that he has concerns with the State Office pertaining to
payment limitation operations throughout Alabama county offices, as well as an evident
lack of knowledge of and failure to monitor payment limitation operations from the State
Office level. Ms. Thomas also was disturbed that a State Office Specialist from North
Dakota was going to train Alabama employees on Payment Limitation Operations rather
than her. Arrangements for this training resulted from a Payment Limitation review in
Geneva County, Alabama that revealed many shortcomings by that county office. Those
shortcomings were credited to a lack of training and understanding of payment limitation
operations. (These concerns are a reflection of Ms. Thomas' performance under
Performance Element #5, Program Management.)

I expressed to Ms. Thomas my concern over her apparent lack of knowledge of many
programs under her responsibility, and the need for her to be an expert in all the programs
under her supervision and management. I also shared with her many complaints from the
field about her training techniques and the lack of confidence many employees have in
her, including her own staff in the State Office. (These concerns are a reflection of Ms.
Thomas' performance under Performance Element #3, Supervision.)

We discussed the need to maintain control of training meetings. The recent NAP training
in Tuscaloosa was given as the example of lack of consistent answers, knowledge and
control during meetings. I reminded Ms. Thomas that we had previously discussed
effective training techniques during a State Committee meeting in North Alabama.

I emphasized to Ms. Thomas that her knowledge and expertise is critical for these
programs to be implemented properly throughout the State. Staffers and county offices
must be able to rely on her, as the expert, for support and confidence that the programs
are being implemented correctly. (These concerns are a reflection of Ms. Thomas'
performance under Performance Elements #5, Program Management and #8, Customer
Service.)

I discussed my displeasure with Ms. Thomas' lack of participation and concern during a
recent NAP Task Force meeting. The task force was developed to assist her in
establishing criteria (yields, planting dates, harvest dates, etc.) to determine producer
participation in this critical program.

Exhibit 6
Page 12 of 33

**145**

Exhibit N
pg. 2

Ms. Thomas offered a lack of communication and change in management style as the reason of the problems mentioned above. I explained that I believe improved leadership skills, better knowledge of programs, and closer oversight of assigned operations, etc. would have prevented these problems.

I recently requested Ms. Thomas' input into the corrective action plan for Geneva County. Her only response to my request was to refer me to her letter of May 9th to the Acting SED, Joan Grider, and a letter to Geneva County CED, Art Lynn. She indicated to me that, in her opinion, the recommendations she set forth in those memorandums mirrored the corrective plan I submitted to EDSO. I told Ms. Thomas that I have thoroughly reviewed those documents and they address very little, if any, of the corrective action plan I submitted EDSO. I expressed my disappointment in her failure to provide me with detailed input to such an important matter when requested.

Ms. Thomas offered that the number of programs under her responsibility was much to large and complicated for her to be an expert in each or to gain the knowledge needed to mirror the performance of other sections in our State Office. I agreed with her that this might truly be some of the problem. We discussed Mr. Chott's evaluation of Alabama's State Office organization and his recommendation that reorganization or reassignment of programs should be considered as a part of our corrective action plan. I related to Ms. Thomas that we would discuss this further at a later date.

I instructed Ms. Thomas to be more involved in the day-to-day operations of the programs for which she serves as chief. I directed her to provide more leadership and make an effort to develop more confidence in her staff in her knowledge and abilities. I explained that I expect her to monitor her assigned programs in county offices and have a handle on training needs in the future. This will require that she develop more knowledge of her assigned programs. I also told Ms. Thomas that I expect her to be prepared when making presentations or delivering training and to utilize more effective training techniques. These are my expectations of all section chiefs in the Alabama State Office, and I expressed to Ms. Thomas that I expect no less from her.

Danny F. Crawford
State Executive Director

Received and acknowledged.

_____
Ozetta C. Thomas

**146**

Exhibit 6
Page 113 of 133

_____
Date

This was received by me on 09/12/01 in my motel room. I refuse to sign, as this is not inclusive of our conversation on 08/20/01.    09/14/01

## FOR THE RECORD
## OTHER INCIDENTS OF ISOLATION FROM THE WORKFORCE
## AFTER THE INITIAL FILING OF COMPLAINT

On September 25, 2001, Sharrie Peterson (State Specialist on my staff) came in my office with a copy of an e-mail message (see Exhibit 1) from the National Office to Danny Crawford. Sharrie told me that Danny had given it to her and told her to handle it. I replied, well if he told you to handle it, you better follow his directions. Sharrie replied, "I gave it to Pam, Program Technician, to e-mail it to the field." The e-mail message was advising the States to resume making Marketing Loss Assistance (MLA) Payments. We had previously been advised to discontinue making such payments because of an issue on the amount of funds. Therefore, we all were eagerly awaiting the word to resume issuing payments. Both farmers and County Offices had been calling about these payments. This was indeed an important message to receive and get out to the field ASAP. However, Danny should have brought the message to me, and I in turn would have gotten it out, or saw that it went out promptly. Yes, Sharrie did advise me what Danny had said, but there seemed to be an implication that the SED comes to a subordinate over a supervisor, which denotes that her position was equal to that of the Chief of the section. But, an even greater concern is what the potential "fallout"could have been, had she not told me and proceeded to send the message out to the counties. During the interim period, I would have been advising farmers and/or county personnel that we still could not issue payments, which would have been contradictory to the e-mail message. These are the types of acts that would cause my integrity to be called into question and it also further undermines my Chief's role.

In October 9-11, 2001 the FSA State Committee meeting was held offsite in Dothan, AL. A tour of a Peanut operation was scheduled for the State Committee on the final day. Although other State Office employees and District Directors were allowed to go on the tour, I was not afforded that opportunity, and I am Chief of the program. I was forced to travel to Dothan for the State Committee Meeting and return (over 300 miles roundtrip) the same day. The scheduled agenda was revised (last revision-Exhibit 2, Pp. 2-3) so many times to deliberate keep me from staying overnight to make the tour. Earlier schedules had me meeting with the State Committee whereby overnight lodging was necessary, and this would have positioned me to be ready for the tour the next day. Better yet, I should have been on the tour, even if no other staff person participated, because I am in charge of administering the peanut program. Here again, SED Crawford is not allowing me to do my job as Chief, and he continues to isolate me from the State Office operation. If it were important for the State Committee members and other state staff to go on a peanut tour, it certainly would have been an enrichment for me to participate.

