Affidavit of Danny F. Crawford

In the matter of EEO complaint of: )
**Ozetta Thomas** )
Complainant )
)
V. )
) Case No. 030475
**USDA-FSA** )
Respondent )

I, Danny F. Crawford, hereby solemnly swear that the information given in response to the following questions are true and complete to the best of my knowledge and belief, so help me God:

Q.: Please state your full name for the record.

A.: Danny Ferrell Crawford.

Q.: What is your title, and Grade?

A.: I'm the State Executive Director (SED) for Alabama Farm Service Agency. I'm Grade 15, I'm not sure of my series.

Q.: What do you do on a day to day basis?

A.: We administer the farm bill programs. I work with staff here in Montgomery and in the counties offices to implement the various farm programs.

Q.: You were Ozetta Thomas' first line supervisor before she retired, is that correct?



Exhibit 10a
Page 1 of 6

A.: Yes. She was Chief of the Production Adjustment Compliance Division which is one of the employees under my supervision.

Q.: During the time you supervised her she filed an EEO complain against you, is that correct?

A.: Yes, several

Q.: The Complainant, Ms. Ozetta Thomas, states in the first item in her first claim for reprisal, EEO complaint number 030475, , that on January 3, 2003 her request for extension for the reassignment to the Office of Civil Rights/Program Complaints Inquiry Branch (OCR/PCIB) was denied. What do you know about this particular request?

A.: I remember the request. My knowledge of that was that Ms. Sharon Holmes did not want to extend the detail. That was one part of it. The other thing is that we needed her current position as Chief of Programs filled here in the office. She had been gone for over a year and everyone in the office had to pick up the slack while she was away. We could not continue like that. The original agreement was that she would be detailed through November, which was her retirement date. That's what they requested. After looking at it we suggested to take it to January since it was the first of the year and a good time to retire. I felt we could get by without her until then. When that time came she decides she wanted to extend the detail. The agreement was completed, and I wanted her to come back and do her job. We needed that position. If she was detailed again I still could not refill her position.

Q.: Did you have any actual input in the decision.

A.: I'm not sure. I gave my input to Ms. Holmes and she or someone else made the ultimate decision. It was not my decision to make. All I know was that I could not continue any further with Ms. Thomas position unfilled and supervision of that section not provided by a permanent chief.

Exhibit 10a
Page 2 of 6

A.: Yes. She was Chief of the Production Adjustment Compliance Division which is one of the employees under my supervision

Q.: During the time you supervised her she filed an EEO complain against you, is that correct?

A.: Yes, several

Q.: The Complainant, Ms. Ozetta Thomas, states in the first item in her first claim for reprisal, EEO complaint number 030475, , that on January 3, 2003 her request for extension for the reassignment to the Office of Civil Rights/Program Complaints Inquiry Branch (OCR/PCIB) was denied. What do you know about this particular request?

A.: I remember the request. My knowledge of that was that Ms. Sharon Holmes did not want to extend the detail. That was one part of it. The other thing is that we needed her current position as Chief of Programs filled here in the office. She had been gone for over a year and everyone in the office had to pick up the slack while she was away. We could not continue like that. The original agreement was that she would be detailed through November, which was her retirement date. That's what they requested. After looking at it we suggested to take it to January since it was the first of the year and a good time to retire. I felt we could get by without her until then. When that time came she decides she wanted to extend the detail. The agreement was completed, and I wanted her to come back and do her job. We needed that position. If she was detailed again I still could not refill her position.

Q.: Did you have any actual input in the decision.

A.: I'm not sure. I gave my input to Ms. Holmes and she or someone else made the ultimate decision. It was not my decision to make. All I know was that I could not continue any further with Ms. Thomas position unfilled and supervision of that section not provided by a permanent chief.

Exhibit 10a
Page 3 of 6

Q.: Ms. Thomas second claim of reprisal states that on January 6, 2003 you denied her request to be indefinitely detailed to OCR/PCIB. How do you respond?

A: My response is he same as the one I just gave you. I didn't deny it; it wasn't within my authority to make that decision. All I know was that we needed her position filled.

Q.: The third claim of reprisal alleges that on January 6, 2003 you denied her request for indefinite sick leave. Please respond.

A.: Ms. Thomas wanted to go on sick leave for an extended period of time. I told her no problem if she provides me with an excuse from her doctor. Our policy requires that sick leave beyond three days be supported by medical documentation .Ozetta Thomas was not sick. We do not grant sick leave to people who are not sick. She could not get a doctor's excuse.

Q.: Have you ever provide indefinite sick leave to others without medial documentation?

A.: No, never.

