IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

OZETTA THOMAS,              )
                            )
        Plaintiff,      )
                            )
     v.                 )        CASE NO. 2:05-cv-411-WKW
                            )
ED SCHAFER, SECRETARY, UNITED  )
STATES DEPARTMENT OF         )
AGRICULTURE, FARM SERVICE    )
AGENCY (FSA),            )
                            )
        Defendant.    )

## MEMORANDUM OPINION AND ORDER

This case is before the court on the Motion for Summary Judgment (Doc. # 55) filed by Defendant Ed Schafer, Secretary of the United States Department of Agriculture. For the reasons set forth below, the motion is due to be GRANTED.

## I.  FACTS AND PROCEDURAL HISTORY

Plaintiff Ozetta Thomas ("Thomas") brought this action alleging discrimination and retaliation by her former employer, the United States Department of Agriculture ("USDA"). Thomas is an African-American female, and she was employed by the Farm Service Agency ("FSA"), which is a part of the USDA, until she retired in February 2003.

### A.  *Thomas's Employment History with the FSA*

Thomas was first employed by the USDA in 1968. After twenty years of service, Thomas was promoted to Program Specialist in 1986 and worked in the FSA state office in Montgomery. (Thomas Dep. 18:21-19:3.) During this period, Daniel Robinson ("Robinson") was Thomas's supervisor. (*Id.* 19:4-6.) In this position, she answered questions from county employees throughout

the state about programs FSA administered.  (*Id.* 20:2-17.)  In 1998, Thomas was promoted to a position with the Office of Civil Rights ("OCR").  (*Id.* 21:14-28.)  However, less than six months later, she returned to serve as a Supervisory Agricultural Program Specialist.  Robinson had been appointed State Executive Director ("SED"), and he hired Thomas for the supervisory position, making her FSA's first African-American female chief.  (*Id.* 23:20-24:19.)

In her new position, Thomas oversaw various programs and supervised three employees.  (*Id.* 25:10-26:2; 27:6-10.)  Additionally, she retained responsibility for the Payment Limitation Program and answered questions about other programs if the employee who specialized in that program was not available.  (*Id.* 29:1-18.)  Thomas also handled appeals when farmers were denied program benefits.  (*Id.* 31:12-22.)  In 1999, she received a cash prize award for her job performance.  (*See* Pl.'s Ex. 9.)

### B.    *Crawford Becomes SED*

In 2001, Danny Crawford ("Crawford") was appointed as SED, and Robinson left. (Crawford Dep. 9:22-10:3.)  As SED, Crawford is responsible for overseeing the administration of FSA programs.  (*Id.* 10:4-7.)  He supervises five divisions, including Thomas's, and oversees District Directors ("DDs") who in turn supervise County Executive Directors ("CEDs").  (Crawford Decl. ¶ 2.)  Thomas alleges that beginning in 2001, Crawford targeted her for discrimination because of her race and gender and retaliated against her.

On July 3, 2001, Crawford met with Thomas about problems with her attendance records. Deborah Williams ("Williams"), Crawford's executive assistant, was also present at the meeting. Crawford informed Thomas that he had been monitoring her attendance for two pay periods and that her time sheets reflected her being at work when she was in fact not there.  (Crawford Dep. 64:16-23;

Thomas Dep. 55:9-56:6.)  Thomas was allowed to correct the mistakes on her time sheet.  She contends that Crawford unfairly singled her out for monitoring.  (Thomas Dep. 79:9-12.)

Soon after becoming SED, Crawford testified that he received numerous complaints about Thomas's performance.  Nearly all of the DDs complained that Thomas gave incorrect information when answering their questions.  (Crawford Dep. 98:7-16.)  Additionally, when Crawford was a CED, before being appointed SED, he received incorrect information from Thomas and, as a result, stopped asking her questions about FSA programs.  (*Id.* 98:12-99:15.)  The staff members Thomas supervised complained to Crawford that Thomas lacked knowledge and provided poor leadership.  (*Id.* 49:11-54:17.)  Based on all of these complaints, Crawford concluded "that [Thomas] did not know her programs and . . . impeded the implementation of those programs in the state." (*Id.* 55:12-20.)  Thomas has offered no evidence disputing these facts.