Apparently, Mr. Crawford considered it was important for him to learn more about the peanut program even before he was appointed to the SED position. He traveled almost 300 miles (one way) to attend the Alabama Annual Peanut Producer Meeting held in Ozark, AL, in February 2001. He wasn't appointed SED until May 21, 2001. Former SED Robinson, Sharrie Peterson, Peanut Specialist, and I attended this meeting also. Mr.

Exhibit 6

Page 14 of 133

FOR THE RECORD, *CONT'D*                                          Page 2.

Robinson had informed me that Danny would be in attendance. Inasmuch as Danny was the CED in a county with no peanut quota, and being so far away from the meeting site, my curiosity led me to inquire why? Mr. Robinson replied that Danny thought that it would be a good idea to show his interest, since he was seeking to become the next SED, and that he knew very little about the peanut program. Danny confirmed this to me as we were in the buffet line for lunch at the meeting. Now, I cannot confirm whether or not Danny was in official travel status from the time he left his duty station and returned. But, whether he was on his time or government time, the point is that he and Mr. Robinson thought the peanut program was important enough for him to attend the meeting. However, I do believe it would be fair game to review Mr. Crawford's travel and T & A, to determine his status during that period.

Another incident that occurred during the October meeting is somewhat insufficient, but does show a repeated pattern; thereby making it the same old practice of discrimination and isolation. After I had met with the State Committee and District Directors, I decided to eat lunch in the restaurant where the meeting was being held before I journeyed back home. As I waited to be seated, the hostess asked if I was with the group that had reservation? I said, well I don't know, what group are you talking about? She replied that the USDA-FSA had a reserved section. In my broken thought, and with a puzzling look, I followed the hostess to the area reserved for FSA, and was seated at the table with some of the State Committee members. I felt so embarrassed and hurt that no one thought enough of me to advise me of these plans or to merely invite me to eat with them since they had a reserved area. Needless to say, the SED's secretary made these plans; however, it was a deliberate intent to isolate me. Such practice is being orchestrated by the SED, Danny Crawford, and it is plain old discrimination.

Another incident I would like to mention that happened in my meeting with the District Director that same day. I believe the contents of my complaint had been leaked, which had recently been filed. It was not just by coincidence that DD Richard Burge used the verbiage of "conspiracy" in a statement (cannot recall the specifics of the statement) that had been made by DD Jack Crawley. In my complaint, I stated that there was a conspiracy among the SED, the District Directors, my staff, and some CED's to rid me of my position. With these two DD's being the main co-conspirators, this was not coincidental. I am sure SED Crawford and Debbie Williams had been made aware of the contents of my complaint, and the word was spread on to personal friendships.

**148**

Exhibit ___6___
Page 115 of 133

Exhibit 1

**Subject: Resuming Payments**
**Date:** Tue, 25 Sep 2001 14:42:23 -0400
**From:** "Phil Brockman" <Phil_Brockman@WDC.USDA.GOV>
**To:** <danny.crawford@al.usda.gov>, <Deborah.Williams@al.usda.gov>,
<jacqueline.watson@al.usda.gov>, <Verdell.Zeigler@al.usda.gov>

2001 MLA payments as well as Wool and Mohair supplemental payments can now be resumed.

Please refer to Notices PF 169, PS 414, LD 517 and Information Bulletins 2178 and 2179 for details.

As you know, payments need to be made by September 30.

Thanks.

CC-PD's
Subject

Danny gave this to Sharrie on 9/25/01 and asked her if she could handle this. She then gave it to PT. Pam to email to all FSA employees.

**149**

Exhibit 6
Page 116 of 133

9/25/01 2:1

Memorandum for Record

November 6, 2001

Subject: Ozetta Thomas - Performance Appraisal

SED, Danny Crawford, met with Ozetta Thomas, Program Specialist, to discuss Ms. Thomas' performance and finalize her appraisal for the period October 1, 2000 through September 30, 2001. The plan developed by Daniel Robinson, former SED, and Ms. Thomas on October 24, 2000 was carried forward when Mr. Crawford was appointed as SED on May 21, 2001. Mr. Robinson did not leave a rating of record on Ms. Thomas for Mr. Crawford's information when he left the position.

Mr. Crawford requested the presence of Deborah Williams, Executive Staff Assistant, as a witness to the meeting.

Mr. Crawford reviewed the Performance Plan and discussed each element. As the elements were read, concerns and deficiencies were discussed. Mr. Crawford reminded Ms. Thomas of their meeting of August 20, 2001, during which he addressed some of his concerns with her performance. Ms. Thomas received a Results Not Achieved rating on the following performance elements: Program Management, Customer Service, and Supervision.

Mr. Crawford informed Ms. Thomas that she was being place on an Opportunity to Improve for a period of 120 days. He will provide closer supervision during the OTI and will meet with her every three weeks to evaluate her progress and discuss any problem areas. Mr. Crawford will also attend Ms. Thomas' staff meetings. She will be scheduled for training in the areas of supervision, management, and effective training techniques; as well as program training when deemed appropriate.

Mr. Crawford allowed Ms. Thomas time to review the evaluation and the OTI. After a few minutes, Ms. Thomas asked if the counseling confirmation letter would be attached to the evaluation. Mr. Crawford responded that it would not. That letter would be maintained in his supervisory file.

Ms. Thomas asked why she was not being allowed an opportunity to respond to the evaluation. Mr. Crawford reminded her again of their meeting of August 20, 2001, during which he outlined specific areas of concern. He discussed those concerns again in detail by taking each element with a "not achieved" rating and outlining the deficiencies and required improvement for each. After each element was discussed, he asked if she had any comments. She did not.

Mr. Crawford advised Ms. Thomas that she would be scheduled to attend two training sessions, one on November 15-16 and another on December 3. She indicated that she would be unavailable to attend the November 15-16 session due to personal reasons. Mr. Crawford agreed to reschedule the training.

At this point, Ms. Thomas stated that she feels she should have been given an opportunity to respond to Mr. Crawford's concerns before being placed on an Opportunity to Improve. Mr. Crawford told Ms. Thomas that he had given her an opportunity to respond when he met with her on August 20. At that time, she refused to acknowledge receipt of the memorandum, and did not choose to respond further. They have had several conversations since that date concerning issues that are being addressed at this time.