Q.: The fourth claim has two subparts to it. Both parts, (a) and (b), pertain to one incident concerning a meeting that occurred in January of 2003. The meeting was originally set for January 21, 2003 but was postponed to January 23, 2003. Ms. Thomas contends that this meeting was held without her knowledge and that as a matter of course she should have been notified of the meeting since she was Chief Program Supervisor for NAP. She contends the failure to notify and include her in the meeting was done to undermine her position and was reprisal for her EEO activity. How do you respond?

Exhibit 10a
Page 4 of 6

A.: I don't recall the exact particulars of the meeting she is referring to. I did not put the meeting together nor did I attend. I believe the meeting happen when some minority producers wanted to meet here with the Farm Loan people. They met with the chief of farm loans, staff and the district director. In that meeting a question came up that dealt with the NAP program. They sent someone to get the specialist from her office that was responsible for that program. Apparently it was someone other than Ms. Thomas. Again, I was not there. The meeting that was originally called did not have anything to do with her program; it concerned the Farm Loan program. It did not involve NAP until a question was raised by one of the farmers. It was at that time that they requested input from her staff. Prior to that there was no reason to notify or contact her about the meeting.

Q.: In item (4c.) of her claim for reprisal Ms. Thomas alleges as further evidence of disparate treatment the fact that you failed to notify the field office that she had returned from her detail at OCR/PCIB. She states it is common practice to do so. How do you respond?

A.: I have never had an employee detailed to another branch of government before. I do not know what "common practice" is. Ms. Thomas could have notified the field when she returned. That is "common practice" when employees return after extended sickness.

Q.: In Ms. Thomas' fifth claim of reprisal she states that on February 24, 2002 she was forced to retire. How do you respond?

A.: I did not force Ozetta Thomas to retire. All I know is that one day I got an email from her stating that effectively immediately she was retiring. That's all I know about it.

Q.: She contends the relationship with you and your actions toward her "forced" her to retire.

A.: Nothing that I did forced her to do anything. She was performing her duties and we had no problems.

Exhibit 10a
Page 5 of 6

Q.: In the last item listed in her complaint for reprisal she states the agency failed to give her a retirement celebration as it did for similimarly situated employees. How do you respond?

A.: The agency does not give retirement celebration for anyone. They are private events that coworkers chose to put on for someone that may be retiring. The agency has never been involved in the planning. There is no standard retirement celebration for employees. Whether or not she got a party is up to her coworkers. They gave her a retirement party a few years earlier when she left the agency.

Q.: Do you have anything you wish to add?

A.: No.

*I have read the above affidavit consisting of 5 pages. It is true and complete to the best of my knowledge and belief. I have made all necessary corrections and additions, initialing next to each, I have also signed or initialed each page. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties. In accordance with 28 U.S.C Section 1746, I declare under penalties of perjury that the above statements are true and correct to the best of my knowledge, information and belief.*

_____        10/18/05
Signature                               Date

*I hereby certify that I obtained the above affidavit in connection with a duly authorized EEO complaint investigation.*

_____        10-18-05
Dennis J. Redic                         Date
EEO Investigator

Exhibit 10a
Page 6 of 6

## Affidavit of Danny F. Crawford

In the matter of EEO complaint of: )
**Ozetta Thomas** )
Complainant )
)
V. )
) Case No. 040175
**USDA-FSA** )
Respondent )

I, **Danny F. Crawford**, hereby solemnly swear that the information given in response to the following questions are true and complete to the best of my knowledge and belief, so help me God:

Q.: Please state your full name for the record.

A.: Danny Ferrell Crawford.

Q.: Your race, for the record.

A.: White\Caucasian

Q.: What is your title, and Grade?

A.: I'm the State Executive Director (SED) for Alabama Farm Service Agency. I'm Grade 15, I'm not sure of my series.

Q.: How long have you been State Director?

A   A little over three and a half years.

Page 1 of 6                                                                              initial *JFC*

**182**

Exhibit 10
Page 1 of 6

Q.: Who is your first line supervisor/

A.: Douglas Fargo.

Q.: What do you do on a day to day basis?

A.: We administer the farm bill programs. I work with staff here in Montgomery and in the counties offices to implement the various farm programs.

Q.: You were Ozetta Thomas' first line supervisor before she retired, is that correct?

A.: Yes. She was Chief of the Production Adjustment Compliance Division which is one of the employees under my supervision.

Q.: How would you describe your relationship with Ms. Thomas before her retirement?

A.: I would say it was rocky before she was detailed to civil rights after a settlement agreement. When she returned it was much better and we never had any problems.

Q.: Why is that?

A.: She did not function well in her capacity as Chief.

Q.: What do you base that on?

A.: Her inability to properly handle the programs she was responsible for and that she lacked the knowledge required of the position; she frequently gave out incorrect information and could not answer county office correctly at times.

Q.: Did you provide her annual evaluation?

A.:   Yes. I evaluated her twice, I believe, after I came to the Montgomery office. She was given an unsatisfactory rating at least one time maybe two I don't remember for sure.