Crawford also received a memorandum from his supervisor, John Chott, about problems with the Payment Limitations Program in Alabama – the program over which Thomas retained direct control.  The USDA reviewed the Payment Limitations Program in Geneva County, Alabama, and found major problems.  (Crawford Decl. ¶ 8.)  Thomas contends that the problems the USDA review revealed were ones that she had previously identified and for which she had suggested changes.  (Def.'s Ex. 5.)  Chott's memorandum to Crawford stated:

> I am concerned about an apparent weakness in your State Office's lack of expertise in and handling of payment limitations matters.  This is an area you should look at carefully when you take corrective actions.  **The latter could include reassignment of duties or much additional training at the State Office level**.

(Def.'s Ex. 3 (emphasis added).)

In August 2001, Crawford and Thomas discussed Thomas's job performance.  Crawford

informed Thomas that she should be concerned about Chott's memorandum. He told her that she appeared to lack knowledge about the programs she was responsible for and that he had received numerous complaints about her job performance. (Crawford Decl. Ex. B.)

Thomas claims that Crawford excluded her from certain meetings. Specifically, there was a meeting for loss adjusters that was to be held in Foley, Alabama, which Thomas was to attend. (Thomas Dep. 82:21-83:9.) Crawford told Thomas that because of cost constraints the meeting should be moved closer to the FSA office. (*Id.* 83:25-84:3.) Jeff Knotts ("Knotts"), one of the employees Thomas supervised, then discussed the matter with Crawford. (*Id.* 84:3-11.) After this conversation, Crawford agreed that the meeting would not be moved but allowed only Knotts to attend. (*Id.* 84:9-85:4.) Crawford stated he made the decision based on cost, but Thomas contends that it was actually less cost effective because Knotts ended up staying in a hotel overnight. (*Id.* 85:9-13.) Thomas claims that "that should have been me [to go]. I'm the chief." (*Id.* 85:18-19.)

Thomas also alleges she was excluded from a peanut training meeting. (*Id.* 87:8-11.) However, Thomas never asked Crawford if she could attend it. (*Id.* 88:12-15.) Sharrie Peterson, another employee Thomas supervised, told Thomas that while at the meeting the FSA employees informally gathered and Crawford stated, "I don't know what I'm going to do with Ozetta at this time." (*Id.* 91:7-9.) Crawford claims that Peterson started the conversation, everyone else chimed in with criticism, and that he only said: "[W]e're, you know, going to try to make sure she does her job." (Crawford Dep. 59:4-18.) Crawford denies stating that he was going to get rid of Thomas. (*Id.* 59:23-60:8.)

In November 2001, Crawford conducted Thomas's annual review and did not give her the highest rating. He gave her a "not achieved" Performance Work Plan ("PWP") rating and placed

4

her on Opportunity to Improve. (Crawford Decl. ¶ 10; Def.'s Ex. 9.) At a follow-up meeting, he informed her that she was making progress and pointed out areas in which she could continue to improve. (Def.'s Ex. 11.) At this meeting, Thomas stated that she would be retiring in eleven months. (*Id.*)

**C.    *Thomas's First EEO Complaint and Settlement Agreement***

On September 14, 2001, Thomas filed her first EEO complaint, claiming that "Mr. Crawford has embarked on a blatant practice of racial discrimination, and he has created a hostile working environment for me." (Def.'s Ex. 8.) Thomas agreed to participate in an early resolution program, and a mediation session was held on December 5, 2001. (Def.'s Ex. 12.) At the mediation, Thomas and USDA reached a binding settlement agreement ("Settlement Agreement"). (*See* Def.'s Ex. 13.) While the USDA did not admit to Thomas's allegations of discrimination, it agreed to detail Thomas to OCR from December 16, 2001, to January 5, 2003; pay her $1,500 in attorney fees; grant her a salary increase; expunge from her personnel files the "not achieved PWP" and her being placed on Opportunity to Improve; replace the "not achieved PWP" with an "achieved PWP"; and place her on leave until her detail began. (*Id.*) Thomas agreed to withdraw her complaint and not file a new claim. (*Id.*) The Settlement Agreement also stated "[t]hat after the agreement is fully implemented, the Agency will within 30 calendar days, provide [Thomas] with a written notice explaining the specific action taken to implement the agreement." (*Id.*)