Mr. Crawford expressed that he expects Ms. Thomas to be the authority on all the programs for which she is responsible. He pointed out that, as discussed earlier, the NAP training conducted in Tuscaloosa was not acceptable to him. Just after that training began, Ms. Thomas was asked the same question three different times and each time, she gave a different answer. He told her it

**130**

Exhibit ___6___
Page 117 of 133

would have been more appropriate for her to say, "I don't know, but I will find out" rather than guess. The manner in which she handled that situation caused her to loose respect of the participants almost immediately and had a negative impact on the overall training.

Mr. Crawford said that he would take several actions to compliment the OTI process and expected her to do the same. One: He expects her to study procedure and make a concerted effort to improve her program knowledge. Specific program training will be provided whenever feasible during the OTI. Two: Mr. Crawford will monitor Ms. Thomas' staff meetings in order to observe how she interacts with her staff on a first-hand basis. He asked that she work with him on scheduling her staff meetings to ensure that he is available. Three: Mr. Crawford will meet with Ms. Thomas every three weeks to discuss her progress and outline any concerns.

Mr. Crawford told Ms. Thomas he wants her to make an effort to develop confidence in her by her subordinate staff as well as field employees. He wants her to gain, or regain, their support. He would like her to be more effective in dealing with programmatic issues. This, in itself, will help increase confidence in her. He told her he expects her to delegate tasks, but it is not acceptable for her to delegate the requirement to maintain knowledge of programs for which she is responsible. In order words, it is not acceptable to him for her to expect her staff to maintain knowledge of the programs and not do the same herself. He reminded her of times that she has told both him and the State Committee that she is not an expert in any of her programs expect Payment Limitations. As the Chief of the Production Adjustment/Compliance Section, that is unacceptable to him. He will not exempt her from knowing her programs or being involved in key elements of the programs.

Mr. Crawford signed the performance appraisal and Opportunity to Improve. However, Ms. Thomas refused to sign either. Mr. Crawford told her she was not required to sign. However, her refusal to sign did not mean that the OTI would not be put in place. It is effective November 6 and will end on March 5, 2002.

Ms. Thomas stated that she will do whatever Mr. Crawford says she must to improve her performance, but she will not place her signature on any document because she does not believe her performance is that bad. She stated Mr. Crawford is using one training session to base his actions on. She told him she was very intimidated at the beginning of that training and she lost before she ever got started. She did not believe he was being fair to her. Mr. Crawford asked her why she was intimidated before the training started. Ms. Thomas stated that people have been "at her" right and left since he came on board as SED. She asked how she could have gone 30 years not knowing the programs. She stated his allegations on her performance were not true. She stated that people don't like her and that is her problem. Mr. Crawford asked who does not like her. She responded, "Evidently, no one." She said she could not see how, after all these years, her performance has gone down so fast, that she would receive a "not achieved" on three of her five elements.

Mr. Crawford told Ms. Thomas that he did not know about the past. He could only respond to her performance since he became SED. He is not basing this OTI on strictly the one NAP meeting. He is using that incident as an example of how she must comply with his instructions and make an effort to improve. Ms. Thomas told him that she had no control even before that meeting started. Mr. Crawford explained that in order for her to achieve the goals he had established for her, she must agree there is a need for improvement. She stated that when people don't like you, nothing you do is right. She feels the NAP meeting was destined to be against her. She has no idea why problems with her performance are just now coming to light.

Mr. Crawford told Ms. Thomas that he hopes she sees and understands the need for a Chief Program Specialist to be able to answer questions during a training session. The fact that she felt intimidated, but cannot identify why, is not an acceptable answer as to why she was unable to effectively carry out her duties during that training session. He reminded her that she had 30

**151**

Exhibit ___6___
Page _118_ of _133_

days to prepare for the training, which is unusual for FSA. Guessing and giving incorrect answers are not caused by intimidation. That is caused by a lack of knowledge.

He also reminded her that well before the meeting in question, he told her to utilize more examples and not simply read off the screen to the participants. However, reading is exactly what she did. In fact, he told her that he is aware she told her staff that she had no intentions of changing her training techniques at his direction.

Ms. Thomas again stated that no one likes her. Mr. Crawford told her she should admit her weaknesses and attempt to improve rather than look for excuses. He told her it is not acceptable for her to ignore his instructions simply because she has always done something a particular way. He suggested that might be part of the problem.

Mr. Crawford told her to schedule a staff meeting on November 20 in order for him to attend. Their first follow-up meeting will be scheduled the week of November 27.

Mr. Crawford asked if Ms. Thomas had any further questions or comments. She did not. He stressed to her that he believes they can achieve her goals if they work together.


_____

Danny F. Crawford
State Executive Director


**152**

Exhibit __6__
Page 119 of 133

REPRODUCE LOCALLY. Include form number and date on all reproductions.

(01-28-99)

United States Department of Agriculture
Service Center Agencies

# PERFORMANCE WORK PLAN

*Privacy Act Notice: Submission of information is mandatory. Failure to provide information will prohibit data collection required by the Office of Personnel Management.*

| 1. EMPLOYEE'S NAME | 2. RATING PERIOD |
|---|---|
| THOMAS, OZETTA C. | 10/1/00 - 9/30/01 |

| 3. TITLE/SERIES/GRADE | 4. ORGANIZATION |
|---|---|
| SUPVR. AGRIL. PROGRAM SPECIALIST GS-1145-13 | USDA/FSA |

| 5. DUTY LOCATION | 6. SOCIAL SECURITY NO. |
|---|---|
| MONTGOMERY, ALABAMA | |

## PART I - PERFORMANCE PLAN

7. CRITICAL RESULTS *(Check a Minimum of 2/Maximum of 5 Applicable Elements)*

Note:    The narrative statement describes the "Results Achieved" level of performance. Where applicable, quantity, quality, and timeliness are derived directly from appropriate agency regulations, policies, instructions, work plans, etc. If no agency or regulatory guidelines exist, further clarification will be provided by the rating official.