Q.:   Do you recall how she scored on the various sections of the performance review; I believe there are usually four or five elements?

A.:   No, not off hand.

Q.:   Did Ms. Thomas file an EEO complaint following her unsatisfactory rating?

A.:   I don't recall for certain when, but I believe so. She was to go under an OTI. I know she filled at least a couple of EEO complaints against me. I know for sure it went to mediation. As part of the mediation agreement, all complaints were settled by her being detailed to a different unit and was no longer under my supervision. The detail lasted a little over a year in order to give her time to reach retirement age at her request and to the first of the year which was best for retiring.

Q.:   Where did she work at that time?

A.:   I believe she worked in the Office of Civil Rights.

Q.:   Did you have any contact with her or the opportunity to evaluate her work?

A.:   No. After she was detailed out of my section I never saw her. I saw her only after the detail was over and she came back to my department. She worked a couple of months or so and then retired. One day I received an email out of the blue stating she was retiring effective immediately.

Q.:   Ms. Thomas testified that after she returned to your department and your supervisions she became ill due to the stress of working under you. She states that on occasion the stress would become so severe she sought a medical leave of absence. She states you denied her request for no justifiable reason. Do you recall this event?

Page 3 of 6                                                                                               initial _____

Exhibit  10
**184**
Page 3 of 6

A.: Yes. She never said anything about any stress or doctor care. She requested sick leave longer than three days, when that occurs I am required to obtain a statement from her physician explaining why extended medical leave is required. I asked her to supply the medical information, she never did, and therefore, I could not grant her request for medical leave. If she was under a doctor's care then it would not have been a problem to get approval and information from her doctor. We had no problems when she returned to her chief position and we never discussed her performance prior to her retiring. The three day sick leave policy is applied the same to all employees.

Q.: How was her performance after she returned?

A.: Much, much better.

Q.: Ms. Thomas contends that you denied her request to have her temporary detail extended out of retaliation. How do you respond?

A.: I was told she did ask to have her detail extended at the Civil Rights branch, not me. I never spoke to her. They didn't want to extend the detail. When she left my department on detail as part of the mediation plan, her position in my office was not filled. The work she was normally responsible for as the Chief had to be spread among other staff employees. After the original detail ended she was to return to her former position, and I needed that slot since we were short handed. If I had agreed to extend her detail that meant I could not fill her former position because she still was in the slot. We were behind in our work and needed to get someone in permanently. During the time she was gone we had several people rotating in and out of her position. It was not my decision to make, it was a completion of the agreement. I needed a chief of the section.

Q.: In addition to the previous EEO complaints filed against you, the case of which I have been asked to investigate allege she was not selected for the vacant position of Program Complaint Specialist with PCIB due to racial discrimination and retaliation for prior EEO complaints. You were identified as one of the Responding Management Officials. Are you aware of the vacancy announcement of which she complains?

A.: In was not a Responding Management Official in any other case. I knew later she filed a complaint but I had no knowledge of the actual vacancy announcement or

Page 4 of 6                                                                                                                  initial ___

185

Exhibit 10
Page 4 of 6

Q.: the circumstances of which she alleges discrimination. I was not involved in any way in the announcement for the position or the selection process. It was none of my business and I wasn't told anything about it.

Q.: Ms. Thomas contends that she was not selected for the position because of a mandate by you, Doug Fargo and John Chott. She alleges that one or all of you put pressure on Sharon Holmes, the former Director of Civil Rights, and Carlton O'Neil not to select her to fill the vacancy announcement.

A.: I don't know what she is talking about. I didn't know there was a vacancy announcement for the position. It was not in my office so I would not be aware of vacancy announcement for other Divisions. I didn't know she had applied for the position, when the position was announced, who made the selection or who was selected to fill the position. Whoever was selected would not affect me.

Q.: Please provide the name race, and EEO activity, if known of employees you have hired or promoted from January 2001 to January 2004.

A.: Ronnie Davis, white male. Sharon Stilles, white female. Katie Brummit, white female. No EEO activity.

Q.: Do you have anything you wish to add?

A.: No.

Page 5 of 6                                                                                               initial _____

186

Exhibit 10
Page 5 of 6

*I have read the above affidavit consisting of 6 pages. It is true and complete to the best of my knowledge and belief. I have made all necessary corrections and additions, initialing next to each, I have also signed or initialed each page. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties. In accordance with 28 U.S.C. Section 1746, I declare under penalties of perjury that the above statements are true and correct to the best of my knowledge, information and belief.*

_____          12/7/04
Signature                                    Date

*I hereby certify that I obtained the above affidavit in connection with a duly authorized EEO complaint investigation.*

_____          12-/26/04
Dennis J. Redic                              Date
EEO Investigator

Page 6 of 6                                              initial _____

Exhibit 10
Page 6 of 6