**D.    *Thomas's Leave and Detail Period***

Thomas contends that Crawford breached the Settlement Agreement and continued to work to undermine her authority while she was on leave and detail. The day after the Settlement Agreement was reached, while Thomas was on leave, she showed up at the FSA office without

informing anyone that she would be coming.  (Thomas Dep. 187:3-11; 188:13-15.)  She wanted to use her computer to send an e-mail to FSA employees to let them know she was leaving and had enjoyed working with them.  (*Id.* 187:12-22.)  When she arrived, her laptop and desktop computers were missing.  (*Id.* 188:16-189:3.)  The desktop computer previously assigned to Thomas had been reassigned to another employee, Valerie Moses, who had been having trouble with her computer because there were no other computers available.  (Crawford Decl. ¶ 13.)  Thomas's laptop was given to Crawford's secretary Irean Bennett ("Bennett"), who had asked for a laptop to be able to work from home.  (*Id.*)

Upon finding her computer missing, Thomas asked Williams for her laptop.  (Thomas Dep. 190:6-12.)  Williams had Mary Reynolds ("Reynolds") return the computer.  (Williams Decl. ¶ 8.)  After Reynolds set up the laptop, Thomas had problems using her laptop, and Reynolds reset the password.[1]  (Reynolds Decl. ¶ 6.)  Thomas claimed she still had trouble with her e-mail but went home without telling anyone about the problem.  (Thomas Dep. 192:10-18.)  On another day while still on leave, Thomas stopped by the office and found that there was no computer at her desk, but she did not ask anyone for help.  (*Id.* 192:18-25.)  Thomas claims that her laptop was removed because of her race, gender, and in retaliation.  (*Id.* 194:7-15.)  When Thomas began her detail with OCR, she was given a new computer and password.  Additionally, Thomas admits she could have sent the e-mail to the FSA staff after she began working at OCR.  (*Id.* 187:23-188:10.)

Shortly after the Settlement Agreement was reached, Crawford sent a memorandum to the Alabama FSA employees informing them that "Thomas has been detailed" to OCR and that Jeff

---

[1]  Crawford and Williams deny ordering Thomas's password to be deactivated.  (Crawford Decl. ¶ 13; Williams Decl. ¶ 7.)  Reynolds stated she did not intentionally deactivate Thomas's password and does not know why it was not working.  (Reynolds Decl. ¶¶ 4,6.)

Knotts was appointed acting chief. (Def.'s Ex. 31.) Crawford sent the e-mail so that employees in the field would know who to contact with questions about programs. (Crawford Decl. ¶ 15.) Thomas contends that the connotation of Crawford's memorandum was that she had been "thrown out" and that Crawford should have stated "she accepted a detail." (Thomas Dep. 206:12-21.) Additionally, Thomas claims Crawford undermined her authority by appointing Knotts as acting chief because he was not her choice to fill the position.

On January 22, 2002, Bennett hand-delivered to Thomas in an unsealed envelope a copy of the "achieved" status PWP, which was part of the Settlement Agreement. (*See* Def.'s Ex. 16.) Because Williams was tasked with carrying out the terms of the Settlement Agreement, she signed Crawford's name on the "achieved" PWP with his authority. (Crawford Decl. ¶ 12; Williams Decl. ¶ 3.) Williams asked Bennett to hand-deliver the document without telling Bennett why it was being delivered. (Bennett Dep. 33:15-20.) Thomas contends that Crawford violated the Settlement Agreement's good faith provisions by delegating this responsibility.

In April 2002, while on detail with OCR, Thomas contacted Crawford requesting that FSA sponsor her to attend the annual Blacks in Government ("BIG")[2] Conference in Atlanta. Thomas wanted to attend the optional conference to receive additional training. (Thomas Dep. 255:13-25.) In 2001, Thomas and another employee attended the BIG conference, and Thomas had previously attended two other times. Shortly after receiving Thomas's request, Crawford sent an e-mail to FSA's African-American employees, asking if anyone was interested in attending the conference. (Def.'s Ex. 42.) Crawford denied Thomas's request to attend because FSA could only afford to send two employees, and he wanted to provide the opportunity to employees who had not participated in

---

[2] BIG is an advocacy group that promotes opportunities for African-Americans in government.

the past. (*See* Def.'s Ex. 43, 44.) Thomas claims she should have been allowed to attend because she was a member of BIG, unlike the two individuals selected to attend. Additionally, she claims that Crawford did not ask if anyone wanted to attend the conference in 2003, although he did use the same method to decide who would attend in 2004. (Pl.'s Ex. 1 at 5.)