| Element | Achieved | Not Achieved |
|---|---|---|
| ☐ **Element #1 - Execution of Duties**<br>Completed work assignments are routinely performed in a timely manner, assuring a quality of work that meets the needs of the organization. Solutions developed demonstrate improvements in work methods. Work products do not require substantive revisions. Assignments are completed in accordance with applicable agency guidelines, including timeframes. Further clarification, as needed: | | |
| ☑ **Element #2 - Communications**<br>As a rule, oral and written communications are clear, correct, timely, and presented in an understandable manner. Supervisor and coworkers are informed of issues and problems when necessary. Information and guidance provided is timely and accurate. Further clarification, as needed: | ✓ | |
| ☑ **Element #3 - Supervision**<br>Work is assigned in a fair and effective manner. Technical guidance to subordinate staff is ordinarily provided in a timely manner. Performance management is implemented in accordance with procedure. Issues, concerns, or problems are handled promptly and fairly. To the extent possible, staff is properly trained and complies with occupational health and safety programs. Management decisions are supported and implemented within appropriate timeframes. Further clarification, as needed: | | ✓ |
| ☐ **Element #4 - Team Leadership**<br>Routinely leads individuals and team members toward specific goals and accomplishments. Provides encouragement, guidance, and direction as needed. Adjusts style to fit situation. Delegates appropriate authority in an effective manner. Coordinates functions of the team members. Demonstrates a sincere interest in employees' activities, abilities, etc. Further clarification, as needed: | | |

e U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual ientation, and marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-26?? (voice and TDD.) To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410 or call (202) 720-5964 (voice or TDD.)  USDA is an equal opportunity provider and employer

Exhibit

Page 120 of 133

| Element | Achieved | Not Achieved |
|---|---|---|
| ☑ **Element #5 - Program Management**<br>Manages program(s) resolving issues and problems within the employee's control. Monitors all aspects of program(s) for quality, effectiveness, and consistency. Program plans and guidance are responsive to objectives and requirements of the Agency. Policy instructions are appropriately issued and are accurate. Evaluates effectiveness of work and adjusts plans accordingly. Further clarification, as needed: | | ✓ |
| ☐ **Element #6 - Special Projects**<br>Special projects are regularly completed on time in a competent, accurate, and thorough manner. Completed projects comply with regulations and procedures. Special projects are completed independently, or reflect research and collaboration with others as required. Further clarification, as needed: | | |
| ☐ **Element #7 - Research and Analysis**<br>Thoroughly and accurately researches issues in a timely manner, using available reference sources (e.g. USDA manuals, or applicable law or regulations). Makes reasonable recommendations or decisions based on available guidance. Further clarification, as needed: | | |
| ☑ **Element #8 - Customer Service**<br>Provides advice that is timely, responsive, and accurate. Maintains appropriate rapport with internal and external customers. Develops and establishes working relationships with external organizations as required. Keeps supervisor and/or team leader informed of difficult and/or controversial issues and unique problems. Takes action to effectively solve problems before they have an adverse impact on the organization or other employees. Further clarification, as needed: | | ✓ |
| ☑ **Element #9 - Equal Opportunity & Civil Rights [Mandatory for supervisors and managers]**<br>Performs all duties in a manner which consistently demonstrates fairness, cooperation, and respect toward coworkers, office visitors, and all others in the performance of official business. Demonstrates an awareness of EO/CR policies and responsibilities of Agency and Departmental goals of valuing a diverse, yet unified workforce. Further clarification, as needed:<br><br>SEE ATTACHED STATEMENT. | ✓ | ✓ |
| ☐ **Element #10 - Personal Contacts - EO/CR [Mandatory for all non-supervisory employees]**<br>Routinely displays courteous and tactful behavior towards internal and external customers, supervisors, coworkers, and/or team members. Projects a positive and professional image of USDA. Performs all duties in a manner which consistently demonstrates fairness, cooperation, and respect toward coworkers, office visitors, and all others in the performance of official business. Demonstrates an awareness of EO/CR policies and responsibilities of Agency and Departmental goals of valuing a diverse, yet unified workforce. Further clarification, as needed: | | |
| ☐ **Element #11 - Resource Management**<br>Monitors allocated funds and maintains complete and accurate records of expenditures. Routinely utilizes resources in an efficient and effective manner. Ensures that funds, property and other resources are guarded against waste, loss, unauthorized use, and misappropriation. Further clarification, as needed: | | |

Exhibit ___6___
Page 121 of 133

(01-28-99)

Page 3 of

| Element | Achieved | Not Achieved |
|---|---|---|
| **Element #12 - Individual Contributions to the Team**<br>Ordinarily displays dependability and reliability. Promotes open communication. Contributes creative ideas and actively participates in team meetings resulting in added value to the team's products and services. When problems arise, explores causes and assists in resolving them. Works with team members to appropriately implement decisions. Is usually open-minded to new ideas and approaches in implementing the team's goals. Willingly accepts and acts on constructive criticism. Further clarification, as needed: | | |
| **Element #13 -** | | |
| **Element #14 -** | | |
| **Element #15 -** | | |

## PART II - PROGRESS REVIEW

**Note:** One progress review is required; however, frequent communication between the employee and rating official regarding performance is encouraged and recommended. Date of review, initials of employee (Emp), and initials of Rating Official (R.O.) must be provided for each review. Employee and Rating Official are encouraged to provide written comments.

8.  RATING OFFICIAL'S COMMENTS

9.  EMPLOYEE'S COMMENTS

| 3A.  Emp Initials:  Date: | 10B.  R.O. Initials:  Date: |
|---|---|

Exhibit _6_
Page 122 of 133

(01-28-99)

Page 4 of

## DISCUSSION TOPICS FOR USE IN PLANNING PERFORMANCE AND CONDUCTING PROGRESS REVIEWS

Employee's performance on primary responsibilities/priorities in the past year.
- revise performance work plan for the coming year, as necessary
- relationship to overall work unit objectives

- Employee's strengths and areas for growth

- Barriers to effective work performance and job satisfaction

- Employee's development (over the past year; future needs for current job; long-term career goals and developmental needs to achieve them)

- Possible work process improvements

- Whether employee continues to grow to meet future needs and demands of the changing environment

- Employee's feedback/constructive suggestions for supervisor

- Anything else the employee or supervisor would like to address

## PART III - SUMMARY RATING

☐ RESULTS ACHIEVED          ☒ RESULTS NOT ACHIEVED*

* A "Results not Achieved" rating requires explanation. Provide additional comments as an attachment.