On January 3, 2002, Thomas filed an informal complaint with the USDA challenging the removal of her computer, the deactivation of her password, the wording of the memorandum stating she had been detailed, and the appointment of Knotts as acting chief. She filed a formal complaint on March 4, 2002, arising out of these instances and alleging race discrimination, gender discrimination, and retaliation. (*See* Def.'s Ex. 32.) On September 29, 2004, the EEOC affirmed the final agency decision finding that Thomas had not been discriminated against or retaliated against with regard to these instances and the denial of her request to attend BIG.[3] (Def.'s Ex. 33.)

On January 11, 2002, Thomas, through her attorney, sent a letter to the USDA claiming that it had violated the Settlement Agreement by not carrying it out its terms within thirty days. (*See* Def.'s Ex. 35.) Thomas sought a permanent reassignment to OCR, damages, and reinstatement of her complaint. (*Id.*) On December 26, 2002, the USDA issued a final agency decision, finding no merit to Thomas's allegations regarding the breach of the Settlement Agreement. (*See* Def.'s Ex. 38.) Thomas appealed, and the EEOC affirmed the decision on October 23, 2003. (*See* Def.'s Ex. 39.)

In November 2003, Thomas, through her attorney, raised new allegations that Crawford breached the Settlement Agreement's good faith provision when he had Williams sign and Bennett

---

[3] Thomas subsequently filed a complaint regarding Crawford's decision denying her request to attend BIG, and this allegation was considered contemporaneously with the other claims listed above.

8

deliver the PWP. (*See* Def.'s Ex. 40.)

E.    ***Thomas's Return from Detail***

Thomas was to return to FSA from her detail to OCR on January 6, 2003. On December 31, 2002, Crawford sent Thomas a letter advising her that her detail was about to end, which stated: "We look forward to seeing you on Monday, January 6, 2003." (Def.'s Ex. 22.) Around that time, Thomas sent Crawford a letter stating that he had failed to comply with the terms of the Settlement Agreement, that she was attempting to extend her detail to OCR indefinitely, and that she did not want to return to the State Office. Thomas requested that she be allowed to work outside the State Office or be given indefinite sick leave. (Def.'s Ex. 19.) Crawford denied Thomas's request to work outside the State Office because he did not think she would be able to supervise her staff if she was not in the office. (Crawford Decl. ¶ 20.) Crawford refused the request for indefinite sick leave, as he had never granted a similar request before. Crawford explained to Thomas that to take more than three consecutive days of sick leave she must have a doctor's note and he had not received one. (*Id.*; Crawford Dep. 135:6-18.) Thomas took three days of sick leave and reported for work on January 9, 2003.

When Thomas returned, she had limited contact with Crawford. (*See* Thomas Dep. 150:20-151:4; 168:22-24.) Thomas complains that she was not adequately welcomed back to the office. Crawford contends that he was extremely busy in early 2003. (Crawford Decl. ¶ 21.) He claims that he welcomed Thomas back at a staff meeting on January 23, 2003; Thomas does not remember the staff meeting. (Bennett Decl. ¶ 3; Crawford Decl. ¶ 24; Thomas Dep. 159:6-16.) Additionally, Bennett distributed a phone list that reflected that Thomas had returned to the office. (Bennett Decl. ¶ 2.)