## PART IV - CERTIFICATION

**Note:** Employee's signature certifies review and discussion with the Rating Official. It does not necessarily mean that the employee concurs with the information on this form.

| 11. PERFORMANCE PLAN *(Sign when plan is established)* | | 12. SUMMARY RATING *(Sign when rating is completed)* | |
|---|---|---|---|
| Employee Signature *Otto C. Thomas* | Date 10/24/00 | Employee Signature *Refused to Sign* | Date |
| Rating Official Signature *Willie J Robinson* | Date 10/24/00 | Rating Official Signature *Kenny J. Crawford* | Date 11/6/01 |
| *I have reviewed the standards of conduct and have had any questions answered by my satisfaction. (Employee initial appropriate block below.)* | | Reviewing Official *(required for summary rating of "Results Not Achieved")* | Date |
| YES *OT* | NO | | |

156

Exhibit  6
Page 123 of 133

United States Department of Agriculture
Service Center Agencies

(01-26-99)

# OPPORTUNITY TO IMPROVE

*This form documents a plan for required performance improvement when performance does not meet expectations (i.e., the "Results Achieved" level). It lists specific examples of the specific deficiencies and the required improvements to bring performance to the "Results Achieved" level. Additional clarifying information, if provided, must be specified in, or attached to, this plan.*

| 1. EMPLOYEE'S NAME | 2. POSITION | 3. ORGANIZATION |
|---|---|---|
| Thomas, Ozetta C. | Supervisory Ag Program Specialist | Alabama State FSA Office |

| 4. COMMENCING DATE | 5. ENDING DATE | 6. PLAN DURATION *(No. of Days)* |
|---|---|---|
| November 6, 2001 | March 5, 2002 | 120 Days |

## PART I - IMPROVEMENT PLAN

| 7. Elements | 8. Deficiency(ies) (Cite specifics) | 9. Required Improvement |
|---|---|---|
| 3 - Supervision:  Work is assigned in a fair and effective manner. Technical guidance to subordinate staff is ordinarily provided in a timely manner.  Performance management is implemented in accordance with procedure.  Issues, concerns, or problems are handled promptly and fairly.  To the extent possible, staff is properly trained and complies with occupational and health safety programs.  Management decisions are supported and implemented within appropriate timeframes.<br><br>5 - Program Management:  Manages program(s) resolving issues and problems within the employee's control.  Monitors all aspects of program(s) for quality, effectiveness, and consistency.  Program plans and guidance are responsive to objectives and requirements of the Agency. Policy instructions are appropriately issued and are accurate.  Evaluates effectiveness of work and adjusts plans accordingly. | Subordinate employees are not provided adequate guidance when problems, concerns, or issues arise.  You neglect to respond or delay response when initial contact is made by county office personnel to a subordinate specialist rather than to you directly. Subordinate employees are left to handle assignments with very little or no guidance.  There is growing evidence of a lack of confidence in your leadership by both field office employees and your own staff in the State Office.<br><br>Recent reviews reflect that programs are not managed properly, issues are not resolved timely, and proper follow-up is not carried out.  There is strong evidence of a lack of knowledge of and failure to monitor payment limitation operations from the State Office level.<br><br>Your training techniques are weak. Recent NAP training reflected a lack of consistent answers, knowledge, and control during the meeting. | You are to be more involved in the day-to-day operations of the programs for which you serve as Chief.  Provide more leadership and make an effort to develop more confidence in your staff in your knowledge and abilities. Monitor your assigned programs in county offices and have a handle on training needs.  Develop more knowledge of all assigned programs.  It is not acceptable for you to consider yourself an expert in only one program and rely on your subordinate employees for all others.  Be more prepared when making presentations or delivering training and utilize more effective training techniques.<br><br>Respond to issues and/or concerns immediately regardless of who is initially contacted. |

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, and marital or family status  (Not all prohibited bases apply to all programs.)  Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD)  To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410 or call (202) 720-5964 (voice or TDD)  USDA is an equal opportunity provider and employer

REPRODUCE LOCALLY. Include form number and date on all reproductions.

Case 2:08-cv-00411-MXW-SRW    Document 64-4    Filed 04/11/2008    Page 126 of 133

Continuation of Page 1

(01-28-99)

**United States Department of Agriculture**
Service Center Agencies

# OPPORTUNITY TO IMPROVE

*This form documents a plan for required performance improvement when performance does not meet expectations (i.e., the "Results Achieved" level). It lists specific examples of the specific deficiencies and the required improvements to bring performance to the "Results Achieved" level. Additional clarifying information, if provided, must be specified in, or attached to, this plan.*

| 1. EMPLOYEE'S NAME | 2. POSITION | 3. ORGANIZATION |
|---|---|---|
| Thomas, Ozetta C. | Supervisory Ag Program Specialist | Alabama State FSA Office |

| 4. COMMENCING DATE | 5. ENDING DATE | 6. PLAN DURATION (No. of Days) |
|---|---|---|
| November 6, 2001 | March 5, 2002 | 120 Days |

**PART I - IMPROVEMENT PLAN**

| 7. Elements | 8. Deficiency(ies) (Cite specifics) | 9. Required Improvement |
|---|---|---|
| 8 - Customer Service: Provides advice that is timely, responsive, and accurate. Maintains appropriate rapport with internal and external customers. Develops and establishes working relationships as required. Keeps supervisor and/or team leader informed of difficult and/or controversial issues and unique problems. Takes action to effectively solve problems before they have an adverse impact on the organization or other employees. | | |

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, and marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410 or call (202) 720-5964 (voice or TDD). USDA is an equal opportunity provider and employer.

Exhibit 6
Page 125 of 133
158

(01-28-99)

Page 2 of 3

## PART I - IMPROVEMENT PLAN, *Continued*

10. **SUPPORT TO BE PROVIDED EMPLOYEE** *(Indicate the support to be provided by the Supervisor or Rating Official (e.g., training, equipment, etc.) and the frequency of discussion.)*

During the 120-day Opportunity to Improve, you will be provided closer supervision by SED Danny Crawford. Mr. Crawford will meet with you every three weeks to evaluate your progress and discuss with you any problem areas. He will monitor your staff meetings.