After returning from detail, Thomas spent the majority of her time learning about a new farm bill, which had been enacted while she was on leave. The new legislation changed how certain FSA programs were administered. (Thomas Dep. 138:9-20.) Thomas had to study the changes to be able to answer questions from the field about the programs. (*Id.* 263:1-6.) Thomas estimated that it would have taken a few weeks to learn all of the program changes. (*Id.* 176:22-177:23.) Thomas had to learn the material from handbooks, although she admits that she did not ask if there was extra training she could attend. (*Id.* 177:8-17.) Crawford asked Thomas to speak at a cotton meeting on February 28, 2003. (Def.'s Ex. 26.) She responded that she would attend but that since she was still learning about the new farm bill she would have one of her staff members on standby to give the presentation. (*Id.*)

Thomas alleges that after returning from detail, Crawford marginalized her role. Specifically, she claims Crawford did not invite her to attend two farm meetings. One of the meetings was scheduled while Thomas was still on detail, and after learning about the meeting, she did not attempt to attend it and was never told that she could not. (Crawford Decl. ¶ 23; Thomas Dep. 265:4-23.) Thomas learned about the other meeting when some farmers appeared in the FSA office with questions about a program. (Thomas Dep. 267:3-8.) A District Director asked Thomas to have one of her staff members answer the questions instead because she did not know the answers, which Thomas claims humiliated her. (*Id.* 268:2-17.) Thomas is not aware of any negative comments made about her after she returned from leave, and Crawford did not receive any complaints about her during this period. (Crawford Decl. ¶ 22; Thomas Dep. 282:9-11.)

On February 24, 2003, less than two months after returning from leave, Thomas decided to retire. She sent an e-mail notifying Crawford that effective immediately she was retired. (*See* Def.'s

Ex. 28.)  Thomas claims that she felt sick that morning, like she did every morning, and she decided "my mind just couldn't take no more of it."  (Thomas Dep. 278:9-13.)  She says she retired because "there was nothing else I could do.  They wouldn't give me a reassignment.  They wouldn't extend my detail.  They wouldn't let me work outside the state office.  And my health just meant more to me."  (*Id.* 178:25-179:3.)

Thomas also complains that after she abruptly announced her retirement a party was not thrown for her.  She notes that an employee in another division had one thrown for him. (*Id.* 292:1-294:21.)  Thomas concedes that she may not have attended a party if one was thrown for her.  (*Id.* 292:5-8.)  Additionally, after she retired, a position opened up in OCR for which she was not selected.

On April 1, 2003, Thomas filed an EEO complaint alleging that her retirement was not voluntary.  (Def.'s Ex. 46.)  She filed this lawsuit on May 3, 2005.  Her original complaint included claims against Crawford, as well as Defendant Schafer.  In an earlier order, this court dismissed Crawford as a party.  (Doc. # 32.)  The Motion for Summary Judgment currently pending before the court is fully briefed and ripe for resolution.

## II.  JURISDICTION AND VENUE

The court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).  The parties do not contest personal jurisdiction or venue, and the court finds allegations sufficient to support both.

## III.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).  The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine factual dispute exists if "a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks and citation omitted).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## IV.  DISCUSSION

Thomas claims that she has been discriminated against by the defendant, forced to work in

a hostile work environment, and retaliated against for filing a complaint.[4]  The defendant denies these allegations.  The court examines whether the defendant is entitled to summary judgment as to each of these claims individually.  Before turning to that analysis, the court must evaluate whether Thomas failed to exhaust her administrative remedies.

### A.    *Failure to Exhaust*

The defendant argues that Thomas has failed to exhaust her administrative remedies as to some of the allegations in the complaint.  Specifically, the defendant argues that Thomas failed to exhaust her administrative remedies as to her claims that (1) Crawford breached the Settlement Agreement by having Williams complete the PWP with the "achieved" status and having Bennett deliver it; (2) Crawford breached the Settlement Agreement by sending a memorandum stating that Thomas "had been detailed" to OCR instead of that she had accepted a detail; (3) Crawford undermined Thomas's authority by appointing Knotts as acting chief; (4) Crawford undermined Thomas's authority by having her computers removed and deactivating her password while she was on leave; (5) Crawford denied Thomas the opportunity to receive additional training by denying her request to attend the BIG conference; and (6) Crawford breached the Settlement Agreement by

---

[4] Thomas's complaint includes one count alleging discrimination and retaliation.  Within that count, Thomas alleges that she was discriminated against on the basis of race and gender, retaliated against, and forced to work in a hostile work environment.  (Third Am. Compl. ¶¶ 24-25.)