You will be scheduled for formal training in the areas of supervision, management, and effective training techniques. You may be scheduled for program training in the programs for which you are responsible.

Exhibit 6

Page 126 of 133

159

### 11. REGULATORY REQUIREMENTS

- During this opportunity to improve (OTI), you will be expected to perform all the elements of the performance work plan. You must independently perform these duties at least at the "Results Achieved" level.
- Upon completion of the OTI, you will be re-evaluated on the element(s) identified in this plan and informed of your performance in relation to your performance work plan.
  - ▸ If you have achieved the results expected/required, the OTI is concluded and you must maintain this level of performance for one year commencing from the date of the OTI.
  - ▸ If at any time during this one-year period your performance falls below the "Results Achieved" level in any of the elements specified in this plan, appropriate remedial action will be proposed. This may include, but is not limited to, a downgrade to a different position or removal from your position.
  - ▸ If at the end of this OTI you have not achieved the results expected/required, it will be necessary to determine an appropriate remedial action to propose as mentioned above.
  - ▸ If a definite decision cannot be made at the end of this OTI regarding your progress, the OTI may be extended. If this occurs, you will be notified in writing.
- Areas in which you think you need additional training will be considered. The scope and level of such training provided will be determined based on how much and what kind of training has already been provided and what is customary for your position duties and grade level. If you believe additional training is needed, submit a written request to me within ten (10) days listing specific training needs.
- Questions regarding this improvement plan, your work assignments, or the level of performance expected from you, should be directed to me.

NOTE:    Experience indicates that, at times, performance problems can be the result of personal situations. While this may not be the case, it may be helpful to consider all the factors contributing to your performance problems. If you feel this may be the case, we encourage you to contact your Employee Assistance Program (EAP) at __1-800-523-5668__. You may contact the program personally, or if you prefer, an appointment can be made for you. All information you provide is strictly confidential, unless you specifically authorize its release.

### 12. PLAN ESTABLISHMENT SIGNATURES *(Sign when improvement plan is established)*

| Employee Signature | Date | Supervisor/Rating Official Signature | Date |
|---|---|---|---|
| *Refused to Sign* | | *Danny F. Crawford* | 11/6/01 |

**DISTRIBUTION (Plan Establishment)**

Original - Rating Official        Copy - Employee        Copy - Reviewing Official        Copy - Human Resources

(01-28-99)

Page 3 of 3

## PART II - FOLLOW-UP REVIEW AND DISCUSSION

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Follow-up No. | | | | | |
| Meeting Date | | | | | |
| Employee Initials | | | | | |
| Supervisor Initials | | | | | |

## PART III - FINAL REVIEW

☐ Employee has achieved the required improvement(s) described in this OTI, OR

☐ Employee has not achieved the required improvement(s) described in this OTI. The employee continues to have problems in the areas described below:

**13.    REVIEW CERTIFICATION**

| | |
|---|---|
| Employee Signature | Date |
| Supervisor/Rating Official Signature | Date |
| Reviewing Official Signature | Date |

**DISTRIBUTION (Plan Completion)**

Original - Human Resources        Copy - Employee        Copy - Supervisor/Rating Official        Copy - Reviewing Official

160

Exhibit
Page 127 of 33

**Yahoo! Mail for ozettat@yahoo.com**

Yahoo! - My Yahoo!   Options - Sign Out - Help

☒ Mail  🖂 Addresses  📅 Calendar  📋 Notepad

**Attachment View — Powered by** Outside In HTML Export

Back to

Memorandum for Record    November 28, 2001

Subject: Ozetta Thomas – OTI Follow-Up Review

Exhibit  6
Page 128 of 133

SED Danny Crawford met with Ozetta Thomas for the first three-week progress review after implementation of an Opportunity to Improve (OTI).

Mr. Crawford explained that he had been unable to attend Ms. Thomas' staff meeting on November 27 due to an Alabama Agribusiness Council meeting. However, he has received positive feedback from her previous staff meeting. He felt the meeting was very organized. Employees in Ms. Thomas' section have indicated her efforts in that meeting gave them more of a sense of leadership on her part. He felt the written agenda was a positive change and her staff had responded positively. He told her those are the kinds of things he thought she should do to ensure her staff knows she is in charge and familiar with subject matter to be discussed during the staff meetings. He acknowledged that she was scheduled to attend workshops and indicated he thought she would discover other simple techniques that would help her regain confidence of her staff.

One area of concern was training techniques, and in the past three weeks, he has not had the opportunity to observe any improvement in that area. He encouraged her to seek workshops that would help her improve training techniques as discussed in the past.

Mr. Crawford asked Ms. Thomas if she has taken the opportunity to review any program handbooks. She responded that she reviews procedure on an every day basis. She stated that she reviews all handbook amendments before they are filed in the basic handbook. She has always made this a routine practice when amendments are received. Mr. Crawford asked if she is able to retain the information. He asked if she compares the phone calls she receives to the changes outlined in the amendments. Ms. Thomas responded that she sometimes has to refer to the handbook when she receives calls to make sure she is giving the right answer. If she is still unable to answer a question, she contacts the National Office. She stated that she would never know everything and Mr. Crawford explained that no one expects her to know everything, but he does expect her to handle questions appropriately and follow-up when she is unable to give an immediate answer.

Mr. Crawford asked how Ms. Thomas is managing the programs under her supervision. Has she made any assignment changes, etc? She responded that program assignments have not changed. The employees are performing the same duties they were when she was selected as

chief. The one exception is Walda Messer who had just been hired when Ms. Thomas became chief. She waited until Ms. Messer obtained the GS-12 level before she assigned the NAP and LAP programs to her. Ms. Thomas pointed out that Ms. Messer works only 60% of her time in the Production Adjustment section. The remainder of her time is spent working in the Conservation/Price Support section. Jeff Kotts is assigned the compliance program along with GIS and GLS. Sharrie Peterson is assigned reconstitutions, peanuts, tobacco, and name and address. She has not assigned payment limitations because no one wanted it. Mr. Crawford asked what exactly did she mean when she says programs are assigned to an employee. What does she expect the employee to do with the program? Ms. Thomas responded that when she assigns a program, the employee is in charge of the program. If a county office has a question, she expects the employee to handle the problem with her assistance only if needed.