Viewed in a light most favorable to Thomas and in combination with *all* the alleged circumstances, allegations such as the following, even if true, are not to be confused with real discrimination, hostility, and retaliation: (1) removal of Thomas's computer *after* she was no longer assigned to the office in which the computer was located; (2) changing the password on said computer; (3) not being welcomed back to the state office at the conclusion of another assignment; (4) benign wording of a memo; (5) delegation of responsibility for signing and hand-delivering said memo; (6) not throwing a retirement party for Thomas, which Thomas admitted she might not have attended anyway; and (7) appointment of an acting chief unsuitable to Thomas to replace Thomas after she was detailed to another office.  Neither Thomas nor her attorney was deterred by two rejections of various combinations of the above complaints by the EEOC.  Nevertheless, the court has carefully considered the evidence and will dutifully analyze it in light of the law.

13

failing to carry out its terms within thirty days. In her response brief, Thomas states that "this case is about Mrs. Thomas being forced to retire. The allegations listed in the complaint are not claims for the purposes of a separate lawsuit, but are facts and claims constituting the continuous acts and occurrences of what happened to Mrs. Thomas, which led to her being forced out." (Pl.'s Resp. Br. 9.) Because Thomas does not bring claims related to these discrete acts but instead uses them to bolster her claim that she was constructively discharged, the court need not analyze each of these actions separately. To the extent that Thomas's complaint includes claims related to each of these discrete acts, Thomas has abandoned them. *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 972 n.36 (11th Cir. 2008) (holding that the plaintiff "did not defend the claim on summary judgment; he thus abandoned it").

Moreover, even if Thomas had not waived these claims, they would be due to be dismissed because she failed to follow the proper procedures to exhaust her administrative remedies. "Before an aggrieved employee may seek relief through the filing of a civil action in federal court . . . he or she must first seek relief in the agency that has allegedly engaged in discrimination." *Grier v. Sec'y of Army*, 799 F.2d 721, 724 (11th Cir. 1986). If the plaintiff fails to comply with this requirement, then the complaint must be dismissed. *Id.* A federal employee who believes that she has been discriminated against on the basis of race or sex must informally consult with an EEO counselor within 45 days of the alleged discriminatory act. *See* 29 C.F.R. § 1614.105(a). After the completion of informal counseling, an employee has 15 days to file a formal complaint with the agency that allegedly discriminated against the employee. *Id.* § 1614.106(a). An employee must file a lawsuit within 90 days of the EEOC's final agency decision or within 90 days of the final decision on appeal. *Id.* § 1614.407.

Thomas claims that Crawford violated the Settlement Agreement by not completing and delivering the "achieved" PWP himself. Bennett delivered the "achieved" PWP to Thomas on January 22, 2002, but Thomas did not raise this claim until November 26, 2003 – well beyond the 45 day time limit. Also, Thomas failed to file this lawsuit within 90 days of the final agency decision regarding her claims about her computers, her password, the memorandum informing the staff that she had been detailed, the designation of Knotts as acting chief, and the denial of her request to attend BIG. The EEOC rendered its final decision as to these acts on January 13, 2005, but Thomas did not file this lawsuit until May 5, 2005, which is 112 days later. Accordingly, Thomas failed to comply with the procedural exhaustion requirements, and summary judgment is due to be entered in favor of the defendant as to claims related to the discrete acts alleged in paragraphs 11, 13-14, and 18-22 of the Third Amended Complaint.

**B.    *Discrimination Claim***

Thomas alleges that the discrimination against her on the basis of race and gender resulted in the adverse action of her being constructively discharged from her position. The defendant responds that there is no adverse employment action because Thomas was not constructively discharged from her position but instead voluntarily retired.