Mr. Crawford asked if she received a question on peanuts or Loss Adjustment, would she refer the questions to Sharrie or Jeff. She responded that if a question comes directly to her, she answers it. She stated that she has never been very familiar with peanuts, but if Sharrie is not in the office she attempts to find the answer in the handbook or calls the National Office for guidance. She stated this also applies to questions on tobacco. Mr. Crawford pointed out that these were two areas that she should be focusing on if she is aware that she is weak in those areas.

Mr. Crawford asked if Ms. Thomas ever defers questions to her specialists. She again stated that if the question comes directly to her, she handles it. He asked if it was common for county office personnel to come to her directly with questions on peanuts and tobacco. She said they usually contact the specialist assigned to the program. Ms. Thomas stated that since employees have individual phone numbers that are published to county offices, field employees usually contact the specialists instead of her. She gets calls if the specialists are not available. Most payment limitation questions come directly to her since the program is not assigned to any of the specialists. Mr. Crawford asked how she was made aware of problems if the questions go directly to the specialists. She responded that she had asked her staff members to keep her informed.

Mr. Crawford asked if she had implemented a telephone log to keep up with unresolved issues. She responded that she had. He pointed out that the telephone log would be a good management tool for her to keep informed on problem issues and to ensure that her employees were responding appropriately to questions. He expressed concern that she relied solely upon her employees to bring things to her attention. This created a very real potential for her to be unaware of potentially serious problem areas. He told her that closer interaction with her employees and daily reviews of the telephone logs would help resolve this concern. He suggested that rather than tell her staff to come to her with problems, she should make it a habit to visit their workstations on a regular basis and ask what they were working on and what problems they were encountering. He told her that weekly staff meetings were good, but they were not sufficient for a manager to keep on top of issues and know what was going on in the section. He told her to get out into the section more and not just tell her staff that if they need her, they should come to her. Ms. Thomas indicated that she has always interacted with her staff. Mr. Crawford said that some of her staff had indicated they needed and wanted more interaction from her. He told her to visit their workstations more, share one-on-one with them, and show them that she is knowledgeable and in control of the section. This will also help to promote teamwork in the section.

Mr. Crawford returned to the telephone log issue and asked if the phone calls were logged daily. Ms. Thomas responded that the logs are placed in a binder weekly. The number of logs turned in depends on the amount of activity in the county offices and the number of questions received. As of this date, they have received quite a few. Mr. Crawford asked if she reviewed the logs on a daily basis and she responded that she did not. He indicated that a weekly review was not sufficient for her to stay on top of issues in a timely manner. Ms. Thomas indicated that all calls are not problem cases and the specialists can answer the call immediately. They only come to her with problem cases. If they have a problem and cannot answer a question, they write it down and put it in the binder. He asked if she was notified of such problems immediately. She responded that she was usually notified within the same day. Once again, Mr. Crawford told Ms. Thomas that he was not satisfied with her telling the specialists to come to her. He wants her to take the initiative as chief, go to them daily, and ask what problems they are having. He wants her to let them know that she can and will help them.

Mr. Crawford asked that if all specialists are in the office and the majority of calls go directly to them, what duties does she perform on a typical day. Ms. Thomas responded that she receives calls too and handles a lot of paperwork. She spends some time on the telephone with National Office personnel discussing procedure and problems. She receives the majority of payment limitation calls and receives calls on other areas as well. Mr. Crawford reminded her that she had previously stated that most calls go to the specialists. She acknowledged that they do, but she does receive some calls because the specialists are often tied up on the phone with other calls. Mr. Crawford asked if she advised the specialists of the problem cases she handles. She indicated they discuss these issues during staff meetings. Ms. Thomas also stated that she handles all the appeals for her division as well as ineligibility claims. These issues take a lot of time and concentration.

Mr. Crawford moved the discussion to State Committee meetings. He has observed that the specialists handle their appeals on their program areas. He asked what type of appeals she handled. She responded that she handles appeals where the producer goes to the county office as well as NAD appeals and STC appeals when the producer comes before the Committee. Ms. Thomas indicated that Sharrie Peterson handles authorization codes. Mr. Crawford asked how State Committee minutes were written. Ms. Thomas responded that each specialist writes their own minutes and the Program Technician compiles them for the SED's secretary to incorporate into the final minutes. Mr. Crawford asked since specialists do not attend off-site State Committee meetings, does she write the minutes for those meetings since she is the only employee from the section to attend. She responded that the specialists write those minutes as well based on information she gives them. Mr. Crawford asked if she saw a problem with the specialists writing minutes for a meeting they did not attend. She responded that she has always handled minutes in this manner and did not see a problem. She indicated that there are not very many off-site State Committee meetings anyway. Mr. Crawford told Ms. Thomas he thought it would be more efficient for her to write the minutes rather than relaying information to each specialist and them writing minutes. Mr. Crawford also reminded Ms. Thomas that the State Committee has requested agenda items in advance in order for them to review issues prior to the meeting and it appears that her section has not complied with that request on several occasions. He indicated that it is also common for his secretary to have to wait on her section's minutes. It could be that the manner in which minutes are written is contributing to this problem. Ms. Thomas stated that most of the minutes are pre-written except for the State Committee's decisions and they just fill in the decision and who made the motions, etc.

<div align="center">**163**</div>

Mr. Crawford told Ms. Thomas that they would work together on building the confidence of her staff and improving her training techniques as opportunities arise. He told her that, as he had indicated before, she is welcome to attend any training that she thinks would be beneficial to her. He asked her to let him know if she has identified any workshops or courses she feels would be helpful. He also indicated that he would continue to review programs and identify those he thought she should attend. Ms. Thomas told him that she receives leaflets on training and she is watching for workshops to attend. She has checked out two videos from the administrative division and has one more to watch.