For a claim of gender or race discrimination based on circumstantial evidence,[5] courts use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1267 (11th Cir. 2001) (applying the *McDonnell Douglas* framework to a claim of gender discrimination); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (using the *McDonnell Douglas* framework to evaluate a racial

---

[5] Thomas does not allege that there is direct evidence of discrimination.

discrimination claim).  After the plaintiff establishes a *prima facie* case of discrimination, a presumption of unlawful discrimination arises.  *Combs*, 106 F.3d at 1527-28.  The burden then shifts to the defendant to "produc[e] legitimate, nondiscriminatory reasons for the challenged employment action."  *Id.* at 1528.  If the defendant puts forth a legitimate, non-discriminatory reason, then the presumption of discrimination disappears, and "the plaintiff has the opportunity to come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Id.*

One element of the *prima facie* case[6] is that the plaintiff must establish "that he suffered so-called 'adverse employment action.'"  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001).  "[N]ot all conduct by an employer negatively affecting an employee constitutes adverse employment action."  *Id.* at 1238.  The Eleventh Circuit has held that to prove there was an adverse employment action "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment."  *Id.* at 1239.  This is an objective test: "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a **reasonable person in the circumstances**."  *Id.* (emphasis added).  For example, receiving criticism from an employer is not an adverse employment action.  *Id.* at 1242.  Treating such critiques as adverse employment actions

> would threaten the flow of communication between employees and supervisors and limit the employer's ability to maintain and improve job performance.  Federal courts ought not to be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee.  Simply put,

---

[6]  The elements of a *prima facie* case for a disparate treatment claim are: (1) the employee is a member of the protected class; (2) the employee was subject to adverse employment action; and (3) the employee treated similarly situated employees outside of the protected class more favorably.  *See Hollifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

16

the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely – without more – establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause.

*Id.*

Thomas argues that she has been constructively discharged. "Constructive discharge qualifies as an adverse employment decision." *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 n.2 (11th Cir. 1997). A constructive discharge occurs when "the terms or conditions of employment under which [an employee] is asked to work are so intolerable that a reasonable person in [the employee's] position would have been compelled to resign." *Thomas v. Dillard Dept. Stores, Inc.*, 116 F.3d 1432, 1434 (11th Cir. 1997). "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant work conditions are not so intolerable as to compel a reasonable person to resign." *Williams v. Russell Corp.*, 218 F. Supp. 2d 1283, 1299 (M.D. Ala. 2002) (quoting *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir. 2001)). The test is objective and does not consider an employee's subjective reaction to the working conditions. *Walton v. Johnson & Johnson Servs. Inc.*, 347 F.3d 1272, 1282 (11th Cir. 2003). The threshold for establishing constructive discharge is "quite high" and requires "pervasive conduct by [the] employer[]." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001).

Thomas contends that the totality of the evidence supports the conclusion that she was constructively discharged.[7] She claims that she meets the standard for constructive discharge

---

[7] The parties disagree about whether the court can consider the events that occurred prior to the Settlement Agreement. The defendant argues that the Settlement Agreement is a binding release of all Title VII claims related to events prior to its entry. However, the court need not decide this issue because even if the events prior to the Settlement Agreement are considered, the evidence does not support the conclusion that Thomas was constructively discharged.

17

because she had no choice but to retire after Crawford criticized her job performance, tarnished her reputation with her staff members and other FSA employees, did not do enough to welcome her upon her return, and limited her opportunities to do her job.

First, Crawford's criticisms of her job performance are not enough to constitute constructive discharge. Thomas admits that Crawford did not critique her performance after she returned from OCR. To the extent Crawford previously criticized Thomas's performance, her claim of unfair criticism is a subjective complaint which would not cause a reasonable employee to feel compelled to quit. The court must bear in mind the Eleventh Circuit's strong language that criticism will rarely without more give rise to a discrimination claim. *Davis*, 245 F.3d at 1232. Assuming strong criticism may give rise to a constructive discharge claim, the facts here do not meet that standard. Thomas complains about receiving criticism from Crawford **years** before she claims she was forced to retire. Moreover, Crawford gave Thomas suggestions and worked with her to improve her performance.

Thomas also claims that Crawford tarnished her reputation with her co-workers when he had her computer removed, disabled her password, appointed Knotts as acting chief, and had Williams prepare the replacement PWP and Bennett deliver it. Assuming these facts are true, an employee's subjective feelings of humiliation are woefully insufficient to state a claim for constructive discharge.

Thomas also alleges that Crawford did not do enough to welcome her back from detail. It is undisputed that Crawford sent Thomas a letter before she returned welcoming her back. Moreover, a reasonable person would not find that failing to be warmly welcomed back would require resignation.