Mr. Crawford asked Ms. Thomas if she has noticed any change, positive or negative, in her staff resulting from her recent efforts to be more involved in their work. She said she has noticed no change. They are the same as far as she knows. She indicated she was not aware there was a problem until he told her. She said the only things she has done differently were to have them log in their phone calls and document everything in writing. She has always told her staff if they have a problem with her, they should let her know and they would work on whatever the problem is. If they do not tell her about problems, she has no way of knowing. Mr. Crawford said it is only human nature to be reluctant to tell your superior that you have a problem with them or their performance. He feels the confidence level is still not what it should be with her staff. Her attitude has always been that if they have a problem with her or with their work, they should come to her. He stressed again the importance of her going to them and working to build the confidence. They need guidance with setting priorities. They are sometimes very frustrated because they may have 100 things to get done and time to do only 80. What do they do? This is where she should be aware of the issue, setting priorities, and managing the staff in order to get the work done. He wants her to "roll up her sleeves" and spend a lot of time with her staff. She said she goes to their workstations many times whether they admit it or not. Mr. Crawford said that she must have not been doing enough of this because there appears to be a problem with the staff. He also indicated that since becoming SED, he has not observed her working at any employee's workstation. She is always in her office, many times with the door closed.

Mr. Crawford asked if she had discussed any of these issues with her employees, particularly during recent performance evaluations. She replied that she asked them if they thought the section was working as a team and she got a totally different picture than he obviously has. Mr. Crawford told Ms. Thomas that some members of her staff indicated to him that they do not even know if she is in the office unless they go to her office. He emphasized that he is attempting to help her with issues her employees had brought to his attention. His personal observations tend to indicate that the employees have reason for concern.

Mr. Crawford stressed to Ms. Thomas that confidence in her is a major concern to him. He hopes that questions are not going directly to the specialists because county offices lack confidence in her. Both county office employees and District Directors have told him this is the case. He stressed again the importance of being knowledgeable in program areas. He said a county office employee should be glad to get the chief on the telephone because that person should be the most knowledgeable one in the office. Ms. Thomas stated that more people did call her before he became the SED and since he came into the State Office, they do not call. She believes the confidence level fell when he became the SED. Mr. Crawford explained that he had a good working relationship with many county office people because he had been a CED. This may be why they are so willing to share concerns with him when they were reluctant to share with former SEDs.

Mr. Crawford stated that Ms. Thomas evidently does not believe there is a problem. He reminded her that she has told him and the State Committee that she is not an expert in her programs. She relies on her specialists to handle the details. He told her that if he asks any other chief a question in any of their areas of responsibility, they can help. If he asks her a question, she has to rely on her specialists for help. He wants to fix that. He wants it to be that when someone asks her a question, she knows the answer and does not have to refer most questions to a specialist under her supervision. He is not talking about every little detail, but she should have a good knowledge of all her areas of responsibility. He stressed that her opinion of the problems was not as important to him as what the field offices and District Directors think. Everyone but her is telling him that there is a problem, and from his personal observation, he agrees. Ms. Thomas stated that before voice mail was installed in the office, all calls came into the main section number. The Program Technician referred calls to the specialists. When voice mail was installed and every specialist got their own number, county offices began calling the specialists directly. She stated county office employees hardly ever call her directly because they know what specialist handles the program. It is not like she is referring the calls to the specialists. Mr. Crawford told her that he had received complaints that even when someone did talk to her, she had to obtain assistance from Sharrie or Jeff to get the answer. Ms. Thomas admitted that if it was a question on peanuts, that was probably so.

Mr. Crawford asked to see the telephone logs for each person in her section, including her own. She advised him they were all in the same binder. He asked when the logs were placed in the binder and she said each Monday. He asked to see it along with the logs that were on each employee's desk. Ms. Thomas went to retrieve the logs and returned. Mr. Crawford reviewed each log and commented that Walda Messer received quite a number of calls. Ms. Thomas commented that Ms. Messer works in three different divisions and that is why she receives so many calls. Mr. Crawford asked if all problems had been resolved and no one was to be called back. Ms. Thomas responded yes, for the most part. However, if a question could not be answered, the employees write out the details so they will remember when they have to get back on the issue. Mr. Crawford asked if they indicate a date to make a follow-up contact. Ms. Thomas responded no. Mr. Crawford expressed concern about this because if the employee who made the notation was not available, no one else would know how or when to follow up. Mr. Crawford asked if the logs were maintained on each employee's desk until placed in the binder. She responded yes and that they are available for anyone to review if the employees is not in the office. Mr. Crawford asked if she had assigned someone to review the logs of those who were out of the office to ensure contacts are made timely. She responded that she had not, but she would have the Technician do this. Mr. Crawford asked if someone maintains the binder and follows up on any outstanding calls after the logs are placed there. She said no, but she would either assign someone to do that or she would do it herself, depending upon who was available. Mr. Crawford suggested that the specialists notate their calendars to remind them they have committed to calling someone back. Ms. Thomas responded that "she guessed she should address that; she did not know." Mr. Crawford told her to establish a policy and administer it consistently.

Mr. Crawford told Ms. Thomas that he felt they were making progress and he had no reason to believe it would not continue. He feels they will meet their objective and reach the standard of performance he expects. He said they would schedule the three-week reviews as closely as possible, but that adjustments in the schedule may be needed with the holidays coming up. He told her to come to him anytime she needs assistance and he would make a point to visit with her more often during the OTI period to observe and make suggestions for improvement. They

will try to conduct another progress review the week of December 18. If she has leave scheduled for that week, she should let him know in advance. He also asked if she had any use or lose leave. She responded that she did not.

Mr. Crawford asked Ms. Thomas if she had anything to add or any suggestions to make. She replied that she did not. She was proud he thought things were working better and she would continue to do her best. She added that he had only 11 more months to put up with her because she would be retiring.

Danny F. Crawford

State Executive Director

Back to

♥ Yahoo! Personals - Find your Valentine now ♥

Address Book · Auctions · Autos · Briefcase · Calendar · Careers · Chat · Classifieds · Finance · Games · Geocities · Greetings · Groups · Kids · Mail Maps · Member Directory · Messenger · Mobile · Movies · Music · My Yahoo! · News · PayDirect · People Search · Personals · Photos · Radio · Shopping · Sports · TV · Travel · Warehouse · Weather · Yellow Pages · more...

Privacy Policy - Terms of Service - Guidelines
Copyright © 1994-2002 Yahoo! Inc. All rights reserved.

Exhibit ___6___

Page 133 of 133