18

Finally, Thomas contends that Crawford limited her ability to do her job by excluding her from two meetings after she returned from detail. Assuming Crawford did exclude her from those meetings, that fact does not establish constructive discharge because a reasonable person would not have felt compelled to resign. Moreover, when Thomas returned from detail she had to learn the intricacies of the new farm bill to be able to do her job. While Thomas may not have liked the work she was doing when she returned to her job, this dissatisfaction is not sufficient to state a claim for constructive discharge.

Nor do these actions in combination, considered in a light most favorable to Thomas, amount to anything remotely resembling a legal justification for quitting the job. Looking at the totality of the circumstances, the court does not doubt that Thomas was unhappy with her job. However, the court also does not doubt that a reasonable person in Thomas's situation would not have felt compelled to quit. Indeed, Thomas's claims are almost textbook examples of the subjective complaints related to allegations of humiliation, unfair criticism, marginalization, and displeasure with working conditions that are insufficient to constitute a claim for constructive discharge. Because Thomas was not constructively discharged, there is no adverse employment action, and Thomas has failed to state a *prima facie* case of discrimination. Accordingly, the defendant's motion for summary judgment is due to be granted as to this claim.

## C.    *Hostile Work Environment Claim*

Thomas claims that a hostile work environment forced her to retire. For there to be a hostile work environment claim "the offending behavior 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Pa. State Police v. Suders*, 542 U.S. 129, 146-47 (2004) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S.

19

57, 67 (1986)).  However, "[a] hostile-environment constructive discharge claim entails something

more: A plaintiff who advances such a compound claim must show working conditions so

intolerable that a reasonable person would have felt compelled to resign."  *Id.* at 147.  As the court

previously established, Thomas was not constructively discharged because the working conditions

were not so intolerable that a reasonable person would have felt compelled to resign.  Accordingly,

the defendant is entitled to summary judgment as to the hostile work environment claim.

**D.    *Retaliation Claim***

Finally, Thomas alleges that she was retaliated against for making claims against Crawford.

The retaliation statute provides:

> It shall be an unlawful employment practice for an employer to discriminate against
> any of his employees . . . because [the employee] has opposed any practice made an
> unlawful employment practice by this subchapter, or because he has made a charge,
> testified, assisted, or participated in any manner in an investigation, proceeding, or
> hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  To state a *prima facie* retaliation claim, "a plaintiff must show that (1) she

engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3)

the adverse action was causally related to the protected expression."  *Weeks v. Harden Mfg. Corp.*,

291 F.3d 1307, 1311 (11th Cir. 2002).  The same burden-shifting framework that applies to

discrimination claims is used for retaliation ones as well.  *See Goldsmith v. City of Atmore*, 996 F.2d

1155, 1162-63 (11th Cir. 1993) (applying burden shifting analysis to a retaliation claim).

Thomas's retaliation claim fails because she has not suffered an adverse employment action

or established a causal connection.  To constitute adverse action, the "plaintiff must show that a

reasonable employee would have found the challenged action materially adverse, which in this

context means it well might have dissuaded a reasonable worker from making or supporting a charge

20

of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal

quotation marks and citation omitted). The Supreme Court emphasized that the standard requires

"*material* adversity because we believe it is important to separate significant from trivial harms."

*Id.* Additionally, this standard is an objective one. *Id.* "[T]he employer's actions must be harmful

to the point that they could well dissuade a reasonable worker from making or supporting a charge

of discrimination." *Id.* at 57.

Because Thomas has limited her claims to the adverse action of constructive discharge, the

court considers this as the only potential adverse action. Courts apply the same standard to evaluate

claims of constructive discharge in the retaliation context as they do for discrimination. *See Durley*

*v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000). For the reasons set forth above, the court

concludes Thomas was not constructively discharged; because she has failed to establish a materially

adverse employment action or a causal connection, she has not stated a *prima facie* case for

retaliation. The defendant is entitled to summary judgment as to Thomas's retaliation claim.

## V. CONCLUSION

Accordingly, it is ORDERED that Defendant's Motion for Summary Judgment (Doc. # 55)

is GRANTED as to each and every claim. An appropriate judgment will be entered.

DONE this 16th day of June, 2008.

        /s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE